**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PETER P. STRZOK,<br><br>          Plaintiff,<br><br>     v.<br><br>WILLIAM P. BARR, in his official capacity<br>as Attorney General of the United States, *et*<br>*al.*,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)   Case No. 1:19-CV-2367-ABJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT AS TO COUNT ONE AND
COUNT TWO, AND MOTION FOR SUMMARY JUDGMENT AS TO COUNT THREE**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 4

STANDARD OF REVIEW ..................................................................................... 13

ARGUMENT ......................................................................................................... 15

I.     PLAINTIFF'S INTEREST IN SPEAKING WAS OUTWEIGHED BY THE FBI'S INTEREST IN ENSURING CONTINUED INTEGRITY OFI ITS MISSION. ......................................................................................................... 15

     A.     The Bureau's Compelling Interest in Objectivity and in Avoiding Appearance of Political Bias Cannot Be Overstated. ........................... 17

     B.     The *Pickering* Balance Weighs in Defendants Favor Because of Plaintiff's Role and the Work-Related Content of His Speech............................... 18

          1.     Plaintiff's Speech Was Directly Related to His Role in the Clinton E-Mail and Russian Interference Investigations. ...................................... 18

          2.     Plaintiff Occupied a High-Level Policy Making Position. ...................... 21

               i.     Plaintiff's Position Fell within a Policy Area. ............................. 22

               ii.     Plaintiff's Position Was at a Policy Level. .................................. 23

               iii.     The FBI's Interests Were Implicated by Plaintiff's Speech. ........ 24

     C.     The Content, Manner, Time, and Place of Plaintiff's Speech Further Reduces the Weight of Its Importance under *Pickering*. ...................................... 25

II.     PLAINTIFF'S DUE PROCESS CLAIM IS MERITLESS. ............................................. 27

     A.     Plaintiff Had No Property Interest in His Former Job. ......................................... 28

     B.     Plaintiff Cannot Plausibly Claim that He Was Denied Due Process. .................. 30

III.     PLAINTIFF CANNOT SUCCEED ON HIS PRIVACY ACT CLAIM. ......................... 32

     A.     Plaintiff Does Not Allege a Privacy Act Violation with Respect to Any Disclosure by Officials in the White House. ........................................................ 32

     B.     Defendants Are Entitled to Summary Judgment As to the Department's Disclosure of Plaintiff's Texts to Members of the Press. ...................................... 34

1.      The Department's Disclosure of the Text Messages from OIG
        Investigation Records Was Compatible with the Purposes For
        Which Those Records Were Collected. ....................................................... 36

2.      The Department Disclosed the Text Messages Pursuant to a
        Routine Use Exception Published in the Federal Register. ...................... 37

C.      Plaintiff Cannot Establish That the Department's Disclosure to the News
        Media Was a Willful or Intentional Violation of the Privacy Act. ........................ 41

CONCLUSION .................................................................................................................... 43

## TABLE OF AUTHORITIES

**CASES**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ................................................................................................ 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................. 14

*Bates v. Hunt*,
    3 F.3d 374 (11th Cir. 1993) ................................................................................. 17

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 14

*Britt v. Naval Investigative Serv.*,
    886 F.2d 544 (3d Cir. 1989) ........................................................................... 35, 37

*Brown v. Glines*,
    444 U.S. 348 (1980) .............................................................................................. 16

*Bryant v. Gates*,
    532 F.3d 888 (D.C. Cir. 2008) ............................................................................ 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................. 41

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*,
    566 F.3d 219 (D.C. Cir. 2009) ............................................................................ 34

*City of San Diego v. Roe*,
    543 U.S. 77 (2004) ................................................................................................ 16

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) .............................................................................................. 30

*Connick v. Myers*,
    461 U.S. 138 (1983) ........................................................................................ 16, 26

*Dave v. D.C. Metro. Police Dep't*,
    926 F. Supp. 2d 247 (D.D.C. 2013) .................................................................... 29

*Davis v. Billington*,
    51 F. Supp. 3d 97 (D.D.C. 2014) ........................................................................ 26

*Dep't of the Air Force v. Fed. Labor Relations Auth.*,
    104 F.3d 1396 (D.C. Cir. 1997) .......................................................................... 35

*Doe v. Dep't of Justice,*
   753 F.2d 1092 (D.C.Cir.1985) ................................................................. 29

*Doe v. Stephens,*
   851 F.2d 1457 (D.C. Cir. 1988) .............................................................. 41

*Douglas v. Veterans Administration,*
   5 M.S.P.R. 280 (1981)............................................................................ 11

*Dutton v. U.S. Dep't of Justice,*
   302 F. Supp. 3d 109 (D.D.C. 2018) ....................................................... 38

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ......................................................................... 15, 26

*Hall v. Ford,*
   856 F.2d 255 (D.C. Cir. 1988) .......................................................*passim*

*Kinsey v. Salado Indep. Sch. Dist,*
   950 F.2d 988 (5th Cir. 1992) .................................................................. 17

*Kissinger v. Reporters Committee for Freedom of the Press,*
   445 U.S. 136 (1980) ............................................................................... 33

*Lamb v. Holder,*
   82 F. Supp. 3d 416 (D.D.C. 2015) .................................................... 28, 29

*Laningham v. U.S. Navy,*
   813 F.2d 1236 (D.C. Cir. 1987) .............................................................. 42

*Locurto v. Giuliani,*
   447 F.3d 159 (2d Cir. 2006) ................................................................... 19

*Mack v. United States,*
   814 F.2d 120 (2d Cir. 1987) ................................................................... 29

*Marshall v. Honeywell Tech. Solutions,*
   536 F. Supp. 2d 59 (D.D.C. 2008) ......................................................... 14

*Maydak v. United States,*
   630 F.3d 166 (D.C. Cir. 2010) ................................................................ 42

*McEvoy v Spencer,*
   124 F.3d 92 (2d Cir. 1997) ..................................................................... 17

*Meijer v. Biovail Corp.,*
   533 F.3d 857 (D.C. Cir. 2008) ................................................................ 14

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................ 34

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) .................................................................. 38

*Mori v. Dep't of the Navy,*
   731 F. Supp. 2d 43 (D.D.C. 2010) ........................................................... 15

*Morrissey v. Brewer,*
   408 U.S. 471 (1972) .................................................................................. 30

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
   429 U.S. 274 (1977) .................................................................................. 16

*Navab-Safavi v. Glassman,*
   637 F.3d 311 (D.C. Cir. 2011) ................................................. 16, 19, 26

*O'Donnell v. Barry,*
   148 F.3d 1126 (D.C. Cir 1998) ................................................................ 25

*Painter v. FBI,*
   694 F.2d 255 (11th Cir. 1982).................................................................. 29

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983) .................................................................................... 25

*Pickering v. Board of Education Township High School District 205, Will County,*
   391 U.S. 563 (1968) .................................................................................. 16

*Pro-Football, Inc. v. Harjo,*
   284 F. Supp. 2d 96 (D.D.C. 2003) ........................................................... 15

*Radack v. U.S. Dep't. of Justice,*
   402 F. Supp. 2d 99 (D.D.C. 2005) ..................................................... 35, 37

*Rankin v. McPherson,*
   483 U.S. 378 (1987) ........................................................................... 19, 21

*Reed v. Dep't of the Navy,*
   910 F. Supp. 2d 32 (D.D.C. 2012) ..................................................... 35, 42

*Rushforth v. Council of Econ Advisers,*
   762 F.2d 1038 (D.C. Cir. 1985) ......................................................... 34, 35

*Scull v. Department of Homeland Security,*
   113 M.S.P.R. 287 (2010).......................................................................... 29

*Soucie v. David,*
  448 F.2d 1067 (D.C. Cir. 1971) ..................................................... 32, 33

*Sussman v. U.S. Marshals Service,*
  494 F.3d 1106 (D.C. Cir. 2007) ................................................. 41, 42, 43

*Sweetland v. Walters,*
  60 F.3d 852 (D.C. Cir. 1995) ............................................................ 34

*Thompson v. District of Columbia,*
  530 F.3d 914 (D.C. Cir. 2008) ......................................................... 28

*Tijerina v. Walters,*
  821 F.2d 789 (D.C. Cir. 1987) ......................................................... 42

*Twist v. Meese,*
  854 F.2d 1421 (D.C. Cir. 1988) ....................................................... 28

*U. S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
  413 U.S. 548 (1973) ......................................................................... 17

*U.S. Department of Justice v. Reporters Committee for Freedom of the Press,*
  489 U.S. 749 (1989) ........................................................................... 9

*U.S. v. Nat'l Treasury Employees Union,*
  513 U.S. 454 (1995) .................................................................... 18, 26

*United States v. Miss. Valley Generating Co.,*
  364 U.S. 520 (1961) ......................................................................... 18

*Vanover v. Hantman,*
  77 F. Supp. 2d 91 (D.D.C. 1999) ..................................................... 15

*Waldau v. Coughlin,*
  Civ. A. No. 95-1151 (LFO), 1997 WL 161958 (D.D.C. Apr. 1, 1997), *aff'd,*
  No. 97-5162, 1997 WL 634539 (D.C. Cir. Sept. 25, 1997) ................... 25

*Waters v. Thornburgh,*
  888 F.2d 870 (D.C. Cir. 1989) ......................................................... 42

## STATUTES

5 U.S.C. App. 3 § 2 ........................................................................... 36

5 U.S.C. § 551 .......................................................................... 32, 33

5 U.S.C. § 552 ...................................................................... 33, 37, 38

5 U.S.C. § 552a ........................................................................ *passim*

5 U.S.C. § 3131 ................................................................................................ 23

5 U.S.C. § 7511 ................................................................................................ 28

5 U.S.C. § 7513 ................................................................................................ 27

42 U.S.C. § 2000ee-1 ....................................................................................... 38

Civil Service Reform Act,
    Pub. L. No. 95-454, 92 Stat. 1111 ............................................................. 13

**RULES**

Fed. R. Civ. P. 12 ............................................................................ 3, 13, 14, 15

Fed. R. Civ. P. 56 ............................................................................................. 15

**REGULATIONS**

28 C.F.R. § 50.2 ............................................................................................... 37

Office of the Inspector General; Privacy Act of 1974; Modified System of Records,
    72 Fed. Reg. 36,725 (July 5, 2007) ............................................................ 35

**OTHER AUTHORITIES**

5A Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 1357 (3d ed.) ........................................ 14

Analysis of House and Senate Compromise Amendments to the Federal Privacy Act,
    reprinted in 120 Cong. Rec. 40,405 (1974) ............................................... 42

*A Review of Various Actions by the Federal Bureau of Investigation and Department
    of Justice in Advance of the 2016 Election*, June 2018,
    https://www.justice.gov/file/1071991/download ........................................... *passim*

Director, Office of Privacy and Civil Liberties,
    https://www.justice.gov/legal-careers/job/director-office-
    privacy-and-civil-liberties ........................................................................... 38

H.R. Rep. No. 93-1380 (1974) ................................................................... 33, 34

*Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*,
    NY Times (Dec. 2, 2017),
    https://www.nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-
    over-possible-anti-trump-texts.html ............................................................... 8

*Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending
    Anti-Trump Texts*, Washington Post (Dec. 2, 2017),

https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html ................................................... 8

# INTRODUCTION

Plaintiff Peter Strzok served his country honorably for over twenty years, first as a uniformed member of the United States Army and then as a Special Agent of the Federal Bureau of Investigation.  In the latter role, in particular, Plaintiff performed with distinction and gained the respect of his superiors.  He rose through the ranks over his career to ever-higher positions of authority and trust within the Bureau, ultimately becoming a member of its Senior Executive Service and then Deputy Assistant Director of its Counterintelligence Division.  As Plaintiff describes in his Complaint, he was at the center of some of the most consequential and politically charged FBI investigations of recent memory—the investigation into former Secretary of State Hillary Clinton's use of a private email server and the investigation into Russian interference in the 2016 Presidential election.

Yet, as the FBI was placing enormous trust in Plaintiff and giving him substantial authority over some of the most important investigations in recent memory, he committed a series of serious and sustained lapses in judgment.  In particular, a Department of Justice ("Department") Office of the Inspector General ("OIG") investigation found that Plaintiff had exchanged over 40,000 text messages with an FBI attorney ("Government Attorney" or "GA") on their government-issued phones, among them texts written in 2016 in which Plaintiff called the President—at that time, still a candidate for President—a "disaster" and suggested that "[w]e'll stop" him from taking office.  And in a text he wrote in 2017—after the President had taken office and during Plaintiff's tenure as a lead investigator for Special Counsel Robert Mueller's team—Plaintiff described his own "sense of unfinished business."  As he wrote to the Government Attorney in that text: "I unleashed it with [the Clinton email investigation].  Now I need to fix it and finish it. . . . Who

gives a f*ck, one more A[ssistant] D[irector] . . . [versus] [a]n investigation leading to impeachment?"

The statements made in those and similar text exchanges involved matters of public concern. But when made by an FBI Special Agent—especially a member of the Bureau's senior leadership—in the context of active investigations over which that Special Agent had official responsibility, these messages posed grave risks to the Bureau's institutional interests and basic integrity. The lapses in judgment embodied in those messages and others like them risked undermining public confidence in two of the Bureau's highest-profile investigations. And even more broadly, those lapses in judgment risked damaging the public trust in the FBI as a non-partisan, even-handed, and effective law enforcement institution—trust that is essential to the FBI's ability to vigorously enforce the nation's laws without fear or favor.

On that basis, FBI Deputy Director David Bowdich—a Bureau veteran and longtime career civil servant—made the decision to dismiss Plaintiff from the FBI. In doing so, Deputy Director Bowdich weighed Plaintiff's years of service against the actual and potential harms wrought by his conduct: "While there is no doubt your 21 years of service to this organization should not be discounted, I am persuaded that serious aggravation is warranted for your [] offense given the severe, long-term damage your conduct has done to the reputation of the FBI. It is difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in the country." As Deputy Director Bowdich noted, the OIG investigation found no evidence that Plaintiff's apparent bias had actually affected his actions or decisions in either FBI investigation. But that did not counsel against Plaintiff's dismissal: "As I considered the facts associated with the adjudication of your case, I could not recall another incident like yours that brought such discredit on the organization. In my 23 years in the FBI, I

have not seen a more impactful series of missteps that has called into question the entire organization and more thoroughly damaged the FBI's reputation.  In our role as FBI employees we sometimes make unpopular decisions, but the public should be able to examine our work without having to question our motives."

Following his dismissal from the FBI, Plaintiff brought this action advancing First Amendment, due process, and Privacy Act claims.  He cannot succeed on any of them.  First, on Plaintiff's alleged facts, his First Amendment wrongful separation claim fails under Rule 12(b)(6).  Plaintiff's senior leadership position within the FBI, and his key role in the Clinton email and Russian interference investigations, imposed upon him a higher burden of caution with respect to his speech—particularly speech involving matters related to those investigations.  Plaintiff plainly failed to meet that burden of caution as to his text exchanges with the Government Attorney, and the substance of those messages posed substantial potential harm to the FBI.  It is because of those text messages, and the paramount importance of preserving the FBI's ability to function as a trusted, nonpartisan institution, that Plaintiff was removed from his position, and not because of any alleged disagreement with Plaintiff's viewpoints on political issues or Tweets from the President.  Under these circumstances, Plaintiff's First Amendment claim cannot survive, even at this early stage of the litigation.

Plaintiff also cannot prevail on his due process argument, and the Court should dismiss that claim as well.  Despite Plaintiff's military service, he did not have a property interest in his position at the time of his dismissal, because he was a member of the FBI's Senior Executive Service ("SES").  That fact alone forecloses Plaintiff's claim.  Yet, even assuming Plaintiff enjoyed some property interest in his position, Plaintiff's due process argument would still fail, because he was given ample notice and opportunity to be heard.  The Due Process Clause was satisfied.

Finally, Plaintiff cannot succeed on his claim that the Department violated the Privacy Act. To the degree Plaintiff bases his claim in part on alleged disclosures by "officials within the White House," such alleged disclosures do not implicate the Privacy Act, which applies only to "agencies" (not the White House).  And as to any Privacy Act claim based on the Department's disclosures of his text messages with the Government Attorney to the news media, Plaintiff also cannot prevail because—even assuming the text messages were contained in an OIG system of records, as Plaintiff alleges—the disclosures were made pursuant to a published routine use compatible with the purpose for which the records were collected.  In any event, even if Plaintiff could somehow establish that the Department's disclosures were inconsistent with the published routine use, he cannot show that the Department did so willfully or intentionally, given the Department's careful analysis and good-faith conclusion that the Department's disclosures were permissible under the published routine use in question.

Accordingly, the Court should dismiss Count One and Count Two of Plaintiff's Complaint or, in the alternative, enter summary judgment in Defendants' favor as to those claims.  In addition, the Court should grant summary judgment for Defendants as to Count Three of Plaintiff's Complaint.

## FACTUAL BACKGROUND

After serving in the United States Army, Plaintiff entered the rolls of the FBI in 1998.  *See* Compl. ¶¶ 14-15.  When Plaintiff exchanged the relevant texts with the Government Attorney, beginning around August 2015 through May 2018, Plaintiff was a member of the FBI's SES.  *See* OIG Report at 396.  During that period, Plaintiff was promoted to Deputy Assistant Director of

the FBI's Counterintelligence Division in September 2016.  *Id.*[1]   As Plaintiff details in his

Complaint, his career at the FBI put him at the center of some of the most important and politically

charged investigations in the Bureau's history.  *See* Compl. ¶¶ 1, 13-16.  Particularly relevant here,

Plaintiff was assigned in August 2015 to lead the criminal investigation of former Secretary of

State and presidential candidate Hillary Clinton's use of a private email server, which the FBI

referred to as "Midyear Exam" or "Midyear."  Compl ¶¶ 15, 32.  Then, in July 2016, Plaintiff was

assigned to the FBI's investigation into the Russian government's efforts to interfere in the 2016

presidential election.  *See* Letter of Unit Chief, Adjudication Unit II, Office of Professional

Responsibility 2, June 15, 2018 ("Proposal Letter") (Exhibit 1).  In Plaintiff's own words, he was

"one of the key members" of that investigative team.  Compl. ¶ 31.  After former FBI Director

Robert Mueller III was appointed Special Counsel over the Russian investigation, Plaintiff was a

member of the Special Counsel's staff from May 2017 until July 28, 2017.  *See* Proposal Letter at

2.

     In early 2017, in response to requests from Congress, various organization, and members

of the public, the OIG opened an investigation into various actions by the FBI and the Department

in connection with the Midyear investigation.  Compl ¶ 32; *A Review of Various Actions by the*

*Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June

2018 ("OIG Report"), https://www.justice.gov/file/1071991/download.   As part of that

investigation, the OIG requested and received from the FBI text message communications of FBI

personnel involved in the Midyear investigation using FBI-issued mobile devices, including those

---

[1] Plaintiff was later reassigned to Deputy Assistant Director of the FBI's Human Resources
Division.

sent and received by Plaintiff, for the period when the Midyear investigation began through July 1, 2017.  OIG Report at 395-96.

In its review of the collected text messages, the OIG identified over 40,000 text messages exchanged on FBI-issued cell phones between Plaintiff and the Government Attorney, who was serving as Special Counsel to former Deputy Director Andrew McCabe.  OIG Report at 396. Those messages included political opinions about candidates and issues involved in the 2016 Presidential election, "including statements of hostility toward then candidate Trump and statements of support for candidate Clinton."  *Id.*  In addition, according to the OIG, "[s]everal of their text messages also appeared to mix political opinions with discussions about the Midyear and Russia investigations," which raised questions as to whether Plaintiff's and the Government Attorney's political opinions may have affected investigative decisions.  *Id.*  Below is a small sample of the text messages exchanged between Plaintiff and the Government Attorney, as described in the OIG Report:

**July 21, 2016:**
Plaintiff:        Trump is a disaster.  I have no idea how destabilizing his Presidency would be.

**July 31, 2016:**
Plaintiff:        And damn this [the Russia investigation] feels momentous.  Because this matters.  The other one [the Clinton E-Mail investigation] did too, but that was to ensure we didn't F something up.  This matters because this MATTERS.

**August 8, 2016:**
GA:                [Trump's] not ever going to become president, Right?
Plaintiff:        No. No he's not.  We'll stop it.

**August 15, 2016:**
Plaintiff:        I want to believe the path you threw out for consideration in [DD's] office-that there's no way [Trump] gets elected-but I'm afraid we can't take that risk.  It's like an insurance policy in the unlikely event you die before you're 40. . .

**August 26, 2016:**

Plaintiff:      Just went to a southern Virginia Walmart.  I could SMELL the Trump support. . . .

**October 19, 2016:**

Plaintiff:      I am riled up.  Trump is a fucking idiot, is unable to provide a coherent answer.

**November 7, 2016: (referencing an article titled "A victory by Mr. Trump remains Possible")**

Plaintiff:      OMG THIS IS F*CKING TERRIFYING.

**March 14, 2017:**

GA:      Finally two pages away from finishing [All The President's Men].  Did you know the president resigns in the end?? ☺

Plaintiff:      What?!?!  God, that we should be so lucky.

**May 18, 2017 (after the GA had just joined the Special Counsel's investigation):**

Plaintiff:      For me, and this case, I personally have a sense of unfinished business. I unleashed it with [the Clinton email investigation].  Now I need to fix it and finish it. . . .  Who gives a f*ck, one more A[ssistant] D[irector] . . . [versus] [a]n investigation leading to impeachment?" . . . [Y]ou and I both know the odds are nothing.  If I thought it was likely I'd be there no question. I hesitate in part because of my gut sense and concern there's no big there there.

OIG Report at 400, 403-05.

Upon review of Plaintiff's text messages, the OIG was "particularly concerned" that they "potentially indicated or created the appearance that investigative decisions they made were impacted by bias or improper considerations."  *See* OIG Report at ix.  The OIG pointed to, in particular, Plaintiff's August 8, 2016 text message stating that "'we'll stop' candidate Trump from being elected," which gave rise to the implication that Plaintiff was "willing to take official action to impact a presidential candidate's electoral prospects."  *Id.*  The OIG Report is replete with other examples of how Plaintiff evidenced political bias—or, at best, created the perception of bias.  *See, e.g.*, *id.* at 399-410.

Plaintiff does not dispute the existence of the text messages that led to his dismissal. Indeed, Plaintiff quotes several—though far from all—in his Complaint.  *See* Comp. ¶ 29. Moreover, Plaintiff acknowledged to the OIG that

> his text messages could be read to suggest that [Plaintiff] held himself responsible for Trump's victory and Clinton's defeat because of the Midyear investigation and that he viewed the Russia investigation as providing him an opportunity to 'fix' this result by working on an investigation that could result in the impeachment of President Trump.

OIG Report at 405.  Plaintiff also does not appear to dispute the OIG's conclusion that his text messages with the Government Attorney "cast a cloud over the FBI's handling of the Midyear investigation and the investigation's credibility."  *Id.* at iii.

When the OIG learned of the existence of the text messages between Plaintiff and the Government Attorney in the summer of 2017, both Plaintiff and the Government Attorney were members of Special Counsel Mueller's staff.  The OIG informed Special Counsel Mueller of the text messages, and Plaintiff was removed from the Special Counsel's investigation on July 28, 2017.  *Id.* at 397.

On December 2, 2017, the New York Times and the Washington Post each reported on the existence of Plaintiff's text messages with the Government Attorney and his removal from the Special Counsel's investigation.  *See* Compl. ¶ 60; *Top FBI Official Assigned to Mueller's Russia Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017),     https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html; *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec. 2, 2017), https://www. nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-over-possible-anti-trump-texts.html.

Shortly thereafter, the chairmen of congressional committees in both the U.S. House of Representatives and the U.S. Senate ("Congressional Committees") made verbal and written inquiries to the Department regarding the existence and substance of the text messages. Declaration of Stephen Boyd ¶ 7 ("Boyd Decl.") (Exhibit 2).  These inquiries included written requests for the Department to produce the text messages to Congress for oversight purposes.  *Id.* In order to respond to Congress, the Department requested the text messages from the OIG, which provided an initial subset of the total universe of discovered text messages between Plaintiff and the Government Attorney that the OIG considered particularly troubling.  *Id.* ¶ 8.  After receiving that subset of the text messages, the Department redacted them to remove non-political, personally sensitive and law enforcement information.  *Id.* ¶ 9.

The Department made its initial hard copy production of the redacted text messages to the Congressional Committees on the evening of December 12, 2017, and subsequent productions to the Congressional Committees followed.  *Id.* ¶ 11.  The Department also determined that it would be appropriate to make the same subset of redacted text messages available to members of press. *Id.* ¶ 12.  The Department did so after consulting with the appropriate senior member of Department career staff—Peter Winn, Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer—who reviewed the text messages to determine whether disclosing them in redacted form to the media would be permissible under the Privacy Act.  *See* Declaration of Peter Winn ¶¶ 3-4 ("Winn Decl.") (Exhibit 3).

As described in his accompanying declaration, Mr. Winn considered that the routine use in an OIG Systems of Records Notice, or SORN, permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an

unwarranted invasion of personal privacy." *Id.* ¶ 10 (quoting Office of the Inspector General Privacy Act of 1974, 82 Fed. Reg. 36,725, 36,726 (July 5, 2007)).  Based on his review of the text messages provided to him, and assuming the text messages were contained in an OIG system of records, Mr. Winn concluded that the public interest outweighed the privacy interest of Plaintiff and the Government Attorney and the relevant routine use would permit disclosure.  Accordingly, Mr. Winn concluded that the Department's disclosure of the text messages would not violate the Privacy Act, and Mr. Winn so advised senior leadership within the Department.  *Id.* ¶¶ 11-18.[2] Senior leadership then made the decision to release the records.  *See* Boyd Decl. ¶ 13.

Fast forward several months, and the FBI's Office of Professional Responsibility ("OPR") was weighing what action should be taken with respect to Plaintiff's conduct.  On June 15, 2018, OPR staff proposed dismissing Plaintiff from the FBI based on its finding that he: (1) engaged in unprofessional conduct by making inappropriate political comments in text messages on his FBI-issued cell phone, in violation of FBI Offense Code 5.21; (2) utilized a personal email account to conduct official FBI business, in violation of FBI Offense Code 5.18; and (3) failed to diligently pursue a credible lead when new information was brought forth regarding the Clinton private server investigation, in violation of FBI Offense Code 1.7.  *See generally* Proposal Letter.

With the assistance of his attorneys, Plaintiff provided a written response to OPR's recommendation and participated in an oral hearing at which he defended his conduct.  *See* Letter of Candice M. Will, Assistant Director, OPR, Aug. 8, 2018 at 18 ("Will Letter") (Exhibit 4).  In

---

[2] As the Inspector General explained in his December 15, 2017 letter to the leadership of congressional oversight committees, the OIG did not object to the release of the FBI text messages to Congress, if the Department determined that legal restrictions did not prohibit it from doing so. The Inspector General also stated in his letter that the Department did not consult OIG regarding the disclosure to the media.  *See* https://judiciary.house.gov/sites/democrats.judiciary.house.gov/ files/documents/Nadler%20Raskin%20Response%20Letter.pdf.

July 2018, Plaintiff and his attorney also signed a "Last Chance" Adjudication Agreement, in which Plaintiff requested, in lieu of dismissal, that OPR reduce the proposed penalty of dismissal "to a 60-day suspension, in which Offense Codes 5.21 and 5.18 are substantiated, Offense Code 5.2 (Dereliction of Supervisory Responsibility) be substituted for Offense Code 1.7, and he be demoted to a non-supervisory position."  "Last Chance" Adjudication Agreement for Peter P. Strzok II (July 2018) (Exhibit 5).  In exchange for a reduced punishment, Plaintiff proposed that he would, among other things, complete a suspension of 60 days and be subject to removal from the rolls of the FBI if he were to engage in any other serious misconduct.  *Id.*

In a letter dated August 8, 2018, the career Assistant Director ("AD") for OPR, Candice M. Will, analyzed the OPR's staff's recommendation, together with Plaintiff's written and oral responses and Plaintiff's "Last Chance" Adjudication Agreement.  *See generally* Will Letter.  As described in her letter, AD Will reviewed the available information and analyzed Plaintiff's conduct according to the twelve factors articulated in the Merit Systems Protection Board's decision in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981).  *Id.*[3]  AD Will determined, based on her weighing of those factors, to suspend Plaintiff from duty without pay for 60 days and to demote him to a non-supervisory position.  *Id.* at 23.

Before the FBI took any official employment action with respect to Plaintiff's misconduct, and before the FBI informed Plaintiff of AD Will's decision, the FBI's Deputy Director ("DD"), David Bowdich, reviewed relevant evidence and the *Douglas* factors.  *See generally* Letter of

---

[3] In *Douglas*, the Merit Systems Protection Board recognized twelve factors "generally recognized as relevant" in determining the appropriateness of a penalty. Those factors include, among others: (1) the employee's job level and type of employment; (2) the employee's past disciplinary record; (3) the employee's past work record; and (4) the consistency of the penalty with those imposed upon other employees for the same or similar offenses. *Douglas*, 5 M.S.P.R. at 305-06.

David Bowdich, FBI Deputy Director, Aug. 9, 2018 ("Bowdich Letter") (Exhibit 6).  On August 9, 2018, DD Bowdich exercised his delegated authority, consistent with FBI policy, to modify disciplinary actions as necessary to advance the best interests of the FBI.  *See* Bowdich Letter at 1; *see also* FBI Policy Directive 0915D, *Disciplinary Appeals Process* § 4.3 (Exhibit 7).  Pursuant to that authority, DD Bowdich reconsidered AD Will's decision and concluded that dismissal was appropriate based on all of the facts.  *See* Bowdich Letter at 1.  DD Bowdich concurred with AD Will that the three offenses were substantiated; however, as he explained in his letter, DD Bowdich disagreed with AD Will's evaluation of the relevant *Douglas* factors in deciding the appropriate penalty.  *Id.*

In his letter, DD Bowdich explained that he had reviewed relevant evidence pertaining to Plaintiff's case, including text messages between Plaintiff and the Government Attorney, Plaintiff's role as one of the most senior counterintelligence agents in the FBI, and Plaintiff's many years of service.  *Id.*  DD Bowdich concluded that—notwithstanding Plaintiff's 21 years of service—"serious aggravation is warranted for your [FBI Offense Code] 5.21 offense given the severe, long-term damage your conduct has done to the reputation of the FBI."  *Id.*  DD Bowdich explained that, as "a Deputy Assistant Director in the Counterintelligence Division, you were expected to be a leader who was beyond reproach and to set an example for not only your direct subordinates, but others throughout the organization who watched and observed your behavior and actions."  *Id.*  DD Bowdich also noted that it was "difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in the country," and that Plaintiff's "sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-Mail investigation and the initial stages of the Russian collusion investigation."  *Id.*  In short, Plaintiff's "repeated

12

selfishness has called into question the credibility of the entire FBI." *Id.*  DD Bowdich indicated

that his decision to dismiss Plaintiff was final and not subject to further administrative review.  *Id.*

The FBI updated Plaintiff's personnel file with an official Standard Form ("SF") 52,

Request for Personnel Action, which terminated Plaintiff from his FBI position effective August

10, 2018.  *See* Pl.'s SF 52 (Exhibit 8).  The following day, on August 11, 2018, the FBI issued a

SF 50, Notice of Personnel Action to Plaintiff, officially alerting him of his termination.  *See* SF

50 (Exhibit 9).

On September 5, 2018, Plaintiff filed an appeal of the FBI's dismissal decision with the

Merit Systems Protection Board ("MSPB"), which was dismissed for lack of jurisdiction by an

Administrative Judge (AJ) on November 15, 2018.  *See* MSPB Initial Decision (Exhibit 10).  The

AJ concluded that, as a member of the FBI SES, Plaintiff did not occupy a position that gave him

appeal rights to the MSPB under the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-

454, 92 Stat. 1111, as amended, codified throughout Title 5 of the United States Code.  *Id.* at 9.

Plaintiff filed this action on August 6, 2019.  Compl., ECF No. 1.  Plaintiff's Complaint

names the Attorney General and the Director of the FBI, in their official capacities, as well as the

Department of Justice and the FBI.  *Id.* ¶¶ 9-12.  Plaintiff alleges that, by removing him from the

rolls of the FBI, Defendants engaged in viewpoint discrimination in violation of the First

Amendment, *id.* ¶¶ 72-74, and deprived him of protections he claims are required by the Due

Process Clause, *id.* ¶¶ 76-77.  Plaintiff also alleges violations of the Privacy Act based on alleged

disclosures of his text messages with the Government Attorney to the news media.  *Id.* ¶¶ 79-82.

## STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under *Iqbal* and *Twombly*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Plausibility" represents something less than "probability," but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted).  If the well-pleaded facts of a complaint do not suggest more than the mere possibility of a violation, the complaint has failed to show that the plaintiff is entitled to relief and cannot survive application of Rule 12(b)(6). *Id.*

Likewise, a complaint cannot substitute conclusions of law and other conclusory assertions for well-pleaded allegations of fact and hope to withstand a motion to dismiss.  In particular, conclusions of law are not to be accepted as true. *Id.* By the same token, "bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a . . . claim[,] and therefore are not entitled to be assumed true." *Id.* at 698 (citation omitted).

In deciding a motion to dismiss under Rule 12(b)(6), courts may consider not only the well-pleaded allegations of the complaint, but also materials "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.)); *see also Marshall v. Honeywell Tech. Sols. Inc.*, 536 F. Supp. 2d 59, 65-66 (D.D.C. 2008) (document

referred to in complaint and central to plaintiff's claim may be considered under Fed. R. Civ. P.

12(b)(6)) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)).

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although a court

should draw all inferences from the supporting records submitted by the nonmoving party, the

mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-*

*Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted). Rather, the

dispute must regard a question of fact that is material, meaning that it is "capable of affecting the

substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law

on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010)

(citation omitted), *dismissing appeal*, 2010 WL 5371504 (D.C. Cir. 2010). The dispute must also

be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable

trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.

## ARGUMENT

## I.   **PLAINTIFF'S INTEREST IN SPEAKING WAS OUTWEIGHED BY THE FBI'S INTEREST IN ENSURING CONTINUED INTEGRITY OF ITS MISSION.**

Plaintiff alleges that he was removed from his position because of the political viewpoints

he expressed in the text messages he exchanged with the Government Attorney—specifically his

statements critical of first Candidate, and then President, Trump. Compl. ¶¶ 32-34. Plaintiff's

First Amendment claim fails as a matter of law, as discussed below.

Although government employees "do not surrender all their First Amendment rights by

reason of their employment," *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), it is well-settled that

a "governmental employer may subject its employees to such special restrictions on free

expression as are reasonably necessary to promote effective government," *Brown v. Glines*, 444 U.S. 348, 356 n.13 (1980), and that those restrictions may include those that would be unconstitutional if applied to the general public, *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).

Plaintiff's Complaint appears to attempt to sketch the contours of a First Amendment claim governed by *Pickering v. Board of Education Township High School District 205, Will County*, 391 U.S. 563 (1968), which articulated the balancing test required to evaluate government employees' free speech rights against those of their government employer. The *Pickering* balancing test has four elements. First, the public employee must have been speaking on a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 146-47 (1983). Second, the Court must balance the interests of the employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Third, the employee must provide that his speech was a substantial or motivating factor in his discharge. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Finally, the government employer must have an opportunity to prove it would have reached the same decision even absent the protected conduct. *Id.* "The first two of the four questions set forth above are questions of law for the court to resolve." *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011).

Defendants acknowledge that Plaintiff's speech regarding the 2016 election is, broadly speaking, related to a matter of public concern. However, as discussed below, Defendants still prevail under *Pickering*—even at this early stage—because the FBI's interest in "promoting the efficiency of the public services it performs through its employees" clearly outweighed Plaintiff's interest as a citizen in exchanging texts of a political and highly damaging nature with the Government Attorney. 391 U.S. at 568. The *Pickering* balance tips strongly in Defendants' favor

16

because Plaintiff's speech relates directly to his governmental duties—*i.e.*, his key roles on the Clinton e-mail and Russian interference investigations, making the potential damage to the government particularly great.  Plaintiff's First Amendment claim also cannot succeed because of his policy-level role within the FBI, which imposed upon him a greater burden of caution with respect to his speech—a burden Plaintiff clearly failed to meet.  *See Hall v. Ford*, 856 F.2d 255, 258-59 (D.C. Cir. 1988); *see also McEvoy v Spencer*, 124 F.3d 92, 103 (2d Cir. 1997); *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir. 1993); *Kinsey v. Salado Indep. Sch. Dist*, 950 F.2d 988, 994 (5th Cir. 1992).  The time, place, and manner in which Plaintiff engaged in that speech also significantly decreases its weight in the *Pickering* framework.

Significantly, the government is not required to point to actual, manifest harm to justify its decision to remove Plaintiff from his position; to the contrary, the Court may draw "reasonable inferences" of harm in balancing the interests under *Pickering*.  As the D.C. Circuit explained in *Hall v. Ford*, "[a]lthough unadorned speculation as to the impact of speech, whether public or private, on the government's enterprise will not suffice," courts may draw "reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior." 856 F.2d at 261.  Here, as discussed below, based on the very significant potential for harm to the FBI's mission, Plaintiff cannot plausibly show that his interest in exchanging texts on his FBI-issued phone outweighed the FBI's interests in promoting the efficiency of its public service by protecting its reputation as a trusted, non-partisan investigative institution.

### A.   The Bureau's Compelling Interest in Objectivity and in Avoiding Appearance of Political Bias Cannot Be Overstated.

Courts have recognized that a government employer's interest in impartiality—and even the appearance of impartiality—justifies limits on employee First Amendment activity.  *See, e.g.*, *U. S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 565-66 (1973)

(noting "this great end of Government—the impartial execution of the laws").  As the Supreme Court has explained, "a democracy is effective only if the people have faith in those who govern." *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961).  Accordingly, the government has a legitimate interest in regulating activity that "might generate [an] . . . appearance of improper influence."  *U.S. v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 473 (1995) ("*NTEU*"); *see also U.S. Civil Service*, 413 U.S. at 565 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent").  The FBI's Core Values include fairness, uncompromising personal and institutional integrity, and leadership by example both professionally and personally.  *See* FBI's Domestic Investigations and Operations Guide, Section 3.1.  As a law enforcement agency, the FBI must be above the political fray and beyond reproach in order to fulfill its duties.  The government's interest in objectivity, therefore, is particularly strong as to the FBI, and weighs heavily against Plaintiff's First Amendment claim.

**B.** **The *Pickering* Balance Weighs in Defendants' Favor Because of Plaintiff's Role and the Work-Related Content of His Speech.**

Plaintiff's personal interest in the speech in the relevant text messages was significantly diminished—and, conversely, the FBI's interest in regulating Plaintiff's speech was particularly great—for at least two separate reasons: (1) the text messages were related to investigations in which Plaintiff himself played a key role, and (2) Plaintiff occupied a high-level position within the Bureau.

1. <u>Plaintiff's Speech Was Directly Related to His Role in the Clinton E-Mail and Russian Interference Investigations.</u>

When evaluating the government's interest under *Pickering*, courts should consider whether the relevant speech "impairs discipline by superiors or harmony among co-workers, has

18

a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).  In short, this element "focuses on the effective functioning of the public employer's enterprise." *Id.*  Courts have recognized that such impairment is particularly acute when there is a need for the appearance of impartiality, and the speech touches directly on a governmental employee's work. *See, e.g.*, *Navab-Safavi*, 637 F.3d at 316-17; *Locurto v. Giuliani*, 447 F.3d 159, 174 (2d Cir. 2006) (distinguishing between off-duty speech on the basis of whether it was work related).

The D.C. Circuit's decision in *Navab-Safavi v. Glassman* is instructive on this point.  Ms. Navab-Safavi was a contract employee of the Broadcasting Board of Governors, the federal government agency that oversaw the Voice of America network and, indirectly, the Persian News Network at the time.  637 F.3d at 313.  Her primary responsibility was to translate material into Farsi and to provide voice-overs of content approved by an editor.  *Id.*  The Board terminated Ms. Navab-Safavi after learning that she had appeared in a music video criticizing the United States' participation in the Iraq war, citing the Board's weighty interest in its journalistic integrity and the risk that Ms. Navab-Safavia's appearance in that video could undermine the Board's mission.  *See id.* at 313, 316-17.  The court rejected the Board's argument that its interest in impartiality outweighed Ms. Navab-Safavi's First Amendment interest, finding that Ms. Navab-Safavi's speech did not address matters within her work responsibilities, and that her role "fell on the side nearer the role of [a] janitor" rather than that of "an on-the-air editorialist for [Voice of America] or a top executive." *Id.* at 317.

Contrast the facts in *Navab-Safavi* with those in this case.  Plaintiff was the senior Special Agent in charge of the Clinton e-mail investigation and a key member of the team investigating

Russian interference in the 2016 Presidential election.  Compl. ¶ 15.  Plaintiff's speech, moreover, was squarely related to his job duties and called into question whether his personal political views influenced his work, undermining public confidence in the FBI's role as an impartial law enforcement agency.  *See generally* Bowdich Letter.  Accordingly, Plaintiff had a significantly reduced First Amendment interest, and the government's corresponding interest in protecting its operations and reputation as a nonpartisan, unbiased institution were particularly great.

As the OIG detailed at length in its Report, and as DD Bowdich described in his August 9, 2017 letter, Plaintiff's text messages also risked serious harm to the FBI's mission by undermining its perception of professionalism and impartiality.  *See* OIG Report at 420-21 ("[W]hen one senior FBI official, Strzok, who was helping to lead the Russia investigation at the time, conveys in a text message to another senior FBI official, [the Government Attorney], that 'we'll stop' candidate Trump from being elected . . . it is not only indicative of a biased state of mind but, even more seriously, implies a willingness to take official action to impact the presidential candidate's electoral prospects."); Will Letter at 20 ("You admitted that your texts 'without question' constituted 'horrible judgment' and have done significant damage to the reputation of the FBI."); Bowdich Letter at 1-2 ("[Y]our sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-Mail investigation and the initial states of the Russian collusion investigation.").  Given that Plaintiff's speech related directly to investigations for which he had significant responsibility, and in light of the effect the text messages had on the FBI's efficient operation, Plaintiff's dismissal was permissible under *Pickering*.

2.      Plaintiff Occupied a High-Level Position.

The *Pickering* analysis further tips in Defendants' favor because Plaintiff held a high-level position within the FBI.   "[T]he higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest."   *Hall*, 856 F.2d at 261 (citing *Rankin*, 483 U.S. at 390-91).   A higher-level employee bears a greater "burden of caution" as to his or her speech, depending upon "the extent of authority and public accountability the employee's role entails."   *Id.*   That stands in sharp contrast to the relative burdens in the case of lower-level employees who serve "no confidential, policymaking, or public contact role."   *Id.*   The basis for this distinction is self-evident:   "High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims."   *Id.* at 263.

As the senior FBI Special Agent in charge of the investigation into former Secretary Clinton's use of a private email server, and then, beginning in September 2016, as the Deputy Assistant Director for the Counterintelligence Division, Plaintiff fell squarely within this "narrow band" of relationships subject to a "greater burden of caution."   *Hall*, 856 F.2d at 261-63.   Three main questions guide the Court in determining whether an employee falls within this category. First, the Court must ask "whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation. . . . In other words, is it a *policy* area?"   *Id.* at 264.   If so, the Court must next ask "whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation.   Put differently, was the individual a *policy level* employee?"   *Id.*   Finally, if both those criteria are met, the Court must ask "whether the government interest in accomplishing its organizational objectives

through compatible policy level deputies is implicated by the employee's speech." *Id.*  In light of these factors, Plaintiff was clearly subject to greater burden of caution regarding his speech.

i. *Plaintiff's Position Fell within a Policy Area.*

The allegations in Plaintiff's complaint establish that his former position at the FBI related to areas in which there is "substantial room for principled disagreement on goals or their implementation." *Id.* at 264.  As Plaintiff explains, in many cases, he led "some of the most high profile and sensitive investigations in recent history."  Compl. ¶ 15.  For example, he "oversaw the investigation of Edward Snowden and literally dozens of spies, including investigations into the most significant U.S. losses of classified information in the past two decades." *Id.*  Particularly relevant here, Plaintiff "was assigned to lead the criminal investigation of former Secretary Hillary Clinton's use of a private email server," and Plaintiff was one of the "key members" in the FBI's investigations into Russian interference in the 2016 Presidential election." *Id.*

These allegations alone are sparse—and do not begin to illustrate Plaintiff's full responsibilities—but they more than suffice to meet this criterion of the test articulated in *Hall*. Overseeing and leading investigations involves leadership and guidance as to both day-to-day activities and the long-term directions those investigations would take.  Insofar as there are numerous policy decisions as to each aspect of Plaintiff's former role, his own allegations plainly suggest a position that involves "room for principled disagreement on goals or their implementation." *Hall*, 856 F.2d at 264 (finding that an "Athletic Directorship clearly is a position that relates to policy concerns," because there could be "principled disagreement on the formulation and implementation of goals," such as "which sports to emphasize").

Plaintiff's allegations regarding his responsibilities, of course, can be supplemented by information incorporated by reference in the complaint and matters of public record.  And those materials establish definitively the policy nature of Plaintiff's position.  As the OIG Report

22

explains, and as is confirmed in Deputy Director Bowdich's decision letter, Plaintiff served—not only as the lead investigator for some of the FBI's most high-profile matters—but also Deputy Assistant Director for the Counterintelligence Division of the FBI.  *See* OIG Report at 43 n.51; Bowdich Letter at 2.  In his role as a Deputy Assistant Director, Plaintiff was "responsible for managing and overseeing foreign counterintelligence [ ] investigative matters nationwide," and for, among other things, the "promulgation of [counterintelligence] policy."  SES Job Posting Information Form, Job Posting Number 20160948 (Exhibit 11); *see also* Deputy Assistant Director Position Description (Exhibit 12) (explaining that Plaintiff's position "exercises authority in establishing and revising important policies).  Plaintiff's leadership position as the head of the Counterterrorism Division leaves no doubt that he was in a position to shape Bureau policy and/or its implementation.

## ii.    *Plaintiff's Position Was at a Policy Level.*

Plaintiff's allegations likewise establish that his authority and responsibilities were sufficiently extensive that he occupied a policy level position.  The "relevant indicia" of policy-making authority include: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders."  *Hall*, 856 F.2d at 262.  Most are present here based only on the allegations in Plaintiff's complaint.  There is no question that, over the course of 21 years at the FBI, Plaintiff developed significant technical competence.  By his own description, Plaintiff led some of the FBI's most important and politically charged investigations.  He was also a member of the SES, Compl ¶ 33, which itself indicates a senior level of responsibility and authority, as well as relatively high pay and programmatic influence.  *See* 5 U.S.C. § 3131 (describing the purpose of the Senior Executive Service); *see also* SF 52 (indicating Plaintiff's salary exceeded $225,000 at

the time of his dismissal).  That Plaintiff was in a policy level position is further confirmed by the

OIG Report and the materials incorporated by reference into the Complaint, which confirm that

Plaintiff occupied the supervisory position of Deputy Assistant Director of the FBI's

Counterintelligence Division.  *See* OIG Report at 43 n.51; Bowdich Letter at 2.  As described

above, Plaintiff enjoyed broad responsibility in that position.  Among many other functions,

Plaintiff  served as the principal management official and advisor to executive FBI management

with regard to all matters under his jurisdiction at the Deputy Assistant Director of

Counterintelligence for the FBI.  *See* Deputy Assistant Director Position Description.  Plaintiff's

former position thus qualifies as "policy-level."

> iii.     *The FBI's Interests Were Implicated by Plaintiff's Speech.*

Finally, there is no plausible argument that Plaintiff's speech did not implicate the FBI's

interest in preserving its perception of impartiality and operational efficacy.  As explained in *Hall*,

to satisfy this criterion, the speech at issue "must relate to policy areas for which [the employee]

is responsible."  856 F.2d at 264.  Here, that test is easily satisfied on the complaint allegations

alone.

Plaintiff and the Government Attorney's controversial and politically charged text

messages directly addressed the investigation into former Secretary Clinton's use of a private

server—an investigation that Plaintiff himself led.  *See, e.g.*, Compl. ¶ 15; OIG Report at 396-400

(discussing Plaintiff's and the Government Attorney's role in the Midyear investigation and

quoting a sampling of text messages).  Plaintiff and the Government Attorney also exchanged

similarly politically charged text messages—including at least one that arguably suggested the

President should be impeached—when both Plaintiff and the Government Attorney were working

on Special Counsel Mueller's investigation into Russian interference into the 2016 election.  OIG

Report at 396-400.  These text messages go to the heart of Plaintiff's responsibilities as a leader

or "key player" in those two investigations, Compl. ¶ 15, and implicate the FBI's interest in maintaining effective operations and public confidence, .*see, e.g.*, Bowdich Letter.

### C.     The Content, Manner, Time, and Place of Plaintiff's Speech Further Reduces the Weight of Its Importance under *Pickering*.

In addition to Plaintiff's policy-level position, and the great public trust that the FBI placed in him, the "content, manner, time and place" of Plaintiff's speech are relevant factors when "weighing the governmental interest in regulating the speech." *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir 1998). It is beyond dispute that Plaintiff's texts with the Government Attorney, which led to his dismissal, were conducted on his FBI-issued phone, *see, e.g.*, Proposal Letter at 3, which weighs heavily in favor of Defendants in the *Pickering* analysis. The FBI has, of course, invested significant resources into its communications systems and therefore has broad authority to regulate how they are used. Courts, moreover, regularly uphold Government restrictions on speech conducted via its own channels of communication. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983); *Bryant v. Gates*, 532 F.3d 888, 896 (D.C. Cir. 2008). The FBI may, of course, discipline an employee without violating the Constitution when that employee uses the FBI's equipment at the expense of one of the agency's core principles. *See, e.g.*, *Waldau v. Coughlin*, Civ. A. No. 95-1151 (LFO), 1997 WL 161958, at *6 (D.D.C. Apr. 1, 1997) ("Plaintiff's liberty interest in speaking on matters of public concern is diminished by the fact that plaintiff used government property to do so."), *aff'd*, No. 97-5162, 1997 WL 634539 (D.C. Cir. Sept. 25, 1997) (per curiam).

Some of Plaintiff's more than 40,000 text messages with the Government Attorney seemingly took place while Plaintiff was on duty. *See* OIG Report at 397.[4] The Government's

_____

[4] Although some of the over 40,000 text messages between Plaintiff and the Government Attorney appeared to originate during work hours when Plaintiff was on duty, OPR did not factor

interest in regulating its employees, during official time, on government property, and using government equipment, is paramount, and easily tips the balance in the FBI's favor. *See Waldau*, 1997 WL 634539 at *6 (finding government had "strong interest in terminating" employee who, on government time, used a government computer to express his views on privatization of the Postal Service); *see also Davis v. Billington*, 51 F. Supp. 3d 97, 122 (D.D.C. 2014) (concluding Congressional Research Employee's interest in speaking was diminished based on his concession that he "used at least some CRS time and resources" when engaging in political speech).

The fact that the relevant speech very likely occurred, at least in part, during work hours strongly favors the Government's interest in regulating it. Although "[e]mployees in some cases may receive First Amendment protection for expressions made at work," *Garcetti*, 547 U.S. at 420, "the fact that [an employee], unlike Pickering, exercised her rights to speech at the office supports [the employer's] fears that the functioning of his office was endangered," *Connick*, 461 U.S. at 153. Thus, courts routinely distinguish between speech that is prepared during work hours and speech that is entirely made outside of the office. *See, e.g.*, *NTEU*, 513 U.S. at 466 (emphasizing that "[t]he speeches and articles . . . were made outside the workplace," among other things); *Navab-Safavi*, 637 F.3d at 313-14 ("VOA resources were not involved in making the video and Navab-Safavi worked on the video only during non-work hours."). The FBI properly pays its employees to spend their work days furthering FBI's statutory mission—not undermining it at government expense.

---

into its analysis the likelihood that Plaintiff and the Government Attorney exchanged texts during work hours, "due to the uncertain nature of [Plaintiff's] work schedule on the specific days related to this inquiry." Proposal Letter at 1 n.1. That at least some of the text messages at issue were likely sent during work hours is still relevant for the Court's evaluation of Plaintiff's constitutional claim, however.

Another aspect of the manner of Plaintiff's speech that weighs against his claim is its vulgar, vituperative, and *ad hominem* character.  The First Amendment does not require an employer to tolerate such speech, even if it touches on a matter of public concern.  *See, e.g.*, *Mitchell v. Hillsborough Cty.*, 468 F.3d 1276, 1288 (11th Cir. 2006); *Germann v. City of Kansas City*, 776 F.2d 761, 764-65 (8th Cir. 1985) (discussing harsh and distrustful tone of employee's letter as important factor in *Pickering* balancing); *Craven v Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1228-29 (10th Cir. 2001) (relying on the abrasive, offensive manner of employee's speech). A review of Plaintiff's text messages quoted above—and more fully set forth in the OIG Report— quickly illustrate the base tone of Plaintiff's discourse.  *See, e.g.*, OIG Report at 399 (quoting Plaintiff's text stating "OMG [Trump's] an idiot"); *id.* at 400 (quoting Plaintiff's texts referring to then-Candidate Trump as a "fucking idiot" and stating that he could "SMELL" support for then-Candidate Trump at a "southern Virginia Walmart").  Plaintiff's First Amendment interests should be weighed accordingly.

*     *     *

At bottom, Plaintiff cannot plausibly allege that he was removed because of the viewpoints expressed in his speech, or because of any Tweets authored by the President.  Rather, he was removed because of the potential harm that his repeated lapses of judgment did to the FBI.  It was entirely reasonable—and certainly constitutional—for DD Bowdich to conclude that the FBI's reputation for impartiality, objectivity, and non-partisanship was directly harmed by Plaintiff's actions, and DD Bowdich removed Plaintiff accordingly.

## II.    PLAINTIFF'S DUE PROCESS CLAIM IS MERITLESS.

Plaintiff received notice of the bases of his proposed dismissal and the opportunity, which he availed himself of, to provide a written response and to have an oral hearing on the bases for

his dismissal.  All the while, Plaintiff was assisted by highly capable counsel.  But the outcome of this process obviously was not what Plaintiff sought.  Plaintiff thus contends that he was denied due process by being deprived of a property interest in his employment.  *See* Compl. ¶ 77.  Not so.  As discussed below, Plaintiff did not have a property interest in his job, and therefore he cannot maintain a due process claim.  But even putting that dispositive point aside, Plaintiff received more than enough due process to satisfy the Constitution.  *See generally Twist v. Meese*, 854 F.2d 1421, 1428 (D.C. Cir. 1988) ("[G]iven the fact that Twist received advance notice, an on-the-record hearing, and an opportunity to submit a written answer to the charges against him, even if Twist had a property right to his continued employment, which we have held he does not, he has received all the process to which he would be due.").

## A.  Plaintiff Had No Property Interest in His Former Job.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest . . . . Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  Plaintiff alleges that he was deprived of a property interest; however, under clearly established law, this allegation is without.

An employee has a property interest in a government position only if, under the law, "he did not serve in his job at his employer's 'will,' but he could be removed only 'for cause.'"  *Thompson v. Dist. of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) (citation omitted).  Here, Plaintiff did not enjoy for-cause removal protections:  Although Chapter 75 of the CSRA provides such protections for many federal employees, 5 U.S.C. §§ 7511, 7513, it generally excludes FBI employees, 5 U.S.C. § 7511(b)(8).  Indeed, numerous courts—including one in this district—have held that FBI personnel lack a protected property interest in their jobs.  *See, e.g.*, *Lamb*, 82 F. Supp.

28

3d at 424-25; *Mack v. United States*, 814 F.2d 120, 123 (2d Cir.1987); *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982).

Veterans, like Plaintiff, may in some circumstances be "preference-eligible," meaning they are entitled to for-cause protections. *See* 5 U.S.C. § 2108(3). However, because Plaintiff was a member of the FBI's SES, he was excluded from that statutory status. *Id.* ("preference eligible" . . . does not include applicants for, or members of, the Federal Bureau of Investigation and Drug Enforcement Administration Senior Executive Service.") Thus, as a non-preference eligible FBI employee, Plaintiff was excluded from the CSRA's for-cause protections and, by extension, any viable argument that he has a property interest in his former job. Absent a protected property interest in his job, Plaintiff cannot seek reinstatement as a remedy for any alleged due process violations. *See Doe v. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985); *Dave v. D.C. Metro. Police Dep't*, 926 F. Supp. 2d 247, 249 n.1 (D.D.C. 2013).

Defendants anticipate that Plaintiff may argue—as he did before the MSPB—that he became preference eligible on August 8, 2018, which is the date of AD Will's letter stating her decision to "demot[e] [Plaintiff] to a non-supervisory position." Will Letter at 23; *see* also MSBP Initial Decision at 4. Therefore, Plaintiff may claim, he was entitled to for-cause protections on the next day when DD Bowdich made the decision to dismiss him. This argument is unconvincing. As the AJ explained in rejecting Plaintiff's argument, the MSPB has "long held that an adverse action is effective on the day on which the appellant is notified that the action will become effective." MSBP Initial Decision at 6 (citing *Scull v. Department of Homeland Security*, 113 M.S.P.R. 287, ¶ 12 (2010)). Neither AD Will's letter nor DD Bowdich's letter included an effective date, and Plaintiff does not allege that he was served with AD Will's August 8, 2018 letter before DD Bowdich made his final determination the next day. The official SF-52 Request

29

for Personnel Action, moreover, indicates that Plaintiff was being terminated directly from his position within the SES, with a proposed effective date of August 10, 2018.  *See* SF-52.  There is therefore no plausible argument that Plaintiff had been removed from the SES prior to the FBI's final decision, reflected in DD Bowdich's letter and the SF-52.

### B.  Plaintiff Cannot Plausibly Claim that He Was Denied Due Process.

Even assuming Plaintiff enjoyed a property interest in his position—which he clearly did not, for the reasons discussed above—Plaintiff could not show that he was deprived of any constitutionally guaranteed amount of process prior to his dismissal.  Plaintiff alleges that he was deprived of due process because DD Bowdich made the decision to remove him—despite the fact that AD Will typically made final decisions for OPR—and because Plaintiff was not allowed to appeal DD Bowdich's decision to a Disciplinary Review Board.  *See, e.g.*, Compl. ¶¶ 50-51.  Not so:  Plaintiff, aided by multiple lawyers, had ample opportunity to respond to his proposed dismissal.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The essential requirements of due process . . .  are notice and an opportunity to respond.").  Indeed, Plaintiff submitted a written response to OPR's June 15, 2018 findings—which clearly stated the basis for his proposed dismissal—and Plaintiff took advantage of the opportunity to participate—again aided by counsel—in an oral hearing to defend his actions.  Due process requires nothing more in these circumstances.  Plaintiff's real objection stems from the FBI's ultimate decision—not from any legitimate lack of process.  Plaintiff received all of the process that the situation could possibly require.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Here, OPR informed Plaintiff that it proposed to dismiss him through a letter dated June 15, 2018.  That letter explained in detail OPR's reasoning and explained specific steps Plaintiff could take to respond to OPR's

analysis and proposed action.  *See* Proposal Letter at 21-22.  As noted above, Plaintiff took advantage of those procedural avenues and submitted both a written response and an oral presentation to attempt to justify his behavior and provide his version of the relevant events.  *See* Will Letter at 18-19.

Despite clear notice of the proposed action against him and ample opportunity for him to make his case, Plaintiff takes issue with the fact that it was DD Bowdich who made the final decision with respect to his dismissal, rather than AD Will.  *See* Compl. ¶ 50.  The Due Process Clause, however, does not mandate that any particular government employee make a particular personnel decision, or that the impacted employee have an opportunity to respond to any particular government decisionmaker.  And DD Bowdich's involvement was not procedurally deficient. Standard FBI's policy expressly permits designees of the FBI Director—here, DD Bowdich—to "modify any disciplinary finding, penalty, or both as determined necessary in the best interests of the FBI.  *See* FBI Corporate Policy Directive 0915D, *Disciplinary Appeals Process*.  Moreover, as reflected in his August 9, 2018 letter, DD Bowdich reviewed AD Will's analysis and relevant facts before making his decision.  *See* Bowdich Letter at 1-2.

In short, Plaintiff received ample due process.  He knew of the conclusions on which his dismissal was based and he had ample opportunity to present arguments.  Plaintiff, aided by his attorney, put on testimony and submitted a lengthy written response to the notice.  He was clearly heard.  The fact that Deputy Director Bowdich made a different decision than what Plaintiff and his attorneys asked for did not deprive Plaintiff of due process.

III.     **PLAINTIFF CANNOT SUCCEED ON HIS PRIVACY ACT CLAIM.**

A.     **Plaintiff Does Not Allege a Privacy Act Violation with Respect to Any Disclosure by Officials in the White House.**

Plaintiff alleges that sometime "[b]etween late July and December 2017, officials in the White House . . . began to contact members of the news media about the [texts between Plaintiff and the Government Attorney] as a means to try to undermine the Special Counsel's investigation." Compl. ¶ 59. To the degree Plaintiff intends to argue that this alleged disclosure violates the Privacy Act, 5 U.S.C. § 552a, *see* Compl. ¶¶ 79-82, Plaintiff has failed to state a claim.

The Privacy Act, by its plain terms, places restrictions only on the disclosure of certain "agency" records, as that term is used in the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552a(b) (setting out "[c]onditions of disclosure" for records contained in a system of records); *id.* § 552a(a)(1) (adopting definition of "agency" from the FOIA). As explained below, Plaintiff has not alleged facts sufficient to plead that "officials in the White House" qualify as an "agency" under that definition.

The President himself, of course, cannot qualify as an "agency" absent "an express statement by Congress" to that effect in light of "the separation of powers." *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992) (President himself not an "agency" under the APA). And both the Supreme Court and this Circuit have consistently recognized that while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President that do not exercise substantial independent authority. In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), for example, the court considered the definition of "agency" under the APA which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency." *Id.* at 1073 (quoting 5 U.S.C. § 551(1)). This Circuit concluded that the APA "apparently confers agency status on any

administrative unit with substantial independent authority in the exercise of specific functions." *Id.* Following this reasoning, the court held that the FOIA, which at the time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), which is an entity within the Executive Office of the President. *Id.* at 1073-74. It reasoned that OSTP's function was not merely to "advise and assist the President," but that it also had an "independent function of evaluating federal programs," and therefore was an agency with substantial independent authority that was subject to the APA. *Id.* at 1075.

The Supreme Court has confirmed the principle that not all entities within the Executive Office of the President are "agencies." In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980), the Supreme Court considered the scope of FOIA, whose definition of "agency" had been amended in 1974 to its current version, where "'agency' as defined in [5 U.S.C. §] 551(1) . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency." 5 U.S.C. § 552(f)(1) (emphasis added). That definition is incorporated by reference into the Privacy Act. *See id.* § 552(a). The Court concluded that, despite this language, "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President." *Kissinger*, 445 U.S. at 156. Rather, Congress did not intend "agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Id.* (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)). That Conference Report further specified that "[w]ith respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie v. David*, 448 F.2d 1067 ([D.C. Cir.] 1971)." *See Rushforth v. Council of Econ Advisers*, 762 F.2d

1038, 1040 (D.C. Cir. 1985) (quoting H.R. Rep. 93-1380, at 14-15); *see also Meyer v. Bush*, 981

F.2d 1288, 1291 n.1 (D.C. Cir. 1993) (explaining Congress had codified the D.C. Circuit's analysis

of EOP entities in *Soucie* in the 1974 FOIA Amendments).

 The controlling question in determining whether an entity within the Executive Office of

the President is an "agency" for purposes of the APA or the Privacy Act, therefore, is whether "the

entity in question 'wield[s] substantial authority independently of the President.'" *Citizens for*

*Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin*., 566 F.3d 219, 222 (D.C. Cir.

2009) (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)).  Here, with respect to

the alleged disclosure "[b]etween July and December 2017," Plaintiff alleges only that "officials

in the White House" released the texts at issue to news media.  Plaintiff, therefore, has not plead

facts that could plausibly establish that those officials wield substantial authority independently of

the President such that they could qualify as an "agency."  Accordingly, Plaintiff fails to state a

claim with respect to the alleged pre-December 2017 disclosure, and therefore that aspect of

Plaintiff's Privacy Act claim must be dismissed.

 **B.**  **Defendants Are Entitled to Summary Judgment As to the Department's**
 **Disclosures of Plaintiff's Texts to Members of the Press.**

 Plaintiff also cannot prevail as to the parts of Plaintiff's Privacy Act claim that implicate

the Department's disclosure of Plaintiff's text messages to members of the news media.  *See*

Compl. ¶¶ 61-64, 80.  The Privacy Act allows disclosure of records "for a routine use as defined

in subsection (a)(7) . . . and described under subsection (e)(4)(D) . . . ."  5 U.S.C. § 552a(b)(3).  A

routine use is defined as a disclosure of a record "for a purpose which is compatible with the

purpose for which it is collected."  *Id.* § 552a(a)(7); *see also Budik v. United States*, 949 F.Supp.2d

14, 28 (D.D.C. 2013), *aff'd* 2013 WL 6222903 (D.C. Cir. Nov. 19, 2013).  Because the Department

was authorized to disclose Plaintiff's text messages to members of the news media pursuant to a

routine use, and because that routine use was compatible with the purpose for which the records were collected, the Court should enter summary judgment for Defendants with respect to the remainder of Plaintiff's Privacy Act claim.

The government may successfully invoke the routine use exception by demonstrating "compatibility" and "publication." *See Budik*, 949 F.Supp.2d at 28; *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 41 (D.D.C. 2012); *Radack v. U.S. Dep't. of Justice*, 402 F. Supp. 2d 99, 105 (D.D.C. 2005); *Dep't of the Air Force v. Fed. Labor Relations Auth.*, 104 F.3d 1396, 1401-02 (D.C. Cir. 1997)).   To determine compatibility, a court must conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3d Cir. 1989).

The compatibility test is satisfied where a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *Id.* at 549-50.  This requirement is independent of, and unaffected by, an agency's published routine uses and was intended to act as a check on the "unnecessary exchange of information to another person or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, *reprinted in* 120 Cong. Rec. 40405, 40406 (1974)).   Some "meaningful degree of convergence" between collection and disclosure is all that is required to overcome this modest barrier.  *Britt*, 886 F.2d at 549.  As discussed below, the OIG's routine use easily satisfies the compatibility requirement.  In addition, agencies are required to publish in the Federal Register notice of the types of disclosures that they may make pursuant to the "routine use" exception. 5 U.S.C. §§ 552a(b)(3), 552a(e)(4)(D).  Plaintiff cannot succeed on his Privacy Act claim related to the Department's disclosure to the news media because, even assuming Plaintiff's text messages

were contained in an OIG system of record, as Plaintiff allege, *see* Compl. ¶ 57, any alleged disclosures were permitted under an OIG routine use exception published in the Federal Register, discussed below.[5]

     1.    <u>The Department's Disclosure of the Text Messages from OIG Investigation Records Was Compatible with the Purposes for Which Those Records Were Collected</u>.

As described in the OIG Report, the text messages at issue were collected as part of the OIG's investigation into various actions by the FBI and the Department in connection with the Midyear investigation that Plaintiff led.  The purpose of that investigation—consistent with the OIG's statutory mandate to "prevent and detect fraud and abuse," 5 U.S.C. § App. 3, § 2—was to respond to public and congressional concerns regarding the FBI's handling of that investigation, *see* OIG Report at i.  Assuming Plaintiff's texts were contained in an OIG system of records, the Department's disclosure of the text messages to the public pursuant to the OIG's routine use was consistent with that purpose by increasing public transparency into the Department's official actions.

Relevant to the compatibility analysis is that the OIG's collection of information relevant to its investigation—including the text messages at issue in this case—later culminated in a publicly available report, which itself described some of those text messages.  *See* OIG Report at 395-410.  Plaintiff could hardly argue that disclosure to the public of the text messages collected through the OIG's investigation is incompatible with the purpose of the collection of those messages, when the ultimate product of the OIG's investigation is a report that also disclosed many

---

[5] If Plaintiff's text messages were not, in fact, contained in an OIG system of records, then they would not be covered by the Privacy Act, and Plaintiff's claim would be subject to dismissal. *See* 5 U.S.C. § 552a(b).  The Court need not resolve that factual question for the purposes of Defendants' motion, however, because Defendants are entitled to summary judgment even assuming the text messages fall within the Privacy Act's protection.

of the same messages publicly.  On these facts, the compatibility requirement is easily satisfied.
*See Britt*, 886 F.2d at 549 (requiring only some "meaningful degree of convergence" between collection and disclosure).

>    2.    The Department Disclosed the Text Messages Pursuant to a Routine Use Exception Published in the Federal Register.

The OIG published a SORN which describes the purpose, scope, uses, management, and maintenance of its investigative records.  *See* 72 Fed. Reg. 36,725.  The Department then determined that disclosing the text messages to the media would be consistent with a routine use contained in that SORN that permits disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy."  *Id.* at 36,726.  Because the routine use the Department relied on is contained in the SORN, which was published in the Federal Register, the publication requirement is satisfied.  *See Radack*, 402 F. Supp. 2d at 105-06 (finding the publication requirement satisfied where the government published notice in the Federal Register of "the categories of individuals covered by the system, the categories of records in the system, the system's purpose, and the routine uses of records maintained in the system").

There is also no doubt that, if the disclosed text messages were contained in an OIG system of records, the Department's disclosures would properly fall within the routine use upon which the Department relied.  That routine use—which permits disclosures to the news media "unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy," 72 Fed. Reg. at 36,726—closely tracks the language from Exemptions 6 and 7(C) of the FOIA, *see* 5 U.S.C. § 552(b)(6), (b)(7)(C).  In evaluating a withholding under Exemption 6 and/or 7(C), courts rely on the declarations of agency

officials to determine whether the agency has properly weighed the private interests at stake versus the public interest in disclosure in analyzing whether the release would constitute an unwarranted invasion of privacy.  *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (explaining that a court may award summary judgment in a FOIA action the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith"); *Dutton v. U.S. Dep't of Justice*, 302 F. Supp. 3d 109, 124 (D.D.C. 2018) (granting the government's summary judgment motion with respect to withholdings under Exemptions 6 and 7(C) on the basis of an agency declaration). Defendants respectfully submit that the Court should do the same here.

In support of their request for summary judgment on this part of Plaintiff's Privacy Act claim, Defendants submit the declaration of Peter Winn, Director of Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer, the senior Department official responsible for providing authoritative legal advice and guidance to the Department's leadership regarding whether disclosures fall within a routine use contained in a component's SORN.  Winn Decl. ¶ 3; *see also, e.g.*, Director, Office of Privacy and Civil Liberties, https://www.justice. gov/legal-careers/job/director-office-privacy-and-civil-liberties (explaining that the Office of Privacy and Civil Liberties "provides legal advice and guidance to, among other things, "[e]nsure[] the Department's privacy compliance, including compliance with the Privacy Act of 1974"); 42 U.S.C. § 2000ee-1 (requiring the Attorney General to designate privacy and civil liberties officers). As Mr. Winn explains in his declaration, the Department's practice has been to treat the "unwarranted invasion of personal privacy" limitation in its routine uses as requiring the same

analysis required under the FOIA's Exemptions 6 and 7(C). *Id.* ¶ 11. That is, the Department does not disclose records to the public or to news media under this routine use if such a disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy." *See* 5 U.S.C. § 552(b)(6), (b)(7)(C). *Id.* This analysis, in turn, requires balancing the public interest in the information against the privacy interest of the individual to which the record pertains, effectively the same balancing test that is required under the privacy provisions of the FOIA. *Id.*

"Whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny. . . . rather than on the particular purpose for which the document is being requested." *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772 (1989); Winn Decl. ¶ 12. Information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. *Id.* (citing *Reporters Committee*, 489 U.S. at 773).

Applying that test, the Department concluded that disclosure was appropriate. As Mr. Winn explains, he considered that both Plaintiff and the Government attorney were both high-ranking officials within the FBI, and that the text messages exhibit very strong opinions about a then-ongoing FBI investigation—an investigation in which both Plaintiff and the Government Attorney were personally involved. Winn Decl. ¶ 13. The communications between Plaintiff and the Government Attorney took place, not on personal devices, but on Department-issued mobile devices, which contained clear banner warnings that inform users of the lack of any reasonable expectation of privacy. *Id.* ¶ 14. While the Department permits limited personal use of its equipment, this policy does not exempt mobile devices from Department monitoring and oversight, and Department employees receive regular training and notices that any activity and

content on Department is subject to being monitored.  *Id.* ¶15. Plaintiff and the Government Attorney knew, or should have been aware, that these texts would have been subject to review by others in the Department and possibly even the subject of a FOIA request or disclosed in connection with criminal prosecutions.  *Id.*

In addition, because the public had already become aware of the names of both individuals, there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting the individuals' names. *Id.* ¶ 16.  However, before providing the texts to Congress and the media, the Department redacted non-work-related personal information contained in the texts, which significantly reduced Plaintiff's privacy interest in the disclosed material.  *Id.*; *see also* Boyd Decl. ¶ 9.  It is also significant that the text messages would be disclosed to Congress—as is permitted by the Privacy Act, *see* 5 U.S.C. § 552a(b)(9)—and that Deputy Attorney General Rosenstein was scheduled to testify publically before Congress the next day where he was expected to be asked questions about these text messages.  Winn Decl. ¶ 16. Congress, of course, could have released the text messages itself without creating any Privacy Act implications, because Congress is not an "agency."  *Id.*; 5 U.S.C. § 552a(a)(1).

As to the public interest side of the balancing, the texts displayed what a reasonable person could consider to constitute bias.  Winn Decl. ¶ 17.  This in turn risked undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department, given that the apparent bias concerned individuals who figured prominently in a criminal investigation for which the FBI senior officials were responsible.  *Id.*  The appearance of possible bias in this matter also involved the potential exercise of government power against a citizen.  *Id.*  Such an appearance of bias in connection with criminal investigations, was sufficient to shift the presumption away from protecting personal privacy to one favoring public transparency.

Under all the facts and circumstances presented to him at the time, it was the considered judgment of the Department that the public interest outweighed the privacy interest of the two individuals, and that the Department's disclosure of the text messages would not violate the Privacy Act. *Id.*

\*    \*    \*

Because the Department's disclosure of the texts at issue between Plaintiff and the Government Attorney would fall within a compatible, published routine use exception—assuming the records were contained in an OIG system of records, as Plaintiff alleges—the Court must dismiss Plaintiff's Privacy Act claim.

### C.    Plaintiff Cannot Establish That the Department's Disclosure to the News Media Was a Willful or Intentional Violation of the Privacy Act.

Even if the Court were to find that the disclosures made by the Department were not permitted under the Privacy Act, Plaintiff would not be entitled to damages because he cannot prove that the disclosure was "intentional or willful." 5 U.S.C. § 552a(g)(4).  Where a complaint is based on violations not described in § 552a(g)(1)(A)-(C) and instead on the "catch-all," § 552a(g)(1)(D)—as Plaintiff's claim is here—the D.C. Circuit has held that only monetary damages, not declaratory or injunctive relief, are available to plaintiffs, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)), and such monetary damages are available only where "the agency acted in a manner which was intentional or willful," 5 U.S.C. § 552a(g)(4).  Therefore, "proof of intent or willfulness is a *necessary* element of [the plaintiff's] claims, and failure to provide supporting evidence [will] lead to summary judgment in favor of the [defendants]." *Sussman*, 494 F.3d at 1122 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)) (emphasis added). An agency acts in an intentional

or willful manner only "by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Sussman*, 494 F.3d at 1122.

In distinguishing between an intentional violation and an inadvertent error, this Circuit has assembled a variety of tests—whether a "violation [is] so patently egregious and unlawful that anyone undertaking the conduct should have known it to be unlawful"; whether the violation was "commit[ed] without grounds for believing it lawful"; and whether the violator acted in "flagrant disregard[ of] other's rights under the act." *Id*. (quoting *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam)); *Waters v. Thornburgh*, 888 F.2d 870, 875 (D.C. Cir. 1989); *Maydak v. United States*, 630 F.3d 166, 182 (D.C. Cir. 2010). Together, these tests provide a barrier to a claim that is "greater than gross negligence." *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) (quoting *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, *reprinted in* 120 Cong. Rec. 40405-06 (1974)).

Additionally, courts have found affirmative evidence of a defendant's belief in the legality of a disclosure—and subsequently no willful or intentional violation—where the defendant does "due diligence before releasing the documents." *Reed*, 910 F. Supp. 2d at 44. For example, in *Reed*, one alleged wrongdoer (Cooper) conducted legal research and consulted with colleagues experienced in Privacy Act issues before deciding to disclose the information. *Id*. Based on that due diligence, the Court found no Privacy Act violation. *Id*. Similarly, regarding a second alleged wrongdoer (Carter), the Court noted that the Navy official "was trained in the Privacy Act, was well aware of his duties under the Act, and asked Cooper to be present during the conference call with the [Charleston Police Department] to be sure that he did not inadvertently violate the Privacy Act." *Id*. at 44 n.1.

Here, Mr. Winn's sworn declaration demonstrates that the Department did not intentionally or willfully seek to violate the Privacy Act. The Department contacted Mr. Winn—Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer—who has extensive expertise with regard to the Privacy Act and is the person in the Department responsible for providing authoritative legal advice and guidance on questions about that statute. *See* Winn Decl. ¶ 3. As described in his declaration, Mr. Winn reviewed the text messages at issue and engaged in a thoughtful analysis of whether the Privacy Act would permit disclosure.

Given the Department's thoughtful treatment of its disclosure—and specifically with respect to any potential Privacy Act implications—Plaintiff cannot prove willfulness or intent because no reasonable finder of fact could conclude that the Department disclosed the text messages without grounds for believing its actions were lawful, let alone that the Department "flagrantly disregard[ed]" any rights guaranteed under the Privacy Act. *Sussman*, 494 F.3d at 1122. Therefore, Plaintiff is not entitled to damages because he cannot prove that any disclosure was "intentional or willful." 5 U.S.C. § 552a(g)(4).

## CONCLUSION

For the above stated reasons, the Court should dismiss Count One and Count Two of Plaintiff's Complaint or, in the alternative, enter judgment in favor of Defendants as to those claim. Further, the Court should enter summary judgment in Defendants' favor as to Count Three.

Dated: November 18, 2019                           Respectfully submitted,

                                                   JOSEPH H. HUNT
                                                   Assistant Attorney General

                                                   MARCIA BERMAN
                                                   Assistant Branch Director

                                                   CHRISTOPHER R. HALL
                                                   Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20001
Phone:  (202) 305-0878
Fax: (202) 616-8460
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*