# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, <br><br> Defendants. | Case No. 1:19-CV-2367-ABJ |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Defendants hereby submit this Statement of Material Facts Not in Dispute in conjunction with their motion, in the alternative, for summary judgment as to Count One and Count Two and their motion summary judgment as to Count Three.

1. After serving in the United States Army, Plaintiff entered the rolls of the FBI in 1998. *See* Compl. ¶¶ 14-15.

2. When Plaintiff exchanged the text messages at issue in this litigation, beginning around August 2015 through May 2018, Plaintiff was a member of the FBI's SES. *See* OIG Report at 396.

3. During the same period, Plaintiff was promoted to Deputy Assistant Director of the FBI's Counterintelligence Division in September 2016. *Id.*

4. Plaintiff's career at the FBI put him at the center of some of the most important and politically charged investigations in the Bureau's history. *See* Compl. ¶¶ 1, 13-16.

5. Plaintiff was assigned in August 2015 to lead the criminal investigation of former Secretary of State and presidential candidate Hillary Clinton's use of a private email server, which the FBI referred to as "Midyear Exam" or "Midyear."  Compl ¶¶ 15, 32.

6. Then, in July 2016, Plaintiff was assigned to the FBI's investigation into the Russian government's efforts to interfere in the 2016 presidential election.  *See* Letter Unit Chief, Adjudication Unit II, Office of Professional Responsibility 2, June 15, 2018 ("Proposal Letter") (Exhibit 1).

7. Plaintiff was "one of the key members" of that investigative team.  Compl. ¶ 31.

8. After former FBI Director Robert Mueller III was appointed Special Counsel over the Russian investigation, Plaintiff was a member of the Special Counsel's staff from May 2017 until July 28, 2017.  *See* Proposal Letter at 2.

9. In early 2017, in response to requests from Congress, various organization, and members of the public, the OIG opened an investigation into various actions by the FBI and the Department in connection with the Midyear investigation that Plaintiff led.  Compl ¶ 32; *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June 2018 ("OIG Report"), https://www.justice.gov/file/1071991/download.

10. As part of that investigation, the OIG requested and received text messages from FBI-issued mobile devices for personnel involved in the Midyear investigation, including those sent and received by Plaintiff, for the period when the Midyear investigation began through July 1, 2017.  OIG Report at 395-96.

11. In its review of the collected text messages, the OIG identified over 40,000 text messages exchanged on FBI-issued cell phones between Plaintiff and the Government Attorney,

who was serving as Special Counsel to former Deputy Director Andrew McCabe. OIP Report at 396.

12. Those messages included political opinions about candidates and issues involved in the 2016 Presidential election, "including statements of hostility toward then candidate Trump and statements of support for candidate Clinton." *Id.*

13. In addition, according to the OIG, "[s]everal of their text messages also appeared to mix political opinions with discussions about the Midyear and Russia investigations," which raised questions as to whether Plaintiff's and the Government Attorney's political opinions may have affected investigative decisions. *Id.*

14. The text messages exchanged between Plaintiff and the Government Attorney, as well as others described in the OIG Report, include the following:

**July 21, 2016:**
Plaintiff:     Trump is a disaster. I have no idea how destabilizing his Presidency would be.

**July 31, 2016:**
Plaintiff:     And damn this [the Russia investigation] feel momentous. Because this matters. The other one [the Clinton E-Mail investigation] did too, but that was to ensure we didn't F something up. This matters because this MATTERS.

**August 8, 2016:**
GA:     [Trump's] not ever going to become president, Right??
Plaintiff:     No. No he's not. We'll stop it.

**August 15, 2016:**
Plaintiff:     I want to believe the path you threw out for consideration in [DD's] office-that there's no way [Trump] gets elected-but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40. . .

**August 26, 2016:**
Plaintiff:     Just went to a southern Virginia Walmart. I could SMELL the Trump support. . . ."

3

**October 19, 2016:**
Plaintiff:   I'm riled up. Trump is a fucking idiot, is unable to provide a coherent answer.

**November 7, 2016: (referencing an article titled "A victory by Mr. Trump remains Possible")**
Plaintiff:   OMG THIS IS F*CKING TERRIFYING.

**March 14, 2017:**
GA:   Finally two pages away from finishing [All The President's Men]. Did you know the president resigns in the end?? ☺
Plaintiff:   What?!?! God, that we should be so lucky.

**May 18, 2017 (after the GA had just joined the Special Counsel's investigation):**
Plaintiff:   For me, and this case, I personally have a sense of unfinished business. I unleashed it with [the Clinton email investigation]. Now I need to fix it and finish it. . . . Who gives a f*ck, one more A[ssistant] D[irector]..[versus] [a]n investigation leading to impeachment?" . . . [Y]ou and I both know the odds are nothing. If I thought it was likely I'd be there no question. I hesitate in part because of my gut sense and concern there's no big there there.

OIG Report at 400, 403-05.

15.   Upon review of Plaintiff's text messages, the OIG was "particularly concerned" that they "potentially indicated or created the appearance that investigative decisions they made were impacted by bias or improper considerations." *See* OIG Report at ix.

16.   The OIG pointed to, in particular, Plaintiff's August 8, 2016 text message stating that "'we'll stop' candidate Trump from being elected," which gave rise to the implication that Plaintiff was willing to take official action to impact a presidential candidate's electoral prospects. *Id.* The OIG Report is replete with other examples how Plaintiff evidenced political bias—or, at best, created the perception of bias. *See, e.g., id.* at 399-410.

17.   Plaintiff acknowledged to the OIG that

his text messages could be read to suggest that [Plaintiff] held himself responsible for Trump's victory and Clinton's defeat because of the Midyear investigation and that he viewed the Russia investigation as providing him an opportunity to 'fix' this result by working on an investigation that could result in the impeachment of President Trump.

4

OIG Report at 405.

18. The OIG concluded that Plaintiff's text messages with the Government Attorney "cast a cloud over the FBI's handling of the Midyear investigation and the investigation's credibility." *Id*. at iii.

19. When the OIG learned of the existence of the text messages between Plaintiff and the Government Attorney in the summer of 2017, both Plaintiff and the Government Attorney were members of Special Counsel Mueller's staff.

20. The OIG informed Special Counsel Mueller of the text messages, and Plaintiff was removed from the Special Counsel's investigation on July 28, 2017. OIG Report at 397.

21. On December 2, 2017, the New York Times and the Washington Post each reported on the existence of Plaintiff's text messages with the Government Attorney and his removal from the Special Counsel's investigation. *See* Compl. ¶ 60; *Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017), https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html; *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec. 2, 2017), https://www.nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-over-possible-anti-trump-texts.html.

22. Shortly thereafter, the chairmen of congressional committees in both the U.S. House of Representatives and the U.S. Senate ("Congressional Committees") made verbal and written inquiries to the Department regarding the existence and substance of the text messages. These inquiries included written requests for the Department to produce the text messages to Congress for oversight purposes. *See* Declaration of Stephen Boyd ¶ 7 ("Boyd Decl.") (Exhibit 2)

23. In order to respond to Congress, the Department requested the text messages from the OIG and, once received, redacted them to remove non-political, personally sensitive and law enforcement information. *Id.* ¶¶ 8-9.

24. The Department made its initial hard copy production of redacted text messages to the Congressional Committees on the evening of December 12, 2017, and subsequent productions followed. *Id.* ¶ 11.

25. The Department also determined that it would be appropriate to make the same subset of text messages available to members of press. *Id.* ¶ 12.

26. The Department did so after consulting with the appropriate senior member of Department career staff—Peter Winn, Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer—who reviewed the text messages to determine whether disclosing them in redacted form to the media would be permissible under the Privacy Act. *See* Declaration of Peter Winn ¶¶ 3-4 ("Winn Decl.") (Exhibit 3).

27. As described in his accompanying declaration, Mr. Winn considered that the routine use in an OIG Systems of Records Notice, or SORN, permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." *Id.* ¶ 10 (quoting 82 Fed. Reg. at 36,726).

28. Based on his review of the text messages provided to him, and assuming the text messages were contained in an OIG system of records, Mr. Winn concluded that the public interest outweighed the privacy interest of Plaintiff and the Government Attorney and the relevant routine use would permit disclosure. *See id.* ¶¶ 11-18

29. Mr. Winn concluded that the Department's disclosure of the text messages would not violate the Privacy Act, and Mr. Winn so advised senior leadership within the Department. *Id.* ¶¶ 11-18.

30. The Department's senior leadership then made the decision to release the records. *See* Boyd Decl. ¶ 13.

31. On June 15, 2018, OPR staff proposed dismissing Plaintiff from the FBI based on its finding that he: (1) engaged in unprofessional conduct by making inappropriate political comments in text messages on his FBI-issued cell phone, in violation of FBI Offense Code 5.21; (2) utilized a personal email account to conduct official FBI business, in violation of FBI Offense Code 5.18; and (3) failed to diligently pursue a credible lead when new information was brought forth regarding the Clinton private server investigation, in violation of FBI Offense Code 1.7. *See generally* Proposal Letter.

32. With the assistance of his attorneys, Plaintiff provided a written response to OPR's recommendation and participated in an oral hearing at which he defended his conduct. *See* Letter of Candice M. Will, Assistant Director, OPR, Aug. 8, 2018 at 18 ("Will Letter") (Exhibit 4).

33. In July 2018, Plaintiff and his attorney also signed a "Last Chance" Adjudication Agreement, in which Plaintiff requested, in lieu of dismissal, that OPR reduce the proposed penalty of dismissal "to a 60-day suspension, in which Offense Codes 5.21 and 5.18 are substantiated, Offense Code 5.2 (Dereliction of Supervisory Responsibility) be substituted for Offense Code 1.7, and he be demoted to a non-supervisory position." "Last Chance" Adjudication Agreement for Peter P. Strzok II (July 2018) (Exhibit 5).

34. In exchange for a reduced punishment, Plaintiff proposed that he would, among other things, complete a suspension of 60 days and be subject to removal from the rolls of the FBI if he were to engage in any other serious misconduct. *Id.*

35. In a letter dated August 8, 2018, the career Assistant Director ("AD") for OPR, Candice M. Will, analyzed the OPR's staff's recommendation, together with Plaintiff's written and oral responses and Plaintiff's "Last Chance" Adjudication Agreement. *See generally* Will Letter.

36. As described in her letter, AD Will reviewed the available information and analyzed Plaintiff's conduct according to the twelve factors articulated in the Merit Systems Protection Board's decision in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). *Id.*

37. AD Will determined, based on her weighing of those factors, to suspend Plaintiff from duty without pay for 60 days and to demote him to a non-supervisory position. *Id.* at 23.

38. Before the FBI took any official employment action with respect to Plaintiff's misconduct, and before the FBI informed Plaintiff of AD Will's decision, the FBI's Deputy Director ("DD"), David Bowdich, reviewed relevant evidence and the *Douglas* factors. *See generally* Letter of David Bowdich, FBI Deputy Director, Aug. 9, 2018 ("Bowdich Letter") (Exhibit 6).

39. On August 9, 2018, DD Bowditch exercised his delegated authority, consistent with FBI policy, to modify disciplinary actions as necessary to advance the best interests of the FBI. *See* Bowdich Letter at 1; *see also* FBI Policy Directive 0915D, *Disciplinary Appeals Process* § 4.3 (Exhibit 7).

40. Pursuant to that authority, DD Bowdich reconsidered AD Will's decision and concluded that dismissal was appropriate based on all of the facts. *See* Bowdich Letter at 1.

41. DD Bowdich concurred with AD Will that the three offenses were substantiated; however, as he explained in his letter, DD Bowdich disagreed with AD Will's evaluation of the relevant *Douglas* factors in deciding the appropriate penalty. *Id.*

42. In his letter, DD Bowdich explained that he had reviewed relevant evidence pertaining to Plaintiff's case, including text messages between Plaintiff and the Government Attorney, Plaintiff's role as one of the most senior counterintelligence agents in the FBI, and Plaintiff's many years of service. *Id.*

43. DD Bowdich concluded that—notwithstanding Plaintiff's 21 years of service—"serious aggravation is warranted for your [FBI Offense Code] 5.21 offense given the severe, long-term damage your conduct has done to the reputation of the FBI." *Id.*

44. DD Bowdich explained that, as "a Deputy Assistant Director in the Counterintelligence Division, you were expected to be a leader who was beyond reproach and to set an example for not only your direct subordinates, but others throughout the organization who watched and observed your behavior and actions." *Id.*

45. DD Bowdich also noted that it was "difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in the country," and that Plaintiff's "sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-Mail investigation and the initial stages of the Russian collusion investigation." *Id.*

46. In short, Plaintiff's "repeated selfishness has called into question the credibility of the entire FBI." *Id.* DD Bowdich indicated that his decision to dismiss Plaintiff was final and not subject to further administrative review. *Id.*

47. The FBI updated Plaintiff's personnel file with an official Standard Form ("SF") 52, Request for Personnel Action, which terminated Plaintiff from his FBI position effective August 10, 2018. *See* Pl.'s SF 52 (Exhibit 8).

48. The following day, on August 11, 2018, the FBI issued a SF 50, Notice of Personnel Action to Plaintiff, officially alerting him of his termination. *See* SF 50 (Exhibit 9).

49. On September 5, 2018, Plaintiff filed an appeal of the FBI's dismissal decision with the Merit Systems Protection Board ("MSPB"), which was dismissed for lack of jurisdiction by an Administrative Judge ("AJ") on November 15, 2018. *See* MSPB Initial Decision (Exhibit 10).

50. The AJ concluded that, as a member of the FBI SES, Plaintiff did not occupy a position that gave him appeal rights to the MSPB under the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, as amended, codified throughout Title 5 of the United States Code. *Id.* at 9.

Dated: November 18, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20001
Phone:  (202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*