# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-cv-2367-ABJ |
| v. | ) | |
| | ) | |
| ATTORNEY GENERAL WILLIAM F. BARR, | ) | |
| in his official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## ERRATA

Defendants file this errata to supplement their motion to dismiss or, in the alternative, for summary judgment as to Count One and Count Two of Plaintiff's Complaint, and motion for summary judgment as to Count Three, filed yesterday.  When filing that motion, Defendants did not include the accompanying Exhibit 1.  Defendants now provide Exhibit 1 to their motion as an attachment to this errata.

Dated: November 19, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
(D.C. Bar No. 988057)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

Washington, D.C. 20005
Tel.: (202) 305-0878
E-mail: Bradley.Humphreys@usdoj.gov
*Counsel for Defendants*

*Strzok v. Barr*, No. 1:19-CV-2367-ABJ

# Exhibit 1



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

June 15, 2018

PERSONAL

Mr. Peter P. Strzok II
Federal Bureau of Investigation
Washington, D.C.

Dear Mr. Strzok:

I have completed my review of an administrative inquiry investigated by the Office of the Inspector General (OIG), Department of Justice (DOJ), regarding allegations that you: (1) made inappropriate political comments in text messages on your FBI-issued cell phone, in violation of FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty);[1] (2) utilized a personal email account to conduct official FBI business, in violation of FBI Offense Code 5.18 (Security Violation – Other); and (3) failed to diligently pursue a significant investigative lead, in violation of FBI Offense Code 1.7 (Investigative Deficiency – Misconduct Related to Judicial Proceedings). Based on a preponderance of the evidence, I conclude the allegations are substantiated. Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I propose dismissing you from the rolls of the FBI.[2]

## DISCUSSION

**Background**

On July 10, 2015, the FBI opened an investigation into the storage and transmission of classified information on former Secretary of State Hillary Clinton's unclassified private servers (Clinton Email investigation). The FBI interviewed numerous witnesses and obtained and analyzed servers and devices used by Clinton, as well as the contents of private email accounts. In August 2015, you were assigned to lead the Clinton Email investigation and, according to your signed, sworn statement (SSS), you "built a team" to conduct the investigation. You made the day-to-day investigative decisions and kept the then-FBI Director (D) and the then-FBI Deputy Director (DD) informed of ongoing developments.

---

[1] Although certain text messages appeared to originate during regular work hours while you were on duty, OPR is using Offense Code 5.21 (Unprofessional Conduct – Off Duty), not Offense Code 5.22 (Unprofessional Conduct – On Duty), due to the uncertain nature of your work schedule on the specific days related to this inquiry.

[2] This administrative inquiry was opened after January 1, 2017, and thus will be analyzed under the FBI's 2017 Offense Codes and Penalty Guidelines.

The Clinton Email investigation culminated on July 5, 2016, with a press conference by D announcing that the FBI had completed its investigation and would recommend to the Justice Department that prosecution of Clinton be declined despite her having been "extremely careless" in handling classified information.[3]  In late September 2016, the Clinton Email investigation was reopened following the discovery of Clinton emails on the laptop of former Congressman Anthony Weiner, the ex-husband of Clinton aide Huma Abedin, during an unrelated criminal investigation. However, from September 28 through October 28, no action was taken by the Clinton Email investigative team to obtain a search warrant to review the emails on Weiner's laptop.  On October 28, 2016, eleven days before the 2016 presidential election, D sent a letter to Congress disclosing the existence of these additional emails as "appear[ing] to be pertinent" to the Clinton Email investigation.  On October 30, thirty-two days after the Clinton Email team learned of the existence of the emails, the FBI obtained a search warrant to review the emails. On November 6, just two days before the presidential election, D sent a second letter to Congress advising that there was, in fact, no new information in the emails and that the FBI's decision remained unchanged – to wit, that criminal charges against Clinton were unwarranted.

In July 2016, you were assigned to lead the FBI's investigation into the Russian government's efforts to interfere in the 2016 presidential election (Russia investigation).  On May 17, 2017, former FBI Director Robert Mueller III was appointed Special Counsel over the Russia investigation.  From May 2017 to July 28, 2017, you worked on the Special Counsel's staff.  You worked closely with former FBI General Attorney (GA).[4]  GA served as counsel to DD, was his liaison to the Clinton Email investigation starting in February 2016[5] and to the Russia investigation beginning in July 2016, and worked on the Special Counsel's staff from May 22 to July 15, 2017.

In early 2017, the OIG began a review of various actions taken by DOJ and the FBI in connection with the Clinton Email investigation.  During the course of its investigation, the OIG interviewed more than 100 witnesses and reviewed more than 1.2 million documents, including electronic communications (ECs), interview reports (FD-302s), agent notes, communications between and among agents, prosecutors, supervisors, and other officials involved in the Clinton Email investigation, as well as a variety of other written materials.  The OIG obtained and reviewed in excess of 100,000 text and instant messages to or from FBI personnel who worked on the investigation.[6]

---

[3] At the time, Clinton was the presumptive Democratic nominee in the 2016 presidential election.  D was subject to widespread condemnation for holding the press conference, including his use of imprecise and misleading language.

[4]                    (P-1)

[5] Text records indicate GA was involved in an unknown capacity in the Clinton Email investigation as early as August 2015.

[6] The OIG reviewed text messages from FBI-issued mobile devices and instant messages exchanged on Government System #1 and Government System #2 applications.  Government System #1 is the FBI's computer system for information classified at the Secret level, while Government System #2 handles Top Secret and compartmented information.

During the course of its review, the OIG located more than 40,000 unique text messages between you and GA from June 30, 2015 to May 17, 2017.[7][8]  Those text messages covered a wide range of topics, including routine work-related communications, as well as personal messages which included discussions about your families, medical issues, and daily events, and reflected that you and GA were communicating on your FBI-issued phones as part of an extramarital affair.[9]  Of serious concern was the overtly political tone of many of your text messages related to the 2016 presidential election, including statements expressing hostility for then-candidate Donald Trump and support for then-candidate Hillary Clinton.  Even more concerning, certain text messages mixed your political opinions with discussions about the work you were conducting on the Clinton Email and Russia investigations, which raised serious questions about your impartiality and whether your political opinions affected your investigative decisions.

On July 28, 2017, when the Special Counsel learned of your improper text messaging, you were removed from the Special Counsel's investigation and returned to the FBI.  Your communications with GA received extensive media coverage and caused many political figures, media commentators, and members of the public to harshly criticize the handling of the Clinton Email and Russia investigations by the FBI, DOJ, and the Special Counsel.

Finally, during the course of its investigation, the OIG uncovered evidence that you used a personal email account to conduct official FBI business.

**Unprofessional Conduct**

The investigation uncovered text messages between you and GA that raised concerns about potential bias in the Clinton Email and Russia investigations, including texts that commented on Trump and/or Clinton, and other texts that expressed political opinions while discussing your work on the Clinton Email and Russia investigations.[10]  GA stated the "predominant reason" the two of you communicated so extensively on your FBI-issued cell phones was "to keep [your] affair a secret from [your] spouses."

**Relevant Text Messages:**

August 16, 2015 (You are the lead agent for the Clinton Email investigation)
You:      [Bernie Sanders is] an idiot like Trump.  Figure they cancel each other out.

---

[7] After initial difficulties securing text messages for the period from December 15, 2016 to May 17, 2017, the OIG was able to recover a large number of these messages, although it "cannot definitively say that [the OIG's] forensic recovery captured every text message exchanged between [GA] and [you] during the gap period."

[8] OPR reviewed approximately 74,000 text messages between you and GA on your FBI-issued cell phones between February 1, 2015 and July 5, 2017.

[9] During the relevant period of time both you and GA were married to other people.

[10] OPR notes that during your text exchanges, you and GA expressed a high volume of critical opinions about a broad array of topics and individuals including your families, work colleagues, the United States government, colleges, cities, entertainers, political commentators, and politicians affiliated with both the Republican and Democratic parties.

December 20, 2015 (GA forwarded you an article about Trump)
GA:        What an utter idiot.
You:       No doubt.

February 12, 2016 (GA is now assigned to Clinton Email investigation by DD)
GA:        I'm no prude, but I'm really appalled by this. So you don't have to go
           looking (in case you hadn't heard), Trump called him the p-word. The
           man has no dignity or class. He simply cannot be president. ...
You:       Oh, [Trump's] abysmal. I keep hoping the charade will end and people
           will just dump him. The problem, then, is Rubio will likely lose to Cruz.
           The Republican party is in utter shambles. When was the last
           competitive ticket they offered?

February 24, 2016 (Discussing the FBI's upcoming interview of Hillary Clinton)
GA:        One more thing: [Clinton] may be our next president. The last thing you
           need [is] going in there loaded for bear. You think she's going to
           remember or care that it was more doj than fbi?[11]
You:       Agreed...

March 1, 2016 (You recalled a conversation with your teenage son)
You:       [My son] asked me who I'd vote for [and he] guessed Kasich.
GA:        Seriously?! Would you not [vote for a] D[emocrat]?
You:       I don't know. I suppose Hillary. I would [vote for a] D[emocrat].
GA:        [Your son] doesn't think you're a[] R[epublican], does he?
You:       [State #1 is] going to [Clinton] anyway. He thinks I wouldn't vote for
           her right now. He knows I'm a conservative Dem[ocrat]. But now I
           wonder.

March 3, 2016
GA:        God trump is a loathsome human.
You:       Yet he may win. Good for Hillary.
GA:        It is.
You:       Would he be a worse president than cruz?
GA:        Trump? Yes, I think so.
You:       I'm not sure. Omg [Trump's] an idiot.
GA:        He's awful.
You:       America will get what the voting public deserves.
GA:        That's what I'm afraid of:
You:       God Hillary should win 100,000,000-0.
GA:        Also did you hear [Trump] make a comment about the size of his d*ck
           earlier? This man cannot be president.

---

[11] You and GA said this conversation related to the number of people that would attend Clinton's interview. You
said you "did not take this to mean [] we should treat [Clinton] differently because she's the next president" and
claimed you "made no decision based on anything [Clinton] might be or [might] become..."

<u>March 12, 2016</u> (GA forwarded an article about a "far right" candidate in State
#2)
GA:     [W]hat the f is wrong with people?
You:    That [State #2] article is depressing as hell.  But answers how we could
        end up with President trump.

<u>March 16, 2016</u>
GA:     I can not believe Donald Trump is likely to be an actual, serious
        candidate for president.

<u>April 1, 2016</u>
GA:     So look, you say we text on that phone when we talk about hillary
        because it can't be traced . . .
You:    Right.

<u>May 3, 2016</u>
GA:     And holy shit Cruz just dropped out of the race.  It's going to be a
        Clinton Trump race.  Unbelievable.
You:    What?!?!??
GA:     You heard that right my friend.
You:    I saw trump won, figured it would be a bit.  Now the pressure really
        starts to finish [the Clinton email investigation] ...
GA:     It sure does.

<u>June 11, 2016</u>
You:    They fully deserve to go, and demonstrate the absolute bigoted nonsense
        of Trump.

<u>June 17, 2016</u>
You:    Now we're talking about Clinton, and how a lot of people are holding
        their breath, hoping.

<u>July 13, 2016</u> (You were assigned to lead the Russia investigation; GA forwarded
an article entitled "For Whites Sensing Decline, Donald Trump Unleashes Words
of Resistance")
GA:     Have you read this?  It's really frightening.
You:    I have not.  But I think it's clear he's capturing all the white, poor voters
        who the mainstream Republicans abandoned in all but name in the quest
        for the almighty $$$$.

<u>July 18, 2016</u>
You:    And f*ck the cheating mother*cking Russians.  Bastards.  I hate them.
GA:     I'm sorry, me too.

July 18, 2016 (While watching the Republican National Convention)
You:    Oooh, TURN IT ON, TURN IT ON!!! THE DOUCHEBAGS ARE
        ABOUT TO COME OUT.  You can tell by the excitable clapping.
GA:     And wow, Donald Trump is an enormous d*uche.

July 19, 2016
You:    Hi.  How was Trump, other than a douche?
GA:     Trump barely spoke, but the first thing out of his mouth was "we're
        going to win soooo big."  The whole thing is like living in a bad dream.
You:    Jesus.
GA:     God, it's just a two-bit organization.  I do so hope his disorganization
        comes back to bite him hard in November.
You:    It HAS to, right?  Right?!? Panicked.

July 21, 2016
You:    Trump is a disaster.  I have no idea how destabilizing his Presidency
        would be.

July 26, 2016 (While watching the Democratic National Convention)
You:    Congrats on a woman nominated for President in a major party.  About
        damn time! . . . Chills, just because I'm a homer for American
        democracy that way.  If they played patriotic music or did something
        with the flag and an honor guard, I probably would have teared up.....
        And [your daughter] just asked, since [Clinton's] married to man, there's
        no First Lady.  What is there?  And I happily told her, a First Husband!
        (who's gonna be an utter charismatic hound dog, btw...)
GA:     Yeah, it is pretty cool.  [Clinton] just has to win now.  I'm not going to
        lie, I got a flash of nervousness yesterday about trump.  The sandernistas
        have the potential to make a very big mistake here ...
You:    I'm not worried about them.  I'm worried about the anarchist Assanges
        who will take fed information and disclose it to disrupt.  We've gotta get
        the memo and brief and case filing done. . . .  And I don't like Chelsea!
        Her husband even less...
GA:     I like Chelsea fine.  Why not?
You:    Self-entitled.  Feels she deserves something she hasn't earned.

July 27, 2016
GA:     Have we opened on him yet?
You:    Opened on Trump?  If Hillary did, you know 5 field offices would...

July 31, 2016
You:      And damn this [Russia investigation] feel momentous.  Because this
          matters.  The other one did too, but that was to ensure we didn't F
          something up.  This matters because this MATTERS.

August 6, 2016 (GA forwarded an article relating to Trump's criticism of a Gold
Star family)
GA:       Jesus.  You should read this.  And Trump should go f himself.
You:      God that's a great article.  Thanks for sharing.  And F Trump.
GA:       And maybe you're meant to stay where you are because you're meant to
          protect the country from that menace.  To that end, read this: [GA
          forwards an article entitled, "Trump's Enablers Will Finally Have to
          Take a Stand"]
You:      Thanks.  It's absolutely true that we're both very fortunate.  And of
          course I'll try and approach it that way.  I just know it will be tough at
          times.  I can protect our country at many levels, not sure if that helps...
GA:       I know it will too. ...
You:      [Referring to and quoting GA's article] I really like this:  [Trump]
          appears to have no ability to experience reverence, which is the
          foundation for any capacity to admire or serve anything bigger than self,
          to want to learn about anything beyond self, to want to know and deeply
          honor the people around you.
GA:       Sigh.  That's the paragraph, upon reading, that caused me to want to
          send it to you.

August 8, 2016
GA:       [Trump's] not ever going to become president, right? Right?!
You:      No.  No he's not.  We'll stop it.

August 10, 2016
You:      OMG I CANNOT BELIEVE WE ARE SERIOUSLY LOOKING AT
          THESE ALLEGATIONS AND THE PERVASIVE CONNECTIONS.
          What the hell has happened to our country!?!?!??

August 14, 2016 (GA forwarded an article entitled "Donald Trump is Making
America Meaner")
GA:       God this makes me so angry.
You:      And I am worried about what Trump is encouraging in our behavior.
          The things that made me proud about our tolerance for dissent – what
          makes us different from Sunnis and Shias losing each other up – is
          disappearing.  I'm worried about what happens if [Clinton] is elected.

August 15, 2016
You:      I want to believe the path you threw out for consideration in [DD's]
          office-that there's no way [Trump] gets elected-but I'm afraid we can't

7

take that risk.  It's like an insurance policy in the unlikely event you die before you're 40...

<u>August 26, 2016</u>
You:    Just went to a southern [State #1 Store].  I could SMELL the Trump support....  Yeah it's scary real down here.

<u>September 12, 2016</u>
You:    [Radio] says Trump hotel opens today.  It doesn't look ready...
GA:     That's one place I hope I never stay in.
You:    Agree.  Hope it fails horribly.  It won't, but still.

<u>September 26, 2016</u> (GA forwarded an article entitled "Why Donald Trump Should Not Be President")
GA:     Did you read this?  It's scathing.  And I'm scared. . . .  Man I should have started drinking earlier. ...

<u>September 28, 2016</u>
You:    Oh sweet jes*s I need to send you what my father has been sending.  The liberal media is all in the tank for Hillary.  Because, you know, Trump isn't batsh*t crazy for our country....
GA:     Please don't.  I really don't want to know what is out there.
You:    My father is crazy, btw.  EVERYTHING about him is a dem[ocrat].  Except maybe [strong] national defense (except Hillary is that but she can't be, because, you know, CLINTON!).
GA:     I know.  His political affiliation is truly baffling.  He's a HUGE D[emocrat].
You:    I know!  I WANT YOU TO MEET HIM AND CONVINCE HIM!  You're very persuasive. ...

<u>September 28, 2016</u> (You forwarded an article entitled "Donald Trump Got Too Much Debate Advice, So He Took None of It")
You:    "Found it hard to focus?"  "Found it hard to focus?!?!??!"  Are you f*cking kidding me?!??!!

<u>October 5, 2016</u> (GA forwarded an article critical of Trump entitled "The Editorialists have Spoken; Will Voters Listen?")
You:    No they won't listen, because they're f*cking stupid.  And I'm moving to [Another Country].

<u>October 8, 2016</u>
You:    Currently reading about Trump.  Wondering if he stepped down if Pence could actually get elected.
GA:     That's probably more likely than Trump getting elected.
You:    I agree.  I think it would actually energize the Republican vote.  And no, not really re path forward.  And funny quote from my cousin-in-law:

Mr. Peter P. Strzok II

"No way Trump will drop out. Hey Republicans: how does it feel to carry something to term?"

October 19, 2016 (While watching a Clinton-Trump debate on television)
You:    I am riled up. Trump is a fucking idiot, is unable to provide a coherent answer. I hate these people.
GA:     Please. I honestly don't want to know. It looks and sounds like a Saturday Night Live skit.
You:    I CAN'T PULL AWAY. WHAT THE FUCK HAPPENED TO OUR COUNTRY, [GA]?!??!?! Bad hombres? That's some jive turkey talk, honkey!
GA:     I don't know. But we'll get it back. We're America. We rock.
You:    Donald just said "bad hombres." Oh hot damn. [Clinton] is throwing down saying Trump in bed with russia. Holy shit are you fucking kidding me?!?!? . . . She could do SO MUCH BETTER. But she's just not getting traction. Jesus.

October 19, 2016 (After GA attempted to convince you to turn off the debate)
You:    Maybe. I have to watch this. And I'm so damn mad, [GA]. And disgusted. And disappointed. Trump just said what the fbi did is disgraceful.

November 1, 2016
GA:     God, this makes me very angry. I honestly think I should bow out rather than find out things, be unable to tell [DD], and powerless to stop them.
You:    No. Need you on the inside now more than ever. Truly. And no bs, your country needs you now. We are going to have to be very wise about all of this. The only thing wrong in your statement is your powerlessness.
GA:     I'm not sure I agree with you there.
You:    ... And this is a finite thing. I want to be done before the inauguration. You're wrong. Not the type of power you (or i) would prefer, but not powerless.

November 3, 2016
GA:     The [Newspaper] probability numbers are dropping every day. I'm scared for our organization.
You:    [Writer #1] and moron [Writer #2] are F'ing everything up, too.

November 7, 2016 (You sent an article entitled "A Victory by Mr. Trump Remains Possible")
You:    OMG THIS IS F*CKING TERRIFYING.
GA:     Yeah, that's not good.

November 9, 2016
GA:    Are you even going to give out your calendars?  Seems kind of
       depressing.  Maybe it should just be the first meeting of the secret
       society.

November 13, 2016
GA:    I bought all the president's men.  Figure I needed to brush up on
       watergate.

November 14, 2016
GA:    God, being here makes me angry.  Lots of high fallutin' national security
       talk.  Meanwhile, we have OUR task ahead of us…

November 20, 2016 (GA forwarded an article entitled "White Nationalists
Celebrate Awakening After Donald Trump Victory")
GA:    This is really disgusting.
You:   Im worried racial tension is going to get really bad…  And god that was
       a depressing article.

December 22, 2016
GA:    The election stuff makes me want to cry.
You:   I know.  Me too.  And I don't see it getting better…
GA:    As you said last night, I'm really scared for our country. …

March 14, 2017
GA:    Finally two pages away from finishing ["All The President's Men"].
       Did you know the president resigns in the end?! ☺
You:   What?!?!  God, that we should be so lucky.

May 18, 2017 (GA had just joined the Special Counsel's investigation)
You:   For me, and this case, I personally have a sense of unfinished business.  I
       unleashed it with [the Clinton email investigation].  Now I need to fix it
       and finish it. . . .  Who gives a f*ck, one more A[ssistant]
       D[irector]…[versus] [a]n investigation leading to impeachment?[12] . . .
       [Y]ou and I know the odds are nothing.  If I thought it was likely I'd be
       there no question.  I hesitate in part because of my gut sense and concern
       there no big there there.

---

[12] In a May 22, 2017 Government System #1 email to GA, you expressed similar sentiments regarding impeachment.  GA forwarded an article entitled, "Trump asked intelligence chiefs to push back against FBI collusion probe after [D] revealed its existence."  You responded saying, "Yup.  Assuming you/team will do it via [Attorney]?"  After GA confirmed this, you responded, "God I suddenly want on this.  You know why."  GA responded and offered to leave the Special Counsel investigation to enable you to join it and you replied, "I'm torn. I think – know – I'm more replaceable than you are in this.  I'm the best for it, but there are others who can do OK. You are different and more unique.  This is yours.  Plus, leaving a S[pecial] C[ounsel] (having been an SC) resulting in an impeachment as an attorney is VERY different than leaving as an investigator . . ."

## Public Reaction to Text Messages

Your removal for cause from the Special Counsel's investigation garnered media attention in the late summer and early fall of 2017. However, in December 2017, when media outlets learned of your illicit relationship with GA and the nature of your political text messaging, the story became a media sensation. It was widely reported, cast doubt on the FBI's investigative findings and the Special Counsel's investigation, and brought harsh criticism upon the FBI from politicians at all levels in both political parties, President Trump, the media, and the public.

## Your Account of Text Messaging

On September 26, 2017 and April 20, 2018, you gave voluntary sworn interviews to the OIG. You said you took "the allegations [] that there might be political bias extraordinarily seriously . . . [and you felt] very comfortable that there was not." You claimed your text messages with GA were your "personal opinion talking to a friend" and stated your political opinions "never transited into the official realm" or impacted your professional duties. You said that the "acts," "decisions," and "conduct" of the investigations were "absolutely clear of any personal beliefs."

You stated that "personal conversations are not relevant" to the investigative decisions that were made, but that "people will want to spin and assign motive or see conspiracy where there is not." You stressed that while you discussed personal opinions with GA "there [was] never a [discussion that] in order to achieve [a particular] personal belief, we're going to need to [take any specific action]." You said it was "ingrained" in your culture and training "that whatever personal beliefs you have [] that there is absolutely a bright and inviolable line between what you think personally [] and the conduct of your official business."

You stated that GA was a "colleague who is also a close friend" and noted that your personal opinions and beliefs "intermixed" in some of your work conversations. You acknowledged that expressing your opinions in such a manner "was dumb to do [] on a government device," but claimed your use of the FBI-issued cell phone to express your opinions was not as bad as expressing your opinions in a more public forum which might call into question the integrity of the FBI investigation. You posited that your texts with GA were a "direct, one-on-one, private conversation" and "a non-official record between two friends." You stated your use of your FBI-issued phone to engage in these conversations was a matter of "convenience" and acknowledged that in hindsight you "would have preferred [] to do that [] not on a [] government system."

You were aware your communications with GA on your FBI-issued phone were monitored and logged and admitted you could "envision a number of scenarios" in which the disclosure of those messages would hurt the integrity of the FBI and the Clinton Email and Russia investigations. You acknowledged your conduct was not "smart from the perspective of perception." However, you claimed it would be difficult to "find a person [who] does not have an opinion about things of either a political or a public interest perspective . . . most people have an opinion and they talk about it." In spite of the strong language and apparent bias evidenced in

your messages with GA, you denied that you were prejudiced against a particular person, pointing out that "at some time or another, [you were] angry at everybody." You stated that "never, ever, ever did [you] ever make any operational or work decision based on any personal preference, desire, or belief." You admitted you viewed the allegations involved in the Russia investigation as more serious than the Clinton Email investigation allegations, but noted that was due to the possible engagement of, and collusion between, a domestic political campaign and a foreign government.

You were aware of the significant public interest and political ramifications in both the Clinton Email and Russia investigations. You acknowledged that you considered certain investigative steps to ensure the public would feel that the investigations were thorough, the conclusions were based on fact, and to deter perceptions that "the fix was in." You told investigators you approached the Clinton Email and Russia investigations with a keen sense of "absolutely [doing] it right" such that the public "could look at it and say this was done right and well, and there is no question about it."

**Security Violation**

The investigation uncovered numerous occasions on which you used your personal email account to conduct FBI business.[13]  Examples of official communications forwarded to your personal email account included drafts of a Congressional response and the search warrant affidavit for the Anthony Weiner laptop. Concerning the latter, you stated that the FBI phones "at the time had significant limitations" which made it impossible to view certain edits. You acknowledged the Weiner search warrant was filed under seal, but claimed it was not "sensitive" because "most of [the information contained therein] had already been in the public domain" and that filing the document under seal was "an administrative sensitivity."[14]  In spite of sensitive grand jury information contained in the document,[15] you argued that using your personal email account to work on the document was "a reasonable exception to the rule given that [you] couldn't read it on the Bureau phone."

You said your understanding of FBI policy regarding the use of personal devices or email accounts to conduct FBI business "is that home computer and personal electronic devices use is discouraged, and that in cases where it is not practical or possible to use your [FBI-issued] device, that there are allowances made. But you should keep operationally sensitive [or classified] detail out of there." Although you claimed you used personal email "when it wasn't possible [to use the FBI's systems] or there [] were problems with the FBI systems," you also acknowledged using your personal home computer to type out FBI related documents "for convenience." You stated you would send the documents from your unclassified FBI email

---

[13] D and GA were also found to have used their personal email accounts to conduct FBI business. The situation is replete with irony given the FBI's criticism of Clinton for having done so.

[14] Irrespective of your personal judgment as to the sensitivity of the information, it was filed under seal and entitled to protection.

[15] The U.S. Attorney's Offices for the Southern District of New York and the Eastern District of Virginia were notified of your actions.

account to your personal email account and then send it back to your FBI account so that it was "incorporated and picked up into the FBI system."

You claimed your "usual practice" was to double delete the work emails after you sent them. You acknowledged you had been issued an FBI laptop to work from home but claimed you did not know how to properly log on to use the machine. You also acknowledged you had an Enterprise Remote Access Service (ERAS) machine but noted it was burdensome to transport and said you only "recently" discovered you could access the FBI unclassified system there as well.

You admitted your wife gained access to your personal cell phone and email accounts in 2017. You noted her access was "unusual [] and limited to a specific period of time," and claimed she did not view any FBI case related information.[16] [17] You claimed you did not have any work-related communications on your personal email account because you had double deleted all such communications. You declined the OIG's request to review your personal email account.

Evidence was also uncovered of your and GA's use of iMessage on your personal cell phones to conduct FBI business. You initially told investigators that you and GA "[t]ypically" used iMessage on your personal cell phones for only personal conversations. When asked if you and GA ever exchanged work-related information on your personal cell phones, you said, "I do not recall that. I can't exclude it ever, ever happening, but I don't recall ever sending work-related stuff on [] iMessage."[18]

**Investigative Deficiency**

### Discovery of Additional Clinton Emails

In September 2016, the FBI's New York Office (NYO) and U.S. Attorney's Office for the Southern District of New York (SDNY) began a criminal investigation of Anthony Weiner related to his online relationship with a minor. Weiner's laptop was obtained pursuant to a

---

[16] On April 4, 2017, you and GA engaged in a text exchange that read, in part:

| You: | [My wife] has my phone []. Read an angry note I wrote but didn't send you. That is her calling from my phone. She says she wants to talk to [you]. Said we were close friends nothing more. |
| GA: | Your wife left me a vm. Am I supposed to respond? She thinks we're having an affair. Should I call and correct her understanding? Leave this to you to address? |
| You: | I don't know. I said we were [] close friends and nothing more. She knows I sent you flowers, I said you were having a tough week. |

[17] During a text exchange from April 4-8, 2017, you and GA discussed that your wife had access to your devices and had located GA's husband's full name, found a hotel reservation ostensibly used by you and GA during a romantic encounter, had access to photographs from your phone, threatened to send all the information to GA's husband, and also threatened to hire a private investigator. GA told you to determine whether your wife might use recovery software to locate other evidence of your affair on your devices.

[18] On May 4, 2017, you and GA exchanged the following text messages on your FBI-issued cell phones:

| You: | Can I imsg a work q? |
| GA: | Yes. |
| You: | Sent. |

federal search warrant. An NYO agent discovered emails and BlackBerry messages by and between Weiner's ex-wife Huma Abedin and Hillary Clinton that appeared to be related to the Clinton Email investigation.[19] The case agent immediately reported his discovery up his chain of command and, on September 28, 2016, DD was notified of the discovery of possible Clinton emails. That same date, DD discussed the matter with you, and you, in turn, discussed the matter with GA via text messaging on your FBI-issued cell phones:

> September 28, 2016:
>
> You:   Got called up to [DD's] earlier...hundreds of thousands of emails turned over by Weiner's atty to sdny, includes a ton of material from spouse. Sending team up tomorrow to review...this will never end...
>
> GA:   Turned over to them why?
>
> You:   Apparently one of his recent texting partners may not have been 18...don't have the details yet.
>
> GA:   Yes, reported 15 in the news.
>
> You:   So I kinda want to go up to NY tomorrw, coordinate this, take a leisurely Acela back Friday....

You told investigators you had planned to go to New York the following day, but a conference call was scheduled instead.[20] You said you initially did not consider this new information to be especially noteworthy because the Clinton Email team previously had people come forward and claim to have Clinton emails. The Clinton Email team would run down the leads if they thought they had potential merit. You nevertheless acknowledged this lead was more credible because it came from an FBI field office and involved information obtained from Abedin's husband.

During the September 29 conference call, NYO participants informed FBIHQ personnel that Weiner's laptop contained "hundreds of thousands" of emails potentially relevant to the Clinton Email investigation.[21] The connection to Clinton's email server was made clear on the call, including the fact that there were email addresses "directly tied" to Abedin and Clinton during the missing three-month timeframe. NYO participants explained that they were prohibited from further examination of the emails due to the parameters of their search warrant, which was limited to evidence of possible child exploitation by Weiner. According to NYO personnel, they were not tasked by FBIHQ to do anything relative to the Clinton emails during or following the call.

You stated that you believed "there [was] something there that potentially [Clinton Email investigators were] going to have to pursue," and "[w]e're likely looking at [a renewed investigation that will last] well into 2017." You said you believed NYO was processing the

---

[19] During the initial Clinton Email investigation, which concluded on July 5, 2016, investigators were unable to locate three months of communications on Clinton's private server or devices, including BlackBerry messages. Therefore, this new discovery of BlackBerry messages was significant.

[20] You did not participate in the September 29, 2016 conference call. However, you were briefed on the issues later that day.

[21] Analysis later determined there were 675,000 emails on Weiner's laptop.

data and that based on your familiarity with similar matters of data processing, "it would not have surprised [you] to have heard back [from NYO] in early-November or [] early-December."

You also emphasized that your focus in late September 2016 was on the Russia investigation, which you deemed to be more critical and time-sensitive. You said, "So [the Weiner laptop] pops up, and it's like goddammit another thing to worry about. And it's important, and we need to do it[,]" but the discovery of additional emails on Weiner's laptop was not "a ticking terrorist bomb."

You acknowledged that you and your team "did not appreciate the later sense of urgency" related to the election. You told investigators that in the early process of discovering the additional emails, "there is not a shadow of [] what's going to unfold a month later." You stated, "there [was] no sense of this is going to be huge and horrible and the election is a month away, and God, are we going to say something, do we need to say something to Congress? This is just [a] good lead and [] we'll get to [it at] the end of the year [or into] next year. We'll get to it as [NYO officials] process through it."

### Failure of the Clinton Email Team to Take Action

In New York, the Weiner case agent was deeply concerned that no action was being taken by Clinton Email investigators with regard to the Clinton emails. He began documenting these concerns in contemporaneous emails and also discussed his concerns with his chain of command and SDNY Assistant U.S. Attorneys (AUSAs). The case agent told the OIG that no one had contacted him regarding the laptop:

> The crickets I was hearing was really making me uncomfortable because something was going to come crashing down. . . . And my understanding, which is uninformed because . . . I didn't work the Hillary Clinton matter. My understanding at the time was I am telling you people I have private Hillary Clinton emails [] and BlackBerry messages []. . . . Why isn't anybody here? . . . Get your ass on the phone, call [the case agent], and get a copy of that drive . . . I still to this day don't understand what the hell went wrong.

The case agent arranged to meet with two SDNY AUSAs on October 19, 2016, because he felt he had nowhere else to turn. He told them about the emails discovered on the Weiner laptop and said, "I'm a little scared here. I don't know what to do because I'm not political. Like I don't care who wins this election, but this is going to make us look really, really horrible. And it could ruin this case, too." The AUSAs recalled the case agent was very stressed and "was getting, for lack of a better word, paranoid that, like somebody was not acting appropriately, somebody was trying to bury this."

That same day, October 21, 2016, following their meeting with the case agent, the AUSAs contacted DOJ to express concern about the lack of action. A DOJ prosecutor who had been assigned to the Clinton Email investigation contacted you to see if you were aware of the discovery of the emails on the Weiner laptop. Thereafter, additional calls were made by DOJ to FBIHQ, including to DD. On October 26, NYO, SDNY, and the Clinton Email team (agents and

prosecutors) participated in a conference call during which FBIHQ claimed to learn important new information about the emails, including their large volume and the presence of Blackberry messages. However, as made clear by the interviews conducted by the OIG, FBIHQ learned nothing new on October 26 that it had not already been told on September 28-29. When asked by the OIG about the failure to timely follow-up on the Weiner laptop, DD stated he thought you "w[ere] actually doing it."

You agreed that no action was taken until SDNY alerted DOJ in late October. You stated it was only after NYO reported "the scope and content" of the Weiner laptop during the October 26 conference call that it became a significant event. You noted that, importantly, Weiner's laptop had backup emails from "the missing three months." You stated "We need[ed] to try and get this because this is, potentially would alter, would change our understanding of the investigative conclusions we arrived at in July."

On October 27, 2016, DD believed the matter was "absolutely urgent" and notified D that they needed to meet to discuss the Weiner laptop matter. When asked why it was urgent, DD said because "it's been sitting around for three weeks," "it's important," and "it's getting closer to" the election. Clinton Email investigators briefed D on October 27 and it was decided that they would seek a search warrant for the Clinton/Abedin emails contained on the Weiner laptop.[22]

### Explanations for Failure to Take Action

You provided a number of explanations for the Clinton Email team's inaction, including: (1) NYO's delay in processing the laptop; (2) a lack of specific information about what NYO had discovered on the laptop; (3) a belief that the laptop did not contain significant new information; (4) the team's focus on the Russia investigation;[23] and (5) legal impediments to reviewing the materials on the laptop. The investigation reveals that there is no reasonable excuse for the FBI's delay in following up on this matter.

1. NYO's delay in processing the laptop

You stated that the Clinton Email team was waiting for additional information about the contents of the laptop from NYO, which was not provided until late October. OPR finds this explanation unavailing because you knew the FBI could not examine the contents of the Clinton emails on Weiner's laptop without first obtaining consent or a new search warrant. The scope of the existing search warrant issued in the Weiner ⬛⬛⬛ (G) ⬛⬛⬛ case would not authorize the Clinton Email team's review of the emails. ADIC NYO informed your Assistant Director of this fact on September 29, 2016. Although NYO was still processing the laptop, it was up to the Clinton Email team to obtain proper search authority. However, the Clinton Email team took no action to inform the prosecutors about the laptop or obtain search authority. The Clinton Email

---

[22] The FBI obtained the search warrant on October 30.

[23] The investigation revealed that D and/or DD inexplicably assigned the same people to the FBI's two most significant investigations at the time, Clinton Email and Russia. This, in turn, meant the people were spread too thin and unable to focus the necessary time and energy needed for proper follow-up investigation on Clinton Email.

team also failed to follow-up with NYO to determine how the processing was proceeding. If they had done so, they would have learned that NYO completed processing of the laptop by approximately October 4, 2016.

### 2. A lack of specific information about what NYO had discovered on the laptop

You stated that it was only when NYO reported the "scope and content" of what was on the laptop on October 26 that it became a significant development. You noted that the laptop included Blackberry backups from the three months that the FBI had not previously reviewed. However, as of September 29, the FBI already knew the laptop contained: (a) over 340,000 emails, some of which were from domains associated with Clinton, including state.gov, clintonfoundation.org, clintonemail.com, and hillaryclinton.com; (b) numerous emails between Clinton and Abedin; (c) an unknown number of BlackBerry communications on the laptop, including one or more messages between Clinton and Abedin, indicating the possibility that the laptop contained communications from the early months of Clinton's tenure as Secretary of State; and (d) emails dated beginning in 2007 and covering the entire period of Clinton's tenure as Secretary of State.

### 3. A belief that the laptop did not contain significant new information

You described your perception of the discovery of emails on the Weiner laptop in late September as simply "a lead that likely is going to result in some investigation." You stated that the suggestion that the matter should have been treated with more urgency was "misplaced" because "[w]e did not know what was there." You believed the team could have reviewed the emails later on, in January or February. However, the laptop was already in FBI custody and it was a logical investigative step to obtain a search warrant to review the contents of the potentially relevant emails to discover whether they were significant. Moreover, although FBIHQ obtained no additional information about the emails from September 29 to October 27, when D was informed of the additional emails on October 27, he immediately notified Congress, suggesting he viewed the emails as potentially significant.[24]

### 4. The team's focus on the Russia investigation

You were assigned to lead the Russia investigation, which was extremely active during the September and October time period, when the emails on the Weiner laptop were found. You stated that the Russia investigation was a higher priority. However, as noted by the OIG, the FBI has more than 14,000 agents and others could have been tasked to assist.[25]

---

[24] D also indicated that had he been properly alerted to the emails in the beginning of October, and if he determined the review could be completed quickly, it may have caused him not to notify Congress, as he did on October 28, eleven days before the presidential election. D stated, "I don't know [if] it would have put us in a different place, but I would have wanted to have the opportunity."

[25] D acknowledged that using the same personnel on the FBI's two highest-profile and most demanding cases was a mistake. D told OIG investigators, "in hindsight I needed another Strzok and maybe I needed two teams." OPR agrees that different teams should have been assigned to the Clinton Email team and Russia investigation. The failure to more broadly staff the two investigations had a negative impact on the investigations and the FBI's reputation.

5. Legal impediments to reviewing the materials on the laptop

You stated that you knew NYO "couldn't review [the Clinton emails] because [that] was outside the scope of [NYO's] warrant." This knowledge should have spurred you to talk to the Clinton Email prosecutors about NYO's discovery on the laptop. The prosecutors could have started the search warrant application process immediately, instead of a month later. As discussed above, the FBI obtained little additional information about the emails from September 28 to October 28. Therefore, there is no reason they could not have obtained a search warrant earlier.

## ANALYSIS

### A. Unprofessional Conduct – Off Duty

According to FBI Offense Code 5.21, employees are prohibited from "[e]ngaging in conduct, while off duty, which dishonors, disgraces, or discredits the FBI; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers or his community."

Your excessive, repeated, and politically-charged text messages, while you were assigned as the lead case agent on the FBI's two biggest and most politically-sensitive investigations in decades, demonstrated a gross lack of professionalism and exceptionally poor judgment. Your misconduct has cast a pall over the FBI's Clinton Email and Russia investigations and the work of the Special Counsel. The immeasurable harm done to the reputation of the FBI will not be easily overcome. While "Trump is a fucking idiot," "I hate these people," "I need to fix it," "No he's not [going to become president]," and "We'll stop it," took less than a minute for you to transmit by text message, the long-term negative impact on the FBI cannot be overstated. Your vituperative text messages will be the subject of damning public discourse for days, months, and even years to come, and the FBI will be recipient of the expressed outrage.

You acknowledged: 1) you were aware of the significant public interest in and political ramifications of the Clinton Email and Russia investigations; 2) your text messages were monitored and preserved; and 3) disclosure of your messages would hurt the integrity of the FBI and the work on the Clinton Email and Russia investigations. You also said your conduct was a mistake "from the perspective of perception." Your argument that it would be difficult to "find a person [who] does not have an opinion about things of either a political or a public interest perspective" is misguided and irrelevant. The hypothetical person you refer to is not: (a) tasked as the lead investigator on the FBI's two biggest and most politically-sensitive investigations during a presidential election year; or (b) in a position to actually influence the investigation, alter investigative decisions, or potentially "stop" someone from becoming president. Your texting became a media sensation, cast doubt on the FBI's investigative findings and the Special Counsel's investigation, and brought harsh criticism upon the FBI from politicians at all levels of both political parties, President Trump, the media, and the public. Although you repeatedly denied that your investigative decisions in the Clinton Email and Russia investigations were the result of actual bias, the *appearance* of biased decision-making caused by your outrageous texts is as bad as if you had been biased.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 5.21 is substantiated.

## B. Security Violation – Other

According to FBI Offense Code 5.18, employees are prohibited from "[e]ngaging in an activity or conduct in violation of a security regulation or policy promulgated by the FBI, DOJ, or another authoritative agency, which has not been specifically delineated in another Offense Code." Pursuant to FBI policy, employees are prohibited from using personal e-mail services (such as Yahoo, Gmail, etc.) for government business.[26]

You admitted using your personal devices and email accounts to conduct FBI business. This is true even though you were provided appropriate FBI devices to conduct work outside of the office (cell phone, laptop, ERAS machine), and although personal email accounts are not secure and are not an authorized means of maintaining public records, which should have been apparent to you given your oversight of the Clinton Email investigation.

Based on a preponderance of the evidence, including your own admissions, I conclude the allegation that you violated Offense Code 5.18 is substantiated.

## C. Investigative Deficiency – Misconduct Related to Judicial Proceedings

According to FBI Offense Code 1.7, employees are prohibited from "[d]uring the investigative or litigative phases of a criminal or civil case, including a proceeding in a FISA Court or similar tribunal, engaging in conduct that dishonors, disgraces, discredits, or otherwise brings the integrity or reliability of the FBI into question."

You failed to diligently follow a significant and credible lead when new information was brought forth regarding the Clinton Email investigation.[27] After being asked by OIG investigators who was responsible for following up on the Weiner laptop, DD said he believed you "w[ere] actually doing it." Without any reasonable or proper follow-up, you wrongly assumed other staff members were processing the new evidence. Your September 28, 2016 text exchange with GA is clear evidence that you knew there were "hundreds of thousands of emails" from Abedin discovered on the Weiner laptop. You acknowledged that you knew NYO did not have the legal authority to view the emails. Yet you took no action to determine the significance of those emails or obtain a search warrant until a month later. You were finally prompted to take action when SDNY contacted DOJ. The OIG harshly criticized the FBI for failing to take proper

---

[26] *See, e.g.,* Rules of Behavior for General Users Agreement Form (FD-889) expressly prohibiting anyone with access to the FBI Information Technology (IT) and Information Systems (IS) from using "personal e-mail services (such as Yahoo, Gmail, etc.) for government business," and FBI Information System Use Policy (Policy Directive 0922D), effective September 12, 2016, requiring any user of the FBI IT/IS system to "[a]cknowledge reading, understanding, and complying with this policy by signing the FD-889."

[27] OPR notes that the Clinton Email investigation was a criminal investigation, and included the use of witness interviews, grand jury subpoenas, search warrants, and 2703(d) orders (court orders for non-content email information) to obtain various evidence. Accordingly, your misconduct in the Clinton Email investigation is being adjudicated under Offense Code 1.7.

investigative steps for approximately one month and noted that the eventual actions taken by the FBI at the end of October 2016 were based on facts known to the FBI at the end of September 2016.

As discussed above, your explanations for the delay are unpersuasive. Faster action should have been taken to review the laptop's emails. Even more troubling, however, your text messages ("Trump is a fucking idiot," "I hate these people," "I need to fix it," "No he's not [going to become president]," "We'll stop it") have created justifiable questions as to whether your decision to prioritize the Russia investigation over following up on the Weiner laptop emails was free from bias. As the lead case agent assigned to the Clinton Email team, your inaction significantly tarnished the integrity of the Bureau.

Based on a preponderance of the evidence, including your own admissions, I conclude the allegation that you violated Offense Code 1.7 is substantiated.

## PENALTY DETERMINATION

When proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

The investigation establishes you violated FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty). The standard penalty is a five-day suspension. Mitigating factors warrant an oral reprimand to a three-day suspension. Aggravating factors warrant a seven-day suspension to dismissal.

The investigation establishes you violated FBI Offense Code 5.18 (Security Violation – Other). The standard penalty is a five-day suspension. Mitigating factors warrant an oral reprimand to a three-day suspension. Aggravating factors warrant a seven- to 30-day suspension.

The investigation establishes you violated FBI Offense Code 1.7 (Investigative Deficiency – Misconduct Related to Judicial Proceedings). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension. Aggravating factors warrant a ten-day suspension to dismissal.

I have considered all mitigating factors supported by the record, including, but not limited to, your 21 years of FBI service, strong performance record, and numerous awards. I am also cognizant of the fact that you were assigned to two very stressful and high-profile investigations during the time of your misconduct. Nevertheless, severe aggravation is warranted because your inappropriate text messages were extensively covered by the media and brought extreme criticism on the FBI and DOJ. Your conduct also caused immeasurable harm to the Bureau's reputation with DOJ, other government officials, and the American public. Potential harm to the Bureau's reputation is listed as an aggravating factor for all misconduct in the Penalty Guidelines. Your inappropriate political comments on your FBI-issued cell phone resulted in skepticism about major investigative conclusions in an extremely high-profile case

and required you to be removed for just cause from the Special Counsel's investigation. Your actions were juvenile and showed extremely poor judgment.

In addition, your use of your personal devices and personal email account to conduct FBI business paralleled the very nature of the case you were tasked to investigate. Ironically, you characterized Clinton's use of a private email server to conduct government business as "ill-advised," "really dumb," and "borderline" criminal. The level of hypocrisy seen in your conduct is staggering and further calls into question your judgment. Your impermissible use of your private email to conduct official FBI business in a matter that involved a possible misuse of a private server and email accounts to conduct government business created a strong likelihood that the public image of the FBI would be significantly tarnished, and the investigative conclusions of one of the FBI's largest cases would be called into question. The Penalty Guidelines specifically call for aggravation under Offense Code 5.18 for matters that compromise a case or have a negative impact on the FBI. Your use of personal devices and a personal email account to work on sensitive material also created a significant security risk.

Finally, following the discovery of potentially significant new evidence in the Clinton Email matter, your lack of a proper oversight and diligent follow through created an enormous embarrassment to the Bureau and has been cited by many as having altered the results of a presidential election. The Penalty Guidelines specifically call for aggravation under Offense Code 1.7 for matters that bring judicial criticism. While there was no specific judicial criticism in this matter, the OIG's criticism of your investigative actions and decisions is analogous. In further aggravation, you are a supervisor and, as such, held to a higher standard, and you have a prior substantiated administrative inquiry. Based on the circumstances of this case, I propose dismissing you for your 5.21, 5.18 and 1.7 offenses.

## CONCLUSION

In sum, I propose dismissing you from the rolls of the FBI. The Assistant Director (AD) of the Office of Professional Responsibility (OPR) will make the final decision in this matter after consideration of your written and/or oral response(s), should you choose to submit either or both.

## PROCEDURAL PROTECTIONS

(1) This Statement of Proposed Action provides you thirty calendar days' advance written notice of the proposed action.

(2) You may contact and use an attorney to assist in the disciplinary matter, subject to limitations imposed by law and regulation regarding the disclosure of classified or sensitive information. The FBI will not be responsible for payment of any attorney's fee or other expense you incur in connection with an attorney's representation of your interests associated with a disciplinary matter or an appeal of a disciplinary sanction.

(3) You have ten calendar days from the date of receipt of this notice to make a written request to review the material which was relied upon by OPR's proposing official. Copies of such

material will be redacted in accordance with civil discovery policy and procedures. These documents are the property of the FBI and will be made available for review for a reasonable amount of time by you and/or your attorney within the FBI office space and control. You may take notes, but you may not make copies.

(4) You and/or your attorney may provide a written response to the proposed action. Your written response may include affidavits or other documents of choice, and it may identify witnesses or documentary sources of exculpatory evidence.[28] Your written response must be submitted within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Due to mail delays associated with security procedures, you must send your response by facsimile to OPR, Adjudication Unit II, WB-410, at 202-436-7887 or 202-436-7455, or by email to Unit Chief Jessica Loreto at jaloreto@fbi.gov.

(5) In addition to, or in lieu of, submitting a written response, you may request an oral presentation which, at your election, will be made telephonically, in person, or by video teleconference to the Assistant Director of OPR. You must request an oral presentation, in writing, within ten calendar days after your receipt of the proposed action or after you have been provided access to the material described in (3) above, whichever occurs later. Upon receipt of your written request for an oral presentation, OPR will provide you at least fifteen days' notice of the presentation date. If you are submitting a written response in addition to making an oral presentation, the oral presentation will be scheduled for a date after the deadline date for OPR's receipt of your written response. During your presentation, you and/or your attorney may present oral testimony or evidence, including any information, affidavits, and other documentation deemed pertinent to your case. The testimony of witnesses is not allowed. Any travel and/or attorney costs incurred as part of your oral presentation are your responsibility. For WebTA, employees in duty status may treat a reasonable amount of file review time, and the time spent during the oral hearing, as part of their official duties and record it as regular hours.

---

[28] You are admonished not to discuss this matter with anyone other than the Inspection Division's Internal Investigations Section (IIS), OPR, the Human Resources Branch's Office of Disciplinary Appeals (ODA), the Security Division, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from IIS (during the investigative stage of the proceedings), OPR (during the adjudicatory stage of the proceedings), or ODA (during the appeal). This prohibition applies to persons from whom you would like to solicit a character reference. If you would like OPR to consider a character reference, provide the undersigned OPR Unit Chief with the person's name, position, and contact information. OPR will determine whether a character reference from the listed individuals would enhance the investigative record and, if so, OPR will solicit the character reference. Absent exceptionally compelling circumstances, OPR will not solicit a character reference from a subordinate on behalf of a supervisor. If you believe additional witnesses need to be interviewed or other additional evidence needs to be obtained, you may direct that request to IIS (during the investigative stage of the proceedings) or include the request in your written response to OPR (during the adjudicatory stage of the proceedings). **If you contact any witness or potential witness during the adjudicatory stage without OPR permission, you can expect to be referred to IIS for Obstruction of Administrative Matter. If counsel does so, counsel and counsel's firm can expect to be prohibited from reviewing the investigative file, submitting a written response, and participating in the oral presentation to OPR.** In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

Mr. Peter P. Strzok II

Employees in duty status may also treat up to one hour prior to the hearing and up to one hour after the hearing as part of their official duties if that time is actually spent preparing for the hearing or discussing the hearing with counsel. Employees in non-duty status are not entitled to use official time to review their file or attend their oral presentation.

(6) You will receive a written decision letter from the AD, OPR, after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision. This decision letter will be delivered to you as soon as practicable following completion of the disciplinary process described above.

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this administrative inquiry will be shared with other divisions, as appropriate. Thus, a copy of this communication is being provided to the Security Division as it may be relevant to your retention of a Top Secret security clearance. Information regarding this inquiry will also be provided to the Special Agent Mid-Level Management Selection Board and/or the Director for their consideration on any future promotion or other action requiring their recommendation.

Sincerely yours,

Jessica A. Loreto, Chief
Adjudication Unit II
Office of Professional Responsibility