# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-2367-ABJ |
| | ) | |
| WILLIAM P. BARR, in his official capacity | ) | |
| as Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (ECF No. 30)

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS AND LEGAL STANDARDS ........................................................... 4

ARGUMENT ................................................................................................................................. 6

I.     THE COURT SHOULD DENY THE MOTION FOR SUMMARY JUDGMENT OR
       DEFER RULING UNTIL AFTER DISCOVERY ........................................................... 6

II.    THE MOTION TO DISMISS THE FIRST AMENDMENT CLAIM MUST BE
       DENIED .......................................................................................................................... 8

       A.     The Complaint Plausibly Alleges Retaliatory Firing Based on Strzok's
              Viewpoint ............................................................................................................... 8

       B.     Concerns Over Disruption Did Not Actually Motivate Strzok's Termination ..... 10

       C.     *Pickering* Balancing Favors Strzok's Right to Free Speech ................................ 15

              1.     Strzok Engaged in the Most Protected Type of Speech ............................ 15

              2.     Private Speech on a Matter of Public Concern Is Presumptively
                     Protected ................................................................................................ 18

              3.     There Is Little on the Employer's Side of the *Pickering* Ledger .............. 20

                     (a)     There Is No Actual Evidence of Disruption ................................. 20

                     (b)     Strzok's Position in the FBI Does Not Leave Him Unprotected .. 23

III.   MR. STRZOK HAS STATED A VIABLE FIFTH AMENDMENT CLAIM ................. 27

IV.    MR. STRZOK HAS PLEADED AND WILL ULTIMATELY PREVAIL ON HIS
       PRIVACY ACT CLAIM ................................................................................................ 33

       A.     Strzok Must Be Afforded Discovery on His Privacy Act Claim .......................... 34

       B.     Defendants' Legal Arguments Are Either Wrong or Subject to Refutation by
              Evidence to be Obtained in Discovery .................................................................. 36

              1.     The Privacy Act Applies to the Disclosure of DOJ Records to the
                     White House and through the White House to Others ............................. 37

              2.     Disclosing Employees' Private Communications to the Press Is Not a
                     "Routine Use" of OIG's Investigative Records ........................................ 38

i

3.    Plaintiff Will Show that the DOJ Willfully and Intentionally Violated
          the Privacy Act.......................................................................................... 41

V.    CONCLUSION.................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
  691 F. Supp. 2d 182 (D.D.C. 2010) ............................................................................. 38

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
  830 F.2d 294 (D.C. Cir. 1987) .................................................................................... 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................................... 6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................................... 4

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013) ...................................................................................... 17

*Boddie v. Dep't of Navy*,
  827 F.2d 1578 (Fed. Cir. 1987) .................................................................................. 31

*Britt v. Naval Investigative Serv.*,
  886 F.2d 544 (3d Cir. 1989) ................................................................................. 38, 39

*Bross v. Dep't of Commerce*,
  389 F.3d 1212 (Fed. Cir. 2004) .................................................................................. 31

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) .................................................................................................... 31

*Connick v. Myers*,
  461 U.S. 138 (1983) .............................................................................................. *passim*

*Convertino v. U.S. Dep't of Justice*,
  684 F.3d 93 (D.C. Cir. 2012) ................................................................................ *passim*

*Czekalski v. Peters*,
  475 F.3d 360 (D.C. Cir. 2007) ............................................................................... 5, 33

*Czurlanis v. Albanese*,
  721 F.2d 98 (3d Cir. 1983) ......................................................................................... 22

*Davis v. Billington*,
  51 F. Supp. 3d 97 (D.D.C. 2014) .......................................................................... 20, 26

*Dinh Tran v. Dep't of Treasury*,
    351 F. Supp. 3d 130 (D.D.C. 2019) ....................................................................... 39

*Doe 2 v. Esper*,
    No. CV 17-1597 (CKK), 2019 WL 4394842 (D.D.C. Sept. 13, 2019) ..................................... 43

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ........................................................................... 39

*Dougherty v. Sch. Dist. of Phila.*,
    772 F.3d 979 (3d Cir. 2014) ...................................................................... 8, 15, 22

*Durham v. Jones*,
    737 F.3d 291 (4th Cir. 2013) .............................................................................. 22

*Elec. Frontier Found. v. U.S. Dep't of Justice*,
    739 F.3d 1 (D.C. Cir. 2014) ............................................................................... 43

*Evans v. Sebelius*,
    716 F.3d 617 (D.C. Cir. 2013) ..................................................................... 5, 33, 42

*First Chi. Int'l v. United Exchange Co.*,
    836 F.2d 1375 (D.C. Cir. 1988) ............................................................................ 7

*Foster v. Ripley*,
    645 F.2d 1142 (D.C. Cir. 1981) ........................................................................... 16

*Gerstein v. C.I.A.*,
    No. C 06-4643 MMC, 2011 WL 89337 (N.D. Cal. Jan. 11, 2011) .......................................... 40

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
    218 F.3d 337 (4th Cir. 2000) ............................................................................. 22

*Gonzalez v. Benavides*,
    774 F.2d 1295 (5th Cir. 1985) ............................................................................ 22

*Gordon v. Town of Hunter*,
    No. 91-CV-0305, 1996 WL 77391 (N.D.N.Y. Feb. 16, 1996) .................................................. 7

*Gustafson v. Jones*,
    117 F.3d 1015 (7th Cir. 1997) ............................................................................ 15

*Hall v. Ford*,
    856 F.2d 255 (D.C. Cir. 1988) .................................................................... 21, 23, 24

*Haverda v. Hays County*,
    723 F.3d 586 (5th Cir. 2013) ............................................................................. 17

*Herron v. Fannie Mae*,
    861 F.3d 160 (D.C. Cir. 2017) ............................................................................. 4

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ...................................................................................... 14

*Ideal Elec. Sec. Co. v. Int'l Fid. Ins.*,
    129 F.3d 143 (D.C. Cir. 1997) ........................................................................... 42

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
    138 S. Ct. 2448 (2018) ........................................................................................ 9

*Kelley v. F.B.I.*,
    67 F. Supp. 3d 240 (D.D.C. 2014) ..................................................................... 38

*Khan v. Parsons Glob. Servs., Ltd.*,
    428 F.3d 1079 (D.C. Cir. 2005) ........................................................................... 7

*Kissinger v. Reporters Comm. for Freedom of the Press*,
    445 U.S. 136 (1980) .......................................................................................... 38

*Lamb v. Miller*,
    660 F.2d 792 (D.C. Cir. 1981) ............................................................. 33, 40, 42

*Lerner v. District of Columbia*,
    362 F. Supp. 2d 149 (D.D.C. 2005) ................................................................... 30

*Lesar v. U.S. Dep't of Justice*,
    636 F.2d 472 (D.C. Cir. 1980) ........................................................................... 40

*Link v. Dep't of Treasury*,
    51 F.3d 1577 (Fed. Cir. 1995) ........................................................................... 28

*Locurto v. Giuliani*,
    447 F.3d 159 (2d Cir. 2006) .............................................................................. 11

*Lopez v. FAA*,
    318 F.3d 242 (D.C. Cir. 2003) ........................................................................... 30

*Matherne v. Wilson*,
    851 F.2d 752 (5th Cir. 1988) ............................................................................. 22

*Maydak v. United States*,
    630 F.3d 166 (D.C. Cir. 2010) ..................................................................... 41, 42

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) .......................................................................................... 17

*Meyer v. Grant,*
  486 U.S. 414 (1988) ............................................................................................ 8, 15

*N.Y. Times v. Sullivan,*
  376 U.S. 254 (1964) ................................................................................................ 26

*Nagle v. Marron,*
  663 F.3d 100 (2d Cir. 2011) .................................................................................... 10

*Navab-Safavi v. Broad. Bd. of Governors,*
  650 F. Supp. 2d 40 (D.D.C. 2009) ........................................................................... 18

*Navab-Safavi v. Glassman,*
  637 F.3d 311 (D.C. Cir. 2011) ................................................................................. 27

*Ortiz-Diaz v. U.S. Dep't of Housing & Urban Dev., Office of Inspector Gen.,*
  867 F.3d 70 (D.C. Cir. 2017) ..................................................................................... 5

*Parkinson v. Dep't of Justice,*
  874 F.3d 710 (Fed. Cir. 2017); ................................................................................ 30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983) ................................................................................................... 14

*Perry v. Sindermann,*
  408 U.S. 593 (1972) ................................................................................................. 28

*Pickering v. Board of Education,*
  391 U.S. 563 (1968) ......................................................................................... *passim*

*Pilon v. U.S. Dep't of Justice,*
  73 F.3d 1111 (D.C. Cir. 1996) ................................................................................. 39

*Rankin v. McPherson,*
  483 U.S. 378 (1987) ................................................................................. 9, 10, 18, 19

*Reed v. Dep't of the Navy,*
  910 F. Supp. 2d 32 (D.D.C. 2012) ........................................................................... 43

*Richardson v. Bd. of Governors of Fed. Reserve Sys.,*
  248 F. Supp. 3d 91 (D.D.C. 2017) ........................................................................... 40

*Richardson v. Bd. of Governors of Fed. Reserve Sys.,*
  288 F. Supp. 3d 231 (D.D.C. 2018) ......................................................................... 40

*Rosenberger v. Rector & Visitors of the University of Virginia,*
  515 U.S. 819 (1995) ................................................................................................. 14

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ................................................................................................ 42

*Sagar v. Lew*,
    309 F.R.D. 18 (D.D.C. 2015) ................................................................................. 7

*Sheppard v. Beerman*,
    94 F.3d 823 (2d Cir. 1996) ................................................................. 2, 8, 10, 11

*Steele v. Mattis*,
    899 F.3d 943 (D.C. Cir. 2018) .............................................................................. 5

*Stone v. F.B.I.*,
    727 F. Supp. 662 (D.D.C. 1990) ......................................................................... 40

*Stough v. Gallagher*,
    967 F.2d 1523 (11th Cir. 1992) ..................................................................... 15, 17

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ............................................................................... 9

*Thompson v. District of Columbia*,
    428 F.3d 283 (D.C. Cir. 2005) ............................................................... 8, 9, 15, 21

*Tijerina v. Walters*,
    821 F.2d 789 (D.C. Cir. 1987) ............................................................................ 41

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    9 F.3d 138 (D.C. Cir. 1993) ................................................................................ 34

*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995) ............................................................................................ 17

*Waters v. Churchill*,
    511 U.S. 661 (1994) ............................................................................... 2, 10, 16, 21

*Waters v. Thornburgh*,
    888 F.2d 870 (D.C. Cir. 1989) ............................................................................ 42

*Winder v. Erste*,
    566 F.3d 209 (D.C. Cir. 2009) ............................................................................ 25

**Statutes**

5 U.S.C. § 552 ..................................................................................................... 37

5 U.S.C. § 552a .................................................................................. 34, 35, 37, 39, 41

5 U.S.C. § 7511 ................................................................................................... 29

5 U.S.C. § 7513 ................................................................................................................... 29

**Rules**

72 Fed. Reg. 36,725 ....................................................................................................... 35, 39

Fed. R. Civ. P. 56(d) .......................................................................................................... 6

"These were dirty people.  These were bad people.  These were evil people, and I hope that someday I'm going to consider it my greatest, or one of my greatest achievements, getting rid of them."  SOGI[1] ¶ 59u.  These were the words that President Trump used just last week to describe to reporters his pride in ensuring the termination of FBI employees, including Plaintiff Peter Strzok, who played significant roles in the investigation of the Russian Government's efforts to undermine the 2016 Presidential elections in Trump's favor.  Those recent comments echoed vitriolic statements President Trump made about Mr. Strzok before and after he was fired in settings from press conferences to Twitter to campaign rallies.  Mr. Strzok's Complaint alleges that his firing by the Deputy Director of the FBI after Mr. Strzok had already entered into a binding agreement to accept demotion and suspension was indeed a politically-motivated achievement of President Trump and his political allies tied to a politically-motivated effort to use Mr. Strzok's text messages to discredit investigations of the President and his campaign.  Yet Defendants' Motion to Dismiss or for Summary Judgment ("Motion") ducks the whole question of whether, in violation of the First Amendment, Mr. Strzok was fired because of the content of his speech.

In fact, Defendants' Motion is as notable for what it doesn't include as for what it does.  Although Defendants attach declarations from officials who played no role in Mr. Strzok's termination, they omit any Declaration from Deputy Director Bowdich, the man who actually fired Mr. Strzok, or the as-yet-unidentified high-ranking Department of Justice official who approved the release of the text messages to the media.  Although the Complaint in this case clearly alleges unconstitutional discrimination based on viewpoint for the disparate manner in

---

[1]      "SOGI" refers to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts and Plaintiff's Statement of Genuine Issues.

which this Administration treats speech praising and speech criticizing the President, this goes entirely unaddressed in Defendants' Motion.

As an initial matter, the First Amendment claim here cannot be dismissed based on the balancing framework supplied by *Pickering v. Board of Education*, 391 U.S. 563 (1968), as Defendants argue, because firing an employee for the content of his or her non-public communications is unconstitutional, irrespective of any balancing of interests. As the Second Circuit has aptly stated, "even if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only *because of* the potential disruption, and *not because of* the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is always unconstitutional." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996) (emphasis in original) (citing *Waters v. Churchill*, 511 U.S. 661, 681–82 (1994)).

The Complaint describes an orchestrated campaign by the President of the United States to pressure the FBI into firing Strzok because of the content of his speech (i.e., his viewpoint). That claim is unquestionably plausible; indeed, it is bolstered by a seemingly endless stream of decidedly unpresidential tweets, President Trump's accusations that Strzok committed "treason," and by contemporaneous news accounts of the President personally imploring the Attorney General and the FBI Director to fire Strzok. Compl. ¶¶ 45–47. That campaign succeeded when the Deputy Director of the FBI, David Bowdich, overturned the final decision of the duly designated "deciding official," Office of Professional Responsibility ("OPR") Assistant Director Candice Will ("AD Will"), who had been meting out punishment at the FBI for over a decade, and who had determined that the FBI's mission was best served by *not* firing Strzok. Compl.

¶¶ 32–36, 48.  Before the President's public demonization of Strzok, Bowdich had reassured Strzok that the disclosure of the texts would *not* end his career with the FBI.  Compl. ¶ 44; SOGI Ex. N ¶ 4.  Thus, even if the government could show that the *Pickering* balancing of interests governs this case and tips in its favor (and it does not), there is still a material dispute over whether Bowdich actually fired Strzok due to genuine concerns about disruption, or instead to bow to the retaliatory animus of a vengeful President.

Further, Defendants' alternative motion for summary judgment is premature.  Mr. Strzok is entitled to develop a full factual record through discovery before the court weighs the competing interests or addresses the disputed motives for Defendants' disregard of Strzok's rights.  Once a motion seeking summary judgment is actually ripe for review, the Court must view all disputed facts and inferences in *Strzok's favor*, an obligation the government pays lip service to, then ignores.

The Court should also deny the Motion with respect to the denial of due process and Privacy Act claims.  Defendants refused to afford Strzok the appeal procedures set forth in their own policies, and refused to abide by the final decision of the duly designated appointed official who was responsible for determining the level of discipline that best served the agency's interests.  These facts state a plausible claim under the Fifth Amendment.  Defendants' motion for summary judgment on Strzok's Privacy Act claim raises more questions than it answers about the government's unprecedented disclosures of records about Strzok to the media.  Defendants' rather bizarre Privacy Act arguments aim to protect the White House from liability (although it is not a Defendant) and assert that the disclosures to the press were "routine" (they weren't) on the basis of two pre-discovery declarations from DOJ lawyers who did not make the decision to release the texts to the media.  Moreover, the extremely limited information that the

Department has previously released in response to FOIA requests suggests that the relevant portions of these declarations are misleading, at best.

Defendants' Motion is a remarkable document.  Defendants contend that they should win at the starting gate.  They demand victory not only without a trial, but without even allowing Strzok to obtain discovery, even on the count that they concede states a claim.  If Defendants are correct, there is no remedy, and indeed no administrative or judicial review, for a career federal employee who is fired for privately expressing political opinions deemed to be disloyal to the President even *after* the FBI official responsible for the Bureau's disciplinary process decided that termination was *not* the appropriate consequence.  This would subject thousands of mid-level managers in the federal government to punishment for expressing their opinions about candidates for national office in private water cooler conversations.  There is no precedent supporting this terrifying argument.

## STATEMENT OF FACTS AND LEGAL STANDARDS

The facts of this case pertinent to the instant motion to dismiss are fully set forth in the Complaint and must be accepted as true.  The only question raised by Defendants' motion to dismiss is whether those facts raise plausible claims under the First and Fifth Amendments.  A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's claims, not the merits, the facts, or the defenses.  *See Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  All of the claims pled in the Complaint here are plausible.

As noted, Defendants also move for summary judgment with respect to all three claims, introducing into the record a few documents and two self-serving declarations.  No discovery has

been taken in this case, and the law in this Circuit is clear that a party must be afforded the opportunity to develop a complete factual record where necessary to respond to a summary judgment motion, as it is here. *See Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). Accordingly, the Court should deny the motion for summary judgment or defer ruling until discovery has been completed and Plaintiff is able to oppose the motion with the benefit of a fully developed record. Pursuant to Local Civil Rule 7(h), Plaintiff is also filing a Statement of Disputed Material Facts, which demonstrates the scope of the factual disputes that exist.

In ruling upon any motion for summary judgment, the Court must resolve all factual disputes in Plaintiff's favor and draw all inferences from those facts on his behalf. This is particularly important where, as here, issues of motive and intent predominate. *Ortiz-Diaz v. U.S. Dep't of Housing & Urban Dev., Office of Inspector Gen.*, 867 F.3d 70, 80 (D.C. Cir. 2017) (reversing summary judgment on Title VII race claim and hoping its decision "will serve as a shot across the bow that courts in this Circuit must adhere to the summary judgment standard and not prematurely reject evidence that a jury could reasonably credit"); *Evans v. Sebelius*, 716 F.3d 617, 622–23 (D.C. Cir. 2013) (where evidence offered two "competing views" of motive, "this is precisely the type of factual dispute that 'must be resolved in a jury room rather than in the pages of the Federal Reporter.'" (quoting *Czekalski v. Peters*, 475 F.3d 360, 362 (D.C. Cir. 2007))); *Steele v. Mattis*, 899 F.3d 943, 952 (D.C. Cir. 2018) (overturning the erroneous grant of summary judgment, and emphasizing that its "humble" task is to "ask only whether, taking all of the evidence together, it would as a matter of law be irrational for jurors to disbelieve the College's assorted rationales and to credit Dr. Steele's version of events").

**ARGUMENT**

## I. THE COURT SHOULD DENY THE MOTION FOR SUMMARY JUDGMENT OR DEFER RULING UNTIL AFTER DISCOVERY

This case presents critical issues of intent, motive, and, according to Defendants, the balancing of constitutional rights.  To the extent that the government seeks to dispose of the case through a Rule 12(b) motion to dismiss, those issues can be resolved on the well-pleaded facts in the Complaint.  As explained *infra* at Sections II–III, Plaintiff has raised plausible claims and Defendants' motion should be denied.  But to the extent that Defendants also ask the Court to find that no material dispute of fact exists that would ever warrant a trial, it is far too early for the Court to address that argument.

Generally speaking, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986).  Ordinarily, a defendant waits until after the close of discovery to move for summary judgment, and even then, the rules permit the opposing party to seek additional discrete information needed to address the arguments by filing a Rule 56(d) declaration.  *See, e.g.*, *Convertino*, 684 F.3d at 102.  Here, of course, the Court has not yet even set up a discovery schedule, no discovery has been taken, and Plaintiff has had no opportunity to develop a factual record to counter the government's premature bid for judgment without a trial.

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; [or] (2) allow time to . . . take discovery . . . ."  *Convertino* explains that a Rule 56(d) motion must be granted where the nonmovant submits an affidavit that satisfies three criteria:

> First, it must outline the particular facts he intends to discover and describe why those facts are necessary to the litigation. Second, it must explain why he could not produce the facts in opposition to the motion for summary judgment. Third, it must show the information is in fact discoverable.

684 F.3d at 99–100 (brackets, quotation marks, and citations omitted).   The Goelman Declaration, submitted with this opposition, outlines the central areas of discovery that are necessary to respond to the instant motion for summary judgment and easily meets the applicable Rule 56(d) standard.   The D.C. Circuit has explained that a "motion requesting time for additional discovery [under Rule 56(d)] should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence'" and that "summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'"   *Id.* at 99; *see also Khan v. Parsons Glob. Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (overturning a district court's grant of summary judgment and noting "[t]he court has long recognized that a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion."); *First Chi. Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380–81 (D.C. Cir. 1988); *Sagar v. Lew*, 309 F.R.D. 18, 20 (D.D.C. 2015).

As set forth in the Goelman Declaration, there is a wealth of information that Strzok has not yet had access to, but which will be discoverable.   Until a full factual record is developed to adequately address the rationale of the DOJ official who made the decision to disclose the texts to the media, the actual motivation behind Strzok's firing, and the appropriate balancing of interests under *Pickering* that Defendants contend is necessary, the Court should defer ruling on the motion for summary judgment.   *See, e.g., Gordon v. Town of Hunter*, No. 91-CV-0305, 1996 WL 77391, at *8 (N.D.N.Y. Feb. 16, 1996) (denying summary judgment in *Pickering* case and

noting "[t]he amount of disruption that [plaintiff] may have caused and the impact his behavior had on his working relationships are complex issues that must be determined after listening to witnesses and after plaintiff has had an opportunity for cross-examination.").

## II. THE MOTION TO DISMISS THE FIRST AMENDMENT CLAIM MUST BE DENIED

### A. The Complaint Plausibly Alleges Retaliatory Firing Based on Strzok's Viewpoint

Plaintiff has alleged viewpoint discrimination based on Defendants' retaliatory termination of his employment. "To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014). If both elements are proven, the burden "shifts . . . to the employer to prove that . . . the same action would have been taken even if the speech had not occurred." *Id.* Retaliatory discharges are "*always unconstitutional*." *Sheppard*, 94 F.3d at 827 (emphasis added).

Federal employees do not lose the ordinary protection against government punishment for speech when they accept employment, and Mr. Strzok's private text messages expressing political views are protected by the First Amendment. *See Meyer v. Grant*, 486 U.S. 414, 422–425 (1988); *Thompson v. District of Columbia*, 428 F.3d 283, 285 (D.C. Cir. 2005). The complaint alleges, and it is far more than plausible given President Trump's public statements, that Strzok was fired, rather than suspended and demoted by agreement, because of the views he expressed. There is little doubt that if Strzok's text messages had expressed animus toward Secretary Clinton and reverence for Candidate Trump, he would still be employed by the FBI. Defendants have offered no response to the allegation of viewpoint discrimination because they have none.

Instead, Defendants' motion is centered on *Pickering* balancing, but even had Defendants not committed the standalone First Amendment violation by practicing viewpoint discrimination, the *Pickering* balancing test is intended to apply where an employee speaks out publicly, which did not occur here.   *Pickering* and its progeny do not apply (or must invariably favor the employee and therefore need not be applied) where a public employee is terminated based on a private conversation about matters of public concern.[2]   As Justice Powell explained in an opinion concurring in a decision to allow a First Amendment challenge to the firing of an employee for political speech (in a case where the parties had assumed the applicability of *Pickering*):

> There is no dispute that McPherson's comment was made during a *private conversation with a co-worker who happened also to be her boyfriend.* She had no intention or expectation that it would be overheard or acted on by others. Given this, *I think it is unnecessary to engage in the extensive analysis normally required* by *Connick v. Myers* and *Pickering v. Board of Education*. If a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for *this type of private speech that routinely takes place at all levels in the workplace.*

*Rankin v. McPherson*, 483 U.S. 378, 393 (1987) (Powell, J., concurring) (emphasis added) (citations omitted).  Notably, Defendants cite no cases applying *Pickering*'s balancing test to the type of private conversation at issue here.

---

[2]     This Circuit has applied a four-factor *Pickering* analysis in determining when public employees' speech is protected for the purpose of retaliation claims, but only where the speech was public or directed to workplace superiors or the government.  *See Thompson v. District of Columbia*, 428 F.3d 283, 285 (D.C. Cir. 2005); *Tao v. Freeh*, 27 F.3d 635, 638, 640 (D.C. Cir. 1994); *cf. Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2472 (2018) ("[T]he *Pickering* framework was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'").  Here, Strzok's speech was intended to remain private and, on its own, had no impact on his professional responsibilities.

**B.      Concerns Over Disruption Did Not Actually Motivate Strzok's Termination**

The *Pickering* balancing of interests allows a government employer to avoid liability if it fired an employee due to genuine concerns about the disruptive influence of his speech on a matter of public concern, but only if the employer's interests in the efficiency of its operations outweighed the plaintiff's interest in free speech. *Pickering*, 391 U.S. at 568. That is a fact-based and context driven exercise; but the exercise *presumes* that the employer actually was motivated by concerns about disruption. If it were not—if the professed concerns were merely a pretext to cover retaliatory animus over the content of the employee's speech about a matter of public importance—then *Pickering* balancing provides no shield. *See Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011) ("no reasonable official could think that such speech-retaliatory conduct was constitutionally permissible"). As the Supreme Court cautioned in *Rankin v. McPherson*, 483 U.S. 378, 384 (1987), "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *See also Waters*, 511 U.S. at 681 (reversing a grant of summary judgment where a jury could have found that the government employer "actually fired Churchill not because of the disruptive things she said . . . , but because of nondisruptive statements about cross-training that they thought she may have made in the same conversation").

In the wake of *Rankin* and *Waters v. Churchill*, 511 U.S. 661 (1994), courts have held that regardless of *Pickering* balancing, an employer who asserts disruption as a pretext to punish a worker because of the content of the speech violates the First Amendment. In *Sheppard v. Beerman*, 94 F.3d 823 (2d Cir. 1996), for example, a court clerk spoke out about concerns regarding corruption by his employer, a New York State Supreme Court judge, and claimed to have notes that he would release to the public. The judge contended that the employee had been

10

insubordinate and disruptive during the confrontation in which the speech occurred, and that it could lawfully fire him for the disruptive speech (an interest outweighing any free speech concerns).  The district court agreed and granted summary judgment.  The Court of Appeals reversed, noting:

> According to Sheppard's complaint, Beerman expressed deep concern over Sheppard's claim to have kept notes detailing Beerman's instances of public corruption, and the possibility that those notes would be made public. And, after firing Sheppard, Beerman seized Sheppard's personal files, and inspected them before returning them to Sheppard. If substantiated through discovery, these facts may tend to show that Beerman's actual motive for firing Sheppard was the content of his speech, and not Beerman's fear that Sheppard would disrupt the office working environment.

*Sheppard*, 94 F.3d at 828.  Based on this, the Court held that "even if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only *because of* the potential disruption, and *not because of* the speech.  That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is *always* unconstitutional." *Id.* at 827 (emphasis modified).  The Second Circuit applied the same test in *Locurto v. Giuliani*, 447 F.3d 159, 172–73 (2d Cir. 2006), also cited by Defendants: A government employer may fire an employee for speaking on a matter of public concern if: "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) *the employer took action against the employee based on this disruption and not in retaliation for the speech*."  (emphasis added).

Here, Strzok has plausibly pled that the concern about disruption professed by Deputy Director Bowdich was *not* the actual motivation for his discharge, and that it was a pretext for reprisal.  More precisely, the President was irate over what he considered to be disloyal and

unflattering remarks about his fitness for office, and demanded Strzok's head, and Bowdich decided that he had to fire Strzok to placate the President.  Compl. ¶ 44.

Strzok is only required to show that his claim is plausible at this stage, but the limited available evidence suggests that his claim will succeed.  He had a distinguished career that spanned more than twenty years during which, Defendants note, he "performed with distinction and gained the respect of his superiors."  Compl. ¶¶ 14–16; Motion at 1.[3]  Two lengthy and exhaustive investigations by the DOJ Office of the Inspector General ("OIG") concluded that Strzok's political opinions had no impact on his work.  Compl. ¶ 32; SOGI ¶¶ 53, 59c, 59p.  The authority to discipline Strzok was held by Candice Will, the Assistant Director of the FBI's Office of Professional Responsibility.  The FBI's published disciplinary policies call for a standard penalty of a 5-day suspension for a first infraction of its policy.  Compl. ¶ 28.  Will carefully considered the entire record, determined that a 60-day suspension and demotion of Strzok out of the SES was the appropriate disciplinary action, presented a "Last Chance Agreement" ("LCA") memorializing those terms to Strzok (which he accepted), and issued a final decision to that effect on August 8, 2018.  Compl. ¶¶ 30, 33–36.

Deputy Director David Bowdich initially assured Strzok that the text messages would not end his career with the FBI.  Compl. ¶ 44.  Bowdich reversed course and fired Strzok on August 9, 2018.  Compl. ¶ 37.  This was after a sustained and public campaign by the President demanding that the FBI fire Strzok, as well as at least one reported non-public demand that FBI Director Wray and Attorney General Sessions explain why Mr. Strzok and Ms. Page "were still in their jobs despite allegations made by allies of the President that they had been disloyal to him

---

[3]      "Motion" refers to the Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, as to Count One and Two, and Motion for Summary Judgment as to Count Three.  ECF No. 30-1.

and had unfairly targeted him and his administration."  Compl. ¶¶ 45–47.  As recently as last week, President Trump bragged about his "achievement" of purging the FBI of the employees who led the investigation into his campaign's contacts with Russia.  SOGI ¶ 59u.  Nevertheless, Defendants' Motion implicitly asks the Court to conclude, without discovery, that the public pressure was *not* accompanied by any undisclosed interference in the FBI's process by the President or his allies and that Bowdich's about-face was entirely unrelated to these demands, both known and (currently) unknown.

This argument is particularly difficult to credit when the government has used AD Will's experience and credibility to support its Motion to Dismiss and for Summary Judgment in another case pending in this District.  In *McCabe v. Barr*, the government has argued, among other things, that AD Will's involvement in the decision to fire McCabe is evidence of the apolitical nature of that decision.  *See* Motion to Dismiss and For Summary Judgment at 21, 28, No. 1:19-CV-2399-RDM (D.D.C. Nov. 1, 2019).  Here, of course, AD Will decided that Mr. Strzok should not be terminated.

Moreover, the Trump administration's treatment of Strzok cannot be considered in a vacuum; the administration has taken a decidedly uneven approach to expressions of political views by government employees, seeking to punish perceived adversaries like Strzok while actively protecting its allies even when their political speech in support of the President or against his political rivals constitutes a clear violation of federal law.  Compl. ¶ 23.

Even since the filing of the Complaint additional evidence of this double standard has surfaced, in the form of the revelation in the OIG's Crossfire Hurricane Report that certain FBI agents working on the Russia investigation had celebrated President Trump's election victory with texts volunteering to work on an investigation of the Clinton Foundations and (apparently

without irony) proclaiming that Secretary Clinton's defeat ensured that there would not be a "criminal . . . in the White House."  SOGI ¶ 59q.  There is no evidence of an attempt to punish these agents, and Plaintiff does not contend that they *should be* punished.  But this vignette is yet additional evidence of this Administration's pattern of treating critics of President Trump more harshly than his supporters.

Based on these facts, the inference that Bowdich acted in accordance with President Trump's desire for political retribution as a result of Strzok's political views is not merely plausible, it is highly probable.  If proved out, it is also dispositive.  As Justice Kennedy explained in *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 828–29 (1995), "[d]iscrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  Viewpoint discrimination is thus an egregious form of content discrimination."  *See also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 61–62 (1983) (Brennan, J., dissenting) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'"); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (holding Lanham Act's bar on the registration of "immoral" or "scandalous" trademarks discriminates on the basis of viewpoint).  Had Strzok espoused the view that Secretary Clinton was a criminal and deserved to be "locked up" rather than criticizing Candidate Trump, he never would have been fired.  That is textbook viewpoint discrimination, and Defendants' failure to even address these allegations in their Motion should be treated as an admission.

### C.  *Pickering* Balancing Favors Strzok's Right to Free Speech

Even if the FBI was not kowtowing to the retaliatory animus of the President, and instead fired Strzok over a genuine determination that his speech was unduly disruptive, Strzok has still stated a viable claim under the First Amendment.  As noted, with rare exceptions, *Pickering* balancing is fact-intensive and premature in advance of discovery and unnecessary to apply in the circumstances here.  *See Thompson*, 428 F.3d at 286 ("The district court could not conduct this 'searching review' based on this record, nor can we."); *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) (*Pickering* balancing requires discovery).  If the Court is inclined to engage in a *Pickering* balancing analysis, it should find that Strzok's strong interests in speaking privately about the political events of the day outweighed any actual or potential disruption to the operation of the FBI.

### 1.  Strzok Engaged in the Most Protected Type of Speech

The expression of political views and commentary on the merits or demerits of candidates for high public office is among the most valued speech and is afforded the highest degree of protection under the law.  *Meyer v. Grant*, 486 U.S. 414, 422–425 (1988) (recognizing constitutional protection of "core political speech" as being "at its zenith").  This type of speech "is more than self-expression; it is the essence of self-government" and occupies the "highest rung of the hierarchy of First Amendment values" entitling it to special protection.  *Stough v. Gallagher*, 967 F.2d 1523, 1529 (11th Cir. 1992).  This is crucial, because "[t]he more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer."  *Dougherty*, 772 F.3d at 991.

The government concedes that Strzok's speech was on a "matter of public concern." While this conclusion is obvious, it is not sufficient to properly assess the relative weight his speech enjoys in *Pickering* balancing.  An employee's interests in speech "is entitled to more

weight when the employee is commenting on a matter of general interest or acting as a whistleblower exposing corruption among public officials rather than merely trying to advance his own interests as an employee, interests that would be no different if his employer were not the government." *Foster v. Ripley*, 645 F.2d 1142, 1148 (D.C. Cir. 1981).

In *Connick v. Myers*, 461 U.S. 138, 154 (1983), for example, the speech at issue arose out of the employee's grievances about internal office policies and "touched upon matters of public concern in only a most limited sense." *Waters* involved similar issues specific to the training of employees and operation of a public hospital. 511 U.S. at 681. Because the speech at issue in both cases fell on the low end of the protection spectrum, the Court held the employers to relatively low burdens to justify regulating (i.e., punishing) the speech, and did not require proof of actual disruption: "The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Connick*, 461 U.S. at 154. Because Myers' speech primarily involved her own workplace grievances, the Supreme Court did "not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 151–152. In the next breath, however, the Court emphasized, "We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.* The Court reiterated the importance of this relative balancing of interests in *Waters*: "[A] government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations, the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." *Waters*, 511 U.S. at 674.

Here, Strzok was not complaining about some workplace slight, or seeking to advance his own interests on the job.  Instead, his opinions about the fitness of a candidate for President is the type of core political expression that enjoys the highest degree of protection under the First Amendment.  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

Because the value of this type of speech is so high, federal courts have consistently held that speech by employees regarding elections and candidates for office are entitled to the greatest protection under *Pickering*.  *See, e.g.*, *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013) ("Letters to the editor, supporting a candidate during a campaign, are a unique form of speech that embody the very essence of the First Amendment and require its full protection."); *Bland v. Roberts*, 730 F.3d 368, 387–88 (4th Cir. 2013) ("[T]he public's interest in Carter's opinions regarding the election may have had particular value to the public in light of his status as a Sheriff's Office employee."); *Stough*, 967 F.2d at 1529 ("On Stough's side of the *Pickering* scale is his interest in commenting on the qualifications of political candidates. This type of speech 'is more than self-expression; it is the essence of self-government' and occupies the 'highest rung of the hierarchy of First Amendment values' entitling it to special protection."). "As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 483 (1995).  And because the nature of core political speech is so highly valued under *Pickering*, a government employer's attempt to punish such speech faces the highest level of scrutiny and requires a

strong justification.  *See Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 57 (D.D.C. 2009) (explaining where plaintiff had protested the U.S. involvement in the Iraq War, that the "Defendants must make a particularly 'strong[ ] showing' that they had a legitimate interest in terminating plaintiff's contract because her speech 'substantially involved matters of public concern'").

### 2.   Private Speech on a Matter of Public Concern Is Presumptively Protected

This case is nothing like those on which Defendants rely in their motion.  Mr. Strzok did not intend to speak publicly about his views on the candidates for the election.  He did not write a letter to the editor of a newspaper seeking publication, hold a press conference, send an email to all of his contacts, or even post on social media.  He shared his political views with someone he trusted, and they remained the personal correspondence of two government employees until high ranking officials in the DOJ or White House leaked the communications to the press.

In this respect, this case is most similar to *Rankin*.  In *Rankin*, a deputy clerk in a Sheriff's office made a private statement to her boyfriend, after hearing a news report on the radio about the attempted assassination of President Reagan, that "if they go for him again, I hope they get him."  Another employee overheard McPherson's remark and reported it to the employer, who fired McPherson.  In assessing whether the speech was protected and whether the firing violated the First Amendment, Justice Powell, in his concurring opinion, observed:

> There is no dispute that McPherson's comment was made during a private conversation with a co-worker who happened also to be her boyfriend. She had no intention or expectation that it would be overheard or acted on by others. Given this, I think it is unnecessary to engage in the extensive analysis normally required by *Connick v. Myers* and *Pickering v. Board of Education*. If a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace.

*Rankin*, 483 U.S. at 393 (citations omitted).  The remaining members of the majority expressly endorsed this view: "We agree with Justice Powell that a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee."  *Id.* at 388 n.13 (Marshall, J., opinion of the Court).

Defendants may reply that Mr. Strzok knew that any texts sent or received on an FBI-issued phone were not truly "private," because communications on these phones could be monitored.  There are two problems with that response.  First, nearly every aspect of a modern workplace, and for that matter nearly every non-workplace aspect of employees' lives, can be monitored.  The fact that a workplace conversation can be discovered does not render it unprotected.  *Rankin* illustrates this principle, as the deputy clerk's comments took place at work and were overheard and reported to management, but the Supreme Court still found the firing unlawful.  If this Court were to hold otherwise, it would chill a tremendous amount of core political speech (water-cooler conversations, emails, text messages, and idle conversations at any time).  There is no legitimate government interest in regulating this type of privately expressed political speech.  At a minimum, *Rankin* stands for the proposition that communications at the workplace which are intended to be private, and which touch upon a matter of public concern are presumptively protected, and require a heavy burden—i.e., "an unusual case"—before the government can "justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace."  *Id.* at 393.

Second, that burden should be even heavier for the government to carry here, because it was the DOJ itself that first leaked and later officially publicized Strzok's speech by giving a selected subset of his texts to the media.  As paragraph 62 of the Complaint alleges, "On December 12, 2017, DOJ willfully and intentionally disclosed to numerous news outlets

approximately 375 text messages to, from, and about Special Agent Strzok.  In a press release, DOJ called this act a 'public release' of the messages."  Defendants should not be heard to complain about the notoriety and putative damage to the FBI's reputation from Strzok's speech when it was their own illegal disclosures, magnified and distorted by the false attacks made by the President and his allies, that placed a spotlight on Strzok's opinions.

### 3.   There Is Little on the Employer's Side of the *Pickering* Ledger

The two factors discussed above—the paramount protection afforded Strzok's speech under the First Amendment and that he expressed his views privately—weigh heavily on Strzok's side of the *Pickering* balancing.  As explained below, Defendants do little to counter that.  They offer no actual evidence of any disruption to the mission of the FBI caused by Strzok's speech, and indeed the IG found that Strzok's decisions and actions in the relevant investigations were *not* impacted by his political views.  Instead, the government argues that it can act entirely on speculation about disruption.  But the cases the government relies upon involved speech that barely nudged across the threshold of "public interest" because they concerned employees' grievances about their workplaces, falling on the low-end of the spectrum of protected speech.  *See Davis v. Billington*, 51 F. Supp. 3d 97, 114 (D.D.C. 2014) (such cases "involve markedly different factual contexts than this case").  The Supreme Court has emphasized that "a stronger showing [of disruption] may be necessary if the employee's speech more substantially involve[s] matters of public concern," as is clearly at issue here.  *Connick*, 461 U.S. at 152.  No such showing of disruption has been made.

### (a)   There Is No Actual Evidence of Disruption

The government does not even try to show that it suffered any actual disruption or harm from Strzok's highly protected speech.  It offers no contemporaneous records of complaints from co-workers, no representation from his supervisors that Strzok's speech created any substantial

disharmony or conflict at the workplace, and no indication that his speech in any way actually influenced or interfered with Strzok's performance of his duties. *Cf. Thompson*, 428 F.3d at 286 ("district court erred in" concluding that government's interest in efficiency outweighed First Amendment rights where it could not "conduct an individualized and searching review of the factors asserted by the employer to justify the discharge" without a fully developed record).

Nor did Deputy Director Bowdich rely upon any evidence of actual disruption at the time he fired Strzok. And, of course, all of the contemporaneous evidence pointed in the opposite direction. The IG determined that Strzok's political views did not influence any of his actions in the investigations and noted that Strzok's co-workers, whom the IG interviewed, confirmed that they didn't even know Strzok's political views. Compl. ¶ 32; SOGI ¶ 53. In any event, even after Strzok's political speech was disclosed, his supervisors went on record supporting his retention by the Bureau, attesting that he was "an extremely talented and intelligent investigator, gifted agent, and hard-working employee, [whose] Division believes [he] will never again engage in misconduct." Compl. ¶ 34.

Rather than actual disruption, the government relies entirely on "reasonable inferences" of harm (Motion at 17), and insists that such amorphous justifications have been blessed by the Supreme Court's decisions in *Connick* and *Waters*, and the D.C. Circuit's decision in *Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988). But those cases dealt with speech on the low end of the spectrum, and the Court's admonition that a comparatively higher burden may be applied when the speech involves core political speech like Strzok's here. *See supra* Section II.C.1. The government faces a far more demanding burden here:

> Occasionally, the state's burden to justify its actions may be as light as merely proving that the employer "reasonably believed the employee's speech was likely to disrupt its operations." However, where, as here, "the employee's

speech more substantially involves matters of public concern," the burden
increases to require objective evidence of disruption.

*Matherne v. Wilson*, 851 F.2d 752, 761 n.53 (5th Cir. 1988) (quoting *Gonzalez v. Benavides*, 774

F.2d 1295, 1302 (5th Cir. 1985)); *see also Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013)

("[I]t is not enough that there is some disruption; the amount of disruption has to outweigh the

importance of the speech and its concern to the public."); *Goldstein v. Chestnut Ridge Volunteer*

*Fire Co.*, 218 F.3d 337, 356 (4th Cir. 2000) (holding that "generalized and unsubstantiated

interests" "in maintaining morale and efficiency" within the fire department did not outweigh

plaintiff's speech interest); *Dougherty*, 772 F.3d at 991 ("The more tightly the First Amendment

embraces the employee's speech, the more vigorous a showing of disruption must be made by

the employer.").   In *Dougherty*, the Third Circuit found that any minimal disruption to the

employer's office was the result of the employer's retaliatory attempts to silence the speech,

rather than the employee's protected speech itself: "It is against this Court's precedent to find

against an employee where the disruption 'was primarily the result, not of the plaintiff's exercise

of speech, but of his superiors' attempts to suppress it.'"   772 F.3d at 992 (quoting *Czurlanis v.*

*Albanese*, 721 F.2d 98, 107 (3d Cir. 1983)).   Here too, any disruption or harm to the agency's

reputation flowed directly from defendants' unlawful release of the texts to the media to try to

discredit the Special Counsel's investigation, not Strzok's speech itself.

Moreover, in those cases in which courts have permitted an employer to rely upon

reasonable predictions of harm, it is because the firing took place soon after the protected speech,

and courts acknowledged that "we do not see the necessity for an employer to allow events to

unfold to the extent that the disruption of the office and the destruction of working relationships

is manifest before taking action."   *Connick*, 461 U.S. at 152.   Here, in contrast, the text messages

were publicly revealed to the media in December 2017, and the FBI did not fire Strzok until

August of the following year.  Aside from a torrent of presidential tweets vilifying Strzok for his "disloyalty," no actual disruption ensued in the roughly nine months between disclosure of his texts and Strzok's firing.  The government's inability to point to any actual harm to the mission of the agency under these circumstances is fatal to its *Pickering* argument.

In *American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 830 F.2d 294, 303 (D.C. Cir. 1987), the D.C. Circuit faced a similar effort by the government to justify firing an employee over his speech.  There too, the government was unable to offer any evidence of actual disruption and instead argued that the plaintiff's conduct had jeopardized the "public's confidence in the confidentiality of the mailstream."  While that concern was "[o]bviously . . . legitimate," not least because the terminated postal worker had written an editorial stating that he read a congressman's mail, the Circuit concluded that in the "absence of any demonstrated harm caused by [the employee's] speech, [he] must prevail in the balancing of competing interests." *Id.*  As in *American Postal Workers Union*, Defendants have not shown that any harm resulted from Mr. Strzok's speech rather than from its own leaks about his political views.

(b)      Strzok's Position in the FBI Does Not Leave Him Unprotected

Unable to show any disruption, the government tries to bolster its *Pickering* presentation by contending that Strzok occupied the type of policy making position which affords less protection from discipline based on public speech.  Here, the government relies almost entirely on the D.C. Circuit's opinion in *Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988).  *See* Motion at 21–25.  *Hall* is nothing like this case.

Hall occupied one of the highest-level positions at the University of the District of Columbia.  As Athletic Director, he reported directly to the President of the University and Board of Trustees.  He was a "highly visible spokesman" and "likely to be thought of by the public as responsible for running the [athletic] department." *Id.* at 265.  Strzok simply did not

occupy a comparable role.   Although the Court need not address the incomplete evidentiary record, Plaintiff notes that Defendants' Exhibit 7 undermines their argument.   The government has denoted employees who occupy a policy-making role by exempting those employees from its standard disciplinary process.   Specifically excluded are the "deputy director (DD), the associate deputy director (ADD), any executive assistant directors (EADs), the general counsel (GC), or any Senior Executive Service (SES) employee *who reports directly to the FBI Director*."   *See* Defs.' Ex. 7 at 1 (emphasis added).   Policy-making employees are subject to disciplinary decisions from the Deputy AG, and Strzok is not in that category.   *See Hall*, 856 F.2d at 255.

Roughly eight thousand other SES-level managers are similarly situated to Strzok in the federal workforce in that they supervise employees, but the vast majority of those employees are not policy-makers.   *See Facts About the Senior Executive Service (SES)*, FEDWEEK (Oct. 29, 2018), https://ask.fedweek.com/facts-senior-executive-service-ses/.   The government's argument would leave thousands of career federal government employees without protections from discipline over the content of their political speech.   That is *not* what *Pickering* intended.

Another crucial distinction is that Hall publicly espoused views that were contrary to those of his employer: "Hall's views as to how the department should have been run were obviously at odds with those of the Board."   *Hall*, 856 F.2d at 265.   This fact was decisive for the Court, which noted that Hall's statements "reflected a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously."   *Id.*   An employer obviously must have confidence that its senior leaders are aligned with the organization's policies and goals, and public speech undermining the employer can be regulated. But there is nothing of the kind here.   As noted above, Strzok was merely expressing his personal political opinions in what he intended to be private messages.   His views about presidential

candidates are not the same as criticizing the policies of his agency.  The government does not cite to a single comparable situation in which punishment for speech in those circumstances has been sustained.

The government offers two other points to tip the balance in its favor: (1) that some of the texts "related" to the investigations Strzok was involved in, and (2) that the "time, place and manner" of his speech rendered it unprotected.  As to the former, "[s]peech can be covered by the First Amendment even if it is related to one's job function" so long as it is not part of the employee's official duties.  *Winder v. Erste*, 566 F.3d 209, 216 (D.C. Cir. 2009).  And, of course, context is crucial.  When an employee speaks publicly in opposition to his employer's interests on a topic related to his work, it can be disruptive.  That is not what happened here.  Strzok was intending to speak privately, and it was Defendants themselves who made his speech public.

Finally, Defendants' "time, place and manner" argument trumpets the fact that Strzok used his government-issued cell phone to engage in the speech.  Defendants note that Strzok and Page exchanged more than 40,000 texts, and argue that "[t]he fact that the relevant speech very likely occurred, at least in part, during work hours strongly favors the Government's interest in regulating it," before piously concluding that "[t]he FBI properly pays its employees to spend their work days furthering FBI's statutory mission—not undermining it at government expense." Motion at 26.  This argument ignores the fact that the overwhelming majority of the 40,000 texts were either work-related (and apolitical) or private texts sent during the evening or on weekends, and FBI policy explicitly allows some personal use of cellphones issued by the Bureau.  *See* SOGI Ex. O at 15–16.  Moreover, the insinuation that the American taxpayers didn't get their money's worth from Mr. Strzok's service with the FBI is belied by OPR's acknowledgement of Mr. Strzok's extraordinary performance record and work ethic.  Compl. ¶ 34.

The fact that the texts were sent on an FBI-issued phone was baked into AD Will's determination of the appropriate penalty. But it was just one factor, which AD Will determined did not justify terminating Strzok. Rather, she engaged in the balancing of all of these factors, and determined that the mission of the agency was best supported by imposing lesser discipline, and keeping a very talented agent on the rolls. Here too, this one factor does not outweigh Strzok's important interest in expressing his core political beliefs, and is insufficient to justify the decision to fire him. *Cf. Davis*, 51 F. Supp. 3d at 122 (denying motion for summary judgment based on the factual dispute over "how much CRS time the plaintiff spent in order to finalize [his] *Wall Street Journal* opinion piece" and whether that use of time justified his termination).

Defendants' further claim that the "vulgar, vituperative, and *ad hominem* character" of Mr. Strzok's speech also "weighs against his claim," and they offer snippets of selectively chosen texts to illustrate "the base tone of Plaintiff's discourse." Motion at 27. In addition to the fact that there is no requirement that political speech be genteel, *see, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (acknowledging that debate on matters of public concern "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"), it is a bit rich for this Administration to be criticizing Mr. Strzok's decorum when the President has repeatedly used the most inflammatory and vulgar language to attack Mr. Stzrok. This pattern, which is ongoing and has included false charges of treason and restraining orders, reached its ugly (thus far) peak at a rally in Minneapolis in October 2019, at which Mr. Trump mimicked Mr. Strzok having an orgasm before tens of thousands of jeering supporters, thereby completing the President's debasement of the office once held by Lincoln and Washington. SOGI ¶ 59b.

In the end, we are left in the same position as the court in *Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011), where the D.C. Circuit affirmed the district court's denial of a motion to dismiss a First Amendment claim involving *Pickering*:

> Neither the district court nor this court has evidence in the record that appellee's conduct interfered with the performance of the governmental function, including the carrying out of the statutory mandates. We have only allegations, and the allegations of the parties are in conflict. At summary judgment or at trial, these conflicts may be resolved on an evidentiary record. At the stage of the motion to dismiss, they cannot. We must take the allegations in the light most favorable to the plaintiff. She stated a claim for violation of her First Amendment rights. The Board asserts its qualified immunity, but we are unable to determine without an evidentiary record whether any act it committed in defense of those functions constituted a violation of clearly established rights, or even in general terms, where the *Pickering* balancing tips.

> We therefore conclude that the district court did not err in denying the motion to dismiss, and we remand the claim for further proceedings consistent with this opinion.

## III.    MR. STRZOK HAS STATED A VIABLE FIFTH AMENDMENT CLAIM

The FBI designated OPR Assistant Director Candice Will to be its final decision-maker with respect to the proposal to discipline Peter Strzok.  Compl. ¶¶ 1, 50.  AD Will had been performing that function for the FBI for many years.  Compl. ¶ 50.  The materials that Defendants have injected into the record along with their motion merely underscore Will's unequivocal role as the deciding official.  *See, e.g.*, Defs.' Ex. 1 at 23 ("You will receive a written decision letter from the AD, OPR after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision.").  Will offered a Last Chance Agreement, which Strzok and his counsel signed and thereby accepted on July 26, 2018.  Defs.' Ex. 5.  In that agreement, Strzok relinquished any appeal rights with respect to AD Will's decision, and accepted the demotion and suspension as the "FINAL decision in this matter."  *Id.* AD Will made reference to and relied upon that LCA in her final decision issued on August 8, 2018.  Compl. ¶ 35.

The government now argues that none of that mattered, and that David Bowdich could ride in at the 11th hour and overturn AD Will's decision at his discretion, because Strzok purportedly had no property interest affording him any protections under the Fifth Amendment. That argument is incorrect for two reasons.  First, "[a] last-chance agreement is a settlement agreement, and a settlement agreement is a contract."  *Link v. Dep't of Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995).  Contracts give rise to property rights.  Indeed, the Supreme Court has emphasized that:

> "[P]roperty" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings."  A person's interest in a benefit is a "property" interest for due process purposes if there are such rules *or mutually explicit understandings* that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (emphasis added).  In *Perry*, the Court found that the employee had alleged a viable property interest, subject to due process protections, by contending that his state university employer had an informal and unwritten agreement that "certain employees shall have the equivalent of tenure."  *Id.* at 602.  The FBI's explicit written agreement with Strzok, in which he offered as valuable consideration the relinquishment of legal rights and obtained the agency's agreement that he would not be fired over these issues, is an even stronger source of a property interest than the implied contract in *Perry*.

The sequence of Mr. Strzok's negotiations with AD Will underscore the contractual nature of the LCA.  Mr. Strzok executed and returned the LCA on July 26, 2018, to AD Will's office, which had stressed to counsel for Mr. Strzok that "in the end, it is [AD Will's] decision." SOGI ¶ 59j.  When AD Will did not issue her decision within several days, counsel for Mr. Strzok inquired, and was informed that AD Will was still considering whether to move forward with the LCA.  Counsel noted that "to the extent that AD Will is considering terminating Pete

instead of moving forward with the LCA," Mr. Strzok requested that AD Will contact Strzok's character witnesses "and consider what they have to say as mitigation under the *Douglas* factors." SOGI ¶ 61e. On August 6, 2018, counsel for Mr. Strzok was informed that AD Will was ready to issue her final decision and was asked whether Mr. Strzok wanted her to wait until one of his character witnesses could submit a letter on his behalf. Counsel responded that, *if* AD Will was ready to move forward pursuant to the terms of the LCA, there was no need to wait for the last character letter, and AD Will proceeded to accept the LCA, extinguishing Strzok's right to appeal to a DRB and his opportunity to submit additional mitigating evidence under the *Douglas* factors. SOGI ¶ 61f. The next day, without warning, Bowdich reversed AD Will's decision and informed Strzok that his decision terminating Strzok constituted a final, unappealable, agency action. SOGI ¶ 61h. While discovery will reveal what (ultimately unsuccessful) pressure was brought to bear on AD Will between July 26 and August 8, 2018, DD Bowdich was evidently unable to withstand the same pressure.[4]

Second, even if the FBI had not contractually promised to give Strzok a last chance and not to fire him over these events, Candice Will's August 8 decision demoting him out of the SES restored him to a veteran's preference eligible status with property rights in his job. *See* 5 U.S.C. §§ 7511(a)(1)(B), (b)(8), and 7513(d). AD Will's decision was unequivocal and had immediate effect: "I am: (a) suspending you from duty, without pay, for 60 calendar days, not dismissing you, as originally proposed; and (b) demoting you to a non-supervisory position." Defs.' Ex. 4 at 1. Thus, Strzok was not a member of the SES when David Bowdich fired him the next day. Courts interpreting this statutory scheme have consistently held that while rank and file

---

[4]    It is notable that AD Will unexpectedly retired from the FBI shortly after DD Bowdich overruled her decision. Whether there was a connection between that decision and Defendants' actions here requires discovery to determine.

employees of the FBI who are not preference eligible have no property interest, non-SES FBI employees who have earned veteran's preference are vested with appeal rights.  *Parkinson v. Dep't of Justice*, 874 F.3d 710, 712–13 (Fed. Cir. 2017); *see also Herr v. DOJ*, SF-0752-14-0447-I-1, 2014 WL 4851394 (M.S.P.B. Sept. 22, 2014).

Either basis for a property interest (the contractual force of the LCA or Strzok's veteran's preference status) means that the FBI was required to afford him procedural due process before firing him.  It is well established that:

> In the employment context, "agencies cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination." Thus, "where 'a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injuries.'" Accordingly, "[w]hen agencies establish 'special' 'pre-termination procedures,' they are bound to follow them."

*Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161 (D.D.C. 2005) (quoting *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) (denying summary judgment on Fifth Amendment denial of due process claim where disputes over agency's compliance with its own written disciplinary procedures)).

Here, the *only* process afforded to Strzok was the OPR process presided over by AD Will.  Strzok submitted his written response to her, appeared before her during an oral reply and answered her questions, and entered into the LCA offered by her.  The agency obviously could have removed AD Will from her role as deciding official, and authorized her merely to make a "recommendation" to Bowdich.  Had it done so, Strzok would then have appeared before Bowdich as the deciding official, and responded to any questions he had about Strzok's actions, or the impact on the agency.  But that was not the arrangement.  Instead, the agency expressly designated Will to be the deciding official, and then disregarded her decision because it did not

sufficiently placate the President.  Without meeting with Strzok or his attorneys and in a striking departure from the FBI's standard disciplinary policies, Bowdich fired Strzok and, in the same letter, declared that his decision was final and unappealable.  This effectively deprived Strzok of any real due process.  After all, in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985), the Supreme Court described the importance of affording a public employee "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  Those protections are illusory if the employee never even has a chance to present his response to the real deciding official.

Courts have unequivocally held that once a decision is issued by an authorized individual, it is binding on the agency and cannot be changed by a higher-level supervisor.  *Boddie v. Dep't of Navy*, 827 F.2d 1578 (Fed. Cir. 1987); *Bross v. Dep't of Commerce*, 389 F.3d 1212, 1218 (Fed. Cir. 2004) (same).  AD Will's decision to suspend and demote, but not fire Strzok, was authorized, final and binding on the FBI.  The FBI deprived Strzok of his property interest in his job by firing him the next day without affording him any procedural due process.

To justify this deprivation, defendants turn to Policy Directive 0915D which they contend gave Deputy Director Bowdich a free hand to overturn the final decision issued by AD Will, and substitute it with his own determination of the appropriate penalty.  The government used the same argument to convince the MSPB that it lacked jurisdiction over Strzok's appeal, but in that proceeding it merely described the policy—the government declined to actually submit it for either Strzok or the MSPB to review.  That gambit worked when the MSPB determined that it lacked jurisdiction, without ever reviewing PD 0915D.[5]

---

[5]     Strzok did not have a copy of the policy, and it is not available to the public.  His counsel explicitly asked the FBI to produce it, but the agency declined.  Counsel then asked the MSPB to

But defendants have now produced that policy, and it is clear that the government overplays its hand. The policy, entitled "Disciplinary Appeals Process" (Defs.' Ex. 7) does *not* apply to the original decisions of the deciding official (here AD Will), but rather to decisions rendered through an appeal process by a Disciplinary Review Board ("DRB") of five FBI officials serving one-year terms in an adjudicatory role. Significantly, the DRB was empowered to either sustain or lower the original penalty—it could not make the penalty more severe. *See* Defs.' Ex. 7 § 6.2.5. The FBI reserved for the Director, however, the authority to reverse a DRB determination, which would allow him to restore the determination or penalty back to the original (more severe) finding of the deciding official. Under a heading called "Exemptions" to this "Disciplinary Appeals Process" policy is the section upon which the FBI relies. Section 4.3 provides: "Although the decisions rendered by . . . the Disciplinary Review Board (DRB) (in adverse action matters) are considered the FBI's final internal disciplinary actions, by virtue of the authority inherent in the position, the FBI Director (or his or her designee) maintains the authority to modify any disciplinary finding, penalty, or both as deemed necessary and in the best interests of the FBI." This exemption by its terms applies to appeals to the DRB, not to final decisions by the original deciding official. But Strzok did not invoke the appeal process; rather, as reflected in the LCA, he expressly waived that process and accepted AD Will's decision. *See* Defs.' Ex. 5.

The FBI offers no other policy or authority which would allow it to disregard the final decision of its own deciding official. For that reason, AD Will's decision was the decision of the

---

require its production, but the agency did not do so and merely relied upon the FBI's representations regarding its substance. The first time that Strzok and his counsel saw the policy was when it was attached by defendants to their motion.

FBI, and Bowdich's decision to summarily remove him without any due process violated his rights under the Fifth Amendment.  *See* SOGI ¶¶ 61–62.

## IV.    MR. STRZOK HAS PLEADED AND WILL ULTIMATELY PREVAIL ON HIS PRIVACY ACT CLAIM

Defendants effectively concede, by limiting their Rule 12(b)(6) motion to dismiss to Strzok's constitutional claims and moving only for summary judgment as to the Privacy Act claim, that Strzok has stated a claim under the Privacy Act.  As explained *supra* at Section II, Defendants' attempt to avoid the discovery that would ordinarily follow as a matter of course is unavailing because the Court is not obligated (or, indeed, permitted) to accept Defendants' self-serving account of their actions without allowing discovery and because Defendants' summary judgment arguments are insufficient as a matter of law.  The actual circumstances of the leaks support the inference that Defendants knew the disclosures were improper but made them anyway as part of an effort to placate President Trump and assist in his efforts to discredit the Mueller investigation.  Defendants' Privacy Act arguments, like their argument on Strzok's constitutional claims, thus present questions of intent and motive that will likely require jury findings based on witness credibility, even after discovery.  *See Evans*, 716 F.3d at 622 (disputes over motive are "precisely the type of factual dispute that 'must be resolved in a jury room . . . .'") (quoting *Czekalski*, 475 F.3d at 362); *Lamb v. Miller*, 660 F.2d 792, 794 (D.C. Cir. 1981) (reversing grant of summary judgment where there was evidence of "possible impermissible motives" for plaintiff's termination despite "substantial evidence" that he violated union rules).  Regardless, Rule 56(d) entitles Strzok to discovery before he should even be asked to respond to the disputed factual assertions that Defendants rely upon.

### A.      Strzok Must Be Afforded Discovery on His Privacy Act Claim

Agency records were impermissibly accessed and used to disseminate information about Strzok to the press on at least two dates.   Both instances require discovery because the information necessary to respond to Defendants' Motion is in their possession.

First, Strzok is currently unable to identify the DOJ official who leaked the information about the text messages between him and Ms. Page prior to December 2, 2017.  Goelman Decl. ¶ 4a.  The identity of the leaker will likely be critical to proving that the leaks were intentional or willful.  *See Convertino*, 684 F.3d at 99; Goelman Decl. ¶ 6.  Strzok is also unable to definitively prove from which system of records the official collected the text messages.  Goelman Decl. ¶ 4g; Winn Decl. ¶ 9 (offering an opinion based on a supposition that "the records of these text messages [were] copied from the FBI's general archives into a 'system of records,' for instance into an OIG investigative file").[6]  Discovery on that issue is necessary to respond to Defendants' half-hearted suggestion that the messages may not have been taken from a "system of records" and to demonstrate that the use of these records was not a "routine use" that was "compatible with the purpose for which [the record] was collected."  5 U.S.C. § 552a(a)(7), (b)(3); *see U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 146 (D.C. Cir. 1993) (whether routine use notice was sufficient presented an "issue[] of fact"); *see also* 72 Fed. Reg.

---

[6]      Mr. Strzok disputes Mr. Winn's reasoning that the "FBI's general archives" are not a system of records within the meaning of the Privacy Act.  Mr. Winn's argument leads to the untenable conclusion that an agency cannot violate the Privacy Act by disclosing sensitive information about individuals from emails and text messages because, according to Mr. Winn, those are not "'records' in a 'system records' [*sic*] that would be subject to the Privacy Act." Winn Decl. ¶ 8.

36,725 (enumerating purported routine uses for the "Office of the Inspector General Investigative Records System").[7]

Second, Strzok also needs discovery to respond to the Government's argument that its December 12, 2017 disclosure of hundreds of his private text messages did not willfully violate the Privacy Act.  Employees from the DOJ Office of Public Affairs disseminated the text messages to select reporters on December 12, 2017 (SOGI ¶ 56c), but in the absence of discovery, Strzok cannot establish the identity of the political appointee who ordered the release of his text messages, show when the appointee did so, or fully demonstrate the inadequacy of the DOJ's asserted efforts to comply with the Privacy Act.  Goelman Decl. ¶ 4a.  All of those facts are pertinent to showing that the DOJ intentionally and willfully violated Strzok's rights. Goelman Decl. ¶ 5.

Discovery is especially appropriate because, even in its absence, the available evidence strongly suggests that the DOJ's rushed disclosure of the text messages about Strzok on the evening of December 12, 2017, was a willful violation of the Privacy Act.  The little thought given to the legal implications and Strzok's statutory rights is underscored by Defendants' ill-fated attempt to cover up their disclosure of the text messages by requiring members of the media to agree not to attribute them to the DOJ.  SOGI ¶ 56g.  That is the kind of evidence from which consciousness of guilt can be inferred.  Defendants rely on Mr. Winn's justification for the December 12, 2017, disclosures, hoping that the Court will miss the fact that Mr. Winn's legal

---

[7]     Because the text messages at issue had to be identified by sender and recipient phone numbers associated with Mr. Strzok and Ms. Page, the position that they were not retrieved from a "system of records" borders on untenable, but Defendants have not acknowledged that the text messages were retrieved from a system of records.  *See* 5 U.S.C. § 552a(a)(5).  Further, because December 2, 2017 predated the supposed balancing that Mr. Winn claims to have engaged in on December 12, 2017, the pre-December 2, 2017 leaks cannot have complied with the lone supposed routine use that Defendants have placed at issue.

rationale was apparently prepared after-the-fact and then back-dated to create a veneer of due diligence.  SOGI ¶ 56d.  Mr. Winn's carefully-manicured declaration, which is based only on the limited facts as "presented to [him] at that time"—apparently meaning on December 12, 2017—obscures facts necessary to evaluate *Defendants*' knowledge and intent, which includes the official or officials (not Mr. Winn) who made the actual decision to release the texts to the media.  Winn Decl. ¶ 18.  It is revealing that, while Defendants included declarations from Mr. Winn and Mr. Boyd, they did not submit a declaration from the unidentified senior Department official who actually authorized the disclosure to the media.  An agency cannot avoid Privacy Act liability for a disclosure actually made for an improper purpose by eliciting a sanitized after-the-fact rationale from an official who does not have all of the facts.  *See Convertino*, 684 F.3d at 99.  The available evidence also shows confusion (or deception) among high-ranking DOJ officials as to the procedures that led to the disclosures.  For example, DOJ officials initially falsely asserted that the OIG approved the disclosures, but the OIG denied that.  SOGI ¶ 56h.[8] Discovery on these issues is necessary.

**B.      Defendants' Legal Arguments Are Either Wrong or Subject to Refutation by Evidence to be Obtained in Discovery**

Each of Defendants' three arguments for summary judgment is either legally irrelevant or incorrect.  First, neither the White House nor any of its staff is a defendant to this action, so whether the White House is an "agency" within the meaning of the Privacy Act is of no consequence.  Second, the disclosures of the OIG investigative records to the press during the pendency of an investigation were neither a "routine use" nor compatible with the investigative

---

[8]      *See also* SOGI Ex. G ("As the DAG just testified, the IG approved the release."), Ex. M at 2 ("The Department did not consult with the OIG in order to determine whether releasing the text messages met applicable ethical and legal standards before providing them to Congress. . . . The Department did not consult with the OIG before sharing the text messages with the press.").

reasons for which those records were collected.  Third, the evidence, including evidence to be obtained in discovery, will prove that the DOJ intentionally and willfully violated the Privacy Act; summary judgment cannot be premised solely upon uncritical acceptance of declarations from two officials who did not make the decision to reveal the texts to the media.

1.   The Privacy Act Applies to the Disclosure of DOJ Records to the White House and through the White House to Others

The sole argument that the pre-December 2, 2017 leaks did not violate the Privacy Act is Defendants' assertion that Strzok "does not allege a Privacy Act violation with respect to any disclosure by officials in the White House."  Motion at 32.  But the Complaint alleges that Defendants indirectly made an illegal disclosure through the White House.  Compl. ¶ 59. Defendants may be right that Strzok cannot sue the White House itself for disclosing White House records, but they are wrong to suggest (if they intend to) that agencies can immunize themselves from Privacy Act liability by using a White House conduit to leak agency records.

As Defendants recognize, the Privacy Act places restrictions on "agency" records.[9]  With limited exceptions, it prohibits disclosure of "any record which is contained in a system of records by any means of communication to *any person*, or to another agency."   5 U.S.C. § 552a(b) (emphasis added).  Defendants cannot and do not dispute that the DOJ, including its Office of the Inspector General, is an agency within the meaning of the Privacy Act, nor do they dispute that the individuals who work in the White House are persons.  Additionally, Defendants

---

[9]     Although the Privacy Act references a definition of "agency" at 5 U.S.C. § 552(e), Defendants rely on the definition in 5 U.S.C. § 552(f)(1), which provides that "agency . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."

have offered no exception to the Privacy Act that permits the disclosure of OIG investigative records to the White House for the purpose of leaking those records for political gain.

For the same reason that moving (non-agency) records from the White House to the State Department (an agency) does not bring the White House records within the Privacy Act, moving agency records from DOJ to the White House does not strip the records of their Privacy Act protection.  *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156–57 (1980).  That is surely why in *Alexander v. F.B.I.*, 691 F. Supp. 2d 182, 191 (D.D.C. 2010), the court granted summary judgment on the disclosure of FBI records to the White House on the basis of a routine use exception for vetting personnel to be given access to the White House, and willfulness—not whether the non-agency status of the White House made the Privacy Act inapplicable to the FBI disclosures.

### 2.    Disclosing Employees' Private Communications to the Press Is Not a "Routine Use" of OIG's Investigative Records

Defendants next argue that the DOJ's decision to disclose Strzok's text messages on December 12, 2017 was "routine" and "compatible with the purposes for which those records were collected."  Motion at 36–40.  As Defendants recognize, the government must prove both a "publication" of an applicable routine use and the "compatibility" between "the purpose for the collection of the record in the specific case and the purpose of the disclosure."  Motion at 35 (quoting *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989)).  The government has done neither.

"[P]roviding information to the media is not among the list of permissible disclosures listed in the Privacy Act," *Kelley v. F.B.I.*, 67 F. Supp. 3d 240, 260 (D.D.C. 2014), so Defendants must rely on a published "routine use" and show that they provided "adequate notice of the purposes for which the [agency] may release an employee's information."  *Dinh Tran v. Dep't of*

*Treasury*, 351 F. Supp. 3d 130, 136 (D.D.C. 2019); *see Britt*, 886 F.2d at 548 (alleged routine use did not provide "meaningful public notice" where it did not state "what information concerning them will be released and the purposes of such release").

Assuming, as Defendants imply, that the relevant system of records here is the OIG system, the purported "routine use" of disclosing investigative records "to the news media and the public" cannot be interpreted to apply to disclosures other than those contained in official OIG reports.  If the exception were meant to be so broad, it would be invalid.[10]  5 U.S.C. § 552a(e)(4)(D) requires agencies to publish the "purpose of [each] use" and the only published purpose here is "to carry out [the OIG's] responsibilities pursuant to the Inspector General Act of 1978."  Yet the Inspector General has testified that it would be "entirely inappropriate" for anyone on his team to "give interviews," reach conclusions, "indicate preliminary ideas," or provide "advice, [or] guidance statements" to the press or public until "the end of [an] investigation."  SOGI ¶ 55d.  The disclosures at issue cannot have been a routine use because they were unprecedented, inconsistent with the OIG's mission, and apparently perpetrated by the DOJ without the OIG's consent.  SOGI ¶ 55c.

Moreover, even if this "routine use" was applicable, there was no "fairly close relationship" between the purpose for which the documents were collected "and the purpose of

---

[10]     Agencies are prohibited from utilizing the "'routine use' exception to circumvent the mandates of the Privacy Act."  *Pilon v. U.S. Dep't of Justice*, 73 F.3d 1111, 1123 (D.C. Cir. 1996) (quoting *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988)).  To the extent that Defendants assert that the routine use for disclosures to the media and the public allows disclosures other than those contained in official reports at the conclusion of OIG investigations, Defendants purport to create a general and impermissible exception to the Privacy Act that allows the disclosure of any record, at any time, on any subject, *unless* the DOJ determines disclosure "would constitute an unwarranted invasion of personal privacy."  72 Fed. Reg. 36,725.  Such an interpretation could not be squared with 5 U.S.C. § 552a(e)(4)(D) or the agency's obligation to provide adequate notice of how records will be used.  *See Dinh Tran*, 351 F. Supp. 3d at 136.

[their] disclosure." *Richardson v. Bd. of Governors of Fed. Reserve Sys.*, 248 F. Supp. 3d 91, 102 (D.D.C. 2017). Leaking records to the media for the purpose of priming the media pump against a target of the President's animosity is not compatible with the purpose for which the OIG collects records or even the impermissibly broad purpose of informing the public suggested by Defendants' brief.[11] This factual dispute as to Defendants' motivations plainly precludes summary judgment. *See Lamb*, 660 F.2d at 794.

And even if the asserted routine use was applicable and the purpose of the disclosure aligned with the purpose for the records' collection (a disputed material fact in its own right), summary judgment would still be improper because the parties dispute whether Defendants engaged in a good-faith, diligent balancing of the public and private interests, as Defendants concede the supposed routine use mandated. Motion at 39–40. Federal "agents' status as public officials does not rob them of their privacy rights," *Stone v. F.B.I.*, 727 F. Supp. 662, 664 (D.D.C. 1990), and the DOJ is ordinarily reticent to release the names of its career employees, in part because it knows that they may then be the victims of threats and intimidation as Strzok has been since the Defendants disclosed his identity. SOGI ¶ 59b; *see Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980) (FBI "agents have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives."); *see also Gerstein v. C.I.A.*, No. C 06-4643 MMC, 2011 WL 89337, at *2 (N.D. Cal. Jan. 11, 2011).

The Defendants, and Mr. Winn, point to the fact that Plaintiff's identity was already public on December 12, 2017 as decreasing the weight of the privacy interests at stake since at

---

[11]     The media and public disclosure routine use has been used only to justify disclosing private information to the public at the conclusion of an OIG investigation and together with the OIG's analysis and conclusions. SOGI ¶ 55c.

that time "there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting [Mr. Strzok's and Ms. Page's] names." Motion at 40. But Defendants never engaged in a balancing analysis in which the non-disclosure of Strzok's identity was a realistic possibility only because they had already leaked information about the text messages before any balancing of interests was contemplated. SOGI ¶ 56d. They should not now be allowed to rely on the effects of their prior indiscretion as a justification for their subsequent improper disclosures to the media.

It is also no answer to say, as Defendants do, that the text messages would have become public anyway. Motion at 36. Many of the private text messages that were provided to the media on December 12, 2017 were not included in the Midyear Report and may never have been publicly disseminated absent the December 12 disclosures. SOGI ¶ 54b. Moreover, by releasing the texts to the media long before the OIG's investigation had concluded that Plaintiff's political opinions had not impacted his work at the FBI, Defendants provided President Trump and his allies a lengthy head start to falsely shape the perception of the Plaintiff as (among other things) a traitor and coup plotter.

3.   Plaintiff Will Show that the DOJ Willfully and Intentionally Violated the Privacy Act.

Strzok expects to prove that the DOJ "acted in a manner which was intentional or willful" as required by 5 U.S.C. § 552a(g)(4).[12] Defendants claim that Strzok will never be able to meet

---

[12]   As Defendants note, "[i]n distinguishing between an intentional violation and an inadvertent error, this Circuit has assembled a variety of tests . . . ." Motion at 42. Defendants contend that "together" the Circuit's cases require conduct "greater than gross negligence" based on *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987), yet the Circuit's more recent cases show that conduct "greater than gross negligence" is but one of several ways in which an intentional or willful violation of the act may be proven. *See Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010). A plaintiff may also succeed by showing that the disclosure was made "without grounds for believing it to be lawful" or "by flagrantly disregarding others' rights

that burden because Mr. Winn provided an opinion to Associate Deputy Attorney General Scott Schools that the public interest in the texts' disclosure outweighed the private interests of Strzok and Ms. Page.   But this Court cannot accept Mr. Winn's declaration as a definitive account of Defendants' decision-making process.   To be sure, Defendants' disclosure of Mr. Winn's advice is a waiver of any privileges Defendants might try to assert against discovery of their decision-making, just as presenting an advice of counsel defense operates as a waiver of the attorney-client privilege.   *See Ideal Elec. Sec. Co. v. Int'l Fid. Ins.*, 129 F.3d 143, 151 (D.C. Cir. 1997).   But Mr. Winn was not the official who made the decision to release the text messages on December 12, 2017 or among the employees who made the disclosures at issue, and his declaration has no necessary bearing on whether those unnamed actors intentionally or willfully violated Strzok's rights.   As noted, disputed issues of intent and motive are rarely suited for summary judgment even on a fully developed record, *see Evans*, 716 F.3d at 622, *Lamb*, 660 F.2d at 794, and they are even less amenable to preemptive summary judgment at this early stage of litigation, *see Convertino*, 684 F.3d at 102.

The task of responding to Defendants' motion is made doubly difficult by the DOJ's ironically extensive redaction, in response to a FOIA request, of post-December 12, 2017 emails regarding the back-dated "Privacy Act Assessment" on *deliberative process grounds.   See, e.g.*, SOGI Exs. D, E (note redactions for "(b)(5)").   Two key issues emerge.   First, if Mr. Winn had actually reached an opinion after sufficient due diligence and careful analysis on December 12, 2017, there would be no need and no right to invoke deliberative process protections for the

---

under the Act." *Id.* (quoting *Waters v. Thornburgh*, 888 F.2d 870, 875 (D.C. Cir. 1989)).   The Circuit's more recent interpretations of the Privacy Act's "intentional or willful" requirement also more closely adhere to Supreme Court precedent, which extends civil liability for "willful" acts "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).

agency's Privacy Act assessment after December 12, 2017. *See Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014) (limiting privilege to "documents that are 'predecisional' and 'deliberative'"). Second, Strzok is being forced to respond to a motion for summary judgment based on records that appear to redact information central to this case. *See Doe 2 v. Esper*, No. CV 17-1597 (CKK), 2019 WL 4394842, at *7 (D.D.C. Sept. 13, 2019) (deliberative process could not be used to shield documents when "the extent and scope of that decision-making process is a central issue in this lawsuit"). Only after discovery can Strzok be expected to fully respond to Defendants' asserted lack of intent, but even the heavily redacted FOIA disclosures debunk Defendants' claim that its December 12, 2017 disclosures were based on "thoughtful analysis" or complete "due diligence." Due diligence, by definition, is performed *before* disclosure, not, as here, where a memorandum justifying the disclosures is prepared belatedly and then back-dated. SOGI ¶ 56d; *cf. Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 44 (D.D.C. 2012) (finding, *after trial*, that agency employee had "not willful[ly] or intentional[ly]" violated the Privacy Act because agency employee "did her due diligence *before* releasing the documents" (emphasis added)).

## V.     CONCLUSION

For the reasons explained above, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment as to Count One and Count Two, and Motion for Summary Judgment as to Count Three should be denied.

Date: December 30, 2019                    Respectfully submitted,

                                           /s/ Aitan D. Goelman
                                           Aitan D. Goelman (DC Bar 446636)
                                           ZUCKERMAN SPAEDER LLP
                                           1800 M Street, NW, Suite 1000
                                           Washington, DC 20036
                                           Tel: (202) 778-1800
                                           AGoelman@zuckerman.com

                                           /s/ Richard A. Salzman
                                           Richard A. Salzman (DC Bar 422497)
                                           HELLER, HURON, CHERTKOF & SALZMAN
                                           PLLC
                                           1730 M Street, NW, Suite 412
                                           Washington, DC 20036
                                           Tel: (202) 293-8090
                                           salzman@hellerhuron.com

                                           *Counsel for Plaintiff*