## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-2367-ABJ |
| | ) | |
| WILLIAM P. BARR, in his official capacity | ) | |
| as Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Pursuant to Local Civil Rule 7(h), Plaintiff Peter Strzok hereby responds to Defendants' Statement of Undisputed Material Facts and sets forth material facts as to which a genuine issue exists that preclude the grant of summary judgment. Although Local Rule 7(h) requires "references to the parts of the record relied on to support the statement," because Defendants have moved for summary judgment before any fact discovery or creation of a record, Plaintiff cites to attached exhibits where relevant information is in his possession. Where the relevant information is within the possession of the Defendants or third parties, the facts set forth below are based on information and belief. For the sake of brevity, Plaintiff repeats only the most critical statements of fact contained in the Complaint. We begin by responding to Defendants' asserted "undisputed facts," followed by the genuine issues remaining for trial with related facts presented in roughly chronological order.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants' Statement of Undisputed Material Facts gingerly side-steps the facts that actually matter to the claims alleged.  Defendants offer a partial narrative that (for the most part) can stand alongside the allegations of the Complaint without contradicting them.  Because the Complaint plausibly pleads claims under the First and Fifth Amendments and the Privacy Act, Plaintiff must be afforded discovery before he can be compelled to fully respond to Defendants' assertions.

1.      After serving in the United States Army, Plaintiff entered the rolls of the FBI in 1998. *See* Compl. ¶¶ 14-15.

**Admitted.**

2.      When Plaintiff exchanged the text messages at issue in this litigation, beginning around August 2015 through May 2018, Plaintiff was a member of the FBI's SES. *See* OIG Report at 396.

**Admitted.**

3.      During the same period, Plaintiff was promoted to Deputy Assistant Director of the FBI's Counterintelligence Division in September 2016. *Id.*

**Plaintiff was promoted on a date, not during a period; otherwise admitted.**

4.      Plaintiff's career at the FBI put him at the center of some of the most important and politically charged investigations in the Bureau's history. *See* Compl. ¶¶ 1, 13–16.

**The phrase "at the center" is imprecise.  The Complaint states the facts alleged.**

5.      Plaintiff was assigned in August 2015 to lead the criminal investigation of former Secretary of State and presidential candidate Hillary Clinton's use of a private email server, which the FBI referred to as "Midyear Exam" or "Midyear." Compl ¶¶ 15, 32.

**Admitted.**

6.      Then, in July 2016, Plaintiff was assigned to the FBI's investigation into the Russian government's efforts to interfere in the 2016 presidential election. *See* Letter Unit Chief, Adjudication Unit II, Office of Professional Responsibility 2, June 15, 2018 ("Proposal Letter") (Exhibit 1).

**Admitted.**

7.      Plaintiff was "one of the key members" of that investigative team. Compl. ¶ 31.

**Admitted, although as set forth in the OIG's Report on the FBI's Investigation into Russia's interference in the 2016 election Report ("Crossfire Hurricane Report"), Plaintiff's role in the investigation was that of a mid-level manager, with several layers of FBI officials both above and below him in the hierarchy.[1]**

8.      After former FBI Director Robert Mueller III was appointed Special Counsel over the Russian investigation, Plaintiff was a member of the Special Counsel's staff from May 2017 until July 28, 2017. *See* Proposal Letter at 2.

**Admitted.**

9.      In early 2017, in response to requests from Congress, various organization, and members of the public, the OIG opened an investigation into various actions by the FBI and the Department in connection with the Midyear investigation that Plaintiff led. Compl ¶ 32; *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June 2018 ("OIG Report"), https://www.justice.gov/file/1071991/download.

**Admitted.**

10.      As part of that investigation, the OIG requested and received text messages from FBI-issued mobile devices for personnel involved in the Midyear investigation, including those sent and received by Plaintiff, for the period when the Midyear investigation began through July 1, 2017. OIG Report at 395-96.

**Plaintiff has no basis to either admit or dispute these statements at this time because he has not been afforded discovery. Plaintiff reserves the right to dispute the veracity of these statements after being afforded the opportunity to take discovery in this matter.**

11.      In its review of the collected text messages, the OIG identified over 40,000 text messages exchanged on FBI-issued cell phones between Plaintiff and the Government Attorney, who was serving as Special Counsel to former Deputy Director Andrew McCabe. OIP [*sic*] Report at 396.

**Plaintiff has no basis to either admit or dispute these statements at this time because he has not been afforded discovery. Plaintiff reserves the right to dispute the veracity of these statements after being afforded the opportunity to take discovery in this matter.**

---

[1]      Office of the Inspector Gen., U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* at iii, Oversight and Review Division 20-012 (Dec. 2019 (Revised)) ("Crossfire Hurricane Report"), https://www.justice.gov/storage/120919-examination.pdf (explaining that Strzok was "not the sole, or even the highest-level, decision maker as to any of" several critical decisions).

12.     Those messages included political opinions about candidates and issues involved in the 2016 Presidential election, "including statements of hostility toward then candidate Trump and statements of support for candidate Clinton." *Id.*

**Admitted that the Midyear Report is accurately quoted. The text messages speak for themselves and include statements criticizing politicians of both major parties.**

13.     In addition, according to the OIG, "[s]everal of their text messages also appeared to mix political opinions with discussions about the Midyear and Russia investigations," which raised questions as to whether Plaintiff's and the Government Attorney's political opinions may have affected investigative decisions. *Id.*

**Admitted that the Midyear Report is accurately quoted. Denied that Plaintiff's political opinions influenced his work or that officials had a sound basis for believing they had. Plaintiff notes that the OIG, at the conclusion of its investigation, explicitly stated that it had found no evidence that political opinions played any role in investigative decisions. *See infra* Statement of Genuine Issues Sections B, C.**

14.     The text messages exchanged between Plaintiff and the Government Attorney, as well as others described in the OIG Report, include the following: [quotations omitted, citation to OIG Report at 400, 403-05.]

**Admitted.**

15.     Upon review of Plaintiff's text messages, the OIG was "particularly concerned" that they "potentially indicated or created the appearance that investigative decisions they made were impacted by bias or improper considerations." *See* OIG Report at ix.

**Admitted that the Midyear Report is accurately quoted. Plaintiff notes, again, the OIG's ultimate conclusion regarding the absence of political bias in any investigative decision or act. This conclusion was known to Defendants at the time they terminated Plaintiff's employment. *See infra* Statement of Genuine Issues Sections B, C.**

16.     The OIG pointed to, in particular, Plaintiff's August 8, 2016 text message stating that "'we'll stop' candidate Trump from being elected," which gave rise to the implication that Plaintiff was willing to take official action to impact a presidential candidate's electoral prospects. *Id.* The OIG Report is replete with other examples how Plaintiff evidenced political bias—or, at best, created the perception of bias. *See, e.g.*, *id.* at 399-410.

**Denied that Plaintiff's political views affected his work. The OIG concluded that Plaintiff's views did not affect his work. Also denied that Plaintiff's private expression of political views in text messages created the perception of bias. Defendants' illegal disclosure of the text messages and President Trump's relentless attacks on Plaintiff, the FBI, and the Mueller Investigation were the cause of the perception of the bias Defendants reference. *See infra* Statement of Genuine Issues Sections B, C.**

17.     Plaintiff acknowledged to the OIG that

his text messages could be read to suggest that [Plaintiff] held himself responsible for Trump's victory and Clinton's defeat because of the Midyear investigation and that he viewed the Russia investigation as providing him an opportunity to 'fix' this result by working on an investigation that could result in the impeachment of President Trump. OIG Report at 405.

**Admit the accuracy of the quote, which is taken out of context and misleadingly incomplete. As the Report notes in the next two sentences, which were omitted by Defendants: "Strzok said he strongly disagreed with this interpretation and provided a lengthy explanation for these statements. Strzok said that he wanted to 'finish' the Russia investigation rather than be reassigned midway through and lose the institutional knowledge of issues being investigated by the Special Counsel."[2]**

18.     The OIG concluded that Plaintiff's text messages with the Government Attorney "cast a cloud over the FBI's handling of the Midyear investigation and the investigation's credibility." *Id.* at iii.

**Admitted that the Midyear Report is accurately quoted.**

19.     When the OIG learned of the existence of the text messages between Plaintiff and the Government Attorney in the summer of 2017, both Plaintiff and the Government Attorney were members of Special Counsel Mueller's staff.

**Admitted.**

20.     The OIG informed Special Counsel Mueller of the text messages, and Plaintiff was removed from the Special Counsel's investigation on July 28, 2017. OIG Report at 397.

**Admitted.**

21.     On December 2, 2017, the New York Times and the Washington Post each reported on the existence of Plaintiff's text messages with the Government Attorney and his removal from the Special Counsel's investigation. *See* Compl. ¶ 60; *Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017) https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html; *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec. 2, 2017), https://www.nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-over-possible-anti-trump-texts.html.

**Admitted.**

---

[2]     Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* at 405, Oversight and Review Div. 18-04 (June 2018) ("Midyear Report"), https://www.justice.gov/file/1071991/download.

22.     Shortly thereafter, the chairmen of congressional committees in both the U.S. House of Representatives and the U.S. Senate ("Congressional Committees") made verbal and written inquiries to the Department regarding the existence and substance of the text messages. These inquiries included written requests for the Department to produce the text messages to Congress for oversight purposes. *See* Declaration of Stephen Boyd ¶ 7 ("Boyd Decl.") (Exhibit 2)

**Admitted that the Boyd Declaration so states.   Otherwise denied.   *See infra* Statement of Genuine Issues Section B.**

23.     In order to respond to Congress, the Department requested the text messages from the OIG and, once received, redacted them to remove non-political, personally sensitive and law enforcement information. *Id.* ¶¶ 8-9.

**Admitted that Mr. Boyd's declaration so states and that the text messages were partially redacted before production to Congress.   Otherwise denied.   Plaintiff disputes the implication that the text messages were properly redacted in accordance with Defendants' standard practices, or that the requests were actually initiated by Congress, rather than from a coordinated effort between the Members of Congress making the inquiries and the White House and/or political appointees within the DOJ.   Plaintiff reserves the right to dispute the veracity of these facts after discovery.   *See infra* Statement of Genuine Issues Section B.**

24.     The Department made its initial hard copy production of redacted text messages to the Congressional Committees on the evening of December 12, 2017, and subsequent productions followed. *Id.* ¶ 11.

**Admitted that certain members of the Congressional Committees or their staffs received some of Mr. Strzok's text messages late in the evening of December 12 or early in the morning of December 13.   Otherwise denied.   Plaintiff reserves the right to further dispute the veracity of these statements after being afforded the opportunity to take discovery in this matter.   *See infra* Statement of Genuine Issues Section B.**

25.     The Department also determined that it would be appropriate to make the same subset of text messages available to members of press. *Id.* ¶ 12.

**Denied.   Plaintiff disputes that it was "appropriate" to release the text messages to the press, or that Defendants genuinely believed at the time that it was appropriate to do so.   Paragraph 25 cites the Boyd Declaration.   However, Mr. Boyd acknowledges that he "was not directly involved in matters involving the media."   Boyd Decl. ¶ 12.   He did not make, or participate in making, the decision to release text messages to the media.   *Id.* Accordingly, Mr. Boyd has no personal knowledge of the reasons that decision was made or the circumstances.   Paragraph 25 is not properly part of the summary judgment record. Moreover, the government's choice to submit a second-hand statement when it surely has access to individuals involved in the decision-making and electronic records of their communications can be viewed as an admission that the allegations of ¶¶ 63-65 of the Complaint are true.   *See infra* Statement of Genuine Issues Section B.**

26.     The Department did so after consulting with the appropriate senior member of Department career staff—Peter Winn, Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer—who reviewed the text messages to determine whether disclosing them in redacted form to the media would be permissible under the Privacy Act. See Declaration of Peter Winn ¶¶ 3-4 ("Winn Decl.") (Exhibit 3).

**Denied.  Plaintiff disputes that it was "appropriate" or "permissible" to release the text messages to the press, or that Defendants genuinely believed at the time that it was appropriate or permissible to do so.  Plaintiff reserves the right to dispute the veracity of these facts after discovery and notes that documents released under FOIA, while heavily redacted, call into question both the timing and scope of Mr. Winn's purported review.  *See infra* Statement of Genuine Issues Section B.**

27.     As described in his accompanying declaration, Mr. Winn considered that the routine use in an OIG Systems of Records Notice, or SORN, permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." *Id.* ¶ 10 (quoting 82 Fed. Reg. at 36,726).

**Denied as incomplete.  Mr. Winn's declaration is unclear as to when he formed this view.  The justification for disclosures appears to have been finalized on January 4, 2018, when it was formalized in a memo that was then back-dated to December 12, 2017, to create a veneer of due diligence.  Discovery on this issue is critical.  *See infra* Statement of Genuine Issues Section B.**

28.     Based on his review of the text messages provided to him, and assuming the text messages were contained in an OIG system of records, Mr. Winn concluded that the public interest outweighed the privacy interest of Plaintiff and the Government Attorney and the relevant routine use would permit disclosure. *See id.* ¶¶ 11-18.

**Denied as incomplete.  Mr. Winn's declaration is unclear as to when he formed this view.  The justification for disclosures appears to have been finalized in January 2018 when it was formalized in a memo that was back-dated to create a veneer of due diligence.  Discovery on this issue is critical.  *See infra* Statement of Genuine Issues Section B.**

29.     Mr. Winn concluded that the Department's disclosure of the text messages would not violate the Privacy Act, and Mr. Winn so advised senior leadership within the Department. *Id.* ¶¶ 11-18.

**Denied as incomplete.  Mr. Winn's declaration is unclear as to when he formed this view.  The justification for disclosures appears to have been finalized in January 2018 when it was formalized in a memo that was back-dated to create a veneer of due diligence.  Discovery on this issue is critical.  *See infra* Statement of Genuine Issues Section B.**

30.     The Department's senior leadership then made the decision to release the records. *See* Boyd Decl. ¶ 13.

**Admitted but incomplete.  The identity of the decision maker is critical to showing willfulness and intent.  Discovery must be allowed.  *See infra* Statement of Genuine Issues Section B.**

31.     On June 15, 2018, OPR staff proposed dismissing Plaintiff from the FBI based on its finding that he: (1) engaged in unprofessional conduct by making inappropriate political comments in text messages on his FBI-issued cell phone, in violation of FBI Offense Code 5.21; (2) utilized a personal email account to conduct official FBI business, in violation of FBI Offense Code 5.18; and (3) failed to diligently pursue a credible lead when new information was brought forth regarding the Clinton private server investigation, in violation of FBI Offense Code 1.7. *See generally* Proposal Letter.

**Admitted.**

32.     With the assistance of his attorneys, Plaintiff provided a written response to OPR's recommendation and participated in an oral hearing at which he defended his conduct. *See* Letter of Candice M. Will, Assistant Director, OPR, Aug. 8, 2018 at 18 ("Will Letter") (Exhibit 4).

**Admitted.**

33.     In July 2018, Plaintiff and his attorney also signed a "Last Chance" Adjudication Agreement, in which Plaintiff requested, in lieu of dismissal, that OPR reduce the proposed penalty of dismissal "to a 60-day suspension, in which Offense Codes 5.21 and 5.18 are substantiated, Offense Code 5.2 (Dereliction of Supervisory Responsibility) be substituted for Offense Code 1.7, and he be demoted to a non-supervisory position." "Last Chance" Adjudication Agreement for Peter P. Strzok II (July 2018) (Exhibit 5).

**Admitted.**

34.     In exchange for a reduced punishment, Plaintiff proposed that he would, among other things, complete a suspension of 60 days and be subject to removal from the rolls of the FBI if he were to engage in any other serious misconduct. *Id.*

**Admitted, but characterizing the Last Chance Agreement as a "proposal" is inaccurate, when it was a binding agreement between the FBI and Plaintiff.  *See infra* Statement of Genuine Issues Section D; Defs.' Ex. 5, ECF No. 30-6.**

35.     In a letter dated August 8, 2018, the career Assistant Director ("AD") for OPR, Candice M. Will, analyzed the OPR's staff's recommendation, together with Plaintiff's written and oral responses and Plaintiff's "Last Chance" Adjudication Agreement. *See generally* Will Letter.

**Admitted.**

36.     As described in her letter, AD Will reviewed the available information and analyzed Plaintiff's conduct according to the twelve factors articulated in the Merit Systems Protection Board's decision in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). *Id.*

**Admitted.**

37.     AD Will determined, based on her weighing of those factors, to suspend Plaintiff from duty without pay for 60 days and to demote him to a non-supervisory position. *Id.* at 23.

**Admitted.**

38.     Before the FBI took any official employment action with respect to Plaintiff's misconduct, and before the FBI informed Plaintiff of AD Will's decision, the FBI's Deputy Director ("DD"), David Bowdich, reviewed relevant evidence and the *Douglas* factors. *See generally* Letter of David Bowdich, FBI Deputy Director, Aug. 9, 2018 ("Bowdich Letter") (Exhibit 6).

**Plaintiff admits the authenticity of the Bowdich Letter.  Otherwise denied.  Official action was taken by AD Will on August 8, 2018.  Plaintiff further disputes that DD Bowdich engaged in any genuine consideration of the allegations or the *Douglas* factors.  Instead, DD Bowdich's decision was designed to placate the President who had been publicly and privately lobbying for Plaintiff's firing because of the content of his speech.  Plaintiff must be afforded discovery into the motivation behind the firing, and what, if any, review of evidence or analysis DD Bowdich actually engaged in on August 9, 2018.  *See infra* Statement of Genuine Issues Sections C, D.**

39.     On August 9, 2018, DD Bowditch (*sic*) exercised his delegated authority, consistent with FBI policy, to modify disciplinary actions as necessary to advance the best interests of the FBI. *See* Bowdich Letter at 1; *see also* FBI Policy Directive 0915D, *Disciplinary Appeals Process* § 4.3 (Exhibit 7).

**Admitted that DD Bowdich unilaterally modified AD Will's decision on August 9, 2018.  Denied that DD Bowdich's action was consistent with his "delegated authority," "consistent with FBI policy," or "in the best interests of the FBI."  Plaintiff expects discovery to show that DD Bowdich's actions were politically motivated, the result of pressure from the White House and/or the Attorney General, and retaliatory.  *See infra* Statement of Genuine Issues Sections C, D.**

40.     Pursuant to that authority, DD Bowdich reconsidered AD Will's decision and concluded that dismissal was appropriate based on all of the facts. *See* Bowdich Letter at 1.

**Plaintiff admits the authenticity of the Bowdich Letter.  Denied that DD Bowdich's conclusion was "appropriate based on all of the facts."  Also denied that that the DD Bowdich meaningfully "reconsidered AD Will's decision."  The Bowdich Letter does not reflect the actual rationale for its conclusions.  *See infra* Statement of Genuine Issues Sections C, D.**

41.     DD Bowdich concurred with AD Will that the three offenses were substantiated; however, as he explained in his letter, DD Bowdich disagreed with AD Will's evaluation of the relevant Douglas factors in deciding the appropriate penalty. *Id.*

**Admitted that Defendants accurately summarize the Bowdich letter.  Denied, to the extent implied, that DD Bowdich genuinely disagreed with AD Will's evaluation of the relevant *Douglas* factors in deciding the penalty to impose.  Discovery is needed to resolve this disputed fact.  *See infra* Statement of Genuine Issues Sections C, D.**

42.     In his letter, DD Bowdich explained that he had reviewed relevant evidence pertaining to Plaintiff's case, including text messages between Plaintiff and the Government Attorney, Plaintiff's role as one of the most senior counterintelligence agents in the FBI, and Plaintiff's many years of service. *Id.*

**Admitted that Defendants accurately summarize the Bowdich Letter.  Otherwise denied.  Discovery is necessary for Plaintiff to determine what review, if any, DD Bowdich engaged in.  *See infra* Statement of Genuine Issues Sections C, D.**

43.     DD Bowdich concluded that—notwithstanding Plaintiff's 21 years of service— "serious aggravation is warranted for your [FBI Offense Code] 5.21 offense given the severe, longterm damage your conduct has done to the reputation of the FBI." *Id.*

**Admitted that Defendants accurately quote the Bowdich Letter.  Denied, to the extent implied, that DD Bowdich was motivated by Plaintiff's conduct, particularly given Bowdich's own prior assurances to Strzok.  *See* Exhibit N, Strzok Decl. ¶ 4.**

44.     DD Bowdich explained that, as "a Deputy Assistant Director in the Counterintelligence Division, you were expected to be a leader who was beyond reproach and to set an example for not only your direct subordinates, but others throughout the organization who watched and observed your behavior and actions." *Id.*

**Admitted that Defendants accurately quote the Bowdich Letter.  Denied, to the extent implied, that DD Bowdich was motivated by Plaintiff's position and conduct, rather than pressure from the President and his allies to fire Strzok.  *See infra* Statement of Genuine Issues Sections C, D.**

45.     DD Bowdich also noted that it was "difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in the country," and that Plaintiff's "sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-Mail investigation and the initial stages of the Russian collusion investigation." *Id.*

**Admitted that Defendants accurately quote the Bowdich Letter.  Denied that any of Plaintiff's actions called into question any decisions made by the FBI.  Rather, any loss of faith in the FBI resulted from the sustained campaign to delegitimize the Clinton and Russia investigations by President Trump and his allies, which began long before the discovery of the texts but eventually included the texts as part of a politically motivated assault on the integrity of the FBI and Special Counsel's Office.  *See infra* Statement of Genuine Issues Section A.**

46.     In short, Plaintiff's "repeated selfishness has called into question the credibility of the entire FBI." *Id.* DD Bowdich indicated that his decision to dismiss Plaintiff was final and not subject to further administrative review. *Id.*

**Admitted that Defendants accurately quote the Bowdich Letter.  Denied that Plaintiff's errors in judgment could reasonably have "called into question the credibility of the entire FBI," which has been under sustained political attack by Mr. Trump since before the 2016 election.  *See infra* Statement of Genuine Issues Section A.**

47.     The FBI updated Plaintiff's personnel file with an official Standard Form ("SF") 52, Request for Personnel Action, which terminated Plaintiff from his FBI position effective August 10, 2018. *See* Pl.'s SF 52 (Exhibit 8).

**Admitted.**

48.     The following day, on August 11, 2018, the FBI issued a SF 50, Notice of Personnel Action to Plaintiff, officially alerting him of his termination. *See* SF 50 (Exhibit 9).

**Admitted.**

49.     On September 5, 2018, Plaintiff filed an appeal of the FBI's dismissal decision with the Merit Systems Protection Board ("MSPB"), which was dismissed for lack of jurisdiction by an Administrative Judge ("AJ") on November 15, 2018. *See* MSPB Initial Decision (Exhibit 10).

**Admitted.**

50.     The AJ concluded that, as a member of the FBI SES, Plaintiff did not occupy a position that gave him appeal rights to the MSPB under the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, as amended, codified throughout Title 5 of the United States Code. *Id.* at 9.

**Admitted.**

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

The following genuine issues must be resolved by the jury at trial, or at the very least

require an opportunity for discovery as provided by Rule 56(d).

**A.     Did the President Engage in a Sustained Effort to Undermine Americans' Faith in the FBI?**

This issue is material to all claims in the case because the evidence shows that the

Defendants fired Strzok and released Privacy Act protected materials to placate the President as

a result of his relentless campaign to discredit the Bureau.  The following facts demonstrate the existence of this campaign:

51.     During his campaign for the Presidency in 2016, Donald J. Trump repeatedly attacked the integrity of the FBI in particular and law enforcement in general.[3]  Before FBI Director James Comey announced that former Secretary of State and Democratic nominee Hillary Clinton would not be prosecuted for her use of a private email server as Secretary of State, Candidate Trump claimed without evidence that a decision not to prosecute Secretary Clinton would necessarily be corrupt.[4]  After Director Comey's announcement, Mr. Trump claimed, again without evidence, that the FBI's decision had been a result of political pressure by the Obama Administration.[5]  Mr. Trump also repeatedly warned that, if Secretary Clinton defeated him in the election, that would be the result of fraud and corruption.[6]  Throughout the campaign, Mr. Trump led supporters at his rallies in chants of "lock her up!"[7]  These campaign tactics conditioned many Trump supporters to believe that the FBI was biased against Trump.

---

[3]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("Crooked Hillary colluded w/FBI and DOJ and media is covering up to protect her. It's a #RiggedSystem! Our country deserves better!" (Oct. 17, 2016, 2:03 PM)), ("EXCLUSIVE: FBI Agents Say Comey 'Stood In The Way' Of Clinton Email Investigation" (linking to dailycaller.com article) (Oct. 17, 2016, 6:42 PM)).

[4]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("Crooked Hillary Clinton is 'guilty as hell' but the system is totally rigged and corrupt! Where are the 33,000 missing e-mails?" (July 4, 2016, 8:26 AM)).

[5]     *See, e.g.*, Trump Campaign (@TeamTrump), Twitter ("CORRUPTION CONFIRMED: FBI confirms State Dept. offered 'quid pro quo' to cover up classified emails." (Oct. 17, 2016, 10:50 AM)).

[6]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("Of course there is large scale voter fraud happening on and before election day. Why do Republican leaders deny what is going on? So naive!" (Oct. 17, 2016, 7:33 AM)).

[7]     Wall Street Journal, *RNC 2016 Chant: 'Lock Her Up' Goes Mainstream*, YOUTUBE (July 22, 2016), https://www.youtube.com/watch?v=VtaxcKvRCpY.

52.     After his election, President Trump continued to incite his supporters against the FBI and the intelligence community.[8]   President Trump repeatedly stated, largely but not exclusively by tweet, that the intelligence community's conclusion that Russia interfered in the 2016 presidential election to help him and hurt Secretary Clinton was untrue, and contended that the investigation into Russian interference, first by the FBI and then by Special Counsel Mueller, was a politically motivated "witch hunt," a "hoax" and a "scam."[9]   President Trump's attacks on the integrity of the FBI and the Russia investigation, which preceded the discovery of the texts at issue in this case, were designed to, and did, further erode his supporters' faith in the integrity of the FBI and law enforcement.

53.     After months of attacks by President Trump and his allies in Congress and the media, the DOJ Office of the Inspector General ("OIG") initiated investigations into the investigations of Secretary Clinton's email and Russian interference in the 2016 election.  The OIG investigations stretched over years, involved the review of millions of documents and the interview of hundreds of witnesses, and culminated in two reports—one issued in June 2018 and

---

[8]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("Information is being illegally given to the failing @nytimes & @washingtonpost by the intelligence community (NSA and FBI?).Just like Russia" (Feb. 15, 2017, 7:19 AM)).

[9]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("The Russia-Trump collusion story is a total hoax, when will this taxpayer funded charade end?" (May 8, 2017, 3:46 PM)), ("You are witnessing the single greatest WITCH HUNT in American political history - led by some very bad and conflicted people!  #MAGA" (June 15, 2017, 4:57 AM)), ("Congratulations to @ABC News for suspending Brian Ross for his horrendously inaccurate and dishonest report on the Russia, Russia, Russia Witch Hunt. More Networks and 'papers' should do the same with their Fake News!" (Dec. 2, 2017, 6:22 PM)), ("A must watch: Legal Scholar Alan Dershowitz was just on @foxandfriends talking of what is going on with respect to the greatest Witch Hunt in U.S. political history. Enjoy!" (Dec. 4, 2017, 4:35 AM)); *cf* Donald J. Trump (@realDonaldTrump), Twitter ("Global warming is an expensive hoax!" (Jan. 29, 2014, 10:27 PM)).

one issued in December 2019.[10]  Both reports criticized, among other things, politically charged texts exchanged between Strzok and a Government Attorney, Lisa Page.  The reports also concluded that there was no evidence that Plaintiff's political opinions impacted his work on either the Clinton or Russia investigations.[11]

## B.   Issues of Material Fact Relevant to the Privacy Act Claim

54.   From what system(s) of records did Defendants collect records about Strzok in order to disclose his private information in 2017?  Defendants essentially concede that the records were retrieved from the OIG's investigative records system by relying on a supposed "routine use" that is specific to that system.  It remains to be discovered whether other systems were utilized to disclose the records at issue.  Plaintiff submits that the following facts are likely to be proven:

a.   The text messages were collected from Mr. Strzok's and Ms. Page's phones and maintained in a system of records by the FBI's Enterprise Security Operations Center ("ESOC") referred to as the "FBI's collection program" and in a separate enterprise.db database.[12]  Both databases stored data so that it could be collected by names, phone numbers, or other personal identifiers that were specific to Mr. Strzok and Ms. Page.

---

[10]   Midyear Report, *supra* note 2; Crossfire Hurricane Report, *supra* note 1.

[11]   *See* Midyear Report at iii (finding no "documentary or testimonial evidence that improper considerations, including political bias, directly affected the specific investigative decisions"); Crossfire Hurricane Report at iv (finding no "documentary or testimonial evidence that political bias or improper motivation influenced the decisions to open the four individual investigations").

[12]   Office of the Inspector Gen., U.S. Dep't of Justice, *Report of Investigation: Recovery of Text Messages From Certain FBI Mobile Devices*, Investigations Div. 2018-003523 (Dec. 2018) ("Text Message Recovery Report"), https://oig.justice.gov/reports/2018/i-2018-003523.pdf.

b.      The text messages between Mr. Strzok and Ms. Page came to light during the OIG investigation into the FBI's handling of the Hillary Clinton email investigation. The OIG collected the text messages from the ESOC and the enterprise.db database and stored the text messages within its "Investigative Records."[13]  The text messages that Mr. Strzok and Ms. Page exchanged were largely "routine work-related communications," although many were "of a personal nature, including discussions about their families, medical issues, and daily events."[14]  Most of these personal text messages were entirely apolotical and were not included in the Midyear Report.[15]

c.      This OIG's investigative records system organizes files by case number such that they may "be retrievable by the surnames of subjects, witnesses, and/or complainants."[16]

d.      One or more of the above noted systems (or other systems unknown) was accessed to retrieve and impermissibly disclose Plaintiff's private information.  Upon information and belief, the DOJ retrieved the text messages that were then leaked to the press from the OIG's investigative records by using either Plaintiff's name, an identifying number, or another identifying particular, such as his cell phone number.

55.    Could the purported "routine use" relied upon by the Defendants have justified their release of Plaintiff's personal records?  Plaintiff answers that it could not, and submits that:

---

[13]     *See id.*; *see also* 72 Fed. Reg. 36,725.

[14]     Midyear Report at 398.

[15]     See generally *id.*

[16]     72 Fed. Reg. 36,725, 36,726.

a.      The OIG published a list of "routine uses" of its investigative records in the Federal Register that includes compatible disclosures "to the news media and the public" unless disclosure would constitute "an unwarranted invasion of personal privacy."[17]   However, the OIG only routinely communicates with the public and media through its public reports, such as the ones issued in June 2018 and December 2019.

b.      The OIG's investigative records exist "to carry out [the OIG's] responsibilities pursuant to the Inspector General Act of 1978, as amended."  The OIG only routinely uses those records "in the course of investigating individuals and entities suspected of having committed illegal or unethical acts and in conducting related criminal prosecutions, civil proceedings, and administrative actions."[18]

c.      Although Defendants characterize the disclosure of texts to the media in this case as such a "routine" use, on information and belief the OIG had never, in its nearly 30 years of existence, allowed reporters to access the files contained in its investigative records during the pendency of an investigation.

d.      On December 11, 2019, Inspector General Horowitz testified to the Senate Judiciary Committee that the OIG should never disclose investigative files to, or engage in substantive communications with, the press regarding ongoing investigations.   The relevant testimony is reproduced below.

> **Sen. Feinstein:** Did you give interviews about your investigation while it was ongoing?
>
> **Inspector General Horowitz:** I'm sorry, did I-
>
> **Sen. Feinstein:** Did you give interviews?

---

[17]     *Id.*

[18]     *Id.*

**Inspector General Horowitz:** Myself?

**Sen. Feinstein:** During the investigation?

**Inspector General Horowitz:** No. I do not do that.

**Sen. Feinstein:** Did anybody on the IG team?

**Inspector General Horowitz:** No, and it would have been entirely inappropriate for them to do so.

**Sen. Feinstein:** So, I'd just like to clear this up, what are the dangers of discussing an investigation that's ongoing?

**Inspector General Horowitz**: So, I actually wrote and we wrote a 500-page report about that that we issued last year on the midyear investigation and among other things criticized what occurred last year with regard to the handling of that investigation. . . . Ongoing investigations, you don't know as an investigator or you shouldn't conclude as an investigator, until you are done with the investigation. You shouldn't be reaching your conclusions until that point. And so giving preliminary ideas, advice, guidance statements, can be misleading and you should not be reaching final conclusions until you get to the end of the investigation.[19]

e.    After the texts in question were discovered by OIG and before December 2, 2017, someone in the leadership of the DOJ caused their existence and contents to be leaked to the press, either by providing this information directly to reporters or by providing it to the White House in order to provide to reporters.[20]

56.    Who authorized the disclosure of the texts to the media, and what was his/her/their motive?  This is relevant to whether the disclosures of information about Plaintiff were compatible with the purpose for which Defendants collected those records as required by the Privacy Act.  It is also relevant to whether the pre-December 2, 2017 leaks to the media and/or the "authorized" disclosure to the media on December 12, 2017 were willful or intentional violations of Plaintiff's Privacy Act rights.  The following facts are relevant to this question:

---

[19]    *Crossfire Hurricane Report Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (Dec. 11, 2019) (official transcript not yet available), https://www.rev.com/blog/inspector-general-report-hearing-transcript-michael-horowitz-testifies-on-fbis-findings.

[20]    Defs.' Statement of Undisputed Facts ¶ 21 cites two December 2, 2017 articles concerning the text messages at issue.

a.      It is unknown which official made the pre-December 2, 2017 disclosures. The identity of that official (or officials) will likely be discovered and is relevant to proving willfulness or intent.

b.      On December 14-15, 2017, DOJ Spokesperson Sarah Isgur Flores engaged in an email exchange with a reporter from Fox News in which Mrs. Flores acknowledged that members of the press were provided access to the texts before either Congress *or* the "official" disclosure of the texts to reporters by DOJ, both of which had occurred on December 12, 2017.   Ms. Flores initially claimed that this disclosure was "not authorized" before subsequently and falsely implying that Congress was the source of the leaks.[21]

c.      On or about December 12, 2017, a high-ranking political appointee at the DOJ made the decision to allow members of the press access to the texts that the DOJ had received from the OIG's investigative records.[22]  On the afternoon of December 12, only hours before the Defendants allowed reporters to view the texts, Department leadership first contacted the Office of Privacy and Civil Liberties ("OPCL").[23]

d.      OPCL did not conduct any "thoughtful analysis" or complete "due diligence" before the unknown official(s) ordered the disclosure of the texts to reporters. In fact, emails sent between OPCL and Associate Deputy Attorney General Schools reveal that a memo assessing the legality of the release wasn't even drafted until December 19, 2017, seven days after the disclosures, and wasn't finalized until early

---

[21]      **Exhibit A**, December 15, 2017 email from Sarah Isgur Flores to Elvan Katmer.

[22]      *See* **Exhibit B**, December 12, 2017 DOJ text messages to reporters.

[23]      **Exhibit C**, December 12, 2017 email from Scott Schools to Peter A. Winn.

2018.  Despite this, the final memo (but not earlier drafts) was back-dated to December 12, 2017, the date of the texts' release.[24]

  e. The extreme irregularity of the DOJ's conduct is underscored by the Department's own communications to Congress.  In letters to Congress, the DOJ referred to its disclosures of the texts between Mr. Strzok and Ms. Page as "extraordinary" and "unique."[25]

  f. Numerous exchanges with reporters also show that the DOJ's disclosures to the press were highly unusual.  To highlight just four of the many questions that apparently stunned reporters sent to the DOJ's Office of Public Affairs on December 13, 2017: Mark Hosenball of *Reuters* asked "Isn't it quite unorthodox, if not unethical or even illegal, for DoJ to deliberately make public or leak evidence collected in an IG investigation";[26] Quinta Jurecic of *The Washington Post* questioned how the DOJ would respond to allegations that it was "unusual or potentially politiciz[ed] . . . an ongoing investigation";[27] Dan Friedman of *Mother Jones* asked whether DOJ had "handy prior examples of instances in which DOJ provided information to the press" in this manner,

---

[24] *Compare* **Exhibit D**, January 4, 2018 email from Peter A. Winn to Scott Schools attaching "2017-12-12 – Privacy Assessment FINAL" *with* **Exhibit E**, December 19, 2017 email from Katherine M. Harman-Strokes to Peter A. Winn attaching "2017-12-19 – Privacy Act Assessment – OIG Records."

[25] **Exhibit F**, December 12, 2017 letter from Stephen Boyd to Chairman Goodlatte.

[26] **Exhibit G**, December 13, 2017 email from Sarah Isgur Flores to Mark Hosenball.

[27] **Exhibit H**, December 13, 2017 email from Ian Prior to Quinta Jurecic.

because he had "never received something like that";[28] and Eli Lake of *Bloomberg View* asked, "[W]hy was this done? What about the due process rights of Page and Strzok?"[29]

g.      Even after the "official" disclosure of the texts to the media on December 12, 2017, employees of the DOJ's Office of Public Affairs instructed reporters that they "couldn't source [the text messages] to DOJ"[30] and not "to attribute the texts to [DOJ]."[31]

h.      After the Office of Public Affairs failed to prevent public reports that it was the source of the leaked text messages, the DOJ misled Congress, the press, and the public by implying that the OIG had signed off on its disclosures to the press.[32]  In fact, the decision to disclose the texts to reporters was made by political appointees at the DOJ, without consultation with OIG, a fact that OIG made clear in Inspector General Horowitz's December 15, 2017 letter to Congress: "The Department did not consult with the OIG before sharing the text messages with the press."[33]

i.      The DOJ failed to properly redact or withhold the text messages in accordance with the ordinary FOIA practices that it now claims apply.

j.      Upon information and belief, the disclosures to the media were intended to discredit the Mueller investigation, engender public distrust of the FBI and the

---

[28]      **Exhibit I**, December 13, 2017 email from Ian Prior to Daniel Friedman.

[29]      **Exhibit J**, December 13, 2017 email from Ian Prior to Eli Lake.

[30]      **Exhibit K**, December 13, 2017 email from Sarah Isgur Flores to Zoe Tillman.

[31]      **Exhibit L**, December 13, 2017 email from Sarah Isgur Flores to Emma Loop.

[32]      *See, e.g.*, **Exhibit G**, December 13, 2017 email from Sarah Isgur Flores to Mark Hosenball ("As the dag just testified, the IG approved the release").

[33]      **Exhibit M**, December 15, 2017 letter from Inspector General Horowitz to Ranking Member Jarrold Nadler, Vice Ranking Member Jamie Raskin, and Congressman Hakeem Jeffries.

intelligence community, and otherwise serve the partisan political agenda of President Trump and his political allies.

k.      To the extent the top DOJ official(s) who authorized the disclosure of the media did *not* actively want to undermine the public's faith in the FBI and investigations of President Trump, upon information and belief, he/she/they disclosed the texts in question in response to President Trump's repeated criticism of these leaders' failure to sufficiently protect President Trump from scrutiny by the FBI and Special Counsel's Office.

**C.      Issues of Material Fact Relevant to the First Amendment Claim**

57.     Was the decision to fire Strzok and countermand the final decision of the FBI's duly designated "deciding official" motivated by retaliatory animus over the content of Strzok's protected political speech?

58.     Relatedly, in deciding to fire Strzok, was Deputy Director Bowdich ("DD Bowdich") attempting to placate the President of the United States who viewed Strzok as disloyal due to the content of his protected political speech?

59.     Did Defendants engage in viewpoint discrimination when they punished Plaintiff's political speech critical of President Trump, while welcoming or tolerating speech supportive of the President and critical of his political rivals?  Although discovery is critical to fully respond to Defendants' motion on these issues, the following facts suggest that the answer is affirmative:

a.      The hundreds of text messages that the DOJ disclosed to the press included private speech between Mr. Strzok and Ms. Page.  Many of the disclosed texts – including nearly all of the texts containing personal political opinions that precipitated the

ultimately successful campaign by the President to have Plaintiff terminated – were unrelated to any FBI investigation in which Plaintiff had participated.[34]

      b.    Once the texts were released, they were relentlessly exploited by the President and his sympathizers, including allies in Congress and the media, who tweeted, wrote, published, issued and declared countless false and defamatory statements about Plaintiff, including accusations of "treason," and attempting a "coup" against a democratically elected President.  President Trump also publicly and privately demanded that Plaintiff be punished for these imagined crimes, including by firing, criminal prosecution, jail and worse.[35]  In the Spring of 2018, President Trump directly pressured then Attorney General Sessions and FBI Director Wray to fire Plaintiff.[36]  At one point, President Trump endorsed the notion that Plaintiff's (nonexistent) crimes justified the death penalty.[37]  At another point, the President mimicked Plaintiff having a sexual orgasm in front of tens of thousands of jeering supporters.[38]  At a subsequent rally the

---

[34]    *See* Defs.' Statement of Undisputed Facts ¶ 14.

[35]    *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("So they now convict Roger Stone of lying and want to jail him for many years to come. Well, what about Crooked Hillary, Comey, Strzok, Page, McCabe, . . . ? Didn't they lie?.... A double standard like never seen before in the history of our Country? (Nov. 15, 2019, 9:13 AM)).

[36]    *See* Murray Waas, *Exclusive: Trump Pressed Sessions to Fire 2 FBI Officials Who Sent Anti-Trump Text Messages* VOX (Apr. 20, 2018 9:30 AM), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages.

[37]    *See* Philip Bump, *Trump, not understanding treason, names people he thinks committed the capital crime*, The Washington Post, May 23, 2019; Donald J. Trump (@realDonaldTrump), Twitter ("My Campaign for President was conclusively spied on. Nothing like this has ever happened in American Politics. A really bad situation. TREASON means long jail sentences, and this was TREASON!" (May 17, 2019, 4:11 AM)).

[38]    *See Trump Mocks Peter Strzok, Lisa Page at Minnesota rally*, The Washington Post (Dec. 2, 2019, 12:27 PM), https://www.washingtonpost.com/video/politics/trump-mocks-peter-

President falsely suggested that Ms. Page had procured a restraining order against Plaintiff.[39]  This premediated campaign of vilification directly resulted in Plaintiff's termination and a host of threats against Plaintiff and his family that have continued even after he was fired.[40]

c.    On June 14, 2018, the OIG issued its report on the FBI's investigation into Secretary Clinton's emails, which the FBI had opened under the codename "Midyear Exam." ("Midyear Investigation").  This report concluded that there was no evidence that Plaintiff's political opinion had affected his work on the Midyear Investigation and noted that, although Plaintiff had expressed a preference for Secretary Clinton over Candidate Trump, Plaintiff had nevertheless been one of the members of the Midyear Team pushing for relatively more aggressive investigative steps against Secretary Clinton.[41]

d.    On June 15, 2018, the day after the release of the OIG Midyear Report, the FBI Office of Professional Responsibility ("OPR") sent Plaintiff a letter, accusing him of violating three sections of the FBI Offense Code and recommending his dismissal.[42]

e.    On July 12, 2018, Plaintiff publicly and voluntarily testified before the House Oversight and Judiciary Committees. In 11 hours of sometimes openly hostile questioning from President Trump's Congressional allies, Plaintiff testified that: he deeply regretted sending the texts in questions, which had provided ammunition for

---

strzok-lisa-page-at-minnesota-rally/2019/12/02/968979d0-38b3-409e-97c6c2e20c9cfa53_video.html.

[39]    Lisa Page (@NatSecLisa), Twitter ("This is a lie.  Nothing like this ever happened." (Dec. 11, 2019, 9:34 AM)).

[40]    **Exhibit N**, Strzok Decl. ¶ 7.

[41]    Midyear Report, *supra* note 2, at iii.

[42]    Defs.' Ex. 1, ECF No. 31-1.

politically motivated attacks against an institution he loved and had served proudly for 20 years; he had never allowed his political opinions to affect his investigative actions; and, contrary to President Trump's repeated statements, the investigation into Russian interference in the 2016 U.S. Presidential election was neither a "hoax" nor a "witch hunt."[43]

      f.     On July 17, 2018, Plaintiff submitted a letter to the FBI OPR responding to OPR's letter of June 15, 2018.  In Plaintiff's letter, a copy of which is attached,[44] he again expressed remorse for sending the texts but contested OPR's allegations that he had violated the FBI Offense Code and argued against OPR's recommendation of dismissal.

      g.     Contrary to Defendants' claim (Motion at 8), that Plaintiff does not "appear to dispute" the conclusion that it was his text messages that "cast a cloud" over the Midyear Investigation and the FBI's credibility, Plaintiff strongly contests and contested that charge, in his public testimony,[45] his July 17, 2018 letter,[46] and his testimony before Assistant Director Candice M. Will ("AD Will") on July 24, 2018, in which Plaintiff noted that it was the cynical use of the texts by the President (who had been attacking the FBI's integrity long before the texts surfaced) and his allies, and not the texts themselves, that damaged the credibility of the FBI.[47]

---

[43] *House Judiciary Comm. and House Oversight and Gov't Reform Comm. Joint Hearing on FBI and DOJ Actions Surrounding the 2016 Election*, 2018 WL 3410042 (July 12, 2018).

[44] **Exhibit O**, July 17, 2018 letter response of Peter Strzok to Candice Will.

[45] *House Judiciary Comm. and House Oversight and Gov't Reform Comm. Joint Hearing on FBI and DOJ Actions Surrounding the 2016 Election*, 2018 WL 3410042 (July 12, 2018).

[46] *See* Ex. O.

[47] Goelman Decl. ¶ 7.

h.      Plaintiff also expressed deep concerns with the lack of due process in his disciplinary process, citing the following facts: repeated public and private statements by President Trump demanding that Plaintiff be fired; Plaintiff's inability to access his own files or the thousands of pages of materials relied upon by OPR; and "the unusual and unprecedented speed of OPR's process," evidenced by the fact that OPR's letter to Plaintiff still contained language keyed to a prior version of the OIG report that had been changed in the final report, which suggested "a rush to judgment which undermines [Plaintiff's] right to due process."[48]

i.      AD Will began her career at the DOJ in 1988 and was appointed Assistant Director for the Office of Professional Responsibility by Director Robert S. Mueller in 2004.[49]  AD Will, as the government has recognized in other litigation, is a "high-ranking career official," and her opinions on what the "standard penalty" is for violations of FBI policy are entitled to considerable weight.[50]  In *McCabe v. Barr*, the government has argued that the fact that former Acting Director McCabe's dismissal resulted from "the conclusions and recommendations" of AD Will, among others, demonstrates the absence of a political motivation for, and the propriety of, McCabe's termination.[51]  Here, in contrast, AD Will's determination of the appropriate penalty for Plaintiff was summarily rejected after President Trump's sustained pressure on the FBI to fire Strzok.

---

[48]     Ex. O at 16 n.7.

[49]     FBI, Nat'l Press Release, "FBI Director Names Candice M. Will as Assistant Director for Office of Professional Responsibility" (Aug. 11, 2004), https://archives.fbi.gov/archives/news/ pressrel/press-releases/fbi-director-names-candice-m.-will-as-assistant-director-for-office-of- professional-responsibility.

[50]     *See* Motion to Dismiss and For Summary Judgment at 21, 28, *McCabe v. Barr*, No. 1:19-CV-2399-RDM (D.D.C. Nov. 1, 2019), ECF No. 23.

[51]     *Id.* at 21.

j.      After conducting an in-person hearing with Plaintiff on July 24, 2018, AD

Will sent Plaintiff a "Last Chance Agreement" ("LCA") whereby Plaintiff would be

suspended for sixty days and demoted rather than terminated.  Plaintiff and counsel

executed and returned the LCA on July 26, 2018.[52]  AD Will's office stressed that "in the

end, it is the AD's decision" as to whether or not to execute the LCA.[53]

k.      At the hearing, AD Will invited Plaintiff to supplement his submission by

providing her a list of up to five character witnesses from whom the AD would solicit

input with respect to Plaintiff.  Plaintiff provided AD Will with the names of four people.

On August 6, 2018, the AD's office sent an email to counsel for Plaintiff informing him

that one of the proposed character witnesses needed until the end of the week to submit a

statement on Plaintiff's behalf and asked counsel whether the Plaintiff wanted OPR to

wait for the character reference before she signed the LCA and letter to Plaintiff's

Division if the AD was otherwise ready to proceed.  Counsel for Plaintiff responded that,

if AD Will was ready to move forward pursuant to the terms set forth in the LCA, there

was no need to wait for the character reference, but that if AD Will was considering

terminating Mr. Strzok, Plaintiff requested that she wait and consider this character

reference as mitigating information under the *Douglas* factors.[54]

l.      Between the time that Plaintiff signed the LCA on July 26, 2018 and AD

Will's decision on August 8, 2018, the campaign of pressure by President Trump and his

---

[52]      Defs.' Ex. 5, ECF No. 30-6.

[53]      **Exhibit P**, July 25, 2018 email from OPR to Aitan Goelman.

[54]      **Exhibit Q**, August 6, 2018 email from OPR to Aitan Goelman.

allies to ensure that Plaintiff was fired continued unabated.[55]   Nevertheless, AD Will, who repeatedly noted that she had the best understanding of the FBI's Offense Code, its relevant precedent, and whatever aggravating and/or mitigating factors existed, made the decision that the terms set forth in LCA were appropriate discipline for Plaintiff.   On August 8, 2018, AD Will signed a 26-page letter that analyzed the entire record and concluded that the appropriate penalty for Plaintiff was the suspension and demotion set forth in the LCA.[56]

   m. On August 9, 2018, DD Bowdich countermanded AD Will's decision in a one-and-a-half-page letter that cited no additional evidence or analysis but concluded that dismissal was appropriate and informed Plaintiff that this decision was final and unappealable.   DD Bowdich, who had previously personally assured Plaintiff that the furor surrounding the texts would not significantly impact Plaintiff's career with the FBI,[57] did not explain what had caused him to change his mind.[58]

   n. After receiving DD Bowdich's letter, counsel for Plaintiff immediately sent DD Bowdich an email protesting both the substantive decision and the process employed by the Deputy Director, which counsel noted was a departure from both past

---

[55] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter ("FBI Agent Peter Strzok (on the Mueller team) should have recused himself on day one. He was out to STOP THE ELECTION OF DONALD TRUMP. He needed an insurance policy. Those are illegal, improper goals, trying to influence the Election. He should never, ever been allowed to…….." (Aug 1, 2018, 6:03 AM)), ("Russian Collusion with the Trump Campaign, one of the most successful in history, is a TOTAL HOAX. The Democrats paid for the phony and discredited Dossier which was, along with Comey, McCabe, Strzok and his lover, the lovely Lisa Page, used to begin the Witch Hunt. Disgraceful!" (Aug. 1, 2018, 7:01 AM)).

[56] Defs.' Ex. 4, ECF No. 30-5.

[57] **Exhibit N**, Strzok Decl. ¶ 4.

[58] *See* Defs.' Ex. 6, ECF No. 30-7.

practice and the FBI's own prior written assurances that it would follow regular process in this matter.  Counsel asked for the opportunity to appeal DD Bowdich's decision to terminate Plaintiff or, in the alternative, an explanation as to why the FBI decided to "abandon both past practice and its own written commitments in this case."[59]  Although counsel received an email from FBI's Office of General Counsel ("OGC") on August 20, 2018, which stated that OGC was "looking into" Plaintiff's complaint and would respond in "due course," Plaintiff never received a response.[60]

o.      After Plaintiff was removed from the rolls of the FBI, he timely filed a notice of appeal with the Merit Systems Protection Board.  This appeal was ultimately dismissed by MSPB on jurisdictional grounds.[61]

p.      On December 9, 2019, the OIG issued the Crossfire Hurricane Report, which evaluated the FBI's investigation into Russian interference in the 2016 election. The Report was over 460 pages long and concluded that there was no "documentary or testimonial evidence that political bias or improper motivation influenced the decisions" that Plaintiff and others made during the Russia investigation.[62]  It also squarely debunked many of the other allegations previously leveled by the President and his allies, including that the FBI had "spied" against the Trump campaign,[63] and that the Russian intelligence source who provided information to members of the Trump campaign was

---

[59]     **Exhibit R**, Aug. 20, 2018 email from Cecilia O. Bessee to Aitan Goelman.

[60]     *Id.*

[61]     Defs.' Ex. 10, ECF No. 30-11.

[62]     Crossfire Hurricane Report at iii–iv, *supra* note 1.

[63]     *Id.* at vi (finding no evidence that political bias affected decision to seek FISA authority).

actually a secret asset of the FBI or the U.S. intelligence community.[64]  President Trump responded to the Report by falsely claiming that it proved the "attempted overthrow" of the government and issuing a thinly-veiled threat to fire Director Wray for his failure to echo the President's false claims about the Report.[65]

  q. The Crossfire Hurricane Report also highlights instances in which FBI agents involved in the investigation sent text and instant messages "which reflect their support for Trump in the 2016 elections."[66]  For example, one supervisory special agent instant messaged another FBI employee on November 9, 2016, "if you hear talk of a special prosecutor….I will volunteer to work [on] the Clinton Foundation."  He also wrote that he was "elated with the election" because he "didn't want a criminal to be in the White House."[67]  Another pair of agents exchanged text messages that read:

> **Handling Agent:** Trump!
>
> **Co-Case Handling Agent:** Hahaha. Shit just got real.
>
> **Handling Agent:** Yes it did.
>
> **Co-Case Handling Agent:** I saw a lot of scared MFers on ... [my way to work] this morning. Start looking for new jobs fellas. Haha.
>
> **Handling Agent:** LOL[68]

Upon information and belief, none of these agents who expressed positive opinions about then President-elect Trump and negative views of Secretary Clinton faced disciplinary

---

[64] *Id.* at 403.

[65] Shannon Pettypiece, *Trump: IG report of justified campaign probe shows 'attempted overthrow' of government*, NBC News (Dec. 9, 2019, 3:53 PM), https://www.nbcnews.com/ politics/white-house/trump-ig-report-finding-2016-campaign-probe-justified-actually-documents -n1098396.

[66] Crossfire Hurricane Report at 339 n.477.

[67] *Id.*

[68] *Id.*

proceedings.  Notably, and appropriately, the FBI has taken steps to prevent these agents' identities from being publicly disclosed, in contrast to the Defendants' decision to disclose Plaintiff's identity to the media.

r.      This disparate and discriminatory treatment is but one example of a broader pattern.  Throughout the Trump Administration, there has been a pattern of treating political speech by federal employees differently based on its content.  While Plaintiff and many others who have criticized the President have faced discipline, up to and including termination, revocation of security clearances, and threats of criminal prosecution, federal employees who praise President Trump and/or attack his political rivals have faced no consequences.[69]

s.      Even career civil servants have been repeatedly singled out for opprobrium in the campaign by President Trump and his supporters to delegitimize any investigation of potential misconduct by the President.[70]  Meanwhile, the public record is replete with examples of federal employees who praise the President and criticize his political rivals having *de facto* immunity, even when their actions are clear violations of federal law.

t.      Presidential advisor Kellyanne Conway is a prominent example of this dynamic.  Even after President Trump's own Office of Special Counsel recommended

---

[69]     *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *Trump Revokes Ex-C.I.A. Director John Brennan's Security Clearance*, N.Y. Times (Aug. 15, 2018), https://www.nytimes.com/2018/08/15/us/politics/john-brennan-security-clearance.html.  Mr. Brennan appears to have been fortunate in that his security clearance was not ultimately revoked.

[70]     *See, e.g.*, Caitlin Oprysko, *White House attacks Lt. Col. Vindman as he testifies against Trump*, Politico (Nov. 19, 2019, 3:17 PM), https://www.politico.com/news/2019/11/19/alexander-vindman-testimony-071576.

Mrs. Conway's removal for flagrant and repeated violations of the Hatch Act,[71] Mrs. Conway faced no consequence, and continues to serve in the administration. President Trump even thwarted attempted Congressional oversight by instructing Mrs. Conway to refuse to comply with a Congressional subpoena under the doctrine of "absolute immunity," an argument since rejected by Judge Ketanji Brown Jackson.[72]

u.   On December 24, 2019 President Trump stated that he considered "getting rid" of the FBI employees who led the Crossfire Hurricane investigation one of his "greatest achievements." "These were dirty people. These were bad people. These were evil people, and I hope that someday I'm going to consider it my greatest, or one of my greatest achievements, getting rid of them," Trump told reporters at Mar-a-Lago, where he was on vacation.[73]

v.   Upon information and belief, if Plaintiff had expressed support for, instead of criticism of, Candidate and then President Trump, he would still be employed at the FBI.

60.   Did the FBI suffer any actual disruption as a result of Plaintiff's protected political speech?  The following facts suggest that it did not:

---

[71]   *See* Press Release, "U.S. Office of Special Counsel, OSC Finds Kellyanne Conway Repeatedly Violated the Hatch Act, Recommends Removal from Federal Service" (June 3, 2019), https://osc.gov/News/Pages/19-10-Kellyanne-Conway-Hatch-Act.aspx.

[72]   *U.S. House of Representatives v. McGahn*, No. 19-CV-2379 (KBJ), 2019 WL 6312011, at *36 (D.D.C. Nov. 25, 2019).

[73]   Chuck Ross, *Trump: 'Getting Rid' Of 'Evil' FBI Officials 'One Of My Greatest Achievements'*, Daily Caller (Dec. 24, 2019, 11:04 AM), https://dailycaller.com/2019/12/24/trump-evil-fbi-achievement/.

a.      The government cites no evidence of actual disruption in its motion and relies entirely on authority supposedly allowing it to rely on reasonable inferences of harm.  Moreover, in his memorandum firing Plaintiff, DD Bowdich cited to no instances of actual disruption in the nearly nine-month interval between the public release of the texts and the firing.[74]

b.      The DOJ OIG reports did not find that any of the actions taken or decisions made by Plaintiff during the investigations were influenced by any political views that he held.[75]

c.      To the extent that the FBI experienced a perception problem as a result of President Trump's relentless attacks on Plaintiff and law enforcement generally, often with references to Plaintiff's personal life and text messages, those issues resulted from Defendants' illegal disclosures of his political views and the politically motivated attacks against Plaintiff by the President and his allies in Congress and the media.

**D.      Issues of Material Fact Relevant to the Fifth Amendment Claim**

61.      Did the FBI vest OPR Assistant Director Candice Will with authority to make a final decision on the proposed discipline of plaintiff, and did AD Will make such a final decision on August 8, 2017, when she approved the LCA and signed and sent her letter to Strzok's Division?   Did AD Will's endorsement of the LCA after Mr. Strzok provided valuable consideration, including giving up his right to review by a Disciplinary Review Board, constitute a contract between Strzok and the agency?   While discovery is needed to answer these questions in full, the following facts suggest the answer is "yes" to each of these questions:

---

[74]      Defs.' Ex. 2, ECF No. 30-3.

[75]      *See supra* note 11.

a.     The June 15, 2018 proposed removal states: "The Assistant Director (AD) of the Office of Professional Responsibility (OPR) will make the final decision in this matter after consideration of your written and/or oral responses, should you choose to submit either or both."  The letter also says, "You will receive a written decision letter from the AD, OPR, after consideration of any oral and written responses to the proposed action, fully stating the reasons for the decision."[76]

b.     This was consistent with the FBI's standard practice and AD Will's role for the more than a decade in which she served as the deciding official, vested with full authority to make a final disciplinary decision, for employees at Plaintiff's level within the FBI.

c.     AD Will is the only official who met with and heard Plaintiff's response to the proposed disciplinary action.

d.     After meeting with Strzok and his counsel and reviewing his written reply, AD Will offered Strzok an LCA in which Strzok would relinquish any internal or external appeal rights he enjoyed and accept a demotion to a non-supervisory position and a 60-day suspension, but would not be fired, as the "FINAL decision in this matter."[77]  Strzok and his counsel signed the LCA and returned it on July 26, 2018.

e.     After AD Will did not issue her decision within several days, on July 30, 2018, counsel for Strzok inquired with AD Will's office, and was informed that AD Will was still considering whether to move forward with the LCA.  Counsel noted that "to the extent that AD Will is considering terminating Pete instead of moving forward with the

---

[76]   Defs.' Ex. 1 at 23, ECF No. 31-1.

[77]   Defs.' Ex. 5 (emphasis in the original), ECF No. 30-6.

LCA," Mr. Strzok requested that AD Will contact Strzok's character witnesses "and consider what they have to say as mitigation under the Douglas factors."[78]

f.      On or about Monday, August 6, 2018, counsel for Mr. Strzok was informed that AD Will was ready to issue her final decision, but that one of Mr. Strzok's character witnesses was unable to submit a recommendation letter until the end of that week. AD Will's office inquired whether Mr. Strzok wanted AD Will to wait to issue her decision until she had a chance to review this final character reference.   Counsel responded that, *if* AD Will was ready to move forward pursuant to the terms of the LCA, there was no need to wait for the last character letter, and AD Will proceeded to accept the LCA, extinguishing Strzok's right to appeal to a DRB and his opportunity to submit additional mitigating evidence under the *Douglas* factors.[79]

g.      On August 8, 2018, AD Will issued a final decision on the disciplinary proposal, in which she decided, "I am (a) suspending you from duty, without pay, for 60 calendar days, not dismissing you, as originally proposed, and (b) demoting you to a non-supervisory position.  AD Will's decision also states that it is "Based on" "Last Chance Agreement, 07/26/2018." [80]

h.      The next day Bowdich reversed AD Will's decision and informed Strzok that his decision constituted a final, unappealable, agency action.[81]  While discovery will reveal what (ultimately unsuccessful) pressure was brought to bear on AD Will between

---

[78]     Ex. Q at 3.

[79]     Goelman Decl. ¶ 8.

[80]     Defs.' Ex. 4 at 1, 24, ECF No 30-5.

[81]     Defs.' Ex. 6 at 2, ECF No. 30-7.

July 26 and August 8, 2018, DD Bowdich was evidently unable to withstand the pressure that AD Will was.

     i.     Shortly after Bowdich overruled her decision not to terminate Strzok, AD Will unexpectedly announced her intention to retire after three decades of federal service.

62.     Did FBI published policies and/or procedures authorize DD Bowdich to overturn a final decision by AD Will, once rendered?  Defendants claim that the answer is yes, but the policy is not clear on the matter, and a jury could reasonably find that the policy is not applicable to this case:

     a.     Policy Directive 0915D, entitled "Disciplinary Appeals Process" applies to decisions rendered through an appeal process by a Disciplinary Review Board ("DRB") of five FBI officials serving one-year terms in an adjudicatory role.  The DRB was empowered to either sustain or lower the original penalty – it could not make it more severe.[82]

     b.     There is no policy which authorized the Deputy Director to overturn AD Will's decision.  The only policy that the FBI purports to have relied upon (Policy Directive 0915D) does not in fact apply to this situation.  It authorizes the Director of the FBI (or his designee) to overturn an appellate decision of the FBI's DRB.[83]  The DRB did not consider or make a decision on Plaintiff's disciplinary action because he accepted the LCA and final decision of AD Will, and did not appeal.

---

[82]     Defs.' Ex. 7 § 6.2.5, ECF No. 30-8.

[83]     Defs.' Ex. 7 at 1–4, ECF No. 30-8.

Date: <u>December 30, 2019</u>                    Respectfully submitted,

<u>/s/ Aitan D. Goelman</u>_____
Aitan D. Goelman (DC Bar 446636)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
AGoelman@zuckerman.com

<u>/s/ Richard A. Salzman</u>_____
Richard A. Salzman (DC Bar 422497)
HELLER, HURON, CHERTKOF & SALZMAN
PLLC
1730 M Street, NW, Suite 412
Washington, DC 20036
Tel: (202) 293-8090
salzman@hellerhuron.com

*Counsel for Plaintiff*