*Strzok v. Barr*, No. 1:19-CV-2367-ABJ

# Exhibit O



Aitan D. Goelman
Zuckerman Spaeder LLP
agoelman@zuckerman.com
(202) 778-1999

ZUCKERMAN
SPAEDER

July 17, 2018

**BY EMAIL to** [REDACTED]**@fbi.gov**

Candice M. Will
Assistant Director, Office of Professional Responsibility
Federal Bureau of Investigation

    Re:    Response to Proposed Removal on behalf of Special Agent Peter Strzok

Dear Assistant Director Will:

    The DOJ Inspector General's report was nothing if not thorough. The report's key finding concerning any discipline for Special Agent Peter ("Pete") Strzok is that "we did not find documentary or testimonial evidence that improper considerations, including political bias, directly affected the specific investigative decisions we reviewed . . . or that the justifications offered for these decisions were pretextual." [DOJ Report Executive Summary, at iii]. The finding that this was *not* pretextual means that the investigative steps taken were reasonable, effective and unbiased.

    Given the finding that there was no evidence – none – that Special Agent Strzok's political opinions impacted any investigative step or decision, the proposal to fire him is unfair. It is also a capitulation to the wishes of the President, who has repeatedly called for his head. Within the past two weeks, the President accused Strzok of lying under oath during Congressional testimony [CBS News, 07/15/2018, https://www.cbsnews.com/news/donald-trump-interview-cbs-news-jeff-glor-peter-strzok-disgrace-claims-mueller-probe-hurting-russia-relations/] and referred to Strzok as a "former" FBI agent [@realDonaldTrump, 07/11/2018, 3:47 PM], after earlier having accused him of "treason" ["Trump Accuses FBI Agent of 'Treason,'" Wall Street Journal, 01/11/2018]. Several members of the House of Representative "Freedom Caucus" have also publicly called for Special Agent Strzok to lose his job. Worse yet, a reputable online publication, citing two sources, reported,

> President Donald Trump sharply questioned Attorney General Jeff
> Sessions and FBI Director Christopher Wray during a White
> House meeting on January 22 about why two senior FBI officials
> — Peter Strzok and Lisa Page — were still in their jobs despite

1800 M STREET NW, STE. 1000, WASHINGTON, DC 20036-5807 | T 202.778.1800 | F 202.822.8106
ZUCKERMAN SPAEDER LLP | WASHINGTON, DC | NEW YORK | TAMPA | BALTIMORE

CANDICE M. WILL
JULY 17, 2018
PAGE 2

> allegations made by allies of the president that they had been disloyal to him and had unfairly targeted him and his administration, according to two people with knowledge of the matter.
>
> The president also pressed his attorney general and FBI director to work more aggressively to uncover derogatory information within the FBI's files to turn over to congressional Republicans working to discredit the two FBI officials, according to the same sources.
>
> The very next day, Trump met Sessions again, this time without Wray present, and even more aggressively advocated that Strzok and Page be fired, the sources said." ["Exclusive: Trump pressed Sessions to fire 2 FBI officials who sent anti-Trump text messages," Vox, 04/20/2018]

These statements represent cynical attempts by self-serving politicians to place their hands on the scales of the Bureau's *independent* disciplinary process. This is not due process.

Special Agent Strzok was not a supporter of President Trump, but he never let that color his official responsibilities. If he truly wanted to hurt Trump's chances to win the 2016 election, he could have leaked information in the summer that the FBI was investigating interactions between members of the Trump campaign and agents from the Russian government trying to influence the election. He did not; that information was explosive and potentially game-changing, and he safeguarded it. And the IG Report observes that Special Agent Strzok and Lisa Page were among the most vocal members of the "Midyear Exam Investigation" (MYE) team in arguing for aggressive investigative techniques to uncover the details of Hillary Clinton's use of a private email server as Secretary of State. In short, Special Agent Strzok's actions in 2016 were exactly what they should be – diligent, aggressive and free of political bias or other improper considerations.

We address each of the three specifications underlying the proposed removal in greater detail below. But in brief, none of the three allegations support the draconian proposal to fire Special Agent Strzok.

The charge that Special Agent Strzok violated Offense Code 1.7 (Investigative Deficiency – Misconduct Related to Judicial Proceedings) by somehow putting investigation of the Anthony Weiner laptop on the back burner is the least supportable of the three charges. Within hours of learning of the possible presence of relevant emails on September 28th, Special

Agent Strzok assigned a subordinate supervisor, a case agent, an Intelligence Analyst and a Staff Operations Specialist, *all with no connection to the Russia investigation*, to pursue the matter. Within 24 hours of learning of the information, that team, as well as an NSLB Unit Chief, had reached out to FBI New York. Indeed, because of his position as a Deputy Assistant Director with responsibility over thousands of ongoing investigations, Special Agent Strzok was not present for, and did not otherwise participate in, the critical September 29th meeting which mapped out the FBI's plan for pursuing the data on the Weiner laptop. Once it became apparent that the laptop might contain different emails from those previously analyzed, the MYE Team (including Special Agent Strzok) diligently pursued that information and reopened the investigation. He acted no differently than other officials leading the investigation and there would be no legitimate reason to single him out for discipline over these operational decisions. We note an initial draft of the IG report (relied upon by OPR in the identification and drafting of their findings) identified fault with Deputy Director McCabe, Executive Assistant Director Steinbach, Assistant Director Priestap, and Special Agent Strzok for not following through with the laptop in a timely manner. Based on subsequent information provided by Special Agent Strzok and others, this element was removed from the final report and no individual was faulted for an investigative deficiency in the response to the Weiner laptop. It is not clear why OPR would reinsert an allegation that had been sufficiently discredited that it was dropped from the IG Report itself.

The allegation of a security violation under Offense Code 5.18 likewise does not justify the proposed dismissal. It also directly conflicts with the charged investigative deficiency. Indeed, Special Agent Strzok's need to use his personal email for work purposes was a direct result of his efforts to aggressively and expeditiously pursue the Weiner laptop information. Special Agent Strzok received a draft affidavit for a warrant to search the Weiner laptop on a weekend evening, while he was out of the office (in keeping with the extraordinary exigency, the warrant was sworn out later that same weekend). Nevertheless, he immediately moved to review the draft, forwarding the document from his FBI email to his personal iPhone because he could not view a redlined version of it on his FBI issued smartphone but could on his personal smart phone. Special Agent Strzok was careful to both double delete the email from his personal system, and to make sure it was captured on the FBI's system in accordance with policy. This action was taken in a good-faith effort to swiftly obtain the necessary warrant, and the limited use fell within the discretion afforded by Section 3.3.1 of the FBI Mobile Devices and Mobile Applications Policy Guide, 0879PG, dated July 6, 2016, permitting use of personal devices for business purposes when "the use of an FBI owned mobile device is not possible or practicable." This underscores that Special Agent Strzok's actions were an every-day occurrence for employees across the Bureau and not the sort of serious violation of policy that could justify firing a Special Agent with more than 20 years of exceptional service.

CANDICE M. WILL
JULY 17, 2018
PAGE 4

    Finally, it would be both unfair and unlawful to fire Special Agent Strzok because he expressed -- however "vituperatively" -- his personal political opinions in what he believed to be private communications with Ms. Page. Assuming the FBI was representative of the country in the fall of 2016, about 55% of FBI employees opposed the candidacy of Mr. Trump.[1] Accordingly, more than half of the FBI likely opposed Trump's candidacy at the time, and the *only* thing that singles Strzok out is that the FBI has a written record of his pre-election political opinions. He cannot be disciplined for having these opinions, for holding these opinions strongly, or even expressing them to others. Both FBI policy and the First Amendment of the Constitution protect his rights to have and express personal political opinions, especially where his personal views about the candidates did *not* affect his actions in either investigation. Thus, the only issue for this proposal is that these opinions were in text messages on an FBI phone rather than stated orally or written on a personal device.

    This is not to say that Special Agent Strzok is trying to shrug off responsibility for having used an FBI-issued cell phone to express these opinions to Ms. Page. It was wrong for him to have used his FBI device for this purpose, and he is very sorry that his actions have contributed to the disclosure of information which brought negative publicity on the agency. While we do not believe that it was reasonably foreseeable at the time that the messages he intended to be private expressions would be disclosed to the public, Special Agent Strzok accepts responsibility for his role in this occurrence, and understands that reasonable corrective action could be warranted. We note that the "standard penalty" for "Unprofessional Conduct – Off Duty" under Offense Code 5.21 is a five-day suspension. A reasonable penalty, however, does not include destroying the career of a faithful and very competent public servant by dismissing him from the FBI.

    The unrelenting pressure that the President and his political allies are injecting into this process is extremely unfair to Pete Strzok. For his sake, as well as for the rank and file members of the FBI who are very likely in this partisan climate to face intense scrutiny over politically sensitive investigations in the near future, it is imperative that this proposed disciplinary action be resolved in a fair manner, and in accordance with fundamental notions of due process.

### A. Pete Strzok's Exceptional Career of Public Service

    It is no coincidence that Directors of the Bureau under multiple administrations have assigned Pete Strzok to work on (and in many cases lead) some of the most high profile and sensitive investigations in recent history. He was one of the initial case agents on the FBI team

---

[1] https://www.realclearpolitics.com/epolls/2016/president/us/general_election_trump_vs_clinton-5491.html.

that ultimately cracked the case of the Russian illegals. He identified the car abandoned by several of the 9/11 terrorists in Boston. He oversaw the investigation of Edward Snowden and literally dozens of other spies, including investigations into the most significant U.S. losses of classified information in the past two decades. It is not happenstance that he was selected to lead both the Clinton and Trump investigations. It is because he is one of the very best agents in the FBI. As Director Comey admitted in his interview with the OIG, Report at 299, in hindsight he realized that what he needed was "another Strzok."

While the OPR background material notes Special Agent Strzok's extensive performance and awards from the FBI, including exclusively Outstanding Performance appraisals; four Special Act/Achievement awards in 1997, 1998, 2004, and 2006; two Quality Step Increases in 2002 and 2004; six cash awards in 2007, 2008, 2009, 2014, 2015, and 2016; and four time off awards in 2002, 2007, 2009, and 2012, it fails to note the following extraordinary awards:

- the Director's Award, the US Attorney for the Eastern District of Virginia's Public Service Award and the Director of National Intelligence's Meritorious Unit Citation, in 2009, all for his work in leading the investigations and eventual convictions of four individuals for spying for the PRC;

- the US Attorney for the Southern District of New York's Outstanding Investigation Award, the Director of National Intelligence's Meritorious Unit Citation, and the Director of National Intelligence Community Excellence in Counterintelligence Award in 2011, all for his work as a case agent for the Boston-based Russian illegal couple which were part of the Ghost Stories investigation;

- the US Attorney for the Eastern District of Virginia's Public Service Award in 2013 for the investigation and prosecution of John Kiriakou for disclosing classified information to the media, a case representing the first ever charge and conviction of violating the Intelligence Identities Protection Act;

- and classified recognition from the intelligence services of the United Kingdom, Canada, New Zealand, Belgium, Italy, Israel, and Taiwan for successful joint operations.

It is simply beyond dispute – the Proposed Removal seeks to end the career of an agent who has provided exceptional service to the FBI.

CANDICE M. WILL
JULY 17, 2018
PAGE 6

### B. Response to the Three Specifications

The proposed removal relies upon three specifications to justify firing Special Agent Strzok. None of them support the termination of his employment in light of his outstanding record of service, and his rights under the First Amendment.

1. *Strzok Was Not Negligent In Pursuing the Weiner Laptop Evidence*



[REDACTED] - [Subject to NDA]

Additionally, the June 12, 2018 letter from Director Wray to the IG incorporated into the IG Report specifically notes that *no one* was to be referred for investigative misconduct. With regard to "investigatory actions, including moving more quickly to secure a search warrant for Anthony Weiner's laptop," Director Wray specifically did *not* characterize the matter as misconduct, in fact stating the opposite: "The FBI appreciates, however, that the OIG recognized that many of the identified missteps were judgment calls by seasoned investigators and prosecutors, and that there was no evidence that any decision was made as a result of bias or other improper considerations." In sum, the IG report made no allegation of investigative conduct; the allegation was not referred to the OPR; and Director Wray excluded this charge from the subjects to be referred to OPR. It is thus wholly inappropriate for the OPR to revive these already debunked allegations.

[REDACTED] - [Subject to NDA]
The Report, at 330, makes clear that OIG "searched for evidence that the Weiner laptop was deliberately placed on the back-burner to protect Clinton, but found no evidence in emails, text messages, instant messages, or documents that suggested an improper purpose." This conclusion is unassailable and should persuade any fair-minded observer that allegations that the FBI "went easy" on Secretary Clinton are baseless. Nevertheless, the proposed removal walks right to the edge of accusing Pete Strzok of trying to delay the inquiry into the newly

---

[2] In defense of OPR, a 06/13/2018 email from OIG staff [REDACTED] - [Subject to NDA]

discovered Weiner laptop until after the election. It quotes extensively from the NYO agent and AUSA from New York speculating that "somebody was trying to bury this," and the proposal declares that "the investigation reveals that there is no reasonable excuse for the FBI's delay in following up on this matter." [Proposal, at 15-16] This insinuation is unfair, and contrary to both the facts and the findings of the IG Report that they could find no evidence that any investigative act or decision was the product of improper considerations.

Within hours of learning of the emails on September 28th, Special Agent Strzok assigned Supervisory Special Agent [REDACTED], a subordinate supervisor, who additionally included an MYE case agent, an Intelligence Analyst and a Staff Operations Specialist, *all with no connection to the Russia investigations*, to pursue the matter. Less than 24 hours after learning of the information, that team, as well as an NSLB Unit Chief [REDACTED], had reached out to FBI New York, and Special Agent Strzok followed up the next day.

This timeline is not based merely on the unanimous recollection of those involved; it is also corroborated by written communications. As noted in a 9:01 AM email from [REDACTED] to Special Agent Strzok on 10/31/2016,

> The only date I have is 09/29/2016. Bill told me about it, and then we did a Lync call with NYO ([REDACTED], [REDACTED]) were on – maybe [REDACTED]). At that point, the system was still crashing so they hadn't gone through all the data. We discussed searching for our material and realized it would be outside the scope of the warrant so we asked them to try to get some basic facts (numbers, domains, etc.) based on plain view in order to inform our decision of whether or not to move forward.

Following the Lync call, the team informed Special Agent Strzok that it would be premature to send a team to New York as the system had not yet finished processing and that there was an investigative plan in place to move forward. It was reasonable for him to agree with this recommendation.

It wasn't until the call with NYO on October 25, 2016 that Special Agent Strzok and the other members of the MYE Team first learned information that made it reasonably likely that the Weiner laptop might contain the type of *mens rea* evidence that could have changed the determination not to recommend prosecution of former Secretary Clinton. At that point, the team shifted into high gear and obtained a more expansive warrant to search the device by October 30th.

The Proposed Removal faults the entire MYE team for not reaching this determination earlier, and points specifically to a call on September 29, 2016 in which Special Agent Strzok was *not* present. During that call the NYO provided other MYE team members with a description of what they had been able to see on a first pass of the Weiner laptop, which had not yet completed forensic processing. They had observed the existence of a significant amount of emails from the Clinton server, and according to the Report there was mention that some of these emails were backups from one or more Blackberry devices. However, at that point investigators couldn't determine the origin of the backups or the content of any of the emails. Additionally, according to the specific recollection of NSLB Unit Chief [REDACTED], who participated on that call, NYO did *not* inform the MYE personnel of the presence of emails from the att.blackberry.net domain. In any event, NYO did not yet have specific and complete details as to the scope of the data, including domains, file structure, and dates. Moreover, during that call NYO informed MYE team members that the significant size of the contents of the laptop had repeatedly caused the system being used to examine it to crash.

The participants on that call made the sensible decision to have NYO complete the forensic processing to allow them to then review the contents of the laptop, and to compile an index of the materials contained therein, and only then to consider applying for a search warrant. The pre-warrant investigative activity included only steps that the FBI could legitimately conduct consistent with the Fourth Amendment under the "plain view" doctrine, and would allow the MYE team to decide whether and how to seek a warrant to obtain the contents of the emails in question. The takeaway from the call on September 29, 2016, was that NYO would contact the MYE team when that part of the review was completed. Not only is this the recollection of the MYE personnel who participated in the call, but it is also corroborated by contemporaneous written evidence (see, e.g., emails to Strzok from the Supervisory Special Agent and FBI lawyer on October 25, IG Report at 313-314, noting "We were waiting for NYO to get back to us about the volume of Huma related emails on the devices," and "I have not heard back from NY").

After the call, Special Agent Strzok was briefed by his subordinates, who relayed the information that the ball was currently in NYO's court. Based on this briefing, there was no reason for Special Agent Strzok to believe that the laptop differed in any material aspect from all of the other data storage repositories the MYE had encountered.

Special Agent Strzok's non-participation in the September 29 conference call, and his decision to task other experienced and very capable agents with following the lead on the Weiner laptop, was not due to carelessness or indifference. He was not sunning on some beach or spending time playing with his children. He was a Deputy Assistant Director working 60-plus hour weeks managing a wide range of global counterintelligence threats, including what he reasonably believed to be the most significant threat to the country's democracy in recent times.

CANDICE M. WILL
JULY 17, 2018
PAGE 9

In July of 2016, the FBI received credible information from extremely sensitive FBI and U.S. Intelligence Community sources that the Russian Government was interfering in the U.S. Presidential election in an attempt to harm the candidacy of Secretary Clinton and aid Mr. Trump's bid for the White House. This information was corroborated by the discovery of evidence of multiple, high-level contacts between agents of the Russian Government and members of the Trump campaign. Special Agent Strzok, who had by that time spent more than 20 years as a counterintelligence and counterterrorism agent, was alarmed. He was also highly motivated to ferret out and stop any attempt by the Russian Government to subvert American democracy.

The next call between NYO and the MYE team wasn't until October 25, 2016. Special Agent Strzok did participate in this call and learned, for the first time, that the Weiner laptop contained a massive amount of emails from the domain att.blackberry.net, the domain of the server that Secretary Clinton used when she began her tenure at the State Department. Special Agent Strzok and the others immediately recognized the potential significance of this information: it was the *first* repository of data that seemed reasonably likely to contain thousands of missing emails from early on in Secretary Clinton's tenure as Secretary of State -- the emails considered to be most likely to contain evidence of Secretary Clinton's *mens rea*.

It is indisputable that Special Agent Strzok first learned these facts during the phone call on October 25, and that he considered them to be significant. There is real-time evidence of both of these things, in the form of contemporaneously sent texts and handwritten notes. *IG Report*, at 315-316. Additionally, the Report notes that the Weiner case agent, who did participate in the later call after missing the September call, was surprised that MYE personnel asked questions such as "That's on there?" and "We didn't know that," making it clear that NYO had not previously passed on those details to the MYE Team. Ultimately, it was determined that the laptop did *not* contain such important evidence, and the belief that Special Agent Strzok had before October 25 and November 2 proved to be accurate.

The proposed removal offers absolutely no explanation for why Special Agent Strzok and Special Agent Strzok alone should shoulder the blame for the decisions or lack of action of the entire MYE team. Because of Special Agent Strzok's position and his assignment to the Russia investigation, which was in full gear at the time, he was less involved in the initial operational decisions regarding the Weiner laptop than other high level members of the team, and less involved in these decisions than he was in the MYE investigation before it was closed (for the first time) in July 2016. In fact, each of the following FBI officials agreed with the plan about how to pursue the information on the Weiner laptop from the September 29 meeting: AD Priestap; SC [REDACTED], Special Agent Strzok's MYE co-lead; NSLB UC [REDACTED]; Supervisory Special Agent [REDACTED] (the SSA on the MYE team); Special Agent [REDACTED]

CANDICE M. WILL
JULY 17, 2018
PAGE 10

[REDACTED], one of the primary MYE case agents; IA [REDACTED], one of the primary MYE IAs; and Special Agent (then SOS) [REDACTED], one of the primary MYE analysts. We have followed the instruction in the proposed removal that we not contact these witnesses for statements as part of this response; however, we urge you to do so. We believe that each of these participants of the MYE Team would testify that a) they agreed with the plan of action for the Weiner laptop reached at the September 29 meeting; and b) they believed that Special Agent Strzok acted diligently in his pursuit of all relevant information during the investigation. Moreover, we are not aware of any effort by the agency to discipline these other leaders of the MYE team for alleged Investigative Deficiency.

The Proposed Removal makes much of a comment purportedly made by Deputy Director McCabe to the IG that he thought "you [i.e., Strzok] were actually doing it." [Proposal at 19] But as noted above, in accordance with DD McCabe's guidance, as relayed through AD Priestap, within hours Special Agent Strzok had assigned a team unrelated to the Russia investigation to follow through, contact New York, and develop an investigative plan, a task they accomplished within 24 hours of his asking them to do so, and he then obtained briefings from his staff and accepted their recommended course of action. This was reasonable.

The accusation that Special Agent Strzok negligently failed to diligently pursue the information on the Weiner laptop stands in marked contrast to his overall aggressive investigation of Clinton during the MYE. As noted by the IG report, Special Agent Strzok was repeatedly among the most aggressive members of the MYE Team. [IG Report at iii, 159] For example, while the MYE Team made robust use of grand jury subpoenas (issuing 56 of them), search warrants (3 were sought and obtained) and 2703(d) orders (5 were issued), Strzok pushed for even more aggressive use of compulsory process in the face of reluctance by career prosecutors in the Justice Department. [IG Report, at 79] "Strzok and Page were two of the strongest advocates of obtaining the culling testimony and laptops" [IG Report at 129], and "Strzok and Page both urged the Department to issue grand jury subpoenas for Mills's and Samuelson's testimony regarding the culling process and to seek a search warrant to seize the culling laptops from [their lawyer's offices]." [IG Report at 159]. The IG Report also noted that Strzok pushed back against the DOJ prosecutors, urging them to more aggressively negotiate the FBI's access to documents in the possession of high-powered Clinton defense attorneys. [IG Report at 84].

These facts are undisputed. Along with the similarly indisputable fact that decisions made by the MYE Team, and the timing of these decisions, hurt the candidacy of Hillary Clinton and helped that of Donald Trump, and that the FBI took great pains to first shield and then downplay the existence of the Russia investigation from the media in the run-up to the election, this is conclusive evidence that the MYE investigation was not impacted by a preference for a

CANDICE M. WILL
JULY 17, 2018
PAGE 11

Clinton Presidency over a Trump Presidency. The narrative of a "Deep State" cell of rabid anti-Trump partisans in the FBI is absurd in light of the actual evidence.

In sum, there is simply no credible evidence that Special Agent Strzok violated Offense Code 1.7 by failing to pursue an investigative lead. He and the other MYE team members reasonably pursued the Weiner laptop lead, which ultimately resulted in no additional material evidence. His actions were consistent with the consensus view of the team, and there is no justifiable reason to single him out for punishment. You should reject this specification in its entirety.

### 2. *Strzok Did Not Violate FBI Policy by His Limited Use of his Cell Phone*

The Proposed Removal faults Special Agent Strzok for forwarding, on a few occasions, emails related to the investigation to his personal email account. Of this handful of emails, the Proposal finds most troubling that Special Agent Strzok, on October 29, 2016, forwarded an email attaching a draft of the affidavit in support of a search warrant for Anthony Weiner's laptop. However, Department of Justice policy allows employees to use personal email accounts for official communications where exigent circumstances require, as long as any government records are captured on government record keeping systems within 20 days. [IG Report at 424]. More specifically, as contained in Section 3.3.1 of the FBI Mobile Devices and Mobile Applications Policy Guide, 0879PG, dated July 6, 2016,[3] FBI policy states:

> Generally, personally owned mobile devices must not be used to conduct official FBI business. This includes processing, storing, or transmitting USGI. Permissible exceptions to this rule are as follows:

> Limited voice and/or data usage of a personally owned mobile device for conducting unclassified, nonsensitive, official FBI business when the use of an FBI owned mobile device is not possible or practicable.

Special Agent Strzok's use of his personal email account meets that standard. It was not possible for him to read a redlined version of the affidavit on his government phone, and because of the urgency of the situation given the approaching election[4], he forwarded the document to his personal email, where he was able to quickly complete the work needed to prepare the search

---

[3] This critically and directly relevant FBI Policy Guide is neither referenced in OPR's recommendation nor included in the materials we were provided for review.

[4] An urgency that, ironically, is directly inconsistent with the idea that Special Agent Strzok, because of his anti-Trump animus or any other reason "slow rolled" review of the materials resident on the Weiner laptop.

warrant affidavit for filing. Thus, because of the technological limitations of his government-issued device, Special Agent Strzok used his personal device (and, as he routinely did, his personal time) to conduct time-sensitive government work. This is the type of exigent circumstance that is allowed by the exception written into the DOJ policy.

The proposed removal does not dispute any of these facts, but seems to premise the security violation charge on the assertion that the search warrant was ultimately filed by the prosecutors under seal, and thus should be considered "sensitive." But the draft affidavit did not contain federal grand jury information. The IG report incorrectly asserts the draft affidavit "appears to" contain information obtained pursuant to a grand jury subpoena, an error OPR compounds by asserting the document "contained" grand jury information.[5] The absence of grand jury information from the draft affidavit can be verified by FBI OGC, specifically NSLB UC [REDACTED], and we urge you to contact her as a witness. Thus, Strzok reasonably believed that this was the type of work product – especially given the time sensitivity – that he could forward to his personal device. As the IG Report also observed, it was Special Agent Strzok's practice to then double delete any work-related email in his personal account, and neither the IG Report nor the Proposed Removal suggests that his draft of the search warrant was in fact exposed to any third party.

Thus, even if one were to find, after the fact, that his draft of the search warrant contained "sensitive" information, this was at best a technical violation of the policy. In good faith and on his personal time, Special Agent Strzok was working to help to quickly prepare and submit the search warrant and obtain authority to complete the review of the Weiner laptop information. According to the Proposed Removal, the standard penalty for a violation of the policy is a five-day suspension; that would be the outer limit of a reasonable penalty under these circumstances. Indeed, we note that in similar circumstances, even lesser punishment was administered. In case number 2009-0217, a Special Agent transmitted an email containing sensitive information from his FBI Unet account to his personal email account, and downloaded attachments containing law enforcement sensitive information to a non-government computer. He was given an oral reprimand.

---

[5] Perversely, OPR's inaccurate conclusion is being relied upon by the FBI's Security Division in their decision to suspend Special Agent Strzok's security clearance, leading to his indefinite suspension.

### 3. *The "Unprofessional Conduct" Charge Does Not Support the Firing of Special Agent Strzok*

It is difficult to discern the actual conduct that this specification of the proposed removal targets as "unprofessional." Is it that Special Agent Strzok developed political opinions? Is it the intensity – i.e., the "vituperative" nature of those opinions? Is it that he expressed them to Lisa Page? All of that conduct is protected by the First Amendment. Indeed, it is axiomatic that the free expression of political opinion is the *most* protected genre of speech under the First Amendment. The importance of avoiding any law or regulation that would tend to chill this type of speech is reflected in both statute, see 5 U.S.C. 7321 (Hatch Act) ("It is the policy of the Congress that employees should be *encouraged* to exercise fully, freely, and without fear of penalty or reprisal, and to the extent not expressly prohibited by law, their right to participate …in the political processes of the Nation.") (emphasis added), and regulation. See 5 CFR 734.402 (FBI employees retain the right to "[e]xpress his or her opinion as an individual privately and publicly on political subjects and candidates.").

Special Agent Strzok does not deny that he wrote the text messages in question, or that he genuinely held and passionately expressed the political opinions therein. He is a patriotic national security official who was confronted with the prospect of a hostile foreign power seeking to exert illegal influence on a presidential election. But the relative strength or intensity of political opinions and their expression cannot be a factor that distinguishes appropriate political speech from inappropriate political speech. The First Amendment protects "strongly held" or "intense" expressions of political belief no less than the more milquetoast articulation of opinion, and to punish Special Agent Strzok for expressing these beliefs, however often or intensely he stated them, would be a clear violation of his constitutional rights.

If the conduct at issue is that Special Agent Strzok was somehow biased against then candidate Trump, and that the bias affected his actual performance of his duties on either the MYE or Russia investigations, then that concern is dispelled by the express findings of the exhaustive IG Report, which we have already addressed, *supra*. Moreover, it is not at all fair to portray political opinion as the same thing as evidence of bias. The term "bias" carries with it a negative connotation, an unfair prejudice in favor or against someone or something. *See, e.g.,* Dictionary.com. "Bias" also necessarily implies a difficulty in making neutral, reasoned and objective analyses of the object of bias. The IG report shows just the opposite – notwithstanding

CANDICE M. WILL
JULY 17, 2018
PAGE 14

his political opinions, Special Agent Strzok carried out his duties objectively and dispassionately.[6]

Page 18 of the Proposed Removal strings together (out of context) excerpts of messages: "Trump is a fucking idiot," "I hate these people," "I need to fix it," "No he's not [going to become president] and "We'll stop it." If the purpose here is to suggest that Special Agent Strzok acted on an alleged bias against then candidate Trump, this charge is baseless and flies in the face of the conclusion reached by the exhaustive IG Report. Taken in context, these messages are hardly as nefarious as the Proposed Removal implies. The "No he's not" was merely Special Agent Strzok's prediction during the campaign that candidate Trump had little chance of winning the election (an opinion which was widely shared at the time). The "I need to fix it" comment was part of a discussion between Special Agent Strzok and Ms. Page about whether he would want to work on the Mueller Russia team or pursue a potential eventual promotion to Assistant Director. Special Agent Strzok was outraged by the fact of Russian interference in our election, and was explaining why he would opt for the Mueller assignment. The "we'll stop it" comment referred to Special Agent Strzok's conviction that the electorate as a whole (of which he was a part) would not choose a candidate like Donald Trump, especially after the recent events of the time, which included candidate Trump's vicious attack on a Gold Star family. It was, again, a commonly held view in mid-August 2016 that Trump was not likely to win the Presidency. And finally, the first two excerpts were merely emphatic expressions of Special Agent Strzok's political opinion that candidate Trump and his associates in the campaign would be poor choices to lead the country.

That leaves the concern that Special Agent Strzok used an FBI device to express these opinions, and that he should have foreseen at the time that there was a realistic possibility that his texts with Ms. Page would be publicly revealed and create an "appearance" of bias (whether true or not). As to the use of an FBI device, Special Agent Strzok has from the very beginning of this inquiry acknowledged this mistake and is genuinely sorry that it has resulted in negative

---

[6] The Proposed Removal also repeats one of the mistakes of the IG Report, by focusing *only* on a select and very small sample of the texts which were critical of then candidate Trump. This materially misrepresents the nature of Special Agent Strzok's political opinions and his articulation of them in his texts to Ms. Page. A review of the entirety of Special Agent Strzok's texts, or even a random sampling of them, would reveal him to be nothing like his public portrayal as a partisan Democrat and Clinton apologist. In fact, Special Agent Strzok's texts contain repeated criticism of Secretary Clinton and former President Clinton, along with numerous other Democrats like Eric Holder and Bernie Sanders.

CANDICE M. WILL
JULY 17, 2018
PAGE 15

publicity to the agency he loves. But we respectfully disagree that it was in any way foreseeable that his communications with Ms. Page would be publicly revealed, or that he is primarily responsible for the public disclosure.

First, it is undisputed that Special Agent Strzok and Ms. Page regarded these communications as private and did *not* expect the public, or anyone else, to read them. The intensely personal nature of some of the texts illustrates this fact. Also, neither Special Agent Strzok nor Ms. Page were responsible for the public disclosure of these texts. Rather, it was the OIG briefing officials within DOJ who both publicly named Special Agent Strzok and Ms. Page, and released to the media a selective sample of their text messages, even while the OIG investigation was ongoing and investigative steps were not complete. By taking this action, OIG and DOJ contributed to the very same public perception of bias that the Proposed Removal and IG Report bemoans.

Not only is it indisputable that Special Agent Strzok believed that his text messages to Ms. Page would remain private, this belief was objectively reasonable. FBI policy provides for de minimis use of text messaging, which would necessarily envision communications between an employee and his doctor, clergyman, attorney, spouse, or innumerable other categories of communications carrying privilege and an expectation of privacy. Special Agent Strzok was not aware (nor are we now) of any previous instance where the government, including the OIG, has undertaken this type of review of texts between two FBI employees. Neither the IG Report nor the Proposed Removal identify any circumstance in which private texts expressing political opinions were previously disclosed. There was simply no reason for SA Strzok to expect that these texts would be reviewed by anyone, much less made public.

Thus, the public disclosure here of texts that were always intended to remain private was both unforeseen and unforeseeable. It is therefore fundamentally unfair to conclude that SA Strzok's participation in these communications, because he failed to anticipate that they could create the appearance of political bias, was misconduct. To illustrate the point, consider a number of FBI officials discussing the upcoming 2016 election in the break room. It is First Amendment protected activity for these officials to express personal opinions about the election, and that would not change even if someone recorded or reported those opinions to the public. There is nothing about the unforeseen public disclosure of such comments that can, retroactively, render the mere expression of political opinion a disciplinary offense. Ordinarily, punishment for severe misconduct requires a showing of intent – some effort to harm someone else, or obtain personal gain. There is no indication that any of the FBI or Departmental rules that the Report concludes were violated here were intended to be strict liability offenses, and if they were, the conflict with SA Strzok's First Amendment rights would be further accentuated.

CANDICE M. WILL
JULY 17, 2018
PAGE 16

Moreover, after taking the highly unusual step of publicly disclosing the emails, if the FBI were to now fire Special Agent Strzok without affording him genuine due process, such action would also violate his rights under the due process clause of the Fifth Amendment. A "stigma-plus" claim arises when the government takes adverse action without due process, *and* those actions create "a stigma or other disability that foreclosed [the employee's] freedom to take advantage of other employment opportunities," in his chosen field. See e.g., *Campbell v. District of Columbia*, 2018 WL 3188384, at *2 (D.C. Cir. June 29, 2018), citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972). [7]

In short, the only aspect of the "Unprofessional Conduct – Off Duty" charge which can be sustained in a fashion which does not violate Special Agent Strzok's constitutional rights is the admitted fact that he used an FBI device to send personal messages to Ms. Page. FBI policy permits "de minimis personal use of government property" if not otherwise inappropriate. Special Agent Strzok is hardly alone among FBI agents in the use of a government phone for personal reasons, but we also understand that the impact on the agency from the negative publicity here makes this situation unusual, and would warrant the imposition of reasonable corrective action. The FBI table of penalties suggests a five-day suspension for a first offense of "Unprofessional Conduct – Off Duty), and as we explain below, OPR has in fact issued far less punishment for even worse conduct. The proposal to fire Special Agent Strzok after more than two decades of exceptional service is grossly excessive.

---

[7] We are of course highly concerned that the repeated calls by the President and members of Congress to fire Pete Strzok interfere with his right to meaningful pre-disciplinary due process. Moreover, the process of review of material at OPR further hampers his ability to respond to the charges and thus obtain due process. He has not been allowed his own copy of the thousands of pages of material relied upon by OPR to arrive at their decision, nor was he even permitted to bring a computer to type notes about the material relied upon by OPR. He was not permitted to contact witnesses, and submit statements of support to rebut the charges. Similarly, the unusual and unprecedented speed of OPR's process – in which a review was completed less than two days after Special Agent Strzok was notified a review had been initiated – is evidenced by the numerous factual errors, conclusions not supported by fact, and assertions and recommendations keyed to language in a prior draft version of the report which were removed or otherwise changed in the final report. All of this suggests a rush to judgment which undermines his right to due process.

### C. Dismissal is Not a Reasonable Penalty

Special Agent Strzok is not some newbie who ran into hot water soon after joining the Bureau. He has given nearly twenty-two years of exceptional service to the FBI. Likewise, this is not a situation where he intended to hurt anyone, or to take action for personal gain. He simply expressed personal political opinions to a friend in texts that were intended to remain private. While the President and his allies in Congress and in the media may be calling for blood, the law demands a more sober analysis.

The Proposed Removal makes reference to the "*Douglas* factors" that should determine the extent of any penalty you may decide to impose. Those factors should be balanced, without affording one factor primary weight. Unfortunately, the proposed removal errs in this regard by focusing almost exclusively on the negative publicity that the agency has encountered as support for the sanction of dismissal, and by failing to balance the relevant *Douglas* factors as a whole. It barely pays lip service to the fact of Special Agent Strzok's distinguished service over more than two decades; or the tremendous amount of support and respect he has earned among his colleagues; or the fact that none of these alleged offenses are serious enough to carry a penalty of dismissal; or that no other employees have been fired under similar circumstances; or the fact that he was working under immensely stressful circumstances, on perhaps the two most consequential investigations in decades; or that he has demonstrated genuine remorse for having embarrassed the Bureau and has conducted himself with the highest degree of professionalism and regard for the agency's interests during the closed and public hearings before Congress; or that everything in Special Agent Strzok's history with the agency suggests the highest probability of rehabilitation.

Moreover, the proposal to fire Special Agent Strzok is not consistent with the Bureau's approach to similar accusations, even when the agents' actions have been malicious or have brought poor press upon the agency (or both). For example, in case 2012-0164, a Special Agent knowingly provided false or misleading information within investigative documents, and violated procedures when he failed to turn over Brady materials in a criminal proceeding. His misconduct resulted in an innocent person wrongly spending more than seven years in prison, and required the agency to enter into a large monetary settlement to bring the victim's civil case to an end. He was given a 60-day suspension. In Case 2015-0233, a Unit Chief acted unprofessionally while off duty with several people, including assaulting a minor and causing him injuries, and drawing his duty weapon and threatening to shoot the minor in front of his mother and 11 year old brother. The UC was criminally charged under state law, and the jury found him guilty of 2nd degree assault. The penalty imposed by the Bureau was a demotion and 60-day suspension. The Bureau has given demotion or 10-60-day suspensions to employees for such gross misconduct as a Special Agent assaulting his wife and berating police officers (2017-

0125), media reports about a Special Agent consistently refusing to pay child support, and using his FBI credit card for personal debts (2016-011), employees writing racially motivated phony text messages purporting to fire a black coworker (2016-0190), a Special Agent who had a long-term sexual relationship with the AUSA assigned to his cases, and who was caught having sex at work with her, resulting in a new trial for the defendant and widespread negative media coverage (2012-0356), and many others. Indeed, the IG Report itself refers to a situation in which "racy texts" exchanged between two FBI agents and an FBI informant were used to impeach the agents in the prosecutions of several defendants for violations of the Foreign Corrupt Practices Act. According to a Washington Post article about the case, which ended without convictions, the foreman of the jury stated that the "texts were one of many things that point[ed] to an absolutely amateurish operation" by the government. See Del Quentin Wilbur, Racy Texts Hurt Justice's Largest Sting Operation Targeting Foreign Bribery, WASH. POST, Feb. 13, 2013. Neither agent was charged with misconduct, and they both remain employed today. In sum, the proposed penalty of removal is disproportionate to the Bureau's record of discipline with regard to even worse infractions, and this factor, along with virtually all of the other *Douglas* factors points to a lesser penalty.

The notoriety of these events should not trump all of these other factors. This is particularly true given that Special Agent Strzok has done everything in his power to mitigate the negative impact to the Bureau caused by the release of these texts. He has submitted to interviews by OIG on numerous occasions and has fully cooperated with investigations being conducted by various Congressional committees. In the three weeks since the IG's Report was released, Special Agent Strzok has been interviewed for more than 21 hours by two House committees, once behind closed doors and once in open hearing. In both instances, he appeared voluntarily; in both he did not assert his Fifth Amendment right to remain silent and answered all questions except those that counsel for the Bureau specifically directed him not to answer. His testimony was sober, credible and compelling. The reaction to the public testimony has been almost universally positive, and Special Agent Strzok is being credited with offering the most compelling defense of the Bureau and its professionalism in recent memory. In fact, with the exception of the President and some of his most devoted followers, the consensus seems to be that Special Agent Strzok's testimony went a long way toward redeeming the reputation of the Bureau among the American public. Since the hearing, he has received a slew of supportive and grateful messages, including many from former Bureau employees whose pride in the service was substantially restored by his public statements.

And even if you fault Special Agent Strzok for the bad publicity (notwithstanding the fact that he was not the source of the leak and has done everything in his power to mitigate the negative reaction), and even if you decide it is an aggravating factor warranting more than the standard five to seven day penalties prescribed in the agency's published table, that still does not

CANDICE M. WILL
JULY 17, 2018
PAGE 19

support the draconian action of firing him. There are lesser sanctions which you can take and that would also serve the agency's interests in taking reasonable corrective action. Indeed, the agency risks even more harmful notoriety if it were to appear to bow to the political firestorm and terminate the employment of an agent with a long and outstanding record of service because he expressed his beliefs about an election.

But in the end, the most important audience for the decision in this case is not the President or other politicians, and it is not the media; it is the ~35,000 hardworking employees of the FBI. The President has repeatedly alleged that the political opinions, as evidenced by the donations and party registrations of some members of the Special Counsel's team is *prima facie* evidence of bias. See https://www.washingtonpost.com/news/post-politics/wp/2018/03/18/trump-said-muellers-team-has-13-hardened-democrats-here-are-the-facts/?utm_term=.2af75f939000. Obviously, the First Amendment prohibits taking account of this. But the question implicitly posed by this case is whether the FBI should stand firmly against, or become complicit in, bringing about a world where staffing decisions are affected by employees' political beliefs, registrations, and donations. If the FBI were to remove all employees who had political opinions, or even restrict the investigative opportunities of those who had strongly held political views, the workforce would be neutered and left to a small class of persons who either had no political beliefs, or who pretended not to have them. Note that the slippery slope may already have begun, as noted in the proposal letter which quotes the case agent in SDNY as declaring his political neutrality before his substantive concern, stating, "I don't know what to do because I'm not political. Like I don't care who wins this election, but . . . ." Proposal Letter at p.15 (emphasis added). It is more than conjecture that this case has the potential to chill the free speech of FBI employees everywhere.

The FBI should not establish this dangerous precedent. For all of these reasons we urge you to reject the proposed sanction of dismissal, and allow Special Agent Strzok to return (in whatever capacity you deem appropriate) to protecting the country that he loves.

We appreciate your consideration of this response, and we look forward to the meeting on July 24, where Special Agent Strzok and I can answer any questions or elaborate on any of these matters in greater detail.

> Very truly yours,
>
> /s/ Aitan D. Goelman
>
> Aitan D. Goelman