**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PETER P. STRZOK, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Case No. 1:19-CV-2367-ABJ |
| v. | ) |
|  | ) |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, | ) |
|  | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**MEMORANDUM IN REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.      PLAINTIFF'S FIRST AMENDMENT CLAIM LACKS MERIT................................... 3

      A.     The *Pickering* Balancing Applies to Plaintiff's First Amendment Claim. ............. 3

      B.     Defendants Are Entitled to Summary Judgment under the *Pickering* Analysis.......................................................................................................... 9

II.     PLAINTIFF'S DUE PROCESS CLAIM LACKS MERIT. ............................................. 14

III.    PLAINTIFF CANNOT PREVAIL ON HIS PRIVACY ACT CLAIM. .......................... 18

      A.     Plaintiff Has Not Adequately Pleaded a Privacy Act Violation with Respect to Any Pre-December 12, 2017 Disclosure of His Texts....................... 18

      B.     Plaintiff Cannot Prevail on His Privacy Act Claim with Respect to the December 12, 2017 Release of His Texts............................................................ 21

            1.     The Department's Disclosure of Plaintiff's Texts to the Public Was Permissible under the Privacy Act.......................................................... 21

            2.     There Was No Willful or Intentional Violation of the Privacy Act, and Therefore Plaintiff Cannot Prevail. ................................................... 28

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Alexander v. FBI*,
691 F. Supp. 2d 182 (D.D.C. 2010) ........................................................................ 21

*Althiabat v. Howard Univ.*
76 F. Supp. 3d 194 (D.D.C. 2014) .................................................................. 15, 16

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ................................................................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 20

*Augustus v. McHugh*,
825 F. Supp. 2d 245 (D.D.C. 2011) ....................................................................... 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 20

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) ................................................................................... 27

*Bryant v. Taylor*,
244 F. Supp. 3d 209 (D.D.C. 2017) ....................................................................... 20

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ............................................................................................... 18

*Crowell v. Benson*,
285 U.S. 22 (1932) ................................................................................................. 21

*Electronic Frontier Found. v. DOJ*,
739 F.3d 1 (D.C. Cir. 2014) ................................................................................... 30

*Elgin v. Department of Treasury*,
567 U.S. 1 (2012) ...................................................................................... 14, 15, 16

*Farhat v. Jopke*,
370 F.3d 580 (6th Cir. 2004) .................................................................................. 13

*Farrington v. Tenn.*,
95 U.S. 679 (1877) ................................................................................................. 16

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ..................................................... 14

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .................................................................. 27

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (20120) ............................................................. 20-21

*Getman v. NLRB*,
   450 F.2d 670 (D.C. Cir. 19714) .................................................. 24

*Greer v. Amesqua*,
   212 F.3d 358 (7th Cir. 2000) ..................................................... 13

*Hall v. Ford*,
   856 F.2d 255 (D.C. Cir. 1988) ................................................. 4, 9

*Henke v. Dep't of Commerce*,
   83 F.3d 1453 (D.C. Cir. 1996) ................................................... 23

*In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) ..................................................... 20

*Lamb v. Holder*,
   82 F. Supp. 3d 416 (D.D.C. 2015) .......................................... 14, 17

*Locurto v. Giuliani*,
   269 F. Supp. 2d 368 (S.D.N.Y. 2003) .......................................... 7

*Locurto v. Giuliani*,
   447 F.3d 159 (2d Cir. 2006) .................................................... 4, 7

*McCready v. Nicholson*,
   465 F.3d 1 (D.C. Cir. 2006) ...................................................... 23

*Mitchell v. Hillsborough Cty.*,
   468 F.3d 1276 (11th Cir. 2006) .................................................. 13

*Navab-Safavi v. Glassman*,
   637 F.3d 311 (D.C. Cir. 2011) .................................................... 9

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964) .................................................................. 13

*O'Donnell v. Barry*,
   148 F.3d 1126 (D.C. Cir. 1998) ........................................................................................ 3, 5

*Pappas v. Giuliani*,
   290 F.3d 143 (2d Cir. 2002) .................................................................................. 5, 11, 12

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ........................................................................................................ 16, 17

*Pickering v. Bd. of Educ.*,
   391 U.S. 563 (1968) ............................................................................................................... 1

*Pilon v. DOJ*,
   73 F.3d 1111 (D.C. Cir. 1996) ............................................................................................. 25

*Rankin v. McPherson*,
   483 U.S. 378 (1987) .................................................................................................... 5, 6, 9

*Reed v. Dep't of the Navy*,
   910 F. Supp. 2d 32 (D.D.C. 2012) ....................................................................................... 33

*Richerson v. Beckon*,
   337 F. App'x 637 (9th Cir. 2009) ........................................................................................ 13

*Russell v. Dep't of the Air Force*,
   682 F.2d 1045 (D.C. Cir. 1982) ..................................................................................... 30, 32

*Sheppard v. Beerman*,
   94 F.3d 823 (2d Cir. 1996) ............................................................................................... 5, 7

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ........................................................................................... 29

*United States v. Flynn*,
   --- F. Supp. 3d. ---, 2019 WL 6836790 (D.D.C. Dec. 16, 2019) ......................................... 19

*Waters v. Churchill*,
   511 U.S. 661 (1994) .................................................................................................... 5, 10

**STATUTES**

5 U.S.C. § 552 ........................................................................................................................ 24

5 U.S.C. § 552a ............................................................................................................... *passim*

5 U.S.C. § 2108 ..................................................................................................................... 16

5 U.S.C. § 7511 ........................................................................................................ 14

**REGULATIONS**

Office of the Inspector General; Privacy Act of 1974; Modified System of Records,
72 Fed. Reg. 36,725 (July 5, 2007) ............................................................... *passim*

**OTHER AUTHORITIES**

*A Review of Various Actions by the Federal Bureau of Investigation and
Department of Justice in Advance of the 2016 Election, June 2018,*
https://www.justice.gov/file/1071991/download ............................................ *passim*

*Crossfire Hurricane Report Hearing before the S. Comm. On the Judiciary,*
116th Cong. (Dec. 11, 2019) ................................................................................ 26

Tom R. Tyler, *Why People Obey the Law* (1990) ...................................................... 12

Restatement (Second) of Contracts § 3 (1981) ......................................................... 16

Restatement (Second) of Contracts § 17 (1981) ....................................................... 15

# INTRODUCTION

Defendants' opening brief explained why Plaintiff cannot prevail on any of his claims, and Plaintiff has not provided any reason in his opposition that the Court should allow his claims to go forward. Plaintiff's refrain throughout his opposition is that the Court should not decide his claims yet because he needs additional information that he intends to obtain through discovery. The flaws in Plaintiff's case, however, cannot be cured by obtaining additional information, because his claims for relief fail as a matter of law. And while some areas of factual disputes may exist, none of them constitutes a material fact about which there is any genuine dispute.

Plaintiff's First Amendment claim lacks merit, and Defendants should prevail, even at this early stage, under the framework established in *Pickering v. Board of Education*, 391 U.S. 563 (1968). Plaintiff works hard to try to convince the Court that it need not engage in the *Pickering* balancing, but Plaintiff's arguments are unconvincing, as courts routinely apply *Pickering* in similar circumstances. Plaintiff's pretext argument also goes nowhere, because there is no dispute that Plaintiff was, in fact, dismissed based as a result of his speech. As Defendants have explained, moreover, the *Pickering* balancing tips far in the Defendants' favor in light of the senior leadership position Plaintiff held within the FBI and the clear disruption Plaintiff's actions had on the FBI's ability to operate effectively.

Nor can Plaintiff cannot succeed on his claim that the FBI violated the Due Process Clause of the Constitution. As Defendants have explained, because Plaintiff was a member of the FBI's Senior Executive Service (SES) when he was dismissed, Plaintiff lacked any protected property interest in his position under the comprehensive Civil Service Reform Act (CSRA). Plaintiff's status under the CSRA is dispositive, and Plaintiff cannot save his due process claim based on an alleged contractual right created through the "'Last Chance' Adjudication Agreement" document

1

executed in July 2018. That document—which was not a contract, as a matter of law—imposed no obligations on the FBI. But, even if Plaintiff did have some cognizable, protected interest, he received notice of the basis for the disciplinary action against him, as well as the potential consequences (*i.e.*, dismissal) and an opportunity to defend himself, which is all the Due Process Clause requires.

Notably, if the Court were to agree with Plaintiff's argument that he had been effectively demoted from the SES just prior to his dismissal from the FBI, thereby regaining a property interest in his continued employment under the CSRA, the outcome would not be what Plaintiff wants here, survival of his Complaint beyond Rule 12(b)(6). Rather, the outcome would be dismissal of his employment claims for lack of subject-matter jurisdiction under the CSRA. Of course, an initial decision of the Merit Systems Protection Board (MSPB), to which Plaintiff initially appealed his removal, determined that the MSPB lacked jurisdiction over his appeal precisely because he was excluded from CSRA protections against removal by virtue of his SES status, which it held he never lost (rejecting largely the same arguments he makes now). The initial MSPB decision was correct. But even if not, Plaintiff's recourse under the CSRA's comprehensive scheme would not be to raise a due process challenge in this Court under the theory that the CSRA provides him a property interest in his job, but rather would be to seek to convince the full MSPB that its initial decision was wrong, and from there to pursue judicial review before the Federal Circuit.

Finally, Plaintiff's Privacy Act claim also fails. Plaintiff has not adequately pleaded a viable Privacy Act claim regarding his unsupported speculation that the Department used the White House as a conduit to leak Plaintiff's texts. In any event, Plaintiff's suggestion that Congress limited communications from an Executive Branch agency to the President or his advisors through

the Privacy Act, would raise serious separation-of-powers concerns that this Court need not address in the absence of a reasonable basis to think that Plaintiff's allegations go beyond mere speculation and in the absence of a clear indication that Congress intended the Privacy Act to have that result.

It is also now beyond dispute that Plaintiff has no viable Privacy Act claim with respect to the Department's disclosure of his texts to the media on December 12, 2017. For the reasons Defendants have already explained and as described in the declaration of Peter Winn, that disclosure falls squarely within a published routine use and therefore did not run afoul of the Privacy Act. Plaintiff's opposition faults Defendants for failing to provide a declaration from the official who made the decision on behalf of the Department. To address this concern, however, Defendants now submit a declaration from then–Deputy Attorney General Rod Rosenstein, who authorized the disclosure on behalf of the Department. Mr. Rosenstein's declaration confirms Defendants' account and removes any doubt that the disclosure was consistent with the Privacy Act—even if Plaintiff could show that the disclosure was somehow inconsistent with the Privacy Act—the Department did not intentionally or willfully violate the statute.

## ARGUMENT

## I.    PLAINTIFF'S FIRST AMENDMENT CLAIM LACKS MERIT.

### A.    The *Pickering* Balancing Applies to Plaintiff's First Amendment Claim.

Plaintiff dedicates a significant portion of his opposition brief to arguing that *Pickering* balancing does not apply to his First Amendment claim. *See* Pl. Mem. at 8-14. But that is a red herring. It is well-established that "[a] public official seeking to make out a claim of retaliation in violation of [his] First Amendment rights must meet [the] four-factor test" articulated in *Pickering* and its progeny. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998). Notwithstanding

Plaintiff's allegations of viewpoint discrimination and pretext, there is no basis for eschewing the *Pickering* analysis here.

Plaintiff first asserts that the Court should jettison the *Pickering* framework because "Defendants . . . committed the standalone First Amendment violation by practicing viewpoint discrimination." Mem. in Opp. To Mot. to Dismiss or in the Alternative, for Summ. J. ("Pl. Mem.") at 9, ECF No. 36. But as a former government employee, Plaintiff's viewpoint discrimination claim and his retaliation claim are essentially one and the same: Plaintiff alleges that he was dismissed from the rolls of the FBI for expressing a critical view of the President.[1] *See id.* at 8; *see also* Compl. ¶¶ 29, 48-49, ECF No. 1. Accordingly, this Court must assess Plaintiff's First Amendment claim under the four-factor *Pickering*, as other courts have done in cases where an employee alleges that his dismissal was motivated by disagreement with the content of his speech. *See, e.g.*, *Locurto v. Giuliani*, 447 F.3d 159, 164, 176-77 (2d Cir. 2006) (police officers terminated for exhibiting racist speech and behavior at a parade); *Hall v. Ford*, 856 F.2d 255, 257 (D.C. Cir. 1988) (athletic director terminated for expressing views critical of the Athletic Department).

But even if the Court were to treat Plaintiff's allegations as raising a standalone viewpoint discrimination claim, it is entirely speculative that, "if [Plaintiff's] text messages had expressed animus toward Secretary Clinton and reverence for Candidate Trump, he would still be employed by the FBI," Pl. Mem. at 8. Plaintiff avers that "the Trump Administration . . . tolerate[s] and even

---

[1] Plaintiff also argues—in a single sentence—that "Defendants' failure to . . . address" his allegations about viewpoint discrimination in the Motion to Dismiss "should be treated as an admission." Pl. Mem. at 14. That is incorrect. Defendants explained why Plaintiff's allegations that "he was removed from his position because of the political viewpoints he expressed in the text messages . . . specifically his statements critical of first Candidate, and then President, Trump," failed to state a First Amendment claim "as a matter of law." Mem. in Supp. of Defs. Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs. Mem.") at 15, ECF No. 30-1; *see also id*. at 15-27.

encourage[s] partisan political speech . . . , as long as this speech praises President Trump," Compl. ¶ 23, and alleges examples of such conduct by "the Trump Administration," *see id.* ¶¶ 23-25. Even assuming the truth of these assertions for the sake of argument, Plaintiff offers no basis to impute this alleged motive to the actual decision maker in this case, FBI Deputy Director (DD) Bowdich. Indeed, the Complaint itself is devoid of any allegations that suggest DD Bowdich, a career public servant at the FBI, removed Plaintiff *because he disagreed with Plaintiff's views*, rather than for the reasons he identified in his decision letter.[2]

Plaintiff next argues that his speech is categorically exempt from *Pickering* balancing because he *intended* the texts on his FBI-issued cell phone with a colleague to be private. *See* Pl. Mem. at 9. As an initial matter, whatever Plaintiff actually intended, he had no reasonable expectation that messages exchanged on his FBI-issued phone would remain between him and his interlocutor. As every government employee should know, communications on government devices are subject to monitoring. That fact should have been particularly clear, of course, to Plaintiff, as the then-Deputy Assistant Director of the FBI's Counterintelligence Division. Plaintiff's text could be (and ultimately were) subject to collection by the Office of the Inspector General (OIG). *See A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June 2018 at 395-96, https://www. justice.gov/file/1071991/download (OIG Report). And they were subject to disclosure (and, in fact, disclosed) as potentially exculpatory information in a criminal prosecution arising out of the

---

[2] Plaintiff also claims that the texts of certain FBI agents working on the investigation into Russian interference also suggests that Plaintiff was dismissed because of his viewpoints. *See* Pl. Mem. at 13-14. But such conduct only recently came to light. And Plaintiff's Complaint does not allege that DD Bowdich was aware of those texts when he made the decision to dismiss Plaintiff.

Special Counsel's investigation. *See* Part III.A, *infra.* For all these reasons, they are simply not analogous to oral "water-cooler" conversations, as Plaintiff claims. Pl. Mem. at 19.

Even putting aside that Plaintiff had no reasonable expectation of privacy in his texts, Plaintiff's argument that his intent that the messages remain private means this case should proceed to discovery cannot be right. "Where and when . . . statements are made . . . is only a factor. No Talismanic or determinative significance attaches to it." *Pappas v. Giuliani*, 290 F.3d 143, 150 (2d Cir. 2002) (holding that "the fact that [the plaintiff] acted anonymously, at home, and on his own time does not alter the ultimate conclusion that [the defendant] was entitled to dismiss him because of the harm to the [police department] that [plaintiff's] statements risked to inflict"). In fact, courts routinely apply *Pickering* balancing to government employee speech that is not directed to the public. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 664 (1994) ("conversation [that] took place at work during a dinner break"); *Rankin v. McPherson*, 483 U.S. 378, 389 (1987) (majority) ("private conversation with another employee"); *O'Donnell*, 148 F.3d at 1133 (one-on-one conversation with supervisor); *Pappas*, 290 F.3d at 145 (anonymous mailing); *Sheppard v. Beerman*, 94 F.3d 823, 825 (2d Cir. 1996) (one-on-one conversation with supervisor).

To be sure, "the manner, time, and place of [an] employee's expression are relevant" to the *Pickering* analysis. *Rankin*, 483 U.S. at 388. But the manner, time, and place of Plaintiff's speech—including the use of vituperative language on a government-issued phone intended for use in carrying out official government duties—supports Defendants' position under *Pickering*. And more to the point here, Plaintiff has failed to cite a single case—nor are Defendants aware of any—that holds speech by a government employee is altogether exempt from *Pickering* balancing as long as the employee intended his speech to remain private. Moreover, Plaintiff himself concedes that *Pickering* balancing applies to speech "directed to workplace superiors or the

government." Pl. Mem. at 9 n.2 (citing cases in this District). Here, Plaintiff sent his texts from his FBI-issued cell phone to a colleague, commenting on matters relevant to highly sensitive investigations that Plaintiff himself was leading. Accordingly, even under Plaintiff's reading of the case law, his speech is subject to the *Pickering* four-factor test.

Finally, Plaintiff's allegations of "pretext" also miss the mark. This is not a case where Defendants have proffered a reason for Plaintiff's dismissal other than those stemming from the speech at issue. To the contrary, DD Bowdich, the ultimate decision maker in this case, expressly stated in Plaintiff's dismissal letter that a basis for Plaintiff's termination was his "making inappropriate political comments in text messages on [his] FBI-issued cell-phone." Def. Mem., Ex. 6 (Bowdich Letter) at 1, ECF No. 30-7. As DD Director Bowdich explained in his decision letter, it was because the content of Plaintiff's texts "called into question the decisions made during both the Clinton E-Mail investigation and the initial stages of the Russian collusion investigation" and "the credibility of the entire FBI," that Plaintiff was being terminated, not suspended. *Id.* at 2.

Contrary to Plaintiff's assertion, therefore, the fact that DD Bowdich considered the public's perception of Plaintiff's texts does not mean that his actual motive for firing Plaintiff was disagreement with the views expressed. *See* Pl. Mem. at 10-11 (citing *Sheppard*, 94 F.3d at 828). Plaintiff's own cited case, *Locurto*, 447 F.3d 159, holds as much. There, former New York City police and fire department employees brought suit against then-Mayor Giuliani and the City of New York after they were terminated for participating in a parade float in blackface and chanting racist statements. *See id. at* 164. The district court found for the terminated employees, holding that "the defendants did not, in fact, . . . dismiss [them] in response to any reasonable concern for disruption of NYPD and FDNY operations but rather, and distinctly, 'in response to the content of their speech and for reasons of public perception and the political impact expected to flow

thereof.'" *Id.* at 176 (quoting *Locurto v. Giuliani*, 269 F. Supp. 2d 368, 395 (S.D.N.Y. 2003)). The Second Circuit reversed. The court reasoned: "[T]he . . . dichotomy between the defendants firing the plaintiffs 'out of a concern for potential disruption' as against their doing so 'for reasons of public perception' or 'in response to the content of plaintiffs' speech,' is a false one." *Id.* at 179 (quoting *Locurto*, 269 F. Supp. 2d at 395). So too here.

Plaintiff also cites *Sheppard*, 94 F.3d 823, but that case provides no help for his argument either. In *Sheppard*, the Second Circuit held that the district court erroneously dismissed the plaintiff's complaint because he successfully alleged facts that "may tend to show that [the defendant's] actual motive for firing [him] was the content of his speech"—that is, Plaintiff's threat to expose the defendant's judicial misconduct—"and not [the defendant's] fear that [the plaintiff] would disrupt the office work environment.*" Id.* at 828. Specifically, the court pointed to the fact that Plaintiff had alleged that the defendant "embarked on a course of conduct . . . designed to . . . punish [him] . . . and to prevent him from disclosing [the] misconduct" by "seiz[ing] [his] files, gratuitously t[elling] others that [he] was insubordinate and was fired for that insubordination, and ask[ing] (or even instruct[ing]) others not to talk with [him]." *Id.* at 829. This case is distinguishable. Plaintiff has not alleged any facts that demonstrate DD Bowdich wished to retaliate against him for the views expressed in his texts. Moreover, the circumstances of DD Bowdich's alleged actions—that he initially told Plaintiff that his texts would not end his career at the FBI and that his decision to terminate Plaintiff occurred months after the texts were originally reported on—are consistent with his explanation that the decision to dismiss Plaintiff was motivated by his assessment of the ongoing reputational damage that accrued to the FBI. *See* Bowdich Letter at 1-2; *see also generally* Def. Mem., Ex. 4 (Will Letter), ECF No. 30-5.

Accordingly, the correct framework for analyzing Plaintiff's First Amendment claim is the *Pickering* balancing test. And, under that test, Plaintiffs' First Amendment claim should be dismissed, as discussed below.

> **B.   Defendants Are Entitled to Summary Judgment under the *Pickering* Analysis.**

Plaintiffs' *Pickering* analysis—and, indeed, his entire brief—is remarkable in that it utterly fails to acknowledge his high-level position at the center of two of the most important investigations in the FBI's recent history. Defendants have not argued—contrary to Plaintiff's claim—that "the American taxpayers didn't get their money's worth from Mr. Strzok's service." *See* Pl. Mem. at 25. Rather, Defendants have acknowledged Plaintiff's long, dedicated career. Yet, Plaintiff's distinguished career notwithstanding, he exchanged numerous texts on a government-issued device that created serious questions of actual or perceived political bias in the execution of his law-enforcement duties. That conduct even suggested that he may take steps to actively influence investigations into either then-candidate Trump or former Secretary Clinton, potentially undermining the proper functioning and public confidence in the FBI's non-partisan investigate function. *See, e.g.*, OIG Report at xii (stating "[w]e'll stop it" in response to a question of whether then-candidate Trump would ever be president). Plaintiff's opposition ignores the very serious implications of those statements—and their detrimental effect on the FBI's reputation—brushing them off as akin to mere "water-cooler" conversations.

Plaintiff's analysis also almost entirely ignores that, as the Deputy Assistant Director for the Counterintelligence Division, he held a senior leadership position within the FBI, which reduced the "government's burden of proving interference with its interest." *Hall*, 856 F.2d at 261 (citing *Rankin*, 483 U.S. at 390-91). Plaintiff tries to distinguish his position from the one held by the university athletic director plaintiff in *Hall*, suggesting, against all odds, that Plaintiff's role

was somehow less important. *See* Pl. Mem. at 23-24. Yet, given his role and the vital national interest in the relevant investigations Plaintiff led, and Plaintiff's high-level position, there can be no doubt that the government's interest here is at least as significant as it was in *Hall.* And given Plaintiff's singular position overseeing critically important investigations involving former Secretary Clinton's e-mail use and Russian interference with the 2016 presidential campaign, Defendants' analysis would not, as Plaintiff claims, subject each of the "[r]oughly eight thousand other SES-level managers" to discipline based on their private conversations. *See* Pl. Mem. at 24. As a key player in those investigations, Plaintiff held a special role of importance within the FBI in matters that touched on the proper functioning of our national democracy, and the specific position he held is highly relevant to the *Pickering* balancing. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 317 (D.C. Cir. 2011) (drawing a distinction between a low-level contract employee and more senior figures within the organization). That is all the more true where Plaintiff's speech itself is related to matters over which he had substantial responsibility. The Court should therefore reject out of hand Plaintiff's attempt to position himself as just another interchangeable senior-level civil servant.

To try to manufacture a disputed question of material fact that might allow his First Amendment claim to proceed, Plaintiff attempts to fault Defendants for not providing any "actual evidence" that his actions disrupted the FBI's operation. *See* Pl. Mem. at 20-23. Plaintiff is wrong for at least two reasons. First, one need only look to the OIG's July 2018 report and the pervasive subsequent public criticism of the FBI and the Department to determine that the FBI's reputation and effectiveness suffered harm attributable to Plaintiff's conduct. Taking an ostrich-like approach to the public debate surrounding his texts cannot help Plaintiff prevail under *Pickering*. Second, even ignoring the facts in the public record, however, the government need not show any evidence

of *actual* harm. *See Waters*, 511 U.S. at 673-74. Rather, a substantial showing that the speech is "likely to be disruptive" will suffice. *Id.* And here, where a high-ranking member of an investigative team has made comments that can reasonably be construed as suggesting bias—or, worse, as suggesting a possibility of active interference with an ongoing investigation—there is more than sufficient evidence of a likelihood of potential disruption, which was central to DD Bowdich's letter dismissing Plaintiff from the FBI. *See* Bowdich Letter at 1-2.

Plaintiff also attempts to brush aside the actual or potential harm Plaintiff did to the FBI by pointing out that the Department released his text to the public on December 12, 2017. *See* Pl. Mem. at 19-20. Plaintiff implies that, had the Department not done so, the texts would have remained private, and no harm would have come to the FBI's operations. *Id.* That is incorrect, as Plaintiff should well know. Even putting aside the Department's December 12, 2017 disclosure, they were disclosed as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation and then later in OIG's report.

Moreover, as discussed further below, the Department released Plaintiff's texts only after the Department determined there was no basis to withhold the texts from Congress, whose Members are not subject to any restrictions on public disclosure. After the provision of the texts to Congress, there is no reason to believe that some or all of them would not have become public; indeed, it is almost certain they would have. Because Plaintiff's messages—exchanged on a monitored government-issued device—were destined for public scrutiny, Plaintiff's characterization of them as "private" is simply incorrect.

In any event, even if Plaintiff's texts could be construed as "private," Defendants will still prevail under *Pickering*. The Second Circuit's analysis in *Pappas* is highly instructive. The plaintiff there, a New York City police officer, Tomas Pappas, anonymously mailed a number of

racially charged diatribes in response to solicitations from charitable organizations using his personal Post Office box. *See Pappas*, 290 F.3d at 145. In conducting its analysis of whether the New York City Police Department (NYPD) permissibly dismissed him, the court assumed that Pappas's mailings constituted speech on a matter of public concern, and the court acknowledged that *Pickering* takes into account "the plaintiff's interest in freely speaking his mind" on such a matter. *Id*. at 146. Yet, the court also explained that "[t]he effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Id.* (citing Tom R. Tyler, *Why People Obey the Law* 22-23, 67 (1990)). And on that basis, which very closely reflects the reasons for Plaintiff's dismissal from the FBI, the Second Circuit concluded that Pappas's removal did not violate the First Amendment.

While Defendants do not intend to suggest that Plaintiff engaged in the sort of racially bigoted communications at issue in *Pappas*, the *Pickering* balancing tips even further toward the government here than it did there. Pappas, to start, did not hold a high-level supervisory position within the NYPD; he was responsible only for maintenance of the NYPD's computer systems. *See id.* at 144, 148-49; *see also id.* at 149 (distinguishing *Rankin* on the basis that Pappas was a police officer as opposed to a civilian clerical employee). Moreover, rather than using a monitored, government-issued device, as Plaintiff did here, Pappas also sent the relevant communications from his home. But the court found that there was still a substantial likelihood that they would cause harm to the NYPD. *See id.* at 150. And it was only because the NYPD decided to initiate disciplinary proceedings that the public ever became aware of the communications that undermined confidence in the police force. *See id*. Still, the court had "little sympathy for the

suggestion that the proper course for the Police Department," upon learning of improper conduct, "was to hush the matter up and keep it secret." *Id.* at 150-51.

Plaintiff is also incorrect to claim that the content of his texts were of such great public importance that they are entitled to special protection. *See* Pl. Mem. at 17-18. First, no matter the importance of the topic at hand, the FBI is still entitled to weigh its interests in forestalling potential harm to its operations under *Pickering*. And second, a review of the texts, as described in the July 2018 OIG report and Defendants' exhibits, belies Plaintiff's suggestion that he was engaged in a high-minded exchange of ideas worthy of particularly great weight under the *Pickering* balancing. As the OIG Report noted, among Plaintiff's texts were messages stating "OMG [Trump's] an idiot," OIG Report at 399, and referring to then-Candidate Trump as a "fucking idiot" and stating that Plaintiff could "SMELL" support for then-Candidate Trump at a "southern Virginia Walmart," *id.* at 400. Plaintiff argues that there is no requirement that "political speech be genteel," citing *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). But Plaintiff forgets the context of his claim. When a government agency acts not in a sovereign capacity but rather that of an employer— as the FBI did here—the character of an employee's speech can matter a great deal under *Pickering*. In particular, when courts look to the time, place, and manner of an employee's speech in conducting the *Pickering* balance, they should afford less weight to the employee's interest under the First Amendment where the speech at issue is couched in vulgar, vituperative, or ad hominem terms. *See, e.g.*, *Mitchell v. Hillsborough Cty.*, 468 F.3d 1276, 1286-87 (11th Cir. 2006).

Ultimately, Plaintiff's opposition fails to address the content of his texts in any meaningful way. While Plaintiff might understandably prefer to focus on the President's tweets rather than his own texts, *see* Pl. Mem. at 23, the President's statements have no bearing on the Court's analysis. Rather, the FBI properly dismissed Plaintiff because of potential harm to its law enforcement

operational mission stemming from his texts, particularly given his position of significant trust, and therefore Plaintiff cannot prevail on his First Amendment claim.

## II.     PLAINTIFF'S DUE PROCESS CLAIM LACKS MERIT.

For the reasons Defendants have already explained, Plaintiff cannot prevail on his due process claim. *See* Defs. Mem. at 27-31. First, and fundamentally, as a member of the FBI SES, Plaintiff did not enjoy protections that would allow him to be removed only for cause; rather, he was employed at the FBI's will. *See* 5 U.S.C. § 7511(b)(8). He therefore lacked a property interest in his job, which is a prerequisite for maintaining a due process claim. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999); *Lamb v. Holder*, 82 F. Supp. 3d 416, 424-25 (D.D.C. 2015).

Plaintiff claims that this well settled principle does not apply to him because—as the argument goes—he purportedly lost his SES status as soon as AD Will signed her name to her August 8, 2018 letter.  If that's true, then there can be no doubt that Defendants should prevail, at least as to Plaintiff's First Amendment and Due Process claims, because this Court would lack jurisdiction, and the only proper forum would be the MSPB.  *See Graham v. Ashcroft*, 358 F.3d 931, 933-36 (D.C. Cir. 2004) (Roberts, J.) (non-preference-eligible FBI special agent's claims precluded under CSRA); *see also Fornaro v. James*, 416 F.3d 63, 66-67 (D.C. Cir. 2005) (Roberts, J.). Of course, the MSPB has already determined it lacked jurisdiction, *see* Def. Mem., MSPB Decision, Ex. 10, ECF No. 30-11, and the time for Plaintiff to appeal that determination in the ordinary course has passed, *see* 5 C.F.R. § 1201.114(e) (setting time limits for review); *see also* MSPB Decision (issued November 15, 2018).

Even putting aside the consequences of Plaintiff's argument, it also lacks any basis in fact or logic.  Plaintiff was a member of the SES—and was paid an SES salary—until the effective date of his dismissal, which was August 10, 2018, as reflected in his official government personnel

forms.  *See* Request for Personnel Action (SF-52), ECF No. 32-1 (showing a proposed "effective date" of August 10, 2018); Notification of Personnel Action, ECF No. 32-2 (same). Furthermore, as explained in the well-reasoned decision of the MSPB Administrative Judge (AJ), who rejected Plaintiff's argument that he was no longer a member of the SES when dismissed, Plaintiff did not receive notice of AD Will's decision until *after* DD Bowdich exercised his authority to review it. *See* MSBP Decision at 6-7.  Moreover, as the AJ explained, AD Will's letter itself indicated that her decision was subject to further review.  *See* Will Letter at 3 ("[N]othing in this disposition affects the ability of [another] Bureau component to address your conduct as a performance matter, security issue, or otherwise as appropriate."). Defendant never lost his status as an SES employee before being dismissed and therefore did not revert to "preference eligible" status under the CSRA.

To try to save his due process claim, Plaintiff points to a July 2018 "Last Chance" Adjudication Agreement" document. *See* Pl. Mem. at 27 (citing Defs. Ex. 5, ECF No. 30-6). But Plaintiff's argument that this document vested in him some sort of property right cannot withstand scrutiny. In *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), the Supreme Court held that, "[g]iven the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment decisions, it is fairly discernable that Congress intended to deny such employees an additional avenue of review in district court." *Id.* at 11-12. "A series of opinions from the Supreme Court and [the D.C. Circuit] make clear that [the CSRA's] remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA." *Fornaro*, 416 F.3d at 66. Plaintiff's attempt to rely on an alleged contractual property right, not recognized in the CSRA, is therefore foreclosed. *See Doe v. Gates*, 981 F.2d 1316, 1320 (D.C. Cir. 1993) ("Understandings which in other circumstances might suggest the existence of a property right cannot do so when they are at

odds with the intent of the legislature regarding the employment entitlements that can be conferred." (quotation omitted)). And, indeed, none of the cases Plaintiff cites for the proposition that the "'Last Chance' Adjudication Agreement" document could serve as a basis to proceed on his due process claim was decided in the context of the CSRA's comprehensive regime.[3]

Even if the Court were to conclude that, the CSRA notwithstanding, Plaintiff could still base his alleged property interest in contract—there was, under these facts, no such contractual agreement. The Court need look only to the text of the "'Last Chance' Adjudication Agreement" document that Plaintiff relies on to conclude that it conferred on Plaintiff no rights, contractual or otherwise. It is not signed by anyone in the FBI—or anyone else, for that matter, other than Plaintiff and his counsel. *See* Defs. Ex. 5. Yet, for there to exist a valid contract, of course, an agreement must be reached by all the necessary parties. *See Althiabat v. Howard University*, 76 F. Supp. 3d 194, 197 (D.D.C. 2014). The document was a *request* by Plaintiff that the FBI impose penalties other than dismissal. *See* Defs. Ex. 5. And nothing in it suggests that FBI would be obligated to take any specific action.  Mere requests do not create any enforceable rights. It is also clear that OPR's process to evaluate Plaintiff's conduct was still ongoing. Indeed, Assistant Director (AD) Candice Will did not issue her decision until August 8, 2018, and, of course, DD Bowdich still had the authority to review that decision. *See* Defs. Mem. at 31; *see also Farrington v. Tenn.*, 95 U.S. 679, 683 (1877) ("A contract is executed where every thing that was to be done is done, and nothing remains to be done."). Plaintiff attempts to create an issue of material fact by suggesting that AD Will allegedly "accept[ed]" Plaintiff's request on August 6, 2018. *See* Pl. Mem. at 29. But

---

[3] Plaintiff cites *Link v. Department of Treasury*, 51 F.3d 1557 (Fed. Cir. 1995), but that decision did not endorse Plaintiff's argument that a contractual agreement creates a property interest that permits an employee to litigate a breach as a due process claim in federal district court. Rather, the employee's claim still is governed by the CRSA, and appeal is available only to the Federal Circuit.  *See, e.g.*, *Lizzio v. Dep't of Army*, 534 F.3d 1376, 1379 (Fed. Cir. 2008).

the fact remains that the FBI never signed off on or implemented an actual last chance agreement, and therefore there was no contract. *See Reddick v. FDIC*, 809 F.3d 1253, 1257 (Fed. Cir. 2016) (finding no jurisdiction because agreement between employer and government employer was not adopted, as reflected by the "lack of the SF-52/50").

The case Plaintiff cites to suggest there may have been an enforceable contract, *Perry v. Sindermann*, 408 U.S. 593 (1972), is easily distinguishable. That case arose in the context of an academic setting, and the Supreme Court concluded that the defendant college may have had some "unwritten 'common-law' that certain employees shall have the equivalent of tenure." *Id.* at 602. Here, of course, there can be no such unwritten understanding that confers on government employees a property interest in their positions. Congress, through the CSRA, set up a comprehensive—and exclusive—scheme governing federal personnel matters. *See Elgin*, 567 U.S. at 11-12. And the CSRA clearly provides that Plaintiff could be fired at will. *See* 5 U.S.C. § 2108(3) (excluding the FBI SES, among other categories of government employees, from the definition of "preference eligible"). Unlike *Perry*, there is, therefore, no similar "unwritten 'common law'"—either created by Plaintiff's request or otherwise—that gave Plaintiff a property interest in his position. 408 U.S. at 602.

Because Plaintiff lacked a property interest in his position, he cannot prevail on his constitutional due process claim. *See, e.g.*, *Lamb*, 82 F. Supp. 3d at 424-25. And in any event, as Defendants explained in their opening brief, Plaintiff had more than ample opportunity to make his case to the FBI in response to OPR's June 15, 2018 initial finding that Plaintiff be dismissed. *See* Defs. Mem. at 30-31. Plaintiff's response to the charges, with the assistance of counsel, included a written response and an oral hearing to defend his actions. That is sufficient under the Constitution. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The essential

requirements of due process . . . are notice and an opportunity to respond."). It is untrue—contrary to Plaintiff's claim—that none of the process mattered simply because it was DD Bowdich who made the ultimate decision. *See* Pl. Mem. at 30-31. The information that Plaintiff submitted to OPR in his defense was detailed at length in AD Will's letter, as was AD Will's analysis. *See* Will Letter. DD Bowdich had the benefit of that information and analysis when exercising his proper authority to come to a different conclusion than the one AD Will reached—the one initially recommended by OPR staff. *See* Defs. Mem. at 30-31; Bowdich Letter at 1-2, Defs. Ex. 6, ECF No. 30-7. Plaintiff received proper notice and had an opportunity to respond, and the ultimate decision maker considered the substance of that response. Due process requires no more.

## III.   PLAINTIFF CANNOT PREVAIL ON HIS PRIVACY ACT CLAIM.

### A.   Plaintiff Has Not Adequately Pleaded a Privacy Act Violation with Respect to Any Pre-December 12, 2017 Disclosure of His Texts.[4]

Plaintiff has not adequately alleged that Defendants violated the Privacy Act with respect to any disclosures of his texts before December 12, 2017. Plaintiff's relevant allegations are contained in paragraph 59 of his Complaint. There, he claims that "someone from the Department of Justice alerted the White House to the existence of [the] texts and, at least, their general content." Compl. ¶ 59. And also that "officials in the White House, in turn, began to contact members of the news media about the texts." *Id.* The next paragraph discusses the December 2, 2017 news stories about the texts. *Id.* ¶ 60. Plaintiff's allegations are purely speculative and cannot survive dismissal. But even if they occurred, there was no Privacy Act violation.

---

[4] Plaintiff claims, incorrectly, that Defendants have "effectively conced[ed]" that Plaintiff has stated a claim under the Privacy Act, because Defendants "mov[ed] only for summary judgment as to the Privacy Act." Pl. Mem. at 33. As is clear from Defendants' opening memorandum, Defendants have asked the Court to dismiss Plaintiff's Privacy Act claim as it relates to any pre-December 12, 2017 disclosure. *See* Defs. Mem. at 32.

Plaintiff acknowledges, as he must, that the White House is not subject to the Privacy Act. *See* Pl. Mem. at 37; *see also* Defs. Mem. at 32-34. Because Plaintiff cannot maintain a cause of action based on any disclosure by the White House, he is left to argue that the Department violated the Privacy Act by "using a White House conduit to leak agency records" to the press. Pl. Mem. at 37; *see also id.* at 37-38 (arguing that OIG investigative records were disclosed to the White House "for the purpose of leaking those records for political gain"). As an initial matter, this assertion about the purpose of the Department's alleged provision of the texts to the White House appears only in Plaintiff's opposition brief, not his Complaint. "'It is axiomatic . . . that a party may not amend his complaint through an opposition brief.'" *Sai v. TSA*, 326 F.R.D. 31, 33 (D.D.C. 2018) (quoting *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014)). Moreover, it is not plausible. The Department knew about the texts and the general content of them since the summer of 2017, *see* Declaration of Rod J. Rosenstein (Rosenstein Decl.) ¶ 5 (attached as Exhibit A). Even under Plaintiff's theory, the Department would have had no reason to wait several months, until December 2017, before disclosing the texts.

Indeed, there is an obvious, more plausible explanation for how the media became aware of Plaintiff's texts and reported on them on December 2, 2017: the Department disclosed their existence and their general content on November 30, 2017 to defense counsel as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation. *See United States v. Flynn*, --- F. Supp. 3d. ---, 2019 WL 6836790, at *3 (D.D.C. Dec. 16, 2019) ("On November 30, 2017, . . . [t]he government informed defense counsel that the DOJ's Inspector General ('IG') reviewed allegations involving certain electronic communications of Peter Strzok . . . that showed a preference for a presidential candidate. This included information about certain text messages between Mr. Strzok and former FBI attorney Lisa Page[.]").

The existence of this more obvious explanation for the December 2, 2017 news reports defeats the plausibility of Plaintiff's wholly speculative assertion that the Department provided the texts to the White House for the purpose of leaking the texts to the media. *See In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) (observing that, in both *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court rejected the plausibility of the plaintiffs' assertions in part because an alternative, more obvious explanation was incompatible with the plaintiffs' suggestion); *Bryant v. Taylor*, 244 F. Supp. 3d 209, 212 (D.D.C. 2017) ("Particularly where the defendant's allegedly unlawful conduct has 'an obvious alternative explanation,' the complaint must allege facts that 'plausibly suggest'—and are 'not merely consistent with'—the defendant's liability." (quoting *Twombly*, 550 U.S. at 557).

Contrary to Plaintiff's suggestion, moreover, the Court should not construe the Privacy Act to limit disclosure of information from a federal agency to the head of the Executive Branch or his advisors. *See* Pl. Mem. at 37-38. Notwithstanding the restriction on disclosure of records contained in a system of records to "any person," 5 U.S.C. § 552a(b), the Privacy Act does not purport to restrict the President from obtaining information that could be necessary for him to exercise his Article II duties, including supervising the Department and the FBI. Indeed, had Congress included such a restriction in the statute—or if the Court were to interpret it to impose one—it would raise serious separation-of-powers concerns. *Cf. Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." (quoting 1 Annals of Cong., 463 (1789)). At a minimum, one would expect a plain statement of such a restriction in a statute before venturing into such uncharted constitutional waters. *See Ashwander*

*v. Tennessee Valley Authority*, 297 U.S. 288 (1936). Plaintiff's unsupported speculation aside, the Court should not construe the Privacy Act to prohibit open and candid communication from agencies to the President or his advisers.[5] *See Crowell v. Benson*, 285 U.S. 22, 62 (1932). For this additional reason, the Court should dismiss Plaintiff's Privacy Act claim with respect to his allegation that the Department provided information regarding his texts to the White House.

## B.   Plaintiff Cannot Prevail on His Privacy Act Claim with Respect to the December 12, 2017 Release of His Texts.

### 1.   The Department's Disclosure of Plaintiff's Texts to the Public Was Permissible under the Privacy Act.

There is no dispute that the Department publicly disclosed a subset of Plaintiff's texts to the public on December 12, 2017. That disclosure was permissible under the Privacy Act, and Defendants are entitled to summary judgment regarding this aspect of Plaintiff's case, because the Department properly determined that it fell within a routine use in the OIG's System of Records Notice (SORN) for disclosures to the media. *See* Defs. Mem. at 34-45; *see also* Declaration of Peter Winn (Winn Decl.) ¶¶ 10-18, Def. Mem. Ex. 3, ECF No. 30-4.

Plaintiff argues that summary judgment is not appropriate because he cannot currently "definitively prove" what system of records (if any) housed his texts. Pl. Mem. at 34. Plaintiff himself, however, has alleged that the texts were stored on OIG's system of records and cites the same SORN that Mr. Winn used to conduct his analysis. *See* Compl. ¶ 57 (citing 72 Fed. Reg. 36,725, 36,726 (July 5, 2007); *see also* Winn Decl. ¶¶ 9-10. Plaintiff's argument also ignores

---

[5] To support his argument that the Privacy Act prevents disclosure of information to the White House, Plaintiff cites *Alexander v. FBI*, 691 F. Supp. 2d 182 (D.D.C. 2010). In that case, the court determined that the plaintiff could not prevail on his Privacy Act claim because a routine use permitted disclosure of information in his background investigation to the White House. *See id.* at 190-91. Because it concluded that a routine use applied, the court did not have any need to address the more basic question of whether the Privacy Act should be read to prohibit disclosure of information to the President. *See id.*

entirely the declaration of Assistant Attorney General Stephen Boyd, which states his understanding that "[ODAG] requested from the OIG, and the OIG provided, an initial subset of the total universe of discovered text messages between Mr. Strzok and the FBI attorney that the OIG considered particularly troubling." Declaration of Stephen E. Boyd ¶ 8, Def. Mem., Ex. 2, ECF No. 30-3. Nowhere in Plaintiff's brief does he give any reason that the Court should not credit Mr. Boyd's sworn declaration. That alone should resolve the question. But, in any event, Assistant Attorney General Boyd's account is now corroborated by the declaration of former Deputy Attorney General Rod J. Rosenstein, which similarly explains that the Department received the relevant texts from OIG. *See* Rosenstein Decl. ¶ 9.

The fact that the texts came from OIG does not mean, of course, that they were contained in a "system of records," as that term is used in the Privacy Act. *See* 5 U.S.C. § 552a(a)(5).[6] And if they were not—because the agency did not, in practice, retrieve the information by using a personal identifier for Plaintiff, *see McCready v. Nicholson*, 465 F.3d 1, 17 (D.C. Cir. 2006)— then Plaintiff's Privacy Act claim would clearly fail. *See, e.g.*, *Augustus v. McHugh*, 825 F. Supp. 2d 245, 256 (D.D.C. 2011).

Here, however, Defendants have assumed—for the sake of argument, and putting Plaintiff's allegations in the most favorable light possible—that OIG *did* maintain Plaintiff's texts in a system of records. *See* Defs. Mem. at 35. Yet, even accepting that assumption as true, Plaintiff still cannot prevail on his Privacy Act claim, because the Department disclosed the texts pursuant

---

[6] Whether Plaintiff's texts would be contained in a FBI system of records is irrelevant to this analysis. The undisputed fact, as established by the declarations of Mr. Boyd and Mr. Rosenstein, is that the texts the Department released to Congress and the media came from OIG. Thus, the relevant analysis necessarily must focus on whether OIG's SORN contains an applicable routine use.

to a published routine use that applies to the OIG's system of records. *See* Defs. Mem. at 36-41; *see also* Winn Decl. ¶¶ 10-18; Rosenstein Decl. ¶ 16.

Plaintiff makes several arguments in response, none of which is convincing. Plaintiff's suggestion that the Court should interpret the relevant routine use in OIG's SORN, JUSTICE/OIG-001, to apply only to disclosures "contained in official OIG reports," Pl. Mem. at 39, misreads the actual text of the routine use, which states that "*[r]ecords in this system* may be disclosed . . . [t]o the news media and the public, including disclosures pursuant to 28 C.F.R. 50.2, unless it is determined that release of the specific information in context of a particular case would constitute an unwarranted invasion of personal privacy." 72 Fed. Reg. 36,725, 36,725-26. (July 5, 2007) (emphasis added). Nothing in that language limits the Department from providing information to the media located in the OIG system of records only when it is part of an official OIG report. *See* 72 Fed. Reg. at 36,725 (describing "Categories of Records in the System," of which "reports" are only one). Plaintiff's interpretation of the SORN, moreover, would lead to absurd results, preventing the Department from commenting to the public on the details of the OIG's work, even on matters of great national importance, and even when there is no investigatory or law enforcement justification for withholding the information.

Plaintiff's fallback argument is that the routine use in the SORN is overly broad because, if interpreted to allow disclosures to the media when the public interest outweighed the relevant privacy interest, it would undermine the purposes of the Privacy Act. *See* Pl. Mem. at 39 & n.10. Plaintiff's argument proves too much, because the Department, including OIG, is *required*, in the context of a FOIA request, to disclose information contained in certain of its records if it determines that the relevant privacy interests are outweighed by the public interest in disclosure. *See* 5 U.S.C. § 552(b)(6), (b)(7)(C). That is the same balancing that is required by the OIG routine

use, *see* 72 Fed. Reg. at 36,726, and that the Department conducted before releasing Plaintiff's records, *see* Winn Decl. ¶¶ 10-18; *see also* Rosenstein Decl. ¶¶ 13, 16. Congress clearly contemplated that agencies would, and should, disclose certain material to the public where, as here, there is a substantial public interest in doing so, even when the proposed disclosure may implicate substantial privacy interests. *See Getman v. NLRB*, 450 F.2d 670, 674-75 (D.C. Cir. 1971). And, for that reason alone, an agency does not act contrary to the Privacy Act whenever the public interest in disclosure outweighs the privacy interests of the individual in favor of public disclosure. *See* 5 U.S.C. § 552a(b)(2), (b)(6), (b)(7)(C).[7]

Plaintiff also claims that, if the routine use were interpreted to allow the December 12, 2017 disclosure, the routine use could not be squared with 5 U.S.C. § 552a(e)(4)(D), "or the agency's obligation to provide adequate notice of how records will be used." Pl. Mem. at 39 n.10. That argument goes nowhere. Section 552a(e)(4)(D) states only that an agency shall publish in the Federal Register "each routine use of the record contained in the system, including the categories of users and the purpose of such use." The Department unquestionably published the routine use in the Federal Register, *see* 72 Fed. Reg. at 36,726, and, as discussed above, the routine use plainly describes when it authorizes disclosure to the media—*i.e.*, at any time "unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." *Id*.

---

[7] To attempt to show that the routine use would somehow "circumvent" the Privacy Act, Plaintiff cites *Pilon v. U.S. Dep't of Justice*, 73 F.3d 1111 (D.C. Cir. 1996). In that case, however, the D.C. Circuit cautioned against circumventing the Privacy Act's exceptions to the bar against disclosure by adopting a construction of the term "disclose" that would allow an employee to evade the bar against disclosure just because he at one time viewed a document under permissible circumstances. *Id*. at 1123. The Department here is not using a routine use to evade the Privacy Act's bar against disclosure; it is simply applying an existing routine use, and that routine use is consistent with the Privacy Act's allowance of disclosures when required by the equivalent FOIA test, as discussed above. *See* Defs. Mem. at 37-40; Winn Decl. ¶¶ 10-18.

Plaintiff also points to testimony by the Inspector General from December 2019, in which he said that it would be inappropriate for OIG investigators to give interviews regarding an ongoing investigation. *See* Pl. Mem. at 39 (quoting *Crossfire Hurricane Report Hearing before the S. Comm. On the Judiciary*, 116th Cong. (Dec. 11, 2019)). The Inspector General's testimony, however, did not include any analysis of the relevant routine use, or whether it would be permissible under Privacy Act to release information, in any specific instance, to the public. The Inspector General said that "giving preliminary ideas, advice, guidance statements, can be misleading and you should not be releasing final conclusions until you get to the end of the investigations." *See* Pl. Resp. to Defs. Statement of Undisputed Material Facts ¶ 55d, ECF No. 36-2. But none of those things occurred here. The Department determined that a discrete set of information was appropriate for release because, among other reasons, doing so would be in the public interest, and because the information would likely be public soon after it was disclosed to Congress. *See* Rosenstein Decl. ¶ 18; *see also* Winn Decl. ¶¶ 10-18.

Next, Plaintiff contends that there is no "fairly close relationship" between the purpose for which the texts were collected and the purpose of their disclosure. *See* Pl. Mem. at 39-40. This argument also fails. It is based on Plaintiff's assertion that the Department "leaked" the texts "for the purpose of priming the media pump." Pl. Mem. at 40. This claim has no grounding in Plaintiff's Complaint, which alleges nothing about the purpose of the December 12 disclosure to the media, only about its effect—*i.e.*, that the disclosure "allowed *President Trump and his allies* to mount a public relations effort." *See* Compl ¶ 68 (emphasis added). But putting aside Plaintiff's inadequate pleadings, both the Winn declaration and the Rosenstein declaration leave no doubt that Plaintiff's speculation regarding the Department's motives is baseless. The purpose of the disclosure was to provide transparency to the public on a matter of great national interest. *See* Winn Decl. ¶ 17. Far

from being some attempt to "prim[e] the media pump," the disclosure also notably revealed information that was potentially embarrassing to the government, *see* Rosenstein Decl. ¶ 15. The disclosure was therefore consistent with the purpose of OIG's collection of Plaintiff's texts, which was to look into actions by the FBI and the Department in connection with their handling of the investigation of former Secretary Clinton's use of a private e-mail server. *See* OIG Report at 395-96; *see also Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3d Cir. 1989). Plaintiff offers nothing but rank speculation to suggest otherwise.

Finally, Plaintiff fails to address the fact that the texts would have inevitably become public, even absent the Department's disclosure of the texts to the media. *See* Pl. Mem. at 40-41. Plaintiff points out that not all of the texts from Plaintiff's government phone were, in fact, described in the OIG's public report published in June 2018. *Id.* at 41. But Plaintiff misses the point. Members of Congress had already requested copies of the texts at issue in this case, and the Department determined that any law enforcement interests would not justify withholding them. *See* Rosenstein Decl. ¶ 12; *see also* Winn Decl. ¶ 16. Congress, of course, is not subject to any Privacy Act restrictions on its release of information to the public. *See* 5 U.S.C. § 552a(a)(1), (b); *Franklin v. Mass.*, 505 U.S. 788, 800 (1992) (explaining that the Privacy Act applies only to "agencies"). As Mr. Winn explained, "[g]iven the politically charged nature of the text messages," it was "very likely" that one or more members of the requesting committees would "disclose them to the public shortly after receiving them from the Department." Winn Decl. ¶ 6. Plaintiff ignores any practical view of reality, therefore, by suggesting that the texts would not become public— particularly in light of their highly charged content and Plaintiff's pivotal role in the investigations into former Secretary Clinton's use of a private e-mail server and that Plaintiff was a member of Special Counsel Mueller's investigative team. Mr. Winn prudently considered that fact when

conducting his analysis under the Privacy Act, *see* Winn Decl. ¶ 16.[8] That the relevant texts were to be disclosed by Congress significantly influenced the Department's decision to disclose them to the media when it did—indeed, it had them since the summer of 2017 and did not disclose them until December 12, 2017, in response to congressional requests, *see* Rosenstein Decl. ¶¶ 5, 14— and undermines any argument that the Department erred when weighing the privacy interests under the routine use.

Moreover, on the other side of the private-public interest balancing, Plaintiff's texts displayed what a reasonable person could consider to constitute bias, notwithstanding Plaintiff's subsequent explanations of them. *See* Winn Decl. ¶ 17. In turn, Plaintiff's statements risked undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department. As Mr. Winn noted in his declaration, a reasonable person could have found the texts to evidence bias by an important official in a leadership position, regarding issues in criminal investigations in which he had a key role. The Department also had an interest in releasing the material in order to avoid the suggestion that it was concealing information that was potentially embarrassing to itself and the FBI. *See id.* ¶¶ 12, 17; Rosenstein Decl. ¶ 15. Plaintiff ignores this aspect of the analysis, but it goes to underscore why the disclosure was permissible.

---

[8] As to the portion of Mr. Winn's analysis that considered that Plaintiff's identity was already public, *see* Winn Decl. ¶ 16, Plaintiff accuses Defendants of attempting to "rely on the effects of their prior indiscretion as a justification for their subsequent improper disclosures to the media." Pl. Mem. at 40-41. But as noted above, there's a more obvious explanation for the source of the news reports that makes Plaintiff's theory implausible. Mr. Winn also considered a number of other important factors when weighing Plaintiff's privacy interests against disclosure, including that Plaintiff held a high-level position within the FBI and that the texts were exchanged on a government-issued device, which was subject to monitoring. Winn Decl. ¶¶ 13-15.

2.      There Was No Willful or Intentional Violation of the Privacy Act.

Even if Plaintiff could somehow plausibly establish that the disclosure of his texts violated the Privacy Act, Plaintiff still could not prevail on his claim. Plaintiff must demonstrate not only that the Department's December 12, 2017 disclosure was unlawful but also that it was an "intentional or willful" violation of the statute. *See* 5 U.S.C. § 552a(g)(4). It is well settled that an agency acts in an intentional or willful manner only "by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citation omitted).

Plaintiff does not dispute Defendants' account of the law. *See* Pl. Mem. at 41-43. Nor could he, for the reasons Defendants have explained. *See* Defs. Mem. at 41-42. There also cannot now be any dispute who made the ultimate decision to release the texts—former-Deputy Attorney General Rosenstein—or that the Department conducted ample due diligence to determine that releasing the texts to the media would not violate the Privacy Act. *See* Rosenstein Decl. ¶¶ 17-19.

To try to create an issue of material fact, however, Plaintiff raises a red herring in the guise of an alleged question of material fact: Plaintiff's argument rests almost exclusively on two email chains between Mr. Winn and others produced in FOIA that, according to Plaintiff, contain deliberative process privilege redactions. *See* Pl. Mem. at 42-43. Plaintiff suggests that the redaction of the emails produced in FOIA shows the Department had not, in fact, made a decision regarding the legality of disclosing certain of his texts as of December 12, 2017—because otherwise, the redacted information allegedly would have been produced. *See id.*

Plaintiff's argument fails. It is entirely speculative to assume that the Department redacted the material as deliberative in the documents Plaintiff cites. The redactions indicate only that they were made pursuant to FOIA Exemption 5. But Exemption 5 covers several different types of

redactions, including to protect attorney work product and the attorney-client privileges, both of which would likely apply to Mr. Winn's memorandum to the file documenting his legal analysis.

In addition, Plaintiff's is incorrect that Mr. Winn could not have concluded on December 12, 2017 that the disclosure would not violate the Privacy Act, because the deliberative process privilege should be applied only to documents that are "predecisional" and "deliberative." Pl. Mem. at 43. Exemption 5 covers "all communications which, if revealed, would expose to public view the deliberative process of an agency." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982). In this instance, Mr. Winn provided analysis to ODAG on December 12, 2017, *see* Winn Decl. ¶¶ 4-5; *see also* Rosenstein Decl. ¶ 16, and then later memorialized his analysis. Disclosure of that analysis would have revealed the deliberative process of the Department.[9]

Also, and more fundamentally, as his declaration makes clear, Mr. Winn, provided his conclusion regarding the Privacy Act to ODAG *before* the public disclosure on December 12, 2017. *See* Winn Decl. ¶¶ 4, 18. That he later authored a memorandum to the file that contained his analysis, as reflected in Plaintiff's exhibits, is not unusual and does not change the fact that he concluded on December 12, 2017 that there would be no Privacy Act violation resulting from a public disclosure. Plaintiff's self-serving speculation that the Winn declaration, signed under penalty of perjury, may be false does not create a material factual issue that should not prevent this Court from entering judgment in Defendants' favor on Plaintiff's Privacy Act claim.[10]

---

[9] Either way, the Department's FOIA redactions are irrelevant and cannot create an issue of material fact here. And the question of whether the information contained in Mr. Winn's intra-Department emails and memorandum on the subject would now be discoverable, as Plaintiff suggests, *see* Pl. Mem. at 42, is not presently before the Court.

[10] Plaintiff also attempts to raise a material fact issue out of OIG's statement in the public record. *See* Pl. Mem. at 36 (citing Pl. Ex. M). Defendants cited the Inspector General's statement in their opening brief. *See* Def. Mem. at 10 n.2. Yet, that statement does not call into question Mr.

se

If there could be any doubt, the Rosenstein declaration confirms that the ultimate decision maker regarding this issue understood that the relevant expert within the Department (*i.e.*, Mr. Winn) concluded that releasing the texts would not violate the Privacy Act. *See* Rosenstein Decl. ¶ 16. Specifically in response to Mr. Rosenstein's concerns that the disclosure could implicate the Privacy Act, the Department consulted with Mr. Winn—the relevant expert—to determine whether doing so would be lawful. *See id*. ¶¶ 15-16. Mr. Winn determined that the disclosure to the public was permissible under the Privacy Act. *See* Winn Decl. ¶ 18. And, based on that conclusion, Mr. Rosenstein authorized the disclosure. *See* Rosenstein Decl. ¶¶ 16-19.

Mr. Rosenstein's declaration also definitively addresses Plaintiff's only remaining arguments that summary judgment is not appropriate because "Mr. Winn was not the official who made the decision to release the text messages on December 12, 2017," or that the Department somehow allegedly failed to adequately consider the Privacy Act implications of that disclosure. Pl. Mem. at 35, 42. The Court now has before it the declaration from the deciding official, Mr. Rosenstein, who clearly believed that the Department would not violate the Privacy Act by disclosing the relevant text messages to the public. *See* Rosenstein Decl. ¶¶ 16-19.

Those are the facts, and they are dispositive. While Plaintiff or the Court could potentially disagree with Mr. Winn's Privacy Act analysis, there can be no question that any violation of that statute was not willful or intentional. Plaintiff therefore cannot prevail on his Privacy Act claim.

## CONCLUSION

For the reasons above, the Court should grant Defendants' motion.

Dated: January 17, 2020                    Respectfully submitted,

---

Rosenstein's declaration, which demonstrates that he understood public disclosure would not violate the Privacy Act. *See* Rosenstein Decl. ¶ 17.

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20001
Phone: (202) 305-0878
Fax: (202) 616-8460
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*

*Strzok v. Barr*, No. 1:19-CV-2367-ABJ

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK,                 )<br>                         )<br>          Plaintiff,        )<br>                         )<br>         v.               )<br>                         )<br>ATTORNEY GENERAL WILLIAM F. BARR, )<br>in his official capacity, et al.,      )<br>                         )<br>         Defendants.      )<br>                         )<br>                         ) | Case No. 1:19-cv-2367-ABJ |

## <u>DECLARATION OF ROD J. ROSENSTEIN</u>

1.      I served in the United States Department of Justice (Department) from December 1990 until May 2019, first as a career employee and then as a political appointee. President Bush nominated me to serve as U.S. Attorney for Maryland, and following Senate confirmation, I took office in July 2005. I continued to serve under that appointment as U.S. Attorney for twelve years, until President Trump appointed me to serve as Deputy Attorney General (DAG). Following Senate confirmation, I took office in April 2017 and served until May 2019.

2.      My duties as DAG included, under the direction of the Attorney General, overseeing the Department's litigating divisions, law enforcement agencies and United States Attorney's Offices.

3.      The statements contained herein are based on my personal knowledge and other information I obtained while performing my official duties.

4.      On January 12, 2017, during the previous Administration, the Department's Inspector General (IG) announced that the Office of Inspector General (OIG) would conduct a review of allegations of impropriety by the FBI and Department in advance of the 2016 election,

including allegations of unauthorized leaks, improper considerations, and inappropriate public statements concerning the investigation of former Secretary Hillary Clinton's use of a private email server, which was closed in 2016.

5.    In the summer of 2017, the IG told me and the Special Counsel (SC) conducting the Russian election interference investigation that in the course of the ongoing review, the OIG had discovered that two high-level FBI employees, Peter Strzok and Lisa Page, used FBI phones to send text messages that might violate Department and FBI policies and raised concerns about whether overt partisan bias influenced their performance of their official duties.

6.    The issue was relevant to the SC because in addition to their involvement in the Clinton email investigation, Mr. Strzok and Ms. Page were working on the Russian election interference matter when I appointed the SC.

7.    The SC removed Mr. Strzok from his role in the ongoing SC investigation after learning about the text messages. Ms. Page had already left the investigation and moved on to other duties.

8.    On or about December 2, 2017, news reporters learned about the OIG review of the inappropriate text messages and reported about them. The Department then received requests for the text messages from several Senate and House committee chairs.

9.    In order to respond to those congressional requests, the Associate Deputy Attorney General (ADAG) responsible for managing congressional oversight—a career Senior Executive Service employee appointed to his position during the previous Administration—requested copies of relevant text messages from OIG. OIG provided a subset of the total universe of discovered text messages between Mr. Strzok and Ms. Page, specifically those messages that OIG identified as inappropriate and particularly troubling.

10.      I was scheduled to testify before the House Judiciary Committee on December 13, 2017, regarding the Committee's oversight of the Department and the FBI, and I did not expect to discuss the text messages. On December 12, 2017, however, I learned that the text messages were ready for release to the Senate and House Committees that had requested them, there was no basis to withhold them, and they arguably were relevant to the Judiciary Committee's oversight hearing.

11.      I expressly asked my staff whether OIG objected to providing the messages to Congress. I was advised that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation.

12.      It was therefore my understanding that law enforcement interests would not justify withholding the text messages from Congress.

13.      I also asked whether Mr. Strzok and Ms. Page had any privacy interest in the text messages that would warrant withholding them from disclosure. I understood that they did not, because the materials proposed for release represented a subset of text messages written by Mr. Strzok and Ms. Page that (1) were sent on government phones with the knowledge that they were subject to review by FBI; (2) were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties; and (3) the redacted portions proposed for disclosure were not sufficiently personal in nature.

14.      Based on the information known to me on December 12, 2017, there was a legitimate congressional oversight interest and no valid basis to decline the congressional oversight request. My staff presented me with the option of delaying disclosure for one day, until after I testified, so that I would not be in the witness chair to receive the inevitable harsh criticism of the FBI that would follow the disclosure. I concluded that it would be inappropriate to withhold the

messages for that reason. I therefore authorized the Department's Office of Legislative Affairs (OLA) to disclose the relevant text messages to the congressional oversight committees.

15.     The Department's Office of Public Affairs (OPA) subsequently recommended providing the text messages to the media because otherwise, some congressional members and staff were expected release them intermittently before, during, and after the hearing, exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department. The disclosure obviously would adversely affect public confidence in the FBI, but providing the most egregious messages in one package would avoid the additional harm of prolonged selective disclosures and minimize the appearance of the Department concealing information that was embarrassing to the FBI.

16.     Before disclosing the text messages to the news media, I wanted to confirm that it would not implicate the Privacy Act. The career ADAG contacted the Department's Acting Chief Privacy and Civil Liberties Officer—also a career Senior Executive Service employee appointed to his position during the previous Administration—and reported to me that the Department's expert had concluded that disclosing the texts to the media would not violate the Privacy Act.

17.     On December 12, 2017, with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event, I authorized OPA to disclose to the news media the text messages that were being disclosed to congressional committees. I told my staff to notify Mr. Strzok's and Ms. Page's lawyers.

18.     The decision to disclose the text messages to the media was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at one time would further the goal that the Department be forthcoming with the public—consistent with our duties to safeguard law enforcement information, protect public safety and national security, preserve privileges and respect valid

4

privacy interests of employees and other citizens—even when information is damaging to the Department.

19.     If I had believed that the disclosure was prohibited by the Privacy Act, I would have ordered Department employees not to make the disclosure.

20.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.


Dated: __1/17/20__                                        _____

                                                          ROD J. ROSENSTEIN