**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-2367-ABJ |
| | ) | |
| WILLIAM P. BARR, in his official capacity | ) | |
| as Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS AND FOR SUMMARY JUDGMENT (ECF No. 30)**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    THE BELATED FILING OF THE ROSENSTEIN DECLARATION DOES NOT
      ENTITLE DEFENDANTS TO JUDGMENT ON THE PRIVACY ACT CLAIM ........... 3

II.   PLAINTIFF HAS A VALID DUE PROCESS CLAIM AND THE COURT HAS
      JURISDICTION TO CONSIDER IT ................................................................. 9

# TABLE OF AUTHORITES

**Cases**

*Black v. TIC Inv. Corp.,*
    900 F.2d 112 (7th Cir. 1990) ................................................................................. 3

*Convertino v. U.S. Dep't of Justice,*
    684 F.3d. 93 (D.C. Cir. 2012) .............................................................................. 4

*Dutta v. State Farm Mut. Auto. Ins.,*
    895 F.3d 1166 (9th Cir. 2018) ............................................................................. 3

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.,*
    928 F.3d 42 (D.C. Cir. 2019) ............................................................................... 4

*Pappas v. Giuliani,*
    290 F.3d 143 (2d Cir. 2002) ................................................................................ 2

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007)................................................................................................ 5

*Seay v. TVA,*
    339 F.3d 454 (6th Cir. 2003) ............................................................................... 3

*United States v. Krizek,*
    111 F.3d 934 (D.C. Cir. 1997) ............................................................................ 5

**Statutes**

5 U.S.C. § 552a(g)(4)............................................................................................... 4

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................ 3

The aims of releasing Mr. Strzok's text messages were to punish Mr. Strzok personally for sending texts critical of Candidate and President Trump and to discredit the then-ongoing Special Counsel investigation.  Beginning with an initial leak to the media through the White House to whet the appetite of the President's allies in Congress, and followed by further disclosures to the press before the DOJ Inspector General could complete his investigation determining that bias did not influence the FBI's conduct of the investigation, officials within the Justice Department enabled the very politically-motivated attacks on the FBI and the Special Counsel by the President and his allies that the FBI then invoked as grounds for firing Mr. Strzok.

The government's Reply and the new declaration of former Deputy Attorney General Rod Rosenstein (ECF Nos. 38, 38-1) confirm the need for discovery before the Court considers the government's summary judgment motion.  By filing a new declaration with the Reply, the government effectively admits that its original submission of the Boyd and Winn declarations did not warrant summary judgment on the Privacy Act claim.  But the Rosenstein Declaration delicately avoids the subject of responsibility for the original, pre-December 2, 2017 leak about the text messages to *The New York Times* and *The Washington Post*, and as to the December 12, 2017 release, describes a decision-making process in which DAG Rosenstein relied on reports by subordinates that were not accurate and a bare conclusion about the legality of disclosure under the Privacy Act, rather than having made his own determination of the Privacy Act question.  The declaration also shows that in deciding to release the text messages former-DAG Rosenstein (1) conflated the absence of a Fourth Amendment expectance of privacy with the absence of Privacy Act protections, and that he (2) failed to consult with the Inspector General about the legality of releasing the messages to the press.  The willfulness of the *agency*'s conduct cannot be assessed without exposing through discovery the communications and actions of the various DOJ

officials directly involved in the decisions to disclose the text messages to the White House and later directly to the press.

The government also speculates recklessly that Michael Flynn's lawyers at Covington & Burling, not DOJ, were behind the original December 2 leak, but this makes no sense. Flynn had already entered an agreement to cooperate with the Special Counsel so his lawyers had no motive to leak and considerable risk in disclosing material provided in confidence; moreover, the leaks included information not disclosed to Flynn, and the pre-complaint investigation specifically traced the leak to the White House. The Court can disregard the government's speculation as nothing in the summary judgment record supports it, and it has no bearing on the plausibility of the allegations in the Complaint.

The government's use of the Rosenstein Declaration to preclude discovery into the Privacy Act allegations in the Complaint is of a piece with its attempt to persuade the Court that "the President's statements have no bearing on the Court's analysis" of the reasons for Mr. Strzok's termination. Reply at 13. Both arguments ask this Court to presume the truthfulness of what the Plaintiff alleges (and the available evidence shows) are pretextual explanations for what would otherwise be unlawful government actions. The government thus misfires when it attempts to distinguish this case from the pretext cases cited in the Opposition. Reply at 7-8.[1] Here, the official, institutional explanation for Strzok's termination has nothing to do with an attempt to placate a President determined to punish what he sees as insolence and undermine the public's faith in the FBI. There is no reason for the Court, Plaintiff, or the public to accept the official story at face value, given the chronology set forth in the Complaint and repeated statements by President

---

[1] *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002), cited for the first time in the reply, involved communications that the *plaintiff* had intentionally disseminated to the public in violation of police department regulations.

Trump directly undermining the official narrative.  This is particularly true given the track record of this Administration in proffering sham rationales to explain improper and/or unlawful acts by the President.

The government also argues for the first time that the Court has no jurisdiction over the Fifth Amendment claim, asserting exclusive Merit System Protection Board ("MSPB") jurisdiction, when it told the MSPB *it* had no jurisdiction and prevailed.

## I.  THE BELATED FILING OF THE ROSENSTEIN DECLARATION DOES NOT ENTITLE DEFENDANTS TO JUDGMENT ON THE PRIVACY ACT CLAIM.

The government cannot hide the evidence of DOJ's willful violation of the Privacy Act behind Rod Rosenstein's record of public service and reputation earned in prior administrations. *First*, it would be procedurally improper to rely on the Rosenstein Declaration, because the government deliberately withheld and did not include the information in its Statement of Undisputed Material Facts filed pursuant to Local Rule 7(h)(1) and Fed. R. Civ. P. 56(c).  The Rule 7(h) statement and the opposing party's response constitute the factual record for purposes of summary judgment.  Rule 56(c) forbids the entry of summary judgment on the basis of facts to which the opposing party has not had an opportunity to respond.  *See Dutta v. State Farm Mut. Auto. Ins.*, 895 F.3d 1166, 1172 (9th Cir. 2018); *Seay v. TVA*, 339 F.3d 454, 481–82 (6th Cir. 2003); *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990).  Together those rules prohibit a party seeking summary judgment from holding back evidence until a reply.

The Court has the discretion to disregard the new facts offered for the first time with a summary judgment reply when, as in this case, there is no colorable reason for the government's failure to include those facts in its original motion.  There is a vast difference between supplementing the record with declarations in support of summary judgment at the conclusion of discovery (which is routine) and injecting completely new "facts" in a pre-discovery summary

judgment reply memorandum (as happened here). It could not have come as a surprise to the government that under *Convertino v. United States Department of Justice*, 684 F.3d. 93 (D.C. Cir. 2012), Plaintiff must be afforded adversarial discovery, including the opportunity to obtain evidence from the person who decided to release records in violation of the Privacy Act. Yet the government first chose to move for summary judgment on the basis of pre-discovery declarations from one DOJ official who "was not directly involved" in the disclosure of the text messages to the press and lacked personal knowledge of the facts, and a second DOJ official who did not finalize an opinion on the legality of disclosing the text messages until weeks after they had been released, while refusing to provide the analysis he reached at the time. Boyd Decl. ¶ 12, ECF 30-3; Statement of Genuine Issues ("SOGI") ¶¶ 25, 56d, ECF No. 36-2. The government now implicitly concedes that its initial motion for summary judgment on the Privacy Act claim was flawed. But the Rosenstein Declaration does not in any way eliminate Plaintiff's need for discovery at this stage of the litigation. The most efficient approach would be for the Court to simply disregard the Rosenstein Declaration rather than permit the government to constructively rewrite its Rule 7(h) statement.

*Second*, the Rosenstein Declaration does not provide a basis for summary judgment in favor of the agency. The statutory question is whether "the *agency* acted in a manner which was intentional or willful," not whether the particular individual who made the final call to authorize release had a bad purpose or intended to flout the law. 5 U.S.C. § 552a(g)(4) (emphasis added). An agency is liable for damages when it is willfully indifferent to its legal obligations under the Privacy Act.[2] The Rosenstein Declaration asserts that he relied on information provided by others

---

[2] *See In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 63 (D.C. Cir. 2019) (concluding that complaint "clears [the intentional or willful] hurdle by plausibly and with specificity alleging that OPM was willfully indifferent to the risk that acutely sensitive private

and made no Privacy Act determination himself.  Thus, the determination whether the *agency* was willfully indifferent cannot be answered without discovery into the statements and information Rosenstein considered.

For example, Rosenstein recounts that he relied on a second-hand report that a subordinate (Winn) had concluded that release of the text messages would not violate the Privacy Act. Rosenstein Decl. ¶ 16.  The government has not produced, and indeed, has withheld, records of the subordinate official's analysis, which the government does not dispute was finalized on January 4, 2018 and then back-dated to December 12, 2017.  In fact, so far as the record reveals, Mr. Winn prepared exactly nothing to document his analysis on December 12, 2017 despite recognizing that the Privacy Act was implicated by the secretive, late-night disclosure of Mr. Strzok's text messages.  *Id.* ¶ 16; Winn Decl. ¶¶ 7–18, ECF No. 30-4.[3]  But even if the summary judgment record included that analysis, Rosenstein made his decision without reviewing it; he rubber-stamped a bare conclusion of Privacy Act compliance, sight unseen.  *See* Rosenstein Decl. ¶¶ 16–17.  There is no factual basis upon which this Court could find that Rosenstein took adequate steps to comply with the Privacy Act just because someone told him that Winn thought it was permissible, even if Winn had in fact reached such a conclusion by that time, a fact that remains to be determined in discovery.

---

information was at substantial risk of being hacked").  Willful indifference is equivalent to recklessness. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (interpreting civil statute as extending civil liability for willful acts to "not only knowing violations of a standard, but reckless ones as well").  Recklessness and willful indifference go beyond gross negligence. *See United States v. Krizek*, 111 F.3d 934, 941–42 (D.C. Cir. 1997).

[3] The government cannot rely on Winn's opinion and refuse to produce it on the basis of any privilege.  Reliance on Winn's advice waives the attorney-client as well as deliberative process privilege.

Rosenstein also states that he understood the Office of the Inspector General had raised no objections to release of the text messages. *Id.* ¶ 11. But the Inspector General himself reported to Congress that DOJ *did not consult* with his office about releasing the text messages to the press. SOGI ¶ 56h; *see also* SOGI Ex. M, ECF No. 36-15. And even if one parses the Rosenstein Declaration generously to conclude that DOJ did consult with OIG about whether release of the messages to *Congress* would interfere with an ongoing OIG investigation, DOJ did not consult with OIG about whether the release of the text messages, even to Congress, were consistent with "applicable legal and ethical standards" including the Privacy Act. SOGI Ex. M at 2. That failure to consult with OIG dooms the government's attempt to rely on a purported "routine use" promulgated by OIG. *See generally* Rosenstein Decl.; Am. Goelman Decl. ¶ 9.

Rosenstein's declaration offers no explanation for the surreptitious manner in which DOJ disclosed the messages to the press: inviting select reporters into its offices under the cover of darkness and instructing them not to source the text messages to DOJ. SOGI ¶¶ 56b, 56g. This behavior is consistent with consciousness of guilt and inconsistent with the confidence in the legality of its action that the agency now claims it had. The same is true of DOJ's effort to claim that OIG had approved the release of the text messages when it had not.

The Rosenstein Declaration also does not address DOJ's responsibility for the coordinated leaks to *The New York Times* and *The Washington Post* before December 2, 2017. If, as the Complaint alleges (¶¶ 59-61), this original leak was part of a scheme to elicit requests for public disclosure of the text messages in furtherance of the broader goal of attacking the Special Counsel investigation, then DOJ's disclosure of the messages to satisfy a congressional appetite its own leak had created and, in turn, to release the messages to the press in anticipation of release by Congress merely consummated a scheme showing flagrant disregard for Plaintiff's rights under

the Privacy Act. Rosenstein's declaration does nothing to refute this allegation, or to support the government's speculation that Michael Flynn's lawyers were responsible for the leak.[4] Not only do the contents of the articles themselves and the investigation of the facts before filing Mr. Strzok's Complaint refute the government's reckless claim of professional misconduct by Flynn's lawyers, it also makes no sense for Flynn's lawyers to have leaked information to the press *after* having already entered into a plea agreement with the Special Counsel on November 30, 2017. *See* Am. Goelman Decl. ¶ 10. The filing of the information on November 30, 2017 and the plea agreement the following day provided a motive for President Trump's allies at DOJ and in the White House to leak the text messages in an effort to discredit an investigation that was drawing close to home on December 2—not General Flynn's lawyers. *See id.*

*Third*, Rosenstein's declaration shows at least reckless disregard for the interests protected by the Privacy Act. If, as noted above, DOJ was responsible for the initial coordinated leak of information about the text messages before December 2, that leak cannot be invoked as a reason why a further disclosure would be appropriate. Moreover, it is simply not the case that a person has no privacy interest in avoiding public disclosure of records just because they were "subject to review by [the] FBI." Rosenstein Decl. ¶ 13. Records such as interoffice emails are constantly scrubbed of personal information notwithstanding the fact that the emails are subject to agency review. Given the FBI's policy of permitting personal use of FBI phones, the Rosenstein Declaration suggests a shocking disregard for the privacy interests of government employees in

---

[4] The government speculates, without any evidentiary support, that General Flynn's lawyers (then at Covington & Burling) were responsible for the leak. But the articles included details about Mr. Strzok and Ms. Page's relationship and reactions to their text messages by DOJ employees that Gen. Flynn's attorneys did not even possess, and which Plaintiff's pre-Complaint investigation traced to the White House. *See* Am. Goelman Decl. ¶ 10. The government's implicit assertion that Gen. Flynn's attorneys leaked the texted messages is desperate speculation. The Court should have none of it.

permissible personal communications over government-owned devices. That is evidence supporting liability for willful indifference.

The Rosenstein Declaration also shows that the decision to release the text messages to the press was made hastily with the objective of minimizing harm to the FBI and DOJ from presidential and congressional attack. Rosenstein Decl. ¶¶ 15, 18. It is clear from the sequence of events Rosenstein describes that he "learned that the text messages were ready for release" on December 12, allowing at most a few hours before DOJ invited reporters to come to the Department to secretly review them. *Id.* ¶ 10. Winn himself was not consulted about the Privacy Act implications until the afternoon of December 12. *See* Winn Decl. ¶ 4; Pls.' Ex. C, ECF No. 36-5. Rosenstein declined the option of delaying disclosure to Congress and seems to have rejected delaying disclosure to the press because he thought it would minimize harm to the FBI and DOJ. Rosenstein Decl. ¶¶ 14, 15. Rosenstein implies in passing that he thought it would also better "respect valid privacy interests of employees," but earlier in his declaration he dismisses Mr. Strzok's privacy interest. *Id.* ¶¶ 13, 18. The implication that DAG Rosenstein rushed the decision in part out of concern for Mr. Strzok's privacy interests is both facially incredible and inconsistent with his assertion that Mr. Strzok had no privacy right. To the contrary, because DOJ released the text messages before the OIG had completed its investigation into whether the FBI had been influenced by bias, that hasty decision harmed Mr. Strzok by giving President Trump and his political allies the opportunity to falsely spin the text messages into an attack on the investigation as corrupted by political bias. The early disclosure of the messages outside of the context of the OIG investigation through which they had come to light meant more exposure and more harm. An agency that sacrifices the Privacy Act protections of its employees without their consent for the

benefit of the agency's public image has plainly acted in flagrant disregard of their rights under the Act.[5]

## II.     PLAINTIFF HAS A VALID DUE PROCESS CLAIM AND THE COURT HAS JURISDICTION TO CONSIDER IT.

After Mr. Strzok was dismissed from the FBI, he appealed his dismissal to the MSPB.  The government moved to dismiss his appeal, successfully claiming that the MSPB "does not have jurisdiction over the appeal."  Am. Goelman Decl. Ex. S, Agency's Mot. to Dismiss for Lack of Jurisdiction at 2, *Strzok v. Dept. of Justice*, DC-0752-18-0803-I-1 (MSPB Oct. 5, 2018).  The government now argues, for the first time in its Reply, that even if Mr. Strzok had a property interest in his continued FBI employment, "the *only* proper forum [is] the MSPB."  Reply at 14 (emphasis added).

This game of jurisdictional whack-a-mole exposes the government's true position: there is no court, administrative body, or other authority that has the right to review Plaintiff's termination.

Mr. Strzok's property interest does not, in any event, turn only on whether the FBI had made a final decision to impose discipline that would have restored his right to MSPB review as a veteran. The LCA also conferred a property interest as a contract.  In its Reply, at 16, the government argues that the LCA was merely a "*request*" rather than a binding contract, because the face of the LCA was signed only by Plaintiff and his counsel.  But the LCA was executed by the FBI on August 8, when AD Will explicitly made the LCA part of her final decision suspending the Plaintiff for 60 days.  *See* Defs.' Ex. 4 at 23, ECF No. 30-5.  Whether or not the face of the LCA, which contains no signature block for the agency, was signed on behalf of the government,

---

[5] The assumption that Congress would have disclosed the text messages anyway has no bearing on whether the Privacy Act permitted DOJ to release them, even if it might affect a jury's calculation of damages.

it became a legally enforceable contract when OPR accepted it after Mr. Strzok's surrender of various valuable rights, including the right to appeal OPR's decision, and explicitly relied on the LCA's promises by foregoing his right to present additional evidence under the *Douglas* factors.

Date: January 31, 2020                    Respectfully submitted,

/s/ Aitan D. Goelman
Aitan D. Goelman (DC Bar 446636)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
AGoelman@zuckerman.com

/s/ Richard A. Salzman
Richard A. Salzman (DC Bar 422497)
HELLER, HURON, CHERTKOF & SALZMAN
PLLC
1730 M Street, NW, Suite 412
Washington, DC 20036
Tel: (202) 293-8090
salzman@hellerhuron.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-2367-ABJ |
| | ) | |
| WILLIAM P. BARR, in his official capacity | ) | |
| as Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED DECLARATION OF AITAN D. GOELMAN PURSUANT
TO RULE 56(d) AND IN SUPPORT OF OPPOSITION
TO MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

I, Aitan D. Goelman, hereby declare:

1. I am a partner with Zuckerman Spaeder LLP.  I have filed an appearance in this matter as an attorney for Peter Strzok.  I also represented Mr. Strzok in connection with the disciplinary hearing before the FBI Office of Professional Responsibility, which was headed by Assistant Director Candice M. Will, as well as Mr. Strzok's appeal to the Merit Systems Protection Board.  The government's motion to dismiss Mr. Strzok's appeal before the MSPB for lack of jurisdiction, which was granted, is attached hereto as Exhibit S.

2. No discovery has occurred to date in this action.

3. Mr. Strzok, myself, attorneys at my firm, and our co-counsel have reviewed a significant body of relevant documents, including: the text messages at issue; Department of Justice and Federal Bureau of Investigation policies and procedures; the exhibits to Defendants'

motions; and relevant productions made by the Department of Justice in response to Freedom of Information Act requests.

4. Despite our efforts, Mr. Strzok is unable to offer the testimony and documentary evidence that is necessary to fully and adequately respond to Defendants' motion for summary judgment.  If discovery is allowed to proceed in this action, there is a high likelihood that Mr. Strzok will develop a record sufficient to show and/or prove:

    a.    The identity of the Department of Justice official(s) who accessed and leaked information about text messages between Mr. Strzok and Ms. Page on or before December 2, 2017;

    b.    The system of records accessed to retrieve information about Mr. Strzok and the method by which those records were retrieved (Defendants' brief implies, without acknowledging, that this system was most likely the Department of Justice, Office of the Inspector General's Investigative Records);

    c.    The system of records where the texts were maintained before they were collected by the OIG;

    d.    The motivation, political or otherwise, for the Department of Justice official's decision to disclose records about Mr. Strzok and the incongruity between those motivations and the purposes for which the records were collected;

    e.    Any communications between the Department of Justice and the White House with respect to the texts on or before December 2, 2017, including any discussion of providing the content or subject matter of these texts, as well as information identifying Mr. Strzok, to the news media;

f.     That the leaks that occurred on or before December 2, 2017 were an intentional and willful violation of the Privacy Act;

g.     The identity of and communications from and among the officials within the "Department's Office of Public Affairs" who "determined that it was appropriate to make the . . . text messages available to certain members of the media" and the influence those officials' advice had on Mr. Rosenstein.  Boyd Decl. ¶ 12;

h.     The system of records from which the text messages were retrieved in order to make the December 12, 2017 disclosures and the method by which they were retrieved (again, Defendants' brief implies but does not confirm that this system was most likely the Department of Justice, Office of the Inspector General's Investigative Records);

i.     The actual substance of communications to Mr. Rosenstein and all records and information he considered in authorizing the release; the motivations of the DOJ officials who provided that advice and information; and the obvious incongruity between those motivations of the DOJ and the purposes for which the records were collected by the OIG;

j.     Any pressure brought to bear on AD Will between Mr. Strzok's execution and transmission of the Last Chance Agreement to AD Will on July 26, 2017 and AD Will's official decision implementing the LCA on August 8, 2017, to withdraw the Last Chance Agreement or to influence her decision as to the appropriate sanction for Special Agent Strzok;

k.     Any communications between the White House, the Office of the Attorney General or other allies of the President, and Deputy Director Bowdich, Director

3

Wray or others in the FBI that precipitated Deputy Director Bowdich's decision to countermand AD Will's decision and fire Special Agent Strzok;

l.       The reasons that Deputy Director Bowdich, who had previously assured Special Agent Strzok that his job would not be materially impacted by the furor over the texts, changed his mind and reversed the decision by AD Will; and

m.      Any other examples of Deputy Director Bowdich or others in the Office of the Director of the FBI reversing a decision by the AD for OPR, including any previous precedent where an employee was fired despite an executed Last Chance Agreement.

5.  Although Mr. Strzok has made specific, well-educated allegations based on the facts known and is submitting a response to Defendants' statement of undisputed materials facts in accordance with Local Civil Rule 7(h), evidence as to the above facts is essential to fully justify his opposition to Defendants' motion.

6.  Most significantly, without discovery Mr. Strzok is unable to fully demonstrate that the leaks at issue were an intentional and willful violation of the Privacy Act and that his termination was based on political viewpoints.

7.  I have reviewed the audio recording of Mr. Strzok's testimony before Assistant Director Candice M. Will on July 24, 2018.  In that testimony, Mr. Strzok disagreed with the notion that his texts themselves had damaged the credibility of the FBI.  Instead, Mr. Strzok argued that it was the cynical use of his text messages by the President and his allies that damaged the credibility of the FBI.

8.  On August 6, 2018 at 8:52 AM, I received an email from the Department of Justice Office of Professional Responsibility ("OPR"), which I attached to the Statement of

Genuine Issues that was submitted in support of Plaintiff's Opposition to Defendants' Motion to Dismiss and for Summary Judgment (Pl.'s Ex. Q, ECF No. 36-19). That email indicated that an individual whom Mr. Strzok had identified as a character reference needed additional time to submit information and asked whether Mr. Strzok wanted AD Will to wait to receive the character reference to issue her decision if she was otherwise prepared to issue her decision. Shortly after receiving that email, I spoke with a representative for OPR who was working under the direction of AD Will. The OPR representative indicated that AD Will was prepared to issue her report. I explained that although there was no need to await further character reference materials if AD Will was going to approve the Last Change Agreement, Mr. Strzok did want AD Will to hold off on issuing a decision until the character reference was submitted if AD Will was considering terminating him instead of moving forward with the LCA.

9. The government's Reply attached a declaration from former Deputy Attorney General Rod Rosenstein ("Rosenstein Decl.," ECF No. 38-1), the previously unidentified political appointee who now acknowledges that he approved the release of Mr. Strzok's text messages. Plaintiff does not concede the truth of those assertions, and discovery may show them to be inaccurate. Even assuming the veracity of the Rosenstein Declaration's assertions, if discovery is allowed, there is a high likelihood that Mr. Strzok will develop a record sufficient to prove:

    a. Although the Rosenstein Declaration does not acknowledge personal involvement in discussions about Mr. Strzok's text messages at DOJ between December 2, 2017 and December 12, 2017, and declares simply that he "learned that the text messages were ready for release to the Senate and House Committees that had

5

requested them, there was no basis to withhold them, and they *arguably were relevant* to the Judiciary Committee's oversight hearing" (Rosenstein Decl. ¶ 10 (emphasis added)), there was a fervent, politically-motivated race to prepare the text messages for disclosure in advance of Mr. Rosenstein's December 13, 2017 testimony, and Mr. Rosenstein was well aware of those efforts;

b.  A high-ranking DOJ official working under Mr. Rosenstein confirmed, to the media, the existence of Mr. Strzok's text messages and the planned disclosure of the text messages in advance of any decision made by Mr. Rosenstein to release the text messages or any consideration of Mr. Strzok's Privacy Act rights;[1]

c.  The same DOJ official confirmed that certain media outlets obtained the text messages in advance of the intended disclosure approved by Mr. Rosenstein;[2]

d.  One of the purposes of the pre-December 12, 2017 disclosures was to create an environment in which the DOJ would feel justified in disclosing, or forced to disclose, Mr. Strzok's text messages, and Mr. Rosenstein acknowledges that his calculus was affected in this manner (*see* Rosenstein Decl. ¶ 18);

e.  Although Mr. Rosenstein was "advised that OIG did not raise any objection and that the disclosure [to Congress] would not interfere with any ongoing investigation" (Rosenstein Decl. ¶ 11), OIG never approved the disclosure of its investigative records to the media and would have objected to the late-night disclosure of its investigative records if it had been alerted to DOJ's plan (*see* Plaintiff's Statement of Genuine Issues ("SOGI"), ECF No. 36-2 ¶¶ 55d, 56h);

---

[1] *See* December 5, 2017 email from Sarah Isgur Flores to Laura Jarrett of CNN, Exhibit T.

[2] December 14, 2017 email from Sarah Isgur Flores to Josh Gerstein and Darren Samuelsohn of Politico, Exhibit U ("I understand the texts were in distribution to reporters from another source before I showed them to anyone and I don't know how that happened.").

f.  Mr. Rosenstein never independently considered whether the disclosure of the text messages to the media was compatible with an applicable "routine use," and therefore, to the extent he served as the deciding official (rather than merely one of the decision makers as implied by the Boyd Declaration), he simply made the final decision to approve action recommended by other officials (*see* Rosenstein Decl. ¶¶ 11–12, 15–17, 19);

g.  The information and advice Mr. Rosenstein received from DOJ employees concerning Mr. Strzok's Privacy Act rights was recklessly prepared, formally justified only weeks after the fact, and then back-dated to create the veneer of due diligence, as described by Plaintiff's Statement of Genuine Issues (SOGI ¶ 56d n.24); and

h.  When the motivations and action of the various DOJ officials involved are considered collectively, a jury will be able to reasonably conclude that the DOJ recklessly and intentionally violated Mr. Strzok's Privacy Act rights.

10. The government's reply speculates that General Flynn's lawyers, presumably meaning attorneys with Covington & Burling LLP, were the source of the December 2, 2017 newspaper stories.  Reply at 19–20, ECF No. 38.  Discovery on these allegations is necessary and will likely show that General Flynn's lawyers did not disclose the text messages on or before December 2, 2017.  The sources referenced in the December 2, 2017 *New York Times* story included "[c]urrent and former law enforcement officials who worked with Mr. Strzok."[3]  Additionally, the *Washington Post*'s December 2, 2017

---

[3] Michael S. Schmidt, Matt Apuzzo and Adam Goldman, *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, N.Y. Times (Dec. 2, 2017),

story included numerous details not provided to General Flynn's lawyers, including the assertions that Mr. Strzok had "a romantic relationship with FBI lawyer Lisa Page . . . according to the people familiar with the matter, who spoke on the condition of anonymity"; that the "greater concern among senior law enforcement officials were text messages the two exchanged"; and that "the people discussing the matter" said "the two would sometimes react to campaign news of the moment."[4]   Based on the content of those articles, I expect discovery to show that the information at issue was leaked from government sources, not private attorneys.

11. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on: January 31, 2020

Aitan D. Goelman

---

https://www.nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-over-possible-anti-trump-texts.html.

[4] Karoun Demirjian & Devlin Barrett, *Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, The Washington Post (Dec. 2, 2017), https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html.

*Strzok v. Barr,* No. 1:19-CV-2367-ABJ

# Exhibit S

PETER P. STRZOK v. DEPARTMENT OF JUSTICE
Docket # DC-0752-18-0803-I-1
Agency's Motion to Dismiss for Lack of Jurisdiction
Summary Page

**Case Title :** PETER P. STRZOK v. DEPARTMENT OF JUSTICE

**Docket Number :** DC-0752-18-0803-I-1

**Pleading Title :** Agency's Motion to Dismiss for Lack of Jurisdiction

**Filer's Name :** Chad Y. Tang, Esq.

**Filer's Pleading Role :** Agency Representative

**Details about the supporting documentation**

N/A

# Table of Contents

Pleading Interview ....................................................................................................... 3
Uploaded Pleading Text Document .............................................................................. 4
Certificate of Service ................................................................................................... 15

PETER P. STRZOK v. DEPARTMENT OF JUSTICE
Docket # DC-0752-18-0803-I-1
Agency's Motion to Dismiss for Lack of Jurisdiction
Online Interview

1. Would you like to enter the text online or upload a file containing the pleading?

See attached pleading text document

_____

2. Does your pleading assert facts that you know from your personal knowledge?

No

_____

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

| | | |
|---|---|---|
| PETER P. STRZOK, | ) | DOCKET NUMBER |
| | ) | DC-0752-18-0803-I-1 |
| Appellant, | ) | |
| | ) | ADMINISTRATIVE JUDGE |
| v. | ) | David Thayer |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | DATE:  October 5, 2018 |
| | ) | |
| Agency. | ) | |
| | ) | |
| | ) | |

## AGENCY'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Pursuant to 5 C.F.R. § 1201.55, the Department of Justice, through its undersigned

counsel and designated representatives, the Federal Bureau of Investigation ("FBI" or "Agency"),

hereby submit this motion to dismiss the Appellant's Appeal because there is no jurisdiction.

First, the Appellant, Peter Strzok, is not preference eligible and precedents have held that only

FBI employees are who preference eligible can assert a claim to the Merit Systems Protection

Board ("MSPB") under Chapter 75.  Second, the Appeal should be dismissed because FBI

employees who are part of the Senior Executive Service, such as the Appellant, also are not

permitted to bring such claims to the MSPB according to the applicable federal statute and

regulation.  FBI Senior Executive Service employees fall under a separate statutory and

regulatory provision that do not include the right to seek external review of removals under

Chapter 75.  The legislative history confirms that Congress intended not to permit external

review of such decisions.  In addition, analogous cases have held that the failure to include FBI

employees in the applicable statutory provisions for other claims, such as the Uniformed

Services Employment and Reemployment Rights Act and whistleblower retaliation claims, precluded review by the MSPB.

## FACTUAL BACKGROUND

The Appellant stated he held a Senior Executive Service position at the FBI.  <u>See</u> Appeal, at 3 (Question 7).  Specifically, the Appellant held the position of Deputy Assistant Director. <u>See</u> <u>id</u>.  On August 9, 2018, the FBI removed the Appellant from his position for misconduct. <u>See</u> <u>id</u>. at 4 ("Removal") and attached letters, dated August 8, 2018 and August 9, 2018.  This decision was made after providing the Appellant advance notice, an opportunity to respond in writing and orally, and representation by an attorney.  <u>See</u> <u>id</u>.

## ARGUMENT

The Board does not have jurisdiction over the appeal.  The Appellant bears the burden of proving jurisdiction.  <u>See</u> 5 C.F.R. § 1201.56(b)(2); <u>Maddox v. Merit Systems Protection Board</u>, 759 F.2d 9, 10 (Fed. Cir. 1985); <u>Denny v. Department of the Navy</u>, 43 M.S.P.R. 123, 127 (1990).[1]  The Board only has jurisdiction over those matters that have been conferred upon it by statute or regulation.  <u>See</u> 5 U.S.C. § 7701; 5 C.F.R. § 1201.3(a); <u>Maddox</u>, 759 F.2d at 10 ("The jurisdiction of the MSPB is not plenary but is limited to those actions which are made appealable to it by law, rule, or regulation."); <u>Leary v. Department of the Navy</u>, 60 M.S.P.R. 529, 531 (1994).  The Federal Circuit in <u>Thompson v. Merit Systems Protection Board</u>, 421 F.3d 1336, 1337 (Fed. Cir. 2005), stated that, "The Board's jurisdiction is strictly limited to that provided by statute, rule, or regulation."

---

[1] Issues of Board jurisdiction may be raised at any time during an MSPB proceeding.  <u>See</u> <u>Morgan v. Department of the Navy</u>, 28 M.S.P.R. 477, 478 (1985).

2

## I.      The Appellant Is Not Preference Eligible

FBI employees are not permitted to bring appeals to the MSPB based on misconduct decisions unless they are preference eligible.  <u>See</u> <u>Parkinson v. Department of Justice</u>, 874 F.3d 710, 713 (Fed. Cir. 2017), <u>cert</u>. <u>denied</u>, 138 S.Ct. 2650 (2018).  For example, in <u>Patterson v. Department of Justice</u>, 52 M.S.P.R. 651, 653 (1992), the MSPB stated that an FBI employee who was not preference eligible could not bring an appeal to challenge his removal.  <u>See</u> <u>also</u> <u>David v. Department of Justice (FBI)</u>, DC-0752-17-0068-I-1, 2016 WL 7439485 (Dec. 21, 2016) (Thayer, J.) (dismissing appeal for lack of jurisdiction and explaining that "employees in the excepted service, like the FBI, and who are not preference eligible, are excluded from the universe of persons entitled to present their appeal to the Board").

Preference eligibility is determined by 5 U.S.C. § 2108.  The relevant part of this statute requires that an employee serve on active duty during specified time periods and/or military campaigns.  <u>See</u> 5 U.S.C. § 2108(3)(A), (B).  The definition of preference eligibility, however, expressly excludes FBI Senior Executive Service employees:  "but does not include applicants for, or members of…the Federal Bureau of Investigation and Drug Enforcement Administration Senior Executive Service."  5 U.S.C. § 2108(3); <u>see</u> <u>also</u> <u>Johnson v. U.S. Postal Service</u>, CH-0752-12-0533-I-1, 2012 WL 3717086 (July 20, 2012) (dismissing appeal because the appellant did not meet the statutory definition of preference eligibility).  Here, the Appellant was removed from his position as an FBI Senior Executive Service employee.  <u>See</u> Appeal.  Therefore, he is not preference eligible and cannot raise an appeal to the MSPB.

3

**II.     The Senior Executive Service Provisions Also Preclude an Appeal**

    **A.     The Statutory Provision for FBI Senior Executive Service Employees Does Not Include an Appeal to the MSPB**

Congress created a general Senior Executive Service ("SES") and a separate SES authority for the FBI and Drug Enforcement Administration ("DEA").  See 5 U.S.C. Chapter 31, Subchapter II ("The Senior Executive Service") and Subchapter III ("The Federal Bureau of Investigation and Drug Enforcement Administration Senior Executive Service").  The FBI is expressly excluded from the definition of "agency" in the general SES statute at § 3131.  See 5 U.S.C. § 3132(a)(1)(B) ("'agency' means an Executive agency…but does not include—the Federal Bureau of Investigation….").  The decision to create a separate and independent SES for the FBI, as well as the DEA, excludes them from applicable provisions for other federal agencies' SES employees, including removals.  See 5 U.S.C. § 3131; cf. 5 U.S.C. § 3151.  The cited reason for such an exclusion was the special nature of the FBI and DEA's missions, which are analogous to other intelligence agencies that have similar exclusions:  "These agencies were excluded from the government-wide SES because of the special nature of their missions."  H.R. Rep. No. 100-608, at 635 (1988).

The applicable provision for removal of FBI SES employees for misconduct under Chapter 75 is 5 U.S.C. § 3151(a)(5)(D).  Section 3151(a)(5)(D) provides that FBI SES employees are only entitled to removal procedures that are consistent with certain subsections of 5 U.S.C. § 7543, specifically "subsections (a), (b), and (c)."  These subsections are the following: (a) an agency may take action against an employee for misconduct; (b) an employee is entitled to advance notice, an opportunity to respond in writing, representation by an attorney, and a written

4

decision, and (c) an agency may provide for an oral hearing in addition to or in lieu of a written response.[2]  See 5 U.S.C. § 7543.

The FBI SES statute for removals did <u>not</u> reference or include any requirement to comply with subsection (d) of § 7543, which is the provision allowing other (non-FBI/DEA) employees to appeal to the MSPB.  <u>See</u> 5 U.S.C. § 7543(d) ("An employee against whom an action is taken under this section is entitled to appeal to the Merit Systems Protection Board under section 7701 of this title.").  The regulations for adverse actions against SES employees also show that FBI SES employees were excluded.  According to 5 C.F.R. § 752.605(a), only SES employee who are "career appointees" can appeal certain adverse actions to the MSPB.  The definition of "career appointees" in the SES regulations, however, includes only those within "the meaning given in 5 U.S.C. § 3132(a)."  5 C.F.R. § 752.602.  The FBI is expressly excluded from the definition in 5 U.S.C. § 3132(a)(1)(B) as indicated above.[3]  Accordingly, the applicable statute and regulations do not provide for FBI SES employees the right to appeal removals outside of the Department of Justice.  Since Congress chose not to include appeal rights for FBI SES employees, they cannot be implied.[4]

---

[2] As stated above, the Appellant received advance notice when he was proposed for removal, time to answer the proposed removal in writing and orally, representation by his attorney, and a written decision by the FBI.  <u>See</u> Appellant's Appeal, supplemental documentation.

[3] The final rule and implementing regulation that followed also did not provide for any external review of FBI SES removals.  The overall authority over FBI and DEA SES employees was given to the Department of Justice's Deputy Attorney General; the Attorney General authorized the Director of the FBI to maintain responsibility for FBI SES employees.  <u>See</u> 57 Fed. Reg. 31314-02, 31314 (July 15, 1992); 64 Fed. Reg. 46845-01, 46845 (Aug. 27, 1999); 28 C.F.R. § 0.157.

[4] <u>See</u> <u>Coleman v. Department of Homeland Security</u>, SF-0752-04-0846-I-1 (Dec. 21, 2004).  In <u>Coleman</u>, the Administrative Judge concluded that there was no jurisdiction over an appeal by an SES employee who was removed by the Transportation Security Administration ("TSA").  The statutory provision in that case allowed for a new personnel management system for TSA employees, but listed only certain rights under Title 5.  The judge concluded after reviewing the

5

### B.      The Legislative History Supports the Lack of Jurisdiction

The legislative history also demonstrates that there is no MSPB jurisdiction over

removals for misconduct by FBI SES employees.  The House Report explained the intent and

basis for Congress' decision to exclude FBI SES employees from appealing removals outside of

the Department of Justice.  The House Report stated the following:

> "Section 3151(a)(5)(D) requires that the regulations provide procedures
> for removal or suspension which are consistent with subsections (a), (b),
> and (c) of section 7543 of title 5.  *In lieu of any hearing or appeal which*
> *might be available outside the agency to an individual in the government-*
> *wide SES*, the Attorney General's regulations shall provide for an
> alternative hearing or appeal.  This provision is intended to ensure basic
> due process to members of the FBI-DEA SES while not undermining the
> need for confidentiality within these agencies."

H.R. Rep. No. 100-608, at 638 (1988) (emphasis added).  Accordingly, the legislative history

confirms the intent of the statue that did not include the rights included in subsection (d) of 5

U.S.C. § 7543, which allows for an appeal to the MSPB as indicated above.

Congress also explained that the purpose of this statutory provision is to exclude external

review.  The stated purpose to exclude external review was the need for confidentiality of

matters at the highest levels of the FBI and DEA.  This is consistent with the reason for creating

the FBI/DEA SES system in the first place.  <u>See</u> H.R. Rep. No. 100-608, at 635 (1988).  This

---

statute and legislative history that "Chapter 75 SES appeal rights are not included and cannot be
implied."

The judge in <u>Coleman</u> also found significant that the statute did include other provisions relating
to Board appeals, "but did not add the chapter 75 Title 5 SES appeal rights."  Here, 5 U.S.C. §
3151 also includes certain limited MSPB appeal rights for a performance-based removal under
Chapter 43 pursuant to 5 U.S.C. § 3592, but did not include Chapter 75 SES appeal rights for
FBI SES employees.  <u>See</u> 5 U.S.C. § 3151(a)(5)(A); <u>cf.</u> 3151(a)(5)(D).  The Appellant's removal
was for misconduct, as opposed to "less than fully successful executive performance as
determined under subchapter II of chapter 43."  5 U.S.C. § 3592(a).  The FBI's Office of
Professional Responsibility adjudicates matters of misconduct by FBI employees, as opposed to
performance-based removals that are handled by the FBI's Human Resources Division.

6

also is consistent with the rationale cited by Congress in excluding FBI employees from asserting

other types of claims described below.  The MSPB should find that the legislative history also

supports Congress' intent to exclude FBI SES employees from appealing Chapter 75 removals

outside of the Department of Justice.

III.     **Analogous Case Law Involving USERRA and Whistleblower Claims**

The MSPB and federal courts, including the Federal Circuit, have ruled that it lacked

jurisdiction in similar contexts.  In these cases described below, FBI employees were not

included in the particular statutory provisions and therefore the MSPB and courts refused to

allow claims to be reviewed outside of the Department of Justice.

A.     **Uniformed Services Employment and Reemployment Rights Act Claims**

The MSPB and courts have dismissed claims brought by FBI employees under the

Uniformed Services Employment and Reemployment Rights Act ("USERRA") for lack of

jurisdiction.  A statutory provision allows federal employees to bring USERRA claims to the

MSPB, but the statute did not include the FBI in the definition of "agency."  <u>See</u> 38 U.S.C. §

4324(b); 38 U.S.C. 4304(5).  As indicated above, the FBI also is not included in the definition of

agency for purposes of the SES regulations regarding removals.  <u>See</u> 5 U.S.C. § 3132(a)(1)(B); 5

C.F.R. §§ 752.602, 752.605(a).

In <u>Hernandez v. Department of Justice</u>, AT-4324-15-0765-I-1, 2016 WL 791741, at ¶ 3

(Mar. 1, 2016) (unpublished), the MSPB found that it lacked jurisdiction over USERRA claims

against the FBI.  The appellant argued that it was unfair to limit him to internal Department of

Justice procedures.  <u>See id</u>. at ¶ 4.  The MPSB rejected that argument and stated, "While we

sympathize with the appellant's desire for a hearing, the Board's jurisdiction is limited to those

matters over which it has been given jurisdiction by law, rule or regulation."  <u>Id</u>. at ¶ 5.  The

7

MSPB also stated that, "Regardless of whether the appellant received the process required [under the internal procedures], the fact remains that the statutory enforcement scheme of USERRA does not grant the Board jurisdiction to enforce the substantive provisions of the Act against the FBI." Id. The Federal Circuit affirmed the MSPB's decision. See Hernandez v. Department of Justice, 662 Fed. Appx. 970 (Oct. 14, 2016) (unpublished); see also Erlendson v. Department of Justice (FBI), 121 M.S.P.R. 441 (2014) (finding lack of jurisdiction for the same reasons cited in Hernandez).

The U.S. Court of Appeals for the Second Circuit in Dew v. United States, 192 F.3d 366 (2nd Cir. 1999), cert. denied, 529 U.S. 1053 (2000), also came to same conclusion. The court held that the relevant statute "reveals it was clearly Congress' intent to preclude" outside review of USERRA claims by the employees of the intelligence community, including the FBI. Id. at 372. The court examined the applicable statute pertaining to FBI employees and explained that it contained certain rights for federal intelligence agency employees, yet did not include the provision for external review. See id. at 373. Here, 5 U.S.C. § 3151 also provided specified procedural protections for FBI SES employees in removals, but did not include a provision for MSPB review. In Dew, the court relied on the legislative history and cited statements that "external enforcement by the MSPB" would be inconsistent with the need to protect from outside review firing decisions in the national security context. See Dew, 192 F.3d at 373. Here, the legislative history for FBI SES employees also indicated Congress' intent not to permit a "hearing or appeal which might be available outside the agency to an individual in the government-wide SES...." H.R. Rep. No. 100-608, at 638. The underlying reason for precluding outside review of claims by FBI SES employees was similar, that is, to ensure that the type of sensitive information handled by FBI SES employees remains confidential. See id.

Pleading Number : 2018042399          Submission date : 2018-10-05 12:10:16          Confirmation Number: 2044145241          page 11 of 15

### B.        Whistleblower Claims

The MSPB and courts also have dismissed cases for lack of jurisdiction because the FBI was not included in the statutory provision for whistleblower retaliation claims.  In <u>Van Lancker v. Department of Justice</u>, 119 M.S.P.R. 514 (2013), an FBI employee asserted a whistleblower retaliation claim.  The MSPB concluded that FBI employees cannot assert such claims at the MSPB.  <u>See id</u>. at 518, ¶ 11.  The relevant statutory provision for prohibited personnel practices, including whistleblower retaliation, did not include the FBI in its coverage.  <u>See id</u>. at 517, ¶ 10. Rather, a separate provision for the FBI provided that the Attorney General could prescribe regulations for internal review for FBI whistleblowers.  <u>See id</u>. at 519, ¶ 14.  The MSPB in <u>Van Lancker</u> also relied on the legislative history, which indicated that Congress intended that FBI whistleblower appeals "not be to the outside but to the Attorney General."  <u>Id</u>.  The reason for limiting reviews internally was "because of the sensitive information that is likely to be involved in such matters."  <u>Id</u>. (citing Federal Register and regulation).  Accordingly, the MSPB deferred to Congress and its stated intent when it concluded there was no jurisdiction.

The Federal Circuit in <u>Parkinson v. Department of Justice</u>, 874 F.3d 710 (Fed. Cir. 2017), <u>cert</u>. <u>denied</u>, 138 S.Ct. 2650 (2018), affirmed the holding in <u>Van Lancker</u>.  The court stated that since the statute envisioned a separate whistleblower protection scheme for FBI employees, "it is improper to read an intent by Congress to allow whistleblower affirmative defenses by preference-eligible FBI employees" under the general provision allowing such claims by other federal agency employees.  <u>See id</u>. at 716.  The court further reasoned that if Congress had intended to allow FBI employees to assert such claims, it could have explicitly stated so in the statute itself, but "[i]t did not."  <u>Id</u>.  Here, the statutory provision that provides the rights for FBI SES employees who are removed also could have included the specific subsection that provided

9

MSPB appeal rights to other employees – 5 U.S.C. § 7543(d) – but it did not.  See 5 U.S.C. §
3151.  Instead, 5 U.S.C. § 3151 only referenced subsections (a), (b), and (c) of § 7543 for the
protections for FBI SES employees.

   The court in Parkinson also relied on legislative history, which showed the Congress
recognized that the FBI has exclusive investigative responsibility for highly sensitive matters,
such as foreign counterintelligence activities.  See id. at 717 (citing Congressional Record).
Congress also determined that FBI employees should be exempted from external review on the
same basis as other national security agencies, including the Central Intelligence Agency,
Defense Intelligence Agency, and National Security Agency.  See id.  The Federal Circuit
therefore concluded based on the statutory provisions and legislative history that the MSPB did
not have jurisdiction over FBI employees' claims of whistleblower retaliation.  See id.

   The reasoning in these USERRA and whistleblower retaliation cases, as well as the
Coleman case cited above, see supra at page 5-6 n.4, supports the FBI's argument that there is no
jurisdiction over claims by FBI SES employees who are removed.  As stated above, the Board
only has jurisdiction over those matters that have been conferred upon it by statute or regulation.
See 5 U.S.C. § 7701; 5 C.F.R. § 1201.3(a); Leary v. Department of the Navy, 60 M.S.P.R. 529,
531 (1994).  The Federal Circuit in Weyman v. Department of Justice, 58 M.S.P.R. 509, 512
(1993), stated that "The Board does not have jurisdiction over all actions that are alleged to be
incorrect," but rather "only has jurisdiction that pertinent statutes and regulations provide it."
Here, the Appellant is not preference eligible, which is required for FBI employees to establish
jurisdiction.  The applicable statutory provision, regulations, legislative history, and analogous

Pleading Number : 2018042399          Submission date : 2018-10-05 12:10:16          Confirmation Number: 2044145241          page 13 of 15

case law also demonstrate that there is no MSPB jurisdiction.[5]  The MPSB should therefore find

that the Appellant cannot meet his burden of establishing jurisdiction.

## CONCLUSION

For the reasons stated above, the Agency respectfully requests that the Appeal be

dismissed for lack of jurisdiction.

Respectfully submitted,

/s/ Chad Tang filed by E-Appeal
Eric Huang
Chad Tang
Assistant General Counsel
FBI, Office of the General Counsel
Employment Law Unit
935 Pennsylvania Avenue, N.W., Suite 10140
Washington, D.C.  20535
Telephone: (202) 324-2570/2390
Date:  October 5, 2018                   Facsimile:  (202) 323-3855

---

[5] The FBI is not aware of any MSPB decisions concluding that the MSPB has jurisdiction over
FBI SES employees who are disciplined for misconduct under Chapter 75.

11

# <u>Certificate Of Service</u>

e-Appeal has handled service of the assembled pleading to MSPB and the following Parties.

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Washington Regional Office | Agency's Motion to Dismiss for Lack of Jurisdiction | e-Appeal / e-Mail |
| Richard A. Salzman, Esq. Appellant Representative | Agency's Motion to Dismiss for Lack of Jurisdiction | e-Appeal / e-Mail |
| Chief Employment Law Agency Representative | Agency's Motion to Dismiss for Lack of Jurisdiction | e-Appeal / e-Mail |
| Eric Huang Agency Representative | Agency's Motion to Dismiss for Lack of Jurisdiction | e-Appeal / e-Mail |

I agree to send a printed copy of the electronic pleading with attachments to non-efilers by the end of next business day, as follows:

| Name & Address | Documents | Method of Service |
|---|---|---|
| Peter P. Strzok Appellant<br><br>3214 Prince William Drive Fairfax, VA 22031 USA | Agency's Motion to Dismiss for Lack of Jurisdiction | US Postal Mail |

*Strzok v. Barr,* No. 1:19-CV-2367-ABJ

# Exhibit T

**Flores, Sarah Isgur (OPA)**

| | |
|---|---|
| **From:** | Flores, Sarah Isgur (OPA) |
| **Sent:** | Tuesday, December 05, 2017 10:12 AM |
| **To:** | Jarrett, Laura |
| **Subject:** | RE: Contempt citations for DOJ/FBI? |

FYI: nunes has a call or meeting with the DAG today. We've already told him that we're going to give him the text messages.

xxx
Sarah Isgur Flores
Director of Public Affairs
202.305.5808

**From:** Jarrett, Laura [mailto:Laura.Jarrett@cnn.com]
**Sent:** Tuesday, December 5, 2017 10:06 AM
**To:** Flores, Sarah Isgur (OPA) <siflores@jmd.usdoj.gov>
**Subject:** Fwd: Contempt citations for DOJ/FBI?


Laura Jarrett
CNN Justice Reporter
202-816-9771

Begin forwarded message:

> **From:** "Langer, Jack" (b) (6) House Email ▮▮▮▮▮▮▮▮▮
> **Date:** December 5, 2017 at 10:01:10 AM EST
> **To:** "Jarrett, Laura" <Laura.Jarrett@cnn.com>
> **Subject: RE: Contempt citations for DOJ/FBI?**
>
> Hi Laura,
>
> We are expecting to put out a press release on this today. I've added you to our press list so you'll receive it.
>
> Jack Langer
> Director of Communications
> House Permanent Select Committee on Intelligence
> Office: (b) (6) ▮▮▮▮▮▮
> Cell: (b) (6) ▮▮▮▮▮▮
>
>
> -----Original Message-----
> From: Jarrett, Laura [mailto:Laura.Jarrett@cnn.com]
> Sent: Monday, December 04, 2017 10:38 PM

To: Langer, Jack
Subject: Contempt citations for DOJ/FBI?

Jack -

I cover DOJ for CNN and saw over the weekend that Chairman Nunes had set a deadline for
COB today for all outstanding subpoena requests to be met from the Justice Dept and FBI. Do
you have any update on what happened or next steps? Thanks in advance.

Laura Jarrett
CNN Justice Reporter
202-816-9771

*Strzok v. Barr,* No. 1:19-CV-2367-ABJ

# Exhibit U

Thank you,

Darren Samuelsohn
Senior reporter, POLITICO
Desk: 703-842-1769
Cell: (b) (6)
Dsamuelsohn@politico.com
@dsamuelsohn

---

**From:** "Flores, Sarah Isgur (OPA)" <Sarah.Isgur.Flores@usdoj.gov>
**Date:** Thursday, December 14, 2017 at 1:26 PM
**To:** Josh Gerstein <jgerstein@politico.com>, Darren Samuelsohn <dsamuelsohn@politico.com>
**Subject:** RE: Sharing a POLITICO link: "DOJ fuels doubts about integrity of Mueller probe"

Thanks, Josh. All reasonable points. Hopefully Darren can take my word for it that no documents were shown to any member of the press before Congress. Although I understand the texts were in distribution to reporters from another source before I showed them to anyone and I don't know how that happened.

xxx
Sarah Isgur Flores
Director of Public Affairs
202.305.5808

---

**From:** Josh Gerstein [mailto:jgerstein@politico.com]
**Sent:** Thursday, December 14, 2017 1:21 PM
**To:** Flores, Sarah Isgur (OPA) <siflores@jmd.usdoj.gov>; Darren Samuelsohn <dsamuelsohn@politico.com>
**Subject:** RE: Sharing a POLITICO link: "DOJ fuels doubts about integrity of Mueller probe"

Hi Sarah:

So in order to respect the terms of the embargo and the sourcing from Tuesday night, I did my best to steer clear of this story entirely. Just seemed awkward for me to try to wade into the specifics of stuff that was supposed to be for guidance or unattributed and the timing of everything.

Now that some of that is, for better or worse, in the public domain maybe you can work out with Darren the timeline he can report. I think he was operating primarily off of what lawmakers were saying yesterday at the hearing and elsewhere on the Hill.

If there's something specific you need me to verify about what went down, I'm happy to do that, but I did not want to breach any confidences.

--Josh

---

**From:** Flores, Sarah Isgur (OPA) [mailto:Sarah.Isgur.Flores@usdoj.gov]
**Sent:** Thursday, December 14, 2017 12:59 PM
**To:** Josh Gerstein <jgerstein@politico.com>; Darren Samuelsohn <dsamuelsohn@politico.com>
**Subject:** Fwd: Sharing a POLITICO link: "DOJ fuels doubts about integrity of Mueller probe"

I haven't seen a response to this. Need correction asap.

Begin forwarded message:

**From:** Darren Samuelsohn <dsamuelsohn@politico.com>
**Date:** December 14, 2017 at 11:08:11 AM EST
**To:** Darren Samuelsohn <dsamuelsohn@politico.com>
**Subject: Sharing a POLITICO link: "DOJ fuels doubts about integrity of Mueller probe"**

Good morning,

Sharing my latest story published this AM in POLITICO: **"DOJ fuels doubts about integrity of Mueller probe"**

https://www.politico.com/story/2017/12/14/justice-department-mueller-investigation-295483

Please share on social media and with friends and collagues. You can tag me @dsamuelsohn on Twitter.

Be in touch,

Darren Samuelsohn
Senior reporter, POLITICO
Desk: 703-842-1769
Cell: (b) (6)
Dsamuelsohn@politico.com
@dsamuelsohn