IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PETER P. STRZOK, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:19-CV-2367-ABJ |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, | ) |
| Defendants. | ) |

**AMENDED DECLARATION OF AITAN D. GOELMAN PURSUANT
TO RULE 56(d) AND IN SUPPORT OF OPPOSITION
TO MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

I, Aitan D. Goelman, hereby declare:

1. I am a partner with Zuckerman Spaeder LLP. I have filed an appearance in this matter as an attorney for Peter Strzok. I also represented Mr. Strzok in connection with the disciplinary hearing before the FBI Office of Professional Responsibility, which was headed by Assistant Director Candice M. Will, as well as Mr. Strzok's appeal to the Merit Systems Protection Board. The government's motion to dismiss Mr. Strzok's appeal before the MSPB for lack of jurisdiction, which was granted, is attached hereto as Exhibit S.

2. No discovery has occurred to date in this action.

3. Mr. Strzok, myself, attorneys at my firm, and our co-counsel have reviewed a significant body of relevant documents, including: the text messages at issue; Department of Justice and Federal Bureau of Investigation policies and procedures; the exhibits to Defendants'

motions; and relevant productions made by the Department of Justice in response to Freedom of Information Act requests.

4. Despite our efforts, Mr. Strzok is unable to offer the testimony and documentary evidence that is necessary to fully and adequately respond to Defendants' motion for summary judgment. If discovery is allowed to proceed in this action, there is a high likelihood that Mr. Strzok will develop a record sufficient to show and/or prove:

   a. The identity of the Department of Justice official(s) who accessed and leaked information about text messages between Mr. Strzok and Ms. Page on or before December 2, 2017;

   b. The system of records accessed to retrieve information about Mr. Strzok and the method by which those records were retrieved (Defendants' brief implies, without acknowledging, that this system was most likely the Department of Justice, Office of the Inspector General's Investigative Records);

   c. The system of records where the texts were maintained before they were collected by the OIG;

   d. The motivation, political or otherwise, for the Department of Justice official's decision to disclose records about Mr. Strzok and the incongruity between those motivations and the purposes for which the records were collected;

   e. Any communications between the Department of Justice and the White House with respect to the texts on or before December 2, 2017, including any discussion of providing the content or subject matter of these texts, as well as information identifying Mr. Strzok, to the news media;

f.  That the leaks that occurred on or before December 2, 2017 were an intentional and willful violation of the Privacy Act;

g.  The identity of and communications from and among the officials within the "Department's Office of Public Affairs" who "determined that it was appropriate to make the . . . text messages available to certain members of the media" and the influence those officials' advice had on Mr. Rosenstein.  Boyd Decl. ¶ 12;

h.  The system of records from which the text messages were retrieved in order to make the December 12, 2017 disclosures and the method by which they were retrieved (again, Defendants' brief implies but does not confirm that this system was most likely the Department of Justice, Office of the Inspector General's Investigative Records);

i.  The actual substance of communications to Mr. Rosenstein and all records and information he considered in authorizing the release; the motivations of the DOJ officials who provided that advice and information; and the obvious incongruity between those motivations of the DOJ and the purposes for which the records were collected by the OIG;

j.  Any pressure brought to bear on AD Will between Mr. Strzok's execution and transmission of the Last Chance Agreement to AD Will on July 26, 2017 and AD Will's official decision implementing the LCA on August 8, 2017, to withdraw the Last Chance Agreement or to influence her decision as to the appropriate sanction for Special Agent Strzok;

k.  Any communications between the White House, the Office of the Attorney General or other allies of the President, and Deputy Director Bowdich, Director

       Wray or others in the FBI that precipitated Deputy Director Bowdich's decision to countermand AD Will's decision and fire Special Agent Strzok;

  l.    The reasons that Deputy Director Bowdich, who had previously assured Special Agent Strzok that his job would not be materially impacted by the furor over the texts, changed his mind and reversed the decision by AD Will; and

  m.  Any other examples of Deputy Director Bowdich or others in the Office of the Director of the FBI reversing a decision by the AD for OPR, including any previous precedent where an employee was fired despite an executed Last Chance Agreement.

5. Although Mr. Strzok has made specific, well-educated allegations based on the facts known and is submitting a response to Defendants' statement of undisputed materials facts in accordance with Local Civil Rule 7(h), evidence as to the above facts is essential to fully justify his opposition to Defendants' motion.

6. Most significantly, without discovery Mr. Strzok is unable to fully demonstrate that the leaks at issue were an intentional and willful violation of the Privacy Act and that his termination was based on political viewpoints.

7. I have reviewed the audio recording of Mr. Strzok's testimony before Assistant Director Candice M. Will on July 24, 2018. In that testimony, Mr. Strzok disagreed with the notion that his texts themselves had damaged the credibility of the FBI. Instead, Mr. Strzok argued that it was the cynical use of his text messages by the President and his allies that damaged the credibility of the FBI.

8. On August 6, 2018 at 8:52 AM, I received an email from the Department of Justice Office of Professional Responsibility ("OPR"), which I attached to the Statement of

Genuine Issues that was submitted in support of Plaintiff's Opposition to Defendants' Motion to Dismiss and for Summary Judgment (Pl.'s Ex. Q, ECF No. 36-19).  That email indicated that an individual whom Mr. Strzok had identified as a character reference needed additional time to submit information and asked whether Mr. Strzok wanted AD Will to wait to receive the character reference to issue her decision if she was otherwise prepared to issue her decision.  Shortly after receiving that email, I spoke with a representative for OPR who was working under the direction of AD Will.  The OPR representative indicated that AD Will was prepared to issue her report.  I explained that although there was no need to await further character reference materials if AD Will was going to approve the Last Change Agreement, Mr. Strzok did want AD Will to hold off on issuing a decision until the character reference was submitted if AD Will was considering terminating him instead of moving forward with the LCA.

9. The government's Reply attached a declaration from former Deputy Attorney General Rod Rosenstein ("Rosenstein Decl.," ECF No. 38-1), the previously unidentified political appointee who now acknowledges that he approved the release of Mr. Strzok's text messages.  Plaintiff does not concede the truth of those assertions, and discovery may show them to be inaccurate.  Even assuming the veracity of the Rosenstein Declaration's assertions, if discovery is allowed, there is a high likelihood that Mr. Strzok will develop a record sufficient to prove:

   a. Although the Rosenstein Declaration does not acknowledge personal involvement in discussions about Mr. Strzok's text messages at DOJ between December 2, 2017 and December 12, 2017, and declares simply that he "learned that the text messages were ready for release to the Senate and House Committees that had

5

requested them, there was no basis to withhold them, and they *arguably were relevant* to the Judiciary Committee's oversight hearing" (Rosenstein Decl. ¶ 10 (emphasis added)), there was a fervent, politically-motivated race to prepare the text messages for disclosure in advance of Mr. Rosenstein's December 13, 2017 testimony, and Mr. Rosenstein was well aware of those efforts;

b. A high-ranking DOJ official working under Mr. Rosenstein confirmed, to the media, the existence of Mr. Strzok's text messages and the planned disclosure of the text messages in advance of any decision made by Mr. Rosenstein to release the text messages or any consideration of Mr. Strzok's Privacy Act rights;[1]

c. The same DOJ official confirmed that certain media outlets obtained the text messages in advance of the intended disclosure approved by Mr. Rosenstein;[2]

d. One of the purposes of the pre-December 12, 2017 disclosures was to create an environment in which the DOJ would feel justified in disclosing, or forced to disclose, Mr. Strzok's text messages, and Mr. Rosenstein acknowledges that his calculus was affected in this manner (*see* Rosenstein Decl. ¶ 18);

e. Although Mr. Rosenstein was "advised that OIG did not raise any objection and that the disclosure [to Congress] would not interfere with any ongoing investigation" (Rosenstein Decl. ¶ 11), OIG never approved the disclosure of its investigative records to the media and would have objected to the late-night disclosure of its investigative records if it had been alerted to DOJ's plan (*see* Plaintiff's Statement of Genuine Issues ("SOGI"), ECF No. 36-2 ¶¶ 55d, 56h);

---

[1] *See* December 5, 2017 email from Sarah Isgur Flores to Laura Jarrett of CNN, Exhibit T.

[2] December 14, 2017 email from Sarah Isgur Flores to Josh Gerstein and Darren Samuelsohn of Politico, Exhibit U ("I understand the texts were in distribution to reporters from another source before I showed them to anyone and I don't know how that happened.").

6

    f. Mr. Rosenstein never independently considered whether the disclosure of the text messages to the media was compatible with an applicable "routine use," and therefore, to the extent he served as the deciding official (rather than merely one of the decision makers as implied by the Boyd Declaration), he simply made the final decision to approve action recommended by other officials (*see* Rosenstein Decl. ¶¶ 11–12, 15–17, 19);

    g. The information and advice Mr. Rosenstein received from DOJ employees concerning Mr. Strzok's Privacy Act rights was recklessly prepared, formally justified only weeks after the fact, and then back-dated to create the veneer of due diligence, as described by Plaintiff's Statement of Genuine Issues (SOGI ¶ 56d n.24); and

    h. When the motivations and action of the various DOJ officials involved are considered collectively, a jury will be able to reasonably conclude that the DOJ recklessly and intentionally violated Mr. Strzok's Privacy Act rights.

10. The government's reply speculates that General Flynn's lawyers, presumably meaning attorneys with Covington & Burling LLP, were the source of the December 2, 2017 newspaper stories. Reply at 19–20, ECF No. 38. Discovery on these allegations is necessary and will likely show that General Flynn's lawyers did not disclose the text messages on or before December 2, 2017. The sources referenced in the December 2, 2017 *New York Times* story included "[c]urrent and former law enforcement officials who worked with Mr. Strzok."[3] Additionally, the *Washington Post*'s December 2, 2017

---

[3] Michael S. Schmidt, Matt Apuzzo and Adam Goldman, *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, N.Y. Times (Dec. 2, 2017),

7

story included numerous details not provided to General Flynn's lawyers, including the assertions that Mr. Strzok had "a romantic relationship with FBI lawyer Lisa Page . . . according to the people familiar with the matter, who spoke on the condition of anonymity"; that the "greater concern among senior law enforcement officials were text messages the two exchanged"; and that "the people discussing the matter" said "the two would sometimes react to campaign news of the moment."[4]  Based on the content of those articles, I expect discovery to show that the information at issue was leaked from government sources, not private attorneys.

11. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on: January 31, 2020

Aitan D. Goelman

---

https://www.nytimes.com/2017/12/02/us/politics/mueller-removed-top-fbi-agent-over-possible-anti-trump-texts.html.

[4] Karoun Demirjian & Devlin Barrett, *Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, The Washington Post (Dec. 2, 2017), https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html.