IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-2367 (ABJ) |
| ) | |
| ATTORNEY GENERAL MERRICK B. ) | **REDACTED** |
| GARLAND, in his official capacity, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| LISA PAGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-3675 (TSC) |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.* ) | |
| ) | |
| Defendants. ) | |

**PETER P. STRZOK'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH
SUBPOENA AND FOR PROTECTIVE ORDER**

The government has worked hard in this case to prevent Plaintiff Peter Strzok from discovering what influence then President Donald Trump had on the decision to fire him. Although the former President has publicly crowed about being responsible for firing Strzok, and contemporaneous news accounts reported his direct pressure on FBI and DOJ leadership to fire Strzok, the government moved to quash a subpoena for Mr. Trump's deposition, arguing that Plaintiff is first required to depose all other FBI officials involved (including Director Wray). It has broadly (and as we explain in Section 3, below, improperly) invoked the Presidential

Communication Privilege to instruct a witness who ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ on the IG investigation concerning Strzok's text messages, not to answer any questions about whether the then President spoke about Strzok or demanded his termination.  Now, the government seeks to also preclude the deposition of Mr. Wray, even though Mr. Wray has unique personal knowledge relevant to Strzok's claims.

The government contends that all of this discovery must be precluded, or at least delayed, unless and until Plaintiff first obtains a confession from the nominal FBI firing official—Deputy Director David Bowdich ("DD Bowdich")—that Mr. Trump's pressure campaign worked and caused him to fire Mr. Strzok.  According to the government, if DD Bowdich denies being influenced in this fashion, then all other inquiry into the circumstances surrounding the firing must be abandoned, and his rather convenient denials accepted.  There is nothing in any of the authority cited by Defendants which requires this extraordinary level of deference to the agency's claimed decision-making rationale.  Where, as here, record evidence shows that high-level government officials participated in relevant actions, or have unique personal knowledge about them, they are subject to discovery (including depositions) just like any other witness.  Likewise, it is ultimately up to the finder of fact to decide whether DD Bowdich fired Mr. Strzok for legitimate reasons or improperly bowed to the wishes of a vengeful and very vocal President.  DD Bowdich's mere denial of being influenced—testimony which the government appears to be eagerly anticipating—does not end the inquiry.[1]

---

[1] Mr. Strzok first noticed Mr. Bowdich's deposition more than a year ago but was unable to serve him because the government refused to provide Mr. Bowdich's address.  After an attorney for Mr. Bowdich was identified, Mr. Strzok proposed taking Mr. Bowdich's deposition in early August, but the Defendants said they were unavailable.  Defendants subsequently insisted on moving Mr. Strzok's deposition to one of the dates on which they had purported to be unavailable for Mr. Bowdich's.  Mr. Bowdich has refused to identify where he lives and refuses to be deposed by

The government's tactics have succeeded in delaying the depositions to the point where the sequence is immaterial. Although Plaintiff has been trying to schedule it for more than a year, Mr. Bowdich's deposition is currently calendared for September 8, 2022. Given the imminent close of discovery, and the time it will likely take to resolve these disputed issues, Plaintiff at this point has no objection to deposing Mr. Bowdich on September 8, and then deposing Mr. Wray (and former President Trump). This would partially satisfy the government's professed "apex" concerns, at least with respect to the timing of the discovery. But the notion that once Mr. Bowdich formally denies being influenced by the extraordinary Trump pressure campaign, Plaintiff must accept his testimony as the gospel truth, is not warranted, and Defendants' motions to quash and otherwise obstruct discovery should be denied.

## BACKGROUND

Defendant Director Wray—whom President Trump nominated to lead the FBI after the firing of FBI Director James Comey—became a central target of former President Trump's relentless campaign to have Mr. Strzok fired. President Trump demanded Mr. Strzok's termination through tweets, through statements to press gaggles on the White House lawn, through commentary while standing shoulder-to-shoulder with Russian President Vladimir Putin on foreign soil, and apparently during White House meetings with Mr. Wray and others. President Trump succeeded on August 9, 2018, when DD David Bowdich purported to exercise *the Director's right* to review and modify a disciplinary action and dismissed Mr. Strzok from the rolls of the FBI. (Exhibit 1 at FBI0007084 (emphasis added); *see also* Exhibit 2, FBI0007135 ("████████████████████████████████████████████████.")).

---

counsel for Mr. Strzok in person, while apparently inviting government counsel to be present with him.

3

Count I of Mr. Strzok's Complaint alleges that the Defendants treated Mr. Strzok more harshly because Mr. Strzok was critical of President Trump, who made his intent to retaliate against public servants who did not kowtow to his wishes abundantly clear. It is both likely and unremarkable that DD Bowdich will testify that the decision to terminate Mr. Strzok's employment was not affected by politics. At trial, Mr. Strzok will ask the finder of fact to reject those statements, and Mr. Wray's testimony is critical to Mr. Strzok's ability to fully present the reasons to do so.

To be sure, there is already evidence in the record from which one should infer that Mr. Strzok's termination was influenced by Mr. Strzok's political views. In addition to the extraordinary pressure from the White House, it is now clear that Mr. Strzok's termination was unprecedented. Discovery has revealed no other instance in the FBI's history where the Director or any other FBI official has directly overturned a "FINAL" decision by the FBI's Office of Professional Responsibility ("OPR"), let alone a final decision premised on a binding last chance agreement. (Exhibit 3, Defs.' Resp. to Strzok Rog 5; Will Dep. 357:2 – 362:20). OPR Assistant Director Candice Will—the career FBI official and attorney who issued the "FINAL" decision that did *not* terminate Mr. Strzok's employment—testified that she ███████████████████ ███████████████████████████████.[2]

---

[2] Exhibit 4, Will Dep. 245:6 – 246:12 (███████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

The record is also replete with comparator cases in which shocking conduct resulted in far lower levels of discipline.  And discovery has shown that the FBI disciplined *only* ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████.  Indeed, the Inspector General's office notified the FBI during the Midyear investigation that there had been ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  (Exhibit 5 at FBI0032323). Moreover, the FBI's decision to exercise Mr. Wray's purported authority to insist on firing Mr. Strzok conflicts with statements that Mr. Wray made before the full scope of President Trump's campaign for his termination became apparent, and with other statements by senior FBI officials (including DD Bowdich himself) to Mr. Strzok indicating that he was not likely to be fired.  (*E.g.* Exhibit 6, Strzok Resp. to Defs.' Rog 13).[3]  It also conflicts with assurances that Mr. Wray made, through his Chief of Staff, to counsel for Mr. Strzok that Mr. Wray would accept whatever decision was made by OPR, assurances that Mr. Strzok relied upon when agreeing to the LCA.

---

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████).

[3] The FBI's justification for Director Wray's authority is based on a provision allowing him to modify certain "final" disciplinary decisions, but the policy is specific to "██████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████." Ms. Will's suspension of Mr. Strzok was "FINAL" because it reflected an agreement between Mr. Strzok and the FBI for valuable consideration as the conclusion to an *adverse* action. (Exhibit 7 at FBI-STRZOK-0006878).  The FBI has not identified any policy that provides that the Director can unilaterally modify such accepted agreements, nor would such a policy be consistent with contract law or due process principles.

As early as January 2018, press reports indicate that Director Wray attended a meeting at the White House during which President Trump demanded that he fire Mr. Strzok.[4]  In the months following the disclosure of Mr. Strzok's text messages, Mr. Wray fielded questions from within and outside the FBI about the potential discipline of Mr. Strzok.  For example, in preparation for a March 2018 all employees conference, ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████" (Exhibit 8 at FBI0061459).  Mr. Wray was so involved that he received details on ██

███████████████████████████████████████████████████████████████

█████████████████████████. (Exhibit 9 at FBI0049689).  Mr. Wray also responded to letters to letters from congresspeople regarding Mr. Strzok and his security clearance (e.g., Exhibit 10), and Mr. Strzok was "read out" of access to sensitive compartmentalized information so that Mr. Wray could deny to Congress that he had access to such information.

On June 11, 2018, DD Bowdich sent Mr. Wray ████████████████████████

███████████████████████████████████████████████████. (Exhibit 11 at FBI-Strzok-0006835).  Almost immediately after the OIG released its Midyear Report on June 14, 2018, the White House ███████████████████████████████████████████. (Exhibit 12, FBI0041160 ("████████████████████████████████████

█████████████")).  Hours after that, Mr. Wray conveyed a press conference at which he insisted, "We're going to adhere to the appropriate disciplinary process, and *once that process is*

---

[4] Murray Waas, *Exclusive: Trump Pressed Sessions to Fire 2 FBI Officials Who Sent Anti-Trump Text Messages* Vox (April 20, 2018), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages.

*complete, we won't hesitate to hold people accountable for their actions*."[5]  Mr. Wray appears not ▆▆▆▆ ▆▆▆▆ (Exhibit 13, Schools Dep at 337:2-17), ▆▆▆▆ ▆▆▆▆, President Trump told the press, "I am amazed that Peter Strzok is still at the FBI, and so is everybody else that read that report. . . . Peter Strzok should have been fired a long time ago."[6]  President Trump continued trying to ▆▆▆▆,[7] and between mid-June and Mr. Strzok's "FINAL" suspension by the FBI on August 9, 2018, Mr. Wray's office ▆▆▆▆ ▆▆▆▆.  (Exhibit 15, Strzok OPR Hr. at 30:1-2).  And it was on Mr. Wray's authority that the independent, final decision of OPR—issued by agreement on behalf of the FBI at large—was overturned.

The Defendants argue (Motion at 4-5) that Mr. Wray's deposition is premature because DD Bowdich has not yet been deposed, and that Ms. Will (the only FBI employee deposed to date) could not testify about communications between Mr. Wray and DD Bowdich.  Mr. Strzok first noticed Mr. Bowdich's deposition more than a year ago but was unable to serve the subpoena for months, including because the Defendants refused to provide his address.  Mr. Bowdich's deposition has been further delayed by the FBI's difficulty in completing document productions in response to Mr. Strzok's November 2020 requests for production and by the purported

---

[5]  *Justice Department OIG Report on Clinton Email Probe*, C-SPAN (June 14, 2018), https://www.c-span.org/video/?447050-1/fbi-director-accepts-oig-report-clinton-email-probe.

[6]  Donald J. Trump, *Remarks by President Trump in Press Gaggle*, National Archives (June 15, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-press-gaggle/.

[7]  Exhibit 11, FBI0060600 ("▆▆▆▆ ▆▆▆▆ ▆▆▆▆").

unavailability of Defendants' attorneys.[8]  Regardless, given Mr. Wray's involvement in the events at issue and the relevant decisions (including what Mr. Wray *did not do* and why), Mr. Bowdich's deposition will not obviate the need for Mr. Wray's testimony.

### LEGAL STANDARD

"A protective order for a high-ranking official should be granted if the court determines that (1) the individual is high-ranking and (2) applying a balancing test, the movant's concern of harm to the official outweighs 'the adversary's significant interest in preparing for trial.'" *Byrd v. District of Columbia*, 259 F.R.D. 1, 6 (D.D.C. 2009) (quoting *Low v. Whitman*, 207 F.R.D. 9, 10–11 (D.D.C. 2002)).  The burden under Rule 26 is on the movant, and "[u]nless the movant can show that the need for the protective order is 'sufficient to overcome plaintiffs' legitimate and important interests in trial preparation,' high-ranking officials are subject to deposition." *Id.* at 7; *see also Kelley v. Fed. Bureau of Investigation*, No. CV 13-0825 (ABJ), 2015 WL 13648073, at *1 (D.D.C. July 16, 2015) ("high ranking government officials are generally not subject to depositions unless they have *some* personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere") (emphasis in original).

---

[8] The FBI most recently produced approximately 9,000 pages of documents on July 11, 2022.  The FBI's productions have contained numerous copies of identical documents, though frequently with inconsistent redactions, such that the breadth of the actual content is dramatically overstated by the number of pages.  The FBI has produced entire production volumes with all content redacted and has in some cases redacted non-confidential testimony that Mr. Strzok himself gave.  Mr. Strzok's ability to review the FBI's productions efficiently is also impacted by the FBI's decision to concatenate numerous emails into large PDFs that are not text searchable and cannot be automatically sorted or searched.

**ARGUMENT**

The Defendants rely largely on the same "apex" authority presented in their motion to quash the deposition of former President Donald Trump. Plaintiff incorporates herein his Opposition to that Motion, which demonstrated that under both D.C. Circuit and Second Circuit authority (where the Motion was originally filed), depositions of even high-level current or former government officials are appropriate if they have unique personal knowledge relevant to the claims. Mr. Strzok does not dispute that Mr. Wray is as a high-ranking government official or that he, unlike former President Trump, is actively engaged in important and time-consuming work. Mr. Wray was, however, involved in and has unique personal knowledge of the events that Mr. Strzok expects to be at the center of this case, and the testimony he can offer about his own actions, inactions, and associated motives cannot be obtained elsewhere.

**I.      Mr. Wray Has Personal Knowledge About The Matter.**

As detailed above, President Trump reportedly personally demanded during a meeting with Mr. Wray in January 2018 that Mr. Strzok be fired. That the Defendants have not produced any record of that meeting, the occurrence of which is confirmed by Attorney General Sessions' schedule (*see* Exhibit 16), adds to the need for deposition testimony about it. If Director Wray were to confirm, as credible news outlets have reported, that then President Trump demanded Strzok's firing in an oval office meeting with Mr. Wray, that would be direct evidence supporting Mr. Strzok's First Amendment reprisal claims.

There is no dispute that the ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

9

███████████████████████████████████. (Exhibit 13, Schools Dep. 342:12 – 343:11).⁹ ███

████████████████████████████████████████████████████████████████████████████████

███ and any information presented to Director Wray about the President's statements would also be highly relevant. Mr. Wray is the only person who can accurately testify to everything he learned about ██████████, what (if anything) he did with that information, and how it informed his actions and inactions.

The record also reveals that Mr. Wray was ████████████████████████████ ████████████████. Similarly, Mr. Wray's office ████████████████████████████ ████████████████████████, Candice Will, who declined to fire Strzok, and with DD Bowdich, who overturned Ms. Will's decision, vitiated an accepted Last Chance Agreement, and fired Strzok without appeal rights. Mr. Wray is the only witness competent to testify to everything he learned about the disciplinary process against Strzok and how President Trump's public and private excoriations of Mr. Strzok impacted Mr. Wray's actions.

Mr. Wray also responded to numerous questions about Mr. Strzok through 2018 and repeatedly expressed his commitment to abide by the ordinary FBI process, yet DD Bowdich acted on Mr. Wray's purported authority when, in an unprecedented departure from FBI norms, he overruled Ms. Will's final decision and fired Mr. Strzok. Plaintiff is entitled to question Mr. Wray about whether he actually delegated this putative authority to DD Bowdich, what limitations if any

---

⁹ Defendants precluded any inquiry by Plaintiffs during the deposition of former Assistant Attorney General Scott Schools into the content of ██████████ (including whether Mr. Trump spoke about Peter Strzok or issued any instructions about actions to take against Strzok). ███ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████.

he placed on the purported authority, and why he did not instruct DD Bowdich to comport with the ordinary process of not intervening in OPR's process in light of Mr. Wray's statements and President Trump's demands.  Only Director Wray has that knowledge.

As such, Mr. Wray has direct, personal knowledge which is certainly relevant to (and could be crucial to) the claims at issue in this case.  His status as FBI Director does not immunize him from testifying.

## II.  Mr. Wray Has Information That Cannot Be Obtained Elsewhere.

Director Wray is a Defendant in this action, and his motives, actions, and inactions are all at issue in connection with Mr. Strzok's First Amendment claim.  The government has at least temporarily foreclosed the only viable alternative source to information about his meeting with President Trump through its motion to quash the subpoena Mr. Strzok served on former President Trump.  *See generally in re Subpoena Served on Donald J. Trump*, *Garland v. Strzok*, Case No. 1:22-mc-27-ABJ (D.D.C.).  Additionally, the government has attempted to foreclose all questioning regarding ████████████████████████████████████████ ████████████████████████████████████ – through its meritless assertion of the Presidential Communications Privilege.

As in *Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 6 (D.D.C. 2018), a defamation action in which the district court approved the deposition of the Acting Director General of Al Jazeera Media Network over "apex doctrine" objections by the defense, and *Judicial Watch v. U.S. Dep't of State*, No. CV 13-1363, 2016 WL 10770466, at *3 (D.D.C. Aug. 19, 2016), where Judge Sullivan authorized the deposition of then Secretary of State Hillary Clinton to testify about her reasons for using a private server to send and receive State Department emails, the knowledge possessed by Mr. Wray about this case is both personal and unique.  While others may be able to

11

testify about the extraordinary pressure campaign from the President and his allies, and the unprecedented steps which ultimately led to Peter Strzok's firing, only Mr. Wray can testify about what information he learned about those topics, what he did and didn't do with it, and why.

As indicated above, given the time being devoted to this Motion and the short duration of the remaining discovery schedule, it is safe to assume that DD Bowdich's deposition will have been completed by the time Director Wray's is scheduled. But Mr. Wray's sworn testimony remains unique and necessary, even if (as the government obviously expects) DD Bowdich denies being impacted by political pressures and claims to have had no communication with Wray (his boss, under whose purported delegated authority he acted) about these matters. Mr. Wray's testimony could either directly refute those denials, or provide further circumstantial evidence discrediting them, which could be crucial to the fact-finder's ultimate decision in the case.

There is simply no authority standing for the proposition that if a government official claims to have acted appropriately and not to have been influenced by a supervisor or other official with illegal motive, his testimony must be accepted as true, without further inquiry. As we explained in the Opposition memorandum regarding the Motion to Quash the Trump deposition, courts have often found discriminatory purpose via the "Cat's Paw" method of proof. *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011); *Steele v. Mattis*, 899 F.3d 943, 950 (D.C. Cir. 2018) ("The actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action."). The defendants in "Cat's Paw" cases invariably argues that the "deciding official" acted for bona fide reasons and was not influenced by the actor with the putative illegal motive. But that mere incantation does not end the inquiry; it is for the finder of fact to decide whether or not to accept that testimony, based on all of the relevant evidence about the decision-

making process. The government's bid here to cut short any meaningful discovery into inappropriate presidential demands that the FBI fire Mr. Strzok because DD Bowdich will testify that he acted appropriately, is misguided and unsupported.

In sum, Mr. Wray has unique knowledge about the circumstances leading to Mr. Strzok firing, and there is no valid basis to preclude his deposition.

### III. The PCP Does Not Shield Director Wray's Testimony.

Defendants, in a footnote (Mot. at 11 n.5), appear prepared to invoke the Presidential Communication Privilege ("PCP") as an alternative basis to preclude questioning of Mr. Wray about any influence former President Trump sought to exert on the FBI to fire Strzok, if Mr. Wray's deposition takes place. This assertion of the PCP is completely unmoored from any of the standards that the Supreme Court or D.C. Circuit courts have held guide the privilege. This Court should rule that the PCP cannot be used to deprive Plaintiff of the crucial information he seeks.

> The presidential communications privilege is a "presumptive privilege" necessary to "guarantee the candor of presidential advisers and to provide a President and those who assist him . . . with freedom to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." The privilege "is rooted in the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge. This confidentiality is important because it is "what ensures the expression of candid, objective, and even blunt or harsh opinions and the comprehensive exploration of all policy alternatives before a presidential course of action is selected."

*U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 351 F. Supp. 3d 140, 149 (D.D.C. 2018), (quoting *In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (alterations omitted) and *United States v. Nixon*, 418 U.S. 683, 708 (1974)). In *U.S. Department of Treasury*, Judge Sullivan examined the applicability of the PCP to communications between then President Obama and his staff, including then Director of the National Economic Council, Assistant to the President for

Economic Policy, and co-chair of the Presidential Task Force on the Auto Industry ("Auto Task Force"), Lawrence Summers, concerning the decision whether or not to bail out the automobile industry. Even though the information at issue there pertained to an important decision with substantial public policy implications, Judge Sullivan nevertheless ordered the evidence to be produced.

Here, in contrast, the government has not even begun to explain what decision or policy President Trump was involved in making when these allegedly privileged communications occurred. The government wants it both ways: steadfastly maintaining that President Trump was completely uninvolved in the decision to fire Strzok, while shielding any information he was given, or any of his own statements, actions, or state of mind, relating to Strzok on the basis that they involved some critical decision or policy. Under these circumstances, the government has failed to show that the PCP applies.

Moreover, even if the government could show that the PCP applied, it is not an absolute privilege. Courts must balance the interests of both parties to determine whether it shields the evidence being sought:

> Although entitled to great weight because of the need for confidentiality, ***the presidential communications privilege should be construed as "narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected*.**" *Moreover, assuming arguendo a former president may assert the privilege, "such a claim carries much less weight than a claim asserted by the incumbent himself."* Ultimately, the application of the privilege "depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." In the context of civil discovery, a court must assess "the public interests at stake in determining whether the privilege should yield in a particular case, ***and must specifically consider the need of the party seeking privileged evidence.***"

*U.S. Dep't of Treasury*, 351 F. Supp. 3d at 149-150 (emphasis supplied) (citation omitted).

The first step in this balancing test is to determine the interests served by protecting the President's confidentiality in the context of the communications at issue. *In re Sealed Case*, 121 F.3d at 753. As Judge Sullivan explained, "The Supreme Court has effectively recognized a continuum when analyzing the public interest in maintaining confidentiality in presidential communications. At one end of that continuum is a claim of privilege based on a 'need to protect military, diplomatic, or sensitive national security secrets.' . . . The public interest in maintaining confidentiality of presidential communications is at its strongest when the claim of privilege rests on a need to safeguard this type of information--information which implicates international and national security interests.'" *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 152 (quoting *Nixon*, 418 U.S. at 706). In contrast, the weakest PCP assertions involves situations where it is simply the principle of executive confidentiality itself which is being espoused: that is "when the privilege depends solely on the broad, undifferentiated claim of public interest in the confidentiality of [presidential] conversations." *Id.* This factor tilts decidedly in favor of disclosure here. Defendants cannot plausibly contend that examining any witness about the content of communications regarding a disputed personnel action against an FBI employee for sending text messages that reflected personal pollical views critical of President Trump implicates any national security or similar concerns.

The same is true of the next factor—precisely who has invoked the purported privilege in the case at hand? In *U.S. Dep't of Treasury*, Judge Sullivan noted that "[s]everal D.C. Circuit cases have considered not only the nature of the materials claimed under the privilege but also *who* asserts the privilege." *Id.* at 153. In *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977), for example, the D.C. Circuit found that it was "of cardinal significance . . . [that] there has been no assertion of privilege by an incumbent president." Judge Sullivan noted in *U.S. Dep't of Treasury*

15

that "no President—past or present—ha[d] invoked the privilege." 351 F. Supp. 3d at 153. Rather, the former Deputy Counsel to President Obama had invoked the privilege on "behalf of the Office of the President," and Judge Sullivan reasoned that "[i]f a former President's invocation is entitled to less weight than an incumbent, it follows that an invocation by the government on behalf of the Office of the President of a former administration, is similarly entitled to less weight." *Id.* Here, Defendants have been cagy about who is precisely invoking the privilege. When pressed at Mr. Schools' deposition, Defendants replied only that it was a claim made "on behalf of the White House, generally." (Exhibit 13, Schools Dep. 349:2-11).

The timing and events in question must also be considered as "the expectation of the confidentiality of executive communications . . . has always been limited and subject to erosion over time after an administration leaves office." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 451 (1977). Here, as in *U.S. Dep't of Treasury*, a considerable amount of time (four years) has elapsed since the events in question, and whatever limited hypothetical risk to presidential advising and decision-making that could have flown from disclosure has completely eroded.

Finally, courts consider the extent to which the subject matter of the evidence at issue has already reached the public. "The interest in maintaining the confidentiality of conversations related to a subject, 'substantially diminishes' when there is public testimony on that subject." *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 153-54 (quoting *Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973) (stating public testimony given related to Watergate substantially diminished the President's interest in maintaining confidentiality of the conversations related to the subject)). Here, the stated subject matter of any meetings the former President had about Strzok has already been reported in the press, and President Trump himself has tweeted and spoken publicly many times on the subject. Further testimony about it is highly unlikely to impair any sound government

16

interest. This factor, like all of the others, shows that the government's purported interest in confidentiality here is *de minimus*.

In contrast, weighty interests justify the need for disclosure of the evidence at issue. In *Dellums*, the court noted that though not as strong as in a criminal context, the "constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented by a civil action for damages." 561 F.2d at 247. Here too, Mr. Strzok seeks vindication of important constitutional rights: his right to freedom of speech expressing his political beliefs without reprisal by his employer and/or the President of the United States, and his right to be afforded the "due process" promised to him by FBI policy and practice before being deprived of his chosen career in public service.

Mr. Strzok also presents a strong showing of "need" with respect to the evidence sought. As Judge Sullivan explained, "This component means 'that the evidence sought must be directly relevant to issues that are expected to be central to the trial'" and not merely "side issues." *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 156 (quoting *In re Sealed Case*, 121 F.3d at 754). Judge Sullivan found this standard satisfied when the plaintiffs demonstrated the pursued discovery "likely contain important evidence." *Id.* at 157.

Mr. Strzok easily meets that standard here. Evidence about any instructions or pressure that the President exerted on the FBI Director is highly relevant, given the highly unusual series of events that led to DD Bowdich overturning Ms. Will's "FINAL" decision. Mr. Strzok's need for this evidence is great. These are not "side issues," and the balance of interests under the PCP tips decidedly in his favor.

Thus, if the Court orders the depositions of Messrs. Trump and Wray (and the re-opening of Mr. Schools' deposition), the PCP presents no bar to their full and frank sworn testimony.

17

## CONCLUSION

The Court should deny Defendants' Motion to Quash and for a Protective Order.

Dated: July 21, 2022

Respectfully submitted,

/s/ Christopher R. MacColl
Aitan D. Goelman (D.C. Bar No. 446636)
Christopher R. MacColl (D.C. Bar No. 1049153)
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
AGoelman@zuckerman.com

/s/ Richard A. Salzman
Richard A. Salzman (D.C. Bar No. 422497)
HELLER, HURON, CHERTKOF & SALZMAN PLLC
1730 M Street NW, Suite 412
Washington, DC 20036
Telephone: (202) 293-8090
salzman@hellerhuron.com

*Counsel for Plaintiff Peter Strzok*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on July 21, 2022, I caused to be served copies of the above **PETER P. STRZOK'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER** on all counsel of record in the above-captioned actions via e-mail.

                                      /s/ Christopher R. MacColl
                                      Christopher R. MacColl (D.C. Bar No. 1049153)