IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:19-cv-02367-ABJ |
| ATTORNEY GENERAL MERRICK B. GARLAND, in his official capacity, et al. | ) ) REDACTED ) ) |
| Defendants. | ) ) |

**PETER P. STRZOK'S NOTICE OF FILING OF ROSENSTEIN DEPOSITION TRANSCRIPT AND LISTING OF INQUIRY AREAS FOR DEPOSITIONS AT ISSUE IN MOTIONS TO QUASH**

Pursuant to the Court's August 10, 2022 Minute Order, Plaintiff Peter Strzok hereby submits this Notice of Filing of Rosenstein Deposition Transcript and Listing of Inquiry Areas for Depositions at Issue in Motions to Quash. The entire Rosenstein deposition has been filed as Exhibit 4 to Mr. Strzok's Supplemental Filing Regarding Defendants' Motions to Quash or for Protective Orders; however, the most relevant portions reflecting the Defendants' invocation of the Presidential Communications Privilege (PCP) and Deliberative Process Privilege (DPP) are at pp. 46-47, 88-90, 96, 112, 152-153, 277-278, and 344-375. In the following two sections, we list the topic areas and questions that we would address with former President Trump and Director Wray at depositions, if given the opportunity.

A. **Mr. Trump's Deposition**

1. **January 22, 2018 Meeting**: We would ask Mr. Trump about a meeting on January 22, 2018 between him, FBI Director Wray, and Attorney General (AG) Sessions. Documents produced during this litigation reveal that ████████████████████████████████████████████████████████████████████████████████████████████████. (*See*,

1

*e.g.*, Supplemental Filing Ex. 3, FBI0014007, January 22, 2018 email from ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇. Contemporaneous news accounts also referred to this "gap" in the texts as one of the topics of the meeting and disclosed that President Trump questioned why Strzok and Page were still in their jobs despite allegations that they had been disloyal to him.[1] He also reportedly pressed Wray and Sessions to "work more aggressively to uncover derogatory information" about Strzok and Page to turn over to congressional republicans.[2]

We would ask whether Mr. Trump made these reported statements, whether he made any other statements about disciplining or investigating Strzok or Page, what response he got from Sessions, Wray, and/or any of the other attendees, what action items he gave to them as a result of the meeting, and whether he has any notes, memos, recordings or other memorialization of the meeting. We would ask him why he made any such statements, what his goals and/or motivations were, and what his demeanor was like during the meeting. We would ask him what efforts, if any, his staff made to follow-up on any items discussed during the meeting.

  **2.**  <u>**January 23, 2018 Meeting**</u>: The same Vox article reported that "[t]he very next day, Trump met Sessions again, this time without Wray present, and even more aggressively

---

[1] *See* Murray Waas, *Trump Pressed Sessions to Fire 2 FBI Officials Who Sent Anti-Trump Text Messages*, Vox (Apr. 20, 2018), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages ("President Donald Trump sharply questioned Attorney General Jeff Sessions and FBI Director Christopher Wray during a White House meeting on January 22 about why two senior FBI officials — Peter Strzok and Lisa Page — were still in their jobs despite allegations made by allies of the president that they had been disloyal to him.").

[2] *Id.*

advocated that Strzok and Page be fired," according to a knowledgeable source.[3]  We would ask the former President the same types of questions identified in ¶ 1, above.

      3.      **June 15, 2018 Meeting**:  According to the deposition testimony of Rosenstein and Bowdich, and documents produced in this case, then ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ DOJ Inspector General (IG) had released its report on the Midyear investigation, and from the DOJ's perspective ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  Coincidentally or not, June 15, 2018 was also the day that the FBI issued its proposal to fire Strzok, and President Trump made remarks to reporters beginning at approximately 9 am that morning in which he railed against Strzok (referring to him and others at the FBI as "scum" and "thieves") and questioned why the FBI had not yet fired Strzok.

      We would ask Mr. Trump what he recalls of that June 15 meeting, including whether any policy or other decisions were being deliberated during the meeting, and if so what they were.  We would ask what he learned about the IG report, what questions if any he had about it, what if anything he said about Peter Strzok, including about Strzok's employment status and potential discipline, what if anything he was told about Strzok's likely discipline, whether he gave any other instructions or expressed opinions about actions to be taken against Strzok, and whether he made any statements about the text messages or about Strzok more generally, such as that he engaged in "treason," had been "disloyal," was part of the "deep state," or about the consequences for the FBI, the Director, the Deputy Director, or others if Strzok was not fired.  We would ask him why he

---

[3] White House meetings on both dates are corroborated by documents previously filed.  *See* ECF No. 79-3.

made any such statements, what his goals and/or motivations were, and what his demeanor was like during the meeting. We would ask about any memorialization of that meeting, and whether any action items were issued.

    4.    **Communications between December 2, 2017 and June 15, 2018**: Then President Trump sent a barrage of tweets and made other public statements during this time period that were highly critical of Strzok. We would ask Mr. Trump about many of those communications, what he intended to accomplish by them, and what if any communications he had with anyone at DOJ or the FBI about his public statements, their meaning, and/or their intended effect. We would ask whether the DOJ or FBI made any effort to persuade President Trump not to make false accusations against Mr. Strzok, for example in response to President Trump's assertion that Mr. Strzok had committed "treason," and how President Trump reacted to any such efforts. We would ask whether he was aware that his purported supporters made death threats and/or engaged in other menacing actions against Strzok and/or Page and their families, and what efforts he made, if any, to curtail those types of actions. We would also ask how President Trump first learned of Mr. Strzok and Ms. Page's text messages to show that the harm Mr. Trump inflicted stemmed from Defendants' violations of the Privacy Act.

    5.    **Communications between June 15, 2018 and August 10, 2018**: The FBI fired Special Agent Strzok on August 10, 2018 when it delivered a letter from Deputy Director Bowdich purporting to exercise authority delegated to him by Director Wray and to overturn the final decision of OPR Assistant Director Candice Will, who had decided on August 8, 2018 *not* to fire Strzok and instead to accept Mr. Strzok's Last Chance Agreement. In the lead up to these events, then President Trump issued many public statements and tweets that were highly critical of Strzok. We would ask Mr. Trump about those public statements, what he intended to accomplish by them,

and about other communications he had with anyone at DOJ and the FBI between those dates regarding Mr. Strzok.  We would also ask Mr. Trump whether the DOJ or FBI ever informed him that its Office of Professional Responsibility decided *not* to fire Strzok, how he reacted or would have reacted to that information, and what understandings other officials at the White House, DOJ, and FBI had about his likely reaction and about his basis for any such understandings.

      6.      **Communications Following August 10, 2018**:  As President, and since leaving office, Mr. Trump made a number of public statements in which he appeared to take credit for the firing of Strzok, sometimes specifically and sometimes in reference to groups of government employees whom he perceived as enemies.  We would ask Mr. Trump what he meant by each of those statements, who he was referring to, why he made them and what, if anything, he intended to accomplish by making them.

      7.      **Origins of the Disclosure to the Press of Text Messages**:  We would ask Mr. Trump whether he ever learned the identity of the person who leaked the existence of Mr. Strzok and Ms. Page's text messages to the press in November or December 2017.

      8.      **Retained Documents Relating to Strzok and/or Page**:  Recent media reports have suggested that President Trump received, and may have retained, previously undisclosed text messages between Strzok and Page.[4]  We would ask Mr. Trump about whether those reports are accurate, from whom he received the messages and when, what text messages he or others kept,

---

[4] *See, e.g.*, Maggie Haberman, Katie Benner & Glenn Thrush, *The Final Days of the Trump White House: Chaos and Scattered Papers*, N.Y. Times (Aug. 20, 2022), https://www.nytimes.com/2022/08/20/us/politics/trump-fbi-search.html?smid=tw-share (suggesting that a binder containing Strzok and Page text messages may have been shipped by Mr. Trump to Mar-a-Lago); Maggie Haberman, *Three Conversations with Donald Trump*, The Atlantic (Sept. 25, 2022), https://www.theatlantic.com/ideas/archive/2022/09/donald-trump-maggie-haberman-mar-a-lago/671510/.

how, why, what he has done with them, and what he knows of others having done or intending to do with them.

B.     **Director Wray's Deposition**

1.     **January 22, 2018 Meeting**:  We would ask Director Wray in detail about the January 22, 2018 meeting, including many similar questions to those under Section A, ¶ 1, above. We would also ask him whether he saw and/or responded to the news reports regarding that meeting.  We would also ask him about any briefings regarding that meeting that he gave to any of his staff, including his Deputy Director, and what statements, if any, they made about the topics of the meeting.

2.     **January 23, 2018 Recap from AG Sessions**:  We would ask Director Wray what then AG Jeff Sessions told him about any discussion he had with President Trump on January 23, 2018, whether he saw any news reports regarding that meeting, and what discussions he had with other FBI officials about the Sessions/Trump meeting.

3.     **June 15, 2018 Meeting**:  We would ask Director Wray whether he attended the June 15, 2018 meeting, and if so, we would ask questions similar to those under Section A, ¶ 3, above.  We would also ask him about any briefings he gave his staff, including his Deputy Director, about the June 15 meeting.

4.     **Midyear Investigation Report and Response**:  We would ask what, if anything, Director Wray recalled about Mr. Bowdich's participation in reviewing, proposing edits to, and responding to OIG's Midyear Report.[5]

---

[5] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████  The FBI's official response accepted OIG's finding that "there was no evidence of bias or

5. **Statements that Disciplinary Process Would Follow Established Procedures and Wray Would Not Intervene**: Director Wray made several public statements indicating that the FBI would follow its ordinary disciplinary process with respect to Mr. Strzok, including testimony in which he assured Congress that the employees were being referred to the FBI's "independent disciplinary office." Privately, Director Wray's Chief of Staff assured Mr. Strzok's counsel that Director Wray expected to abide by the decision OPR made and would not intervene. The Director's office also corresponded with the Office of Professional Responsibility.[6] Mr. Strzok relied on assurances that Director Wray would not intervene when he agreed to surrender his appeal rights in exchange for a penalty less than termination of his employment.

We would ask Director Wray why he repeatedly noted that the Office of Professional Responsibility was "independent," whether he in fact intended to abide by its final decision regardless of what that was, what internal discussions he had regarding OPR's decision and his intention to abide by it, when he learned that Ms. Will intended not to dismiss Mr. Strzok, whether that information changed his intended conduct in any way, and why he ultimately permitted Mr. Bowdich to exercise his purportedly delegated authority to fire Strzok notwithstanding prior assurances that Director Wray would not have anything to do with Strzok's disciplinary process.



[6] ███████████████████████████████████████

**6.     Communications with Deputy Director Bowdich and Delegation of Authority re Strzok**: Deputy Director Bowdich purported to exercise authority delegated to him by Director Wray in overturning the Will "non-firing" decision and deciding to terminate Strzok's employment.  We would ask Director Wray about the disciplinary process and appeal process as it normally is applied at the FBI, his delegation of any authority to DD Bowdich, the scope of that delegation, and his discussions with DD Bowdich about Strzok and/or the Strzok disciplinary process from December 2, 2017 to August 9, 2018.

**7.     Communications with AG Sessions and/or DAG Rosenstein about Strzok:** After the disclosure of the texts in December 2017 the DOJ released a statement from AG Sessions in which he declared, "I have directed that the FBI Director review the information available on this and other matters and promptly make any necessary changes to his management and investigative teams consistent with the highest professional standards."  In June 2018, after many highly critical comments from Republican members of Congress about why Special Agent Strzok still retained his security clearance, AG Sessions said in an interview that Strzok had lost his security clearance.[7]  This statement was not accurate.  (Supplemental Filing Ex. 1 at 302:9-13).  In light of the frequency with which Director Wray, Mr. Bowdich, AG Sessions, and Mr. Rosenstein met, we would ask Director Wray about any communications he and/or Mr. Bowdich had with Mr. Sessions and/or Mr. Rosenstein about Mr. Strzok's security clearance, and any similar communications regarding personnel actions relating to Strzok, and any actions taken as a result of those discussions.

---

[7] *See* Julia Manchester, *Sessions says FBI agent Peter Strzok no longer has his security clearance*, THE HILL (June 21, 2018), https://thehill.com/homenews/administration/393587-sessions-says-strzok-lost-his-security-clearance/.

Dated: September 29, 2022 — Respectfully submitted,

<u>/s/ Aitan D. Goelman</u>
Aitan D. Goelman (D.C. Bar No. 446636)
Christopher R. MacColl (D.C. Bar No. 1049153)
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
AGoelman@zuckerman.com

Richard A. Salzman (D.C. Bar No. 422497)
HELLER, HURON, CHERTKOF & SALZMAN PLLC
1730 M Street NW, Suite 412
Washington, DC 20036
Telephone: (202) 293-8090
salzman@hellerhuron.com

*Counsel for Plaintiff Peter Strzok*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2022, I caused to be served copies of the above **PETER P. STRZOK'S NOTICE OF FILING OF ROSENSTEIN DEPOSITION TRANSCRIPT AND LISTING OF INQUIRY AREAS FOR DEPOSITIONS AT ISSUE IN MOTIONS TO QUASH** on all counsel of record in the above-captioned actions via e-mail.

/s/ Aitan D. Goelman
Aitan D. Goelman (D.C. Bar No. 446636)