**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PETER P. STRZOK,<br><br>    Plaintiff,<br><br>    v.<br><br>ATTORNEY GENERAL MERRICK B. GARLAND, in his official capacity, et al.,<br><br>    Defendants. | Case No. 1:19-cv-2367 (ABJ) |
| LISA PAGE,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>    Defendants. | Case No. 1:19-cv-3675 (TSC) |
| ATTORNEY GENERAL MERRICK GARLAND, in his official capacity, UNITED STATES DEPARTMENT OF JUSTICE, FBI DIRECTOR CHRISTOPHER A. WRAY, in his official capacity, FEDERAL BUREAU OF INVESTIGATION,<br><br>    Movants,<br><br>    v.<br><br>PETER P. STRZOK<br><br>IN RE SUBPOENA SERVED ON DONALD J. TRUMP | Case No. 1:22-mc-27 (ABJ)<br><br>**REDACTED** |

**PLAINTIFF PETER STRZOK'S BRIEF ON THE INAPPLICABILITY OF EXECUTIVE
PRIVILEGES TO TESTIMONY RELEVANT TO HIS CLAIMS**

Pursuant to the Court's August 10, 2022 minute order, Plaintiff Peter Strzok submits this brief on the applicability of the Presidential Communications Privilege ("PCP") and the Deliberative Process Privilege ("DPP") to questions that he would ask former President Trump and Director Wray if permitted to take their depositions. After having repeatedly asserted the PCP on behalf of the "White House," the "Office of the President," and "the current President," *see, e.g.*, Rosenstein Dep. at 344:18-22, 345:3-7, and being ordered to proceed with the instant briefing process to ascertain "if the *current President* is going to assert executive privilege in all of the future depositions," 8/10/22 Hrg. Tr. at 13, Defendants' October 18, 2022 submission suggests that President Biden *may not* want to maintain executive privilege over the communications at issue.[1] The Defendants should not be permitted to make privilege assertions on behalf of the current President when he has declined to adopt their view. Regardless, the testimony Mr. Strzok seeks cannot be covered by the PCP because no presidential decision was appropriately at issue. Mr. Strzok's need for answers to the questions he proposes to ask would also overcome any PCP or DPP claim that might be asserted. The Court should hold that the questions identified by Mr. Strzok must be answered and order President Trump's and Director Wray's depositions to proceed.

## SCOPE OF DISPUTE

Defendants have indicated that they will continue instructing witnesses not to answer questions regarding: (1) nonpublic communications with former President Trump that related to Mr. Strzok or his text messages with Ms. Page; and (2) discussions between Director Wray and Mr. Bowdich regarding the FBI's response to the OIG's Midyear Review Report other than "testimony [that] relates specifically to the OIG's findings or conclusions regarding Mr. Strzok."[2]

---

[1] Defendants attempt to justify this strategy by citing *Alexander v. F.B.I.*, 186 F.R.D. 128, 136 (D.D.C. 1998), in which the court declined to impose sanctions for a witness's compliance with an instruction not to answer a question based on an assertion of the PCP that the Executive Office of the President ("EOP") later elected not to "perfect." In *Alexander*, counsel for the EOP was clear during the relevant deposition that certain communications "*could* be subject to Presidential communications [privilege]." *Id.* at 135. Here, the Court granted Defendants more than a month to ascertain the current administration's position, yet Defendants apparently did not do so.

[2] Footnote 5 (at p. 6) of Mr. Strzok's September 29, 2022 submission on the areas for inquiries erroneously stated that Mr. Bowdich was a subject of the FBI's Midyear Investigation. Mr.

1

As to the second area of dispute, Mr. Strzok would limit his questions to what Director Wray recalls about Mr. Bowdich's participation in reviewing, proposing edits to, and responding to OIG's Midyear Report insofar as those actions concerned Mr. Bowdich's historical conduct, Mr. Strzok, or to groups of employees that included Mr. Strzok. This would include, for example, what Director Wray recalls about Mr. Bowdich's agreement or disagreement with Director Wray's assertion that mistakes in the Midyear investigation "were not, in any respect, the result of bias or improper considerations" and that there was "no evidence to connect the political views expressed by [Strzok and others] with the specific investigative decisions." Midyear Review Report Attachment B at 1, 3. Mr. Strzok does not need testimony that is not relevant to his claims.

In addition to the PCP, Defendants say they will invoke the DPP to cover questions about communications with President Trump that "are phrased so broadly as to cover pre-decisional executive branch deliberations that do not pertain to Mr. Strzok." ECF 94 at 3. Mr. Strzok does not dispute that the government can instruct witnesses not to provide information about pre-decisional deliberations of topics unrelated to him and Ms. Page. Mr. Strzok would ask follow-up questions to identify the decision at issue and its supposed lack of relevance, but he believes any portion of potential dispute concerning decisions that do not pertain to him is moot.

**STANDARD**

The PCP is a presumptive privilege that "is limited to communications 'in performance of [a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Nixon v. Adm'r of Gen. Servs.* (*Nixon II*), 433 U.S. 425, 449 (1977) (quoting *United States v. Nixon (Nixon I)*, 418 U.S. 683, 708, 711, 713 (1974)); *see also In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997) (extending privilege to some "communications made by

---

Bowdich was at least tangentially *involved* in the FBI's Midyear Investigation and had his conduct reviewed as part of the subsequent OIG Midyear Investigation Review. Mr. Strzok is building evidence of Mr. Bowdich's biases arising from his right-wing political orientation and OIG's scrutiny. *See A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* at 48, DOJ Oversight and Review Division 18-08, June 2018, https://www.justice.gov/file/1071991/download ("Midyear Review Report") (mentioning Mr. Bowdich thirty-five times).

presidential advisers in the course of preparing advice for the President" and explaining that the privilege covers "materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."). Unlike the DPP, the PCP can be invoked to cover information that is "post-decisional and factual," and "in this way . . . [it] is broader than its deliberative process cognate." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 886 (D.C. Cir. 2021). However, the PCP "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752. The PCP "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *Id.*

Current or former presidents may invoke the PCP, but a former president's assertion is entitled to less weight. *Nixon II*, 433 U.S. at 448; *see also Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021). The President to whom a confidential communication was made, a successor, or another government actor may waive the privilege. *See Protect Democracy Project*, 10 F.4th at 890; *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

The DPP covers "advisory opinions, recommendations, and deliberations that are part of a process by which [g]overnment decisions and policies are formulated[.]" *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021) (quoting *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). To qualify for the privilege, information must be "both predecisional and deliberative." *Id.* at 362. Information is "predecisional if it was 'generated before the agency's final decision on the matter[.]'" *Id.* (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021)). Information is "deliberative when it is 'prepared to help the agency formulate its position[,]' and it 'reflects the give-and-take of the consultative process[.]'" *Id.* (quoting *Fish & Wildlife Serv.*, 141 S. Ct. at 786; *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006)). Although the DPP "originated as a common law privilege," it is most often encountered in FOIA litigation, and Congress has imposed additional requirements that agencies show they "reasonably foresee[] that disclosure

would harm an interest protected by an exemption" or that "disclosure is prohibited by law." FOIA Improvement Act § 2, 130 Stat. at 539 (codified at 5 U.S.C. § 552(a)(8)(A)(i)).

To assert the DPP, an Agency must provide: "(1) a formal claim of privilege by the 'head of the department' having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege." *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000).

Both the PCP and DPP are "qualified, not absolute," and "may be overcome by an adequate showing of need." *Protect Democracy Project*, 10 F.4th at 886 (citing *In re Sealed Case*, 121 F.3d at 753-57; *Dellums*, 561 F.2d at 247-50). As to the DPP, "[t]his need determination is to be made flexibly on a case-by-case, ad hoc basis." *In re Sealed Case*, 121 F.3d at 737. A court may take account of factors "such as 'the relevance of the evidence,' 'the availability of other evidence,' 'the seriousness of the litigation,' 'the role of the government,' and the 'possibility of future timidity by government employees.'" *Id.* at 737-38. The DPP "disappears altogether when there is any reason to believe government misconduct occurred." *Id.* at 746. As to the PCP, the need to maintain the confidentiality of presidential communications may be entitled to "great weight," but "[u]ltimately, the application of the privilege 'depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." *U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 351 F. Supp. 3d 140, 149-50 (D.D.C. 2018) (quoting *In re Sealed Case*, 121 F.3d at 743). "In the context of civil discovery, a court must assess 'the public interests at stake in determining whether the privilege should yield in a particular case, and must specifically consider the need of the party seeking privileged evidence.'" *Id.* at 150; *see also Dellums*, 561 F.2d at 247, 249 (PCP claim yielded to "strong constitutional value"). The information sought should be both "important evidence" and "not available with due diligence elsewhere." *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 151.

4

**ARGUMENT**

Testimony about communications with President Trump related to Mr. Strzok's text messages, employment, or potential termination is not subject to a valid PCP claim for three reasons: (1) the PCP has not been properly asserted; (2) the PCP cannot be invoked to shield testimony related to Mr. Strzok when the Defendants contend there was no presidential decisionmaking; and (3) even assuming that the PCP could apply, Mr. Strzok's need outweighs the government's interest in shielding this information from discovery. Testimony related to Mr. Bowdich's reaction and proposed response(s) to OIG's Midyear Investigation Report should be permitted because: (1) the DPP has not yet been properly asserted; and (2) Mr. Strzok's need would overcome any privilege assertion that could be made.

## I.   The PCP Has Not Been Properly Asserted.

"[A]s the incumbent, President Biden is the principal holder and keeper of executive privilege, and he speaks authoritatively for the interests of the Executive Branch." *Trump v. Thompson*, 20 F.4th at 33. The case law indicates that, at least once briefing has commenced (outside the FOIA context),[3] assertions of the PCP must be made personally by a current or former president, or in some instances by his close advisors. *See In re Sealed Case*, 121 F.3d at 744 n.16 (noting that in "*Nixon, Sirica* and *GSA*, President Nixon personally asserted the presidential communications privilege" and that the case law suggests "that the President must assert the presidential communications privilege personally"); *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) ("[P]resident may himself state the particular reasons which may have induced him to withhold a paper[.]"); *Dellums*, 561 F.2d at 247 (It is "of cardinal significance . . . [that] there has been no assertion of privilege by an incumbent president . . . . Absence of support from the incumbent at least indicates that 'the risk of impairing necessary confidentiality is

---

[3] The personal invocation rule does not apply in the FOIA context. *See, e.g.*, *Cause of Action Inst. v. U.S. Dep't of Commerce*, 513 F. Supp. 3d 116, 124 (D.D.C. 2021); *Lardner v. U.S. Dep't of Justice*, No. CIV.A.03-0180(JDB), 2005 WL 758267, at *7 (D.D.C. Mar. 31, 2005) ("[T]his Court concludes that the personal invocation of the presidential communications privilege is also a civil discovery rule that should not be imported into the FOIA analysis.").

attenuated.'"); *see also Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) ("[T]he issue of whether a President must personally invoke the privilege remains an open question.").

Defendants' October 18, 2022 submission fails to assert the PCP on behalf of President Biden, and Defendants concede that they cannot "perfect" any assertion of the PCP without his blessing. Br. at 1. Therefore, no PCP claim has been properly asserted. It may be that there is no question Mr. Strzok would ask former President Trump for which President Biden would not relinquish all claims of executive privilege. Proceeding with former President Trump's deposition appears to be the only way to resolve this fog.

That former President Trump's deposition is necessary to clarify issues related to executive privilege is just one more reason that his deposition is appropriate. Former President Trump might assert the PCP when President Biden's office appears to have declined to assert it, but he has not done so yet. That is despite the fact that former President Trump consented to the transfer of the Defendants' motion for a protective order from the Southern District of New York to this Court, and he does not appear to be lacking free time or resources to devote to Mr. Strzok. For example, the former president has persisted with his meritless lawsuit against Mr. Strzok, *see Donald Trump v. Hillary Clinton*, Case No. 22-13410 (11th Cir.), and he has used his fame and following to harass and defame Mr. Strzok and his family as recently as earlier this month.[4] Moreover, he has demonstrated his awareness and willingness to assert the PCP in advance of civil discovery elsewhere. *See, e.g.*, *Trump v. Thompson*, 573 F. Supp. 3d 1, 12 (D.D.C.) (denying preliminary injunction sought by former President Trump to shield discovery of purported privileged material), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 212 L. Ed. 2d 55, 142 S. Ct. 1350 (2022); *see also*

---

[4] *See @Real_RobN*, Twitter (Oct. 1, 2022, 11:25 PM), https://tinyurl.com/krmdxdwa (video of former President Trump at a political rally in Michigan where he defamed Mr. Strzok and accused Mr. Strzok and his "lover" of having a "torrid affair," having an insurance policy to "take out Trump," and asserted that Mr. Strzok and his wife, along with Ms. Page, were "sick" and "dangerous people who are willing to burn every American institution to the ground to target their political opponents"). This appearance came two days after the Department of Justice elected to publicly file a confidential, previously undisclosed draft of the letter terminating Mr. Strzok's employment. Plaintiff received numerous threatening messages because of these events.

Katelyn Polantz, Sara Murray & Evan Perez, *DOJ asks judge to force Trump White House lawyers to testify in Jan. 6 probe*, CNN (Oct. 25, 2022), https://www.cnn.com/2022/10/25/politics/trump-firewall-justice-department-cipollone-philbin-secret-grand-jury. Because the PCP has not actually been asserted by either President Biden or former President Trump, despite the ample opportunity provided by the Court, it has not been properly asserted, and the deposition of former President Trump should proceed.

## II. The PCP Cannot Apply Because Defendants Contend That There Is No Presidential Decision At Issue.

Throughout this case, Defendants have steadfastly maintained that former President Trump played no role whatsoever in the decision to fire Peter Strzok. This assertion dooms defendants' invocation of the PCP, because the privilege can only be asserted to protect communications that occurred "in the process of shaping policies and making decisions." *Nixon II*, 433 U.S. at 449. "[N]o court has suggested that the mere fact that a President's direct involvement in a communication, either as an author or recipient, renders it automatically protected." *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 28 (D.D.C. 2013). The contours of what information can be subject to a valid PCP claim is determined by reference to the fact that the privilege "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities" and is intended to support the President in undertaking his or her enumerated responsibilities including "to take Care that the Laws be faithfully executed." U.S. Const. Art. II § 3; *Nixon II*, 433 U.S. at 447.

The only sworn testimony in the record so far is there was no policy or decision that the Defendants planned to discuss at the January 2018 or June 2018 meetings with President Trump, and Defendants' employees and former employees have maintained that they did not go to the White House to get ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See* Rosenstein Dep. 348:19 – 349:15, 392:14 – 393:5. That apparently did not matter to President Trump, who ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ *id.* at 393:1-2, and according to news reports demanded that the FBI fire Mr. Strzok during at least one of these meetings. *See, e.g.*, Murray Waas, *Trump pressed*

7

*Sessions to fire 2 FBI officials who sent anti-Trump text messages*, VOX (Apr. 20, 2018), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages. Any assertion that President Trump was seeking to comply with his enumerated Article II duties by inserting himself into a process intended to be free from political influence would be absurd.

The PCP simply cannot attach because Defendants are unable to make the threshold showing that the communications at issue were made "in the process of shaping policies and making decisions" and "ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752. To properly assert the privilege, Defendants would have to concede that President Trump was involved in the decision to fire Mr. Strzok, a fact they will not admit.

### III. Even Assuming The PCP Applies, Mr. Strzok's Need Outweighs The Interests In Nondisclosure.

Once the PCP has been properly asserted by a president as to communications within the contours described in *Nixon I* and *Nixon II*, a court must consider "the public interests at stake" and "the need of the party seeking privileged evidence." *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 150. Here, the public has no need to shield testimony concerning demands that President Trump made for Mr. Strzok's termination or assurances that Defendants provided about the outcome of their disciplinary process. Indeed, the public would benefit from compelled testimony. This is also extremely important evidence demonstrating that the FBI yielded to President Trump's demands when it fired Strzok, and there is no means for Mr. Strzok to uncover this testimony by other "due diligence."

#### a. The Public's Interest In Preventing This Discovery Is Minimal Or Nonexistent.

In evaluating the public's interest in maintaining the confidentiality of presidential communications, courts recognize a "continuum" between "military, diplomatic, or sensitive national security secrets" that lend themselves to strong PCP claims and a "broad, undifferentiated claim of public interest in the confidentiality of presidential conversations" that provides a comparatively weak basis for PCP claims. *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 152; *see also*

8

*Nixon II*, 433 U.S. at 447. The communications here concern personnel action against a career civil servant.[5] In essence, the Defendants purport to protect a generalized interest in the confidentiality of presidential advice that they presume President Biden shares by shielding advice that President Trump received (or demands he made) about a decision he was not supposed to influence, and one that the Defendants insist he did not influence. The Court should ascribe this purported interest in confidentiality little weight. *See Dellums*, 561 F.2d at 247.

This weak, generalized interest must be further tempered by additional factors. First, yielding to the public's supposed general interest in the confidentiality of Presidential communications would effectively sanction any President's ability to make indiscriminate private demands for the termination of his perceived political enemies throughout the government. Neither separation of powers interests nor satisfaction of Article II duties would be served by greenlighting such conduct. That would assure President Trump (should he regain the Oval Office)[6] or any successor that such conduct would not be discoverable.

Second, "the public interest in maintaining confidentiality is also diminished by the undisputed fact that there have been public disclosures already made on the subject[.]" *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 153; *see also Nixon v. Sirica*, 487 F.2d 700, 718 (D.C. Cir. 1973) ("public testimony . . . substantially diminishes the interest in maintaining the confidentiality"). President Trump's penchant for demanding terminations and resignations is anything but a secret,[7]

---

[5] Several decisions by courts in this District address precisely the sort of confidential communications that demonstrate the importance of the PCP, but the testimony at issue here is simply categorically different. *See, e.g.*, *Protect Democracy Project, Inc. v. NSA*, 453 F. Supp. 3d 339, 347 (D.D.C. 2020) (Communication "directly related to presidential decision-making with respect to foreign relations and intelligence-gathering activities. . . . [D]eliberations about these decisions and activities are among those principally protected by the presidential communications privilege.") (subsequent history omitted); *Ctr. for Public Integrity v. DOD*, 486 F. Supp. 3d 317 (D.D.C. 2020) (communications concerning foreign affairs).

[6] *See* Jonathan Swan, *A radical plan for Trump's second term*, Axios (July 22, 2022), https://www.axios.com/2022/07/22/trump-2025-radical-plan-second-term.

[7] *See, e.g.*, Michael D. Shear & Matt Apuzzo, *F.B.I. Director James Comey Is Fired by Trump*, N.Y. Times (May 9, 2017), https://www.nytimes.com/2017/05/09/us/politics/james-comey-fired-fbi.html; Peter Baker, Katie Benner & Michael D. Shear, *Jeff Sessions Is Forced Out as Attorney*

and Trump repeatedly publicly demanded Mr. Strzok's termination and took credit for it after the fact. Even the Department of Justice acknowledged, in settling claims brought by FBI Deputy Director Andrew McCabe, that comments by executive branch officials about disciplinary matters concerning a career FBI employee were inappropriate.[8] Testimony on Trump's Oval Office demands that Mr. Strzok be fired is required to ensure those statements are admissible at trial, but confirmation of the accuracy of what has already been reported hardly poses a threat to the Office of the President or the public.

Third, this Court has entered a Protective Order, ECF No. 58, that allows discovery to be maintained as confidential, pending further court order or trial. In the extremely unlikely event that public disclosure of this information would injure the public or the Office of the President, the Court could still prohibit or limit public disclosure. *See United States v. Stone*, 394 F. Supp. 3d 1, 39 (D.D.C. 2019) (ordering some text redacted from public report on basis of executive privilege produced pursuant to protective order); *Fish v. Kobach*, No. 16-2105-JAR, 2017 WL 1373882, at *8, n.58 (D. Kan. Apr. 17, 2017) (noting that documents ordered produced over privilege objections would be subject to protective order).

In sum, Defendants' basis for their PCP claim is a generalized interest that the President has not even asserted, and to the extent such a weak privilege claim can be at all valid, it must be further discounted because the Constitutional needs underlying the PCP do not support its assertion here. The benefit to the public from prohibiting this discovery is vanishingly small, if it exists.

---

*General as Trump Installs Loyalist*, N.Y. Times (Nov. 7, 2018), https://www.nytimes.com/2018/11/07/us/politics/sessions-resigns.html; Charlie Savage, *Inspector General Fired by Trump Urges Whistle-Blowers 'to Bravely Speak Up'*, N.Y. Times (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/us/politics/michael-atkinson-inspector-general-fired.html; Michael S. Schmidt, *Comey and McCabe, Who Infuriated Trump, Both Faced Intensive I.R.S. Audits*, N.Y. Times (July 6, 2022), https://www.nytimes.com/2022/07/06/us/politics/comey-mccabe-irs-audits.html.

[8] 10/24/2021 Settlement Agreement, *McCabe v. Garland*, Case No. 19-2399 (RDM) (D.D.C.), https://tinyurl.com/dn43a83e.

### b. The Public's Interest In Allowing This Discovery Is Significant.

"[T]here is . . . a strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented by a civil action for damages" in some cases. *Dellums*, 561 F.2d at 247. In *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977), the D.C. Circuit found that the PCP was overcome by Plaintiffs' need for discovery aimed at helping to remedy deprivation of liberty and infringement on First Amendment rights, and in *U.S. Department of Treasury v. Pension Benefit Guarantee Corp.*, 351 F. Supp. 3d 140 (D.D.C. 2018), the court similarly found that that the need for discovery to prove alleged violations of ERISA and due process rights overcame the PCP claim, notwithstanding the absence of harm to First Amendment and liberty interests that might usually present as more serious. Here too, Mr. Strzok seeks vindication of important constitutional rights: his right to freedom of speech expressing his political beliefs without reprisal by his employer and the President of the United States, and his right to be afforded the "due process" promised to him by FBI policy and practice before being deprived of his chosen career in public service.

Conversely, the public has no interest in the outcome of this litigation being based on an incomplete record, and it has a significant interest in seeing ample sunlight shown on the unlawful terminations of a career civil servant at the behest of former President Trump. This factor weighs heavily in favor of Mr. Strzok.

### c. This Testimony Is Important To Mr. Strzok's Case.

Mr. Strzok devoted his life to honorably serving this country. He did so as an officer in the Army and then as an FBI Agent who simultaneously served as a Captain in the U.S. Army Reserve. Compl. ¶ 1. His life was thrown into disarray in December 2017 when personal text messages he exchanged with Ms. Page in response to shocking conduct by Presidential Candidate Donald Trump were disclosed without necessary context in a frenzied nighttime release orchestrated by the Department of Justice's press office. Mr. Strzok became a frequent target of President Trump, who accused him of "treason" and repeatedly demanded that the FBI fire him. *See* Opp. to Mot. to Quash or for Protective Order at 2-5, *In re Subpoena Served on Donald J. Trump*, Case No. 1:22-

mc-27-ABJ (Mar. 9, 2022), ECF No. 11. His hope to maintain a career in public service in the aftermath of these events was extinguished in August 2018 when Deputy Director Bowdich exercised authority purportedly delegated to him by Director Wray and made the unprecedented decision to abrogate a Last Chance Agreement that had been accepted by the FBI's Office of Professional Responsibility guaranteeing that Mr. Strzok would not be fired unless he engaged in additional misconduct.

Mr. Strzok filed this case to remedy violations of the rights guaranteed to him by the First and Fifth Amendments to the Constitution of the United States and by the Privacy Act. He intends to prove at trial that he would not have been fired if his text messages had shown a preference for Donald Trump over Hillary Clinton, and relatedly that the FBI ceded to the unrelenting pressure from President Trump and his political allies on Capitol Hill when it fired him. *See* Compl. ¶ 45. Evidence that President Trump summoned senior DOJ and FBI officials to meetings where he demanded that Mr. Strzok be fired (and any information or responses he received) is "important evidence" that is "directly relevant to issues that are expected to be central to the trial." *In re Sealed Case*, 121 F.3d at 754. These are not merely "tangentially relevant" facts that "relate to side issues," nor is Mr. Strzok's request for this testimony based on "mere speculation." *Id.* at 755. Reputable news outlets reported that President Trump made the Oval Office demands that Mr. Strzok be fired and claimed credit for his termination after the fact. The reaction that DOJ and FBI officials had to those demands may also provide critical evidence, particularly given that the FBI proposed dismissing Mr. Strzok on June 15, 2018, apparently within a matter of hours of one of the meetings with Mr. Trump.

Defendants may argue that evidence of the private demands President Trump made to senior FBI and DOJ leaders for Mr. Strzok's termination is not important if Mr. Strzok cannot show that Director Wray or others relayed those demands to Mr. Bowdich. Not so. Mr. Strzok should not be limited to relying on Mr. Bowdich's self-serving testimony or his extremely limited recollection of his conversations with Director Wray, and the record shows that Director Wray and

Mr. Bowdich met regularly and ███████████████████████████████████████.[9] Moreover, because Mr. Bowdich purportedly exercised authority delegated to him by Director Wray when he fired Mr. Strzok, testimony revealing why Director Wray permitted Mr. Bowdich to exercise his authority after the Director's office insisted it would not intervene in Mr. Strzok's disciplinary action may be critical. That could be informed by what Director Wray was told by President Trump in January 2018 or by what Director Wray learned about the June 2018 meeting, particularly given Mr. Bowdich's testimony that ███████████████████ public reports that President Trump had demanded Mr. Strzok's termination in at least one Oval Office meeting were inaccurate. Bowdich Dep. at 202:13-16 ████████████████████████████████ ████████████████████████████████████████████████████████████████.

The second component of the "needs inquiry" is whether the evidence is "not available with due diligence elsewhere." *U.S. Dep't of Treasury*, 351 F. Supp. 3d at 156. This component exists because the PCP can cover information that originates at a lower level of government and might be collected without the need for discovering that the information was conveyed to the President. *See id.* at 159 (proponent should "explain why evidence covered by the presidential privilege is still needed"). It cannot reasonably be applied where, as here, the information originated not from the bowels of the government, but from the President himself. Because the information here was a private Presidential communication in the first instance, there is no chance it exists in a government repository that the Defendants will concede is not covered by the PCP.

## IV. The DPP Has Not Been Properly Asserted.

As noted above, the assertion of the DPP requires "(1) a formal claim of privilege by the 'head of the department' having control over the requested information; (2) assertion of the

---

[9] *See, e.g.*, Bowdich Dep. at 161:15 – 162:9 ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege." *Landry*, 204 F.3d at 1135. The only person known to have control of the testimony that Mr. Strzok would acquire at Director Wray's deposition is Director Wray. The rule is that "to avoid waiving the privilege, defendant must make a detailed argument, including affidavits from the proper governmental authorities, in support of the privilege." *Doe v. D.C.*, 230 F.R.D. 47, 51 (D.D.C. 2005). Mr. Lynch (who signed Defendants' October 18, 2022 submission) is an able attorney who is familiar with the facts of this case, but the submission attached no assertion, let alone an affidavit, that he or anyone else has consulted Director Wray or determined precisely what his testimony would be before declaring it privileged.

### V. Mr. Strzok's Need Overcomes Defendants' Invocation of the DPP To Present Testimony On Mr. Bowdich's Participation In Reviewing, Proposing Edits To, And Responding To OIG's Midyear Report.

The OIG's Midyear Review Report is a critical document in this case because it referred Mr. Strzok to the Office of Professional Responsibility ("OPR") for discipline and was the accepted factual record for OPR's decision *not* to fire Mr. Strzok. Mr. Bowdich appears to have proposed edits to OIG's Midyear Report on behalf of the FBI and helped compile the FBI's official response to the report even though his conduct was under review. Mr. Strzok does not dispute that deliberations about how the FBI should respond to the OIG Midyear Report would be "predecisional and deliberative." The presumptive privilege is, however, overcome as to testimony related to Mr. Strzok or the extent of Mr. Bowdich's biases and conflict of interest.

Mr. Strzok is interested in Mr. Bowdich's use of his authority to respond and propose edits to the Midyear Review Report for two reasons. First, because Mr. Bowdich's own conduct was under review, Mr. Bowdich was conflicted throughout the process that culminated in Mr. Strzok's termination. Among other actions, the OIG investigated Mr. Bowdich's involvement in the sequence of events surrounding a delay in pursuing emails on the laptop of Anthony Weiner, including his participation in several meetings throughout October 2016 where the existence of thousands of emails on the laptop was discussed. Ultimately, Mr. Bowdich fired Mr. Strzok for

offenses that included delay in pursuing those emails, effectively laying blame for the delay at Mr. Strzok's feet when numerous FBI employees including Mr. Bowdich were aware of or contributed to the delay. Second, Mr. Bowdich has quibbled with the FBI and OIG's determination that Mr. Strzok's political views did not affect any official actions, a hesitance that aligns with false narratives that have been promulgated by the leaders of Mr. Bowdich's political party. Mr. Bowdich's views and actions when preparing the official FBI response, which recognized that none of Mr. Strzok's official actions were "in any respect, the result of bias or improper considerations," Midyear Review Report, Attachment B, FBI Response at 1, is relevant to when and why Mr. Bowdich started resisting this fact.

The Court should permit questioning of Director Wray and other witnesses about these topics because Mr. Strzok has forcefully alleged that the Defendants violated his Constitutional and Privacy Act rights. When "there is 'any reason' to believe the information sought may shed light on government misconduct, public policy (as embodied by the law) demands that the misconduct not be shielded merely because it happens to be predecisional and deliberative." *Alexander v. FBI*, 186 F.R.D. 154, 177-78 (D.D.C. 1999) (quoting *In re Sealed Case*, 121 F.3d at 746). There are many reasons to believe there was government misconduct here. Additionally, a balancing of the public's interests and Mr. Strzok's favors allowing Mr. Strzok to collect answers to these questions. Defendants have not made any showing that they will suffer harm from providing answer to the questions at issues, and "a series of boilerplate and generic assertions that release of any deliberative material would necessarily chill internal discussions" is insufficient. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370.  The outcome of this litigation is critical to Mr. Strzok, and the public's interest is to see it decided on a record that is complete.

Dated: October 28, 2022

Respectfully submitted,

*/s/* Aitan D. Goelman
Aitan D. Goelman (D.C. Bar 446636)
Christopher R. MacColl (D.C. Bar 1049153)
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1849
AGoelman@zuckerman.com
CMacColl@zuckerman.com

Richard A. Salzman (D.C. Bar 422497)
HELLER, HURON, CHERTKOF &
SALZMAN PLLC
1730 M Street NW, Suite 412
Washington, DC 20036
Telephone: (202) 293-8090
salzman@hellerhuron.com

*Counsel for Plaintiff Peter Strzok*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2022, I caused to be served copies of the above **PLAINTIFF PETER STRZOK'S BRIEF ON THE INAPPLICABILITY OF EXECUTIVE PRIVILEGES TO TESTIMONY RELEVANT TO HIS CLAIMS** on all counsel of record in the above-captioned actions via e-mail.

/s/ Aitan D. Goelman<br>
Aitan D. Goelman (D.C. Bar No. 446636)