```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3     Peter Strzok,                )  Civil Action
                                    )  No. 19-cv-2367
 4                    Plaintiff,    )
                                    )  STATUS CONFERENCE
 5     vs.                          )  PUBLIC
                                    )
 6     Merrick B. Garland, et al.,  )  Washington, DC
                                    )  February 23, 2023
 7                    Defendants.   )  Time:  10:00 a.m.
       -------------------------------------------------------
 8     Lisa Page,                   )
                                    )  Civil Action
 9                    Plaintiff,    )  No. 19-cv-3675
                                    )
10     vs.                          )  STATUS CONFERENCE
                                    )  PUBLIC
11     U.S. Department of Justice,  )
       et al.,                      )  Washington, DC
12                                  )  February 23, 2023
                      Defendants.   )  Time:  10:00 a.m.
13     _____

14                  TRANSCRIPT OF STATUS CONFERENCE
                            HELD BEFORE
15           THE HONORABLE JUDGE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE
16     _____

17                     A P P E A R A N C E S

18     For Plaintiff
         Strzok:         Christopher MacColl
19                       Aitan D. Goelman
                         ZUCKERMAN SPAEDER LLP
20                       1800 M St. NW, Suite 1000
                         Washington, DC 20036
21                       (202) 778-1849
                         Email:  Cmaccoll@zuckerman.com
22                       Email:  Agoelman@zuckerman.com

23                       Richard A. Salzman
                         HELLER, HURON, CHERTKOF & SALZMAN, PLLC
24                       1730 M Street, NW, Suite 412
                         Washington, DC 20036
25                       (202) 293-8090
                         Email: Salzman@hellerhuron.com
```

```
1     For Plaintiff
        Page:              Kaitlin Brooke Konkel
2                          Robert J. Katerberg
                           ARNOLD & PORTER KAYE SCHOLER LLP
3                          601 Massachusetts Avenue, NW
                           Washington, DC 20001
4                          (202) 942-5757
                           Email: Kaitlin.konkel@arnoldporter.com
5                          Email: Robert.katerberg@arnoldporter.com

6     For Defendants:      Joshua Charles Abbuhl
                           Michael Gaffney
7                          Bradley Humphreys
                           U.S. DEPARTMENT OF JUSTICE
8                          1100 L Street, NW
                           Washington, DC 20005
9                          (202) 616-8366
                           Email:  Joshua.abbuhl@usdoj.gov
10                         Email:  Michael.J.Gaffney@usdoj.gov
                           Email:  Bradley.humphreys@usdoj.gov

11

12     _____

13    Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
14                            United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
15                            Washington, DC  20001
                              202-354-3267
16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Good morning, Your Honor,
 2    pursuant to order, this is a sealed hearing, the courtroom has
 3    been closed.  This morning we have civil action number 19-2367,
 4    Peter Strzok versus Merrick v. Garland, et al. and civil action
 5    number 19-3675, Lisa Page versus the United States Department
 6    of Justice, et al.
 7              Will one attorney representing plaintiff Strzok
 8    please approach the lectern and identify yourself and your
 9    colleagues for the record, followed by plaintiff Page, followed
10    by the government.
11              MR. MacCOLL:  Good morning, Your Honor.  Christopher
12    MacColl, with Zuckerman, Spaeder, for Mr. Strzok.  Also with me
13    in the courtroom today is Richard Salzman, with Heller, Huron;
14    Aitan Goelman, also with Zuckerman, Spaeder, and; Mr. Strzok
15    himself.  Thank you, Your Honor.
16              THE COURT:  All right.  Good morning.
17              MR. SALZMAN:  Good morning.
18              MS. KONKEL:  Good morning, Your Honor.  I'm Kaitlin
19    Konkel for plaintiff Lisa Page.  I'm here with Ms. Page and my
20    colleagues Robert Katerberg and Amy Jeffress, from Arnold &
21    Porter.
22              THE COURT:  All right.  Good morning.
23              MR. ABBUHL:  Good morning, Your Honor.  My name is
24    Joshua Abbuhl, with the Department of Justice.  With me, also
25    from the Department of Justice, is Michael Gaffney, Bradley
```

1    Humphreys, Marcia Berman, Christopher Hall.  And from the FBI,

2    Pooja Patel and Marisa Ridi.

3         THE COURT:  Good morning, everybody.  The hearing was

4    originally prompted by the fact that there's some discovery

5    disputes that we need to iron out and you contacted chambers,

6    as I asked you to do.  And I'm going to get to those, but I've

7    also been wanting to get to a lot of other matters, and thought

8    since I was going to be talking to you, I might as well talk to

9    you about everything.

10        So we do have the miscellaneous matter that was filed

11   on January 24th of 2022, the motion to quash the former

12   President Trump's deposition subpoena.  Then there was a motion

13   at docket 75 to quash the deposition subpoena of Christopher

14   Wray.  A lot of supplementary information was provided by both

15   sides in support of all of that.

16        I held a hearing last August where I granted the

17   motion to quash the deposition notices and subpoenas insofar as

18   how the depositions would be sequenced, but left open the

19   question of whether they would happen at all.  And I ordered

20   that the depositions of FBI Deputy Director David Bowdich and

21   Deputy Attorney General -- former Deputy Attorney General Rod

22   Rosenstein take place first.

23        Then the parties were supposed to file supplemental

24   pleadings telling me how any information gathered in those

25   exercises would bear on the resolution of the Apex Doctrine

1    issue.  And I also said, looking forward to the executive

2    privilege issues that we were going to have to resolve, why

3    don't we start identifying what the questions are that we want

4    to ask in these depositions.  And then I asked whether the

5    government was going to assert its executive privilege in

6    response to those questions.  And I also ordered the parties to

7    set forth legal arguments about the applicability of the

8    executive privilege.

9           All that briefing has taken place.  The government

10   filed -- the plaintiffs filed their notice of supplemental

11   questions, of questions that they wanted to ask and the areas

12   inquires and the -- then the government responded to the areas

13   of inquiry at the depositions and said I think this is

14   privilege, this is privilege, this isn't.

15          We got the briefs on executive privilege, and then I

16   issued another order, in light of a status report back in

17   December, that said plaintiffs have to provide the defendants

18   with lists of 30(b)(6) topics and you can let me know if

19   there's any disputes with respect to some of the topics.  And,

20   unsurprisingly, that happened.

21          And, so, that's the discovery dispute that prompted

22   the status conference.  Now there's also a discovery dispute

23   with respect to documents that are being requested of Ms. Page.

24          So what's on the table, as far as I can tell, are the

25   Apex Doctrine rulings left open as to former President Trump

1    and Christopher Wray -- prior to which I required the

2    completion of other depositions -- the executive privilege

3    questions, and the discovery disputes.  And this is all

4    intertwined.  It's something like a law school issue-spotting

5    exercise, which one are you going to take up first?  And I'm

6    going to take them up in that order because that turned out to

7    be the easiest way for me to think about all of it.

8         With respect to the Apex Doctrine, I put the law on

9    the record in the August 22nd, 2022 hearing.  The rule

10   explained by the Supreme Court in *United States versus Morgan*,

11   313 U.S. 409, from 1941, which is regularly enforced in this

12   circuit, is the top executive department official should not,

13   absent extraordinary circumstances, be called to testify

14   regarding their reasons for taking official actions.

15        Consistent with that, it's well-established in this

16   circuit that a party attempting to depose a high-ranking

17   government official must demonstrate the extraordinary

18   circumstances requiring such a deposition.  The test is that

19   those officials are generally are not suject to depositions

20   unless they have some personal knowledge about the matter and

21   the party seeking the deposition makes a showing that the

22   information cannot be obtained elsewhere.

23        That's also been expressed as:  Unless the official

24   has unique firsthand knowledge related to the litigated claims

25   or that the necessary information can't be obtained through

1    other, less burdensome or intrusive means.

2              The Apex Doctrine is supposed to protect the

3    integrity and the independence of the government's decision-

4    making processes, and it permits high-ranking government

5    officials to perform their official tasks without disruption or

6    diversion.  Separation of powers concerns are part of the

7    context and the underpinning for the ruling.

8              But in *Clinton versus Jones*, 520 U.S. 681, at 705,

9    the Supreme Court recognized that separation of powers does not

10    bar every exercise of jurisdiction over the President of the

11    United States, and in that case they were talking about

12    deposing a sitting president.

13              One of the officials involved is a former official,

14    the former President.  But that alone is not dispositive.

15    There are three rationales for the protection of the Apex

16    Doctrine.  First, in *Morgan*, the Supreme Court instructed that

17    the integrity of the administrative process must be equally

18    respected with that of judicial decision making, cautioning

19    against probing the mental processes of highly ranking agency

20    officials.

21              And this will one bears on the issue, but it doesn't

22    fall squarely within the heartland of what the purpose of the

23    rule is, this case doesn't.  Because we're talking about an

24    employment decision, as opposed to agency policy.  And it was

25    an employment decision that was already being played out in the

1    public eye, with public statements, as the -- that the

2    President chose to disseminate along the way.  And the

3    government keeps telling me, it wasn't the President's decision

4    to make anyway.

5            Second, the doctrine ensures that high-ranking

6    government officials are permitted to perform their official

7    tasks without disruption or diversion.  This one doesn't apply

8    to the former President as strongly as it would bear directly

9    on Christopher Wray.  And, third, the Court said, A contrary

10   rule might discourage otherwise upstanding individuals from

11   public service.

12           I note the courts in this district have consistently

13   held that the Apex Doctrine is no less applicable to former

14   officials than to current officials.  Even though, they say,

15   the rationale based on interference with official duties is

16   absent, the other two rationales apply to former officials and

17   current officials with equal force.

18           But the doctrine doesn't bar all testimony by either

19   group of people.  The doctrine only forecloses the deposition

20   of officials who lack relevant knowledge that can't be obtained

21   from other witnesses, or through less burdensome or obtrusive

22   means.

23           I deferred to the Trump and Wray decisions until

24   Bowdich and Rosenstein could be deposed and I've reviewed all

25   of your subsequent submissions.

1              When the Bowdich deposition was described, frankly it
2      was like I was reading about two different depositions.  So I
3      have now read every single word of it myself.  And I've read
4      the entire Rosenstein deposition myself.  And I have to tell
5      you, the Wray deposition -- I mean, the Bowdich deposition,
6      when we're talking about whether Christopher Wray should be
7      deposed, I don't read it the way plaintiffs attempt to
8      characterize it.

9              At page 33 the witness testified that he personally,
10     strongly, disagreed with the Will decision.  It's true, as
11     plaintiffs point out, the frequent meetings between the
12     director and the deputy gave, as they put it, ample opportunity
13     to learn of any pressure being applied by the President.  But
14     Bowdich testified, at pages 201 to 202, that he absolutely did
15     not recall being told by Christopher Wray the President had
16     pressured him to fire Mr. Strzok, which is -- who was the
17     subject of the motion to quash -- and that he tried to keep
18     Mr. Wray out of the process.

19             I don't believe that leaves much wiggle room at all
20     for a factfinder to conclude that he did what he did because
21     Christopher Wray told him to or because Christopher Wray
22     conveyed a message from the then President, or because he
23     thought the President had directed him to.

24             Indeed, the former President was quite vocal and
25     public about what he wanted, in any event, and it wasn't

1    necessary for Mr. Wray to tell anybody what the President was

2    thinking.  But, more importantly, Mr. Bowdich expressed strong

3    opinions of his own.  He emphasize the very high-profile nature

4    of the case under investigation and the high level of the

5    employees involved.

6           He emphasized the impact of the text messages on an

7    investigation that would be subject to enormous public scrutiny

8    and the impact of the messages on the reputation and

9    credibility of the agency as a whole, which, according to the

10   deposition, in the deponent's mind ultimately outweighed the

11   credit due to the plaintiff's reputation and history of

12   exemplary service at the very highest levels of the agency.

13          Indeed, some of that prominence was why he felt that

14   strong action was necessary.  Whether that's credible or not is

15   not for me to say.  How it would bear on the constitutional

16   claims, if found to be credible and true, is not before me or

17   up to me either.

18          I also read the Rosenstein deposition and it isn't

19   particularly illuminating on the issues in this case regarding

20   the Strzok termination or any other issues.  There are pages

21   and pages of questions about other issues before we even get to

22   the termination, such as the appointment of the Special

23   Counsel, the President's reaction to Comey and the Clinton

24   email issues.  There are many questions from Ms. Page's counsel

25   regarding the Privacy Act issues that aren't the focus of the

1    motions to quash, before we get to the questions about the

2    termination of Mr. Strzok.

3          Mr. Rosenstein said he didn't attend the January 26,

4    2018 meeting with the President, Attorney General Sessions, and

5    Christopher Wray, he didn't know who did, he didn't know the

6    contents of the meeting.  He didn't recall being at the January

7    23rd meeting, he didn't recall if he had discussions about it

8    with Mr. Sessions or Mr. Wray.  He was not a good alternative

9    source of information.  So the deposition didn't do much to

10   support the notion that testimony sought was available

11   elsewhere, because it wasn't available from him.

12         He attended the June 15, 2018 meeting about the IG

13   report.  He said repeatedly that he didn't remember comments by

14   the President regarding the plaintiff or regarding firing him.

15   But he did say that the President had said it all publicly, in

16   any event.  He said it was possible that statements were made.

17   And he offered that if the President did say anything, that he,

18   Mr. Rosenstein, viewed it as an opinion and not an order.  He

19   said the President probably discussed Mr. Strzok, but he

20   couldn't recall or distinguish between what the president had

21   said publicly versus what he said in the Oval Office.  And he

22   denied any knowledge of or involvement in Mr. Bowdich's

23   decision.

24         So that's the background I have before ruling on the

25   Apex Doctrine issues.  And I do find that the case presents

1    extraordinary circumstances.  Given the facts that the firing

2    decision was made at the highest level of the Department

3    immediately under Director Wray, that it varied from the

4    procedure that had been established and allegedly varied from

5    agency regulations, that it varied from the decision of the

6    officially designated decision maker, and that it varied from

7    an agreement offered to and accepted by the plaintiff, and the

8    fact that the proposed questions, or at least the proposed

9    questions as I plan this morning to narrow them, will not probe

10    the operations or decisions made by the FBI, other than with

11    respect to this one employment decision.

12         I will permit a two-hour deposition of the

13    exceedingly busy Christopher Wray.  And the motion to quash his

14    deposition completely based on the Apex Doctrine alone will be

15    denied.  I note, and it's very important to emphasize, that

16    that is not a ruling on the privilege issues.  That is just a

17    ruling on whether a deposition can happen at all.

18         I also note that even if Mr. Bowdich was clear that

19    the decision was his and not the director's the procedures that

20    were followed raise questions about how he became the

21    designated decision maker under the unique circumstances

22    involved.

23         I will say, now that I've given you two hours, that

24    I've read a few deposition transcripts now and I would

25    recommend that counsel utilize that opportunity to ask open-

1    ended questions and glean information rather than to ask

2    argumentative questions advancing their own theory.  You don't

3    have a lot of time to waste.

4         What about the deposition of former President Trump?

5    The utility of and the necessity for that deposition is less

6    clear.  His views on the subject were broadly communicated.

7    The defendants insist that there is a lack of any evidence

8    suggesting the former President influenced the actual decision

9    maker.  They say that at docket 101, at page 3.

10        But the President's own contemporaneous and recent

11   statements concerning his role make the inquiry legitimate and

12   likely to lead to relevant evidence that can't be obtained

13   elsewhere, even if it isn't ultimately fruitful.  It is of some

14   relevance if he expressed his viewpoint or issued directives

15   during meetings in the Oval Office.

16        Although, even if he were to take credit for the

17   firing, as he did then, and apparently again recently, there

18   would still be a question for the factfinder as to whether to

19   credit his assertions on that point, given Bowdich's testimony

20   and whatever Wray has to say, and whatever else may bear on his

21   credibility.  But he has fewer concerns in terms of any risk

22   that the time devoted to the deposition would take him away

23   from his official duties.  The Apex Doctrine still applies and

24   I'm not ruling solely on the basis that he is a former

25   official.

1          But the considerations underlying the doctrine are

2     much weaker in this case.  I can take note of the public fact

3     that he has personally initiated civil lawsuits during his post

4     presidency period and that suggests that his schedule as a

5     former president and current candidate can withstand the modest

6     demands on his time that a deposition would impose.

7          Also, narrowing the topics, as I plan to do, can

8     ameliorate the potential impact on people being willing to work

9     in the government in the future, notwithstanding the fact that

10    this deposition will proceed.

11         So now I've read through the proposed areas of

12    questioning at docket 91-5 and the defendant's response at

13    docket 101 and the briefs on executive privilege.  And while I

14    will permit the depositions, I will require that they be

15    narrowly tailored and limited to the following of the topic

16    areas identified.

17         And as I go through each of these topics, basically

18    I'm pulling them from docket 91-5, plaintiff Strzok's notice of

19    filing of Rosenstein deposition transcript and listing of

20    inquiry areas for depositions at issue in the motion to quash.

21    And you'll find that, to the extent possible, I'm following the

22    order of the topics listed in that and in the government's

23    response.

24         Questions regarding the January 22nd, 2018 meeting

25    are permitted for both the Trump and Wray depositions, but only

1    with respect to discussions at that meeting of the text

2    messages between the two plaintiffs or the two plaintiffs in

3    general, disciplining them, investigating them, et cetera.

4           With respect to the January 23rd, 2018 meeting, those

5    questions are also permitted but, again, only with respect to

6    any discussions of the plaintiffs.

7           The June 15th, 2018 meeting was about the Inspector

8    General's report on the midyear investigation.  But, again, the

9    deposition cannot be that broad.  It has to be limited to any

10   discussion of the fate of the plaintiffs, their employment

11   status or likely discipline.  Plaintiffs may not ask the former

12   President or Christopher Wray about what they said, quote, any

13   policy or other decisions being deliberated at that meeting,

14   close quote.  They can ask Mr. Wray what, if anything, he then

15   communicated to Bowdich with respect to the two plaintiffs.

16          And, again, these are not privilege rulings, these

17   are Apex Doctrine rulings.  This is the scope of the deposition

18   I'm letting you take.

19          The plaintiffs can ask the former President about his

20   own public statements and communications about the plaintiffs

21   between December 2nd, 2017 and June 15, 2018, as well as

22   between June 15, 2018 and August 10, 2018, as well as any

23   related communications about his statements with the Department

24   of Justice or the FBI.

25          The proposed questions concerning understandings that

1    others in the White House may have had about his communications

2    are excluded.  If the testimony is that he was not informed

3    that OPR decided not to fire the plaintiff, then there can be

4    no questions about what his reaction would have been if he had

5    been informed because that would simply call for speculation.

6         Communications following August 10, 2018, that

7    category of questions with respect to the Trump deposition is

8    okay.  The source of the disclosure of the text to the press,

9    the claim really is about the later disclosure, what happened

10   when the press was called and given the text.  So I'm not sure

11   that that is appropriate.  It seems to go beyond the scope of

12   what we need to get to.

13        He can be asked if he retained the text messages,

14   where he got them, what he did with them, although I think it

15   has limited relevance to the complaint and there's no need to

16   get into what other people are doing with the text messages.

17        With respect to Mr. Wray, the fourth category of

18   questions, Mr. Bowdich's participation in the midyear report,

19   I'm not going to permit questions about that.  I don't believe

20   that the description of Bowdich's testimony offered in support

21   of this category in footnote 5 of the document is accurate.

22   When asked about the statement made by Mr. Wray when

23   transmitting the IG report, there was no evidence of any bias

24   affecting the investigation.  Mr. Bowdich's answer was, "I hope

25   that's true."

1          I don't think you can get from that to what the

2     plaintiff said, quote, Bowdich seemed to disclaim the FBI's

3     official position, suggesting a personal belief more alined

4     with his own political affiliation may have informed his

5     decision to terminate the plaintiff, close quote.  That's maybe

6     something you want to argue and that may be up to the jury to

7     decide.  That is a very thin read upon which to authorize an

8     inquiry into this topic, given the Apex Doctrine, and it

9     doesn't support it.  So those questions aren't going to be

10    asked.

11         There were other questions proposed for Christopher

12    Wray only about his statements about following established

13    procedures, and that is an acceptable topic for his deposition.

14    Also, questions about how the authority was delegated to

15    Mr. Bowdich are permissible.  I don't believe that questions

16    about conversations about plaintiff Strzok's security clearance

17    are.  They're not as -- they're not close to the heart of the

18    claims and the necessity hasn't been established.  If you want

19    to know why Attorney General Sessions said what he said, then

20    depose Sessions.

21         Finally, questions touched upon in the Rosenstein

22    deposition such as conversations between the President and

23    Mr. Wray about -- or with the Attorney General about Mr. Comey,

24    about the firing of McCabe, about Crossfire Hurricane in

25    general, about the midyear review in general and the security

1    clearances, they're all off limits.  The parties have not made

2    the necessary showing of need under the Apex Doctrine to go

3    beyond the specific issues in this case.

4          As I said, this is solely a ruling on the Apex

5    Doctrine, not executive privilege.  But that brings us to a

6    critical point, which is whether the depositions would be an

7    empty exercise.

8          So what is the executive privilege?  There's two

9    aspects of the privilege at stake here.  Presidential

10   communications privilege, which would cover conversations with

11   former President Trump directly and conversations conveying the

12   information received directly from Mr. Trump to others.  It is

13   the primary privilege at stake in the Trump deposition.

14         The presidential communications privilege, though, is

15   also at stake in the Wray deposition.  But the Wray deposition,

16   in addition, raises real concerns about the deliberative

17   process prong of the executive privilege involving an internal

18   agency decision.

19         What is the presidential communications privilege,

20   the seminal case?  As everyone in this room knows, is

21   *United States versus Nixon*, 418 U.S. 683, from 1974.  The court

22   said that the confidentiality of a President's conversations

23   and correspondence is necessary for, quote, protection of the

24   public interest and candid, objective, and even blunt or harsh

25   opinions in Presidential decision making.  A President and

1    those who assist him must be free to explore alternatives in

2    the process of shaping policies and making decisions, and to do

3    so in a way many would be unwilling to express accept

4    privately.  These are the considerations justifying a

5    presumptive privilege for Presidential communications.  The

6    privilege is fundamental to the operation of government and

7    inextricably rooted in the separation of powers under the

8    Constitution.

9          The court also noted, though:  However, neither the

10   doctrine of separation of powers, nor the need for

11   confidentiality of high-level communications, without more, can

12   sustain an absolute, unqualified Presidential privilege of

13   immunity from judicial process under all circumstances.  The

14   President's need for complete candor and objectivity from

15   advisers calls for great deference from the courts.  However,

16   when the privileged depends on the broad, undifferentiated

17   claim of public interest in the confidentiality of such

18   conversations, a confrontation with other values arises.

19         You can't ignore the fact, though, that the *Nixon*

20   opinion and the balancing against other values in which that

21   court was engaged was in the context of a request, yes, for a

22   specific set of records, but in a criminal investigation.  And

23   the Supreme Court emphasized that frequently.

24         Thereafter, in *Nixon versus Administrator of the*

25   *General Services*, 433 U.S. 425, at 449, in 1977, after

 1   discussing the fact that the former President, in that case

 2   Nixon, retained the privilege, although the incumbent

 3   President's view might carry more weight, the Supreme Court

 4   summed up its previous decision and said:  The appellant may

 5   legitimately assert the presidential privilege, of course, only

 6   as to those materials whose contents fall within the scope of

 7   the privilege recognized in *United States versus Nixon*.

 8           In that case the Supreme Court said, talking about

 9   its own opinion:  The court held that the privilege is limited

10   to communications in performance of a President's

11   responsibilities of his office and made in the process of

12   shaping policies and making decisions.  That was the court's

13   own gloss on its own opinion.

14           More recently, Justice Kavanaugh also emphasized the

15   fact that the privilege is not absolute in his concurrence in

16   the denial of the cert petition in *Trump versus Thompson*, at

17   211 L.Ed.2d 579, 142 S.Ct. 680, at page 681, it's in 2022.  He

18   took the position that a former President could, as a matter of

19   law, invoke the privilege.  But then he added:  To be clear, to

20   say that a former President can invoke the privilege for

21   presidential communications that occurred during his presidency

22   does not mean that the privilege is absolute or cannot be

23   overcome.

24           The test set forth in *Nixon*, at page 713, and *Senate

25   Select Committee on Presidential Campaign Activities versus*

1   *Nixon*, 498 F.2d 725, at 731, an en banc decision from this

2   circuit, may apply to a former President's privilege claim as

3   they do to a current President's privilege claim.

4           Moreover, he said, it could be argued that the

5   strength of a privilege claim should diminish to some extent as

6   the years pass after a former president's term in office.

7           The D.C. Circuit, in *Trump versus Thompson*, 20 F.4th

8   10, had also noted that the incumbent President is the one in

9   the best position to assess the present and future needs of the

10  executive branch, that in past cases in the circuit the current

11  President's views were found to control, but that either

12  President's privilege was a qualified one, in any event.

13          The law is also clear that the deliberative process

14  privilege, the other prong of the executive privilege, is also

15  a qualified one. *In re:  Sealed Case*, at 121 F.3d 729, which

16  arose out of the Special Counsel investigation into Mike Espy.

17  In that case the court held:  Courts must balance the public

18  interests at stake in determining whether the privilege should

19  yield in a particular case, and must specifically consider the

20  need of the party seeking privileged evidence.  This is the

21  D.C. Circuit -- whose opinions bind me -- speaking.

22          It said that an analysis involves determining whether

23  plaintiff's need for the documents outweighs the defendant's

24  need to protect he them.  To resolve this question, the court

25  has to balance the competing interests on a flexible, case by

1    case, ad hoc basis, considering such factors as the relevance

2    of the evidence, the availability of other evidence, the

3    seriousness of the litigation or investigation, the harm that

4    could flow from disclosure, the possibility of future timidity

5    by government employees, and whether there was a reason to

6    believe that the documents would shed light on government

7    misconduct, all through the lens of what would advance the

8    public's, as well as the parties', interests.

9         The *Espy* case makes it clear that the presidential

10   communication privilege is not, like the deliberative process

11   privilege, limited to pre-decisional communications.  No

12   particular decision needs to be identified.

13        The deliberative process privilege does require a

14   decision, but the precedent that governs in this circuit does

15   not hold that the privilege is limited to deliberations

16   concerning the formulation of policy.  It's been extended to

17   cover mundane operational matters such as the selection of

18   contractors and even internal deliberations about public

19   relations or how to respond to congressional inquiries.

20        So we have all of that to consider in this case.  But

21   judges do not issue advisory opinions or rule on hypothetical

22   questions.  Indeed, I don't have subject matter jurisdiction

23   under Article III to do that.  And this concept applies with

24   particular force when the question is a constitutional one that

25   raises the real possibility of conflict between the judicial

1    and executive branches.  So you don't wade into that if you

2    don't have to and that issue is not ripe for adjudication and I

3    absolutely shouldn't consider it or rule on it or hint about

4    how I'm going to rule on it unless and until the issue is

5    joined.

6            And that is why I issued an order that plaintiff

7    Strzok must outline the proposed areas of inquiry in advance

8    and then said:  The defendants must respond to that notice,

9    identifying all questions to which they intend to assert

10   executive privilege, specifying as to each whether they are

11   asserting the presidential communications or deliberate process

12   prong privilege, or both.

13           That order seemed to have been in English, as far as

14   I could tell.  The government responded, though:  In the

15   ordinary course, the government would object, the party would

16   move to compel, and then the government would consult the

17   incumbent president regarding privilege.  Accordingly, the

18   defendants understand the current briefing to serve the

19   function of identifying where defendants would raise such

20   objections in the first instance, giving the presumptive

21   privileged nature of some possible answers to the proposed

22   questions, to preserve the President's ability to perfect the

23   privilege.

24           That wasn't how I understand my order.  And the

25   defendants didn't make any attempt to seek clarification.  You

1    just handled it how you wanted to handle it.

2         As to the presidential communications prong of the

3    executive privilege in this case, we are already talking about

4    a very narrow universe of conversations; conversations between

5    the President and the Attorney General or the FBI Director

6    about one subject:  Whether the plaintiff should be fired.  And

7    potentially, conversations the FBI Director had or may have had

8    with his subordinates in which he relayed those conversations,

9    if there were any, and if there were any conversations in which

10   he relayed them.

11        The point of the order was to get clarification in

12   advance as to where there would be a point to the deposition at

13   all, which was somewhat intertwined in the Apex Decision.  What

14   I got was an extremely vague set of statements regarding the

15   privilege that could potentially be asserted.

16        The defendant said, in docket 95 in response to

17   plaintiff's notice, quote, Most of the questions proposed to

18   ask about nonpublic conversations of former President Trump

19   with his advisors, some or all of which may have been in the

20   service of presidential decision making.  But, really, not very

21   clear or helpful.

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████



13    In any event, the defendant's presidential

14    communications memo, at docket 111, said:  Perfection of the

15    presidential communications privilege would require

16    consultation with the sitting President, which should be

17    required, if ever, only in the context of a motion to compel

18    specific deposition testimony and after the court has ruled on

19    the defendants' motions to quash.

20            They also insisted that I needed to have a deposition

21    transcript first, so that I could rule on a question-by-

22    question basis.  I don't believe that order of operations is

23    required, but I've now ruled on the motion to quash insofar as

24    it's based on the Apex Doctrine.  So the question is:  Do we

25    have to have the deposition first, before I can even rule on

1    executive privilege, as the government insists?  I read all of

2    the cases you cited and they do not establish such a clear-cut

3    requirement.  A defendants rely primarily on *Cheney versus U.S.*

4    *District Court for the District of Columbia*, 542 U.S. 367, from

5    2004, but that does not seem to control.

6         This is different from the *Cheney* situation in which

7    the district court had ordered the then currently serving

8    vice president and other federal officials to provide discovery

9    about a panel created under the auspices of the vice president,

10   the National Energy Policy Development Group.  The

11   vice president brought a mandamus action to stop the case and

12   the discovery.  The District Court denied it, the Court of

13   Appeals denied mandamus on the grounds that the vice president

14   could have invoked executive privilege in the district court,

15   so there was no need for the extraordinary writ of mandamus.

16   And they said that the vice president should have had to

17   provide detailed specific objections before the issue made its

18   way up to them, the Circuit.

19        But the Supreme Court sent it back down.  It

20   emphasized that given the separation of powers concerned --

21   separation of powers concerns underline the privilege, the

22   default position is that you afford the presidential

23   confidentiality the greatest possible level of protection.  It

24   also emphasized that while the *Nixon* case did say that

25   privilege was not absolute, *Nixon* involved a request for

1    information in a criminal case and it specifically

2    distinguished that situation from a civil case where the

3    party's need for the information is not as great.

4            In addition to the need for the information, though,

5    the Supreme Court also considered the burden imposed by the

6    discovery order.  It differentiated civil from criminal because

7    it said, well, criminal cases have been through some process

8    first, that anybody could file a meritless claim against the

9    government.  Here, though, the claimants have already been

10   scrutinized by a court for facial validity and have been

11   permitted to move forward.

12           Most important though, what the Supreme Court was

13   concerned about in *Cheney* was the broad scope of the discovery

14   being requested.  It was a broad swath of document requests and

15   interrogatories, et cetera.  And it said that the *Nixon* opinion

16   did not impose a burden on the government to object on a

17   question-by-question, document-by-document basis.

18           The *Cheney* court said:  Given the breadth of the

19   discovery requests in this case compared to the narrow subpoena

20   orders in *United States versus Nixon*, our precedent provides no

21   support for the proposition that the Executive Branch shall

22   bear the burden of invoking executive privilege with sufficient

23   specificity and of making particularized objections.  To be

24   sure, *Nixon* held that a President cannot, through the assertion

25   of a broad and undifferentiated need for confidentiality

1    withhold information.  But it did so only after the party

2    requesting the information, the Special Prosecutor, had

3    satisfied his burden of showing the propriety of the request.

4           So the *Cheney* court pointed out that the Court of

5    Appeals had acknowledged in that case that the discovery

6    requests were not appropriate.  They were too broad.  And in

7    those circumstances, the Supreme Court said in *Cheney*, Nixon

8    does not require the executive branch to bear the onus of

9    critiquing the unacceptable discovery requests line by line.

10          *Cheney* also involved concerns with disrupting the

11   effective function of the presidency and the vice presidency.

12   And that concern is not present as to Trump, but it is as to

13   Wray.

14          So at page 390 the court explained:  In recognition

15   of these concerns, there's sound precedent in the District of

16   Columbia itself for the district courts to explore other

17   avenues, short of forcing the executive to invoke privilege,

18   when they are asked to enforce against the executive branch

19   unnecessarily broad subpoenas.

20          That's not where we are in this case.  The Supreme

21   Court sided with approval to a decision in *United States versus*

22   *Poindexter*, 727 F.Supp. 1501, in which the criminal defendant

23   Poindexter sought to have the district court enforce subpoena

24   orders against President Reagan to obtain allegedly exculpatory

25   material.  The executive objected:  The subpoenas are

1    unreasonable and oppressive, rejecting the defendant's argument

2    that the executive must first assert executive privilege to

3    narrow the subpoenas.

4         The District Court agreed with the President that it

5    was undesirable as a matter of constitutional and public policy

6    to compel a President to make his decision on privilege with

7    respect to a large array of documents.  So the court decided to

8    narrow, on its own, the scope of the subpoenas, to then allow

9    the executive to consider whether to invoke executive privilege

10   to a possibly smaller number of documents following that

11   narrowing.  The Supreme Court said this is but one example of

12   the choices available to the District Court and the Court of

13   Appeals in this case.

14        Now I'm back to quoting the Supreme Court in *Cheney*.

15   Under these circumstances, the *Cheney* court said, instead of

16   requiring petitioners to object to particular discovery

17   requests, the District Court should have required respondents

18   to demonstrate their particular requests would tend to

19   establish the theory of the case.

20        So I'm not at all sure that *Cheney* says that we have

21   to do what the government says it wants me to order them to do,

22   which is let the depositions go forward, if I let the

23   depositions go forward, and have them ask all the questions and

24   go through question by question so that the executive branch

25   can note its objections before I then ask the administration:

1    Now that your lawyers have noted potential objections, are you

2    actually going to seek to shield this stuff or not?

3          If anything, Cheney seems to be saying exactly the

4    opposite:  Don't make them go question by question if you can

5    resolve it more efficiently, District Court.  You have choices,

6    you have discretion.  And the circumstances were not analogous.

7          We have already done significantly more than what was

8    done in *Cheney* to refine, identify exactly what is at stake and

9    what information is being sought.  I can, and I have, based on

10   the submissions before me, narrowed the areas of inquiry and

11   then asked the government to tell me if it's asserting the

12   privilege or not and I can rule on that before the depositions

13   take place.

14         Unlike in the *Cheney* case, we know exactly who the

15   participants in the conversations were, we know the topics of

16   the conversations.  We even know the dates of the

17   conversations.  So getting an up or down answer at this point

18   would operate to add efficiency and minimize the burdens on

19   both sides.  It does not affect the day-to-day operations of

20   the executive branch in any way.

21         Also, it occurs to me that the government's

22   insistence that we proceed this way is a little inconsistent

23   with its position that under the Apex Doctrine we shouldn't

24   depose these official at all.  If these officials are too busy

25   to be deposed, why are you insisting that they be deposed

1    twice?

2          The government also cites *Alexander versus FBI*, 186

3    F.R.D. 128, in this District in 1998.  And that isn't binding

4    and it doesn't compel a different outcome, in any event.  It

5    was a more analogous circumstance.  Officials in former

6    administrations brought an action alleging violations with

7    their privacy rights when FBI files about them were shared with

8    the Clinton White House.

9          Howard Ickes, the Deputy Chief of Staff at the White

10   House had already been deposed and he asserted privilege

11   somewhat vaguely surrounding his communications with the

12   President himself.  However, later, he provided a declaration

13   detailing the contents of the communication so the government

14   said at that point there's no need to protect the privilege

15   because there's nothing else left that hasn't been disclosed.

16         The sum total of the Court's discussion on the point

17   was whether it should sanction the witness's failure to answer

18   the questions, even though he'd been instructed not to answer

19   by his counsel who was asserting a valid presumptive privilege,

20   i.e., communications with the President.  It does not mean --

21   it does not hold and it does not even consider whether there

22   that is to be some sort of a mandatory two-step procedure

23   before finding out what it is that the President actually wants

24   to do.

25         *In re:  Sealed case*, 121 F.3d 729, at 741, from the

1   D.C. Circuit, also cited in the government's brief, doesn't

2   mandate that I wait before asking you to answer the question I

3   already asked of you to answer either.  The defendant takes a

4   single sentence from the opinion, quote, The White House did

5   not have an obligation to formally invoke its privileges in

6   advance of the motion to compel, close quote, completely out of

7   context.

8           In that case and in the paragraph with that sentence,

9   the issue was waiver.  Had the White House waived the privilege

10  by saying in a press release that it would produce the

11  documents and then by not identifying the specific privileged

12  documents before filing its motion?

13          The court said, Nor did the White House have an

14  obligation to formally invoke its privileges in advance of the

15  motion to compel.  In its response to the subpoena, the White

16  House informed the OIC that it believed the withheld documents

17  were privileged, thus satisfying the Federal Rules of Civil

18  Procedure.  The court noted that the motion to compel was the

19  first event which could have forced disclosure of the

20  documents, and that's all that mattered for the waiver

21  analysis.

22          Since the OIC was clearly aware in advance of the

23  motion to compel that the White House likely would be asserting

24  privilege, it was not prejudiced by any delay in the White

25  House's formally invoking the privileges.  That's it.  That was

1   the issue.  Entirely different circumstances.

2          Here, we've had the issues identified.  We've already

3   had the deposition where the privilege has already been

4   asserted, although not by anyone who has the actual authority

5   to do so.  And the Court already asked the defendants to answer

6   the question of whether the current president will invoke.

7          During the Rosenstein deposition, executive privilege

8   was in fact invoked by a Department of Justice lawyer

9   representing the defendants.  And he said he was doing so,

10  quote, on behalf of the Office of the President.  When asked

11  which one, counsel said the current President.  But when asked

12  if President Biden had issued that instruction he again said,

13  the Office of the President and didn't answer.  And then the

14  lawyer representing the witness also asserted the privilege

15  because the deponent, who allegedly had been talking to the

16  President, was not the one who owned the privilege.

17         It also struck me that the government says, in its

18  executive privilege memo, docket 101, that assertion of the

19  presidential communications privilege would be proper because,

20  quote, Mr. Strzok seeks testimony regarding nonpublic

21  conversations involving President Trump and his close advisors

22  in the context of presidential decision making, close quote.

23         But then in the very same paragraph, defendants say

24  plaintiff, quote, cannot come close to making the focused

25  demonstration of need required to overcome the privilege, given

1    that former President Trump was not the decision maker

2    regarding any of the events that formed the basis of

3    Mr. Strzok's claims, close quote.

4           So as the defendants see it, we are talking about the

5    President's communications with his close advisors, but not

6    with respect to presidential decision making, which

7    significantly diminishes the intrusion on any separation of

8    powers concerns.

9           Given all the fog surrounding these issues, in order

10    to figure out what we're dealing with here to try to get to the

11    bottom of it efficiently, then, I've asked if the current

12    President is going to assert the privilege.  And I want to know

13    the answer.  That raises the legal question:  Does it have to

14    be the current President who asserts executive privilege?  Do

15    we need that to have to consider executive privilege at all?

16    That is an open question, according to the Supreme Court,

17    whether the former President has any privilege to assert or

18    whether that privilege resides only with the current president?

19           In denying cert in *Trump versus Thompson* the Supreme

20    Court took pains to say that the Circuit's comments on that

21    matter were only dicta, and since the D.C. Circuit has been

22    able to rule against the former President, even if one assumed

23    he had the right to object, they didn't have to reach the

24    question.

25           I certainly don't think I need to decide that issue

1    today either because I don't know what the current President

2    will do, or whether, if he does not invoke the privilege, the

3    former President will invoke the privilege during his

4    deposition or before.

5            It is interesting to note, though, that the original

6    miscellaneous action regarding subpoenaing him was filed

7    publicly, almost a year ago.  And in all that time, the former

8    President has not taken a single step to intervene himself or

9    to move to quash.

10           One question, though, is whether the issue could

11   become moot if we deposed Director Wray first and he says he

12   never discussed the termination of Mr. Strzok or the

13   President's views about it with Mr. Bowdich at all.  At that

14   point then why are we asking the President about this?

15           Also, even if executive privilege is invoked by the

16   former President, and even if that invocation is honored, the

17   privilege is not absolute.  It could also be relevant to any

18   assertion of privilege that he has previously and is now

19   currently speaking publicly about this very issue.

20           I note, though, that when we get to this you need

21   more than just a showing of relevance or plaintiffs' need for

22   the information; there also has to be a showing of public

23   interest.  And there the situation is markedly different from

24   *United States versus Nixon* or, for example, the attempt to

25   obtain statements made in the Oval Office regarding an

1    unprecedented attack on the United States Capitol and the

2    certification of a national election.  The District Court and

3    the Circuit Court's opinions in *Trump versus Thompson* were very

4    much rooted in their circumstances.

5              But I'm not going to rule on the executive privilege

6    question in a vacuum either until I have been told whether the

7    current President will be asserting executive privilege with

8    respect to the very specific and very narrow set of

9    communications I have just identified, and I don't find the

10   deposition of the President needs to take place or that a

11   transcript be generated before I get that information.

12             So how long do you think you need to find that out?

13             MR. ABBUHL:  Would two weeks be sufficient, Your

14   Honor?

15             THE COURT:  That would be fine.  You can file and it

16   can be --

17             MR. ABBUHL:  Your Honor, if I could just clarify.

18   After getting the transcript -- I'm sorry, Your Honor.  If we

19   could have two weeks after we get an expedited copy of this

20   transcript, to make sure we can go through all the details

21   specifically?

22             THE COURT:  Should I just set it three weeks from

23   today, is that --

24             MR. ABBUHL:  That works for fine for the government,

25   Your Honor.

1          THE COURT:  Is that -- will it take you longer than a

2     week to produce a transcript?

3          THE COURT REPORTER:  Could I have two weeks?

4          THE COURT:  It will take you two weeks.  Okay.

5          All right.  So we'll say that the government has to

6     file a notice informing me of that information by March 24th.

7     Today is February 23rd.  So that's about four weeks.  All

8     right.

9          If President Biden does invoke the privilege, then I

10    have to rule on whether it's being appropriately invoked in

11    this situation.  If he does not, I'm only going to have to rule

12    if and when the former President refuses to answer at the

13    deposition, or if he intervenes or personally moves to quash

14    once the date is actually set.  And at that point, the parties

15    may have to brief the issues of how the Supreme Court's denial

16    of cert. in *Trump versus Thompson* bears on the issue of who

17    gets to assert the privilege and what impact or persuasive

18    value the Circuit's dicta in that case has on the

19    determination, given the Supreme Court's characterization of

20    the opinion in that manner.

21         But it may not be necessary for us to even reach

22    whose privilege it is, if it turns out we can rule even

23    assuming the former President has the right to assert it based

24    on whether the privilege is being properly asserted, as was

25    done in *Trump versus Thompson*.

1          So that ruling may narrow the scope of the

2     depositions significantly, although there were proposed

3     questions about non-privilege matters, such as the President's

4     own public statements, and they would be permitted and the

5     deposition would still move forward.

6          As for the Wray deposition, if it's conducted after

7     the Trump deposition, the same terms I just outlined with

8     respect to the presidential communications prong of the

9     executive privilege will cover his communications with the

10    President or his revelations of his communications with the

11    President, if any, and we can rule on that before his

12    deposition.

13         However, if he testifies that he didn't discuss the

14    termination decision with Will or Bowdich at all, then the

15    deliberative process privilege issue won't arise.  But if it

16    does arise, then one question we've yet to explore is who has

17    to invoke that?  Is it the President?  Is it the Attorney

18    General as head of the Department of Justice of which the FBI

19    is a component?  Is it the FBI Director as the head of the

20    agency?  No one has briefed that issue.  And then we would have

21    to determine, if it's asserted, if it's outweighed by the other

22    factors the Court has to consider.

23         It still seems odd, though, that while the defendants

24    on the one hand are talking about the Apex Doctrine and the

25    need to bother a high-ranking public official as little as

1    possible, they are also the ones who are saying let's possibly

2    do it twice.  So the parties are welcome to try to work out a

3    solution that would tee up the issue of the deliberative

4    process prong of the executive privilege within the FBI and

5    enable me to rule prior to the deposition, as I plan to do,

6    with the presidential communications privilege.

7            In fact, I think the parties would be well advised to

8    think about whether a short deposition of Christopher Wray

9    first on whether he spoke to Bowdich about these matters could

10   short circuit a lot of this, both the presidential

11   communications and deliberative process privileges, although I

12   suspect that plaintiff's point of view would be we still need

13   to know how often the President expressed his wishes and with

14   what level of vehemence to test Mr. Wray's credibility on that

15   point, even if he says I never told anybody about it.

16           And since much of what the plaintiffs want to ask the

17   former President doesn't fall within the executive privilege, I

18   would permit his deposition to go forward no matter what

19   Mr. Wray says on that issue.  But to get to the existence of

20   privileged communications with Mr. Bowdich, as opposed to the

21   content, that could point towards having a short deposition

22   first, and then ruling on the privilege and then determining

23   whether you even have to rule on the privilege before you go

24   further, or we can just have one and then rule on it, which is

25   not ideal.

1        So I think I've done all I can do today.  I've ruled

2   on the pure Apex Doctrine questions.  I've told you the

3   principles that will apply.  The law is not going to change in

4   the executive privilege determination with respect to both

5   prongs of the privilege.  And I've asked you again what the

6   current privilege holders plan to do.  And then once we have

7   all of that, I think you all are going to schedule these

8   depositions and they're going to be narrowed as I narrowed

9   them.

10       Which leaves us with the reason you called, which is

11  that the 30(b)(6) deposition topics and the issues with respect

12  to the request for production of documents that's been sent to

13  Ms. Page.  I think you've already ascertained that the

14  transcript is going to be my ruling.  There's not going to be a

15  follow-up written opinion on this; you've waited too long for

16  this.  And there isn't -- it would be ridiculous to have you

17  wait for me to get that in writing.  I think you have all my

18  reasoning, you have all the citations, you know what I'm

19  thinking on everything.

20       One question I'm going to ask you -- I sealed this

21  because a lot of these rulings were based on sealed

22  submissions.  Seems to me that very little of what I've just

23  said needs to remain under seal, other than possibly my summary

24  of the Bowdich deposition and my summary of the Rosenstein

25  deposition, since the substance of their testimony was given to







44

























56









































CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

                   Dated this 8th day of March, 2023

_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001