## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:19-cv-2367 |
| | ) | |
| ATTORNEY GENERAL WILLIAM F. | ) | |
| BARR, in his official capacity; UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE; | ) | |
| FBI DIRECTOR CHRISTOPHER A. | ) | |
| WRAY, in his official capacity; FEDERAL | ) | |
| BUREAU OF INVESTIGATION, | ) | |
| 950 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

1.      Peter Strzok served his country with distinction in the armed services and as a
Special Agent with the Federal Bureau of Investigation for more than 25 years.  In June 2018,
the FBI proposed to fire Special Agent Strzok primarily due to text messages he had written in
which he expressed his political opinions regarding the 2016 presidential election and then-
candidate, now President, Donald Trump.  The proposal to discharge Strzok identified the
Assistant Director of the Federal Bureau of Investigation Office of Professional Responsibility,
Candice Will, who had been tasked with issuing disciplinary actions relating to senior officials of
the FBI for more than a decade, as the "deciding official." The proposal also confirmed that
Strzok could then appeal any disciplinary decision to the FBI's Disciplinary Review Board, all in
accordance with the agency's standard procedures.

2.      On August 8, 2018, Assistant Director Will issued a decision in which she rejected the proposal to fire Special Agent Strzok, and instead decided that he would be demoted and suspended for sixty days without pay.  Will's decision was based upon the facts underlying the charges in the proposed removal, the agency's schedule of disciplinary offenses, the agency's record of discipline in comparable circumstances, and upon Strzok's long and outstanding record of service to the FBI and the country.  The disciplinary decision was also reflected in a "last chance agreement" which Will offered and which Strzok accepted.

3.      On August 9, 2018, the FBI summarily fired Special Agent Strzok, notwithstanding Assistant Director Will's decision and the last chance agreement.  The discharge was effective immediately, without affording Strzok an appeal to the FBI's Disciplinary Review Board, or any other due process.  The discharge decision was made by Deputy Director David Bowdich, and was the result of unrelenting pressure from President Trump and his political allies in Congress and the media.  The campaign to fire Strzok included constant tweets and other disparaging statements by the President, as well as direct appeals from the President to then-Attorney General Jefferson Sessions and FBI Director Christopher Wray to fire Strzok, which were chronicled in the press.

4.      The concerted public campaign to disparage and, ultimately, fire Special Agent Strzok was enabled by the defendants' deliberate ██████████ disclosure to the media of texts, intended to be private ████████████████████████████████████████████ ████ .

5.      The FBI fired Special Agent Strzok because of his protected political speech in violation of his rights under the First Amendment to the Constitution of the United States.  The FBI also deprived Strzok of his property interest in his employment without due process, in

violation of his rights under the Fifth Amendment to the Constitution.  This action seeks

equitable and injunctive relief, including reinstatement and back pay, for these flagrant violations

of plaintiff's rights under the Constitution ███████████████████████████████████

████████.

### JURISDICTION AND VENUE

6.     This lawsuit arises under the Constitution of the United States ███████████████

and presents a federal question within this Court's jurisdiction pursuant to 28 U.S.C. § 1331.

The Court has authority to issue declaratory, injunctive, and equitable relief, including

reinstatement of plaintiff to his employment with the FBI, pursuant to 28 U.S.C. § 2201 and its

inherent equitable powers.  Upon a finding that Special Agent Strzok was discharged in violation

of his rights under the Constitution, this Court would also have authority to award him

appropriate back pay under the Back Pay Act, pursuant to 5 U.S.C. § 5596(b)(1), and to award

him attorneys' fees and costs pursuant to 28 U.S.C. § 2412, ██████████████████████

███████████████████████.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Special

Agent Strzok worked in the District of Columbia and the unconstitutional █████████████

████████ actions by defendant took place in this District.

### PARTIES

8.     Plaintiff, Peter Strzok, is a citizen of the United States, who resides in Virginia.

He worked for the Federal Bureau of Investigation until his unlawful discharge on August 9,

2018.

9.     Defendant the United States Department of Justice (DOJ) is the federal agency for which plaintiff was employed, and includes Defendant, the Federal Bureau of Investigation (FBI), to which plaintiff was assigned to work.

10.     Defendants DOJ and FBI are federal agencies within the meaning of 5 U.S.C. § 552a(a)(1).

11.     Defendant William Barr is the Attorney General of the United States and is the head of DOJ, where Special Agent Strzok was employed.  He is sued in his official capacity only.

12.     Defendant Christopher Wray is the Director of the FBI, to which Special Agent Strzok was assigned to work.  He is sued in his official capacity only.

## FACTS

### Special Agent Strzok's Exceptional Career in Public Service

13.     Special Agent Peter Strzok has devoted his career to the protection of this country.  He was commissioned as a Second Lieutenant into the U.S. Army Reserve upon graduating from college in May 1991, and entered active duty on September 14, 1991, beginning in the Officer Basic Course in Ft. Sill, Oklahoma.  Following OBC, he served in the 101st Airborne Division as an artillery officer until he was honorably discharged on September 16, 1995.  From that time forward he remained a Captain in the U.S. Army Reserve until reaching his maximum service date on July 1, 2019.

14.     Special Agent Strzok then spent almost twenty-two years serving this country with the FBI, beginning his career as an analyst in what was then known as the National Security Division.  He then applied for and was offered a position as a Special Agent of the FBI.  After graduating from the FBI Academy in Quantico, Virginia, in 1998, Strzok was assigned to the

4

FBI's Boston Field Office.  Over the next 20 years, Strzok was promoted seven times across two field offices and FBI Headquarters and rose to become Deputy Assistant Director of the FBI's Counterintelligence Division.

15.     During his long and distinguished career in the FBI, Special Agent Strzok worked on (and in many cases led) some of the most high profile and sensitive investigations in recent history.  He was one of the initial case agents on the FBI team that ultimately dismantled a ring of illegal Russian agents.  He identified a car abandoned by several of the 9/11 terrorists in Boston.  He oversaw the investigation of Edward Snowden and literally dozens of spies, including investigations into the most significant U.S. losses of classified information in the past two decades.  He was assigned to lead the criminal investigation of former Secretary Hillary Clinton's use of a private email server, and participated in the FBI's investigations into Russian interference in the 2016 Presidential election.

16.     Over the course of his long career with the FBI, Special Agent Strzok demonstrated consistently exemplary performance, and it is no coincidence that Directors of the Bureau under multiple administrations assigned him to the investigations that were most critical to U.S. national security. He repeatedly earned Outstanding performance appraisals; was the recipient of four Special Act/Achievement awards (in 1997, 1998, 2004, and 2006); two Quality Step Increases (in 2002 and 2004); six cash awards (in 2007, 2008, 2009, 2014, 2015, and 2016); and four time off awards (in 2002, 2007, 2009, and 2012).  Strzok also received the following extraordinary awards:

- the Director's Award, the US Attorney for the Eastern District of Virginia's Public Service Award and the Director of National Intelligence's Meritorious Unit Citation, in 2009, all for his work in leading the investigations and eventual convictions of four individuals for spying for China;

- the US Attorney for the Southern District of New York's Outstanding Investigation Award, the Director of National Intelligence's Meritorious Unit Citation, and the Director of National Intelligence Community Excellence in Counterintelligence Award in 2011, all for his work as a case agent for the Boston-based Russian illegal couple which were part of the Ghost Stories investigation;

- the US Attorney for the Eastern District of Virginia's Public Service Award in 2013 for the investigation and prosecution of an individual for disclosing classified information to the media, a case representing the first ever charge and conviction of violating the Intelligence Identities Protection Act;

- classified recognition from the intelligence services of over ten foreign nations for successful joint operations.

**The Administration's Viewpoint Discrimination Against Special Agent Strzok**

17.     Pursuant to federal regulation and FBI policy, an FBI employee has the right to "[e]xpress his or her opinion as an individual privately and publicly on political subjects and candidates." 5 C.F.R. § 734.402(a).

18.     Like other federal employees, FBI agents' right to express their political opinions is not absolute.  Like other federal employees, the delineation between acceptable limitations on political speech of FBI agents and unlawful restrictions was established by Congress in the Hatch Act, 5 U.S.C. § 7321 *et seq.*

19.     The Supreme Court has upheld the constitutionality of the Hatch Act in *U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers*, 413 U.S. 548 (1973), and recognized the authority of the federal government to infringe, to a certain extent, the First Amendment rights of government employees in order to provide effective government and avoid the public perception of "political justice."  *Id.* at 565.  However, as the Court specifically held, the Hatch Act represented *Congress's* determination of the proper balance between two competing interests: that of the federal employee "'as a citizen, in commenting upon matters of public concern and

the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 564 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

20.     The Hatch Act prohibits certain political activities by government employees while recognizing that, "to the extent not expressly prohibited by law," federal "employees should be encouraged to exercise fully, freely, and without fear of penalty or reprisal" their right to political speech.  5 U.S.C. § 7321.  The law thereby draws the line between the competing interests of effective government and free speech for employees, and in doing so, defines what is prohibited and states unequivocally that all other political speech is not only permissible, but encouraged.

21.     There has been no assertion, nor could there be, that the political speech engaged in by Special Agent Strzok violated the Hatch Act.  This speech was therefore protected under the First Amendment to the United States Constitution.

22.     Even if the government could constitutionally punish Special Agent Strzok for the political speech at issue, it cannot practice viewpoint discrimination in deciding what political speech by government employees to allow and what political speech to punish.  *See, e.g., Rosenberger v. Univ. of Virginia*, 515 US. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  Viewpoint discrimination is thus an egregious form of content discrimination.").

23.     The Trump Administration has consistently tolerated and even encouraged partisan political speech by federal employees, as long as this speech praises President Trump and attacks his political adversaries.  For example, President Trump rejected the recommendation

of his own Office of Special Counsel that advisor Kellyanne Conway be removed from her job for repeatedly violating the Hatch Act by attacking former Vice President Biden and publicly advocating for and against various U.S. Senate candidates. When asked about the OSC's recommendation, Mrs. Conway responded "blah, blah, blah…If you're trying to silence me through the Hatch Act, it's not going to work. Let me know when the jail sentence starts." Anita Kumar, *Federal Agency Recommends That Kellyanne Conway Be Removed From Service*, POLITICO (June 13, 2019, 12:05 PM), https://www.politico.com/story/2019/06/13/federal-agency-recommends-that-kellyanne-conway-be-removed-from-service-over-hatch-act-1364221.

24.     The House Committee on Oversight and Reform subsequently attempted to initiate its own investigation into Mrs. Conway's Hatch Act violations. When the Committee subpoenaed Mrs. Conway for her testimony, President Trump instructed her to defy the subpoena, asserting that his advisors were "absolutely immune" from Congressional testimony. Andrew Desiderio, *Kellyanne Conway Defies Subpoena, Skips Oversight Hearing*, POLITICO (July 15, 2019, 4:18 PM), https://www.politico.com/story/2019/07/15/kellyanne-conway-subpoena-oversight-hearing-1416132.

25.     Although Mrs. Conway may be the highest-profile Trump Administration employee to enjoy the right to violate the Hatch Act with impunity, she is far from the only one, as there have "been a growing number of complaints since Trump took office that federal employees are using their platform to campaign for the President or his allies, a violation of the Hatch Act. "  Anita Kumar, *Complaints Grow That Trump Staffers Are Campaigning for Their Boss*, POLITICO (May 15, 2019, 12:09 PM), https://www.politico.com/story/2019/05/15/trump-staff-campaign-complaints-1318864.

8

26.     During the Trump Administration this viewpoint discrimination has infected the FBI as well.  While Special Agent Strzok and others who expressed negative opinions of President Trump have been subject to administrative punishments of various degrees of severity, no actions have been taken against agents who expressed harsh criticism of Secretary Clinton during the 2016 campaign, or those in the New York Field Office who leaked negative information about Secretary Clinton to the Trump campaign in the weeks before the election. Jim Dwyer, *Giuliani Promised a Surprise Before the Election.  Comey Delivered One.,* N.Y. TIMES, June 19, 2018, https://www.nytimes.com/2018/06/19/nyregion/giuliani-fbi-comey-clinton.html

27.     This viewpoint discrimination is part of a broader campaign against the very principle of free speech underlying the First Amendment, initiated and led by a President who has repeatedly attacked the press as the "enemy of the people," urged censorship of opinions that he deems insufficiently flattering and the withdrawal of security clearance of critics (including Special Agent Strzok) who present no risk to national security.

**Special Agent Strzok's Termination for Political Speech Critical of the President**

28.     On June 15, 2018, the FBI's Office of Professional Responsibility issued a proposed notice of disciplinary action, seeking to dismiss Special Agent Strzok from the rolls of the FBI based on three specifications of alleged misconduct.  Each of the three specifications in the proposal carried a standard penalty of a five-day suspension or less, but the proposal contended that the penalty should be aggravated because of the notoriety of text messages that Strzok had written to an FBI attorney, which he intended to be private.  The text messages concerned a matter of profound public importance – namely the 2016 Presidential election – and

were critical of then-candidate Trump at a time when Strzok was involved in the Hillary Clinton

email investigation and/or the Russia investigation.

29.     The proposed removal noted that, "[o]f serious concern was the overtly political

tone of many of your text messages related to the 2016 presidential election, including

statements expressing hostility for then-candidate Donald Trump and support for then-candidate

Hillary Clinton."  The proposed removal then recounted many of the text messages, including:

**February 12, 2016**

Oh, [Trump's] abysmal. I keep hoping the charade will end and people will just dump
him.

**March 3, 201**6

GA[1]: God trump is a loathsome human.

You: Yet he may win. Good for Hillary.

GA: It is.

You: Would he be a worse president than cruz?

GA: Trump? Yes, I think so.

You: I'm not sure. Omg [Trump's] an idiot.

GA: He's awful. …

**June 11, 2016**

You: They fully deserve to go, and demonstrate the absolute bigoted nonsense of Trump.

**July 18, 2016**

You: And f*ck the cheating mother*cking Russians. Bastards. I hate them.

GA: I'm sorry, me too

---

[1] "GA" is the FBI attorney in question.

**July 21, 2016**

You: Trump is a disaster. I have no idea how destabilizing his Presidency would be.

**August 6, 2016**

…[Referring to and quoting op/ed] I really like this: [Trump] appears to have no ability to experience reverence, which is the foundation for any capacity to admire or serve anything bigger than self, to want to learn about anything beyond self, to want to know and deeply honor the people around you. …

**August 8, 2016**

GA: [Trump's] not ever going to become president, right? Right?!

You: No. No he's not. We'll stop it.

**August 15, 2016**

You: I want to believe the path you threw out for consideration in [DD's] office-that there's no way [Trump] gets elected-but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40...

The proposed removal characterized these communications as "politically charged text messages," and concluded that "[y]our vituperative text messages will be the subject of damning public discourse for days, months, and even years to come, and the FBI will be recipient of the expressed outrage."

30.    The proposed removal designated Office of Professional Responsibility Assistant Director (AD) Candice Will as the deciding official.  Special Agent Strzok and his counsel submitted a written response to the proposed removal to AD Will and appeared before her for an oral reply.  In his responses, Strzok explained that the comment in his August 8, 2016 text "No he's not.  We'll stop it" was meant to reassure the FBI attorney in question that the American people were not likely to elect then-candidate Trump as President, who was trailing in the public polling at that time and had just attacked a Gold Star family.  He also explained that his August

11

15 message using an analogy of an insurance policy related to the question (which some FBI officials had been debating) of whether, in order to protect extremely sensitive sources and methods, the FBI could less aggressively pursue the Russian interference investigation on the assumption that Mr. Trump would not win.  Strzok's opinion was that, despite polls at the time showing Secretary Clinton as the prohibitive favorite to become President, the matter was so serious that the FBI needed to pursue the investigation aggressively.

31.     The FBI's investigation into Russia's interference in the 2016 election was active in the summer of 2016, but this was not known to the public.  Special Agent Strzok was one of the key members of that investigative team, and he appropriately held information about the existence of the investigation in strict confidence, taking extraordinary measures to ensure that the existence of the investigation remained secret even within the FBI.  Any public disclosure of the existence of that investigation would likely have been devastating to the Trump presidential campaign.  The existence of that investigation did not become publicly known until after President Trump was elected.

32.     An investigation by the DOJ Office of Inspector General preceding the proposed removal closely examined whether any official action or decision taken by the "Midyear Exam" (the code name of the Clinton email investigation) team was motivated by opinions regarding the candidates in the 2016 election or any other personal political philosophy or point of view.  The OIG determined that "we did not find documentary or testimonial evidence that improper considerations, including political bias, directly affected the specific investigative decisions we reviewed . . . or that the justifications offered for these decisions were pretextual."  DOJ Report Executive Summary, at iii.  The OIG report also concluded that, at times, Special Agent Strzok and the FBI attorney were among the most vocal members of the Midyear Exam team in arguing

for the use of aggressive investigative techniques to uncover the details of Hillary Clinton's use of a private email server as Secretary of State.

33.     On August 8, 2018, Assistant Director Will issued a decision that sustained two and reduced one of the specifications, but rejected the proposal to remove Special Agent Strzok from his employment with the FBI.  Instead, Will mitigated the proposed penalty to a 60-day suspension and demoted him from the Senior Executive Service ("SES").

34.     Explaining the basis for her disciplinary decision, Assistant Director Will noted that in determining the appropriate penalty, "I have considered all mitigating factors supported by the record, including but not limited to your 21 years of FBI service, outstanding performance record, and numerous awards, including those noted in your written response."  She also acknowledged "the fact that you were assigned to two very stressful and high profile investigations during the time of your misconduct," and the input from management in Special Agent Strzok's assigned Division, which affirmed that "you are an extremely talented and intelligent investigator, gifted agent, and hard-working employee, who your Division believes will never again engage in misconduct."

35.     Assistant Director Will also acknowledged a "Last Chance Agreement" which she had offered, and which Special Agent Strzok had accepted on July 26, 2018, which provided that he would be suspended and demoted (not fired), but stated that he would be summarily dismissed if he violated the terms of the agreement by engaging in additional misconduct.  That agreement further specified that:

> Mr. Strzok further agrees that the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless reopened based on credible evidence of a violation of this agreement.  Mr. Strzok agrees to waive his right to appeal to the FBI's internal disciplinary entity or to the Merit Systems Protection Board (emphasis in original).

36.     Assistant Director Will concluded her decision with the following: "Based on the record as a whole, including your written response and oral presentation, I am suspending you for 60 days and demoting you to a non-supervisory position for your 5.21, 5.18 and 5.2 offenses."

37.     The next day, August 9, 2018, Deputy Director Bowdich intervened and overturned the decision by Assistant Director Will, claiming "I have reconsidered the AD's punishment and conclude that dismissal is appropriate under the facts of this case."

38.     Deputy Director Bowdich relied entirely on the specification relating to Special Agent Strzok's text messages as the basis for purportedly overturning Assistant Director Will's decision: "Though the Office of Inspector General found no evidence that your bias impacted your investigative actions or decisions, your sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-mail investigation and the initial stages of the Russia collusion investigation."

39.     Deputy Director Bowdich declared that his decision was "final" and is "not subject to further administrative review."

40.     Special Agent's Strzok's termination deprived him of the standard internal due process afforded to other FBI employees, and which was promised to Special Agent Strzok in the initial proposed removal.  The FBI's standard disciplinary process consists of an appeal to a five-member Disciplinary Review Board comprised largely of career management and executive level officials.  Those appeal procedures provided:

> Should the disciplinary process result in a suspension without pay for more than fourteen calendar days, demotion or dismissal, you may appeal that sanction to the HRD in writing, stating your grounds.  The HRD will convene a Disciplinary Review Board (DRB) consisting of five voting members selected by the Associate Deputy Director's (ADD) Office to ensure a broad cross-section of the FBI. . . . Utilizing the substantial

evidence standard of review, the DRB will review the reasonableness of the OPR's underlying findings of misconduct and the assessed penalty.  You will be notified in writing of the DRB's findings and decision.

41.     Immediately after he was notified of his firing, plaintiff's counsel wrote to Deputy Director Bowdich, asking for the opportunity to invoke this appeal procedure:

Deputy Director Bowdich:

I represent Peter Strzok and am in possession of your letter dated August 9, 2018, terminating Special Agent Strzok and thereby overturning the decision of the FBI's Office of Professional Responsibility ("OPR") that Special Agent Strzok's profound remorse, record of exemplary service and unlikelihood of recidivism justify the less severe punishment of a 60-day suspension and demotion rather than termination.  Your letter states that your decision to terminate "is final, and not subject to further administrative review."  This is inconsistent with both past practice and the language of previous communications from OPR.  Both the OPR letter of August 8, 2018, and the OPR letter of June 15, 2018, announcing the disciplinary recommendation, stated that Special Agent Strzok would be entitled to appeal any adverse decision more severe than a 14-day suspension to a 5-member, cross-divisional Disciplinary Review Board.  Given that the availability of such an appeal is consistent with past practice, and Director Wray's repeated statements that he intended to scrupulously follow the FBI's ordinary practice in this matter, we respectfully request the opportunity to appeal your decision administratively and, if you decline, an explanation as to why the Bureau decided to abandon both past practice and its own written commitments in this case.

42.     Deputy Director Bowdich did not respond to this email. The FBI's Office of General Counsel sent an email to plaintiff's counsel on August 20, 2018, indicating that it was "look[ing] into" Special Agent Strzok's request and would respond "in due course."  But Strzok received no subsequent response from the FBI.  The agency never afforded Strzok any form of appeal, and it removed him from the rolls of the agency.

43.     Following the FBI's August 9, 2018 decision to fire him, Special Agent Strzok attempted to appeal his discharge to the Merit Systems Protection Board, and he filed a timely appeal.  The Board concluded that it lacked jurisdiction over the appeal and declined to make a determination about whether the firing had violated Strzok's rights under the Constitution, or to

review the discharge at all.  Apart from this lawsuit, Strzok has no other viable remedial scheme to seek relief for the violation of his rights under the Constitution.

44.     Deputy Director Bowdich's rejection of the final decision of Assistant Director Will, the designated "deciding official" in the disciplinary process for Special Agent Strzok, and his denial of Strzok's promised and standard appeal procedures, was the direct result of unrelenting pressure from President Trump and his political allies on Capitol Hill.  In fact, before the Administration's campaign to demonize and fire Strzok, Bowdich himself reassured Strzok that the public disclosure of the texts would not significantly affect Strzok's career at the FBI.

45.     Upon information and belief, President Trump directly and indirectly pressured FBI Director Wray and then-Attorney General Sessions to fire Special Agent Strzok when his text messages critical of the President were first disclosed.  That pressure was recounted in contemporaneous news reports:

> President Donald Trump sharply questioned Attorney General Jeff Sessions and FBI Director Christopher Wray during a White House meeting on January 22 about why two senior FBI officials — Peter Strzok and Lisa Page — were still in their jobs despite allegations made by allies of the [P]resident that they had been disloyal to him and had unfairly targeted him and his administration, according to two people with knowledge of the matter. The [P]resident also pressed his [A]ttorney [G]eneral and FBI [D]irector to work more aggressively to uncover derogatory information within the FBI's files to turn over to congressional Republicans working to discredit the two FBI officials, according to the same sources. The very next day, Trump met Sessions again, this time without Wray present, and even more aggressively advocated that Strzok and Page be fired, the sources said.

Murray Waas, *Exclusive: Trump Pressed Sessions to Fire 2 FBI Officials Who Sent Anti-Trump Text Messages* Vox (Apr. 20, 2018 9:30 AM),

https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages.

46.     Since that time, Special Agent Strzok has been the subject of numerous and continuing hostile tweets from the President, including one in July 2018 (roughly a month before Strzok was fired) in which the President referred to Strzok as a "former" FBI agent.



The complete list of venomous tweets is far too long to recount here, but include:







.....remain in the FBI while he himself was being investigated. This is a real issue. It won't go into a Mueller Report because Mueller is going to protect these guys. Mueller has an interest in creating the illusion of objectivity around his investigation." ALAN DERSHOWITZ....

9:15 AM · Aug 1, 2018 · Twitter for iPhone



Agent Peter Strzok was just fired from the FBI - finally. The list of bad players in the FBI & DOJ gets longer & longer. Based on the fact that Strzok was in charge of the Witch Hunt, will it be dropped? It is a total Hoax. No Collusion, No Obstruction - I just fight back!

12:04 PM · Aug 13, 2018 · Twitter for iPhone

47.     President Trump also publicly, falsely, and repeatedly accused Special Agent

Strzok of "treason" and of being part of an attempted coup.  Rebecca Ballhaus, *Trump Accuses*

*FBI Agent of 'Treason,'* WALL STREET JOURNAL, Jan. 11, 2018,

https://www.wsj.com/articles/trump-accuses-fbi-agent-of-treason-1515710206.  On June 15,

2018, on the North Lawn of the White House, President Trump stated, "I'll tell you what —

you're asking me about Peter Strzok being fired.  I am amazed that Peter Strzok is still at the

FBI, and so is everybody else that read that report.  And I'm not even talking about the report;

I'm talking about long before the report.  Peter Strzok should have been fired a long time ago,

and others should have been fired."  Transcript of President Trump's June 15, 2018 Remarks on

the North Lawn, http://transcripts.cnn.com/TRANSCRIPTS/1806/15/cnr.01.html.

48.     But for the intervention of the President and his political allies and their insistence

on punishing Special Agent Strzok for the content of his protected speech, the FBI would have

18

imposed the lesser discipline decided upon by Assistant Director Will, and Strzok would not have been discharged. Defendants discharged Strzok because of his protected speech in violation of the First Amendment.

49. The retaliatory response to Special Agent Strzok's protected political speech is consistent with a policy and practice adopted by this President and his administration to stifle dissenting speech by current and former federal employees, and to chill such speech in the future. This policy is illustrated by, among other things, the unprecedented use of non-disparagement agreements as a condition for working in the White House, the unprecedented decision to threaten and revoke the security clearances of former high level security officials based expressly and exclusively upon their political speech, and the campaign of retaliatory action against other current or former government officials who have investigated or disclosed potential wrongdoing by the administration.

## **Defendants' Violation of Strzok's Fifth Amendment Due Process Rights**

50. As set forth above in ¶¶ 37-39, Defendants refused to abide by the final decision of Assistant Director Will to suspend and demote, rather than fire, Special Agent Strzok. Assistant Director Will was the appropriately designated deciding official who had been vested with authority to render a final disciplinary decision and who actually made a final decision after taking account of the appropriate facts, the agency's table of penalties, mitigating factors, and the agency's practice with respect to comparable disciplinary situations. Will had served as the deciding official in similar circumstances for the better part of a decade.

51. Defendants also refused to provide Special Agent Strzok with the standard appeal rights to a Disciplinary Review Board afforded under the FBI's standard procedures, and promised to Strzok in the original proposed removal.

52.     By firing Special Agent Strzok under these circumstances, Defendants deprived Strzok of his property interest in his public employment without affording him due process, in violation of the Fifth Amendment.

53.     These actions have caused and will continue to cause plaintiff substantial harm, including the loss of his job, the loss of retirement benefits, the loss of other benefits associated with his employment, and back pay.



54.     As set forth above, the decision to fire Special Agent Strzok in violation of his Constitutional rights was the result of a long and public campaign by President Trump and his allies to vilify Strzok and pressure the agency to terminate him.  This campaign itself was made possible by the Department of Justice's disclosure of Strzok's personal records ████████████ █████████████████████.

55.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

56.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



57.

58.

59.

60.

61.

████████████████████████████████████████████████████

████████████████████

62.    ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

63.    ████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

64.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████

65.    ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

66.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

67.    ██████████████████████████████████████

████████

68.    The disclosure of the texts allowed President Trump and his allies to mount a public relations effort falsely depicting Special Agent Strzok as a leader of a "Deep State" "witch hunt" against President Trump in order to stir up outrage among the President's supporters and discredit the Russia investigation.

69.    This campaign to publicly vilify Special Agent Strzok contributed to the FBI's ultimate decision to unlawfully terminate him, as well as to frequent incidents of public and online harassment and threats of violence to Strzok and his family that began when the texts were first disclosed to the media and continue to this day.

70.    ██████████████████████████████████████████

████████████████████

## VIOLATIONS OF LAW

## COUNT ONE

**UNLAWFUL TERMINATION OF PLAINTIFF'S EMPLOYMENT BECAUSE OF HIS PROTECTED SPEECH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

71.    Paragraphs 1-70 are realleged.

23

72.     Defendants fired plaintiff because of his protected political speech.  Defendants'
actions infringed upon plaintiff's right to freedom of speech, in violation of the First Amendment
to the United States Constitution.

73.     Upon information and belief, Defendants treated plaintiff more harshly than they
would have treated similar communications because the content of plaintiff's communications
was critical of President Trump.

74.     Neither the Civil Service Reform Act of 1978, nor any other statute or regulation,
affords Special Agent Strzok an administrative remedy or any other alternative scheme to obtain
relief for the violation of his rights under the Constitution.

<u>**COUNT TWO**</u>

**INFRINGEMENT OF PLAINTIFF'S RIGHT TO DUE PROCESS UNDER THE LAW IN
VIOLATION OF THE FIFTH AMENDMENT TO
<u>THE UNITED STATES CONSTITUTION</u>**

75.     Paragraphs 1-70 are realleged.

76.     Defendants refused to abide by the final decision of the appropriately designated
"deciding official." Defendants instead fired plaintiff while depriving him of an appeal procedure
to the Disciplinary Review Board, which was a standard part of the FBI's disciplinary process,
and the applicability of which was confirmed in the proposed removal.  Defendants' actions
deprived plaintiff of his property interest in his public employment without due process of law,
in violation of the Fifth Amendment to the Constitution.

77.     Neither the Civil Service Reform Act of 1978, nor any other statute or regulation,
affords Special Agent Strzok an administrative remedy or any other alternative scheme to obtain
relief for the violation of his rights under the Constitution.

## COUNT THREE



WHEREFORE, plaintiff requests that this Court:

1) Declare that defendants have violated his rights under the Constitution;

2) Enjoin defendants from further violations of plaintiff's rights;

3) Reinstate plaintiff into the position he would have occupied absent defendant's violation of his constitutional rights;

4) If, for whatever reason, the Court declines to award plaintiff reinstatement, then award him appropriate front pay as a substitute for reinstatement;

5) Award plaintiff back pay as equitable relief from the unlawful termination of his employment, and pursuant to the Back Pay Act;

6) ███████████████████████████████████████████████

███████████████

7) Award pre-judgment and post-judgment interest on all amounts awarded herein;

8) Award plaintiff his costs and reasonable attorneys' fees incurred in this action and the claims that necessarily preceded it;

9) Award such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff requests trial by jury.


Date: July 26, 2024                                Respectfully Submitted,

                                                   /s/ *Aitan D. Goelman*
                                                   Aitan D. Goelman (DC Bar 446636)
                                                   Christopher R. MacColl (DC Bar 1049153)
                                                   **ZUCKERMAN SPAEDER LLP**
                                                   1800 M Street, NW, Suite 1000
                                                   Washington, DC 20036
                                                   Tel: (202) 778-1800
                                                   AGoelman@zuckerman.com
                                                   CMacColl@zuckerman.com


                                                   /s/ Richard A. Salzman
                                                   Richard A. Salzman (DC Bar 422497)
                                                   **HELLER, HURON, CHERTKOF
                                                   & SALZMAN PLLC**
                                                   1010 Wayne Ave., Suite 510
                                                   Silver Spring, MD 20910
                                                   Telephone: (202) 293-8090
                                                   salzman@hellerhuron.com