**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-CV-2367-ABJ |
| v. | ) | |
| | ) | **REDACTED VERSION** |
| ATTORNEY GENERAL MERRICK B. | ) | |
| GARLAND, in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.      Mr. Strzok Led Two of the FBI's Most Significant Investigations and Served as the Most Senior FBI Agent on Special Counsel Mueller's Investigation .......................... 2

II.      While Holding These Senior Roles, Mr. Strzok Exchanged Thousands of Text Messages with Ms. Page on His FBI-Issued Device ........................................................ 4

III.     Special Counsel Mueller Removed Mr. Strzok After OIG Discovered Concerning Text Messages Between Mr. Strzok and Ms. Page ........................................................ 5

IV.     In the Midyear Exam Report, OIG Concluded Mr. Strzok Caused Significant Damage to the FBI and Referred Mr. Strzok to the FBI for Appropriate Action .............. 8

V.      After OPR Provided Mr. Strzok With Notice and an Opportunity to Be Heard, Mr. Bowdich Dismissed Mr. Strzok, As Initially Recommended by OPR Career Staff ......... 11

       A.      The FBI's Disciplinary Process ................................................................. 11

       B.      Mr. Strzok's Disciplinary Proceedings .................................................. 13

       C.      Events Leading Up to the FBI's Decision to Dismiss Mr. Strzok ......................... 14

       D.      The FBI's Decision to Dismiss Mr. Strzok ............................................. 17

STANDARD OF REVIEW ................................................................................................. 19

ARGUMENT ...................................................................................................................... 20

I.      The Government Is Entitled to Summary Judgment on Mr. Strzok's First Amendment Claim ........................................................................................................... 20

       A.      Mr. Strzok Was Properly Dismissed Because His Interest in Speaking Is Far Outweighed by Critical Law Enforcement Interests of the FBI ................... 21

       B.      The Evidence Does Not Support Mr. Strzok's Claim that the FBI Dismissed Him Because of Pressure from Former President Trump ................. 29

II.     Mr. Strzok Cannot Prevail on His Due Process Claim ...................................... 35

       A.      Mr. Strzok Had No Property Interest in His Former Job ...................................... 35

       B.      Mr. Strzok Cannot Plausibly Show that He Was Denied Due Process ............... 43

CONCLUSION ................................................................................................................... 45

i

## TABLE OF AUTHORITIES

### Cases

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ............................................................................................ 35

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................... 20

*Baumann v. District of Columbia*,
  795 F.3d 209 (D.C. Cir. 2015) ................................................... 22, 24, 28, 29

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*,
  518 U.S. 668 (1996) .......................................................................................... 23

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) .......................................................................................... 35

*Breiterman v. U.S. Capitol Police*,
  15 F.4th 1166 (D.C. Cir. 2021) .............................................................. *passim*

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) .......................................................................................... 44

*Cobell v. Norton*,
  226 F.R.D. 67 (D.D.C. 2005) .......................................................................... 44

*Connick v. Myers*,
  461 U.S. 138 (1983) .............................................................................. *passim*

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) .............................................................................................. 42

*Far Out Prods., Inc. v. Oskar*,
  247 F.3d 986 (9th Cir. 2001) .......................................................................... 34

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ................................................................................... 21, 22

*Geshke v. Crocs, Inc.*,
  740 F.3d 74 (1st Cir. 2014) .............................................................................. 34

*Hall v. Ford*,
  856 F.2d 255 (D.C. Cir. 1988) ............................................................... *passim*

*Hawkins v. District of Columbia*,
  923 F. Supp. 2d 128 (D.D.C. 2013) ............................................................... 24

*Herr v. DOJ*,
    SF-0752-14-0447-I-1, 2014 WL 4851394 (M.S.P.B. Sept. 22, 2014) ..................................... 43

*Hozier v. Midwest Fasteners, Inc.*,
    908 F.2d 1155 (3d Cir. 1990) ..................................................................................... 34

*Johnson v. United States*,
    628 F.2d 187 (D.C. Cir. 1980) .................................................................................... 43

*Lamb v. Holder*,
    82 F. Supp. 3d 416 (D.D.C. 2015) ......................................................................... 35, 36

*Lauren W. ex rel. Jean W. v. DeFlaminis*,
    480 F.3d 259 (3d Cir. 2007) ..................................................................................... 34

*LeFande v. District of Columbia*,
    841 F.3d 485 (D.C. Cir. 2016) ..................................................................... 22, 23, 24, 28

*Lehman v. Nakshian*,
    453 U.S. 156 (1981) ................................................................................................. 34

*Lewis v. Gov't of D.C.*,
    282 F. Supp. 3d 169 (D.D.C. 2017) ............................................................... 22, 23, 26

*Link v. Dep't of Treasury*,
    56 M.S.P.R. 254 (M.S.P.B. Jan. 13, 1993) ............................................................... 41

*Link v. Dep't of Treasury*,
    51 F.3d 1577 (Fed. Cir. 1995) .................................................................................. 41

*Mack v. United States*,
    814 F.2d 120 (2d Cir. 1987) ..................................................................................... 36

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................................................. 43

*Navab-Safavi v. Glassman*,
    637 F.3d 311 (D.C. Cir. 2011) ..................................................................... 22, 23, 25

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ................................................................... 22, 23, 25

*Painter v. FBI*,
    694 F.2d 255 (11th Cir. 1982) .................................................................................. 36

*Parkinson v. Dep't of Justice*,
    874 F.3d 710 (Fed. Cir. 2017) .................................................................................. 43

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ........................................................................... 41

*\*Pickering v. Board of Education of Township High School District 205*,
    391 U.S. 563 (1968) ................................................................... *passim*

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ................................................................... *passim*

*Scull v. DHS*,
    113 M.S.P.R. 287 (M.P.S.B. Feb. 19, 2010) ...................................... 42

*Thompson v. District of Columbia*,
    530 F.3d 914 (D.C. Cir. 2008) ......................................................... 35

*U.S. Dep't of Air Force v. Fed. Labor Rels. Auth.*,
    949 F.2d 475 (D.C. Cir. 1991) ......................................................... 41

*United States v. Flynn*,
    411 F. Supp. 3d 15 (D.D.C. 2019) ................................................... 10

*Wagner v. FEC*,
    793 F.3d 1 (D.C. Cir. 2015) ...................................................... 24, 25

*Waldon v. Wal-Mart Stores, Inc., Store No.*,
    1655, 943 F.3d 818 (7th Cir. 2019) .................................................. 34

*Waters v. Churchill*,
    511 U.S. 661 (1994) .......................................................... 21, 24, 29

## Statutes

5 U.S.C. § 402(b) ................................................................................. 6

5 U.S.C. § 404 ..................................................................................... 6

5 U.S.C. § 2108(3) ............................................................................. 36

5 U.S.C. § 7511 ........................................................................... 35, 36

5 U.S.C. § 7513 ................................................................................. 35

5 U.S.C. § 7703(b)(1) ........................................................................ 42

28 U.S.C. § 1295(a)(9) ...................................................................... 42

## Rules

Fed. R. Civ. P. 56(a) ......................................................................... 19

**<u>Other Authorities</u>**

U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 14, 2018) ("Midyear Rpt."),
   https://perma.cc/7DMQ-RZ6T ........................................................................... *passim*

U.S. Dep't of Justice, Off. of the Inspector Gen., *Review of Four FISA Applications & Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) ("Crossfire Rpt."),
   https://perma.cc/5LUS-TMGW ............................................................................... 2

**INDEX OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 1. | Letter from Deputy Director David Bowdich to Peter Strzok, dismissing Mr. Strzok from the FBI (August 9, 2018) ("Bowdich Ltr.") |
| 2. | Letter from Assistant Director Candice Will to Peter Strzok, regarding OPR's disciplinary decision (August 8, 2018) ("Will Ltr.") |
| 3. | Letter from OPR Unit Chief to Peter Strzok, proposing that Mr. Strzok be dismissed from the FBI (June 15, 2018) ("Proposal Ltr.") |
| 4. | Last Chance Agreement (July 26, 2018) ("LCA") |
| 5. | Letter from Aitan Goelman to Candice Will, responding to OPR's proposed dismissal, and cover email (July 17, 2018) |
| 6. | Transcript of Peter Strzok's Hearing before Candice Will (July 24, 2018) ("OPR Hrg. Tr.") |
| 7. | Candice Will Deposition Transcript (June 15, 2022) ("Will Tr.") |
| 8. | Candice Will Deposition Errata Sheet |
| 9. | David Bowdich Deposition Transcript (Sept. 9, 2022) ("Bowdich Tr.") |
| 10. | Christopher Wray Deposition Transcript (June 27, 2023) ("Wray Tr.") |
| 11. | Donald J. Trump Deposition Transcript (Oct. 17, 2023) ("Trump Tr.") |
| 12. | Excerpts from Nancy McNamara Deposition Transcript (Aug. 12, 2022) ("McNamara Tr.") |
| 13. | Excerpts from FBI 30(b)(6) Deposition Transcript (Apr. 14, 2023) ("FBI 30(b)(6) Tr.") |
| 14. | Excerpts from Michael Horowitz Deposition Transcript (Apr. 20, 2022) ("Horowitz Tr.") |
| 15. | Excerpts from Scott Schools Deposition Transcript (June 9, 2022) ("Schools Tr.") |
| 16. | Excerpts from Peter Strzok Deposition Transcript (Aug. 8, 2022) ("Strzok Tr.") |
| 17. | Declaration of John F. Kelly and Attachments ("Kelly Decl.") |
| 18. | FBI Policy Directive 0915D (Disciplinary Appeals Process) |
| 19. | FBI Policy Directive 0235D (Disciplinary Appeals Process) |
| 20. | Memorandum from FBI Director Louis J. Freeh, *Standards of Conduct, Disciplinary Matters – Revision of the FBI's Disciplinary Process* (March 5, 1997) |
| 21. | FBI Director Robert Mueller, *Standing Delegation of Authorities of the Director, Federal Bureau of Investigation* (March 2007) |
| 22. | Folder of David Bowdich materials regarding Peter Strzok's discipline, including materials provided by Candice Will |
| 23. | Letter relaying decision of Deputy Director Mark F. Giuliano to overturn lower disciplinary decision (Sept. 25, 2015) |
| 24. | Letter relaying decision of Deputy Director Sean M. Joyce to overturn lower disciplinary decision (Sept. 27, 2013) |
| 25. | Letter relaying decision of Deputy Director Sean M. Joyce to overturn lower disciplinary decision (July 16, 2013) |
| 26. | Letter from David Bowdich, overturning lower disciplinary decision (February 22, 2018) |

| Exhibit Number | Description |
|---|---|
| 27. | Order No. 3915-2017, appointing Robert S. Mueller III as Special Counsel (May 17, 2017) |
| 28. | Memorandum from OIG to Nancy McNamara, *Request for production of documents concerning FBI actions in advance of the 2016 election* (June 29, 2017) |
| 29. | Letter from Inspector General Michael Horowitz to Chairman Johnson and Chairman Grassley regarding OIG's discovery of certain text messages in connection with its review of DOJ and FBI actions in advance of the 2016 election (December 13, 2017) |
| 30. | Email of OIG staff, *First cut at Page-Strzok excerpts* (July 26, 2017) |
| 31. | Email chain of OIG staff, *Re: First cut at Page-Strzok excerpts* (July 26-27, 2017, last email sent 11:30 a.m.) |
| 32. | Email chain of OIG staff, *Re: First cut at Page-Strzok excerpts* (July 26-27, 2017, last email sent 8:44 a.m.) |
| 33. | Email among OIG staff, *FW: First cut at Page Strzok excerpts*, listing attachment "Political comments.xlsx" (July 27, 2017) |
| 34. | Email from Michael Horowitz to OIG staff, *RE: Draft document request*, noting scheduled meeting with Special Counsel Robert Mueller and Deputy Attorney General Rod Rosenstein (July 27, 2017) |
| 35. | Email from OIG staff, copying Michael Horowitz and OIG staff, *Re: Call from Aaron*, relaying information from call with Aaron Zebley (July 28, 2017) |
| 36. | Email chain including Michael Horowitz and David Bowdich, *RE: meeting tomorrow morning?* (July 27-28, 2017) |
| 37. | Handwritten notes of various calls and meetings from July 27 and July 28, 2017, and cover email (email dated February 26, 2018) |
| 38. | Email from David Bowdich to Peter Strzok, *Call* (August 1, 2017) |
| 39. | Meeting Invitation: David Bowdich and Peter Strzok, *A/DD Mtg. w/Pete Strzok* (Aug. 1, 2017) |
| 40. | Email chain including Aitan Goelman, and OPR personnel, *Re: Peter Strzok*, including discussion of written response to OPR proposal letter and OPR materials (July 5, 2018) |
| 41. | Invitation for Peter Strzok OPR Hearing (July 24, 2018) |
| 42. | Email from OPR Unit Chief to Candice Will, *Last Chance* (July 24, 2018) |
| 43. | Email from OPR Unit Chief to Aitan Goelman, *Peter Strzok Last Chance Agreement*, attaching unsigned last chance agreement (July 25, 2018) |
| 44. | Email from Candice Will to David Bowdich, *Pending Matter* (July 25, 2018) |
| 45. | Email from Aitan Goelman to OPR Unit Chief, *FW: 2018-07-26_Last Chance_Adjudication Agreement.PDF*, attaching signed last chance agreement (July 26, 2018) |
| 46. | Meeting Invitation: David Bowdich and Candice Will, *DD Mtg. w/Candice Will* (July 26, 2018) |
| 47. | Email chain between Candice Will and OPR staff, *DD Mtg Today at 2:30PM* (July 26, 2018) |
| 48. | Email chain between Candice Will and Deputy Director Bowdich executive assistant, *Re: can you call the deputy please,* [*phone number*] (July 27, 2018) |

| Exhibit Number | Description |
|---|---|
| 49. | Additional email in chain between Candice Will and Deputy Director Bowdich executive assistant, *Re: can you call the deputy please,* [*phone number*], regarding CD (July 27, 2018) |
| 50. | Printout of email with last chance agreement and handwritten note indicating delivery to David Bowdich (note indicating date of July 27, 2018) |
| 51. | Email chain between Aitan Goelman and OPR Unit Chief, *RE: Peter Strzok* (July 30, 2018) |
| 52. | Email chain with Candice Will and OPR Unit Chief, *RE: Peter Strzok character reference,* referencing August 6, 2018 call with Aitan Goelman (August 6, 2018) |
| 53. | Text of initial David Bowdich draft of letter dismissing Peter Strzok |
| 54. | Email from David Bowdich executive assistant to Candice Will, *letter --- UNCLASSIFIED,* requesting review of David Bowdich's draft dismissal letter (August 8, 2018) |
| 55. | Email from Candice Will to David Bowdich executive assistant, *Re: letter --- UNCLASSIFIED,* attaching Candice Will's proposed edits to David Bowdich's draft dismissal letter (August 8, 2018) |
| 56. | Email chain including Candice Will, OPR Unit Chief, George Crouch, David Schlendorf, and other individual regarding delivery of dismissal letter to Peter Strzok (August 10, 2018) |
| 57. | FBI Job Posting for Senior Executive Service position, Deputy Assistant Director, Counterintelligence Division |
| 58. | Peter Strzok Standard Form 50 Notification of Personnel Action, noting Peter Strzok's promotion to Senior Executive Service ("SF-50") |
| 59. | Peter Strzok Standard Form 52 Request for Personnel Action, dismissing Peter Strzok ("SF-52") |
| 60. | Excerpts from Plaintiff Peter Strzok's Responses to Defendants' Interrogatories |
| 61. | Audio CD of Peter Strzok's Hearing before Candice Will (July 24, 2018) |

## INTRODUCTION

After years of discovery, voluminous document productions, and numerous depositions, including those of the ultimate decisionmaker, FBI Deputy Director David Bowdich; the FBI Director; and a former President of the United States, there is no further need for factfinding. The reason for Peter Strzok's dismissal from the FBI is clear and not subject to genuine dispute: the FBI dismissed Mr. Strzok because he exchanged politically charged text messages on his FBI-issued device about individuals who were centrally connected to high-profile investigations Mr. Strzok was leading. Under the framework established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), the FBI's strong interest in maintaining the public's faith and trust, and in maintaining its reputation as a neutral, unbiased investigative agency, far outweighed Mr. Strzok's interest in sending messages about individuals connected to FBI investigations. Accordingly, Mr. Strzok's dismissal was consistent with the First Amendment.

███████████████████████████████████████████████

██████████████████████████████████—Mr. Strzok contends now that his dismissal was the result of "pressure from President Trump and his political allies." Am. Compl. ¶ 3, ECF No. 147. But Mr. Strzok has no evidence to support that claim. Indeed, the record shows that the FBI dismissed Mr. Strzok based solely on the nature of his misconduct and its impact on the FBI. Mr. Strzok cannot avoid summary judgment by relying on mere innuendo and speculation.

Mr. Strzok's due process claim is also foreclosed. As an at-will employee, he lacked any property interest in his continued employment at the FBI. Mr. Strzok's arguments to the contrary primarily rest on a so-called Last Chance Agreement ("LCA") that only he and his counsel signed. But that argument rests on a flawed premise: that an at-will employee who lacks a protected property interest in continued employment can acquire such an interest by committing misconduct

and—on the verge of dismissal—proposing and signing an LCA. Mr. Strzok is also wrong on the facts, which establish that the LCA was merely a proposal Mr. Strzok made to avoid dismissal. At no point did the FBI agree not to dismiss Mr. Strzok in exchange for the LCA, and Mr. Strzok lacked any objectively reasonable expectation in continued employment by virtue of that document. To the contrary, ███████████████████████████████████████ ████████████████████████████████████.

Finally, even assuming Mr. Strzok had a protected interest in continued employment, his due process claim would still fail. Mr. Strzok had ample notice and opportunity to be heard, assisted by counsel. Those procedural protections easily satisfy the flexible constitutional standard of due process. The government is entitled to summary judgment.

## BACKGROUND

I.  **Mr. Strzok Led Two of the FBI's Most Significant Investigations and Served as the Most Senior FBI Agent on Special Counsel Mueller's Investigation**

Mr. Strzok led "some of the most high profile and sensitive investigations in recent history" at the FBI. Am. Compl. ¶ 15. One of those was the FBI's investigation into the use of a private email server by former Secretary of State and then-presidential candidate Hillary Clinton. *See* U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 14, 2018) ("Midyear Rpt."), at 39-40 (https://perma.cc/7DMQ-RZ6T). In August 2015, the FBI selected Mr. Strzok to lead the investigation, codenamed "Midyear Exam." *Id.* at 43, 45, 397; *see* Ex. 16 ("Strzok Tr."), at 70-71. At the time, Mr. Strzok was serving as the Assistant Special Agent in Charge of the FBI's Washington Field Office, and he was chosen to lead the Midyear investigation "because he was one of the most experienced and highly-regarded counterintelligence investigators within the FBI." Midyear Rpt. at 43. The investigation generated intense public interest, and the Midyear team

frequently briefed then-Director James Comey and other senior FBI officials. Midyear Rpt. at 47-48. Mr. Strzok often played a significant role in those briefings. *Id.* ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.

   In late July 2016, the FBI opened an investigation into the Russian government's efforts to interfere in the 2016 presidential election, which included an investigation into whether the Russian government had coordinated with Donald Trump's presidential campaign. Once again, the FBI selected Mr. Strzok to help lead this highly sensitive investigation, codenamed "Crossfire Hurricane" (it is sometimes also referred to as the "Russia investigation"). *See* Midyear Rpt. at 397 & n.196; U.S. Dep't of Justice, Off. of the Inspector Gen., *Review of Four FISA Applications & Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) ("Crossfire Rpt."), at i, 64-65, 81-83 (https://perma.cc/5LUS-TMGW**)**. Mr. Strzok participated in the FBI's deliberations regarding whether to open the Crossfire Hurricane investigation, and, after the investigation was authorized, he drafted and approved the FBI document formally opening the investigation and helped select members of the investigative team. Crossfire Rpt. at ii, 52, 58. As with the Midyear investigation, Mr. Strzok was among the FBI agents to regularly brief the FBI Director regarding Crossfire Hurricane. Crossfire Rpt. at 69. In September 2016, the FBI promoted Mr. Strzok to Deputy Assistant Director, another SES position. Midyear Rpt. at 43 n.51, 396; Ex. 57.

   The FBI conducted and oversaw the Crossfire Hurricane investigation from late July 2016 until May 17, 2017. Crossfire Rpt. 63. On that day, then-Deputy Attorney General Rod Rosenstein appointed Robert S. Mueller III as Special Counsel, transferring authority to conduct the investigation from the FBI to the Special Counsel's Office. Crossfire Rpt. 248 n.392; Ex. 27 (Mueller

appointment letter). ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ .

## II.    While Holding These Senior Roles, Mr. Strzok Exchanged Thousands of Text Messages with Ms. Page on His FBI-Issued Device

Over the course of these high-profile investigations, Mr. Strzok sent and received thousands of text messages with Lisa Page. Ms. Page was an FBI attorney involved with the Midyear investigation, the Crossfire Hurricane investigation, and the Mueller investigation. Ms. Page served as Special Counsel to Andrew McCabe, who was then the FBI Deputy Director.

From June 2015 through July 2017—which covers the period when Mr. Strzok was leading the Midyear and Crossfire Hurricane investigations and serving as the lead agent on Special Counsel Mueller's investigation—Mr. Strzok and Ms. Page exchanged more than 40,000 unique text messages on their FBI-issued devices. Midyear Rpt. at 397 n.198. ██████████████████

███████████████████████████████████████████████

████████████████████████████████████████ .

In some of the text messages sent on their government devices, Mr. Strzok and Ms. Page expressed political opinions regarding Donald Trump and Hillary Clinton, the two major-party candidates in the 2016 presidential election, both of whom were centrally connected to FBI investigations that Mr. Strzok was leading. Midyear Rpt. at 396. These text messages included "statements of hostility toward then candidate Trump and statements of support for candidate Clinton." *Id.* As some examples, Mr. Strzok—from his FBI-issued device and while on investigations pertaining to Mr. Trump and his election opponent, Ms. Clinton—called Mr. Trump "abysmal," "a

disaster," and a "fucking idiot." *Id.* at 399-400. In other exchanges, Ms. Page twice stated that Mr. Trump "cannot be President," and Mr. Strzok stated, "Hillary should win 100,000,000-0," and that he "could SMELL the Trump support" after walking into a "southern Virginia Walmart." *Id.* Shortly before the 2016 election, Mr. Strzok sent Ms. Page an article discussing the possibility of Mr. Trump being elected, stating "OMG THIS IS F*CKING TERRIFYING." *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████.

### III.   Special Counsel Mueller Removed Mr. Strzok After OIG Discovered Concerning Text Messages Between Mr. Strzok and Ms. Page

The Department's Office of the Inspector General ("OIG") is an independent and objective entity that conducts reviews of the programs and operations of the Department and its components,

including the FBI. 5 U.S.C. §§ 402(b), 404. On January 12, 2017, after the Midyear investigation concluded and while Mr. Strzok was working on the Crossfire Hurricane investigation, OIG announced that it would conduct a review of various Department and FBI actions during the Midyear investigation. Midyear Rpt. at 2. OIG initiated the review after receiving requests from numerous members of Congress, various organizations, and members of the public. *Id.*

---

[1] For technical reasons, the times that appear on the last-in-time emails of many of the email chains in Defendants' productions appear in Coordinated Universal Time ("UTC"), which is the same as Greenwich Mean time, rather than Eastern Time. Where there are earlier emails in the same chain, the times stated on those emails appear in Eastern Time.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████:

████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████
██████████████████████████████████████
████████████.

██████████████████████████████████████████████████

█████████████████████████████████████████████.

███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████.

**IV.    In the Midyear Exam Report, OIG Concluded Mr. Strzok Caused Significant Damage to the FBI and Referred Mr. Strzok to the FBI for Appropriate Action**

After alerting the relevant actors at the Department, the FBI, and the Special Counsel's Office about the text messages, OIG continued its review of the Midyear investigation. OIG concluded the review and released its final report on June 14, 2018. *See generally* Midyear Rpt. The

Midyear Report covered a range of topics related to the investigation into Secretary Clinton's use of a private email server, *see id.* at i, including a prominent discussion of politically charged text and instant messages sent by members of the investigative team—including Mr. Strzok and Ms. Page—that raised concerns about potential bias in FBI investigations. *See id.* at i, xi-xii, 396-410, 497; *see generally id.* at Ch. 12. The Midyear Report quoted many of the Strzok-Page text messages and noted that Mr. Strzok and Ms. Page repeatedly told OIG investigators that their political preferences played no role in any investigative decision, *see, e.g.*, *id.* at 399-409.

Ultimately, the Midyear Report concluded that, while OIG did not locate evidence that political bias "directly affected" "specific investigative decisions," *id.* at iii, 420, Mr. Strzok's text messages nonetheless caused substantial damage to the public's trust in the FBI as an unbiased and nonpartisan law enforcement agency. *See id.* at 420-24. The text messages were "deeply troubl[ing]" because they "potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations." *Id.* at 420. As explained by the OIG:

> [W]hen one senior FBI official, Strzok, who was helping to lead the Russia investigation at the time, conveys in a text message to another senior FBI official, Page, that "we'll stop" candidate Trump from being elected—after other extensive text messages between the two disparaging candidate Trump—it is not only indicative of a biased state of mind but, even more seriously, implies a willingness to take official action to impact the presidential candidate's electoral prospects. This is antithetical to the core values of the FBI and the Department of Justice.

*Id.* at 420-21. Thus, the messages sent by Mr. Strzok (and four other employees mentioned in the report) "brought discredit to themselves, sowed doubt about the FBI's handling of the Midyear investigation, and impacted the reputation of the FBI." *Id.* at 420. By sending the text messages, Mr. Strzok "cast a cloud over the FBI Midyear investigation and sowed doubt [regarding] the FBI's work on, and its handling of, the Midyear investigation." *Id.* Moreover, "the damage caused by [his] actions extends far beyond the scope of the Midyear investigation and goes to the heart of the FBI's reputation for neutral factfinding and political independence." *Id.*

The Midyear Report discussed and rejected attempts by the five employees at issue, including Mr. Strzok, to excuse the messages by stating they had intended them to remain private. *Id.* at 421. OIG "found this reliance on the 'private' nature of these messages to be misplaced. Because these messages were exchanged on government systems and devices, they were never 'private.'" *Id.* To the contrary, "rather than being 'private' communications, these messages were at all times potentially subject to being reviewed by others (including the OIG) and to being disclosed to the public." *Id.* Furthermore, "[t]he employees exchanging text messages . . . are trained law enforcement agents or attorneys, and should have known that these messages were potentially subject to release in response to FOIA requests, subject to disclosure in civil litigation, or discoverable as impeachment evidence even in the absence of the OIG investigation"; in addition, the text messages "also potentially implicate the FBI's or prosecutors' disclosure obligations in any prosecutions resulting from the investigations at issue."[2] *Id.* at 421-22.

Ultimately, OIG concluded as follows:

> At a minimum, we found that the employees' use of FBI systems and devices to send the identified messages demonstrated *extremely poor judgment and a gross lack of professionalism*. This is not just because of the nature of the messages, but also because many of the messages commented on individuals (Clinton and Trump) who were inextricably connected to the Midyear and Russia investigations. The FBI is charged with the investigation of many important and sensitive matters . . . . It is essential that the public have confidence that the work of the FBI is done without bias or appearance of partiality, and that those engaged in it follow the facts and law . . . without any agenda or desired result other than to see that justice is done.

> Although we found no documentary or testimonial evidence directly connecting the political views these employees expressed in their text messages . . . to the specific Midyear investigative decisions we reviewed . . . , the messages cast a cloud over the FBI investigations to which these employees were assigned. Ultimately, the

---

[2] Indeed, on November 30, 2017, the Department disclosed the existence of the Strzok-Page text messages and their general content to defense counsel as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation. *See United States v. Flynn*, 411 F. Supp. 3d 15, 24 (D.D.C. 2019); Schools Tr. at 95.

consequences of these actions impact not only the senders of these messages but also . . . the entire FBI.

*Id.* at 423-24 (emphasis added). Accordingly, OIG referred Mr. Strzok and other employees to the

FBI for appropriate action. *Id.* at 424.

**V.      After OPR Provided Mr. Strzok With Notice and an Opportunity to Be Heard, Mr. Bowdich Dismissed Mr. Strzok, As Initially Recommended by OPR Career Staff**

    **A.      The FBI's Disciplinary Process**

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████.

[3]

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████. [4]

**B.      Mr. Strzok's Disciplinary Proceedings**

████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[4] █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████.

   ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█ ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████.

    **C.**    **Events Leading Up to the FBI's Decision to Dismiss Mr. Strzok**

   ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

--------------------------------

[5] █████████████████████████████████████████████████████

████████████████████████

**D.    The FBI's Decision to Dismiss Mr. Strzok**



## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although a court should

draw all inferences from the supporting records submitted by the nonmoving party, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## ARGUMENT

### I.   The Government Is Entitled to Summary Judgment on Mr. Strzok's First Amendment Claim

When a government agency disciplines an employee because of the employee's speech, challenges to that discipline are governed by the balancing test first enunciated in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). At its core, the *Pickering* framework asks whether, in the specific circumstances of a particular case, the employee's interest in speaking outweighs the government agency's interests as an employer. Here, that balance favors the government. As recognized at every step of the investigative and disciplinary process, Mr. Strzok caused substantial harm to the public's trust in the FBI's reputation as a neutral, non-partisan law enforcement agency, a trust that is crucial to the FBI's ability to carry out its important public duties. That governmental imperative far outweighs any interest Mr. Strzok had in sending politically charged text messages (on monitored government devices) about individuals who were centrally connected to investigations he was leading.

Mr. Strzok's alternative theory—that he was dismissed not because of the harm he caused to the FBI, but rather due to improper pressure from former President Trump—is not supported by

the factual record. ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████. Despite exhaustive dis-

covery, Mr. Strzok can point to no evidence raising a genuine factual dispute regarding the reasons

for his dismissal.

### A.     Mr. Strzok Was Properly Dismissed Because His Interest in Speaking Is Far Outweighed by Critical Law Enforcement Interests of the FBI

**1.** "Government agencies are charged by law with doing particular tasks," and "[a]gencies

hire employees to help do those tasks as effectively and efficiently as possible." *Waters v. Church-*

*ill*, 511 U.S. 661, 674-75 (1994) (plurality op.). Accordingly, courts have long recognized that

government employers require "a significant degree of control over [an employee's] words and

actions," because otherwise "the government would have 'little chance for the efficient provision

of public services.'" *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021)

(quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see Waters*, 511 U.S. at 675 (plurality

op.) (when an employee "begins to do or say things that detract from the agency's effective oper-

ation, the government employer must have some power to restrain her"). To be sure, a public

employee does not give up all First Amendment protection by working for the government, *Con-*

*nick v. Myers*, 461 U.S. 138, 140 (1983), but in light of the practical needs of the government as

an employer, "[w]hen a citizen enters government service, the citizen by necessity must accept

certain limitations on his or her freedom," *Garcetti*, 547 U.S. at 418.

To accommodate both the First Amendment rights of individuals as well as the govern-

ment's interest as an employer, courts apply the well-established *Pickering* balancing test. *See*

*generally, e.g.*, *Waters*, 511 U.S. at 671-77 (plurality op.) (discussing the theoretical underpinnings

of this balance); *Garcetti*, 547 U.S. at 418-20 (similar). Under that test, a public employee must

satisfy a "four-element test" to set out a First Amendment claim:

> For the employee to prevail: (1) he must have spoken as a citizen on a matter of
> public concern; (2) his interest in speaking on matters of public concern must out-
> weigh the government's interest in promoting efficiency; (3) his protected speech
> must have been a substantial or motivating factor in prompting the retaliation; and
> (4) the government must be unable to show that it would have reached the same
> decision absent the protected speech.

*LeFande v. District of Columbia*, 841 F.3d 485, 493-94 (D.C. Cir. 2016). The first two elements

are "questions of law for the court to resolve," *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C.

Cir. 2011), and courts appropriately grant summary judgment to government agencies when that

balance tips in the agency's favor. *See, e.g.*, *Breiterman*, 15 F.4th at 1178; *Baumann v. District of

Columbia*, 795 F.3d 209, 215-19 (D.C. Cir. 2015). When conducting the balancing test, the speech

should "not be considered in a vacuum"; rather, "the manner, time, and place of the employee's

expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483

U.S. 378, 388 (1987); *see O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (noting sim-

ilar considerations are relevant to "the governmental interest in regulating the speech").

On one side of the balance is the public employee's interest "in commenting upon matters

of public concern," or in other words, the public employee's interest in maintaining "the First

Amendment rights they would otherwise enjoy as citizens," *Pickering*, 391 U.S. at 568. On the

other side, the *Pickering* framework "requires full consideration of the government's interest in

the effective and efficient fulfillment of its responsibilities to the public." *Lewis v. Gov't of D.C.*,

282 F. Supp. 3d 169, 183 (D.D.C. 2017) (quoting *Connick*, 461 U.S. at 150); *see also Navab-

Safavi*, 637 F.3d at 315 (recognizing "the governmental interest in promoting the efficiency of the

public services it performs through its employees without disruption" (quoting *O'Donnell*, 148

F.3d at 1133)). Among the "[p]ertinent considerations" is whether the employee's statement "interferes with the regular operation of the enterprise." *Lewis*, 282 F. Supp. 3d at 183 (quoting *Rankin*, 483 U.S. at 388). "[A]voiding such interference [with the agency's operations] can be a strong state interest." *Rankin*, 483 U.S. at 388.

Another important factor in the *Pickering* balance is the role and seniority of the government employee: "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Id.* at 390; *accord Hall v. Ford*, 856 F.2d 255, 261 (D.C. Cir. 1988) ("[T]he higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest[.]"). Thus, the *Pickering* balance tips more toward the government employer when the employee is in a leadership position and engages in inappropriate speech that impedes their agency's mission and operations. *See, e.g.*, *Breiterman*, 15 F.4th at 1177 ("As a supervisor, Breiterman had greater responsibility to uphold the mission and policies of the Capitol Police, and her breach undermined her ability to continue in a supervisory role."); *Navab-Safavi*, 637 F.3d at 317 (holding that *Pickering* balance favored employee rather than employer after concluding that the public employee's role was "nearer the role of the janitor than . . . [an] executive"); *Lewis*, 282 F. Supp. 3d at 183 (heightened standard applied to "a senior HR advisor").

In evaluating disciplinary action, courts defer to the agency's evaluation of the government's interests as an employer and the impact of an employee's speech on agency operations. *See, e.g.*, *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 677 (1996) ("*Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests."); *LeFande*, 841 F.3d at 494 (courts owe "a wide degree of deference to the employer's judgment" in evaluating impact of employee's speech). In making those predictive judgments, government

employers may appropriately "draw[] reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior[s]." *Hall*, 856 F.2d at 261. Thus, "a showing of actual disruptiveness is not required; a government employer is allowed to consider the potential disruptiveness of the employee's speech." *Baumann*, 795 F.3d at 217; *id.* at 218 (rejecting police employee's First Amendment claim when employee's improper release of a recording "'carrie[d] the clear potential for undermining' . . . ongoing investigations" (quoting *Connick*, 461 U.S. at 152)). Courts also give "substantial weight" to an agency's "reasonable predictions of disruption," "even when the speech involved is on a matter of public concern." *Waters*, 511 U.S. at 673 (plurality op.); *see Wagner v. FEC*, 793 F.3d 1, 22 (D.C. Cir. 2015) (similar).

Finally, of particular importance here, D.C. Circuit precedent recognizes that a government agency's disciplinary decisions related to employee speech are entitled to greater deference when the government employer is a law enforcement agency disciplining a law enforcement officer. *Breiterman*, 15 F.4th at 1176-77; *accord LeFande*, 841 F.3d at 495; *Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 141 (D.D.C. 2013).

**2.** The parties do not dispute the first and third elements of the *Pickering* test, *i.e.*, that Mr. Strzok was dismissed because of his text messages, and that Mr. Strzok's politically charged text messages involved a matter of public concern. But Mr. Strzok cannot prevail on the second element because his interest in using government phones to send politically charged text messages about individuals who were centrally connected to investigations he was leading is far outweighed by the FBI's interest in maintaining a reputation of unbiased neutrality. *See, e.g.*, *Breiterman*, 15 F.4th at 1178 (granting government's motion for summary judgment on basis of this element).

The *Pickering* balance here is not remotely close. ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████.

There can be no question that Mr. Strzok's text messages "interfere[d] with the regular operation of the [FBI]," *Rankin*, 483 U.S. at 388, and undermined "the efficiency of the public services it performs though its employees without disruption," *Navab-Safavi*, 637 F.3d at 315 (quoting *O'Donnell*, 148 F.3d at 1133). The FBI is the country's preeminent law enforcement agency. It is charged with conducting innumerable critical investigations every year, and some of its most sensitive matters involve investigations into political figures. To effectively carry out this mission on behalf of the public, it is critical that the FBI maintain a reputation of neutrality and nonpartisanship. *See* Midyear Rpt. at 423-24 (OIG explaining that it is "essential that the public have confidence that the work of the FBI is done without bias or appearance of partiality"); *see also Wagner*, 793 F.3d at 9 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." (citation omitted)).

By sending politically charged text messages on his FBI-issued phone, including political commentary about individuals he was investigating, Mr. Strzok caused immense damage to the FBI's reputation of neutrality. ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████   The harm from Mr. Strzok's appearance of bias was readily apparent upon dis-

covery of the text messages. ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████.[7] *See supra* at 7-8.

   ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[7] Another "[p]ertinent consideration[]" in the *Pickering* balance is whether an employee's speech "impedes the performance of the speaker's duties." *Lewis*, 282 F. Supp. 3d at 183 (quoting *Rankin*, 483 U.S. at 388).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ .

The appropriateness of Mr. Strzok's dismissal is underscored by his senior leadership role at the FBI and the gravity of his misjudgment in sending these text messages. The more senior a government employee, the greater their duty of care in their speech, *Rankin*, 483 U.S. at 390, and "the less stringent the government's burden of proving interference with its interest," *Hall*, 856 F.2d at 261. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████ Accordingly, the level of leadership Mr. Strzok was entrusted with makes his dismissal all the more appropriate, given OIG's ████████ conclusion that Mr. Strzok caused significant damage to the reputation of the FBI, *see supra*, and that he had exhibited "extremely poor judgment and a gross lack of professionalism," Midyear Rpt. at 423; ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ *See, e.g.*, *Connick*, 461 U.S. at 151 ("Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place . . . and ultimately impair the efficiency of an office or agency."); ████████████████████

████████████████████

On the other side of the balance, Mr. Strzok's interest in sending the text messages is extraordinarily weak. Under the *Pickering* balance, the employee's speech "will not be considered

in a vacuum"; rather, "the manner, time, and place of the employee's expression are relevant." *Rankin*, 483 U.S. at 388. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ Mr. Strzok's interest in sending such text messages in these circumstances comes nowhere close to outweighing the FBI's critical interest in maintaining its reputation as a neutral law enforcement organization.

In conducting the *Pickering* balance, the Court's review is not *de novo*. Courts apply "a wide degree of deference to the employer's judgment" in evaluating the impact of an employee's speech, *LeFande*, 841 F.3d at 494 (quoting *Connick*, 461 U.S. at 152), including an employer's reasonable prediction of "potential disruptiveness," *Baumann*, 795 F.3d at 217 (citation omitted), to which courts must give "substantial weight." *Waters*, 511 U.S. at 673 (plurality op.). This deference is amplified for law enforcement agencies, given "the special degree of trust and discipline required in a police force," *Breiterman*, 15 F.4th at 1176-77, particularly when an employee's speech "carries the clear potential for undermining the ongoing investigations," *Baumann*, 795

F.3d at 218 (cleaned up). Viewed through this deferential lens, the FBI's judgment regarding the harm to the FBI's reputation was even more reasonable, and disciplining Mr. Strzok because of his improper speech does not violate the First Amendment.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Further, the relief that Mr. Strzok requests in this lawsuit is for the Court to enforce a (purported) agreement in which the FBI would suspend him without pay for 60 days and demote him. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ .

**B.    The Evidence Does Not Support Mr. Strzok's Claim that the FBI Dismissed Him Because of Pressure from Former President Trump**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ :

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████:

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

Mr. Strzok has advanced the contrary theory that, despite the consistent view across those who had to reckon with his conduct across the FBI and Justice Department, he was dismissed not because of his admittedly serious and damaging misconduct, but because "[b]ut for the intervention of the President and his political allies and their insistence on punishing Special Agent Strzok for the content of his protected speech, the FBI would have imposed the lesser discipline decided upon by Assistant Director Will, and Strzok would not have been discharged." Am. Compl. ¶ 48. But Mr. Strzok can offer no competent evidence to support the speculation that the FBI dismissed him because of any political pressure from Mr. Trump. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[8] ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

    To be sure, Mr. Trump publicly expressed his negative view of Mr. Strzok on a number of occasions, including questioning why he was still employed at the FBI, *see, e.g.*, Am. Compl. ¶ 46.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████. Mr. Strzok's speculation that another motivation

was possible, or any argument that the Court should assess Mr. Bowdich's credibility notwith-
standing the absence of conflicting testimony or documentary evidence, is insufficient to create a
genuine issue of material fact in dispute that could defeat summary judgment. *See, e.g.*, *Waldon v.
Wal-Mart Stores, Inc., Store No. 1655*, 943 F.3d 818, 823 (7th Cir. 2019) ("Criticizing the credi-
bility of the movant's affiants, alone, is not enough to avoid summary judgment.").[9]

Having obtained every opportunity to support his claims, including depositions of a sitting
FBI Director and a former President, there is now no "wiggle room . . . for a factfinder to conclude
that [Mr. Bowdich] did what he did because Christopher Wray told him to or because Christopher
Wray conveyed a message from the then President, or because he thought the President had di-
rected him to." Feb. 23, 2023 Hrg. Tr. at 9, ECF No. 113.[10] ████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████, Defendants are entitled

to summary judgment on Mr. Strzok's First Amendment claim.

---

[9] *See also, e.g.*, *Geshke v. Crocs, Inc.*, 740 F.3d 74, 80 (1st Cir. 2014) ("[O]ur summary
judgment duty to draw inferences in favor of the nonmovant does not permit us to offset uncon-
troverted testimony through adverse credibility determinations."); *Lauren W. ex rel. Jean W. v.
DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) ("The fact is that in considering a motion for sum-
mary judgment the court should believe uncontradicted testimony unless it is inherently implausi-
ble[,] even if the testimony is that of an interested witness."); *Far Out Prods., Inc. v. Oskar*, 247
F.3d 986, 997 (9th Cir. 2001) (a "party opposing summary judgment may not simply question the
credibility of the movant to foreclose summary judgment."); *Hozier v. Midwest Fasteners, Inc.*,
908 F.2d 1155, 1165 (3d Cir. 1990) (a non-moving party "cannot survive summary judgment
simply by asserting that the factfinder might disbelieve the testimony of [the movant's] witnesses
on [a] potentially dispositive issue").

[10] Although Mr. Strzok's amended complaint includes a jury demand, under principles of
sovereign immunity, a "plaintiff in an action against the United States has a right to a jury only
where Congress has affirmatively and unambiguously granted that right by statute." *Lehman v.
Nakshian*, 453 U.S. 156, 168 (1981). There is no such affirmative waiver as to Mr. Strzok's First
and Fifth Amendment claims. Thus, even if the Court were to deny Defendants' motion for sum-
mary judgment, this Court would be the factfinder at trial.

II.     **Mr. Strzok Cannot Prevail on His Due Process Claim**

A.      **Mr. Strzok Had No Property Interest in His Former Job**

**1.** The Due Process claim fails at the threshold because Mr. Strzok did not have a protected interest in continued employment at the FBI at the time of his dismissal. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest . . . . Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (internal citation omitted). To have such an interest in a benefit, "a person clearly must have . . . more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "For [an] employee to have a constitutionally protected property interest in his job," he must prove an "objectively reasonable expectation that he [was] entitled to retain it." *See Hall*, 856 F.2d at 266.

At-will government employees, like Mr. Strzok, lack a property interest in their jobs. "Most cases involving government employees fall into one of two categories: terminable at will or terminable only for cause." *Id.* at 265. "Those who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely." *Id.*; *see also Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) (an employee has a property interest in a government position only if, under the law, "he could be removed only 'for cause.'" (citation omitted)).

Mr. Strzok was an at-will employee who did not enjoy for-cause removal protections: although Chapter 75 of the Civil Service Reform Act ("CSRA") provides such protections for many federal employees, 5 U.S.C. §§ 7511, 7513, it generally excludes FBI employees, 5 U.S.C. § 7511(b)(8). And "[t]hose employees not covered by the termination provisions of the CSRA, like [Mr. Strzok], have no . . . property right [in their continued employment]." *Lamb v. Holder*,

82 F. Supp. 3d 416, 424 (D.D.C. 2015); *see also, e.g.*, *Mack v. United States*, 814 F.2d 120, 123 (2d Cir. 1987); *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982). Similarly, while veterans, may in some circumstances be "preference-eligible" employees entitled to for-cause protections, *see* 5 U.S.C. § 2108(3), members of FBI's SES like Mr. Strzok are excluded from that statutory status, *id.* Thus, as a non-preference eligible FBI employee, Mr. Strzok was excluded from the CSRA's for-cause protections and lacked a property interest in his former job.

**2.** Nonetheless, Mr. Strzok has previously advanced two arguments as to why he had an "objectively reasonable expectation" of continued employment at the FBI. First, Mr. Strzok has claimed that the LCA that he proposed and signed created a contract, and that "[c]ontracts give rise to property rights." ECF No. 36 ("Pl.'s Opp'n") at 28. Second, Mr. Strzok has asserted that he was demoted "out of the SES" such that he became a for-cause employee before Mr. Bowdich dismissed him. *Id.* at 29. Neither of these arguments held up in discovery.

**a.** The LCA did not afford Mr. Strzok a property interest in his job at the FBI. As an initial matter, Mr. Strzok's argument about the LCA's effect rests on a flawed and unprecedented premise: that an at-will employee who lacks a protected property interest in continued employment can acquire such an interest by committing misconduct and—on the verge of dismissal—proposing and signing an LCA. Mr. Strzok's argument is that, by signing a document in which the employee agrees not to seek further process as to the misconduct in question or "any other serious misconduct," *see* Ex. 4, the employee *gains* constitutional due process protections to which he would otherwise not be entitled under the Fifth Amendment. The Court should reject that argument. First, it conflicts with the statutory scheme that Congress set forth in the CSRA, which excludes SES FBI employees from the CSRA's for-cause termination provisions. *See* 5 U.S.C. § 7511(b)(8). Under the CSRA, the FBI was not required to afford Mr. Strzok with any particular process before

penalizing him for his misconduct. He cannot acquire greater protections than what Congress afforded him *after* committing misconduct. Second, and relatedly, Mr. Strzok's argument runs contrary to the terms and purpose of the LCA. An LCA is a document signed by those hoping to avoid more severe punishment, in which an employee proposes not to seek certain process in the future. Such a document cannot be the basis for concluding that the Constitution requires the FBI to provide *more* process. Third, to date, Mr. Strzok has not cited any case—from this circuit or elsewhere—in which an LCA has been found to convert an at-will employee into one with for-cause due process protections. This Court should not reach that counterintuitive result here either.

In any event, Mr. Strzok is wrong on the facts, which establish that the LCA was not a contract but merely a proposal made by Mr. Strzok to avoid dismissal. At no point did the FBI accept the LCA's terms, which Mr. Strzok and his counsel understood. And when Mr. Strzok ultimately received Ms. Will's letter referring to the LCA, he knew that the accompanying letter from Deputy Director Bowdich controlled. Therefore, at no point between when Mr. Strzok proposed the LCA and when he received Mr. Bowdich's letter dismissing him did the LCA provide an "objectively reasonable" basis for Mr. Strzok to conclude that he had a constitutionally protected interest in continued employment at the FBI. *See Hall*, 856 F.2d at 266.

As set forth above, *see supra* at 14-15, ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

[REDACTED]

Thus, the LCA's text—like the context in which it was proposed—demonstrates that the LCA was just that: a proposal Mr. Strzok made in hopes that the FBI would allow him to remain. It was not an agreement between the FBI and Mr. Strzok.

[REDACTED]

.

██████████████████████████████████████████████████████

████████████████████████████████████████

The facts here therefore distinguish this case from those that Mr. Strzok has previously relied upon and that the Court has referenced, all of which involved different LCAs and different contexts. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████. It was not "negotiated by an agency," as occurred in *U.S. Department of Air Force v. Federal Labor Relations Authority*, 949 F.2d 475, 478 (D.C. Cir. 1991), which is not, in any event, a Fifth Amendment Due Process case. Similarly, unlike in *Link v. Department of Treasury*, the LCA here was not "a settlement agreement." *See* 51 F.3d 1577, 1582 (Fed. Cir. 1995). In *Link*, after the employee appealed an adverse agency action, "the parties settled the appeal" and the "administrative judge accepted the agreement into the record and dismissed the appeal"; pursuant to "the terms of the settlement," "the agency agreed" to do certain things and, "[i]n return," the employee agreed to waive certain appeal rights. *Link v. Dep't of Treasury*, 56 M.S.P.R. 254, 256 (M.S.P.B. Jan. 13, 1993). None of that occurred here. And to the extent Mr. Strzok ever believed that the LCA was the end of the line—███████████████████████████████████████████████████—there certainly were no "mutually explicit understandings that support [Mr. Strzok's] claim of entitlement" to continued employment at the FBI. *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

**b.** If Mr. Strzok argues—as he did in his preceding appeal to the Merit Systems Protection Board ("MSPB") and in earlier briefing before this Court—that he acquired a property interest because he was demoted to a preference-eligible position on August 8, 2018, that argument also fails. Mr. Strzok was not demoted; he remained an SES employee until dismissed by Mr. Bowdich.

41

Mr. Strzok's argument to the contrary rests on the same inaccurate statement of the events surrounding the LCA and Ms. Will's letter. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. As the Administrative Judge explained in rejecting Mr. Strzok's similar argument before the MSPB, the MSPB has "long held that an adverse action is effective on the day on which the appellant is notified that the action will become effective." MSPB Initial Decision at 6, ECF No. 30-11 (citing *Scull v. DHS*, 113 M.S.P.R. 287, ¶ 12 (M.P.S.B. Feb. 19, 2010)). Mr. Strzok was notified of dismissal on August 10, 2018, when he received both letters. He was not notified of a demotion at any earlier date. And, indeed, no demotion occurred. ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████. There is therefore no plausible argument that Mr. Strzok had been removed from the SES prior to the FBI's final decision to dismiss him.

Even if, counterfactually, the Court were to conclude that Mr. Strzok was demoted from the SES, the result would be dismissal for lack of jurisdiction. The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees," and Mr. Strzok's proper recourse would have been to seek further review of the MSPB decision concluding that he remained an SES employee. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6 (2012) (citation omitted); *see also* 28 U.S.C. § 1295(a)(9); 5 U.S.C. § 7703(b)(1). Indeed, the only decisions that Mr. Strzok has previously cited for the proposition that "non-SES FBI employees who have earned veteran's preference are vested with appeal rights," all involved appeals to the MSPB rather than review in federal district court. *See* Pl.'s Opp'n 30 (citing *Parkinson v. Dep't of Justice*, 874 F.3d 710, 712-13 (Fed. Cir. 2017) ("[M]any federal employees do not have the right to appeal *to the Board*. . . .

including those of the FBI . . . with the exception of certain preference-eligible employees.") (emphasis added); *Herr v. DOJ*, SF-0752-14-0447-I-1, 2014 WL 4851394 (M.S.P.B. Sept. 22, 2014) ("He timely appealed his removal *to the Board*, which—because he is a preference-eligible veteran—has jurisdiction.") (emphasis added)).

* * *

Because Mr. Strzok lacked "a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that he would continue in his job," he did not have a constitutionally protected "property interest in continued employment" at the FBI, *Hall*, 856 F.2d at 265, and Defendants are entitled to summary judgment on his Due Process claim.

### B.    Mr. Strzok Cannot Plausibly Show that He Was Denied Due Process

Even assuming Mr. Strzok enjoyed a protected interest in his position—which he did not, for the reasons discussed above—Mr. Strzok cannot show that he was deprived of any constitutionally guaranteed amount of process prior to his dismissal. The Fifth Amendment requires that "a person receive his 'due' process, not every procedural device that he may claim or desire." *Johnson v. United States*, 628 F.2d 187, 194 (D.C. Cir. 1980). The due process requirements are flexible and are informed by context, including the private interest that will be affected, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of any additional procedural safeguard. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Yet, despite clear notice of the proposed action against him and ample opportunity for him to make his case, Mr. Strzok takes issue with the fact that it was Mr. Bowdich who made the final decision with respect to his dismissal, rather than Ms. Will. *See* Am. Compl. ¶ 50. The Due Process Clause, however, does not mandate that any specific government employee make a particular personnel decision. And Mr. Bowdich's modification of Ms. Will's decision was entirely proper. █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

Mr. Strzok may also contend that he lacked a meaningful opportunity to be heard because his oral presentation was before Ms. Will, and it was Mr. Bowdich who made the ultimate decision regarding his employment. To start, that ignores numerous authorities recognizing that, in the civil context, in-person hearings are not required to satisfy due process. *See, e.g.*, *Cobell v. Norton*, 226 F.R.D. 67, 90 (D.D.C. 2005) ("The Court has afforded the parties the opportunity to be heard through their written submissions, which is sufficient to satisfy the [opportunity to be heard] requirement of Rule 37."); *cf. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985) ("The essential requirements of due process . . . are notice and an opportunity to respond . . . *either in person or in writing . . . .*" (emphasis added)). It follows, therefore, that Mr. Strzok did not have a constitutional guarantee to appear in-person before Mr. Bowdich specifically. ████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

     Mr. Strzok also maintains that he should have been able to appeal the dismissal decision to the DRB. *See* Am. Compl. ¶¶ 39-41. However, Mr. Strzok's argument misunderstands the organizational structure of the FBI disciplinary process. Mr. Bowdich, the FBI Deputy Director, sat above both OPR and the DRB. As discussed above, ████████████████████████████████

████████████████████████████████████████████████████

███████. Thus, appeal to the DRB would have been relevant only if *OPR* had decided to dismiss Mr. Strzok, at which point he could have sought review by that body. And, even then, the DRB's decision would have been subject to Mr. Bowdich's review. However, because it was Mr. Bowdich who decided to dismiss Mr. Strzok, appeal to the DRB was properly unavailable.

## CONCLUSION

    The Court should enter summary judgment in favor of Defendants.

Dated: September 16, 2024             Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Joshua C. Abbuhl*
JOSHUA C. ABBUHL
(D.C. Bar 1044782)
BRADLEY P. HUMPHREYS
(D.C. Bar. 988057)
MICHAEL J. GAFFNEY
(D.C. Bar 1048531)
CHRISTOPHER M. LYNCH
(D.C. Bar 1049152)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20001
Phone: (202) 616-8366
Fax: (202) 616-8460
Joshua.Abbuhl@usdoj.gov

*Counsel for Defendants*