# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER P. STRZOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-2367-ABJ |
| | ) | |
| ATTORNEY GENERAL MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT II AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.    After More than Twenty-Five Years of Distinguished Service to this Country,
Mr. Strzok Expressed Shock and Disapproval at Donald Trump in Text Messages .......... 2

II.    Before President Trump Demanded Mr. Strzok's Termination, Mr. Bowdich
Assured Mr. Strzok that His Career with the FBI Would Continue ................................. 5

III.    Defendants Facilitated a Race Between Media Outlets to Publish Misleading
Stories about Mr. Strzok and Leaked His Text Messages .................................................. 6

IV.    President Trump Pressured the FBI to Fire Mr. Strzok, and Mr. Bowdich Listened ......... 9

V.    The FBI and Mr. Strzok Executed an LCA that Promised Mr. Strzok He Would
be Suspended and Demoted, but not Fired ...................................................................... 12

VI.    Mr. Bowdich Purported to Unilaterally Abrogate the Last Chance Agreement
and Fired Mr. Strzok Consistent with President Trump's Demands ............................... 17

VII.    Mr. Bowdich's Termination of Mr. Strzok Had No Basis in Policy or Precedent .......... 20

VIII.    Comparator Cases Show that Politics (and Trump's Demands) Motivated Bowdich ...... 21

IX.    President Trump Correctly Claimed Credit for Mr. Strzok's Termination ..................... 23

LEGAL STANDARD .......................................................................................................... 23

ARGUMENT ................................................................................................................. 23

I.    The Evidence of Viewpoint Discrimination and the Private Nature of the Texts
Means the Court Should Deny Defendants' Motion Without Reaching *Pickering* .......... 23

II.    Mr. Strzok's First Amendment Rights Outweigh any Disruption under *Pickering* ......... 31

III.    Due Process Required the FBI to Honor the LCA ........................................................... 35

    A.    The Last Chance Agreement Bound Mr. Strzok and the FBI ............................. 36

    B.    Mr. Bowdich's Abrogation of the Last Chance Agreement Infringed
Mr. Strzok's Rights Under the Last Chance Agreement ..................................... 43

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*American Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
   830 F.2d 294 (D.C. Cir. 1987) ........................................................................ 33, 34

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................ 43

*Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979) .................................................... 36

*Boddie v. Dep't of Navy*, 827 F.2d 1578 (Fed. Cir. 1987) .......................................... 40

*Castro v. Terhune*, 29 F. App'x 463 (9th Cir. 2002) ................................................. 44

*Connick v. Myers*, 461 U.S. 138 (1983) .............................................................. 32, 33

*Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235 (D.D.C. 2022) .......................... 45

*Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014) ................................ 34

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024) ...................... 35, 36

*Evans v. Sebelius,* 716 F.3d 617 (D.C. Cir. 2013) ..................................................... 23

*Gilbert v. Dep't of Just.*, 334 F.3d 1065 (Fed. Cir. 2003) .......................................... 37

*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) ............................................................. 36

*Haverda v. Hays County*, 723 F.3d 586 (5th Cir. 2013) ............................................ 32

*Henke v. U.S. Dept. of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996) ............................ 37

*Herr v. DOJ*, 2015 MSPB Lexis 2976 (M.S.P.B. 2015) .............................................. 40

*Hewitt v. Helms*, 459 U.S. 460 (1983) ....................................................................... 44

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ...................................................................... 26

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
   585 U.S. 878 (2018) ................................................................................... 24, 25

*LeFande v. District of Columbia*, 841 F.3d 485 (D.C. Cir. 2016) .............................. 31

*Link v. Dep't of Treasury*, 51 F.3d 1577 (Fed. Cir. 1995) ......................................... 37

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................................... 43, 44

*McCabe v. Garland*, No. 19-2399 (RDM) (D.D.C. Oct. 14, 2021),
https://tinyurl.com/yck8dypt ................................................................................ 13

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ........................................ 31

*Nagle v. Marron*, 663 F.3d 100 (2d Cir. 2011) ........................................................... 26

*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009) ........................... 32

*Ortiz-Diaz v. U.S. Dep't of Housing & Urban Dev.*, 867 F.3d 70 (D.C. Cir. 2017) ................. 23

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) .................................... 25

*Perry v. Sindermann*, 408 U.S. 593 (1972) .................................................................. 36

*Pickering v. Bd. of Educ. Of Township High School Dist. 205*, 391 U.S. 563 (1968) .......... passim

*Propert v. D.C.*, 948 F.2d 1327 (D.C. Cir. 1991) ........................................... 39, 44, 45

*Rankin v. McPherson*, 483 U.S. 378 (1987) ........................................................ 24, 25

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ......................... 25

*Sheppard v. Beerman*, 94 F.3d 823 (2d Cir. 1996) .................................................... 26

*Signature Tech. Sols. v. Incapsulate, LLC*, 58 F. Supp. 3d 72 (D.D.C. 2014) ............................. 38

*Steele v. Mattis,* 899 F.3d 943 (D.C. Cir. 2018) ........................................................... 23

*Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368 (Fed. Cir. 1999) ................................... 36

*Stough v. Gallagher*, 967 F.2d 1523 (11th Cir. 1992) ................................................... 32

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994) .............................................................. 24

*Thompson v. District of Columbia*, 428 F.3d 283 (D.C. Cir. 2005) ............................... 24

*U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers AFL-CIO,*
413 U.S. 548 (1973) ............................................................................................ 32

*U.S. Dept. of Air Force v. Fed. Lab. Rel. Auth.*, 949 F. 2d. 475 (D.C. Cir. 1991) ..... 36, 37, 40, 41

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of UDC*,
56 F.3d 1469 (D.C. Cir. 1995) .......................................................................... 36

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ............................... 32

*Waters v. Churchill*, 511 U.S. 661 (1994) ........................................................... 32, 33

**Statutes**

18 U.S.C. 926C(c)(1) ................................................................................................ 1, 35

5 U.S.C. § 7103 .............................................................................................................. 37

5 U.S.C. § 7321 ................................................................................................................ 3

5 U.S.C. § 7323 ................................................................................................................ 3

5 U.S.C. § 7511(b)(8) ..................................................................................................... 38

5 U.S.C. § 8412 ......................................................................................................... 1, 35

**Other Authorities**

Geoffrey Berman, *Holding the Line* 69 (2022) ............................................................ 27

U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 14, 2018) ("Midyear Rpt."), https://perma.cc/7DMQ-RZ6T ....................................................................... 3, 4, 7, 22

U.S. Dep't of Justice, Off. of the Inspector Gen.*, Review of Four FISA Applications & Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) ("Crossfire Rpt."), https://perma.cc/5LUS-TMGW ...................................................................... 3, 4, 21, 26

**INDEX OF EXHIBITS**

| Ex. | Exhibit Description |
|---|---|
| 1. | Email from OPR Unit Chief to Aitan Goelman, *Peter Strzok Last Chance Agreement*, attaching unsigned last chance agreement (July 25, 2018) |
| 2. | Email from Aitan Goelman to OPR Unit Chief Staff, *FW: 2018-07-26_Last Chance_Adjudication Agreement.PDF*, attaching signed Last Chance Agreement (July 26, 2018) |
| 3. | Letter from Assistant Director Candice Will to Peter Strzok, regarding OPR's disciplinary decision, with Enclosures Including Signed Last Chance Agreement (August 8, 2018) |
| 4. | Email from OPR Unit Chief to OPR employee, *OPR's Bi-Weekly Report: July 28 – August 10, 2018 ---UNCLASSIFIED* (August 8, 2018) |
| 5. | Email from Assistant Director Candice Will to Christopher Wray, David Bowdich, Paul Abbate and Zachary Harmon, *OPR's Bi-Weekly Report: July 28 – August 10, 2018 --- UNCLASSIFIED* (August 10, 2018) |
| 6. | Draft Termination Letter from David Bowdich |
| 7. | Email from Bowdich assistant to Assistant Director Candice Will, *letter – UNCLASSIFIED*, attaching STRZOKLETTER.docx (August 8, 2018) |
| 8. | Email from Assistant Director Candice Will to Bowdich assistant, *RE: letter – UNCLASSIFIED*, attaching STRZOKLETTER.docx (August 8, 2018) |
| 9. | Email chain between OPR Unit Chief and Aitan Goelman, Re: *Peter Strzok* (August 9, 2018) |
| 10. | Letter from Deputy Director David Bowdich to Peter Strzok (August 9, 2018) |
| 11. | Email chain with OPR Unit Chief and Candice Will, *Fwd: RE: Peter Strzok character reference* (August 10,2018) |
| 12. | Email from Aitan Goelman legal assistant to OPR Unit Chief, *Letter to Candice Will re Response of Peter Strzok*, attaching 2018-07-17 Letter to Candice Will re Response of Peter Strzok.pdf (July 17, 2018) |
| 13. | Memo from OPR to Human Resources Division Assistant Director, *Douglas Factors response requested for DAD Peter Strzok from AD HRD.* (June 14, 2018) |
| 14. | Memo from CID to Director's Office, *Synopsis: To provide Douglas Factors for DAD Peter P. Strzok II.* (June 15, 2018) |
| 15. | Email thread between General Counsel and Deputy Director David Bowdich, *RE: Strzok Goelman Email Aug 13 18* (August 13, 2018) |
| 16. | Letter from OPR Unit Chief to Peter Strzok, C*ompleted review of an administrative inquiry investigated by the OIG, Department of Justice regarding allegations.* (June 15, 2018) |
| 17. | Peter Strzok Deposition Transcript Excerpts (August 8, 2022) ("Strzok") |
| 18. | Candice Will Deposition Transcript Excerpts (June 15, 2022) ("Will") |
| 19. | Peter Winn Deposition Transcript Excerpts (February 2, 2022) ("Winn") |
| 20. | Michael Horowitz Deposition Transcript Excerpts (April 20, 2022) ("Horowitz") |
| 21. | David Bowdich Deposition Transcript (September 9, 2022) ("Bowdich") |
| 22. | Donald Trump Deposition Transcript (October 17, 2023) ("Trump") |

| Ex. | Exhibit Description |
|---|---|
| 23. | Sarah Isgur Deposition Transcript Excerpts (February 4, 2022) ("Isgur") |
| 24. | Nancy McNamara Deposition Transcript Excerpts (August 12, 2022) ("McNamara") |
| 25. | Peter Strzok's Amended Interrogatory Responses, Redacted (November 2, 2023) |
| 26. | FBI 30(b)(6) Deposition Transcript (April 14, 2023) ("30(b)(6) Tr.") |
| 27. | Emails between Fox News White House Producer ▮▮▮▮▮▮▮ and Director of Public Affairs Sarah Isgur Flores and ▮▮▮▮▮▮▮, *Re: FOX Q – FBI AGENT REMOVED FROM RUSSIA INVESTIGATION?* (December 2, 2017) (Isgur email) |
| 28. | Emails between National Security Correspondent Reuters News Jonathan Landay and Director of Public Affairs Sarah Isgur Flores, *Re: NYT/WP stories on transfer of FBI agent Strzok* (December 2, 2017) |
| 29. | Emails between Director of Public Affairs Sarah Isgur Flores and NBC News Mike Levine, *Re: Statement from the AG* (December 2, 2017) |
| 30. | Emails from Director of Public Affairs Sarah Isgur Flores to Journalists |
| 31. | Email from OIG employee to Michael Horowitz, cc to other OIG employes, *Greatest Hits and Political Texts Spreadsheets* (December 8, 2017) |
| 32. | Email from OPR Unit Chief to Assistant Director Candice Will and employee, *News* (April 12, 2018) |
| 33. | Handwritten note from ▮▮▮▮▮▮▮ to Peter Strzok |
| 34. | Tweet from Donald Trump, *Lover FBI Agent Peter Strzok* (June 28, 2018) |
| 35. | Tweet from Donald Trump, *I am on Air Force one flying to NATO and hearing reports that the FBI lovers Peter Strzok and Lisa Page…* (July 10, 2018) |
| 36. | Congressional Testimony Hearing Transcripts (July 12, 2018) |
| 37. | Email thread from INSD, EAC Section Chief James Langenberg to Thomas Seiler, *FW: Request re: [REDACTED] as it pertains to 2 individuals in question --- UNCLASSIFIED //FOUO* (January 23, 2018, last sent 7:09 AM) |
| 38. | Tweets from Donald Trump, *In one of the biggest stories in a long time, the FBI now says it is missing five months worth of lovers Strzok-Page texts,…* (January 23, 2018, 6:55 AM) and *Where are the 50,000 important text messages between FBI lovers Lisa Page and Peter Strzok?…* (January 23, 2018, 10:54 PM) |
| 39. | Fox News *Senator Rand Paul: Do FBI agents Strzok and Page still have security clearances? The answer should alarm you.* (Published, April 16, 2018) |
| 40. | VOX *Exclusive: Trump pressed Sessions to fire 2 FBI officials who sent anti-Trump text messages* by Murray Waas (Published, April 20, 2018, 9:20 AM EDT) |
| 41. | FBI Public Affairs – Director's AM News Briefing (April 23, 2018, 5:00 AM EDT). |
| 42. | FBI Public Affairs – Director's AM News Briefing (April 30, 2018, 5:00 AM EDT). |
| 43. | Email from Michael Horowitz to OIG employee (May 1, 2018) |
| 44. | Email thread between Assistant Director Candice Will and OIG employee (May 3, 2018, last sent 10:42 PM) |
| 45. | Tweet from Donald Trump, *Lisa Page, who may hold the record for the most Emails in the shortest period of time (to her Lover, Peter S),…* (May 7, 2018, sent 9:29 AM) |
| 46. | FBI Public Affairs – Director's AM News Briefing (May 8, 2018, 5:00 AM EDT). |

| Ex. | Exhibit Description |
|-----|---------------------|
| 47. | Email thread between Michael Horowitz and OIG employee, *RE: Report* (May 14, 2018, last sent 9:58 PM) |
| 48. | FBI Public Affairs – Director's AM News Briefing (June 22, 2018, 5:00 AM EDT). |
| 49. | FBI Public Affairs – Director's AM News Briefing (July 12, 2018, 5:00 AM EDT). |
| 50. | FBI Public Affairs – Director's AM News Briefing (July 16, 2018, 5:00 AM EDT). |
| 51. | Notification Memo from AD, Inspection Division to AD, Human Resources Division, *Peter P. Strzok II, DAD Human Resources Division DOJ Oversight and Review Investigation Administrative Inquiry* (June 13, 2018) (OPR Referral) |
| 52. | DOJ-OIG, Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations 21-127 September 2021 (OIG Report) |
| 53. | Email thread between OPR Unit Chief and Assistant Director Candice Will, *Re: Peter Strzok* (July 30, 2018, last sent 6:17 PM) |
| 54. | Scott Schools Deposition transcript (May 19, 2023) ("Schools") |
| 55. | Email thread between Assistant Director Candice Will and OPR Unit Chief, *Re: Peter Strzok character reference* (August 6, 2018, last sent 9:50 AM) |
| 56. | Email thread between OPR Unit Chief and Aitan Goelman, *RE: Peter Strzok* (July 31, 2018, last sent 3:42 PM) |
| 57. | Email thread between OPR Unit Chief and former FBI General Counsel, *RE: Peter Strzok* (August 6, 2018) |
| 58. | Email thread between FBI General Counsel and OPR Unit Chief, *RE: Peter Strzok character reference* (August 1, 2018) |
| 59. | Christopher Wray Deposition Transcript (June 27, 2023) |
| 60. | OPR, *Offense Codes and Penalty Guidelines 2017 Governing FBI's Internal Disciplinary Process* |
| 61. | Disciplinary Appeals Process 0915D |
| 62. | Supplemental Political Speech Precedent Reports Redacted, as produced. |
| 63. | Letter from Deputy Director John Pistole Redacted (February 11, 2005) |
| 64. | "Last Chance" Adjudication Agreement for [Employee Name] Month 20xx (Template Letter Updated ██████) |
| 65. | Designees for the Purposes of Summary Dismissal and Disciplinary Review from FBI Director Christopher Wray (March 10, 2022) |
| 66. | Letter from OPR Unit Chief to [Redacted] (July 18, 2018) |
| 67. | Email thread from Candice Will, *RE: Re:* (May 30, 2018) |
| 68. | Political Speech Precedent Reports, as produced. |
| 69. | Letter from OPR Unit Chief to [Redacted] (July 18, 2018) |
| 70. | Letter from AU-I OPR to [Redacted] (August 19, 2021) |
| 71. | Letter from OPR Unit Chief to [Redacted] (July 18, 2018) |
| 72. | Email thread between Bradley Humphreys to Christopher MacColl, *RE: Strzok v. Garland* (August 6, 2024) |
| 73. | The New York Times, *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, by Michael Schmidt, Matt Apuzzo and Adam Goldman (Published December 2, 2017) |

| Ex. | Exhibit Description |
|---|---|
| 74. | The Washington Post, *Top FBI official assigned to Mueller's Russia probe said to have been removed after sending anti-Trump texts* by Karoun Demirjian and Devlin Barret (December 2, 2017) |
| 75. | Tweets from Donald Trump, *FBI Agent Peter Strzok (on the Mueller Team) should have recused himself on day one…*(August 1, 2018, 9:03 AM) and *…..remain in the FBI while he himself was being investigated…*(August 1, 2018, 9:15 AM) |
| 76. | Email from White House Press Office to DOJ employee, *Remarks by President Trump in Press Gaggle* (June 15, 2018, 12:41 PM) |
| 77. | Trump Briefing Notes Prepared by Scott Schools |
| 78. | Email thread between Assistant Director Candice Will and employee, *Re: Page/Strzok Case* (April 12, 2018) |
| 79. | FBI Public Affairs – Director's AM News Briefing (June 18, 2018, 5:00 AM EDT) |
| 80. | Oversight Hearing with Deputy AG Rod Rosenstein before the Committee on the Judiciary House of Representatives | One Hundred Fifteenth Congress | First Session | December 13, 2017 | Serial No. 115-49 |
| 81. | Defendants' Objections and Responses to Plaintiff Strzok's First Set of Interrogatories |
| 82. | Certain text messages produced by Defendants in this action (STRZOK_PAGE_DOJ-OIG_00011691) |
| 83. | Certain text messages produced by Defendants in this action, a slipsheet has been inserted in place of approximately 245 pages of text messages (STRZOK_PAGE_DOJ-O1G_00011704) |
| 84. | Expert Report of Professor Danielle Citron (Nov. 9, 2021) ("Citron Rpt.") |
| 85. | Declaration of Retired General and Former White House Chief of Staff John F. Kelly (May 12, 2023) ("Kelly Decl.") |
| 86. | Declaration of Andrew George McCabe (October 23, 2024) ("McCabe Decl.") |

**INTRODUCTION**

The FBI agreed that Peter Strzok would not be fired.  It did so by accepting a "Last Chance Agreement" ("LCA") by which Mr. Strzok forfeited his disciplinary appeal rights, accepted a demotion, and agreed to a 60-day suspension for sending anti-Trump text messages to a like-minded colleague.  That was supposed to be "the FBI's FINAL decision in this matter."  The agreed-on penalty was orders of magnitude more severe than any prior punishment of an FBI employee for sending political messages.  Nonetheless, the agreement preserved a path to Mr. Strzok's eventual retirement from the FBI, to which he had devoted his entire professional life.  It also preserved the law enforcement pension that he had earned through more than twenty years of exemplary service to this country.[1]  The FBI finalized Mr. Strzok's LCA on August 8, 2018, when FBI Assistant Director Candice Will of the Office of Professional Responsibility ("OPR") signed and "issued" "the Bureau's final disposition of this disciplinary inquiry, from which no appeal will be taken."  The parties had, by that date, documented their agreement through a signed offer and a signed acceptance, with mutual consideration, and the agreement was therefore a contract that was binding on both parties.  The FBI routinely executed and had always honored such agreements.

But then—for the first time in the history of the FBI, and in response to an onslaught of political animus from President Donald J. Trump, including assertions that Mr. Strzok had committed "treason" and should be fired—the FBI's Deputy Director David Bowdich purported to abrogate and overturn the final agreement that the FBI had accepted.

A mountain of evidence undermines Bowdich's assertion that politics did not affect his unprecedented decision.  That mountain includes:  prior assurances from FBI officials, including

---

[1] Defendants maintain that Mr. Strzok is ineligible for a pension under 5 U.S.C. § 8412, as he was separated "by removal for cause" and for other statutory rights provided to FBI agents who "separated from service in good standing," *see* 18 U.S.C. 926C(c)(1).

Bowdich himself (made after Mr. Strzok's text messages had been reviewed but before President Trump's demands) that Strzok would not be fired; contemporaneous notes of an Oval Office meeting where President Trump apparently asked that Strzok be fired; numerous public statements by President Trump asserting that Strzok should be fired and then taking credit for getting him fired; the comparatively lesser discipline imposed on other employees whose terminations were not requested by Trump but who ███████████████████████████ sent similar political messages; the complete *absence of any discipline* for employees who ████████████ ███████████ sent pro-Trump messages (and the FBI's indifference to reports from the IG that ███████████████ exchanged inappropriate messages); and the rare—indeed truly unique—nature of the FBI purporting to unilaterally abrogate a finalized agreement that it had entered into with an employee.  If Mr. Strzok had sent exclusively anti-Clinton and pro-Trump text messages, he would still be an FBI agent.  A trial is necessary to resolve the disputed material fact that Mr. Strzok's political viewpoints (and Trump's demands) are the reasons he was fired.

No trial is necessary, however, to read the final decision that Ms. Will signed and issued on behalf of the FBI, or the signed last chance agreement that it attached and accepted, or Ms. Will's own testimony affirming that this ████████████████████████████████████.  The Court should grant summary judgment in Mr. Strzok's favor on his Fifth Amendment claim, enforce the Last Chance Agreement, and schedule a hearing on back pay and attorneys' fees.

## BACKGROUND

I.  **After More than Twenty-Five Years of Distinguished Service to this Country, Mr. Strzok Expressed Shock and Disapproval at Donald Trump in Text Messages.**

Mr. Strzok served his country with distinction in the armed services and as an FBI Special Agent for 25 years.  (Strzok 23-24).[2]  Agent Strzok was promoted seven times as he rose to become

---

[2] The name of a witness within a parenthetical citation refers to their deposition transcript.

Deputy Assistant Director of the FBI's Counterintelligence Division. (*See* Exs. 11, 13, 14). He was among the FBI's foremost counterintelligence experts, extremely intelligent, talented, and hard-working, and an exemplary employee. (Ex. 14).

From August 2015 to July 5, 2016, Mr. Strzok served as the lead agent on an investigation into the use of a private email server by former Secretary of State Hillary Clinton, codenamed "Midyear Exam" ("Midyear"). *See* U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 14, 2018) ("Midyear Rpt."), at 39-40 (https://perma.cc/7DMQ-RZ6T). On July 31, 2016, the FBI opened, and Special Agent Strzok began assisting with, an investigation into the Russian government's efforts to interfere in the 2016 presidential election, codenamed "Crossfire Hurricane" ("Crossfire"). *See U.S. Dep't of Justice, Off. of the Inspector Gen., Review of Four FISA Applications & Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) ("Crossfire Rpt."), at 50 (https://perma.cc/5LUS-TMGW).

Between 2016 and early 2017, Mr. Strzok exchanged a large number of text messages with an FBI lawyer, Ms. Page. Mr. Strzok and Ms. Page worked on some of the same matters, but they had no reporting relationship at the FBI. (Midyear Rpt. at 45 (org. chart)). The FBI permitted employees to send personal texts on its devices because such messaging was without cost to taxpayers and the FBI preferred to have personal messages on a government device rather than risk government communications landing on a personal device. (Winn 310; Strzok 106, 259).[3] Mr. Strzok and Ms. Page's messages thus permissibly ████████████████████████

---

[3] Mr. Strzok's private, off duty expressions of his personal political views to Ms. Page came at no inherent expense to taxpayers, was not an attempt to influence any election, and was not otherwise "political activity" under 5 U.S.C. § 7323. The views expressed were thus protected under 5 U.S.C. § 7321, notwithstanding the political nature of many of the messages.

████████████████████████████████████████  (Ex. 3 at 3).

Broadly, the messages expressed "hostility for then-candidate Donald Trump and support for then-candidate Hillary Clinton." (*Id.*)  In response to shocking conduct, such as Trump's disparagement of a gold star family, Mr. Strzok expressed his view that candidate Trump was "an idiot," "a disaster," and that a Trump presidency would be "destabilizing" and "TERRIFYING." (Midyear Rpt. 399-400).  In one regrettable and unprofessional exchange shortly before midnight on August 8, 2016, Ms. Page wrote, "He's not ever going to become president, right? Right?!" Mr. Strzok attempted to reassure her with the response, "No. No he's not. We'll stop it." (*See id.* at 404).  He then encouraged Ms. Page to go to sleep.

As found by OIG and endorsed by the FBI, Mr. Strzok and Ms. Page did not take any official action that was "the result of bias or improper considerations." (Midyear Rpt. Ex. B at 1). Indeed, Defendants determined that there was "no evidence that bias or improper considerations affected" any of Mr. Strzok's official "actions or decisions." (*Id.* at 9).  The Midyear Report emphasized that in some instances, Mr. Strzok advocated "more aggressive investigative methods" into then candidate Clinton's actions than other investigators. (*Id.* at 150).  Donald Trump was never a subject of the Midyear Investigation and was not personally a subject of the Crossfire Investigations until May of 2017, well after Mr. Strzok sent the messages at issue. (*See* Crossfire Rpt. 53 (describing investigation opened)).  The FBI evaluated Mr. Strzok's texts as "off duty" conduct, and they caused no disruption to the workplace when they were sent.[4]

The DOJ Office of the Inspector General ("OIG") conducted a review of the Midyear Investigation, and in July 2017, it identified Mr. Strzok's private political messages to Ms. Page. By that later point (after the texts at issue), Mr. Strzok had been "assigned for all intents and

---

[4] Mr. Strzok accepted discipline under Offense Code 5.21 "Unprofessional Conduct – *Off Duty*."

purposes" to Special Counsel Mueller's team, which had ████████████████████

███████████████████ (Strzok 63).  Mr. Strzok was ultimately removed from the Special

Counsel team, likely to limit any potential appearance of bias.  (*See* Strzok 122).  By that point,

President Trump had already been publicly accusing Mr. Mueller, a lifelong Republican and career

public servant, of running a politically motivated "hoax."  (Will 60-61).  Mr. Mueller met with Mr.

Strzok and "expressed the hope that [Mr. Strzok's] career, while not with the Special Counsel's

Office, would continue to great things," and added that he "would look forward to working with

[Mr. Strzok] again at some point in the future."  (Strzok 119).

## II.    Before President Trump Demanded Mr. Strzok's Termination, Mr. Bowdich Assured Mr. Strzok that His Career with the FBI Would Continue.

Mr. Strzok met with then Acting Deputy Director Bowdich on or about August 1, 2018.

Mr. Bowdich had reviewed Mr. Strzok's text messages and assigned him to the Human Resources

Division.  (Bowdich 124).  Mr. Bowdich assured Mr. Strzok that the assignment "wasn't forever,"

and that while the OIG investigation "might leave [Mr. Strzok] scathed," he would "ultimately be

okay" and "return to the mainstream of the FBI's activities."  (Strzok 138).  Mr. Bowdich said this

temporary assignment "would be a good rounding experience for [Mr. Strzok's] career" and allow

him to "see the administrative side of the house."  (*Id.*)  Mr. Bowdich noted that he too "had come

back to an administrative role after having been the assistant director of LA field office."  (*Id.*)

Shortly thereafter, Andrew McCabe (then likely the Deputy Director) asked if Mr. Strzok

wanted to discuss his future in the FBI.  (Ex. 25, Resp. 13; McCabe Decl.)  Mr. Strzok met with

Mr. McCabe and Mr. Bowdich.  Mr. McCabe had also reviewed the relevant texts, and just like

Mr. Bowdich, he assured Mr. Strzok that once the OIG report was done, he would at worst be

suspended, and that the group—i.e. McCabe, Bowdich, and Strzok—would be back talking about

where to send Mr. Strzok as a Special Agent in Charge of a field office.  (Ex. 25, Resp. 13; McCabe

Decl.)  Mr. Bowdich gave no contrary indication.  (*See id.*)  Based on his experience, Mr. McCabe indeed believed that Mr. Strzok's career at the FBI would continue.  (McCabe Decl. ¶¶ 8-9).

Between August 2017 and June 2018, Mr. Strzok dedicated himself to working diligently as an FBI Deputy Assistant Director for Human Resources.  (Strzok 65-66).  He supported a variety of institutionally important projects in that role.  (Strzok 66).  He also participated in emergency response activities, including a trip to Puerto Rico after the devastation of Hurricane Maria.  During that trip, Mr. Bowdich offered words of encouragement about the work Mr. Strzok was doing within the Human Resources Division.  (Ex. 25, Resp. 13).

## III.   Defendants Facilitated a Race Between Media Outlets to Publish Misleading Stories about Mr. Strzok and Leaked His Text Messages.

In early December 2017, Department of Justice Press Secretary Sarah Isgur acted as a ███████████████████████████████████████████████████████████████ ████████████████ on Mr. Strzok's text messages and his "personal relationship" with Ms. Page. (Isgur 65, 68).  Both newspapers published stories on December 2, 2017.[5]  The leaks were unprecedented.  As FBI Assistant Director Nancy McNamara wrote on December 3, 2017, ███ ████████████████████████████████████████ (McNamara 98, 227).  The FBI usually takes leaks of information about personnel matters ████████████ (Bowdich 173).  Yet Defendants ████████████████████.  (Ex. 26, 30(b)(6) Tr. 265).  In their immediate aftermath, Ms. Isgur facilitated stories by other outlets by directing reporters to potentially useful sources and confirming the story "as a source familiar."  (*See* Exs. 27-29).

Ten days later, Ms. Isgur summoned select reporters to the Department's headquarters to

---

[5] The New York Times identified its sources as "three people briefed on the matter" and "[c]urrent and former law enforcement officials who worked with Mr. Strzok."  (*See* Ex. 73).  Special Counsel spokesman Carr and Ms. Isgur were both sources for the New York Times story.  (*Id.*)  The Post's sources were "people familiar with the matter" who addressed concern among "senior law enforcement officials" and "[a] former senior Trump administration official."  (Ex. 74).

review a set of Mr. Strzok's text messages and ordered ████████████ (Isgur 218, 221; Ex.

30).  She provided packets of the text messages on ████████████ meaning the Department

of Justice could not be reported as the source.  (Isgur 135-36).  While the OIG protected the identity

of other senior employees, Defendants' premature disclosures of Mr. Strzok's name and texts

provided President Trump a new named target for his ongoing attacks on the FBI and the DOJ.

(*See* Midyear Rpt. 45).  The disclosures also imperiled the accuracy of the public narrative.  OIG

itself ████████████████████████████████████████

████████████████████████████████████████

(Ex. 31).  The timing of the leaks, six months before OIG finished its investigation and published

its report, prevented a balanced story—i.e. one that included OIG's determination that Mr. Strzok's

political views did *not* impact his official actions.  (*See id.*; *see* Ex. 51).

Defendants' leaks sparked a wave of criticism in the right-wing press and subjected Mr.

Strzok to innumerable death threats.  (*See* Expert Rpt. of Professor Citron, Nov. 9, 2021. ("Citron

Rpt."), Ex. 82 at 8-20).  Even amidst this wave of public criticism and hate, Assistant Director



words were particularly encouraging as she was

intimately familiar with FBI internal investigations and disciplinary cases.  ████████████

████████████████████████████████████████

███████████████

Mr. Strzok "hung in there."  In the face of reporters camping outside his home and photographing his children, online posts fantasizing about ways to kill him, hate of the most grotesque nature towards his family, and outright death threats, Mr. Strzok dedicated himself to his work in the Human Resources Division.  (*See* Citron Rpt. at 8-20; Ex. 13).  He worked to mend the rifts stemming from disclosures of private messages that he had not imagined would become public and cooperated with every lawful investigation.  (*See, e.g.*, Ex. 36).

President Trump's Congressional allies subpoenaed Mr. Strzok to testify twice during the summer of 2018.  After his first, purportedly confidential testimony, Republican members of Congress misleadingly leaked portions of the deposition.  (*See* Ex. 34).  President Trump then demanded that Mr. Strzok testify in a publicly televised hearing.  (*See* Ex. 34-35).  Mr. Trump's allies on Capitol Hill followed his instructions.  Mr. Strzok testified publicly and truthfully before Congress on July 12, 2018, expressing  his "significant regret," his "sense of regret and remorse," that he was "sorry for these texts and the way they've been used" and repeatedly that he was "deeply regretful."  (Ex. 36 at 10, 117, 157).  Mr. Strzok also pushed back strongly against the narrative being advanced by President Trump and his allies, that the Russia investigation was a "hoax" perpetrated by "Deep State" elements within the FBI and DOJ.  (*See generally* Ex. 36). The coverage of the hearing was politicized, and some members of Congress publicly apologized to Mr. Strzok for treatment that was "unfair, to say the least."  (*Id.* at 5, 83).  Although many observers praised Mr. Strzok for his candor and spirited defense of the FBI's integrity, President Trump did not.  Mr. Trump watched the testimony while at a NATO summit, tweeted about the testimony from Air Force One, used a press conference with Russian President Putin to lambast Mr. Strzok, and then called, again, for the FBI to terminate him.  (Ex. 35, 75; Trump 96-103).  Mr.

Bowdich ████████████████████ Mr. Strzok's testimony, but he testified that he fired Mr.

Strzok ████████████████████████████████████ aligned with

President Trump's assertions and right-wing media fiction.  (Bowdich 93-94).

## IV.     President Trump Pressured the FBI to Fire Mr. Strzok, and Mr. Bowdich Listened.

Mr. Bowdich paid attention to media coverage ████████████████████

████████████████. (Bowdich 53, 54).  He did so by reviewing news stories that

the FBI's Office of Public Affairs thought would interest the leadership of the FBI ████████

████████████████████████████████████████

████████████. (Bowdich 50-51, 59, 104).  Mr. Bowdich's responses to Trump and his allies'

demands show a pattern of politically calculated, reactive conduct:

- January 11, 2018: President Trump accused Mr. Strzok of "treason."  Mr. Bowdich ████

████████████████████████████████████████

████ the President accusing Strzok of a capital crime. ████████████████

████████████████████████████████████.

- January 22, 2018:  A collection gap in Mr. Strzok's text messages ████████████

████████████████████████.  The next day President Trump

tweeted, "In one of the biggest stories in a long time, the FBI now says it is missing five months

worth of lovers Strzok-Page texts, perhaps 50,000, and all in prime time.  Wow!"  (Ex. 38).  In

response, the FBI assigned 54 employees to find and produce Mr. Strzok and other FBI employees'

messages.  (Ex. 40; Bowdich 207-209).

- February 21, 2018:  President Trump met with Chief of Staff John Kelly, Attorney General

Sessions, and White House Counsel Don McGahn and, according to notes of the meeting,

questioned Mr. Sessions about firing Mr. Strzok and Ms. Page.  (Kelly Decl.).

- April 11, 2018:  Senator Rand Paul called for Mr. Strzok to be fired.  (Ex. 39; Bowdich 228-29).  The story was included in ████████████████████████████████████████.  Mr. Bowdich, ████████████████ and called ████████████ to ask whether the ████████████ ████████████████████████████. (Ex. 78; Will 132-133; Bowdich 238).

- April 20, 2018: A media outlet reported that during a January 22, 2018 meeting "President Donald Trump sharply questioned Attorney General Jeff Sessions and FBI Director Christopher Wray . . . about why two senior FBI officials — Peter Strzok and Lisa Page — were still in their jobs despite allegations made by allies of the president that they had been disloyal to him and had unfairly targeted him and his administration."  (Ex. 40 at 2).  It also reported on the discussions about the email "collection gap" in that same meeting.  (*Id.* at 4).  The following Monday, April 23, 2024, the article was ████████████████████████████████████ (Ex. 41; Bowdich 202).  Director Wray never told Mr. Bowdich that ████████████████████████████ ████████████████████.  (Bowdich 202).  During this time, it was ████████████████ ████████████████████████████████. (Bowdich 98).

- April 30, 2018:  The ████████████████████ carried a Wall Street Journal article titled *Strzok-Page Texts Reveal Sympathy For Comey Over Dismissal*.  ████████████. The next day, Mr. Bowdich ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.

- June 22, 2018:  The ████████████████████████ the story that Attorney General Sessions had "said that FBI agent Peter Strzok 'no longer possesses his security clearance,'" which was false, and a statement the likes of which ████████████████████████

████, yet the FBI did not correct the misstatement.  (Ex. 48; Bowdich 300-303).

• In the period leading up to Mr. Bowdich's termination of Mr. Strzok, President Trump repeatedly asserted that Mr. Strzok should be fired, and those statements ██████████████:

o On May 7, 2018, President Trump tweeted, in part, "Why is Peter S still there? What a total mess. Our Country has to get back to Business!"  (Ex. 45).  On May 9, Ms. Will, who was in regular contact with Bowdich, wrote █████████████████████████████
██████████████████████████████████████████
█████████████████████ (Ex. 47; Will 159).

o On June 14, 2018, ██████████████████████████
██████████████████████████████████████████
████████████████████████.[6]  Less than 24 hours later, President Trump stated to press on the White House lawn, "I am amazed that Peter Strzok is still at the FBI, and so is everybody else that read that report.  And I'm not even talking about the report; I'm talking about long before the report.  Peter Strzok should have been fired a long time ago, and others should have been fired."  (Ex. 76 at 7).  The ████████████████████████ featured articles reporting that Trump had called Mr. Strzok ██████████████████████.

o On July 11, 2024, Trump tweeted about "former FBI Agent/Lover Peter Strzok," even though Mr. Strzok had not yet been fired.  Stories related to the tweets ████████████████
████████████ (Ex. 48).

o On July 15, 2018, with CBS Evening News, President Trump called Mr. Strzok "a disgrace

---

[6] ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████

to our country.  He was a disgrace to the FBI."  (*See* Ex. 50 at 9; Trump 102-03).

   o   On July 16, 2018, on Fox News, President Trump said, "He's a disgrace to our country,

he's a disgrace to the great FBI, a disgrace, and how he's still being paid is beyond belief."  (Trump

102-03).  Also on July 16, 2018, President Trump excoriated Mr. Strzok in a press conference with

Vladimir Putin, stating, in a response to an unrelated question from the press, "if anybody watched

Peter Strzok testify over the last couple of days, and I was in Brussels watching it, it was a disgrace

to the FBI, it was a disgrace to our country and you would say that was a total witch hunt."  (Trump

96-97).  Mr. Bowdich considered his ██████████████████████████████████████

████████████████████████████████████████.

      Trump's attacks were motivated by the political orientation of Mr. Strzok's texts.  (*See*

Trump 31-32).  Mr. Bowdich recognized that President Trump ████████████████████████

██████████████████████████████████████████that President Trump would

ever accept that Mr. Strzok ██████████████████████████ (Bowdich 299, 324).  Mr.

Bowdich also knew that former FBI Director Comey and Deputy Director McCabe had been fired

by President Trump (or his DOJ subordinates) after displeasing President Trump—events that had

led to Mr. Bowdich's elevation.  (Bowdich 146-49).  On this record, a finder of fact could easily

conclude that Mr. Bowdich's subsequent, unprecedented decision to overturn the LCA and fire

Strzok (*see infra* § V-VII) was a decision made because of the anti-Trump content of Mr. Strzok's

political speech and/or President Trump's content-based demands.

**V.    The FBI and Mr. Strzok Executed an LCA that Promised Mr. Strzok He Would be Suspended and Demoted, but not Fired.**

      ████████████████████████████████████████████████████

████████████████████████████████████████.  There were numerous

subjects of the OIG investigation (including ████████), but ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.[7]

    The day after OIG finalized the Midyear Report that referred Mr. Strzok for discipline, OPR Adjudication Unit II Chief ████████████████████████████████████████ ████████████████████████████. (Ex. 16; Will 128).  The proposal explained that ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ (Ex. 16 at 21 (emphasis added)).  The letter explained in detail many of the procedural protections available and noted again that Mr. Strzok would receive █ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 16 at 23 (emphasis added)). ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. (Ex. 16).

    Mr. Strzok availed himself of the opportunity to submit a letter to Candice Will (Ex. 12), and on July 24, 2018, he met with AD Will, ████████████████████████████. (Def. Ex. 61).  Ms. Will explained that after she made her decision, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[7] On March 17, 2018, AG Sessions fired DD McCabe, who had also been targeted by Trump.  As part of the settlement of Mr. McCabe's subsequent lawsuit, Defendants agreed that external officials "should not comment publicly on ongoing career civil service employee disciplinary matters, except as provided by statute or regulation."  Settlement at 2, *McCabe v. Garland*, No. 19-2399 (RDM) (D.D.C. Oct. 14, 2021), https://tinyurl.com/yck8dypt.



LCAs were "used throughout the federal government" and the FBI had been using them "with increasing frequency," through they were not "mentioned in FBI policy." (*See* Ex. 52 at ii, 19). LCAs were governed by their terms, which the FBI had always honored. (*See id.*; Ex. 81, Rog. 5). After the hearing, OPR sent a proposed LCA and ████████████████████████████████████████████ (Ex. 1).

On July 26, Mr. Strzok signed the LCA and sent it back to ██████████. (Ex. 2). The agreement stated, that, if accepted, "the OPR Assistant Director's decision will constitute *the FBI's FINAL decision* in this matter, *unless the matter is reopened* based on credible evidence of a violation of this agreement," Mr. Strzok would "complete a suspension of 60 calendar days," "*OPR [would] retain jurisdiction* over this matter, and that *failure to abide by this agreement [would] cause OPR to reopen this matter* and summarily dismiss the employee," and Mr. Strzok "agreed that if he engages in any *other* serious misconduct, the appropriate sanction [would] be removal from the rolls of the FBI." (Ex. 2 (emphasis added)). The signed LCA was not operative until accepted by Ms. Will, and if it was not accepted, Mr. Strzok's ████████████████████ ████████████████████████████████████████.

On July 30, 2018, counsel requested that if █████████████████████████████████

14

██████████ (Ex. 53).  FBI General Counsel (GC) ██████████ and former GC ██████████ were among the references Mr. Strzok requested.  (Ex. 56).  On August 1, 2018, ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████  Mr. Strzok's counsel reiterated the request that OPR wait to complete the file, including receipt of ██████████ letter, if the LCA was not going to be accepted, and noted that regardless, the letter might be helpful for the Security Division's ██████████

██████████████████ for security clearance purposes.  (Ex. 55).

██████████ letter arrived, on schedule, on August 10, too late to be considered by Ms. Will or Mr. Bowdich.  (Ex. 11).  ████████████████████████ who had resigned in good standing in mid-2018 and was well known and respected throughout the FBI leadership, submitted a thoughtful, compelling and personal letter.  ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████

On August 8, 2018, Ms. Will signed and issued a ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

Ms. Will's letter concluded the FBI's disciplinary process.  Ms. Will—an attorney with decades of experience—knew Mr. Strzok's signed LCA █████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████.  In other words, it was a contract.  (*See id.*)  ████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████  At that point, no decision from Mr. Bowdich existed.  (Will 323).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████  Mr. Strzok opened and read the letter from Ms. Will before he opened

and read the letter from Mr. Bowdich.  (Strzok 338).  He understood that Ms. Will had accepted

the LCA.  (*See* Strzok 328, 337-38).

**VI.**    **Mr. Bowdich Purported to Unilaterally Abrogate the Last Chance Agreement and Fired Mr. Strzok Consistent with President Trump's Demands.**

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████████

The character references that Mr. Strzok had requested had not even been collected.  (*See, e.g.,*
Ex. 11).  █████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████[8]    Mr.  Bowdich  gave  Mr.  Strzok  no

opportunity to make  a verbal or written statement to him.

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

_____

[8] ████████████████████████████████████████████████
█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████    The final letter began

by correctly recognizing that "[b]y letter dated August 8, 2018, the Assistant Director (AD), Office

of Professional Responsibility, *notified you* of her decision to suspend you for 60 days and demote

you to a non-supervisory position."  (*Id.* at 1 (emphasis added)).  ████████████████████

███████████████████████████████████████████

████████████████████████████    His letter purported to rely on "FBI

Corporate Police Directive 0915D, *Disciplinary Appeals Process*" (Ex. 10 at 1), even though no

appeal had been or could be taken in Mr. Strzok's case.  The referenced policy explicitly stated,

"All provisions discussed herein are to ensure the integrity and objective fairness of the appellate process" and more specifically "appellate reviews of the underlying findings of misconduct and the penalties assessed by the Office of Professional Responsibility (OPR) in disciplinary actions." (Ex. 61 ¶ 2; *see* Bowdich 63). The language Mr. Bowdich relied on giving the "the FBI Director (or his or her designee) . . . the authority to modify any disciplinary finding, penalty, or both" referred only to modifying non-adverse actions (by definition ███████████████████ ██████████████████████████) by the Human Resources Branch or █████████████████ ████████████████████████, i.e. when an employee had appealed. (Ex. 61 ¶¶ 4.3, 8.1.6). It made no mention of overturing an LCA. (*See id.*) The policy was, in other words, thoroughly inapposite to Mr. Strzok's file.

## VII.    Mr. Bowdich's Termination of Mr. Strzok Had No Basis in Policy or Precedent.

No FBI policy justified Mr. Bowdich's action. There was no appeal in Mr. Strzok's case, and Ms. Will's decision to suspend and demote Mr. Strzok was a "final action" by the FBI. (*See* Exs. 3, 4). ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Mr. Bowdich's supposed right to exercise *the Director's* power also ran afoul of the FBI's Office Codes and Penalty Guidelines, which contained no mention of *any right* within the FBI to overturn an LCA and stated that the Director's authority to amend a disciplinary decision was "the sole province of the Director." ███████████. ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ In the only instance where

a disciplinary decision was overturned without an appeal, the letter explicitly stated, ████████

███████████████████████████████████████████████████████████████

████. No such case-specific delegation was made here. (*See* 30(b)(6) Tr. 179-181).[9]  In fact,

only 4 of 1,992 disciplinary decisions had been overturned using the Director's authority between

2013 and 2018, and in all of those cases, ██████████████████████████████████████

███████████████████████████. (Ex. 52 at 8 n.23; *see* Defs. Exs. 23-26).

## VIII.  Comparator Cases Show that Politics (and Trump's Demands) Motivated Bowdich.

While the FBI disciplined other employees who criticized Mr. Trump, the agency ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

---

[9] After discovery closed in this case, the FBI amended ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ was produced only after he had given deposition testimony in this case (though it existed
long before), and Plaintiff was therefore unable to question him about it.  (*See* Ex. 72).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Mr. Strzok's termination was also orders of magnitude more severe than the punishments imposed on other FBI employees ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

The discipline meted out to other employees whose termination was not demanded by President Trump was broadly consistent with previous discipline for political speech in the workplace, even when it was outright racist. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Mr. Strzok's 60-day suspension and demotion, let alone his termination, vastly exceeded any prior penalty imposed by the FBI for political speech—including speech that was independently far more disruptive.

**IX.     President Trump Correctly Claimed Credit for Mr. Strzok's Termination.**

In his deposition, former President Trump testified that, 

Trump's public statements in which he repeatedly took credit for Mr. Strzok's termination can be credited, even if he and the government now insist on disclaiming them.  (*See, e.g.*, Trump 14).  And while credibility is an issue for trial, Trump was correct when he publicly boasted that he got Peter Strzok fired.

## LEGAL STANDARD

On a motion for summary judgment, "the court must view the evidence in the light most favorable to . . . the non-moving party, drawing all reasonable inferences in his favor."  *Ortiz-Diaz v. U.S. Dep't of Housing & Urban Dev.*, 867 F.3d 70, 72 (D.C. Cir. 2017); *Evans v. Sebelius,* 716 F.3d 617, 622–23 (D.C. Cir. 2013) (two "competing views" of motive is "precisely the type of factual dispute that must be resolved" by a finder of fact. (cleaned up)); *Steele v. Mattis,* 899 F.3d 943, 947 (D.C. Cir. 2018) (a "court may neither make credibility determinations nor weigh the evidence" (cleaned up)).

## ARGUMENT

**I.     The Evidence of Viewpoint Discrimination and the Private Nature of the Texts Means the Court Should Deny Defendants' Motion Without Reaching *Pickering*.**

Defendants presume that Mr. Strzok's First Amendment claim "is governed by the balancing test first enunciated in *Pickering*." MSJ at 20. This is incorrect. Because there is substantial evidence that Mr. Strzok's termination was the result of viewpoint discrimination by Defendants, and because the texts in question were private rather than public speech, the Court can and should deny the government's motion without even reaching the *Pickering* balancing test. *See Pickering v. Bd. of Educ. Of Township High School Dist. 205*, 391 U.S. 563 (1968).

The *Pickering* test is designed to apply to *public* statements made by government employees. As Justice Powell explained in a concurring opinion in a case where the parties had assumed the applicability of *Pickering*:

> There is no dispute that McPherson's comment was made during a *private conversation with a co-worker who happened also to be her boyfriend.* She had no intention or expectation that it would be overheard or acted on by others. Given this, *I think it is unnecessary to engage in the extensive analysis normally required* by *Connick v. Myers* and *Pickering v. Board of Education*. If a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for *this type of private speech that routinely takes place at all levels in the workplace.*

*Rankin v. McPherson*, 483 U.S. 378, 393 (1987) (emphasis added) (cleaned up). Notably, Defendants cite no cases applying *Pickering*'s balancing test to the type of private conversation at issue here. Indeed, the four-prong standard set forth in the government's brief, MSJ at 20, underscores what a poor fit *Pickering* is for these facts, since that test *presumes* that the employee's political speech was designed to be public.[10]

---

[10] This Circuit has applied a four-factor *Pickering* analysis in determining when public employees' speech is protected for the purpose of retaliation claims, but only where the speech was public or directed to workplace superiors or the government. *See Thompson v. District of Columbia*, 428 F.3d 283, 285-86 (D.C. Cir. 2005); *Tao v. Freeh*, 27 F.3d 635, 638, 640 (D.C. Cir. 1994); *cf. Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 585 U.S. 878, 907 (2018) ("[T]he *Pickering* framework was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" (citation omitted)).

It is of no moment that the texts in question were sent on devices owned by the FBI, or that speech that Mr. Strzok intended to remain private later became public—just as the fact that Ms. McPherson's conversation with her co-worker/boyfriend took place on property owned by the agency did not somehow convert that private conversation into public speech in *Rankin*. Here, Deputy AG Rosenstein acknowledged in his testimony to Congress that the messages in question were private, at least until the Department of Justice disclosed them to the press. (Ex. 80 at 37).

Even if Mr. Strzok's statements had been intended to be public, this Court would not need to reach the *Pickering* test because Strzok's punishment was the result of viewpoint discrimination. As Justice Kennedy explained in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995), "[d]iscrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Janus v. American Federation of State, County, and Municipal Employees, Council 31* also emphasizes what a poor fit *Pickering* is to actions targeting the viewpoint of the speech: "[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case." 585 U.S. 878, 908 (2018); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 61–62 (1983) (Brennan, J., dissenting) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'"); *Iancu v.*

---

Here, Strzok's speech was intended to remain private and, on its own, had no impact on his professional responsibilities. Moreover, the question the *Pickering* framework addresses is whether a public employee's speech is completely protected, not whether an employer can escalate the degree of discipline imposed by a neutral decisionmaker for unprofessional speech due to the employee's political orientation and the demands of the Chief Executive.

*Brunetti*, 588 U.S. 388, 399 (2019) (even discrimination based on "immoral" or "scandalous" content is viewpoint discrimination).   Courts have therefore held that regardless of *Pickering* balancing, an employer who asserts disruption as a pretext to punish a worker based on the content of his speech violates the First Amendment. *See, e.g.*, *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996) (An "employer may fire the employee only *because of* the potential disruption, and *not because of* the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is *always unconstitutional*." (emphasis modified)); *Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011) ("no reasonable official could think that such speech-retaliatory conduct was constitutionally permissible").

Contrary to Defendants' assertion, discovery in this case has provided substantial evidence that Mr. Strzok's termination was the result of viewpoint discrimination, and that he would not have been terminated had he criticized Mr. Trump's political adversaries and praised Mr. Trump himself.   The evidence establishes the stark difference in treatment between FBI personnel ███ ███████████████████████████████████████████████████████████████████. (*See* Ex. 25, Rog. 14).   Employees whom OIG identified as expressing criticism of Mr. Trump were brought before OPR and subject to discipline ranging from ████████████████████ to termination (as in Mr. Strzok's case).   Employees, including agents and a supervisor who worked on the Russia or Midyear investigations, who expressed support for Trump and/or animus toward Clinton ████████████████████████. (*See* Ex. 81, Rog. 6; Crossfire Rpt. 339 n.477).   Moreover, the FBI *knew at the time* that the list of employees sent to OPR for review ██████████████████████████. (Ex. 67).

It is easy to understand the rationale for this disparate treatment:  failure to punish critics

of Trump would precipitate renewed attacks by the President and his allies portraying the FBI as a corrupt, politicized, manifestation of the mythical "Deep State," while failure to punish Trump supporters would lead to no negative consequences for the agency.  This, after all, was the President who had fired the Director of the FBI when he would not pledge personal loyalty to him and regarded Mr. Strzok's criticism of him as treasonous.  (*See* Bowdich 141-44, 187-88).  Mr. Trump conceded this double standard at deposition when he testified that he did not consider pro-Trump agents to be ███████████████████████████████████████████

████████████████████████████████████).  Indeed, given Mr. Trump's attacks on anyone who criticizes or attempts to prosecute even his most lawless and violent supporters, (*see, e.g.*, Trump 138), maintaining this double standard by ignoring Mr. Strzok's Constitutional rights was the easy course.[11]  And discovery has shown that contrary to Defendants' interrogatory responses, President Trump *did* pressure aides and DOJ officials to fire Mr. Strzok.  (*See* Kelly Decl.).  While Mr. Trump's aides might have endeavored to delay, distract, and ignore some of the President's most obviously unlawful orders, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████.

Additionally, as President Mr. Trump had a well-documented method of communicating his desires to his underlings without going through the formal chain of command by simply making these desires publicly known.[12]  Indeed, Mr. Trump acknowledged the ████████████████████

---

[11] The viewpoint discrimination practiced here by the FBI was consistent with the publicly established practice during the Trump Administration.  (*See* Ex. 25, Rog. 14).

[12] *See, e.g.*, Geoffrey Berman, *Holding the Line* 69 (2022) ("No one needed to talk to Trump to know what he wanted.  You could read his tweets.").

████████████████████████████████████████████████████████████████

████████████████    Mr. Bowdich's decision to reverse an LCA was entirely unprecedented.  The

FBI has identified ████████████████████████████████████████████████████

██.  And Mr. Bowdich has *admitted* that he fired Strzok in part for ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████.

There is overwhelming evidence that then President Trump was very closely following Mr.

Strzok's employment status and relentless in his public *and* private demands that Mr. Strzok be

terminated.  While Mr. Trump ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.  This is consistent

with common sense, since the same President had eviscerated the prior FBI leadership for not

bowing to his wishes, and Bowdich himself had just ascended to the number two spot.

The government's response to this mountain of evidence is to ignore it.  None of it matters,

according to the government, because Mr. Bowdich incanted the mantra that his decision to

overturn the LCA and fire Mr. Strzok had nothing to do with Mr. Trump's oft-expressed demands.

*First*, there are a host of reasons to doubt Mr. Bowdich's truthfulness on this point.  In addition to

the evidence set forth above, there is ample evidence of Mr. Bowdich's bias in the record: Mr.

Bowdich ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.

     *Second*, the record establishes that Bowdich changed his opinion about whether Strzok should be fired after Trump's relentless campaign for Mr. Strzok's termination. When Mr. Bowdich assigned Mr. Strzok to the FBI's HRD after Strzok's removal from the SCO, Bowdich assured Strzok that this move was temporary and that he would eventually return to a role in operations. (Ex. 25, Rog. 13; Strzok 137-40). This sentiment was later reinforced by Deputy Director McCabe in a meeting with Bowdich, who expressed no disagreement either to Strzok or in private to Mr. McCabe. (*See* Ex. 25, Rog. 13; McCabe Decl.) Mr. Strzok has provided detailed descriptions of this series of discussions with Mr. Bowdich in 2017, including a conversation between the two men in Mr. Bowdich's office and one on an FBI plane returning from a trip to Puerto Rico to survey recovery efforts after Hurricane Maria, and Mr. McCabe corroborated those accounts. (Strzok 137-44). To be sure, █████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.

     Even if Bowdich had explicitly denied making these statements ███████████, that would only underscore the need for a finder of fact to make credibility determinations and decide which witness is telling the truth. Predictably, the government spins the record evidence on this issue in its favor and contends that from the first time that Mr. Bowdich read the texts in the summer of 2017, he was convinced that Mr. Strzok would have to be terminated from the FBI. MSJ at 30.

This is in direct conflict with the testimony provided by Strzok and McCabe, and this genuine dispute distinguishes this case from those cited by the government, MSJ at 34, holding that it is not enough to forestall summary judgment for a non-movant simply to question the credibility of a witness's undisputed testimony.  After all, if Mr. Bowdich did indeed change his mind between when he first reviewed the texts in the summer of 2017 and when he overturned the LCA in August 2018, he would need to explain the reason for this change of heart.  A finder of fact would be well-grounded in concluding that the politically motivated demands by then-President Trump and his allies caused Mr. Strzok's termination.



*Third*, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Bowdich's state of mind is a central dispute at issue in this case, and it cannot be resolved on summary judgment.

Defendants misapprehend the Court's comment at the February 23, 2023, hearing that there is "no wiggle room" for a factfinder to conclude that Director Wray told Mr. Bowdich that Trump had ordered him to fire Strzok.  MSJ at 34 (cleaned up).  Defendants appear to believe that the Court said that, unless Mr. Strzok could provide direct evidence that Mr. Bowdich's decision to terminate Mr. Strzok was the result of an explicit private order from the President, passed down through the bureaucratic chain of command, they would be entitled to summary judgment.  But the Court commented one page later that Bowdich *did not need Wray to inform him what Trump wanted*, and "whether [Bowdich] is credible is not for me to say."  (2/23/23 Hr. Tr. 10).  Moreover, the question before the Court was whether Mr. Strzok was entitled to depositions of Director Wray and former President Trump, not whether a factfinder could find that Mr. Bowdich fired Mr. Strzok

because of the political orientation of Strzok's texts or Trump's numerous public demands. These issues require a finder of fact to decide precisely those questions, and witness credibility can be judged only at trial.

## II.    Mr. Strzok's First Amendment Rights Outweigh any Disruption under *Pickering*.

Even if the Court decides to employ the balancing test set forth in *Pickering* and its progeny, it should still deny Defendants' Motion on Strzok's First Amendment claims. Defendants' MSJ, at 22, accurately sets forth the four-prong test this Circuit has directed courts to use in conducting its *Pickering* balancing analysis, and it accurately concedes that Strzok prevails under the first and third prongs, as "Strzok was dismissed because of his text messages," and the messages "involved a matter of public concern." MSJ at 24. But the fourth prong is also undisputed, as the government cannot show that it would have terminated Mr. Strzok "absent the protected speech." *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016).

That leaves only the second prong in dispute: whether Mr. Strzok's interest in speaking on matters of public concern "outweigh[s] the government's interest in promoting efficiency." *Id.* According to the government, Mr. Strzok's interest in speaking on these matters of public concern "is extraordinarily weak." MSJ at 27. This ignores the facts and the law.

Mr. Strzok's speech here involved a matter of utmost public importance – his opinion about the fitness about a candidate in a particularly consequential Presidential election. That is core political expression that enjoys the highest degree of protection under the First Amendment. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (cleaned up)).

Because the value of this type of speech is so high, federal courts have consistently held that speech by government employees regarding elections and candidates for office are entitled to

the greatest protection under *Pickering*. *See, e.g.*, *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013) ("Letters to the editor, supporting a candidate during a campaign, are a unique form of speech that embody the very essence of the First Amendment and require its full protection."); *Stough v. Gallagher*, 967 F.2d 1523, 1529 (11th Cir. 1992) (Plaintiff's "interest in commenting on the qualifications of political candidates . . . 'is more than self-expression; it is the essence of self-government' and occupies the 'highest rung of the hierarchy of First Amendment values' entitling it to special protection." (citation omitted)). "As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 483 (1995) (O'Connor, J., concurring). And because the nature of core political speech is so highly valued under *Pickering*, a government employer's attempt to punish such speech faces the highest level of scrutiny and requires a strong justification. *See Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 57 (D.D.C. 2009) (explaining where plaintiff had protested the U.S. involvement in the Iraq War, that the "Defendants must make a particularly 'strong[ ] showing' that they had a legitimate interest in terminating plaintiff's contract because her speech 'substantially involved matters of public concern'" (citation omitted)).[13]

The cases cited by Defendants, in contrast, generally involve speech far lower on the scale of Constitutional protection. For example, *Connick v. Myers*, 461 U.S. 138, 154 (1983), arose out of the employee's grievances about internal office policies and "touched upon matters of public concern in only a most limited sense." *Waters v. Churchill*, 511 U.S. 661 (1994), another case

---

[13] It is not just the courts that have drawn the line there. Strzok's speech was clearly protected under the Hatch Act, which reflected *Congress's* determination of the proper balance between two competing interests: that of the federal employee "'as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers AFL-CIO,* 413 U.S. 548, 564 (1973) (quoting *Pickering*, 391 U.S. at 568).

cited repeatedly by the government, involved similar issues specific to the training of employees and operation of a public hospital.  Because the speech at issue in both cases fell on the low end of the protection spectrum, the Court held the employers to relatively low burdens to justify regulating (i.e., punishing) the speech.  Because the speech in *Connick* primarily involved the plaintiff's own workplace grievances, the Supreme Court did "not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.  In the next breath, however, the Court emphasized, "We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.*  The Court reiterated the importance of this relative balancing of interests in *Waters*: "[A] government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations[,] the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." *Waters*, 511 U.S. at 674.

In fact, it is the government's side of the *Pickering* scale that is extraordinarily weak, as the MSJ points to no evidence of contemporaneous disruption of FBI activities caused by Mr. Strzok's speech.  To the contrary, two exhaustive investigations by OIG found no evidence that any of Mr. Strzok's investigative actions were infected by political bias.  In fact, OIG noted that, despite Mr. Strzok's preference for Secretary Clinton in the 2016 election, he urged investigative steps that were more aggressive than other government employees, and Mr. Strzok's coworkers did not even know his political leanings.  Midyear Rpt. at iii.  The "evidence" of disruption described in the MSJ is merely individuals' opinion that the texts damaged the FBI's reputation for impartiality.  The D.C. Circuit rejected precisely this argument in *American Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 830 F.2d 294, 303 (D.C. Cir. 1987).  There, the Court of

Appeals recognized that while the "public's confidence in the confidentiality of the mailstream" was obviously a legitimate concern, in the "absence of any demonstrated harm caused by [the employee's] speech, [he] must prevail in the balancing of competing interests." *Id.*

Defendants' MSJ also elides the fact that any damage to the FBI's reputation was caused by Defendants' improper disclosure of the text messages to the press and by President Trump and his allies' weaponization of them to attack the credibility of the FBI. But Mr. Trump's attacks on the integrity of the FBI began long before he learned of the texts, and these attacks would have continued even absent the discovery (or existence) of the texts. (*See* Bowdich 132-36). After all, as candidate, President, and former President, Mr. Trump has chosen to baselessly accuse the FBI (and a wide swathe of other institutions and public servants) of bias, "witch hunts," "hoaxes," and "treason." Although Mr. Trump clearly used Mr. Strzok's texts as a pretext to support some of these accusations, the attacks themselves would have come anyway, and many Americans would have believed them. (*See* Will 401-03).

In this way, this case resembles *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014). There, as here, any disruption to the government agency's work was caused by the government's reaction to the employee's speech rather than the speech itself, a fact which the Third Circuit found fatal to the government's case. *Id.* at 992 ("It is against this Court's precedent to find against an employee where the disruption 'was primarily the result, not of the plaintiff's exercise of speech, but of his superiors' attempts to suppress it.'" (citation omitted)). Here, too, any damage to the FBI's reputation came not from the texts themselves but from Defendants' decision to release them to the media in the middle of an OIG investigation, and President Trump and his allies' subsequent incorporation of the texts into their campaign to discredit the FBI.

After the texts became public and were then weaponized by President Trump and his allies

in Congress and the media to further their pre-existing attacks against the FBI, DOJ and SCO, Mr. Strzok admitted to having exercised poor judgment and expressed profound regret for his actions. He made these admissions both publicly and privately, including in public testimony before Congress and in the closed-door hearing with AD Will.  (Ex. 36; Defs. Ex. 61).   Remarkably, Defendants attempt to turn this acceptance of responsibility, which AD Will correctly found was a consideration militating *against* firing Mr. Strzok, into an argument justifying his termination. MSJ at 29.  But Mr. Strzok's genuine expressions of remorse were not, as Defendants characterize them, an admission that the texts independently damaged the FBI.  They were, rather, regret that he had written texts that had been used by President Trump and his allies to attack the FBI, an institution that Mr. Strzok loved and had devoted his career to serving.  (Def. Ex. 61 at 3:40).  In any case, Mr. Strzok took responsibility for the messages he sent and accepted discipline for them, but agreed with the FBI that he would not be fired for his lapse in judgment.

## III.    Due Process Required the FBI to Honor the LCA.

Unlike the First Amendment claim, the facts underlying Mr. Strzok's Fifth Amendment claim are not contested.  The FBI and Mr. Strzok entered a contract that guaranteed a definite penalty (demotion and 60-day suspension) and promised Mr. Strzok would not be terminated for the offenses, thereby preserving a path to good standing separation.  The FBI then deprived Mr. Strzok of that property interest without due process.[14]

Mr. Strzok's due process claim requires a showing that he was (1) "deprived of a protected interest," and (2) that Defendants failed to provide "the process [he] was due."  *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (quoting *UDC Chairs Chapter, Am. Ass'n of*

---

[14] In addition to employment itself, avoiding "removal for cause" protected the law enforcement pension Mr. Strzok had earned through more than twenty years of FBI service.  *See* 5 U.S.C. § 8412.  Separating "from service in good standing" also provides valuable statutory rights that the FBI deprived Mr. Strzok of when it reneged on the LCA.  *See* 18 U.S.C. 926C(c)(1).

*Univ. Professors v. Bd. of Trs. of UDC*, 56 F.3d 1469, 1471 (D.C. Cir. 1995)).  He satisfies both elements with undisputed evidence.

### A.    The Last Chance Agreement Bound Mr. Strzok and the FBI.

The Supreme Court has made plain that "property interests subject to procedural due process protection are not limited by a few rigid, technical forms.  Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'"  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).  A government employee has a property interest if the government has "fostered rules and understandings" which entitle the employee 'to believe that he would lose his job only for'" specified reasons.  *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979) (finding a protected property interest established by an FBI handbook provision).  When "the government gives a public employee assurances of continued employment or conditions dismissal only for specific reasons, the public employee has a property interest in continued employment."  *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999); *accord Esparraguera*, 101 F.4th at 33.  The key inquiry is whether the plaintiff had a "legitimate expectation" in the property interest allegedly denied.  *Id.* at 35-36.

A contract between the government and the Plaintiff creates such an expectation, as the D.C. Circuit has explained: "To determine whether [a plaintiff] had a property interest in continued employment, we ask if he had a legitimate expectation, based on rules (statutes or regulations) *or understandings (contracts expressed or implied)*, that he would continue in his job."  *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988) (emphasis added); *see Perry*, 408 U.S. at 601 ("A written contract with an explicit a tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment . . . .").

Courts have long acknowledged that LCAs are contracts.  *U.S. Dept. of Air Force v. Fed. Lab. Rel. Auth.*, 949 F. 2d. 475, 478 (D.C. Cir. 1991) ("'Last chance' agreements are probationary

contracts negotiated by an agency with an employee who faces removal or serious discipline for poor performance."); *Link v. Dep't of Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995) ("A last-chance agreement is a settlement agreement, and a settlement agreement is a contract."); *Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003) (applying contract law to last chance agreement breached by employee). As then-Judge Ruth Bader Ginsburg explained, writing for the majority in rejecting the government's claim that such agreements were not a proper subject for mandatory bargaining under 5 U.S.C. § 7103, LCAs are nothing like ordinary disciplinary tools wielded by federal agencies precisely because they presume an agreement among the parties: "Furthermore, last chance agreements differ from standard 'disciplinary instruments' in key respects. To be effective, a suspension or warning requires neither the acquiescence of the subject employee nor his participation in its formulation. A last chance offer, by contrast, has no force without the subject employee's acceptance." *U.S. Dept. of Air Force*, 949 F.2d at 481.

"A contract has certain essential elements, to wit, competent parties, lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation." *Henke v. U.S. Dept. of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996). The United States as a party is subject to these ordinary principles of contract formation. *Id.* The undisputed record here contains *all* of the elements of a contract. Mr. Strzok made an offer to accept discipline of a demotion and suspension, forego providing additional relevant information to the process (in the form of references from high level colleagues), and to waive important appeal rights for this alleged misconduct and for any future misconduct. AD Will—the official designated by the FBI to make a final decision and a 15-year veteran of the OPR process who had decided thousands of similar actions—accepted that offer. There was hence the classic "meeting of the minds" necessary for contract formation. There was likewise consideration on both sides. Strzok waived appeal rights and accepted

discipline; the FBI promised not to fire him for this conduct and instead imposed lesser discipline.

The contract was formed when AD Will accepted the LCA on August 8, 2018, and issued her disciplinary action, which acknowledged "that the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless the matter is reopened based on credible evidence of a violation of this agreement." (Ex. 2). AD Will's signed letter adopted and attached the LCA; it stated, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[15] There was nothing novel about this resolution. The FBI had been using LCA's "with increasing frequency" in the years preceding this contract, and it was Will's subordinate in OPR who sent the draft LCA form to Strzok's counsel. (Exs. 1, 52 at ii). Thus, Ms. Will's August 8 decision consummated a contract consistent with the FBI's routine process and common law, and it afforded Strzok a legally cognizable property interest in continuing his employment.

The FBI offers a few arguments to muddy the waters, but none of them is persuasive. First, it suggests, MSJ at 36, that Strzok is trying to transform his status from an at-will employee to one with general civil service protections by having committed misconduct, in contravention of 5 U.S.C. § 7511(b)(8). Nothing so elaborate is alleged, nor is it necessary for Strzok to prevail on his Fifth Amendment claim. Instead, Mr. Strzok need *only show* that the FBI entered a valid contract to resolve *this* disciplinary action, and that contract created an expectation sufficient to establish a property interest in continued employment. Nothing in the statute prevents the use of

---

[15] Ms. Will signed the August 8 letter, attached the LCA to it, and referred to the LCA in it, so the government's argument that she did not sign the LCA itself is a red herring. Even had she not signed the letter, "one party's failure to sign an agreement does not invalidate it if the parties' conduct manifests assent to the terms of the contract," as this Court noted in denying the FBI's earlier Motion to Dismiss, quoting *Signature Tech. Sols. v. Incapsulate, LLC*, 58 F. Supp. 3d 72, 81 (D.D.C. 2014). OPR's conduct manifested assent to the terms of the LCA.

LCAs generally, nor does it call into doubt the FBI's decision to use one in Mr. Strzok's case.

Next, the FBI argues that while Strzok may have offered a contract, the FBI did not accept it because Mr. Bowdich told Ms. Will on July 26, 2018 that he might ██████████████████ ██████ and he later did. (Will 291-92). Had AD Will or DD Bowdich acted differently, this argument would have more force. Had Ms. Will declined to execute the LCA until Mr. Bowdich appointed a different "deciding official,"[16] then no contract would have been executed. But AD Will accepted the LCA and imposed lesser discipline as the agency's authorized decision-maker in a "FINAL" disciplinary action. There is nothing conditional or equivocal about that action. It is proven not only by the repeated reference to final action in the letter, but also by the ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. These facts impugn the FBI's argument, MSJ at 40, that ██████████████████████████████████████████████████████ ████████████████████████████████████████████.

As the Court of Appeals for the Federal Circuit explained in finding a denial of procedural due process on similar facts:

> We do not say that some other official could *never* be substituted for the first-level line supervisor, but if that were done it would have to be done before Moran had begun to consider the charge and discipline, if any, to be levied on [the plaintiff], *and certainly before Moran had made up his mind what the proposed discipline should be.* If higher-level management thought from the beginning that this was a

---

[16] As Mr. Bowdich's own conduct in relation to the handling of the Weiner laptop was examined by OIG (Bowdich was interviewed by OIG in connection with its investigation and mentioned repeatedly by the Midyear Report), Mr. Bowdich was not a neutral decision maker as to that issue. *See Propert v. D.C.*, 948 F.2d 1327, 1333 (D.C. Cir. 1991).

special case requiring a certain type of punishment, management should have immediately removed the matter from Mr. Moran.

*Boddie v. Dep't of Navy*, 827 F.2d 1578, 1580 (Fed. Cir. 1987) (emphasis modified).  The same is true here.  Moreover, AD Will's acceptance of the LCA occurred when she signed her letter—i.e. on August 8, 2018—as is clear from the present tense language it employed: ███████████████

████████████████████████████████████████████████████████

███████████████████████████████.  In addition to her use of present tense, AD Will did not (as sometimes happens) identify a future date upon which the suspension and demotion would become effective.  "The effective date of an indefinite suspension is the date specified in the agency's decision letter as the first day that the employee will be in a non-duty, non-pay status."  *Herr v. DOJ*, 2015 MSPB Lexis 2976, at *5 (M.S.P.B. 2015).  Here, she issued her decision, and accepted the LCA on August 8, 2017.[17]

AD Will's acceptance of the LCA was not erased by Bowdich's decision the next day to fire Strzok, an action that Defendants wrongly contend was authorized by FBI policy.  There are several problems with this argument.  First, *none* of the policies the FBI relies upon even mention, much less govern LCAs, and as the Court of Appeals made clear in *Dept. of Air Force*, LCAs are fundamentally different than unilateral agency disciplinary actions (whether suspensions, demotions, or terminations) precisely because they are contracts.  949 F.2d at 481.  Here, the record shows that the FBI had never previously sought to abrogate an LCA.  Thus, even if there was a clear delegation of authority to the Deputy Director to overrule Ms. Will, that would not bear on rights founded in fully formed LCAs, which "differ from standard 'disciplinary instruments' in

---

[17] Defendants cite to *Herr* for the proposition that the 30-day deadline for an appeal begins to run on the later of the date the action went into effect or was received by the employee.  That is not the issue in this case.  The only question here is on what date the contract was formed, and the undisputed evidence shows that occurred on August 8, when Will issued her decision and accepted the LCA on behalf of the FBI.

key respects." *Id.*

In any event, the Deputy Director had not been delegated the authority to unilaterally alter OPR's final decisions in *non-appealed* cases. The FBI's Offense Codes reserved *only to the Director* the final authority to alter standard disciplinary decisions. ████████████████

████████████████. To be sure, long after it fired Strzok (and even *after* discovery in this lawsuit closed, and it was too late for FBI officials to be questioned about the change), the FBI ██████████████████████████████████████ but Bowdich did not purport to rely on any such delegations in his decision to fire Strzok. The FBI has also scrounged up a 1997 "Freeh Memorandum" that is so obscure it was not even "available to employees in the FBI's Policy Library" or on "FBI OPR's intranet site, which generally includes relevant FBI OPR policy and guidance." (Ex. 52 at 14-15). It is a matter of undisputed fact that Bowdich relied on and cited only policy directive 0915D, which pertains *only* to the appeal process, and the LCA entered here precluded any appeal. (*See* Ex. 10, 61).[18] The fact that the FBI empowered the Director (or a designee) to modify a disciplinary penalty after an employee appealed is unremarkable. It has nothing to do with the question at issue here: whether Bowdich could abrogate an accepted LCA. The FBI offers no authority for that power. Indeed, it is illuminating that after this litigation ensued (and after this Court denied the agency's Motion to Dismiss), the FBI ████████████████████████████████████████ ████████████████████████████████████████ ████████████████. This underscores that at the time of the events at issue, Mr. Bowdich lacked that authority.

---

[18] The DRB is a five-member body that could review final OPR decisions if the employee elected to appeal. ████████████████████████████████████████. (Ex. 61 ¶¶ 6.2.5, 6.2.7).

As a last gasp, the FBI suggests that a footnote in Ms. Will's August 8 decision undoes all that her letter and the LCA accomplished.  That is, the agency relies upon footnote 2 of her letter, which said that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ (Ex. 3 at 1).  Will explained in her deposition that the footnote is ████████████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

██████████████████████████████.  In fact, to the extent this footnote is relevant, it supports Mr. Strzok's argument: if the Director (or Deputy Director) had the authority to reverse a fully executed LCA based on disciplinary factors considered by OPR, presumably that right would have been included in the footnote, ████████████████████████████████████████████████ ███████████████████████████████.  As with any contract, this boilerplate footnote does not alter the more specific guarantee that the FBI's FINAL disciplinary penalty would be as specified.

AD Will's description reflects the undisputed reality regarding this disciplinary process; the LCA accepted by her August 8 decision was indeed ████████████████████████ (Will 267).  There was ████████████████████████████████████████████████████████ which is why Mr. Strzok had a legitimate expectation that his employment would continue beyond this disciplinary action.  (Will 266).  He thus had a valid property interest protected by law.

**B.      Mr. Bowdich's Abrogation of the Last Chance Agreement Infringed Mr. Strzok's Rights Under the Last Chance Agreement.**

Having established a cognizable property interest in continuing his employment with the FBI, Strzok prevails upon his Fifth Amendment claim if he was deprived of that property interest without due process.  The undisputed facts prove as much.  As an initial matter, the FBI was bound for the reasons described *supra* to comply with the LCA.  Mr. Strzok's procedural rights were violated in the first instance when the FBI failed to honor the LCA.

The procedures employed were also deficient.  The due process clause requires procedural protections that are sufficient in light of:  (1) the private interest; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the governmental interest.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  As the Court explained in *Mathews*, "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Id. at* 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

When DD Bowdich intervened and overturned AD Will, he not only failed to comply with the LCA and upended the guarantees that the final decisionmaker, AD Will, had already made, he also offered no due process whatsoever to Strzok.  Had Strzok known that the process he was ostensibly afforded before Ms. Will was entirely illusory, he would have pursued the opportunities afforded to *all* FBI employees directly with Mr. Bowdich.  This would have included his written reply and a meeting to address concerns and/or inclinations held by Mr. Bowdich.  But it is undisputed that the FBI offered none of that.  Not only did Mr. Bowdich not offer to meet with Strzok or his counsel prior to overturning AD Will's final decision, he also did not bother to ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ In that response to the proposed removal, Mr. Strzok and his counsel addressed not only the substance of the charges, but also many persuasive reasons that Strzok's prior service, contributions to the agency and the extenuating circumstances warranted a lesser penalty. ████████████████ Similarly, he ignored counsel's post-decision plea for the ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████

A "meaningful opportunity" for due process required the ability to know and be heard by the person who is going to make the decision on behalf of the agency. *See Hewitt v. Helms*, 459 U.S. 460, 476 (1983) (holding an inmate should receive an opportunity to present his written views "to the prison official charged with deciding" the matter who should review the "then-available evidence"); *Propert*, 948 F.2d at 1333-34 (requiring a "meaningful opportunity to be heard" as a matter of right); *Castro v. Terhune*, 29 F. App'x 463, 465 (9th Cir. 2002) (due process required "a meaningful opportunity to present . . . to the critical decisionmakers"). Absent an opportunity to know and be heard by the decision maker, the concept of due process becomes a sham, where so long as an opportunity to persuade some official irrelevant to the process is afforded, an agency is free to deprive a citizen of his rights. None of the authority cited by Defendants supports adopting this alarming standard.

Applying the *Mathews* factors here leads to the inescapable conclusion that the FBI denied Mr. Strzok any meaningful due process after Mr. Bowdich unilaterally and without warning replaced Will as the actual decision maker. That is, Mr. Strzok had a strong interest in his career with the FBI, which not only afforded him and his family financial security, but the opportunity to provide consistently extraordinary service to his country. The "significance of the private interest

in retaining employment has long been established." *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 271 (D.D.C. 2022) (cleaned up).  The procedure used by Bowdich (ignoring all of the standard response rights afforded to FBI employees generally and disregarding the executed LCA) was an egregious deprivation of Strzok's property interest in continued employment, just as the failure to provide any meaningful due process created an intolerable risk in *Propert*, 948 F.2d at 1333.  Finally, as to the government's interests, "while cost to the government is a factor to be weighed in determining the amount of process due, it is doubtful that cost alone can ever excuse the failure to provide adequate process." *Id.* at 1335.  And here, it would have cost nothing to the government to afford Strzok the same procedural due process protections afforded to all FBI employees.  For whatever reason (and the record suggests it was a result of President Trump's longstanding and increasingly strident demands for Mr. Strzok to be fired), Bowdich was unwilling to afford him any of that process.

On this record, Strzok has proven with undisputed evidence that after entering the LCA he had a reasonable expectation of continued employment with the FBI (a valid property interest), and the FBI deprived him of that interest in a manner that was both substantively impermissible and lacked any meaningful due process.  This violated his rights under the Fifth Amendment.

## CONCLUSION

The Court should grant summary judgment in Mr. Strzok's favor on his Fifth Amendment claim and schedule a hearing on back pay and attorneys' fees.  It should deny the government's Motion and schedule a trial on his First Amendment claim.

Date: October 31, 2024                      Respectfully submitted,


                                            /s/ Aitan D. Goelman
                                            Aitan D. Goelman (DC Bar 446636)
                                            Christopher R. MacColl (DC Bar 1049153)
                                            ZUCKERMAN SPAEDER LLP

1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
AGoelman@zuckerman.com

/s/ Richard A. Salzman
Richard A. Salzman (DC Bar 422497)
HELLER, HURON, CHERTKOF & SALZMAN
PLLC
1730 M Street, NW, Suite 412
Washington, DC 20036
Tel: (202) 293-8090
salzman@hellerhuron.com