*Strzok v. Garland, et al.,* No. 1:19-cv-2367-ABJ (D.D.C.)

# Plaintiff's Exhibit 36

## To Plaintiff's Summary Judgment Memorandum

## (Provisionally Filed Under Seal)

# Hearing - Hearing Transcripts

## Title Info

| | |
|---|---|
| **Title:** | HOUSE JUDICIARY COMMITTEE AND HOUSE OVERSIGHT AND GOVERNMENT REFORM COMMITTEE JOINT HEARING ON FBI AND DOJ ACTIONS SURROUNDING THE 2016 ELECTION |
| **Date:** | July 12, 2018 |
| **Location:** | WASHINGTON, DC |
| **Committee:** | Oversight and Government Reform;HouseCommittee on Oversight and Government Reform. House;Judiciary;HouseCommittee on the Judiciary. House |
| **Permalink:** | https://congressional-proquest-com.nyli.idm.oclc.org/congressional/docview/t65.d40.07120018.s00?accountid=139558 |

## Speaker

REP. TREY GOWDY

## Body

(CORRECTED COPY - FIXES MERGED)

GOODLATTE: Good morning. The committees on the Judiciary and Oversight and Government Reform will come to order.

And without objection, the chair is authorized to declare recesses of the committee at anytime.

We welcome everyone to this morning's hearing on oversight of FBI and DOJ actions surrounding the 2016 election.

Before we begin, without objection, the MOU that Mr. Gowdy and I entered into will govern these proceedings.

The chair recognizes the gentleman from New York, the ranking member of the Judiciary Committee.

NADLER: Mr. Chairman, I want to express my appreciation to the staff for -- for preparing all sorts of parliamentary objections which we will not use. But I appreciate the chairman consulting with us on the MOU. And pursuant to our conversation, I do not object.

GOODLATTE: The chair thanks the gentleman.

The chair recognizes himself for the purpose of an opening statement.

I wish this hearing were not necessary.

Many children grow up wanting to become FBI agents, to catch bad guys and protect the American people. I have little doubt that our witness today has done that very thing during his many years serving as an FBI special agent.

GOODLATTE: A special agent's mission is a vitally important business to which we dedicate some of our best and brightest.

However, this is precisely why our joint investigation is such an anomaly.

We want the FBI and the Department of Justice to be off the front pages and to return to doing what they are best at: battling crime, terrorism, and espionage, and protecting all of us from harm. We don't want to read text message after text message dripping with bias against one of the two presidential candidates. We don't enjoy finding compelling evidence that the FBI director had predetermined the outcome of the case months in advance.

But that is thus far what we have found, and these are only small pieces of the larger puzzle. The more information we acquire, the more interviews we conduct, and the more sources we contact, the more we learn.

It has, unfortunately, taken a great deal of effort to get our executive branch agencies to cooperate with our legitimate congressional oversight. But we have made substantial progress, and it is a credit to our investigative task force members and staff.

For all those in this room who continue to disparage our investigation as mere conspiracy theory, and for all those who have chosen to ignore serious irregularities and potential crimes that we have uncovered, I say this: Imagine if you were under investigation and the investigator hated you, disparaged you in all manner of ways, and fraternized with another employee working on your case who also hated you, denigrated your supporters, and made crucial investigative decisions on how your case should be treated and eventually adjudicated.

Would anyone sitting here today believe that this was an acceptable state of affairs, particularly at an agency whose motto is "Fidelity, Bravery and Integrity"? I think not.

To my colleagues on the other side of the aisle, please replace President Trump's name with your own name in a small sample of things Mr. Strzok has said. Envision how you would feel if you found out that the chief agent investigating you, as a member of Congress, was making these statements, "F Trump," "Trump is a disaster," "Just went to a Southern Virginia Walmart. I could smell the Trump support." Or perhaps most alarmingly and revealingly, "We'll stop it," referring directly to Mr. Trump's candidacy for president.

In fact, for those who think we are wasting time in this committee, suppose all of this had been said about candidate Obama

before he was elected or, even more topical, about Hillary Clinton
while she was running in the same election. Would we be where we are
today?

The only honest answer is an absolute, affirmative yes. Of course
we would be here, because every single Democrat would be protesting
bias and discrimination against their preferred candidates by an
out-of-control FBI and DOJ.

So please stop saying this doesn't matter and is only the product
of conspiracy theory.

Instead, the American people hope you will understand that this
investigation goes to the very heart of our system of justice, one that
is supposed to be fair and treat everyone equally under the law.

Mr. Strzok and others inside the FBI and DOJ turned our system of
justice on its head, and that's why we're here and why this matters.

GOODLATTE: Yesterday, Chairman Gowdy and I received a letter from
my colleagues on the other side of the aisle, raising numerous
objections about the nature of our investigation. These claims are
largely spurious and I have responded publicly to them before. However,
these claims are also revealing.

The final line of that letter states that our Democratic
colleagues will, quote, "undertake efforts to protect their rights,"
end quote.

I implore my friends not to continue their efforts to undermine
this investigation. And as for their rights, I submit that the rights
that should concern us are the rights of the American people, namely to
know the facts, to trust that their law enforcement agencies are
operating fairly and justly, and to feel secure in the knowledge that
no one is above the law.

I now recognize the ranking member of the Judiciary Committee, the
gentleman from New York, Mr. Nadler, for his opening statement.

NADLER: Thank you, Mr. Chairman.

Mr. Chairman, I must say, before I begin my formal statement, that
this country has a number of emergencies right now under the
jurisdiction of this committee which we're not spending any time or any
attention to, the leading one obviously being the fact that 3,000
children were improperly taken away from their families, and the
administration seems either unwilling or, out of a total incompetence,
unable to return the kids to their families even under court order.

We ought to be holding hearings about the intentions or the
competence of the Department of Homeland -- of the Department of
Homeland Security on this question. Mr. Chairman -- and it's of more
immediate concern than this hearing, certainly.

At the outset of this Congress, when my Democratic colleagues and
I asked you to hold hearings about the Russian government's campaign to
undermine our last election, you said no and you offered a variety of

excuses.

We could not look into President Trump's overt attempts to obstruct the early stages of the Russian investigation because you said, quote, "There are other committees that have jurisdiction over part of this," unquote.

You were also reluctant to interfere with the special counsel. Quote, "Until Mr. Mueller's investigation is complete, it is redundant for the House of Representatives to engage in fact-gathering on many of the same issues."

You also insisted that the House Judiciary Committee would never intrude on an active criminal investigation, claiming, perhaps erroneously, that the majority never questioned the FBI about the Clinton investigation while that investigation was still ongoing.

Mr. Chairman, this joint investigation is now so far afield from the original statements that it can be difficult to discern what we are investigating at all. You initially described this inquiry as, quote, "an investigation regarding charging decisions in the investigation surrounding Secretary Clinton's e-mail server in 2016," close quote.

Just a few days ago, over the course of an 11-hour interview, Republicans asked Mr. Strzok more than 200 questions about the special counsel's investigation, more than 30 questions about Mr. Strzok's personal interactions with the special counsel, and 25 questions about the FBI's use of confidential sources -- confidential human sources to determine who at the Trump campaign might have been compromised by a foreign government.

Are we no longer going to wait until Special Counsel Mueller concludes his work, Mr. Chairman?

Or perhaps the rules of this joint investigation, such as they are, operate differently now that we're approaching the midterm elections and Special Counsel Mueller is closing in on the president's close associates. In the majority's view it seems our job is to ask questions about the internal workings of the special counsel's investigation and to demand documents that lay out his strategy, but not to make any attempt to understand how the Russian government influenced our last election, or any effort to protect our next election from an attack by the Russian government, a key foreign adversary.

In the majority's view, it is more important to quiz -- to quiz Mr. Strzok about the FBI's use of confidential human sources in some wild attempt to prove President Trump's basis claim that a, quote, "spy," unquote, was planted inside his campaign, than it is to lean about the impact of exposing the identity of these sources while they are still working undercover. My Republican colleagues appear to have revealed the identity of at least one source -- such source already.

In the majority's view, the text messages exchanged Mr. Strzok and Lisa Page are a higher priority for us than President Trump's request that James Comey end the investigation into Michael Flynn, or his decision to fire Director Comey, quote, "because of that Russia thing

with Trump and Russia," unquote -- that's a quote from the president --
or his repeated attempts to fire Special Counsel Mueller directly.

In the majority's view, we do not have time to conduct oversight
on almost any national security issue, but we have hours on end to
discuss Mr. Strzok's affair.

Which brings me to my next point. I have come to expect that
President Trump will tweet abhorrent things about decent people, but I
hope I can expect better behavior from my colleagues.

Mr. Strzok volunteered to be here today, just as he volunteered to
appear two weeks ago for what turned out to be an 11-hour interview.
You don't have to like him, but you have to treat him and any witness
before this committee with respect. Questions like, "Do you love Lisa
Page?" and, "Who did you vote for in the last election?" questions the
president's posed in his interview, are not relevant to any aspect of
our official business.

I would say the same of the majority's treatment of Deputy
Attorney General Rosenstein on June 29th, which was at best uncivil;
and of the committee's treatment of Lisa Page, which has been unfair to
say the least.

Mr. Chairman, I agree with you that Ms. Page must eventually
comply with a duly issued subpoena. But it is beneath your office to
suggest, as you did this week, that her decision not to appear to for a
deposition means, quote, "she has something to hide." It beneath our
committee to call her pathetic, as Mr. DeSantis did. It has nothing to
do with the swamp, as Mr. Jordan suggested.

Can we not be decent to our witnesses, Mr. Chairman? Must
Republicans descend to the president's level, even in his defense?

I know that the majority wants a public fight with Mr. Strzok
today. I expect that they will ask him questions about the special
counsel's investigation that you know the FBI will not permit him to
answer, as you did more than 200 times in our last meeting with Mr.
Strzok, so that his decision not to answer, and instructions by the FBI
not to answer, can be played out on cable news again and again.

And I expect that Mr. Strzok walked into this room knowing that
Republicans may soon call for him to be held in contempt for following
the longstanding policy of the Department of Justice.

FBI agents like Mr. Strzok should not comment on or even
acknowledge the existence of an ongoing criminal investigation. The
single decision not to -- I'm sorry -- the single decision to deviate
from that protocol can cause lasting damage to our republic, as anyone
who has read the inspector general's report and his conclusions about
Mr. Comey's deviations from that protocol must acknowledge.

When we reach that impasse, Mr. Chairman, I hope you will think
back to the statements you made about interference with the special
counsel earlier this Congress and consider the -- the consequences of
our words and actions here today.

The majority keeps telling us over and over again that there was bias in the Clinton investigation, bias in the Russian investigation, and that bias must never again affect an investigation at the Department of Justice.

NADLER: The rules that prevent Mr. Strzok from answering some of the questions today are designed to accomplish precisely that: to prevent Congress and the public from injecting bias in counsel -- I'm sorry -- to prevent Congress and the public from injecting bias and politics into the special counsel's investigation or into any other investigation. When the special counsel's job is done, I invite all of us to join in examining his findings. Until then, Mr. Chairman, I hope we can treat our guest with common courtesy and leave the special counsel alone to do his job. I yield back.

GOODLATTE: The chair thanks the gentleman and it's now my pleasure to recognize the chairman of the Oversight and Government Reform Committee, the gentleman from South Carolina, Mr. Gowdy, for his opening statement.

GOWDY: Thank you, Mr. Chairman.

In our justice system, we give law enforcement officers incredible powers; the power to investigate, to search, to seize, to stop, the power to allege, and accuse, the power to eavesdrop and intercept private communications, the power to look through bank records, the power to look through phone records, the power to even check what books you checked out of the library.

These are awesome powers that must be used responsibly because those powers affect reputations and freedom. These awesome powers are given a correspondingly high expectation that these powers will be used fairly, lawfully, professionally, and a manner worthy of our respect.

About two weeks ago, FBI Agent Peter Strzok was interviewed for more than 10 hours. We learned that Agent Strzok has a most unusual and largely self serving definition of bias. Agent Strzok, despite the plain language of his text and e-mails, despite the Inspector General's report and despite common sense, doesn't think he was biased.

He thinks calling someone destabilizing for the country isn't bias. He thinks promising to protect the country from someone he hasn't even begun to investigate isn't bias. He thinks promising to stop someone he is supposed to be, fairly, investigating from ever becoming president isn't bias.

He thinks talking about an insurance policy to keep someone from becoming president isn't bias. But that's for one of the folks he was investigating. He has a different set of rules for others that he's investigating.

Agent Strzok thinks saying someone he is, allegedly, investigating should be elected president 100 million to zero before he ever interviews. He doesn't think that's bias. Agent Strzok thinks pronouncing someone innocent before bothering to interview more than 30 different witnesses isn't bias.

He thinks claiming you can smell the Trump supporters isn't bias, but he doesn't say a single solitary word about being able to smell the support of any other candidate. To him, that isn't bias.

The moment Special Counsel Bob Mueller found out about Peter Strzok's text and e-mails, he kicked off of the investigation. But that was a year and a half too late. The text and the e-mails may have been discovered in May of 2017, but the bias existed and was manifest a year and a half before that, all the way back to late 2015 and early 2016.

So, it wasn't the discovery of text that got him fired. It was the bias manifest in those texts that made him unfit to objectively and dispassionately investigate. So, if the bias existed in late 2015 and early 2016, and it did, his own fitness to investigate existed then, as well.

Agent Strzok struggled to define bias for the better part of 10 hours. For the rest of us, bias is the prejudging of a person, a group, or a thing. It usually has a negative connotation, but it is a preconceived position or a prejudgment. It is the making up of your mind ahead of time based on anything other than the facts, and that is exactly what he did. Bias is saying, Hillary Clinton should win the presidency 100 million to zero, when she was still under investigation, wasn't even the nominee, hadn't been interviewed and 30 other witnesses had also not been interviewed.

In March of 2016, Agent Strzok had Clinton winning 100 million to zero, even though the investigation was far from being over. That is the prejudging of someone's innocence before all the evidence is in.

On the other hand, he said, Trump would be destabilizing, called him an idiot, abysmal, bigoted nonsense (ph), called him a disaster. He said he should F himself.

Strzok promised to stop Trump from becoming president before the investigation even began. He talked, longingly, of Trump resigning two months after he was inaugurated and well before the special counsel investigation even began.

Strzok even talked about impeachment the day the special counsel was appointed. That is prejudging guilt, it is prejudging punishment, and it is textbook bias. We live in a 50/50 country and we accept that. But we're a 100 percent country when it comes to having law enforcement that doesn't prejudge innocence before investigations are over and doesn't prejudge guilt and punishment before an investigation even begins.

Agent Strzok had Hillary Clinton winning the White House before he finished investigating her. Agent Strzok had Donald Trump impeached before he even started investigating him. That is bias.

Agent Strzok may not see it, but the rest of the country does. And it's not what we want, expect, or deserve from any law enforcement officer, much less the FBI. A fair, bias-free investigation is not a Republican or Democrat issue, it's an American issue. Or at least it used to be.

GOODLATTE: The chair thanks the gentleman and recognizes the
Ranking Member of the Oversight and Government Reform Committee, the
gentleman from Maryland, Mr. Cummings, for his opening statement.

CUMMINGS: Thank you very much, Mr. Chairman. When Chairman
Goodlatte and Chairman Gowdy launched their joint investigation into
Hillary Clinton's e-mails, they promised not to interfere with the
ongoing criminal investigation being conducted by Special Counsel
Mueller.

They were crystal clear. Let me read some of their statements. On
December the sixth, Chairman Gowdy said, and I quote, "I specifically
communicated to Special Counsel Robert Mueller I would not willingly or
unwillingly interfere with an ongoing criminal probe" end of quote.

On March 18, Chairman Gowdy said, and I quote, "I've been really
very clear, leave him alone, let him do his job," end of quote.
Chairman Gowdy went on to offer advice directly to the president. And
this is what he said, and I quote, "My advice to the president is the
same thing I just told his lawyer, give Bob Mueller the time, the
independence, and the resources to do the job."

It went on to say that, "When you are innocent, if the allegations
of collusion with the Russians -- and -- and there's no evidence of
that, and you are innocent of that, act like it," end of quote. This
was the advice that Chairman Gowdy gave to the President of the United
States of America.

And let me very -- be very clear, I have a tremendous amount of
respect for the chairman of the Oversight Committee. Chairman Goodlatte
echoed those comments declaring that he and Chairman Gowdy had, and I
quote, "no intentions of interfering with the substantive investigation
of Mr. Mueller," end of quote.

But now they're doing the opposite. Behind closed doors, they're
asking individuals involved in the Russia investigation hundreds of
questions about confidential human sources, FISA applications, and
potential witnesses in the special counsel's criminal probe.

In public, they're holding emergency hearings, issuing unilateral
subpoenas, and threatening contempt and impeachment. They even demanded
that the top Justice Department Law Enforcement Officer in charge of
this investigation, and I quote, "finish it the hell up," end of quote.

So what has changed? What has changed? Why did our chairman
promise not to interfere wittingly or unwittingly, but then suddenly
launched this aggressive attack against our special counsel? There has
been one obvious development. The special counsel has now obtained five
guilty pleas and indicted 18 others, including some of President
Trump's closest advisors.

Here are the individuals who are -- already admitted their guilt.
Michael Flynn, President Trump's national security advisor, he pleaded
guilty to lying about his secret communications with the Russians,
making false statements to the FBI, and impeding the investigation
while he worked at the White House last year.

Let me underscore: These are not allegations, these are admissions. President Trump's National Security Advisor admitted that he committed these crimes, and he is now cooperating with the special counsel.

Rick Gates, President Trump's Deputy Campaign Chairman. He pleaded...

GOODLATTE: The chair would instruct the individual from holding signs up. That is an inappropriate thing to do.

CUMMINGS: Is there a rule for that, Mr. Chairman?

(OFF-MIKE)

Mr. Chairman.

(OFF-MIKE)

(UNKNOWN): These people pleaded guilty.

(UNKNOWN): Are there any rules against what they are doing? Cite the rule. Cite the rule if there's a rule against what they're doing. Cite the rule.

(OFF-MIKE)

GOODLATTE: The gentleman may proceed.

CUMMINGS: Thank you very much, Mr. Chairman. Let me underscore, these are not allegations, these are admissions. President's top -- Trump's top national security advisor admitted and he committed these crimes and he is now cooperating with the special counsel.

Rick Gates, President Trump's deputy campaign chairman, he pleaded guilty to, quote, "conspiracy against the United States of America," end of quote. To intentionally engaging in a variety of criminal schemes and to lying to the special counsel and the FBI last year and even this year. He admitted to committing those crimes. He is also cooperating with the special counsel.

George Papadopoulos, President Trump's Foreign Policy Advisor. He pleaded guilty to making false statements to the FBI in 2017 about when he first learned that the Russians had dirt on Hillary Clinton. Also now cooperating with the special counsel.

Richard Pinedo, Digital Marketing Strategist. Pleaded guilty to identity fraud and trafficking in hundreds of stolen bank account numbers over the internet, which were bought by Russians to interfere with the 2016 election.

And Alex van der Zwaan, the son-in-law of a Russian oligarch, pleaded guilty to lying to special counsel and the FBI in November about his work with President Trump's Campaign chairman, Paul Manafort, for foreign nationals aligned with Russia.

Of course this does not include Mr. Manafort himself, who is

scheduled to begin his criminal trial later this summer. He is sitting
in solitary confinement after allegedly engaging in witness tampering.

CUMMINGS: This also does not include Michael Cohen, the
president's longtime lawyer. At this moment, he may be considering
whether to cooperate with special counsel.

At the last Judiciary Committee hearing, Chairman Gowdy said that
if the special counsel has evidence of a crime, he submit it -- he
should submit it to the grand jury.

As Chairman Gowdy himself said, if you are innocent, act like it.
Today I urge our chairmen to change course and to keep their promises
to protect the integrity of the special counsel's ongoing investigation
and instead of asking hundreds of questions that undermine it, to work
with him.

And with that, Mr. Chairman, I yield back.

(OFF MIKE)

GOODLATTE: We welcome our witness, and Mr. Strzok, if you would
please rise, I'll begin by swearing you in. Do you swear that the
testimony that you are about to give shall be the truth, the whole
truth and nothing but the truth, so help you God?

STRZOK: I do.

GOODLATTE: Thank you. Let the record show that the witness
answered in the affirmative. Mr. Peter Strzok is a Deputy Assistant
Director of the Human Resources Division of the FBI.

Mr. Strzok has worked at the FBI for approximately 22 years. Prior
to his current assignment, he was a Deputy Assistant Director in the
Counterintelligence Division. It was his assignment in that division
that brings him before the committees today as we continue our
investigation.

Your written statement will be entered into the record in its
entirety and we ask that you summarize your testimony in five minutes.
To help you stay within that time, there's a timing light on your
table. When the light switches from green to yellow, you have one
minute to conclude your testimony. When the light turns red, it signals
your five minutes have expired.

Mr. Strzok, you may begin.

STRZOK: Chairman Goodlatte and Gowdy, Ranking Members Nadler and
Cummings, thank you for the opportunity to testify before your
committees again, this time in an open hearing.

I testify today with significant regret, recognizing that my texts
have created confusion and caused pain for people I love. Certain
private messages of mine have provided ammunition for misguided attacks
against the FBI, an institution that I love deeply and have served
proudly for over 20 years. I'm eager to answer your questions, but let
me first address those much-discussed texts.

Like many people, I had and expressed personal political opinions during an extraordinary presidential election. Many contained expressions of concern for the security of our country, opinions that were not always expressed in terms I'm proud of. But having worked in national security for two decades and proudly served in the U.S. Army, those opinions were expressed out of deep patriotism and an unyielding belief in our great American democracy.

At times, my criticism was blunt; but, despite how it's been characterized, it was not limited to one person or to one party. I criticized various countries and politicians, including Secretary Clinton, Senator Sanders, then candidate Trump and others.

But let me be clear unequivocally and under oath, not once in my 26 years of defending our nation did my personal opinions impact any official action I took. This is true for the Clinton e-mail investigation, for the investigation into Russian interference and for every other investigation I have worked on. It is not who I am and it is not something I would ever do, period.

I understand that my sworn testimony will not be enough for some people. After all, American's are skeptical of anything coming out of Washington. But the fact is, after months of investigations, there is simply no evidence of bias in my professional actions.

There is, however, one extraordinarily important piece of evidence supporting my integrity, the integrity of the FBI and our lack of bias. In the summer of 2016, I was one of a handful of people who knew the details of Russian -- Russian election interference and its possible connections with members of the Trump campaign.

This information had the potential to derail and quite possibly defeat Mr. Trump, but the thought of expressing that or exposing that information never crossed my mind. That's what FBI agents do every single day and that's why I'm so proud of the bureau. And I am particularly proud of the work that I and many others did on the Clinton e-mail investigation. Our charge was to investigate it competently, honestly and independently, and that's exactly what happened.

I'm also proud of our work on the Russian interference investigation. This is an investigation into a direct attack by a foreign adversary and it is no less so simply because it was launched against our democratic process, rather than against a military base. This is something that all Americans of all political persuasions should be alarmed by.

In the summer of 2016, we had an urgent need to protect the integrity of an American presidential election from a hostile foreign power determined to weaken and divide the United States of America. This investigation is not politically motivated. It is not a witch-hunt. It is not a hoax.

I expect that during this hearing, I'll be asked about that ongoing investigation. Where the FBI has directed me not to answer, I will abide by the FBI's instructions. But let me be clear, this is not

because I don't want to answer your questions. If I were permitted to answer, I would. And the answers would doubtless be disappointing to the questioners and undermine the conspiracy narrative being told about the Russian investigation.

I understand we're living in a political era in which insults and insinuation often drown-out honesty and integrity. But the honest truth is that Russian interference in our elections constitutes a grave attack on our democracy. Most disturbingly, it has been wildly successful, sewing discord in our nation and shaking faith in our intuitions.

I have the utmost respect for Congress' oversight role. But I strongly believe today's hearing is just another victory notch in Putin's belt and another milestone in our enemy's campaign to tear America apart. As someone who loves this country and cherishes its ideals, it is profoundly painful to watch and even worse to play a part in.

Mr. Chairman, I welcome your questions.

GOODLATTE: We will now proceed under the five-minute rule with questions. I will begin by recognizing the chairman of the Oversight and Government Committee -- Reform Committee, Mr. Gowdy.

GOWDY: Thank you, Mr. Chairman.

Agent Strzok, the FBI investigation into potential Russia collusion with the Trump campaign began on July 31, 2016. You drafted the originating document. You approved the originating document. You were the point of contact on the originating document. And the FBI has represented to Congress that nothing from an investigative standpoint, with respect to Russian collusion and the Trump campaign began before July 31, 2016.

But 10 days before the investigation even began, 10 days before you drafted the originating document, approved the originating document with the point of contact on the originating document, 10 days before the investigation began -- which the department you work for says nothing was done before July 31st -- you said, "Trump is a disaster. I have no idea how destabilizing his presidency would be."

And because you struggled a couple of weeks ago with a word that I thought a commonly accepted definition, I'm going to go ahead and give you the definition of destabilizing. The first one, kind of, is obvious. It's to make unstable.

GOWDY: The second one caught my attention -- the second dictionary definition: to call something such as a government to be incapable of functioning or surviving. That's a pretty significant allegation to make 10 days before you even began to investigate someone. So, that was before July 31st. I want to ask you, in that first week -- we'll go ahead and up it to eight days. Between July 31st and August 8th, how many interviews did you conduct related to the alleged collusion between Russia and the Trump campaign?

STRZOK: So, Congressman, as you know, the council for the FBI,

based on the special counsel's equities has instructed me not to answer questions about the ongoing investigations...

GOWDY: I'm asking for a number.

STRZOK: ...to Russian attempts to...

GOWDY: Agent.

STRZOK: ...interfere.

GOWDY: Agent Strzok, I'm asking for a number. I haven't gotten to the names. How many people had you investigated -- had you interviewed between the beginning of and on (ph) July 31st and August the 8th? It's an eight-day time period or a weekend to an investigation. How many people had you interviewed?

STRZOK: Congressman, I understand your question. I appreciate it. And I would very much like to answer it. But as I've stated, as you know, the counsel of the FBI, based on the special counsel's equities have directed me not to answer any questions about the ongoing investigation into Russian attempts to interfere...

GOWDY: So -- so.

(CROSSTALK)

GOODLATTE: The gentleman -- the gentleman will suspend and the clock will suspend. Mr. Strzok, you are under subpoena and are required to answer the question. Are you objecting to the question? If so, please state your objection.

NADLER: Mr. Chairman, I object.

GOODLATTE: The gentleman does not have standings to object. There is no...

NADLER: I -- point of order.

GOODLATTE: ...no point of order here that the.

NADLER: The point of order should be heard.

GOODLATTE: The gentleman will state his point of order.

NADLER: My point of order is that intentionally or otherwise, this demand put Mr. Strzok in an impossible position. He is still an employee of the FBI. And FBI counsel's instructed him not to answer the question.

GOODLATTE: The gentleman...

NADLER: If we have a problem with this policy, we should take it up with the FBI, not badger Mr. Strzok.

GOODLATTE: The gentleman's point of order is not well taken.

NADLER: It's right on point.

GOODLATTE: No, it's not. The -- Mr. Strzok, are you objecting to the question, and if so please state your objection.

STRZOK: Mr. Chairman, two things. One, I do not believe I am here under subpoena. I believe I am here voluntarily. Second, I will not, based on direction of the FBI to me, based on that, I will not answer that question because it goes to matters which are related to the ongoing investigations being undertaken by the special counsel's office.

GOODLATTE: Mr. Strzok, you have not stated a valid legal basis for not responding to a question directed to you by a member of the United States House of Representatives, and you are overruled.

NADLER: Point of order, Mr. Chairman.

GOODLATTE: Your -- let me -- let me continue. Your testimony is essential to this hearing, and to our oversight and information-gathering functions with regard to the actions taken and decisions made by the Department of Justice and the Federal Bureau of Investigation in 2016 and 2017. I am specifically directing you to answer the question in response to our subpoena, not withstanding your objection.

NADLER: Point of order, Mr. Chairman.

GOODLATTE: Mr. Strzok, please be advised that you can either comply with the committee's directive to answer the question or refuse to do so, the latter of which will place you at risk of a contempt citation and, potential, criminal liability.

NADLER: Point of order.

GOODLATTE: Do you understand that?

NADLER: Point of order, Mr. Chairman.

GOODLATTE: The question is directed to the witness.

NADLER: And I have a point of order before he answers the question.

GOODLATTE: The point of order is not well taken, until.

NADLER: You don't know what the point of order is. You can't say it's not well taken.

GOODLATTE: The point of order -- the witness will answer the question.

NADLER: Mr. Chairman, I have -- I raise my point of order and I insist on it.

GOODLATTE: What is the point of order?

NADLER: The United States Attorneys' Manual instructs department personnel not to respond to questions about the existence of an ongoing investigation or a comment on its nature or progress.

In a letter to Congressman John Linder in 2000, referred to as the Linder letter, the department made this policy, explicitly, applicable to a request from Congress, quote, "All though Congress has a clear and legitimate interest in determining how the department enforces statutes, congressional inquiries during dependency (ph) of a matter poses an adherent threat to the integrity of the department's law enforcement and litigation functions", un-question -- unquote.

Therefore, the chairman -- the question being directed at the -- at the witness is out of order, the witness' declination to answer it as against the instructions of the FBI, pursuant to FBI policy which is necessary, so it not to allow us to subvert an ongoing criminal investigation. He is right.

GOODLATTE: The gentle...

NADLER: And he should not answer the question.

GOODLATTE: The gentleman has not stated a valid point of order.

(CROSSTALK)

NADLER: I appeal the ruling of the chair in that case.

GOODLATTE: Nonetheless -- nonetheless, the United States Supreme Court has recognized that it is, unquestionably, the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respect the dignity of the Congress and its committees and to testify, fully, with respect to matters within the province of proper investigation.

NADLER: Mr. Chairman, (inaudible).

GOODLATTE: The...

NADLER: Mr. Chairman, you know -- or we all know that if we were to ask a question of a witness about a military secret. If we were to ask them, how does the H-bomb work, he could not answer that question.

GOODLATTE: The gentleman has not...

NADLER: This is the same thing.

GOODLATTE: ...stated -- that is classification issue. Not an issue of whether or not this is a valid question for which.

NADLER: I appeal the ruling of the Chair.

(UNKNOWN): You've ruled it's not a point of order.

NADLER: He has ruled (ph), but it's not a point of order.

GOODLATTE: That is -- that is not a ruling. Mr. Strzok.

NADLER: Mr. Chairman, I insist on my point of order and I insist on...

GOODLATTE: Mr. Strzok.

NADLER: ... appealing the ruling of the chair.

GOODLATTE: Mr. Strzok, knowing the advice that I have (inaudible)...

(UNKNOWN): Point of order, Mr. Chairman, point of order. I believe there's a point of order that's been raised, and you've ruled we have a right now to answer Mr. Nadler's (inaudible).

GOODLATTE: It is not a valid point of order. The chair has...

(CROSSTALK)

(UNKNOWN): You can't just repress it, Mr. Chairman, because you don't.

NADLER: ...on that question, on that ruling.

UNKNOWN: Point of order, Mr. Chairman.

GOODLATTE: Mr. Strzok.

NADLER: Mr. Chairman, I appeal the ruling of the Chair that you have just made on that -- on the -- on whether (inaudible).

(CROSSTALK)

GOODLATTE: You have not stated a valid point of order.

NADLER: And that is your ruling and I appeal it.

GOODLATTE: That is not an appealable...

(CROSSTALK)

(UNKNOWN): Point of order, yes it is, Mr. Chairman. Appealing the ruling of the chair is exactly what he's requesting. He's appealing it. That requires a vote to either sustain it or overrule it.

GOODLATTE: The gentleman from New York has not cited a rule of the House that is being violated. Therefore, it is not a point of order.

(UNKNOWN): That's your rule (inaudible).

(CROSSTALK)

NADLER: I appeal that ruling of the Chair.

JACKSON LEE: Mr. Chairman -- Mr. Chairman, is it not appropriate to also interject the attorney-client privilege, which cannot be

overridden, and is a rule of the House to the extent...

GOODLATTE: The...

JACKSON LEE: ...that the witness' have the right...

GOODLATTE: ...gentlewoman will suspend.

JACKSON LEE: ...to an attorney client privilege in this House.

GOODLATTE: Mr. Strzok.

JACKSON LEE: And that is what this witness is asserting. Attorney client...

GOODLATTE: Mr. Strzok.

JACKSON LEE: ... privilege, and he has been advised not to answer the questions.

GOODLATTE: The gentlewoman will suspend.

The gentleman has not raised the attorney-client privilege. He has said that he's been instructed by the FBI not to answer the question. Now...

JACKSON LEE: By lawyers.

GOODLATTE: ... he knows -- he knows the advice I have just given him. If he would like, I'll restate it. But knowing this, will you answer the committee's question as directed or do you refuse to answer the committee's question?

(CROSSTALK)

NADLER: And I insist on appealing the ruling of the chair...

(UNKNOWN): Point of parliamentary inquiry, Mr. Chairman.

(CROSSTALK)

NADLER: ... that (inaudible) was not in order.

(UNKNOWN): Point of parliamentary inquiry -- point of parliamentary inquiry, Mr. Chairman.

GOODLATTE: The gentleman from South Carolina has the time. A parliamentary inquiry is not in order during the gentleman's time. The chair is instructing the witness to answer the question, and the question to you is...

NADLER: Mr. Chairman...

GOODLATTE: Will you answer the committee question as directed, or do you refuse to answer the committee's question?

NADLER: Mr. Chairman, I move to adjourn.

(UNKNOWN): Second.

GOODLATTE: You're not recognized for that purpose.

(LAUGHTER)

(OFF MIKE)

(UNKNOWN): He has to be recognized.

NADLER: Mr. Chairman, I think you have no choice but to recognize such a motion.

GOODLATTE: I do not have...

(OFF MIKE)

NADLER: Are we just going to make up rules as we go along, is that...

GOODLATTE: The -- the -- the motion is not in order during the time controlled by the gentleman from South Carolina.

NADLER: I appeal that ruling of the chair.

GOODLATTE: Mr. Strzok, will you answer...

NADLER: Can I appeal your ruling of the chair that my motion to adjourn is not in order?

GOODLATTE: The gentleman is not in order.

NADLER: That may be, but I appeal your ruling.

GOODLATTE: The gentleman is not recognized.

(OFF MIKE)

Knowing this, will you answer the committee's question as directed, or do you refuse to answer the committee's question?

STRZOK: Mr. Chairman, as you know, counsel for the FBI has directed me not to answer questions about the ongoing investigation. As you also know, counsel for the FBI is sitting here behind me. May I consult with them?

GOODLATTE: You may consult with your own counsel.

STRZOK: But I may not consult with the FBI's counsel?

(LAUGHTER)

GOODLATTE: Only -- only with your own counsel.

(OFF MIKE)

NADLER: Mr. Chairman, there's no basis for that. He can consult with the FBI counsel. He's an FBI employee.

GOODLATTE: The gentleman is not recognized.

NADLER: And the chairman is not being proper.

GOODLATTE: The chairman is being proper.

(UNKNOWN): The witness can't be directed not to confer with his attorney.

GOODLATTE: The FBI is not his attorney. His attorney is seated behind him. If he wishes to consult his attorney (ph)...

(CROSSTALK)

(UNKNOWN): He's an employee of the FBI, Mr....

(CROSSTALK)

GOODLATTE: ....as (ph) he's already done, he may do so.

NADLER: And his attorney may consult with the FBI attorney?

(UNKNOWN): Isn't the privilege that of the FBI, and shouldn't the FBI counsel be solicited on that point?

(OFF MIKE)

STRZOK: Mr. Chairman, my counsel has reiterated that counsel for the FBI has directed that I may not answer that question.

GOODLATTE: Mr. Strzok, in a moment we will continue with the hearing, but based on your refusal to answer the question, at the conclusion of the day we will be recessing the hearing and you will be subject to recall to allow the committee to consider proceeding with a contempt citation.

SWALWELL: A point of order, Mr. Chairman. Will the committee also consider contempt for Mr. Bannon, who refused to answer Mr. Gowdy's questions when he was actually under subpoena?

(CROSSTALK)

GOODLATTE: That is not a proper point of order in this hearing.

(CROSSTALK)

(UNKNOWN): Parliamentary inquiry.

SWALWELL: Mr. Gowdy, do you remember that?

(UNKNOWN): Parliamentary inquiry.

SWALWELL: Do you remember that?

GOODLATTE: The time is controlled by the gentleman from...

(UNKNOWN): Parliamentary inquiry.

GOODLATTE: A parliamentary inquiry is not in order when the gentleman from South Carolina controls the time.

SWALWELL: Mr. Bannon didn't answer your questions under subpoena.

GOWDY: Agent Strzok, just so the record's clear, because it's been a little while -- I didn't ask you the content of those interviews, I didn't ask you the names of who you interviewed, I asked you whether or not you interviewed anyone from July the 31st until August the 8th, and I find it interesting that the FBI will tell us no interviews were conducted before July 31st, that apparently doesn't impact an ongoing probe, but between July 31st until August 8th it does.

Here's the good news -- I already know the answer to it. I went and looked at the file. The first interview that I could find is on August the 11th of 2016, which is 11 days after it began, which makes me wonder, on August the 6th -- so you hadn't interviewed anyone, you're investigating this alleged Russian collusion with the Trump campaign, you're the lead investigator, you originated the investigation, you're the point of contact, you drafted the document, and here you are before you've interviewed a single solitary witness saying "F Trump," then that same day your colleague, Lisa Page, wrote, "Maybe you're meant to protect the country from that menace," and you responded, "I can protect the country at many levels."

We're not even a week into an investigation that you originated, approved, were the contact for, you hadn't interviewed a single solitary soul until August the 11th, and you're already promising to protect the country from that menace Donald Trump.

And then on August the 8th, you still hadn't interviewed anyone. You're 8 days into your Russian collusion with the Trump campaign investigation and you got another text from your colleague, Lisa Page. "Trump's not ever going to become president, right? Right?!" And you replied, "No. No he's not. We'll stop it." By the time you'd promised to stop him from becoming president on August the 8th, how many interviews had you conducted?

STRZOK: Mr. Gowdy, so two answers to that. One, with regard to how many interviews had or had not been conducted, I have been directed by counsel for the FBI not to answer that question.

Second, sir, I think it's important to take those texts in the context of how they were written and what they meant.

GOWDY: And -- and someone may ask you that question, Agent Strzok, but I didn't. I asked you how many people you interviewed before you wrote it. If you want to get into context, let one of my other colleagues do that with you. Here's what I want to know, who's the "he" in "he's not"?

STRZOK: "He" is then-candidate Trump.

GOWDY: So when you said, no Donald Trump's not -- and -- in connection with the question going to become president, what's the "it"? We'll stop "it"?

(CROSSTALK)

STRZOK: Chairman Gowdy -- Chairman Gowdy, that text needs to be taken in the context of which it was...

(CROSSTALK)

GOWDY: I'm -- I'm asking -- look, if you want to have a debate over a two-letter word, we're going to have to do that some other time. What and who did you mean by "it"?

STRZOK: Mr. Gowdy, as I've stated, that text was written late at night in shorthand, and I didn't intend it to be (ph) (inaudible) what it's important to understand is...

(CROSSTALK)

GOWDY: I don't care when it was written, I don't care whether it was longhand, cursive -- I don't care about any of that. I want to know what "it" meant, Agent Strzok.

STRZOK: "It" would be his candidacy for the presidency and my sense that the American population...

(CROSSTALK)

GOWDY: See, it wasn't that tough. It's -- yes, it's not that tough.

STRZOK: ...would not vote him into office.

GOWDY: Right, right. Well, we hadn't gotten to the "we'll" yet.

STRZOK: Well, I'm trying to -- I'm trying (inaudible) and explain the text. I -- I wrote it.

(CROSSTALK)

GOWDY: Your testimony is the "we'll" is the American people, is that right? That's your testimony, the "we'll stop it," you were speaking on behalf of the American people, is that correct?

STRZOK: Mr. Gowdy, what my testimony is and what I said during extensive asking of this question during my prior interview is I don't recall writing that text. But I can tell you...

(CROSSTALK)

GOWDY: Do you deny writing the text?

STRZOK: What I can tell you -- what I can tell you is that text in no way suggested that I or the FBI would take any action to influence the candidacy of (inaudible)

(CROSSTALK)

GOWDY: Agent -- Agent Strzok, that -- that is a fantastic answer
to a question nobody asked.

STRZOK: Yes, Mr. Gowdy, you asked what I meant.

GOWDY: My question to you is the "we'll"...

(UNKNOWN): Chairman, is the witness going to be permitted to
answer the question he was posed?

(OFF MIKE)

GOODLATTE: After the conclusion of Mr. Gowdy's question, if there
is a question that he has not had the opportunity to answer, he will be
given additional time to do that. The witness will.

(UNKNOWN): We look forward to that.

GOODLATTE: (Inaudible) Mr. Gowdy's now, and he will not be
interrupted by others.

GOWDY: So your testimony a couple of weeks ago...

(UNKNOWN): His time is expired, Mr. Chairman. By two and a half
minutes.

GOWDY: Your testimony a couple of weeks -- it's -- it's going to
be tough for me to get through it if I keep getting interrupted.

Your testimony a couple of weeks ago was the "we" meant the
American people, which I found confusing because on November the 7th,
which is the day before the election, you said this: he's -- you were
concerned that those same American people that you were speaking on
behalf of might actually elect Donald Trump president.

So you said, "OMG this is f-ing terrifying," I think we know what
f-ing means. I'm pretty sure we have OMG down, too. What was terrifying
about those same American people you trusted to stop him in August, not
stopping him in November? What was so terrifying, Agent Strzok?

STRZOK: Mr. Gowdy, I -- I do not have a copy of the transcript. We
have not been provided that transcript (inaudible) ...

GOWDY: It's not the transcript. It's your text.

STRZOK: ... Mr. Gowdy, what I would say to that is, one, I was not
referring to the American electorate at all. The American electorate, I
respect. And their decisions and their right to vote is absolutely a
cornerstone of our democracy.

So, at no time did I insult or call into question the -- the --
the judgment or the -- the power of the American electorate. What I was
expressing in that text is my personal belief and my personal sense of
how I saw and what I believed in the potential upcoming administration.

GOWDY: And see, that -- that's what I find so confounding because in August you blamed the we on the American people, that the American people would stop it because you don't want it to be you and Lisa Page...

(UNKNOWN): Mr. Chairman, isn't there a point of order?

GOWDY: ... and you don't want it to be the FBI ...

(UNKNOWN): Are we not given five minutes to answer questions? We have been -- we have indulged this ...

(UNKNOWN): Nine.

(UNKNOWN): ... harassment nine minutes. This ...

GOODLATTE: The chair ...

(UNKNOWN): ... Judiciary and the Oversight Committee, I thought we operated ...

GOODLATTE: ... The gentlewoman ...

(UNKNOWN): ...under a rule of law.

GOODLATTE: ... the gentlewoman will suspend. The chair, in agreement with the ranking members of both committees, agreed that there would be liberality in the questioning by the chairmen and the ranking members of each committee. The gentleman will continue.

GOWDY: What I find confounding, Agent Strzok ...

(UNKNOWN): Then, Mr. Chairman, we expect that liberality on every one of our questionings.

GOWDY: ...What I find confounding, Agent Strzok, is you were counting on the American people -- that was the we you referenced in August when you said, "We'll stop it." But the American people didn't stop it. He actually won.

So then we go to March of 2017 and you're already talking longingly about him resigning. And then we go to the day that Special Counsel Mueller -- well, before we go to that, that's March of 2017. March of 2016 you wrote, "God Hillary should win 100 million to 0." And I'm assuming Hillary would be former Secretary of State Hillary Clinton?

STRZOK: That's correct.

GOWDY: All right. In March of 2016, weren't you investigating her for potential mishandling of classified information.

STRZOK: We were.

GOWDY: Had you interviewed her yet?

STRZOK: No.

GOWDY: Had you interviewed more than 30 other witnesses that wound up being interviewed?

STRZOK: I would have to check the case file, but I'll take your representation that's (ph) ...

GOWDY: Well, if she had said something incriminating in your interview that took place months later of her -- of -- of her, would she have won 100 million to 0 then?

STRZOK: Likely not. No.

GOWDY: Well then why wouldn't you wait until the investigation was over before you have her, the nominee, and winning a general election against an opponent that hadn't even been named yet? A hundred million to zero, Mr. Strzok, that's how bad she should win?

STRZOK: Mr. Gowdy, those personal expressions of my observing the political process of the presidential primaries had no bearing on my actions of any investigation to include the investigation of Secretary Clinton's server (ph) ...

GOWDY: You couldn't think of a ...

STRZOK: ... or anybody else. Sir, if I may ...

GOWDY: ... You couldn't think of a single person that would not vote for Hillary Clinton for president, 100 million to 0, Agent Strzok?

STRZOK: ... Sir, that was -- sir, that was clearly hyperbole which I (inaudible) ...

GOWDY: Well -- well let's say it was hyperbole. Let's divide it by 10. How about we say it was hyperbolic and divide it by 10; 100 million divided by 10 I'm pretty sure is 10 million, 0 divided by 10 is still 0. You couldn't think of a single solitary person that was going to vote for her for president before you interviewed her and while you were supposed to be investigating her.

STRZOK: Congressman, clearly that's not the truth. Clearly, I could envision millions of Americans who are likely and did vote for then candidate ...

GOWDY: Well, you wrote it.

STRZOK: ... My point, sir ...

GOWDY: Did you write it?

STRZOK: ... my point ...

GOWDY: Did you write it? Did you write that text?

STRZOK: ... I did write that, sir, in a expression ...

GOWDY: OK. Were you under duress?

STRZOK: ... a political expression engaging in hyperbole.

GOWDY: Were you under duress?

(UNKNOWN): Asked and answered over and over again.

GOODLATTE: The gentlewoman will suspend. The gentleman from South Carolina controls the time.

GOWDY: All right. We're going to go into one other time period. May 17, 2017, Bob Mueller is appointed, your friend Jim Comey has been fired. He's already leaked the memos to his law professor friend and Mueller is Special Counsel.

Do you remember how long it took for you to start talking about impeachment after Bob Mueller was appointed?

STRZOK: I don't, sir.

GOWDY: One day -- one day and you were talking about impeachment. And for anyone who may have missed it, the day after his appointment, Agent Strzok, you did it again, five days later. Now, how many interviews have you done as part of the Special Counsel team within the first five days of his appointment?

STRZOK: Sir, again, same answer as before. I can't into details (inaudible).

GOWDY: Right, and the answer is also the same, it's zero. No interviews have been done.

STRZOK: I don't know if that's true or not.

GOWDY: No interviews have been done by August the eighth when you're talking about stopping him and how terrifying it would be for him to win and how you can protect the country. And no interviews have been done before you're talking about impeachment of the President.

STRZOK: Mr. Chairman.

GOWDY: No wonder Bob Mueller kicked you off of the investigation, Agent Strzok. My question is, if you were kicked off when he read the texts, shouldn't you have been kicked off when you wrote them?

STRZOK: Not at all.

GOWDY: Well, it wasn't the discovery of your texts, Mr. Strzok, it was the existence of your bias that got you kicked off.

STRZOK: No, Mr. Gowdy, it wasn't. I do not have bias. My personal opinions, in no way, have ever impacted (inaudible).

(CROSSTALK)

GOWDY: Well, then why did you get kicked off?

STRZOK: Mr. Gowdy, my understanding of why I was kicked off was that based on the understanding of those texts and the perception that they might create is something that...

GOWDY: Well, hang -- hang on a second...

STRZOK: ...Special Counsel Mueller (inaudible)...

GOWDY: ...Agent Strzok. Hang on a second.

(CROSSTALK)

GOWDY: Perception.

STRZOK: ...extraordinary integrity.

GOWDY: You're saying it was the perception that 13 Democrats on the Special Counsel probe including one who went to what he hoped was a victory party. That's a perception problem too. They weren't kicked off, you were. Why were you kicked off?

STRZOK: Mr. Gowdy, I cannot speak to Special Counsel Mueller's staffing decisions...

(CROSSTALK)

GOWDY: How long did you talk to him?

STRZOK: ...or the reasons why he did or didn't (inaudible).

GOWDY: How long did you talk to him when he let you go?

NADLER: (Inaudible) witness answer the question?

GOODLATTE: The witness will be afforded the opportunity to answer the question if there is a question he wants to answer after Mr. Gowdy is done.

STRZOK: My recollection, it was a short meeting. Somewhere between 15 to 30 minutes, probably around 15 minutes.

GOWDY: And your testimony is Bob Mueller did not kick you off because of the content of your texts. He kicked you off because of some appearance (ph) that he was worried about?

STRZOK: My testimony -- what you asked and what I responded to was that he kicked me off because of my bias. I'm stating to you, it is not my understanding that he kicked me off because of any bias. That it was done based on the appearance. If you want to represent what you said accurately, I'm happy to answer that question. But I don't appreciate what was originally said being changed.

GOWDY: I don't give a damn what you appreciate, Agent Strzok. I don't appreciate having an FBI Agent with an unprecedented level of animist (ph) working on two major investigations during 2016.

GOODLATTE: The chair recognizes the gentleman from Maryland, Mr. Cummings.

(CROSSTALK)

(UNKNOWN): (Inaudible)...

STRZOK: Mr. chairman, could I respond...

(UNKNOWN): ...is the witness permitted to answer the questions that you promised him he would have an opportunity to answer?

GOODLATTE: Does the.

(UNKNOWN): He endured 15 minutes of badgering of the witness. Can he be allowed, now, to answer as you promised, Mr. Chairman?

GOODLATTE: The gentleman will suspend. The witness, at any time, can ask for additional time to respond to any member's question if the time has been ended.

(UNKNOWN): You said you were going to give him that opportunity at the end of (inaudible).

GOODLATTE: I am giving him that opportunity.

STRZOK: Mr. Chairman, may I respond to...

GOODLATTE: Yes you may.

STRZOK: ...to (ph) Mr. Gowdy's? Sir, I think it's important, when you look at those texts that you understand the context in which they were made and the things that were going on across America.

In terms of the texts that -- we will stop it, you need to understand that that was written late at night, off the cuff, and it was in response to a series of events that included then candidate Trump insulting the immigrant family of a fallen war hero.

And my presumption based on that horrible, disgusting behavior, that the American population would not elect somebody demonstrating that behavior to be President of the United States.

It was in no way, unequivocally, any suggestion that me, the FBI, would take any action, what so ever, to improperly impact the electoral process for any candidate. So, I -- I take great offense and I take great disagreement to your assertion of what that was or wasn't. As to the 100 million to one, that was clearly a statement made in jest and using hyperbole.

I, of course, recognize that millions of Americans were likely to vote for candidate Trump. I acknowledge that is absolutely their right. That is what makes our democracy such a vibrant process that it is.

But to suggest, somehow, that we can parse down the words of shorthand textual conversation like they're some contract for a car is -- is, simply, not consistent with my or most people's use of text

messaging.

I can assure you, Mr. Chairman, at no time in any of these texts did those personal beliefs ever enter into the realm of any action I took. Furthermore, this isn't just me sitting here telling you. You don't have to take my word for it.

At every step, at every investigative decision, there were multiple layers of people above me; the Assistant Director, Executive Assistant Director, Deputy Director and Director of the FBI, and multiple layers of people below me. Section Chiefs, Supervisors, Unit Chiefs, Case Agents and analysts, all of whom were involved in all of these decisions.

They would not tolerate any improper behavior in my any more than I would tolerate it in them. That is who we are as the FBI. And the suggestion that I, in some dark chamber somewhere in the FBI, would somehow cast aside all of these procedures, all of these safeguards, and somehow be able to do this is astounding to me.

It, simply, couldn't happen. And the proposition that that is going on, that it might occur anywhere in the FBI, deeply corrodes what the FBI is in American society, the effectiveness of their mission, and it is deeply destructive.

(APPLAUSE)

SWALWELL: Mr. Chairman, I have a motion. I have a Rule 11 motion, Mr. Chairman, and clause two. I move to subpoena Steve Bannon. Mr. Bannon was a witness in the House Intelligence Committee investigation. He was under subpoena. He refused to answer questions by...

(CROSSTALK)

GOODLATTE: The gentleman's...

SWALWELL: ...Mr. Gowdy.

GOODLATTE: ...motion -- the gentleman is not recognized. The chair recognizes.

SWALWELL: Mr. Chairman, I...

GOODLATTE: The chair recognizes the gentleman from Maryland, Mr. Cummings...

SWALWELL: Mr. Chairman, a motion is always in order.

GOODLATTE: ...for his questions.

SWALWELL: A motion is always in order, Mr. Chairman. It's Rule 11, clause two.

CUMMINGS: I will -- I will yield to Mr. Swalwell for one minute.

SWALWELL: Mr. Chairman, I move to subpoena Steve Bannon. In our House Intelligence Investigation he was under subpoena. He refused a

number of times to answer questions of Mr. Gowdy.

Mr. Gowdy appears to have a sincere interest in getting to the bottom of what happened. And so, I move, under Rule 11, to bring Mr. Bannon to this committee, also, Mr. Chairman (inaudible) receipt (ph) of Devin Nunes' letter to our committee recommending that the Judiciary Committee continue on the House Intelligence Committee's investigation into Russia and recommended witnesses.

So, I move, now, for consideration for Mr. Bannon to be subpoenaed and if he refuses, for contempt proceedings to occur.

(UNKNOWN): Mr. Chairman, I object...

GOODLATTE: The chair recognizes the gentleman from (inaudible).

(CROSSTALK)

(UNKNOWN): ...the consideration of the motion of this being made.

(UNKNOWN): (Inaudible) Cummings.

SWALWELL: I yield back to Mr. Cummings, but the motion has to be heard immediately, Mr. Chairman, under Rule 11, clause 2...

(CROSSTALK)

(UNKNOWN): Mr. Chairman, I object.

GOODLATTE: The gentleman will suspend. The motion is not germane and the gentleman from Maryland, Mr. Cummings (inaudible)...

SWALWELL: I move to table the ruling of the Chair.

(CROSSTALK)

(UNKNOWN): I move to overrule the ruling of the chair.

SWALWELL: Mr. Chairman, I vote to table the motion.

GOODLATTE: Motion made to table the appeal of the ruling of the chair. All those in favor of tabling the appeal, respond by saying "aye." Those opposed, "no." In the chair, the ayes have it.

(UNKNOWN): Mr. Chairman, I ask for a recorded vote.

(CROSSTALK)

(UNKNOWN): Point of parliamentary...

(UNKNOWN): I ask for a recorded vote.

(UNKNOWN): Chairman, point of parliamentary inquiry.

GOODLATTE: Gentleman will state his point of parliamentary.

(UNKNOWN): On the vote to table, or for that matter, on the vote

to appeal the ruling of the chair, can (ph) we take separate votes of the two committees or one vote of everything?

GOODLATTE: My understanding was that both you and Mr. Cummings were satisfied with one roll call vote. But we'll go through each committee in order, and then we'll take the cumulative vote after the conclusion of both committees.

(UNKNOWN): I just wanted to clarify that point.

(UNKNOWN): Mr. Chairman, I had asked for a recorded vote.

GOODLATTE: The recorded vote has been requested, and the clerk will call the roll. The question is on the motion to table the appeal of the ruling of the chair of the clerk for the Judiciary Committee will commence.

CLERK: Mr. Goodlatte?

GOODLATTE: Aye.

CLERK: Mr. Goodlatte votes aye. Mr. Sensenbrenner?

SENSENBRENNER: Aye.

CLERK: Mr. Sensenbrenner votes aye. Mr. Smith? Mr. Smith votes aye. Mr. Chabot?

CHABOT: Aye.

CLERK: Mr. Chabot votes aye. Mr. Issa? Mr. King?

KING: Aye.

CLERK: Mr. King votes aye. Mr. Gohmert? Mr. Gohmert votes aye. Mr. Jordan?

JORDAN: Yes.

CLERK: Mr. Jordan votes yes. Mr. Poe?

POE: Yes.

CLERK: Mr. Poe votes yes. Mr. Marino? Mr. Marino votes yes. Mr. Gowdy?

GOWDY: Pass.

CLERK: Mr. Labrador? Mr. Collins? Mr. Labrador votes aye. Mr. Collins? Mr. Collins votes aye. Mr. DeSantis? Mr. DeSantis votes aye. Mr. Buck? Mr. Ratcliffe? Mr. Ratcliffe votes yes. Ms. Roby? Mr. Gaetz? Mr. Gaetz votes aye. Mr. Johnson of Louisiana? Mr. Johnson votes aye. Mr. Biggs? Mr. Biggs votes aye. Mr. Rutherford?

RUTHERFORD: Aye.

CLERK: Mr. Rutherford votes aye. Ms. Handel? Ms. Handel votes yes.

Mr. Rothfus? Mr. Nadler? Mr. Nadler votes no. Ms. Lofgren?

LOFGREN: No.

CLERK: Mr. Lofgren votes no. Ms. Jackson Lee?

JACKSON LEE: No.

CLERK: Ms. Jackson Lee votes no. Mr. Cohen?

COHEN: No.

CLERK: Mr. Cohen votes no. Mr. Johnson of Georgia?

JOHNSON: No.

CLERK: Mr. Johnson votes no. Mr. Deutch? Mr. Deutch votes no. Mr. Gutierrez? Mr. Gutierrez votes no. Ms. Bass? Mr. Richmond? Mr. Richmon votes no. Mr. Jeffries? Mr. Cicilline?

CICILLINE: No.

CLERK: Mr. Cicilline votes no. Mr. Swalwell?

SWALWELL: No.

CLERK: Mr. Swalwell votes no. Mr. Lieu?

LIEU: No.

CLERK: Mr. Lieu votes no. Mr. Raskin? Mr. Raskin votes no. Ms. Jayapal? Ms. Jayapal votes no. Mr. Schneider?

SCHNEIDER: No.

CLERK: Mr. Schneider votes no. Ms. Demings?

DEMINGS: No.

CLERK: Ms. Demings votes no.

GOODLATTE: The clerk of the Oversight in Government Reform Committee will call the roll.

CLERK: Mr. Gowdy?

GOWDY: Pass.

CLERK: Mr. Gowdy passes. Mr. Duncan?

DUNCAN: Aye.

CLERK: Mr. Duncan votes aye. Mr. Issa?

ISSA: I am aye for both committees.

CLERK: Mr. Issa votes aye. Mr. Jordan?

JORDAN: Yes.

CLERK: Mr. Jordan votes yes. Mr. Sanford?

SANFORD: Aye.

CLERK: Mr. Sandford votes aye. Mr. Amash? Mr. Gosar?

GOSAR: Aye.

CLERK: Mr. Gosar votes aye. Mr. DesJarlais? Mr. DesJarlais votes aye. Ms. Foxx? Mr. Massie?

MASSIE: Aye.

CLERK: Mr. Massie votes aye. Mr. Meadows? Mr. Meadows votes aye. Mr. DeSantis? Mr. DeSantis votes aye. Mr. Ross?

ROSS: Aye.

CLERK: Mr. Ross votes aye. Mr. Walker? Mr. Walker votes aye. Mr. Blum?

BLUM: Aye.

CLERK: Mr. Blum votes aye. Mr. Hice? Mr. Hice votes aye. Mr. Russell? Mr. Russell votes aye. Mr. Grothman? Mr. Grothman votes aye. Mr. Hurd? Mr. Palmer? Mr. Palmer votes aye. Mr. Comer?

COMER: Yes.

CLERK: Mr. Comer votes yes. Mr. Mitchell? Mr. Gianforte?

GIANFORTE: Yes.

CLERK: Mr. Gianforte votes yes. Mr. Cummings? Mr. Cummings?

(UNKNOWN): He can't hear you (ph).

CUMMINGS: No.

CLERK: Mr. Cummings votes no. Ms. Maloney?

MALONEY: No.

CLERK: Ms. Maloney votes no. Ms. Norton?

NORTON: No.

CLERK: Ms. Norton votes no. Mr. Clay? Mr. Lynch?

LYNCH: No.

CLERK: Mr. Lynch votes no. Mr. Cooper? Mr. Cooper votes no. Mr. Connolly?

CONNOLLY: Nay.

CLERK: Mr. Connolly votes nay. Ms. Kelly?

KELLY: Nay.

CLERK: Ms. Kelly votes nay. Ms. Lawrence?

LAWRENCE: Nay.

CLERK: Ms. Lawrence votes nay. Ms. Watson Coleman? Ms. Watson Coleman votes no. Mr. Krishnamoorthi?

KRISHNAMOORTHI: No.

CLERK: Mr. Krishnamoorthi votes no. Mr. Raskin?

RASKIN: No.

CLERK: Mr. Raskin votes no. Mr. Gomez? Mr. Welch?

WELCH: No.

CLERK: Mr. Welch votes no. Mr. Cartwright?

CARTWRIGHT: No.

CLERK: Mr. Cartwright votes no. Mr. DeSaulnier? Mr. DeSaulnier votes no. Ms. Plaskett?

PLASKETT: No.

CLERK: Ms. Plaskett votes no. Mr. Sarbanes? Mr. Sarbanes votes no.

(UNKNOWN): Mr. Chair, how is Mr. Gowdy recorded?

CLERK: Mr. Gowdy passed.

GOODLATTE: The -- the clerk -- the clerk will call the roll of the...

(UNKNOWN): A pass is not a vote.

GOODLATTE: The clerk of the Judiciary Committee will call the roll of members who have not yet been recorded.

CLERK: Mr. Issa? Mr. Issa votes yes. Mr. Gowdy? Mr. Buck?

BUCK: Aye.

CLERK: Mr. Buck votes aye. Ms. Roby? Mr. Rothfus?

ROTHFUS: Aye.

CLERK: Mr. Rothfus votes aye. Ms. Bass? Mr. Jeffries?

(OFF MIC)

GOODLATTE: I've been asked by the minority and the majority council to advise members that their votes will only be counted once if they're on both committees, and the clerk of the Oversight in Government...

(CROSSTALK)

(UNKNOWN): Mr. Chairman, point of order. On -- on what -- on what basis would that rule be, since we -- each committee is voting separately on that?

GOODLATTE: Procedurally we have agreed to one unified voted. The clerk of the Oversight in Government Reform Committee will call the roll of those members who have not voted.

CLERK: Mr. Gowdy? Mr. Amash? Ms. Foxx? Mr. Hurd? Mr. Mitchell? Mr. Clay? Mr. Gomez?

GOODLATTE: The gentleman from Missouri.

CLAY: No.

GOODLATTE: The gentleman from Missouri votes no.

CLERK: Mr. Clay votes no.

GOODLATTE: The clerk will report.

HURD (?): (inaudible).

GOODLATTE: The clerk will suspend. The gentleman from Texas is recognized.

HURD: Aye.

GOODLATTE: Mr. -- Mr. Hurd of Texas votes aye.

CLERK: Mr. Hurd votes aye.

GOODLATTE: The gentlewoman from North Carolina.

FOXX: Yes.

CLERKK: Mrs. Foxx votes yes.

GOODLATTE: Clerk will report.

CLERK: Mr. Chairman, 38 members voted aye, 31 members voted no.

GOODLATTE: And the motion to table the appeal of the ruling of the chair is upheld. The chair recognizes the gentleman from Maryland, Mr. Cummings, for his questions.

CUMMINGS: Mr. Strzok, first of all, let me say this that the -- to the members of the FBI who may be watching this I want them to be clear that we have the utmost respect for the organization and you. And I

thank them for doing what they do every day, and protecting our rights, and protecting our people and protecting our way of life.

And as I listened to you in answering Chairman Gowdy's questions, particularly at the end you gave a very impassioned statement. But -- but can you understand why there are members that question whether the thoughts that you may have, that you put in an e-mail or text, might interfere with the investigation? I mean, can you understand the -- at least the questioning of that?

STRZOK: Yes, sir. I do.

CUMMINGS: And I want to -- and I know you are familiar with oaths because I'm sure you've taken them 50 million times. But I remind you that you're under oath and I'm -- I'm -- I'm just going to ask you this, how do you square that? In other words, I understand the piece about there's so many layers that the FBI wouldn't even allow it to happen, even if they -- you -- you wanted to -- wanted them to.

But, how do you take that, compartmentalize -- I guess, that's the best the word I can think of -- and then when you walk into that room be neutral, independent, or live up to your oath? Do you understand my question?

STRZOK: I do, sir.

CUMMINGS: All right. Can you -- can you answer that? Because I think that would be very helpful to me. And I -- hopefully, your answering that question will be helpful to my colleagues, in fairness to all of us. Go ahead.

STRZOK: Yes, sir. Thank you. And I certainly do, sir, appreciate and understand that question and that concern, and why people would look at those texts and want to know why and how they should believe that those personal beliefs played any role in my official acts.

What I can tell you, sir, is that I, like every FBI agent, like every person in this room, like everybody watching, has a political opinion. And each and every one of those people in the FBI, whatever their political beliefs, walks in the door and they leave those behind.

The FBI has a culture. It is in our training. It is in our policy. And everything we do is dedicated to the pursuit of the facts where they lay and applying the law to those facts.

There is no room for personal belief. It is something that is anathema to us. It is simply something culturally that doesn't occur; and, were it to occur, it would be noted and stopped.

And in addition to that culture, we have policies, we have procedures, we have laws, we have guidelines that are designed to provide outside checks and balances, to provide for outside review, to provide for any number of ways that the individual actions of any agent, any analysts, any support personnel are not acting in any way other than official policies and procedures.

So, when I tell you again, as I did, personally what I believe and

what I did, I understand my people may or may not have doubts or
believe that. But then, I would turn to you and say look at the
entirety of the rest of the organization, of the men and women who make
it up, of all the things that are in place to ensure that our job in
the FBI is to competently and independently purse the facts wherever
they are. And -- and I cannot stress to you enough, that is exactly
what is done day-in, day-out. And that is exactly what exactly what has
guided my behavior for over 26 years.

CUMMINGS: All right, thank you very much. And let me ask you this,
in previous testimony to Congress, President Trump's FBI director
Christopher Wray explained the critical importance of protecting
confidential human sources. And this is what he said, Agent Strzok, and
I quote, "The day we can't protect human sources is the day the
American people start become less safe," end of quote. Do you agree
with that?

STRZOK: I do.

CUMMINGS: The problem is, we now have the transcript of your
11-hour closed-door interview with our Committees and it shows that the
Republican members asked you repeatedly about confidential human
sources involved in a Russia investigation. Is that correct?

STRZOK: My recollection is yes, sir.

CUMMINGS: Do you remember how many questions they asked you about
that?

STRZOK: I do not, sir.

CUMMINGS: Let me read one of their questions from the transcript: One Republican member asked you this
question, and I quote, "In the
month of July, was there any information from confidential human
sources given to you, as it relates to the Russia investigation?" end
of quote. Do you recall -- call being asked that question?

STRZOK: I do.

CUMMINGS: That question was specifically about information from
confidential human sources in the Russia investigation. Obviously, you
could not answer that question, and that is because the Department of
Justice has a long-standing policy against revealing information from
confidential human sources during an ongoing criminal investigation. Is
that right?

STRZOK: Yes, sir.

MEADOWS: Will the gentleman yield?

CUMMINGS: I will -- I will yield if I -- at the end, I want to
finish.

And -- and that is what Director Wray was talking about when he
testified that revealing those sources or their information will make
America less safe. Is that right?

STRZOK: I -- I don't know why Director Wray said that, but I agree
with the statement.

CUMMINGS: In your experience, how dangerous could it be to reveal
the identity of a confidential human source?

STRZOK: Extraordinarily dangerous.

MEADOWS: Will the gentleman yield to his friend?

CUMMINGS: Of course.

MEADOWS: I -- I -- I thank the gentleman. I want to be clear,
since the gentleman from Maryland, who is my friend, is going along a
line of argument that would suggest a question asked by me. I want to
make it perfectly clear: I asked if you talked with confidential human
sources. I never asked for a name, nor would I ever ask for a name of a
confidential human source. I appreciate it. I'll yield back.

CUMMINGS: I don't think I said that. But anyway, thank you,
gentleman.

Disclosing the identity of a confidential human source could
create -- could -- could create a risk to that person or our national
security. Is that correct?

STRZOK: Yes.

CUMMINGS: What effect could revealing a confidential human source
have on the FBI's ability to recruit or retain human sources in the
future?

STRZOK: I think it could and is having an extraordinary impact, in
that people who come to the FBI with information are putting themselves
at risk -- anywhere from risk of their job, risk of their life. And
they trust and put their, literally, and sometime lives in the hands of
the FBI. So when they observe, if their identity is putting at risk,
clearly, that's a personal risk to that individual source. But every
other potential source out there, every other person in Washington,
D.C., or Beijing, or Moscow, wondering about approaching the FBI to
them information is going to look to how well or how poorly the FBI
protects their information and protects their identity as they weigh
whether or not to take that extraordinary risk to -- to work with the
FBI, and to work for the United States of America.

CUMMINGS: Mr. Strzok, the Inspector General's report criticized
your political text messages, and raised concern that your political
views may have impacted your decision, in the summer and fall of 2016,
to prioritize the Trump Russia investigation over the reopening of the
Clinton email investigation. I understand from your transcribed
interview with the committee that you dispute that finding.

STRZOK: I do.

CUMMINGS: You told us, during your interview, that you immediately
assigned agents to follow up on the Weiner laptop, and we know that you
were a key player in the FBI's actions, such as sending a letter about

the reopening of the Clinton investigation shortly before the election that clearly, her -- Secretary Clinton's -- candidacy and benefited Candidate Trump. But more importantly, you described, during your interview, that you believed Russia's attempts to interfere with our election posed a grave threat to our national security. You stated, and I quote, "I cannot think of a more grave allegation of attack Counterintelligence Division, or let alone, the nation, than that a hostile foreign power was seeking to clandestinely influence our presidential election." Do you remember saying that?

STRZOK: I do.

CUMMINGS: Why is the interference by hostile foreign power in our presidential election such a monumental threat to our -- our nation?

STRZOK: Well, I -- I think when you look at the -- when you look at the threat that represents, when you look at the threats facing the United States, and what it means to protect the United States, the prospect of voting is the key core of who we are as a democracy, and there is no more important vote that we exercises as a people than the vote for the president of the United States.

So when I look at the span of threats that I was responsible for, that the Counterintelligence Division was responsible for, and the FBI, the prospect of a hostile foreign power interfering and influencing the election for the president of the United States of America, I can think of few more severe or consequential threats facing our nation than that one.

CUMMINGS: And just two more questions. What could be the potential impact of a hostile foreign power successfully interfering with our presidential election?

STRZOK: Well, I -- I think it's multifold. I think there is, certainly, from -- from a broad perspective, it draws into question the -- the effectiveness and the -- the credibility of our electoral system. It places into question the motivations and the actions of those people, either who are elected, or who brought in -- who were brought in as staff to staff that campaign, and eventually, administration. I think it draws into question whether or not the actions of the elected party and group of governing folks who are acting, ultimately, in the interest of the United States, or whether or not there's the potential that those interests have been compromised in favor of that foreign power.

CUMMINGS: And finally, how -- how is that threat made worse if -- if the presidential campaign colluded or worked with the hostile foreign power?

STRZOK: I -- I -- I think that would be the -- the worst realization of that potential threat. I think it would indicate the FBI -- and some of that's a -- a hypothetical. I think the FBI would approach that from the perspective that if there were people within the campaign who were colluding or working with the government of Russia, that there is very little that would be of more importance to the FBI, or actually, the expectation of the American people, that we get to the bottom of it. The American people, I think, expect that. Frankly, any

presidential candidate who might have that going on in their campaign, I think would want to know about that, and have the FBI get to the bottom of it. But any -- any actual inclusion or cooperation would be amongst the gravest threats to our democracy.

CUMMINGS: Mr. Chairman, I yield -- I yield back.

GOODLATTE: The chair thanks the gentleman and recognizes himself. Of the questions Chairman Gowdy asked, your texts and emails make it appear you'd come to a conclusion on the Clinton case long before you had interviewed many witnesses, including Clinton herself. You also appear to have been pining for the impeachment of President Trump at the very beginnings of the Russia case. Does the FBI normally make such decisions on whether to recommend prosecution or exoneration so far ahead of all the facts coming to light?

STRZOK: Typically, sir, the DOJ makes prosecution decisions in cases.

GOODLATTE: Do they normally make such decisions in -- whether to recommend prosecution far ahead of the facts coming to light?

STRZOK: Sir, I don't think any -- in my experience, the final decision is never made until the conclusion of the case. I think it is fair to say that in the conduct of investigations, particularly very large investigations with a lot of folks working on it, my experience is there comes a time if you're worth your salt in the conduct of that investigation.

And agent, the attorneys assigned to that will have a very good idea well before the case is concluded that there may or may not be demonstrable crimes. That there may...

GOODLATTE: Let me -- let me ask you this then, how many other cases on which you have worked, do you recall a pining on the disposition of the case months ahead of interviewing multiple witnesses?

STRZOK: I remember quite a few cases where I or agents would discuss the prospects of the outcome of the case with prosecutors as the case was going on. From the beginning of the case talking about what crimes may or may not be relevant. As the case proceeded, to identify which elements may or may not be strong or demonstrable, as well as towards the end when we were trying to shore up evidence that may or may not be there. But...

GOODLATTE: And -- and let me ask you this about that, in regard to those cases, was it normal behavior on your part to chat with colleagues in the manner you did on the Russia case about how much you despise the very person you're investigating, or complimenting the person you're investigating in the Clinton case? Is that typical?

STRZOK: Sir, I -- I would draw a distinction between commenting on case-related matters versus discussion of personal belief. I think those are very different matters than saying this person as a witness was not credible, or this person as a target or a subject did or didn't do something. That is a very different matter...

GOODLATTE: So you could...

STRZOK: ... in my mind.

GOODLATTE: ... completely separate out what your personal opinion is from what you discussed with others in investigations?

STRZOK: I'm telling you, sir. I separated out my personal belief from any action I took.

GOODLATTE: But you did not do that with regard to Attorney Page, who was also involved in these investigations, correct?

STRZOK: Sir, I disagree with that. I separated out my personal beliefs from any action I took officially as an FBI agent, every day.

GOODLATTE: Do -- do you recognize how your vitriol against President Trump makes it appear you could never approach the case in a fair-minded manner?

STRZOK: Sir, I -- of course I appreciate that. I understand that people would look at...

GOODLATTE: So let's discuss a text that hits home for me. On August 26, 2016, you texted Ms. Page quote, "Just went to a Southern Virginia Walmart. I could SMELL the Trump support." And smell is in capital letters, all capital letters. What does Trump support smell like, Mr. Strzok?

STRZOK: Sir, that's a expression of speech. I clearly wasn't smelling one thing or the other. What I was commenting on is living in Northern Virginia, driving...

GOODLATTE: Well, what does that mean?

STRZOK: ... What I -- what I meant by that was living in Northern Virginia, having traveled 100 -- 150 miles south within the same state, I was struck by the extraordinary difference in the expression of political opinion and belief amongst the community there from where I live.

GOODLATTE: And -- and you describe that as smell in capital letters?

STRZOK: Sir, that was a choice -- the quick choice of words in a text (inaudible)...

GOODLATTE: All right, so earlier -- just...

STRZOK: ... seen or heard.

GOODLATTE: ... Well, OK. So earlier, you had texted Ms. Page that another part of Virginia, Loudoun County, which is, I think, in Northern Virginia is quote, "Still ignorant hillbillies." end quote. Is that what you meant?

STRZOK: No, sir. Not at all.

GOODLATTE: That you consider Trump supporters to be ignorant
hillbillies?

STRZOK: Not at all, sir.

GOODLATTE: What did you mean by that?

STRZOK: Well, sir, the first thing I'd tell you as a -- as a proud
Fairfax County resident, there's a healthy, sort of, competition
between Fairfax and Loudoun. Second thing I would tell you is that in
no way did I or do I believe any resident of Loudoun County, or
Southern Virginia or anywhere else in the nation is -- are any of those
things. That was a flippant text...

GOODLATTE: So do -- do you understand the implications of this
text when my constituents in Virginia read it?

STRZOK: I do, sir. And I would ask you to tell them that that was
a -- in some cases, certainly, unfortunate use of words that in no way
do I believe that those things are -- are what...

GOODLATTE: Now, you and Ms. Page used personal phones and accounts
to communicate. Have you turned over those communications to the
inspector general?

STRZOK: No, sir.

GOODLATTE: If not, why not?

STRZOK: Sir, they asked. And working with my attorney, the
inspector general and I arranged an agreement where I would go through
my personal accounts and identify any material that was relevant to FBI
business and turn it over. Those were (ph) viewed (ph). There was none.
And my understanding is the inspector general was satisfied with that
action.

GOODLATTE: We -- we -- we know from texts that you and Ms. Page
would transition to iMessage and Gmail. Who determined that messages
were only personal in nature and not business-related, especially since
you've just testified at length that a number of the communications
that you have made on government communications devices were personal
in nature?

STRZOK: Sir, the broad, broad context of what I used personal
e-mail and phones for was personal communication. For those things that
were work-related, almost universally that material was translated into
FBI systems. Certainly, if there was anything that was of record or
would constitute needing to be there, it was provided. But, I made that
decision.

GOODLATTE: So, let me ask you this, when did Attorney General
Lynch know that charges would not be brought against former Secretary
of State Clinton?

STRZOK: I can't answer that question, sir. That's something you'd

have to ask her.

GOODLATTE: Do you know whether it prior to Lynch's announcement that she would defer to career prosecutors and Director Comey on whether to prosecute...

STRZOK: Sir, I don't know.

GOODLATTE: ... Clinton? Why would Lisa Page text that Lynch's decision was a quote, "Real profile in courage, since she knows no charges will be brought." end quote?

STRZOK: Sir, that's a question you'd have to ask her.

GOODLATTE: So, how did you take that statement when she texted it to you?

STRZOK: The way I took that, sir, is that we had for many months working with a team, a team of career attorneys in the Department of Justice, a team of attorneys from the Eastern District of Virginia, a team of agents from the FBI have been working intensively on this case. We had gone through mountains of evidence, tons of interviews and we were looking at the various statues that might apply to any sort of criminal conduct.

And I think we were -- as we surveyed that, as the attorneys looked at it, saw a number of very fatal areas where elements of the crime were lacking our ability to demonstrate facts to prove those elements of a crime. So I think we had begun to arrive at a sense that it was going to be difficult if not impossible to identify any statute where we could satisfy those elements of the crime.

My assumption certainly is that from the Department of Justice's perspective, those attorneys were briefing their supervisors who were briefing their supervisors, who were briefing their supervisors who were briefing their supervisors, who were ultimately briefing the deputy attorney general and the attorney general. And that she would have that same sense that it was a difficult if not impossible proposition to conclude that there were viable charges to be brought against Secretary Clinton.

GOODLATTE: Mr. Strzok, did you ever believe these texts would become public?

STRZOK: I did not.

GOODLATTE: Given that, you felt free to express your true feelings, didn't you?

STRZOK: I -- I suppose, yes. That's a difficult (ph) question to answer.

GOODLATTE: Mr. Strzok, former Director Comey played judge, jury and -- and exonerator in the Hillary Clinton investigation. In your experience at the FBI, have you ever seen the FBI director make the decision on whether to prosecute for the Department of Justice?

STRZOK: Mr. Chairman, I -- I -- I would not agree with that characterization of Director Comey, and in answer your question, I have not seen it before.

GOODLATTE: All right. Was that appropriate, what he did, hold a news conference and publicly announce the decision that was supposed to have been made by the Department of Justice?

STRZOK: Sir, that was his decision. I -- I -- I don't...

GOODLATTE: Was it appropriate, in your opinion?

STRZOK: Sir, I don't think it's for me to say whether or not...

GOODLATTE: I think it is for you to say. I asked you the question. What's your opinion?

STRZOK: Sir, I understand the variety of factors that went into -- well, I understand some of the factors that went into Director Comey's decision to make the announcement. I can tell you that that decision was not made lightly at all. I can tell you my experience in that decision.

GOODLATTE: But you're not aware of any precedent for that.

STRZOK: I am not.

GOODLATTE: Mr. Strzok, in a footnote, 197 of the Inspector General's report, it is noted that, quote, "Supervision of the Russia investigation was briefly transitioned from Strzok to another counterintelligence division, DAD, in early 2017." Why were you transitioned from the Russia investigation in early 2017?

STRZOK: Sir, let me see if I can answer that question without getting into operational detail. The -- the investigation was brought. What Russia was doing against our country encompassed a variety of things. There were actions in the cyber arena. There were actions by their agents and their intelligence services. There were actions by subjects of investigation that are currently ongoing.

The prospect of how the FBI would investigate that was a multi-tiered effort, and so some of those efforts that traditionally fell into line with that other DAD and their span and scope of responsibility were moved to their -- to their supervision.

GOODLATTE: So the footnote goes on to state that, quote, "However, A.D. Priestap told us that FBI leadership decided to keep Strzok involved in the Russia investigation, and he was therefore reassigned back to it." Do you know who in, quote, "FBI leadership," end quote, decided to keep you involved in the Russia investigation?

STRZOK: I do not.

GOODLATTE: Could it have been Deputy Director McCabe?

STRZOK: Sir, I -- it -- possibly. I do not know.

GOODLATTE: And when were you assigned back to the Russia investigation -- and when you were reassigned back the Russia investigation, were you still in a supervisory role?

STRZOK: Sir, I would answer that question, again, I -- I -- I don't -- I don't entirely -- my recollection does not comport with the statement from A.D. Priestap. There were elements of the investigation that stayed under subordinate leaders and subordinate section chiefs and unit chiefs, on down the line. There were elements of it that were transferred to a different DAD, and remained with that DAD. So my recollection is that it differed from -- from A.D. Priestap's.

GOODLATTE: Mr. Strzok, did you ever consider recusing yourself, since you had such personal disdain for the person you were investigating?

STRZOK: I did not.

GOODLATTE: Yet, others did require that, ultimately.

STRZOK: Sir, I would not characterize those decisions as subject to the same set of considerations.

GOODLATTE: You don't think that it was the bias expressed in your text messages that caused Mr. Mueller to review -- remove you from the investigation?

STRZOK: I do not think that the -- there were -- that bias was expressed in those text messages. I cannot speak to why Director Mueller chose to remove me from the investigation. But I can tell you that those text messages are not indicative of bias.

GOODLATTE: Mr. Mueller did -- never told you why you were being removed?

STRZOK: He -- my recollection of the discussion was he mentioned the existence of the text messages, and that based on that, he needed to ask me to return to the FBI.

GOODLATTE: Lots of people have text messages, Mr. Strzok.

STRZOK: Yes, sir. And my -- again, my impression, not stated by him, but my impression was that based on the appearance of those messages, and in part of a desire by him to avoid even the appearance of any potential bias, that he asked me to return, but that's a question for him.

GOODLATTE: But he kept everyone else on the investigation.

STRZOK: Sir, I don't know the staffing decisions that were made by Director Mueller after I departed.

GOODLATTE: Including 13 Democrats.

STRZOK: Sir, I don't know the affiliation of the people on his team.

GOODLATTE: So, but he was concerned enough about your texts to remove you, but you never felt concerned enough to remove yourself.

STRZOK: That's correct.

GOODLATTE: Mr. Strzok, you're going to get asked other questions here that relate to your transition from the investigation of Ms. Clinton into the beginnings of this investigation into the Trump campaign and the alleged collusion with the Russian government.

Now Mr. Strzok, the FBI is a creation of this body. Congress created the FBI with its Constitutional authority. Today, you are here under subpoena. I know you've come voluntarily in your opinion, but you're also under subpoena, also an exercise of Congress' Constitutional authority. Which takes precedence: FBI policy or the United States Constitution?

STRZOK: Sir, always, the United States Constitution. My understanding is I am not here under subpoena; that I am here voluntarily. I understand a subpoena was issued for my prior closed interview, but not for this session today.

GOODLATTE: A -- a subpoena was issued, and -- and service of which was accepted.

STRZOK: That's not my understanding, sir.

GOODLATTE: In a Supreme Court case handed down just last year, the Court reviewed whether statements made by a juror that indicated racial bias required the piercing of jury deliberations. Justice Kennedy wrote the opinion of the court holding that racial bias exhibited by juror provided an exception to the rule that jury deliberations must remain confidential, because it is necessary, quote, "to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy."

On several occasions, you have referenced that all the texts and the questions were simply personal opinions exchanged with a close confidante, and in no way reflected your intent to act on your opinions. Yet, if you made these statements while on a jury, it is hard to imagine that you would not be kicked off immediately because of the risk that your bias would undermine a functioning democracy. Do you still hold that personal opinions, even in the face of Supreme Court precedent, should not have tainted your involvement on any investigation relating to Secretary Clinton or President Trump?

STRZOK: Mr. Chairman, I think you're mixing apples and oranges. My -- my -- I'm not an attorney, and I -- I -- I'm not familiar with that Supreme Court ruling. But based on what you said, protected categories, things like race, gender, ethnicity, sexual orientation, religion, are protected matters that we may not -- the government, and by law, people may not be discriminated against based on their role, one way or the other, in any one of those categories. That is entirely separate and distinct from political belief or political opinion.

That, on the other hand, is encouraged, is protected by the First Amendment, and this body, under the Hatch Act, my understanding is sad

and said, and recognize (inaudible)...

GOODLATTE: No one stopped you from sending the texts, Mr. Strzok, but the special counsel, Mr. Mueller, removed you from the investigation when he saw the texts.

STRZOK: That's -- that's true, sir. He did. Now, if I may go back to answering your question, if I may, in terms of political speech, that is radically different from any sort of protected category of race, gender and ethnicity or other categories. Political speech, political thought is protected. The courts have recognized -- the Constitution recognizes we all have political belief and so when it comes to the expression of that political belief, that is something that this body under the Hatch Act enumerated kind of the categories of what was prohibited, and then expressly stated that if it is not prohibited, then it is expressly encouraged.

So I would tell you that no one in here -- it -- it's an impossible definition to say people must not have political opinion. Everyone does. Of course they do. The test is whether or not that is left behind when you are doing your job. To your question of whether or not I would express that in front of a jury, of course, I wouldn't. That would be inappropriate.

As to your question of whether each and every one of those jurors, when they go home and they're sitting in the backyard with a friend, has a political opinion, my answer would be undoubtedly, almost if not all of those jurors would.

GOODLATTE: But they're instructed when they leave the jury panel each day to not communicate with anyone regarding the matter that they are considering. So that is a very different thing. You are considering a matter and you were conducting texts of a very biased, salacious manner that was totally inappropriate, and when Mr. Mueller saw that, he removed you.

STRZOK: Sir, I appreciate the concern, but what I'm telling you is there is a vast difference in my mind between an action as a juror being instructed by a judge not to discuss the matters of the trial compared to a citizen of the United States...

GOODLATTE: ... you don't suppose there's a reason why...

STRZOK: ...discussing his...

GOODLATTE: You don't suppose there's a reason why that instruction (ph)?

The chair recognizes the gentleman from New York, Mr. Nadler.

NADLER: Thank you.

Let me begin by congratulating the witness on his completely correct statement of the key First Amendment law, that people are entitled to political opinions. Now, you, sir, obviously expressed your political opinions as to Mr. Trump and Hillary Clinton and various others in text messages to Lisa Page.

STRZOK: I did.

NADLER: And she to you.

STRZOK: Yes.

NADLER: And these are private political opinions?

STRZOK: Yes.

NADLER: Which you did not express publicly?

STRZOK: Correct.

NADLER: And the inspector general found with respect to the investigation to Hillary, quote, "we found no evidence of the conclusions by the prosecutors were affected by bias or other improper considerations. Rather, we determined that they were based on the prosecutor's assessment of the facts, the law and past department practices." That is correct that that is a finding of the I.G., no?

STRZOK: Yes, sir.

NADLER: Thank you. And with respect to the Russia investigation, the I.G. said that they would -- that he was disturbed by the appearance that investigative decisions might have -- might be impacted by bias, but made no such findings, and in fact, hadn't completed his investigation of the Russian investigation. Is that correct?

STRZOK: Yes, sir.

NADLER: Now, when he -- when -- when people talk about the appearance, whether people on this panel or the inspector general the appearance of bias created by those text messages, those text messages might create the appearance of bias only if they're public. Is that not correct?

STRZOK: That is correct.

NADLER: Because otherwise there'd be no appearance.

STRZOK: That's correct.

NADLER: And they were not intended to be public were they?

STRZOK: Correct.

NADLER: They were communications between two private individuals.

STRZOK: True.

NADLER: Which are totally permitted?

STRZOK: That's correct.

NADLER: Now, are FBI agents permitted to have political opinions?

STRZOK: Yes.

NADLER: And as a 22 year veteran of the FBI, could you tell us
without naming names, were you familiar with the fact -- with other FBI
-- other FBI -- with other FBI personnel having political opinions with
respect to the presidential campaign?

STRZOK: I was.

NADLER: And were some of these people anti-Trump?

STRZOK: They were.

NADLER: And were some of these people pro-Trump?

STRZOK: Yes.

NADLER: Thank you. And to your knowledge, did any of the pro-Trump
bias or the anti-Trump bias and personal opinions affect decisions and
investigations by the FBI?

STRZOK: Not to my knowledge.

NADLER: OK. Now, you mentioned the Hatch Act.

STRZOK: Yes.

NADLER: Under the Hatch Act, the FBI is prohibited, is it not,
from inquiring as to the political opinions of people it is hiring?

STRZOK: I don't know the Hatch Act well enough to tell you.

NADLER: Well, I'll say that that is the case. The government may
not under the Hatch Act, inquire as to the political opinions of people
it is hiring for nonexempt positions; to do so would be improper. And I
must say that I think that all of these inquiries about your political
opinions as revealed by these text messages are irrelevant and wrong
unless it can be shown, as it has not been shown, as was found
definitively not to be the case of the Hillary investigation, and has
not been shown in the Russia investigation that they affected any
decisions in the investigation. Let's leave it at that on that point.

Now, Mr. Strzok, what is the FBI -- what is the FBI's policy - oh,
let me say one other thing, it is prudent -- and I'll observe this
because you don't -- you said you couldn't answer -- but it's obviously
prudent of Mr. Mueller in finding these text -- and hearing about all
these text messages, to think that they might be subject to incorrect
interpretations on publicity and in order to avoid the kind of attacks
on this investigation that we are seeing from Republican members of
this committee and from the administration, to ask you to leave that
investigation, having nothing to do with your competence or fairness to
the investigation, but simply to somewhat insulate that investigation
from unfair attacks.

Would you think that that might be a correct ...?

STRZOK: Yes.

NADLER: Thank you. Now, Mr. Strzok, what is the FBI's policy with respect to its agents commenting publicly about an ongoing criminal investigation?

STRZOK: We don't do that.

NADLER: Sorry?

STRZOK: We do not do that.

NADLER: And why is that policy in place?

STRZOK: I think for a variety of reasons. One, I think it is inherently unfair to the subject of that investigation. It can to skew the conduct of the investigation, other witnesses, other future investigative avenues. It can skew potential jurors in the event a case is taken to prosecution. I can think of any number of reasons why we don't do that.

NADLER: And are you -- thank you -- are you familiar with the inspector general's report on the FBI's handling of the Clinton investigation?

STRZOK: I am.

NADLER: In that report was highly critical of Director Comey, was it not, for, among other things, departing from protocol and commenting publicly about an ongoing criminal investigation?

STRZOK: It did say that, yes.

NADLER: It was critical of him?

STRZOK: Yes.

NADLER: And -- for doing that? And although some people have said that they don't agree with the decision not to charge Mrs. Clinton, in fact, the departure from protocol was directed -- the first departure from protocol I should say was Director Comey's commenting on his opinion about her handling of various emails and so forth. Having decided after she wasn't being charged, his departing from protocol, his publicly commenting about that, was that not one of the deviations from protocol cited by the report?

STRZOK: By the report, yes, sir.

NADLER: Thank you. Has the FBI asked you to adhere to that policy of not commenting on ongoing criminal investigations, namely the Russia investigation, for example, today?

STRZOK: Yes.

NADLER: How so?

STRZOK: They instructed me, my understanding is, that general

counsel for the FBI met with Chairman Goodlatte and his staff and came up with an approved list of topics that I might speak about and that outside of that list, that I was not to discuss anything having to do with ongoing investigations.

NADLER: Thank you, and I will simply observe that asking you or anybody else, like Mr. Rosenstein, to comment on ongoing criminal investigations is against policy and is liable to taint those investigations and to damage the reputations of people or to even endanger the safety of informants, as you have said.

Mr. Strzok, you're an experienced counterintelligence official. Can you explain why, briefly -- because I think you touched on this in Mr. Cumming's questions -- why the investigation to the Russian government's attack on our elections and other critical infrastructure is important to our national security?

STRZOK: I think it's extraordinarily important because of what it represents. We -- the selection of our nation's leader, of the chief executive, of the person who is charges with the defense of the United States, the national security of the United States, whether that's militarily or economic, there is no greater responsibility in the land.

And the way we do that, the underpinning of what we are in America, the election, is the process by which we do that. So the idea that a -- not only a foreign nation, but an advanced, hostile foreign nation would be inserting themselves clandestinely in that process to undermine the will of the United States is terrible.

NADLER: And is -- thank you. And is that why you thought it important to prioritize in -- and I think it was in October of 2016, the Russian investigation and leave Hillary -- leave Mr. Weiner's laptop to someone else you asked to -- to look into it?

STRZOK: The first reason I did it is because the director told me to. The director said it was a top priority which was relayed from him and AD Priestap, and the second thing was, yes, clearly when you're looking into allocation of resources based on the threat to national security, the Russian influence investigation were a much greater impact than a mishandling of classified information investigation.

NADLER: Thank you. And the -- but the first reason is the director told you to.

STRZOK: Yes sir.

NADLER: Thank you. How frequently does the FBI engage in counterintelligence operations against foreign powers?

STRZOK: Every day.

NADLER: All the time.

STRZOK: Yes, sir.

NADLER: And how frequently does the FBI investigate a possible conspiracy between a presidential candidate or campaign and a hostile

foreign power?

STRZOK: It's the first one I can remember in my lifetime.

NADLER: So it is fair -- is it fair to say that we are
unprecedented territory?

STRZOK: I -- speaking from my experience, that's fair.

NADLER: Speaking from your experience...

STRZOK: From my experience in the FBI, I can't...

NADLER: Yes?

STRZOK: Yes, sir.

NADLER: And is it fair to say that our country faced and is
possibly still facing a grave threat from a hostile foreign power?

STRZOK: It is.

NADLER: Thank you. I think that is correct, Mr. Strzok. We know
that Russia, after successfully interfering with our last elections, is
actively working to disrupt the upcoming elections in 2018. We are told
this by all of our intelligence agencies, all of whom still stand by
their 2017 assessment that the Russian government waged a complex
campaign to influence the 2016 election to the benefit of President
Trump.

Last week, the Senate Intelligence Committee, on a bipartisan
basis, confirmed this assessment. And the Director of National
Intelligence testified before the Senate Intelligence Committee about
an even more urgent threat. Quote, "There should be no doubt that
Russia perceive that its past efforts are successful and views the 2018
U.S. midterm elections as a potential target for Russian midterm
operations," close quote.

And what is the majority's response to this problem? To launch an
investigation into Hillary Clinton's emails and to do as much as they
can to undermine special counsel Robert Mueller, who is running what is
perhaps the most consequential national security investigation of this
generation.

When they aren't bullying you and Mrs. Page -- and Ms. Page, Mr.
Strzok, the Republicans are usually taking aim at Deputy Attorney
General Rod Rosenstein. And just as they insist on asking you questions
about an ongoing investigation, questions you cannot answer, the
majority insists on demanding some of the most sensitive information in
the Deputy Attorney General's position -- possession, documents he
cannot provide for the same reason.

They want copies, for example, of the scoping (ph) documents that
lay out the special counsel's exact lines of inquiry, so to disclose it
(ph) would be dangerous and unprecedented. Republicans are in effect
demanding the DOJ violate the very policies the Inspector General
criticized the department for violating in 2016.

This is incredibly inappropriate and dangerous, and we are forced to ask ourselves, "Why?" Why have House Republicans been so dismissive of Russia's attacks on the United States? Why are Republicans so intent on destroying public confidence in the Justice Department and in the special prosecutor -- special counsel's investigation? Why have they abandoned House rules to pick totally unnecessary fights with you, Mr. Strzok, with Lisa Page, and with Deputy Attorney General Rosenstein?

The obvious answer is because they are scared. Because President Trump is scared. Because the special counsel's investigation is operating at a breakneck pace and has already produced five guilty pleas and criminal charges against 23 individuals and entities. Because accountability is coming, one way or another, and they are scared and they are trying to undermine the investigation and to distract attention.

Now I must say the basis of many of these questions that we're hearing today of Mr. Strzok by the majority, by the Republicans, is the 11-hour interview with Mr. Strzok. And I now call upon the majority to release that transcript in full today. This will show that this is the entire joint investigation is at best a partisan distraction from more important matters. But the -- but the witness before us today, Mr. Strzok, testified not under confidentiality but -- not under confidentiality rules, but in private for 11 hours.

There is nothing that prevents the majority from releasing that transcript. Selected portions of that transcript have been leaked by members of the majority. Misleading portions taken out of context, and I -- I -- I don't know if demand is the right word, but I demand it so far as I can, that that transcript be released in full so that people can see it, can see the testimony today, and can make better judgments.

And I ask the chairman now to order the release of that transcript. Will the chairman do so?

GOODLATTE: Not today.

NADLER: Will the chairman ever do so?

GOODLATTE: The -- the -- you can direct your questions to the witness. That's your time to do that, not to discuss this.

(UNKNOWN): Mr. Chairman...

(CROSSTALK)

NADLER: I will observe that the chairman will not answer the question and that this is part of the continuing evasion and attempt at -- at obfuscation, because we know (ph)...

(CROSSTALK)

(UNKNOWN): Will the gentleman yield?

NADLER: No, not at the moment. I will in a moment...

(CROSSTALK)

(UNKNOWN): Very good (ph).

NADLER: ...when I finish the sentence. Because we know the pattern. And the pattern is we're not releasing transcripts except parts of them that may create -- that may convey the full -- the impression, false or true, that we want to create -- convey. There is no legal reason why this transcript should not be released. There is no -- there is only a partisan reason why this transcript should not be released. There is no valid reason why it shall -- should not be released.

If there was a purpose to our -- to our inquiries, to our spending 11 hours, they -- there's no reason they shouldn't be released. I yield now.

GOODLATTE: I thank the gentleman for yielding, and I would just say that it is very customary in investigations to keep transcripts of private interviews until the conclusion of the investigation. This investigation certainly hasn't concluded, and it is very appropriate that the -- the questions that were asked are -- and the answers given are not shared...

NADLER: Are you claiming -- are you claim...

GOODLATTE: ...with other potential witnesses.

NADLER: Were you claiming my time the (ph) -- I am observe -- I will observe that many of the same questions are being asked today, number one, but number two, given the fact that selective portions of the transcript have been leaked, I think that -- that changes it. I'll yield to Mr. Cicilline.

CICILLINE: I was just going to inquire. I've, sort of, been trying to get the answer to this question, but to the extent that this transcript is available to all of us. I intend to release it. I can't find any prohibition that makes us unable to release it in our rules.

We now have the same witness after 11 hours here in a public hearing. So, the notion that we have to, somehow, keep this secret while pieces of it (ph) are being released. They're doing a real disservice to the American people. And I'm asking the Ranking Member, is there any reason, this afternoon, I can't just release it as a member of this committee?

GOODLATTE: Would the Ranking Member yield?

NADLER: Let me -- one second. I'm not aware of any, but I'd have to look at the House rules and all. I will yield.

GOODLATTE: I thank the gentleman for yielding. It is correct that, both, members on the Republican side and the Democratic side have use quotations from the transcript for the purpose of interview in a hearing. And that is a legitimate use of the transcript.

NADLER: And I'm reclaiming my time. Some members have also used it

for the purpose of talking to the news media. And that may be or may not be an appropriate use, but be (inaudible) the transcript should be released. I yield back.

RASKIN: Would the gentleman yield?

NADLER: Who -- yes, I'll yield to the gentleman from Maryland.

RASKIN: I'd like to ask the Ranking Member if it's legitimate within the rules of the committee and the House of Representatives for members to release certain portions of the overall transcript, is there anything that would prevent us from releasing the entire transcript?

NADLER: I'm unaware of anything that would -- off the top of my head, that would prevent a member from releasing the transcript, but I -- but that's off the top of my head. I wouldn't want to -- I wouldn't want to say that definitively.

CICILLINE: Mr. Chairman, are you aware of anything that would preclude us from doing that?

GOODLATTE: Yes, the decision is made by the Chairman of the committee.

NADLER: Let me -- before I yield back, let me just say. We don't want -- we don't want.

CICILLINE: Mr. Chairman. Would you clarify...

(CROSSTALK)

NADLER: We don't want portions released. That's wrong.

CICILLINE: I'm not going to practice (ph) having the Chairman of the committee make decisions for me. So, could you explain to me...

NADLER: I'm reclaiming.

CICILLINE: ...is there a rule that precludes me from this afternoon, releasing this transcript? If it's just your preference I don't, that's not sufficient enough.

GOODLATTE: This is a conduct of investigation (ph). The Chair of the two committees are conducting that investigation. We will decide when transcripts of private interviews are going to be released and...

NADLER: Reclaim -- go ahead.

GOODLATTE: ...no one on this side of the aisle has released it other than to ask a question based upon it in the hearing which is an appropriate use of it.

NADLER: Reclaiming my time.

(CROSSTALK)

NADLER: I'm reclaiming...

CICILLINE: We could release it as part of this hearing.

NADLER: ...reclaiming -- reclaiming my time. I will observe that some members have released parts of the transcript by being quoted in the media not for questions here. Does the gentleman from Rhode Island still want time?

CICILLINE: I just have a unanimous consent request. I'd ask unanimous consent that the transcript of this -- with this (ph) be made an official part of this record in its entirety.

(UNKNOWN): I object.

GOODLATTE: Objection is heard.

NADLER: I'll -- I'll.

(UNKNOWN): Role call vote.

(CROSSTALK)

NADLER: I yield to the gentleman from Rhode Island.

CICILLINE: I thank the gentleman for yielding. Again, Mr. Chairman, I think this of tremendous interest to the American people. There's an effort here to, sort of, characterize this witness' behavior. Much ado (ph) has been made of it.

We had an 11 hour hearing in which this very same witness has testified. He's now testifying consistently before the American people. There is, it seems to me (ph), no good reason other than a personal preference of some, apparently, that this transcript not be released.

And I would to the Chairman respectfully, if there is no prohibition, the fact that you would prefer we not is insufficient to persuade me and I think Mr. Raskin. And we intend to release this transcript unless someone presents us with some rule under our House proceedings or this committee that prevents us from doing it. And we'll give you until five o'clock this afternoon to present that, otherwise we intend to release the transcript.

NADLER: Reclaiming -- reclaiming my time. I'll, simply, I -- I want (ph) to associate myself with the remarks of the gentleman from Rhode Island. I would -- I would agree with him. I think it would be a public service to release these transcripts. That's why I demanded they be released. There is no good reason not to. And at this point, I think I'll yield back the balance of my time.

GOODLATTE: If so, the Chair wants to respond to the gentleman from Rhode Island. First of all...

NADLER: Then I will (ph) yield back the balance of my time.

GOODLATTE: ...first of all, there was a -- an agreement in the interview that it was private, confidential, and that it would not be released. So, that is not going to take place under this -- this set of

circumstances.

NADLER: Reclaiming.

GOODLATTE: Secondly, if the gentleman -- we're here investigating
irregularities conducted in investigations by the FBI. If the gentleman
wants to perpetuate that by creating irregularities here and releasing
questions so that other potential future witnesses can an -- can -- can
read the question before they're asked, that is, in my opinion, exactly
what many on the gentleman's side of the aisle have been all about,
attempting to disrupt this investigation and this hearing process...

NADLER: Reclaim.

GOODLATTE: ...from start to finish.

NADLER: Reclaiming...

(UNKNOWN): Will the gentleman yield?

NADLER: ...reclaiming my time. Mr. Strzok.

RASKIN: Would the gentleman yield?

NADLER: ...reclaiming my time.

(UNKNOWN): Mr. Chairman, I object.

(UNKNOWN): He's yielded his time three times.

NADLER: Mr. Strzok, would you object to the release of the
transcript of the -- of that hearing?

STRZOK: No, I would not object.

NADLER: Thank you. I will observe, then, that the minority -- the
Chairman says that there was an agreement not, you know, on the conduct
of that hearing. The minority was not a party to that agreement. There
may have been an agreement between Mr. Gowdy and Mr. Goodlatte, but at
no point were we asked.

GOODLATTE: It was stated on the record in there.

NADLER: No -- it was stated as a decision, as a fact, as a
(inaudible) plea. We were not asked. We agreed to nothing because we
were not asked. And we think that the transcript ought to be released
for the reason -- for the -- for the reasons stated. And if the witness
doesn't object, I don't know why the majority should object. I yield to
Mr. Meadows.

MEADOWS: If the gentleman will yield? In earnest, I will be glad
to work with my colleagues on the other side of the aisle about
releasing all relevant information. I mean, I think if we're -- we're
talking about full transparency, let's talk about full transparency in
a variety of other things.

You know, it's -- it's interesting, we want to release one thing,

but yet, we're somehow allowing Peter Strzok to suggest that there's a whole lot of things that are off the record. And so, but I will work in earnest with -- with my colleagues (inaudible).

(CROSSTALK)

NADLER: I -- I -- I appreciate the gentleman and let me, simply, say that we are not disrupting a legitimate investigation into the investigation. The Republican investigation...

(CROSSTALK)

MEADOWS: But it is a release of information...

NADLER: ...is intended to...

MEADOWS: ...of a legitimate investigation.

NADLER: ...and is trying to -- to disrupt the investigation into the Russian interference in our election by the Special Counsel.

GOODLATTE: Will the gentleman yield?

NADLER: That's what's really at stake. I yield back.

GOODLATTE: The gentleman yields back. All right, so now that the Chairman and the Ranking Member have had ample time to ask questions and I think that the gentleman from New York has the record, we are going to move, because we have 72 more members who have questions to ask, to strict adherence to the five minute rule. And we'll begin by recognizing the gentleman from Wisconsin, Mr. Sensenbrenner for five minutes.

SENSENBRENNER: Thank you very much, Mr. Chairman. Let me observe that, you know, there have been all kinds of complaints about leaking transcripts and things like that. One of the reasons we are here, today, is because there has been a flood of leaks out of the Justice Department about what is going on.

Barely a day goes by when you can't pick up the newspaper and find out that it's rumor this and rumor that. And then, we have a witness from the FBI that comes up here and says', oh, no, we can't talk about that, here, to the Congress which has constitutional oversight responsibility because it's against our rules.

Well, I hope there'd be a few prosecutions of people out of Justice that have been leaking this stuff to the various news media.

Now, I want to get to looking at statutes. You know, you look at rules. I've been looking at statutes, and somehow along the line, in the report, the conclusions of the Clinton investigation, the word "gross negligence" was changed to "extremely careless" in determining Mrs. Clinton's handling of classified information. Now, "gross negligence" would mean that it would subject her to criminal liability. "Extremely careless" would have the opposite effect. It would not. So I'd like to ask you, Mr. Strzok, a couple questions about that.

In the original May 2 draft of the statement that Director Comey was making, he characterized Mrs. Clinton's actions as grossly negligent. Is that correct?

STRZOK: That's my recollection, yes.

SENSENBRENNER: Yes. Are you aware that "gross negligence" was changed to "extremely careless" in the eventual statement?

STRZOK: Yes.

SENSENBRENNER: OK. Now, do you recall that the June 6 -- 6, 2016 meeting attended by you and Mr. Rybicki, Ms. Moyer, Mr. Moffa and Lisa Page to discuss the language of the statute on whether to use "grossly negligent" or something else in the draft statement. What was discussed at that meeting?

STRZOK: So sir, I don't remember that specific meeting. There are a variety of meetings with a bunch of people that included discussion of this concern.

SENSENBRENNER: OK. Did the alternative phrase "extremely careless" come up at the meeting?

STRZOK: It -- it did at some point, sir. I don't know if it was during that meeting, or at another one. I -- I don't remember that specifically.

SENSENBRENNER: Who -- well, whenever it happened, who brought it up?

STRZOK: My recollection, sir, is that somebody within our Office of General Counsel did. It was one of the attorneys. I don't remember which one.

SENSENBRENNER: OK. You -- you don't remember who did.

STRZOK: No, I -- it was a...

SENSENBRENNER: OK.

STRZOK: ... it was a legal issue that one of the attorneys brought up.

SENSENBRENNER: OK. Now immediately after that meeting, metadata shows that you modified the draft statement on June 6th. Is this when the phrase "grossly negligent" was changed to "extremely careless"?

STRZOK: Sir, again, I don't recall specifically when it happened. I am aware, as well, of that metadata. My recollection is of working on the draft with a group of us in my office, because it was the largest office...

SENSENBRENNER: OK.

STRZOK: ... and taking the inputs of probably five, ten (inaudible) people.

SENSENBRENNER: Well, was it your -- was it your...

STRZOK: And it was made there.

SENSENBRENNER: Was it your computer that put the change into the statement?

STRZOK: I -- based on my subsequent review of that metadata, I believe that to be true.

SENSENBRENNER: OK, and who -- who has access to your computer? Anybody beside you?

STRZOK: No, I do.

SENSENBRENNER: OK, OK.

STRZOK: My secretary had access to elements of it, but...

SENSENBRENNER: And why was the change made?

STRZOK: I guess...

SENSENBRENNER: You know, you were in the meeting where it was agreed that the change would be made. Why was that?

STRZOK: My recollection, sir, again, was this was -- and I'm not an attorney. My recollection was that attorneys within the FBI had raised the concern that the use of "gross negligence" triggered a very specific legal meaning, and a legal context...

SENSENBRENNER: Yeah, criminal. Crimi

STRZOK: ... in -- in a legal...

SENSENBRENNER: Criminal.

STRZOK: That's exactly right. In a legal context, "grossly negligent" is used in various statutes to -- particularly, one of the -- the mishandling statutes in 793 -- to talk about a criminal element of the criminal defense.

SENSENBRENNER: OK.

STRZOK: And so sir, if I may, quickly, and I promise I'll (inaudible) time. So one of the...

SENSENBRENNER: Well so, let -- you know, let me say, this change was Hillary's "get out of jail free" card, right?

STRZOK: Absolutely not, sir. Not in any...

SENSENBRENNER: Well, Hillary -- Hillary hasn't been prosecuted. So if she wasn't grossly negligent, but was extremely careless, you know, then there's no criminal standard involved. With grossly negligent, there is.

STRZOK: Sir, I think there are a lot of things I would disagree
with in that assertion. First is, she received no "get out of jail
free" card. We pursued the facts, wherever they...

SENSENBRENNER: Well, she did -- she did get a "get out of the
White House free" card when the voters cast their votes.

STRZOK: Sir -- sir, I've heard that said a lot, and I can tell
you, there's nothing further from the truth.

SENSENBRENNER: Oh.

STRZOK: There was an effort to...

SENSENBRENNER: Trump won. That's the truth.

STRZOK: So sir, what I would tell you with regard to that
decision, there was concern within the perspective of a legal
definition of that term that people would draw an inference based on
that use that it was necessarily talking a -- a particular subset of a
statute. My understanding is...

SENSENBRENNER: My time is just about up. That rates four
Pinocchios. I yield back.

STRZOK: Sir -- Mr. Chairman, may I respond?

GOODLATTE: The gentleman may respond.

STRZOK: Sir, what I would tell you with regard to that decision is
that there was concern about the use of the word "grossly negligent,"
and the question of whether or not Director Comey wanted to convey that
in the sense of applying the elements of a crime, and that whether or
not his use, when people heard that, particularly when lawyers looked
at it, whether or not they would interpret that as his saying that she
did or did not commit any particular statute.

My recollection is that the lawyers, based on that, looking at the
use of the word "grossly negligent" -- looking at the way that's been
defined, looking at the statute where it occurs -- both realized that
that was probably not what he wanted to say, and ultimately, he made
the decision to change that wording, and convey what it was he did want
to say, and that all of those discussions were generated based on a
legal discussion of the use of that term as a -- as a legal definition,
not as a indicia of violation of any particular statute at all.

GOODLATTE: The chair recognizes the gentlewoman from California,
Ms. Lofgren, for five minutes.

LOFGREN: Thank you.

Mr. Strzok, I think it would be easier, going back to the last
question, if you were simply able to indicate, to your knowledge,
whether the evidence would have supported the use of gross negligence,
and apparently, the decision made by the lawyers and the FBI was that
that was not the case, and therefore, that term should not be used.

I just want to talk at a -- at a more macrolevel about what's
going on here. You know, I -- one of the things I try and do is to --
to imagine how I would feel if various things had been done or said
about a member of my own party who was president, and how I would
react, because I think it's important to try and understand that.

And when you take a look at the texts that you sent, I think
you've acknowledged that it would make people who were supporters of
Trump uneasy about your intentions, and I think that was reflected in
the Inspector General's report. And I think, obviously, that brought
suspension of you and the FBI among people who were Trump supporters.

The fact that you also had highly-critical texts of the Attorney
General Eric Holder, of Governor Martin O'Malley, of Senator Bernie
Sanders -- I mean, isn't really relevant. They were not, to the best of
my knowledge, subject to an investigation. And so, you know, it was
important that the Inspector General go in and take a look to find out
for us, for this committee and for the American people what really
happened, and he did. He went in. He spent a lot of time. He
interviewed many people, and here was his conclusion. He did chastise
you -- and I understand you accept that admonishment -- but found that
there was no evidence whatsoever of political bias in the decisions
made in that investigation. And a direct quote: "We did not find
documentary or testimonial evidence that improper considerations were
made."

Now, you know, to -- to -- to listen to some of my friends, you'd
think that the FBI, which I had always felt was a (inaudible) made up
of conservative law enforcement people had magically been transformed
into a left wing organization. That's not my understanding, and in
fact, if you take a look at the people who are in charge, I mean you've
got Mr. Wray, who was appointed by President Trump who is not a
Democrat.

Mr. Comey, who was appointed by Mr. Trump, he's not a democrat. I
happen to know that Robert Mueller's not a Democrat. So these are not
political decisions made by political operatives, they should be
following the evidence.

And I'd just like to note that if -- if you had wanted to harm and
interfere with the election of President Trump, you could have leaked
information that the investigation was ongoing.

But none of that came out, and as a matter of fact, we asked the
leaders of the Department of Justice and FBI about whether there was an
investigation of Mr. Trump prior to the election and we were told they
could not comment on it, which was, in fact, the appropriate response.

You should not comment on an ongoing investigation. If you find
something, you have an indictment, if you don't find something, you say
nothing. That's where Mr. Comey erred.

He violated that policy and he damaged the campaign of one of the
candidates and the rest is history. So I just think that this hearing's
extraordinary hearing, I've been here a member of Congress for 24
years, this is the first time we've had this kind of event of (ph) -- a

circus, really, of -- of trying to really investigate the investigators
when that's already done.

I would urge that we -- we make sure that the actions we take do
not create further divisions in our country. You know, President Trump
tweeted a few months ago, quote, "the top leadership and investigators
of the FBI and the Justice Department have politicized the sacred
investigative process in favor of Democrats and against Republicans,
something which would have been unthinkable just a short time ago".

Is that tweet supported by the inspector general's report, Mr.
Strzok?

STRZOK: No.

LOFGREN: No, it is not. I would hope that those of us on the
committee who believe in the rule of law, who understand that our
country will be damaged if we allow political divisions to attack our
law enforcement agencies to undercut investigations that we will be
harming our country in a way that our enemies, including Russia, hope
we would do.

That's why the interfered in our election, to cause us harm, to
create division among the American people and among us here in the
halls of government. So I would ask that we take yes for an answer,
that the inspector general did investigate this matter.

He found out there wasn't political influence and we wait for the
results of Mr. Mueller's investigation. I pray that we find that our
president was not involved. That would be great news for our country
and if that's Mr. Mueller's finding, I will accept it, not investigate
it.

I hope that we can put our partisanship at the door, step back
from the precipice that we are finding ourselves now, and I would hope
that this hearing, which I think serves no good purpose for our
country, could be brought to an end.

I yield back, Mr. Chairman.

GOODLATTE: Time of the gentlewoman has expired. The chair
recognizes the gentleman from Tennessee, Mr. Duncan for five minutes.

DUNCAN: Thank you, Mr. Chairman, and first of all, very quickly, I
would like to associate myself with the really outstanding opening
statements made by Chairman Goodlatte and Chairman Gowdy, which I think
were two of the finest opening statements I've heard in my 30 years in
Congress and express my views completely.

Let me also say, while Mr. Strzok will stubbornly not admit what
almost everyone else knows is extreme bias, I find it amazing that he
can sit here and say that he was not biased in a way that clearly
colored and effected his investigations.

And if you don't agree with that, I want to read the words from
Mr. Horowitz, the inspector general of the Justice Department, who
wrote that the Clinton investigatin, quote, was -- the way it was

conducted, quote, "was inconsistent with typical investigative strategy
and gave rise to accusations of bias and preferential treatment",
unquote.

Then I -- I would guess that Mr. Strzok knows Chris Swecker who
spent 24 years with the FBI and retired as the head of all the FBI
criminal investigations. And Mr. Swecker wrote, he said the I.G. report
presents jarring evidence of political bias by the FBI against
Republican presidential candidate Donald Trump but fails to add it all
up to come to the inevitable conclusion that political bias was there.

This is like saying one plus one equals zero. Mr. Strzok, do you
have reason to think that Mr. Horowitz or Mr. Swecker have some sort of
bias or animosity toward you?

STRZOK: Sir, I disagree with Mr. Swecker's conclusions. I can't
speak to Mr. Swecker's motivations of bias whatsoever, and I know of no
bias by the inspector general.

DUNCAN: Also, Sharyl Attkisson, a columnist for one of the Capital
Hill newspapers wrote this, quote, "the earth shattering -- the earth
shattering finding on Strzok by the inspector general confirms the
citizenries worst fears, a high ranking government intel official
allegedly conspired to affect the outcome of a U.S. presidential
election."

Let me ask you ask you this, Mr. Strzok, you know that judges who
have even minimal bias are required to recuse themselves from a case.
Do you think that FBI agents are -- have some sort of -- that they're
special people -- people who shouldn't be held at the same high
standards that judges are in deciding where to recuse themselves?

STRZOK: Sir, I would absolutely say that FBI agents, judges, all
are expected that whatever their personal beliefs, that they set those
beliefs aside in their pursuit of their truth or their application of
the law.

DUNCAN: So you don't believe that you were entitled to a lower
standard and -- and -- and used that to --

(CROSSTALK)

STRZOK: I believe I'm held to the highest standard and that I
abided by that.

DUNCAN: But you told Chairman Goodlatte that you did not think you
should have recused yourself in this -- in this case.

STRZOK: Sir, I'd say that's entirely consistent. I believe that
all of my personal opinions were never taken into account in anything
that I did in an official act. I think that was appropriate, and I
think that is in keeping with the high standards of the FBI.

DUNCAN: Well I think that since both the Clinton and Trump
investigations had in hand such tremendous political ramifications, I
think the ethic, fair, just and proper thing would have been for you to
recuse yourself and move onto other work.

There were many other cases that you could have worked on that you have never expressed any bias whether or not. There were all kinds of cases.

STRZOK: Sir, I -- I completely disagree with you. I don't think it would have been either necessary or required for me to recuse. I think every day with the Clinton investigation, with the Russian influence investigation, with the thousands of other investigations that when I walked in the door the entirety of my action was dedicated to pursuing the facts wherever they lie...

DUNCAN: You know that many times...

STRZOK: ... and in applying the law to those fact.

DUNCAN: ... many times judges have defendants appear before them who, after they've been found guilty, they apologize and say they're sorry but trying to get probation. And yet, many times people think those apologies are said more in hopes of getting probation and in -- and in regret that they have been caught, rather than in sincere apology.

Do you -- do you feel that you should apologize in any way to the American people for the things that you have expressed, this extreme bias that you expressed? Do you have any regret as to calling Trump supporters, saying that they smelled and things of that nature?

STRZOK: Sir, I think I expressed (ph) a couple of things. One, I -- I -- I don't agree with your characterization of my views as bias. I think what I clearly articulated -- and I can understand those concerns.

And I hope when you heard me in my opening statement when I talked about my regret -- to the people, the harm and the hurt; to the people that I love and my family when I talked to the way that these texts have been used against the FBI; when I responded to questions about using a turn of phrase about what's, you know, smelling when I should have said hearing, or seeing or whatever the case may be -- that, yes, those were not intended as direct animus towards any set of people.

And I hope that people understand that I do sincerely regret that. So, I've said it (ph) I'll say it again ...

GOODLATTE: The time of the gentleman has expired.

STRZOK: ... and -- and I hope you hear that.

GOODLATTE: The chair recognizes the gentlewoman from New York, Ms. Maloney, for five minutes.

MALONEY: Thank you. Thank you. Mr. Strzok, for -- for months, the Republicans have increasing used their congressional oversight authority to undermine Special Counsel Mueller's investigation. They have even called for his investigation to be shut down; and, why? It's concerning national security and it seems to be successful.

The special counsel has now obtained five guilty pleas and indicted 18 others. And included in these indictments, and confessions and guilty pleas, Michael Flynn plead guilty to lying to the FBI, Rick Gates plead guilty to conspiring against our country, George Papadopoulos plead guilty to making false statements to our country and the FBI.

So I'm not exactly sure what the Republicans want to shut down. Do they want to shut down the special counsel's upcoming trials against campaign manager Paul Manafort? One of these trials is scheduled to begin here in Virginia, in the Eastern District of Virginia later this summer.

And related to it, on February 22nd, a grand jury in Virginia approved a set of 32 counts of tax, financial and bank fraud charges against Mr. Manafort. And on February 16th, a federal grand jury in the District of Columbia separately approved five other charges against Mr. Manafort and Mr. Gates, including and I quote, "conspiracy against the United States," end quote.

And in this indictment that is coming forward, I'd like to quote from it. It says, "The defendant, Paul Manafort ... together with others," including Gates, "knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a -- of government agencies, namely the Department of Justice and the Department of the Treasury, and to commit offenses against the United States of America (sic)." end quote.

Now, since this indictment, Gates has -- has pleaded guilty and he's now cooperating. And, included in his statement of offense quote, "Manafort engaged in a variety of criminal schemes, and Gates as part of that work for Manafort, knowingly and intentionally conspired to assist Manafort in criminal schemes," end quote.

So I'd like -- like to ask you, Mr. Strzok, to be clear, Mr. Gates is swearing under oath that he's -- in his guilty plea that he conspired with Mr. Manafort in criminal activity. Is that correct, from what I'm reading?

STRZOK: Ma'am, I'm not familiar with his statement of facts, but I'll -- I'll stipulate to what you're reading.

MALONEY: OK. So in -- in a -- in a few weeks, Mr. Manafort's trial date is set to begin. And the special counsel team of prosecutors will present their evidence. And I -- I cannot imagine how anyone in this body or in this country, with the exception of Mr. Manafort and his co-conspirators, would ever want in any way, shape, or form to halt this trial from going forward.

Can you think of any reason why anyone would want to halt this trial from going forward, Mr. Strzok?

STRZOK: I am not aware of any.

MALONEY: Thank you. And, I yield back.

MEADOWS: And, will the gentlewoman yield...

MALONEY: And I yield to Mr. Cummings.

CUMMINGS: I yield to the gentleman, Mr. Meadows.

MEADOWS: I -- I thank the gentleman and I thank the gentlelady.
Mr. Chairman, I -- you know, in a spirit of transparency, and I think
we all want transparency here, I would offer for the chairman's
consideration and this body's consideration releasing the full
transcripts that we had in the 11th hour, breaking (ph) with two
different conditions.

One is -- is that we have the opportunity to interview Ms. Lisa
Page first, since those text messages were back and forth between two
messages. And the second, that we can scrub that transcribed interview
for any personal relevant information that might be embarrassing before
we do that. And with that, I'll yield back.

GOODLATTE: If the gentleman will yield?

CUMMINGS: Yes, I yield to the gentleman.

GOODLATTE: Thank you. The gentleman's -- the spirit of the
gentleman's recommendation is taken -- is well taken and we will
definitely take that under advisement.

JACKSON LEE: The gentleman yield?

GOODLATTE: I yield.

JACKSON LEE: I would also hope that we would have -- give the FBI
the opportunity for redaction of anything that would impact on the
nation's national security. I think that is extremely important and I
hope the gentleman would accept my...

CUMMINGS: Reclaiming...

JACKSON LEE: ... modification.

CUMMINGS: ... reclaiming my time, it's my understanding that the
gentleman does accept that -- the gentleman from North Carolina?

MEADOWS: (OFF-MIKE).

CUMMINGS: And I want to thank him for trying to, as he usually
does, trying to work these things out. And full transparency and I
think that's important. I think the American people and this committee
would appreciate it. And, again, I thank you.

GAETZ: Will, the gentleman yield for a question?

CUMMINGS: I yield.

GAETZ: Does the gentleman from North Carolina's suggestion relate
solely to the testimony of Agent Strzok or under the same guise of
transparency would we apply that same process and that same standard to

the previously unreleased testimony of Andrew McCabe who was examined
in a similar environment?

MEADOWS: I...

CUMMINGS: I yield to the gentleman.

MEADOWS: ... I -- I think in a spirit of transparency, we need to
look at all transcribed interviews to let the American people judge for
themselves. I thank the gentleman for his question, and I think that's
consistent with my conversation with the gentleman from Maryland.

CUMMINGS: Thank you very much. And I yield back.

GOODLATTE: The chair recognizes the gentleman from Texas, Mr.
Smith, for five minutes.

SMITH: Thank you, Mr. Chairman. Mr. Chairman, I'll yield my time
to my friend and colleague from Texas, Mr. Ratcliffe.

RATCLIFFE: I thank my colleague for yielding.

Agent Strzok, on May the 9th, 2017, President Trump fired FBI
director Jim Comey. That same day, you and FBI lawyer Lisa Page
exchanged quite a few texts on the topic.

At 8:14 p.m. on that day, you texted Ms. Page and said, quote,
"And we need to open the case we've been waiting on now, while Andy is
acting," end quote.

First, is that Andy McCabe, the former deputy director of the FBI
who has since been fired and criminally referred by the inspector
general?

STRZOK: It is.

RATCLIFFE: All right. And what case are you referring to opening,
now that Andy is the acting director of the FBI?

STRZOK: Sir, to get into that would relate to ongoing
investigations, which, consistent with the department's policy on
ongoing investigations and based on the special counsel's (ph) equities
(ph), I'm not authorized to discuss ongoing investigation...

(CROSSTALK)

RATCLIFFE: OK. Well, let me see if I can give you a question that
you can answer.

You sent four more texts to Ms. Page. And her first response to
you at the bottom of that page you're looking at is, quote, "We need to
lock in" -- and then there's a black mark where someone's name's been
redacted -- "we need to lock in [redacted] in a formal chargeable way,"
period. "Soon," period.

Whose name's been blacked out?

STRZOK: Sir, I don't know. I need to see the original list -- or
original text.

RATCLIFFE: You don't know? OK. Well I don't know either. Here's
what else I don't know. I don't know if the person whose name has been
redacted is Republican or Democrat. I don't know if they're black or
brown or white.

STRZOK: I don't either, sir.

RATCLIFFE: I don't know their religious beliefs. I don't know
their sexual orientation. I don't know those things, and I don't care.

But here's what I do know. I do know that decisions about when and
whether to open investigations and when and whether to charge people
with crimes aren't supposed to depend on who's sitting in the
director's chair, or on political decisions, or on the political
agendas of FBI agents and lawyers.

So if a Trump-hating FBI agent and a Trump-hating FBI lawyer who
have talked about effing (ph) Trump, stopping Trump, impeaching Trump
are, within hours of President Trump firing their boss -- if they start
talking about opening an investigation now that Andy is acting, and
that some person needs to be locked in in a formal, chargeable way,
soon.

I know, as a former U.S. attorney, that if, in fact, that's what
happened, I know that whoever is the subject of that case that was
opened -- now that Andy is acting -- and whoever you and Ms. Page
talked about needing to be locked in soon in a formal chargeable way,
well, they would have had their civil liberties violated. They would
have been deprived of due process.

So my first question to you, you wouldn't answer. My second
question to you, you couldn't answer. Let's go for a third question.

On page 400 of the inspector general report, someone tells the
inspector general, quote, "There is a bright line -- a bright and
inviolable line -- between what you think personally and believe (ph),
and the conduct of your official business." Who said that?

STRZOK: I believe I did, sir.

RATCLIFFE: You did say that. And I heard you say similar things
last week, I heard you say similar things today. You said it very
clearly, you said it very unequivocally in your opening remarks, that
you never crossed that inviolable line in 26 years.

Earlier today in response to a question, you said, "I took my
personal belief out of every official action." So you're asking us to
believe that when you say things like, "F Trump," and "stop Trump," and
"impeach Trump," that those are just personal beliefs.

And that when you say those things, you never cross that line,
that bright inviolable line and allow it to impact your official
conduct. That's really what this comes down to that you're asking us to
believe isn't it?

STRZOK: Sir, I am asking you to believe that I am offering you evidence...

RATCLIFFE: Yes, well you have, you've made...

STRZOK: ... whether it's the IG report...

RATCLIFFE: ... you've made it crystal clear...

STRZOK: ... whether it's anything that's been found that there's been no...

RATCLIFFE: Listen you have under oath been as clear as a bell on that. You've said it over and over again and because of that I'm almost embarrassed to ask you this question. Of the approximately 50,000 text messages that I've seen with your personal beliefs like F Trump, Stop Trump, impeach Trump, go ahead and confirm on the record that none of that occurred on an official FBI device on official FBI time. Go ahead and do that.

STRZOK: Sir. No, they did, many of them did...

RATCLIFFE: Oh they did, OK, so...

STRZOK: ...and I would say of the 50,000 Sir, the majority...

RATCLIFFE: ...so early, no I'll give you a chance at the end. So what you really meant to say was that when you said you never crossed that bright inviolable line, what you meant to say was, except for 50,000 times, except for hundreds of times a day where I went back and forth expressing my personal opinions about F-ing Trump and stopping Trump and impeaching Trump on official FBI phones, on official FBI time. Other than that, you never crossed that line I'm sure there are 13,000 FBI agents out there that are beaming with pride at how clearly you've drawn that line.

Agent Strzok, are you starting to understand why some folks out there don't believe a word you say and why it's especially troubling that you, of all people, are at the center of the three highest profile investigations in recent times that involved President Trump and that you were in charge of an investigation, investigating and gathering evidence against Donald Trump, a subject that you hated, that you wanted to F him, to stop him, to impeach him. And do you see why that might call into question everything you've touched on all of those investigations?

Chairman, I'm -- I'm done with this witness and I yield back.

STRZOK: Mr. Chairman, if I can respond.

GOODLATTE: Briefly.

STRZOK: Sir, while there are several questions and I'll answer them all briefly.

GOODLATTE: There were several statements, I only heard one

question.

STRZOK: Fair enough. First, I understand why people might think that particularly based on the misrepresentations of extreme folks in the media, conspiracy theorists, folks in this body and elsewhere and that's why I'm glad to be here today publicly, why I'm glad to hear that people are calling for the release of my private interview so people can judge for themselves, who I am, what I said, and the facts and not something that's being spun or misrepresented on some 10:00 talk show or other place. So absolutely I can understand that and I'm glad that the facts are coming out.

A second Sir to your -- to your earlier point about I never and I'm unaware of any case being open that represented some violation of civil liberties or a removal of due process rights. I have never done any activity, opened any case with regard to that. And when you look in the context of when it occurred Sir, during the time that Director Comey had been fired, where the President said initially that that had occurred because of a memorandum written by the Deputy Attorney General looking at his conduct in the Clinton investigation and then days afterwards pivoting and telling Russian diplomats and Lester Holt that it was because of the Russia investigation and a huge burden had been taken off his shoulders.

We all were very concerned about from an investigative standpoint the pace and severity and the unprecedented nature of fact and events that were unfolding in our investigator...

GOODLATTE: Mr. Strzok, I did say briefly.

STRZOK: Yes, I -- I appreciate that Mr. Chairman, I'm wrapping up.

GOODLATTE: In that regard though...

STRZOK: ...desire to along with things and while before things change was very important to us.

GOODLATTE: pointed to your response however, and in the interest of full transparency, and to Mr. Ratcliffe's point, will you authorize the release of all of the other text messages that have not been released to the Congress to this point?

STRZOK: Sir, I -- I would authorize the release of any work-related text messages that are out there.

GOODLATTE: Ahh, but the question is what is work-related and what is not?

STRZOK: That's right Sir and I would not -- I would not accept or agree to the release of non-work related text messages.

GOODLATTE: Even -- even though your testimony is that you would never let your work interfere with your personal opinion.

STRZOK: That is exactly my testimony.

GOODLATTE: So how are we going to know that unless we see those

text messages?

STRZOK: So the Inspector General very carefully and an independent body went exhaustively through the entirety of that body and found Sir that there were no acts of bias; that there was nothing demonstrative...

GOODLATTE: The Inspector General works for an entirely different entity than the United States Congress. Will you authorize release of them to the United States Congress?

STRZOK: No Sir.

GOODLATTE: The Chair...

ISSA: Mr. -- Mr. Chairman, a point of inquiry, I'm trying to understand his answer. My understanding was that the Inspector General did not see what he is claiming to be his personal texts that these were -- that they were requested and he delivered what he said was business related. So if I understand correctly, no one has seen anything that he determined, Mr. Strzok determined would not be delivered because in his opinion, they were not business related. I have a number of texts in front of me that I would say were very personal that we're looking at that undoubtedly he would have objected to turning over.

GOODLATTE: The gentleman makes a very good point. He may want to ask questions about that when he is shortly to be recognized. But first we're going to recognize the gentlewoman from Texas, Ms. Jackson Lee for five minutes.

JACKSON LEE: Mr. Chairman, thank you very much. I'm sorry my colleague walked out before Mr. Strzok had give his answers. I hate no one. I do not hate the Administration, the President, my colleagues. In fact, I love this nation; I honor this nation. And so I believe it is important that we stand on the force of truth in the Constitution.

In the oversight of these two committees, it is unfortunate that none of these committees, Judiciary oversight have decided to pursue more precious or more important issues than asking about Hillary Clinton's emails which have been well documented that there was no criminal impact and in essence she was vindicated by the Inspector General's report and other reports.

Unfortunately this has become a fishing expedition. What we have not done is investigated the children being stolen away from their families, nor have we looked at our President meeting with Mr. Putin, getting his annual performance review while offending our NATO allies. Foreign policy scholars are aghast that this President, one who famously refused to read his briefing materials will be meeting with Mr. Putin.

In addition, we are wasting time doing the Clinton investigation rather than investigating the role that Russia played in the 2016 elections, unanimous and unassailable assessment of the intelligence community is that the Russians helped Trump over Hillary and intended to harm her. In the judgment of the Republican-controlled Senate

intelligence committee, they agree with that assessment.

Unfortunately, the President and House Republicans do not agree.
The leader of Russia is known to have sanctioned murder of dissidents,
jailed journalist and this is the President who is described as easy to
meet with.

Neither the Judiciary Committee or the Oversight committees
investigated the President's indicating that he can pardon himself. So
here we are Mr. Strzok to ask you questions. I saw you in the closed
session. I think you're a credible witness and I believe you love
America.

My questions on require yes or no. Did anything you did or say in
2016, change the fact that Trump campaign associate Carter Page was
under counterintelligence surveillance going back to 2013? Anything
that you did, yes or no Sir.

STRZOK: No.

JACKSON LEE: Did anything you did or say in 2016 change the fact
that in March 2016, the president met with George Papadopoulos, who
would later plead guilty for lying to the FBI?

STRZOK: No.

JACKSON LEE: Did anything you did or say in 2016 change the fact
that Donald Trump Jr. met with agents of the Russian government in
Trump Tower in 2016?

STRZOK: No.

JACKSON LEE: Did anything you did or say in 2016 change the fact
that the president asked Russians to hack into Hillary Clinton's
e-mails?

STRZOK: No.

JACKSON LEE: Did anything you did or say in 2016 change the fact
that Paul Manafort, who has proven -- who has pleaded guilty, in fact
that in July 2016 that Paul Manafort changed the GOP party platform at
the 2016 GOP convention in order benefit Russia or change the platform?

STRZOK: Ma'am, without saying whether or not that's accurate, no.

JACKSON LEE: Did anything you did or say in 2016 change the fact
that in May 2016, George Papadopoulos was drunk in a London bar
bragging about how Russians had dirt on Hillary Clinton?

STRZOK: Again, ma'am, without confirming whether or not that's
accurate, no.

JACKSON LEE: Did anything you do or say in 2016 change the fact
that when Donald Trump was presented with dirt on Hillary Clinton, he
responded "I love it"?

STRZOK: Again, ma'am, only commenting on public accounts of that,

no.

JACKSON LEE: Did anything in the I.G. report change the fact that
Donald Trump Jr. was communicating with WikiLeaks Julian Assange about
the timing of releasing e-mails designed to harm Hillary Clinton?
Anything you do?

STRZOK: Anything I did, no.

JACKSON LEE: Did -- you're well aware that Mr. Flynn has pleaded
guilty, is that not correct?

STRZOK: That's correct.

JACKSON LEE: You're well aware that he was a national security
advisor for the president of the United States?

STRZOK: That's correct.

JACKSON LEE: Well in his offense statement that we have right
here, Mr. Flynn , the -- indicated that his amendment -- I'm sorry, his
statements, false statements and omissions, caused impeding the Russian
investigation.

But more importantly, I believe it's important to take note of the
fact that he provided information to the Russian ambassador that said
here, calm down, don't bother to get upset about sanctions.

And according to a whistleblower, he said the sanctions would be,
quote, ripped up to allow money to start flowing to one of Flynn's
business projects. You had no interference with that, did you not?

STRZOK: I did not.

JACKSON LEE: And you had no involvement, if you will, during your
June 2018 interview I noticed some concern in your voice when recalling
the 2016 campaign season, specifically October 2016 and specifically as
it relates to the state of Trump Russia investigation.

Why were you so concerned about what was happening at that time?

STRZOK: I'm sorry ma'am, you would rephrase that question?

JACKSON LEE: During your June 2016 -- excuse me, June 2018
interview, I noted some concern in your voice when recalling the 2016
campaign season, specifically October 2016 and specifically as it
relates to the state of the Trump Russia investigation.

Why were you so concerned about what was happening at that time?

STRZOK: Well I think -- trying to keep this is at a -- at a level
not talking about open -- our open investigations.

JACKSON LEE: Only your --

STRZOK: Yes, ma'am. So the predicating information, the
information we had, which was alleging a Russian offer of assistance to

a member of the Trump -- Trump campaign was of extraordinary significance.

It was credible, it was from a extraordinarily sensitive and credible source, and as we looked at what that represented, the -- the key time was obviously coming into the election.

And so for us, there was absolutely a need to one, this was a serious allegation, two, of extraordinary gravity, and three, given the fact that the election was upon us and that if in fact then candidate Trump were elected, that whether he or certainly more likely or possibly members of his campaign were actively working with the Russians, we needed to get to the bottom of that.

It could be that none of them were, it could be that some or it could be on a far worse scale, but the urgency for us to understand what was going on in advance of the election and certainly in advance of any inauguration, I can't overstate the importance of that.

JACKSON LEE: I thank you. Mr. Chairman, may I put into the record -- I ask unanimous consent to put into the record articles including the one by Cillizza, no evidence Strzok biased the investigation any meaningful way.

GOODLATTE: Without objection.

JACKSON LEE: I -- I thank you. And the patriotism of this witness and all of us should indicate that certainly Russian involvement

(CROSSTALK)

GOODLATTE: The time of the gentlewoman has expired.

JACKSON LEE: I yield back, thank you.

GOODLATTE: The -- the gentleman just answered questions regarding the substance of the Trump Russia collusion investigation. We have many more questions that we are entitled to ask and the gentleman is responsible for answering with regard to the onset of that investigation.

We are not interested in the substance of Mr. Mueller's investigation. But the manner in which it was created and your involvement in that is very much directly related to that.

So when we return, we will have more questions for you regarding that as we indicated earlier. Now, the committee will stand in recess for votes, and we will reconvene at 2:00 p.m.

(RECESS)

GOODLATTE: The committee will reconvene and the chair recognizes the gentleman from California, Mr. Issa, for five minutes.

ISSA: Thank you, Mr. Chairman. Mr. Strzok, you -- you were part of the Hillary Clinton e-mail investigation, that's correct?

STRZOK: Yes.

ISSA: And in that investigation, you were part of the decision for
her to -- and her lawyers to go through e-mails that were produced
during -- exclusively used, if you will, during her time as secretary,
go through and determine which ones were of government and which ones
were not, both the classified and unclassified. Is that correct?

STRZOK: I was not.

ISSA: You were not involved at all?

STRZOK: That's correct.

ISSA: OK. But you're aware of it?

STRZOK: I'm aware of their statements to us about how they did it.

ISSA: And do you think it was OK for Secretary Clinton to
determine what could or couldn't quality for her to turn in under the
Federal Records Act?

STRZOK: I can't speak to that. That was a decision, to my
understanding, between her and her attorneys. And I ...

ISSA: OK. But you're aware that in her production, she failed to
delivered some items that have now been ruled as classified, correct?

STRZOK: I'm aware that we recovered information that was not in
the material that she turned over. I don't know if it was her failure,
the failure of the attorneys conducting that sort or simply because she
didn't have it. I -- I -- I don't know the answer to that question.

ISSA: So, I bring up something that came up in the previous
rounds. So far, only you have determined what should be turned over
from your private e-mails that -- or, your non-government e-mails and
texts -- what should be delivered because it was government in nature.
You've made that decision?

STRZOK: That's right.

ISSA: And it's your position that nobody else in the way of a
government entity should be able to look over your shoulder, so to
speak, and make that decision?

STRZOK: That's right.

ISSA: So you think it's OK for the target, and you are a target,
of an investigation to determine what should be delivered, rather than
-- if you will -- the government, right?

STRZOK: Sir, I'm not aware of any investigation of which I am a
target.

ISSA: Well, you're a target of -- of our investigation. We think
that you had a bias and you acted on it. And that's been made pretty
clear. So I'm going to just ask one series of questions very quickly,

if I could.

You -- you did a number of texts all of the texts that are
presented to us as far as I know, came from your government phone,
correct?

STRZOK: I believe that to be the case, yes.

ISSA: So you've made not texts available from your private phone,
is that correct?

STRZOK: That's correct.

ISSA: Did you ever text on your private phone?

STRZOK: I did.

ISSA: Did you ever text Lisa Page on your private phone?

STRZOK: I did.

ISSA: Did you ever text Lisa Page on your private phone, similar
texts to the ones you did on your government phone?

STRZOK: By similar, you mean what?

ISSA: Commenting on Mr. Trump, or Hillary Clinton or anything else
political in nature.

STRZOK: I don't specifically recall but it's probably a safe
assumption that, yes, I did.

ISSA: So, it's likely that they'd be similar.

STRZOK: It's a safe assumption. I don't ...

ISSA: So, your personal phone has likely similar texts to the ones
that we found on your government phone, that's correct?

STRZOK: I would say it has similar expressions of personal belief,
yes.

ISSA: OK. So in front of you, you have one sheet of paper that was
presented to you a few minutes ago. And I'm going to just go -- to go
to a date and ask you to read your own words. March 4, 2016.

STRZOK: You want me to read this?

ISSA: Yes, please.

STRZOK: "OMG, he's an idiot."

ISSA: May 4, 2016.

STRZOK: "Now the pressure really starts to finish MYE."

ISSA: July 19, 2016.

STRZOK: "Hi. How was Trump other than a douche? Melania?"

ISSA: July 21, 2016.

STRZOK: "Trump is a disaster. I have no idea how destabilizing his presidency would be."

ISSA: August 6, 2016.

STRZOK: I don't believe I wrote this text, sir.

ISSA: OK, it's been attributed to you, so well go on to the next.

STRZOK: It's incorrect (ph).

ISSA: August 8, 2016. And I'll preface it by saying this for context, Ms. Page said, "not ever going to become president, right? Right?!"

STRZOK: "No. No he's not. We'll stop it."

ISSA: Repeat that again.

STRZOK: "No. No he's not. We'll stop it."

ISSA: August 15, 2016.

STRZOK: "I want to believe the path you threw out for consideration in Andy's office -- that there's no way he gets elected -- but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40."

ISSA: On October 20, 2016.

STRZOK: "I can't pull away. What the ..." and I defer to the chairman whether or not it might be (inaudible) ...

ISSA: You can just use one letter, if you don't mind.

STRZOK: "Why the F -- what the F happened to our country, Lis?"

ISSA: OK, read it again that way.

STRZOK: Sir, did you not -- was it not intelligible?

ISSA: I just want to hear it one more time.

STRZOK: You just want to hear it...

ISSA: Yes.

STRZOK: ... for me to repeat it?

ISSA: Please.

STRZOK: OK, sir, happy to indulge you. "I can't pull away. What

the F happened to our country, Lis?"

ISSA: Why in the world do you believe that this committee should not ask for the record of similar texts from your private account to find out what else you might have said about insurance policies, or about the President of the United States or investigation? That is a rhetorical question. You need not answer. And I yield back.

STRZOK: Mr. Chairman, may I nonetheless answer?

GOODLATTE: You may respond briefly, even though he said it was a rhetorical question.

STRZOK: I appreciate that, Mr. Chairman. Congressman, what I think is critical -- and I -- I'm glad you brought up a lot of these because I would like to make the point that I did earlier...

ISSA: I -- I didn't bring them up. I just asked you to read your own words.

STRZOK: ... I -- sir, if I -- if I may? What is important is that these texts represent personal beliefs just like those that you'd find on my personal phone. What these texts do not represent is any act, any suggestion of an act, any -- any consideration that we need to do this or not do this.

And furthermore, I would encourage you, as I believe -- I -- I forget who I said this to earlier this morning, you need to read these texts in the context of what was going on at the time. So when I make the comment about Trump having no idea how destabilizing his presidency would be, that came on the heels of a speech where then candidate Trump said he didn't know whether or not the United States should honor its commitment to mutual defense under NATO.

ISSA: I appreciate that. Mr. Chairman.

STRZOK: But think about that...

ISSA: Thank you very much. That's not briefly. Mr. Chairman, in light of these actual...

(UNKNOWN): Mr. Chairman, the witness keeps...

GOODLATTE: No, no, no.

(CROSSTALK)

STRZOK: Given that every...

(UNKNOWN): He should be permitted to answer his question.

GOODLATTE: Everyone -- everyone will suspend. I told the gentleman he could answer briefly. He has answered briefly and...

(UNKNOWN): He has not finished answering.

GOODLATTE: We will now turn to the gentlewoman from Washington,

D.C., for her questions.

NORTON: Thank you Mr. Chairman. In order to allow this witness to continue, let me ask, let me ask a question. Mr. Strzok, you are a senor or were a senior, an experienced FBI staff person, is that not right?

STRZOK: I would consider myself the senior in experienced staff person, yes.

NORTON: Now, you had been involved in the Mueller investigation of the last election involving Hillary Clinton and Donald Trump at the highest level is that not the case?

STRZOK: If -- if you mean the highest level that I had interactions with those cases with the director and deputy director and senior staff of the Department of Justice, yes.

NORTON: That's what I mean. Now, we've been reading from your personal phone and your and -- and your official phone. Did it occur to you that your personal political messages of -- if they became public might be misinterpreted in light of your role in the investigation?

STRZOK: Congresswoman, to be very honest, I didn't anticipate that because I never thought these texts should become public.

NORTON: Well even though they were -- some of them were not on your personal phone.

STRZOK: Correct, I'm -- I'm that's correct.

NORTON: So that means anything that's on your official phone, of course, belongs to the public. So -- so -- I just want to establish that this -- this confusion between your public and private phone is part of our problem here today.

Now as we hold this hearing, I just want to know for the record that President Trump is on his way to a very controversial meeting with Vladimir Putin. Let me ask you Sir about an undisputed finding of the intelligence committee and by that I mean the CIA, the NSA, the FBI, these people do not usually speak in such absolute terms. So hear them.

We assessed Russian President Vladimir Putin order and influence campaign in 2016 aimed at the U.S. presidential election. Russia's goals were to undermine public faith in the U.S. democratic process, denigrate Secretary Clinton and harm her electability and potential presidency. We further assess Putin and the Russian government developed a clear preference for President-Elect Trump. We have a high confidence in these judgments.

Are these conclusions familiar to you Sir?

STRZOK: They are.

NORTON: Are you aware of any finding that undermines these conclusions of the three intelligence committees?

STRZOK: I am not.

NORTON: The Senate committee on the other side of the capital under the leadership of a Republican Chairman, Richard Burr, and not split in the way our own intelligence committee here in the House, has made a bipartisan finding affirming the Intelligence Committees assessments and I want to quote just briefly from them that the three committees the Intelligence Commission assessment is a quote sound intelligence product.

Now let me indicate something that I had not known before preparing for this hearing that they not only cited the usual context here in the United States, they quoted public Russian leadership commentator -- commentary, Russian media reports, all aligned with the body of our intelligence reporting. Were you aware of the confluence of what the Russians were saying and what our own intelligence sources are saying?

STRZOK: I -- I believe I understand your question to be the -- between the intelligence community and methods and open source reporting including those from Russia, yes I was aware of all those things coming together at the same time.

NORTON: Do you have any reason to believe that the Senate Intelligence Committee or the NSA or the CIA or the FBI or the Office of the Division of Intelligence are on some kind of an effort to discredit President Donald Trump?

GOODLATTE: The gentlelady's time has expired but you may answer the question.

STRZOK: No not at all.

NORTON: Thank you Mr. Chairman.

GOODLATTE: The gentlelady from the District of Columbia yields back. The gentleman from Ohio is recognized.

CHABOT: Thank you Mr. Chairman. Mr. Strzok, you were involved in investigating both the matter of Hillary Clinton's private email server and the so called the Russian Collusion matter. Is that correct?

STRZOK: That's correct.

CHABOT: And Ms. Page, was also involved in both of those, correct?

STRZOK: She was not a member of the investigative team for either. She was a senior staff member for Mr. McCabe who I believe began...

CHABOT: But somebody (inaudible) communicating with on a fairly regular basis on these matters.

STRZOK: Yes Sir.

CHABOT: Thank you. And you would agree, would you not, that both investigations were supposed to be fair and unbiased?

STRZOK: Yes, and that they were.

CHABOT: Yet, you were both rooting for Hillary Clinton to win and you both detested Donald Trump, did you not?

STRZOK: I think that's fair to say.

CHABOT: And in fact, as we've learned, you apparently found Donald Trump supporters detestable too like those around Loudoun, Virginia, as we've already heard whom you called ignorant blanks, I'm not going to say that here; that you had visited a Southern Virginia Wal-Mart and could smell the Trump support. And I have to say when I read those communications and when I hear them here, those between the two of you, specifically what you had to say about Trump supporters, it reminded me of something that Hillary Clinton had said about Trump supporters. She found them, what did she call them, deplorables.

And I would submit that it was your and -- and Hillary Clinton's smug view of Donald Trump's supporters that was truly deplorable. Don't you think that the American people when they're paying your salaries, when they're paying for a fair and unbiased investigation by none other than the FBI deserved a whole lot better than what those comments I just referred to reflect?

STRZOK: Congressman, two things. One, I absolutely regret the appearance of some of those texts and wish I would have said or phrased or not said at all some of the things I did. Two, I take -- I disagree completely with your attribution of my views of Trump supporters. I never said that. I expressed no such thing. There are millions and millions and millions Americans who I (inaudible) and respect and honor who voted for Mr. Trump (ph)...

(CROSSTALK)

CHABOT: (inaudible) Let me -- let me (inaudible in my time here.

STRZOK: But I just respect their mistake (ph).

CHABOT: So also interestingly, you told Ms. Page, and I'll quote here: "I loathe Congress," and she agreed. Now you're -- you're probably in pretty good company there. A survey I saw a while back about Congress found us less popular than root canals and head lice and colonoscopies and -- although we did beat out playground bullies and the Ebola virus.

But this is not about us, it's about you and whether or not the American people can have the confidence in the investigations that you were involved in and whether you were fair and unbiased when you investigated both Hillary Clinton and Donald Trump. Would you agree with that?

STRZOK: Sir, I appreciate that concern very much. And let me explain a little bit about that comment. I have the utmost respect for Congress, for its role in oversight, for its role in passing laws for any -- any of the functions (ph). What I was stating in that comment was the efforts by some to turn legitimate oversight activity into unwarranted...

(CROSSTALK)

CHABOT: We appreciate (ph) (inaudible) -- there's a lot of us up here...

STRZOK: ...criticism of the FBI for the FBI doing nothing but doing it's job.

CHABOT: There's a lot of us up here that don't like Congress particularly, too, so I would (ph) (inaudible)...

STRZOK: (inaudible)

CHABOT: ...a lot of the American people, the vast majority would agree with you on that. Mr. Strzok, you were removed from the Mueller investigation, correct?

STRZOK: Yes.

CHABOT: But for the most part, all the others that were there are still there, correct?

STRZOK: I can't speak to the current staffing and personnel of the special counsel.

CHABOT: Well, let me -- let me tell you who they are. Greg Andres, who gave $1,000 to the Democrat running to hold the Senate seat previously held by Barack Obama, and $2,600 to Democrat Senator Gillibrand and zero to the Trump campaign. He's still there.

And Rush Atkinson, who donated to the Clinton campaign and zero to the Trump campaign, he's still there. And Kyle Freeny (ph), who contributed to both the Obama presidential campaigns and to Hillary Clinton's campaign and zero to the Trump campaign, still there. And Andrew Goldstein, who donated $3,300 to both Obama campaigns and zero to the Trump campaign, still there.

And Elizabeth Prelogar -- who, by the way clerked, for liberal Supreme Court Justice's Ruth Bader Grinsburg and Elena Kagan and contributed to both the Obama and Clinton campaigns and zero to the Trump campaign, still there. And James Quarles, who contributed to the democratic presidential campaigns of Dukakis and Gore and Kerry and Obama and Hillary Clinton. Now, he did contribute to former Congressmen Chaffetz and Allen, but he contributed $20,000 to the democratic and senate campaign committees and zero to the Trump campaigns.

I could go on, but I'm just about to run out of time. Suffice it to say that nine of the 16 investigators still on the case gave to Hillary Clinton or Barack Obama or to both, and none gave to Trump. Now shouldn't such a wide disparity in political support of one party over the other give the American people concern that even though you are off the Mueller team, that the fairness and lack of bias that President Trump deserves and the American people deserve just might be lacking here?

GOWDY: The gentleman's out of time, but the witness may answer the

question.

STRZOK: Thank you, Mr. Chairman. Sir, what I'd tell you is this, and what I'd ask you to tell your constituents is this: I have and had no idea what contributions were made by anybody staffing the special counsel's office. What I can tell you, and what I'd ask you to relay to your constituents, is the men and women that I saw, the attorneys, the agents, the analysts, were the most remarkable, bright, patriotic, hardworking people that I've ever had the honor of working with.

I want you to know, and whether people leave here believing me or not, I was absolutely and remain absolutely convinced that the efforts and the personnel who make up the office of the special counsel are the best in America, and I have complete faith and confidence that they will arrive at the truth and that they will do that well.

GOWDY: The gentleman from Ohio yields back, and the gentleman from Tennessee is recognized.

COHEN: Thank you, Mr. Chair. And Mr. Strzok (ph), I don't know where to start. If I could give a Purple Heart, I would. You deserve one. This has been an attack on you in a way to attack Mr. Mueller and the investigation that is to get at Russia collusion involved in our election, which is what this committee should be looking at. A direct strike at democracy and what this country's about and free and fair elections, keeping us independent of who is our foe, not our -- our -- you know, our competitor, our foe.

I just returned from the OSCE in Berlin, and there is little question among our allies and people and diplomats throughout Europe that Russia is an antagonistic country that is trying to wreak havoc in the Baltics, in the Balkans as well, they tried to -- use assassination to try to influence the elections in Montenegro, what they've done in Ukraine with Crimea and the Donbass, what they've done in Georgia, what they've done in Moldova -- they are the bad guys.

And you've dedicated your -- most of your life to working in counterintelligence. And one of your big cases, I think, was Donald Heathfield and Tracey Ann Foley, is that correct?

STRZOK: Yes, sir.

COHEN: And that was -- you -- how many Russian folks did you expose and bring to justice?

STRZOK: That was a -- that was a long, large investigation that a tremendous number of extraordinary people worked on. That -- there were ultimately, I believe, 10, roughly, Russian illegals that were here, but that -- I started out in the early days and was honored to start out, and again, that -- that ran a decade.

COHEN: And how many Russians were -- were -- were deported for that?

STRZOK: Sir, I -- if memory serves, 10 or 11, but I -- I'm not certain on that number.

COHEN: A pretty good case that you worked on. A good job.

STRZOK: Yes, a great case (ph).

COHEN: Did you work on Russia primarily when you were at the FBI in that area?

STRZOK: At that period early on, yes.

COHEN: Are there some things you can tell us about the Russians that maybe we should know before the president meets with Mr. Putin, his very good friend and man he can not say anything bad about?

STRZOK: Well, sir, I-- I can speak to my experience as a -- as a national security professional in the FBI. The Russians are a top-rate adversary in terms of their foreign intelligence service, in terms of how competently they are able to use their intelligence service to achieve their foreign policy and national security goals, many of which you referenced.

Their desire, their -- the threat from (ph) NATO, trying to undermine the Western Alliance, trying to minimize the role and influence and leadership of the United States around the world, attempting to minimize and undermine the extraordinary greatness of our democracy, to make it seem pedestrian and nothing special and on par with their kleptocracy and near-dictatorship that they have, to somehow make us seem less.

But that's my intelligence perspective. I wouldn't presume to get into a foreign policy...

COHEN: They engage occasionally in assassination...

STRZOK: They do.

COHEN: ...of political rivals?

STRZOK: Yes.

COHEN: And arrest of journalists for -- for maybe talking and writing about things that the state doesn't believe in?

STRZOK: Yes.

COHEN: It's not America.

STRZOK: Not at all.

COHEN: Well, that's unfortunately what the Mueller investigation is looking into, is Russian collusion to influence our election and to influence our politics. And you have dedicated your life to working against that type of involvement and against that type of effort to subvert our democracy, and to undermine it. I thank you for that. It's astonishing to me that you would be put on trial as you have today.

The beginning of this discussion, this committee meeting, somebody said we don't want young people to look at the front pages constantly

and see things about the FBI that's putting the FBI and the Justice
Department and questions and -- on the front page.

Well, I would submit to this committee that the people who are
putting that on the front page is this committee, and the people who
won't accept what the Investigator General said, that there was no bias
involved in the actions of you or others that were investigating, there
was -- found no evidence that the conclusions by the prosecutors were
effected by bias or other improper considerations, rather we determined
they based on the prosecutor's assessment of the facts, the law and
past department practice.

With that as a fat, there's no reason for this hearing, no reason
at all. But it puts it on the front page again and again and again, and
as you earlier, the Russians are loving it, because this is what they
want.

This is what they want. You'd think it was Benghazi. It was a
never ending television show from Congress that got nowhere, except
tried to influence the people that watched Fox News.

And that's what this is about, and this is really unfortunate, and
as they say to put lipstick on a pig, but this is nothing but a ruse to
try to get to the Mueller investigation and make people think it's
baseless, that it's biased, that it's 13 Democrats that are working on
this and their prejudiced and their discriminatory and their biased
because they -- just as Jack Nicholson said in the movie "A Few Good
Men", you can't handle truth.

And the truth is this is the most corrupt administration ever and
it's going to be exposed by Robert Mueller, thank god. I yield back and
I thank you.

GOODLATTE: The gentleman from Tennessee yields back. The gentleman
from Ohio is recognized, Mr. Jordan.

JORDAN: Thank you -- thank you, Chairman. Agent Strzok, did you
provide any information to reporters, journalists or media
personalities about anything related to Trump Russia investigation in
2016, '17 or '18?

STRZOK: No.

JORDAN: Did the press ever talk to you, Agent Strzok, about this
issue, did they ever come to you?

STRZOK: This -- the Trump Russia collusion investigation? No, sir.

JORDAN: Did the press ever come to you to -- I'm asking first did
you talk to them, I'm asking now did they ever come to you about
anything related to Trump Russia investigation in 2016, 2017 or 2018?

STRZOK: I received a number of calls from various members of the
media, particularly when I returned from the Office of Special Council,
in every instance --

(CROSSTALK)

JORDAN: Prior to going on the Special Council team, did you get any inquiries from the press that you took?

STRZOK: Not that I took, I referred them to the Office of Public Affairs at he FBI.

JORDAN: Have you read the dossier?

STRZOK: Yes.

JORDAN: OK, and you wrote about it too, didn't you?

STRZOK: I don't know what you mean by writing about it.

JORDAN: We got a -- we got an e-mail that you sent, it should be presented there or should be in front of you there. I want you to take a look at this. This is an e-mail you wrote to Lisa Page, Bill Priestap, Jim Baker, Jim Rybicki and CCd Andy McCabe.

Subject line is Buzzfeed's about to publish the dossier. Are you familiar with this e-mail?

STRZOK: I am.

JORDAN: All right. Says this, comparing now the set is only identical to what McCain had, parenthesis it has differences from what was given to us by Corn and Simpson. Did you write all that?

STRZOK: Congressman, I -- let me answer it this way. First, if I could address the chairman, over the break I was authorized by the general council --

JORDAN: Hang on -- hang on a second, I just want my time stopped if you could. Are you addressing me or the chairman --

(CROSSTALK)

STRZOK: I'd like to address --

(CROSSTALK)

-- this is all going to come together in -- in an answer.

GOODLATTE: Is there a course (ph) that you want to direct (ph)?

STRZOK: No it's something -- I wanted to answer question from earlier based on something I've been told by the FBI.

GOODLATTE: I think I'm aware of what the FBI told you, and you and I will have another chance to talk about that. But right now, the gentleman from Ohio controls the time.

JORDAN: You wrote this. That was the question.

STRZOK: So obviously --

JORDAN: Wait, wait, wait look at the --

(CROSSTALK)

STRZOK: -- Congressman, here's -- here's -- here's my --

(CROSSTALK)

JORDAN: Do you see the from line, you see the from line?

STRZOK: Congressman, I do. And I understand this --

JORDAN: It says Peter Strzok, and then it says to Lisa Page and a whole bunch of other key people at the FBI, so did you write it?

STRZOK: I did write this.

JORDAN: All right, let me ask you a couple questions about it. It has differences from what was given to us by Corn and Simpson. Who's Corn?

STRZOK: Sir, to answer that question, and I would love to answer that question, and every part of you and you know why I'd want to answer that question because you have this information.

JORDAN: Who's Simpson?

STRZOK: I have been -- sir, if I may. I cannot answer that question based on the --

JORDAN: You wrote about it, it's now -- it's now public. Who's Corn, who's Simspon?

STRZOK: Based on direction by the FBI, sir, I am not able to answer questions about ongoing investigative matters.

JORDAN: I just want to figure this out, I want to figure this out Agent Strzok. You're -- you're referencing three copies of the dossier. The Buzzfeed copy you have, the one John McCain's staff gave to you, and the one that you said you got from Corn and Simpson.

The one McCain gave to you and the one Buzzfeed has are identical in your words, but they have -- the Corn and Simpson one is different. It's kind of important.

STRZOK: Sir, here's -- here's -- it is important, and I want to answer your question. And here's the position that I'm in, Congressman. I have been directed --

(CROSSTALK)

Can I answer your question?

(UNKNOWN): Mr. Chairman, may the witness be permitted --

(UNKNOWN): Mr. Chairman --

(CROSSTALK)

-- Mr. Jordan repeatedly asked the question, doesn't let him
answer it.

GOODLATTE: The gentleman from Ohio controls the time.

STRZOK: I have been directed that I may state that I have read the
dossier, that I read the dossier as it came in in parts and pieces to
the FBI.

JORDAN: You've already told me who read it.

(CROSSTALK)

I want to know who Corn and Simpson are.

STRZOK: And sir, what I am telling you is that I have been
directed I may not state the various places where the FBI received that
information.

(CROSSTALK)

JORDAN: I know what you're saying, I know what you're saying. Did
you ever communicate with David Corn?

STRZOK: No.

JORDAN: Did you ever communicate with Glenn Simpson?

STRZOK: No.

JORDAN: Did you every communicate with Nellie Ohr?

STRZOK: No.

JORDAN: Did you ever communicate with Bruce Ohr?

STRZOK: Yes.

JORDAN: When did you communicate with Bruce Ohr?

STRZOK: My recollection is somewhere between three -- possibly
three or four or five times in the late 2016 early 2017 timeframe.

JORDAN: What'd you talk about?

STRZOK: We talked about investigative matters that Mr. Ohr was
involved in.

JORDAN: Did you talk about the investigation we're focused on
here, Agent Strzok?

STRZOK: My direction from the FBI is that I may answer that
question, sir.

JORDAN: I got it, I got it, I got it. Let's go back to the e-mail

that you sent that you won't talk about. Are there three copies of the dossier as evidence by what you said in this e-mail?

STRZOK: Sir, to be clear, I want to talk about this e-mail, I want nothing more than to answer your question --

(CROSSTALK)

JORDAN: Are there three copies?

STRZOK: Three copies of what?

JORDAN: The McCain copy, the Buzzfeed copy and the one that you got from Corn and Simpson?

STRZOK: Sir, the most I can say is we received a variety of copies of and different types of --

(CROSSTALK)

JORDAN: Let me ask you one other question. Glenn Simpson testified in front of the Senate Judiciary Committee on August 22nd 2017. He was asked did anyone from Fusion ever communicate with the FBI.

His response, no, no one from Fusion ever spoke with the FBI. So here's what I'm having trouble understanding. If Glenn Simpson says no one ever spoke with the FBI, how is it that you got a copy of the dossier from Simpson?

STRZOK: Sir, I can tell you I never had contact with Fusion, with Mr. Simpson, with MR. Corn. I -- and again, sir --

(UNKNOWN): Chairman, regular order.

GOODLATTE: The gentleman will have a few more seconds since he was interrupted.

JORDAN: Well I mean -- this is the frustration that every single member of this committee feels is -- when -- when Agent Strzok won't answer -- well more importantly, the American people feel when Agent Strzok won't answer fundamental questions like the guy he references in an e-mail, Corn and Simpson, and won't tell me who they are, this is unbelievable.

But that's where it's gotten to now and it's -- it's as frustrating as it can get. Mr. Chairman, I yield back.

STRZOK: Mr. Chairman, may I respond?

GOODLATTE: Briefly.

STRZOK: Sir, it is as frustrating to me as it is to you. I can tell you, sir, I would love --

(CROSSTALK)

(UNKNOWN): Mr. Chairman, may the witness be permitted to answer?

(CROSSTALK)

GOODLATTE: The gentleman will suspend --

JORDAN: If it's so frustrating, answer the question.

(UNKNOWN): If you'll allow him to, I'm sure he will.

JORDAN: He has never answered the question...

(UNKNOWN): Then stop interrupting him.

GOODLATTE: We're about...

(UNKNOWN): The gentleman...

(CROSSTALK)

(UNKNOWN): ... instruct the gentleman from Ohio to stop badgering ...

(CROSSTALK)

(UNKNOWN): ... the question.

GOODLATTE: ... we're about -- we're about to move on. The gentleman from Ohio's time has expired. We're about to move on where Mr. Strzok can answer a question that he refused to answer earlier on advice of counsel and I'm going to yield to Mr. Gowdy for the purpose of doing that right now.

STRZOK: ... sir, Mr. Chairman, before Mister Gowdy starts, may I respond to Mr. Jordan?

GOODLATTE: Very briefly.

STRZOK: Very briefly, sir, I would love to do that. There is an appropriate time for oversight and as you well know, that is at the end of an investigation, once it is concluded. I am certain Congress will absolutely have the opportunity to look at any investigation once it's closed, ask all these questions and I would love to answer each and every one of your questions...

GOODLATTE: Mr. Strzok...

STRZOK: ...once the FBI allows...

(CROSSTALK)

GOODLATTE: ...already know that answer from you and you have already been advised that you can answer the questions here because guess what, this is the United States Congress where you're testifying, not under the jurisdiction of the Federal Bureau of investigation.

(UNKNOWN): Mr. Chairman, we should not -- we cannot be asking about an ongoing investigation that is sabotaging ongoing investigation

by this committee and that's what he's not cooperating with and we should not do it.

GOODLATTE: It is not...

(CROSSTALK)

GOODLATTE: These questions are table setting questions regarding the formation of -- of this and he can answer those questions.

(UNKNOWN): He cannot answer questions regarding an ongoing investigation.

GOODLATTE: He's been advised by the FBI that he can and so Mr. Gowdy...

(UNKNOWN): He is advised by the FBI that he cannot.

GOODLATTE: No, he's been advised that he can and Mr. Gowdy is going to again, ask his question.

GOWDY: The gentleman from Ohio has asked for 15 seconds.

JORDAN: So Agent Strzok, who's being square here? Glenn Simpson says no one from Fusion spoke with the FBI; you say in your e-mail, we've got a copy of the dossier from Simpson.

(UNKNOWN): Mr. Chairman, regular order.

GOODLATTE: We will have regular order will revisit that question. Now, the chair recognizes the gentleman from South Carolina.

GOWDY: Agent Strzok, between July 31, 2016 and August 6 ...

(UNKNOWN): Mr. Chairman, regular order.

GOODLATTE: This is regular order. The gentleman refused to answer the question earlier. He has now been advised and I have been advised by the FBI that he may answer the question that was in order earlier, and he's now going to answer the question.

(UNKNOWN): But Mr. Chairman, Republicans have controlled the time, now the time goes to the Democrats.

GOODLATTE: The gentleman will be recognized shortly.

GOWDY: Agent Strzok, between July 31, 2016 and August 6, 2016, how many witness interviews did you conduct as part of the Russia-Trump campaign alleged collusion investigation?

STRZOK: I don't recall and I'd have to check the case file.

GOWDY: We waited all on time for that answer?

STRZOK: Yes, sir.

GOWDY: That's eerily similar to what you said a couple hours ago.

STRZOK: Sir, I am telling you and I would reject the characterization that I refused to answer anything. I want to answer these questions...

(CROSSTALK)

GOWDY: ... I just asked you one and I'm looking for a number.

STRZOK: Sir, my answer is...

GOWDY: ... I'm looking for a number.

STRZOK: I do not know without the opportunity to check the case file.

GOWDY: You don't recall in the first week of an investigation that you originated, approved with a contact person on, you don't recall how many witness interviews you did in the first week?

STRZOK: Sir, I remember that there were interviews conducted; I do not know when they fell on a calendar to be able to tell you whether they were...

GOWDY: When the last...

(CROSSTALK)

STRZOK: ...or the other on something that was occurring in the context of a myriad other responsibilities.

GOWDY: When's the last time you looked at the file, Agent Strzok?

STRZOK: Probably going on a year.

GOWDY: For those of us who happened to look at it yesterday, would you disagree that the first interview took place on August 11?

STRZOK: I don't know, congressman. I cannot answer that.

GOWDY: Well, prior to July 31, 2016, how many witness interviews did you conduct as part of the Russia-Trump campaign alleged collusion investigation?

STRZOK: None.

GOWDY: So none before July 31, which would be none at the time you said what you said in that text on July 21.

STRZOK: I don't understand the text you're referring to.

(UNKNOWN): Point of order, Mr. Chairman, this is on our time.

GOODLATTE: ... are you done?

GOWDY: What, no, there are two more questions he wouldn't -- he wouldn't answer.

GOODLATTE: The gentleman will continue.

GOWDY: Between May 17...

(UNKNOWN): Would you explain why he can continue on our time?

GOODLATTE: He can -- he's not on your time.

(UNKNOWN): Not mine personally, Democratic time.

GOODLATTE: He's on our time because he was advised earlier by the FBI that he could not answer the questions and now he's advised that he can. So the questions will be asked and answered.

GOWDY: Between May 7...

(UNKNOWN): Parliamentary inquiry, what rules are we following that would dictate such an answer by you, Mr. Chairman?

GOODLATTE: We are following the rules of the committee.

(UNKNOWN): Could you cite the rule?

(CROSSTALK)

(UNKNOWN): No.

GOODLATTE: Gentleman will ...

(CROSSTALK)

(UNKNOWN): ... Mr. Chairman.

(CROSSTALK)

(UNKNOWN): ... be ...

(CROSSTALK)

GOODLATTE: ... the democrats' obstruction of this hearing ...

(UNKNOWN): ... Point of Parliamentary inquiry.

GOODLATTE: ...can continue, but when you do, and the FBI tells him he can't answer a question and they change their mind and says he can, we're going to take the time out to do that and then we're going to continue.

(UNKNOWN): Mr. Chairman, Point of Parliamentary inquiry.

(CROSSTALK)

(UNKNOWN): ... the democratic members of this committee (ph) have a right to know what the rules are in governing this hearing ...

GOODLATTE: ... the gentleman from South Carolina is recognized.

(CROSSTALK)

GOODLATTE: ... the gentleman, the gentleman is not in order.

(UNKNOWN): ... are you making it up as you go along?

GOWDY: Agent Strzok, between May 17, 2017 and May 18, 2017, how many interviews did you conduct as part of special counsel team?

STRZOK: I don't believe I conducted any.

GOWDY: Between May 17, 2017 and May 22, 2017, how many witness interviews did you conduct in that five day period?

STRZOK: Well, sir, you just went back a back a year from 2018 to 2017, and I don't know...

GOWDY: May 2017 -- May 17, 2017 and May 22, 2017.

STRZOK: Yes, I believe you may have said '18, but '17, I don't know.

GOWDY: Whether I did or not, it's the 17, 2017.

STRZOK: Fair enough and I don't recall.

GOWDY: Well, chairman, I appreciate you letting me make that clear and -- and again the contacts when you would not answer it was you used the word, impeachment, on May the 18, 2017, and you used the word, impeachment, on May 22, 2017. And your testimony is, you can't recall a single interview you would have gone as part of that investigation that was supposed to lead to impeachment. I think that line of questioning, I'm glad the FBI finally realized it, albeit a couple hours too late, when you are prejudging not just a result, but a punishment which is what impeachment is, when you are prejudging the conviction and the sentencing when you have not conducted a single solitary interview, I'm sorry, Agent Strzok, but that is letting your bias impact your professional judgment.

STRZOK: Mr. Chairman, may I respond?

GOODLATTE: Briefly.

STRZOK: Sir, so look, I never prejudged anything, not in this case, not in any others. And second...

GOWDY: Impeachment for what, Agent Strzok? Impeachment for what?

STRZOK: Second of all..

(CROSSTALK)

(UNKNOWN): ... Mr. Chairman, what are the rules here?

(CROSSTALK)

(UNKNOWN): ... Mr. Chairman, what are the rules?

GOODLATTE: The gentleman -- the gentleman will allow the witness to answer the question ...

(CROSSTALK)

GOODLATTE: ... and then we'll move on.

STRZOK: Second...

(OFF-MIC)

(UNKNOWN): He was given time to respond.

STRZOK: ... the notion -- at the time I was a deputy assistant director. I have section chiefs, unit chiefs in the field, supervisors, agents, people who typically do interviews -- not me. If something is notable or high-level, I might be involved, but it would be rare if never that I would typically get out there and conduct interviews, first of all.

Second, you mentioned the use of the word, impeachment, that was used in the context of my not knowing what this would lead to. I was not prejudging impeachment; when I used that term, it was saying ...

GOWDY: ... oh, Agent Strzok, please ...

STRZOK: ... it might lead all the way (ph) to something (ph)...

GOODLATTE: Thank you...

STRZOK: ... than (ph) the other.

GOODLATTE: ... Thank you, Agent Strzok.

GOWDY: Agent Strzok, are you kidding?

GOODLATTE: The chair now recognizes the gentleman from Missouri, Mr. Clay...

CLAY: Thank you...

GOODLATTE: ... for five minutes.

CLAY: ... Mr. Chairman. And, Special Agent Strzok, I just continue to be amazed that my colleagues in the majority are more interested in your text messages than they are about the leader of the free world doing everything possible to undermine the Western alliance.

It just amazes me, Special Agent Strzok, as a counterintelligence specialist you know all too well the pervasive, constant and growing danger that the Russian Federation poses to this country, our allies and to democracy in general. It is appalling that my colleagues in the majority continue to re-litigate the 2016 election, while the president does more damage in the western -- to the Western alliance than the sum total of all previous Russian and Soviet leaders could have dreamed of.

And it is remarkable that Mr. Trump accused our trusted ally Germany of being, and I quote, totally under the control of Russia. I would say that the president is half-right. Someone is totally under control of Russia but it's not Germany.

You know, the president should look in the mirror and explain why virtually every decision he makes and every word he utters weakens our key friends, erodes our strategic alliances and strengthens our most dangerous adversary. Mr. Strzok, can you offer an explanation as to why the president is so eager to punish our allies and please Vladimir Putin?

STRZOK: Sir, I -- I wouldn't presume to do that. No.

CLAY: All right. Let's -- let me move on to the meeting of July -- June the 9th, 2016 in Trump Tower. We have a series of e-mails in front of us, one from Rob Goldstone who told Donald Trump Jr. that, "The crown prosecutor of Russia met with Aras Agalarov this morning and in their meeting offered to provide the Trump campaign with some official documents and information that would incriminate Hillary in her dealings and be very useful to your father."

And he says, "This is obviously very high level and sensitive information but is part of Russia and its government's support for Mr. Trump." Mr. Strzok, without commenting specifically on these e-mails or this instance, can you explain generally from a counterintelligence perspective why it would be concerning that high level campaign aides would be meeting with a representative from a hostile foreign government? What would be those -- the risks?

STRZOK: Well, I -- again, not -- not relating it to any particular event, I -- I think the hypothetical would be enormously concerning because a hostile foreign power, one, by definition, that hostility is their national interests are adverse to ours. The -- the fact that people would be meeting or attempting to work together implicates a variety of potential criminal violations.

I think it would give concern about the -- the motivations and the actions of the people involved. And whether or not -- whose interests, whether America's or that hostile foreign power's, they were truly working towards.

CLAY: And when campaigns are given defensive counterintelligence briefings, are they generally instructed to report foreign interference attempts to the FBI?

STRZOK: That is typically part of a C.I. defensive briefing, yes.

CLAY: I want to thank you so much for your responses and your patience. And, you know, today's hearing is a sorry display on the part of my Republican colleagues, who have put the defense of the president over the ultimate responsibility we in Congress have to protect our national security.

All of you should be ashamed of yourself. And, Mr. Chairman, I yield back.

GOODLATTE: The chair recognizes the gentleman from Iowa, Mr. King, for five minutes.

KING: Thank you, Mr. Chairman. To start this off, I'd like to yield to the gentleman from South Carolina for a brief presentation.

GOWDY: I thank the gentleman from Iowa. Agent Strzok, to you have your texts in front of you?

STRZOK: I do not.

GOWDY: Can you -- well, let me read one to you. And you tell me whether or not you recall saying this. On May the 18th, 2017, who gives a -- I'll give you a hint, it starts with f -- one more person's (ph) under (ph) investigation leading to -- guess what that last word is.

CLAY?: Sorry.

STRZOK: Sir, I recall the text. It's impeachment.

GOWDY: Impeachment. The day after Mueller was appointed. How about on May the 22nd? Do you remember that text? Do you have that one in front of you?

STRZOK: I do not.

GOWDY: Well, let me see if this refreshes your recollection. This is you in response to something Lisa Page sent you, "I'm torn. I think, know, I'm more replaceable than you are in this. I'm the best for it, but there are others who can do it. OK, you're different and more unique. This is yours. Plus, leaving an S.C., having been an S.C., resulting in an ..." guess what that next word is.

STRZOK: I'm sure you've got it, sir.

GOWDY: No, well you wrote it.

STRZOK: Are you asking me what (inaudible)...

GOWDY: Yes. What is it?

STRZOK: ... you're asking me to guess?

GOWDY: What do you think it is?

STRZOK: I don't need to guess (ph), impeachment, sir.

GOWDY: Impeachment. Five days. Five days after Mueller has been appointed special counsel and you're already talking about impeachment, twice. I thank the gentleman from Iowa.

KING: Thank you ...

STRZOK: Mr. Chairman, may I respond, please?

KING: ... I'm reclaiming my time. The gentleman is -- on (ph)...

GOODLATTE: At the conclusion of Mr. King's time, you may (inaudible)...

KING: Mr. Strzok, I'm over here now, to your -- to your left. And I wanted to point out that you've repeatedly stated here before this committee that you separated out your personal beliefs from any action that you took. You'd agree with that, I'm confident.

And as implausible as that sounds to us, we've listened to a dogmatic defense of the implausible argument that no matter how biased you were, no matter how profane in that bias you were, it didn't affect your judgment or your decisions. Now, that's a tough argument to make, but I recall your response to Mr. Duncan of Tennessee on that topic and you said, "I don't agree with the characterization of my views as biased." Do you hold with that position that your views are not biased ...

STRZOK: Yes.

KING: ... whether or not they -- it colored your activities as an agent?

STRZOK: I believe they did not color them and I believe they are not bias.

KING: The -- the derogatory texts that you delivered, that have been before this committee for the better part of this day, don't reflect a bias?

STRZOK: They don't, sir; and why? Because not a...

KING: So (ph)...

STRZOK: ... single representative or the I.G. has been able to demonstrate a single act...

(CROSSTALK)

KING: You've gone to a level...

(CROSSTALK)

STRZOK: ... not one...

(CROSSTALK)

STRZOK: ... not one...

KING: Reclaiming my time, Mr. Strzok.

STRZOK: ... a lot of text there, but not one act.

KING: It's one thing to say that you found a way to wall off your bias, but it's not possible to take under oath and tell the American people in this committee that there is not bias.

STRZOK: Sir...

KING: There is never ever -- there is -- the evidence of this bias
is replete throughout this -- throughout this documents that we have.
Let me take you another place. Were you -- were you involved in the
questioning of Hillary Clinton on July 2nd, 2016?

STRZOK: Yes, I was.

KING: And...

(CROSSTALK)

STRZOK: ... because I think if the 2nd or 3rd, but if you
represent it's the 2nd, it's the 2nd.

KING: 2nd is the date that I believe we worked with. But in any
case, in that room, how many agents were in that room?

STRZOK: Three, including myself.

KING: And were there any other representatives of the executive
branch of government?

STRZOK: There were.

KING: And who were they?

STRZOK: Five attorneys from the Department of Justice.

KING: Five?

STRZOK: Yes, sir.

KING: Five attorneys from the Department of Justice and four then
from the FBI...?

STRZOK: No, sir.

KING: ... including yourself?

STRZOK: No, sir. A total of eight people...

(CROSSTALK)

KING: Five from the FBI, five DOJ.

(CROSSTALK)

STRZOK: (Inaudible). Yes.

KING: And then the people in the room with Hillary Clinton were
Cheryl Mills, Heather Samuelson.

(CROSSTALK)

STRZOK: Secretary Clinton -- one, two, three, I believe four other

attorneys. Four or five, sir.

KING: I see. And did you -- did you record any of that interview? And can you tell me how long that took?

STRZOK: I -- we did not record it. My recollection is that it took several hours. I don't recall the exact time.

KING: And then what documents would you have that memorialize the interview?

STRZOK: An FD-302 is created based on the notes taken by the participants in the interview.

KING: And how many of those eight agents or officers were -- had their notes -- that took notes in that room?

STRZOK: I don't know. I know the two I did, I believe some, and I know the two agents did. I don't recall about the DOJ attorneys.

KING: I want to ask you to reconstruct. Who were those agents?

STRZOK: They were two of the case agents assigned to the Clinton investigation.

KING: And what are their names?

STRZOK: Sir, FBI policy...

(CROSSTALK)

KING: I expected that answer. But I want to let you know we must know who was in that room. And we must have access to those notes because that's what they use to compile the 302 report. Did you brief Director Comey on that 302 report?

STRZOK: Well, two things. Going back to 302, it is relied on notes, but it's also drafted based on the memories of the agents participating in it. So...

KING: Notes and memory.

STRZOK: ... notes are not complete (ph), but yes. My recollection is I did brief Director Comey on the results of that interview.

KING: And we will be asking for the specifics on that data that you are knowledgeable of. And I'd ask the Chairman if you would be willing to issue a subpoena for the text that Mr. Strzok testifies as are not work-related. I believe there is a very good chance they are work-related.

And the balance of this for the information on who was in the room on that date when Hillary Clinton was interviewed, which officers from the FBI, which officers from the DOJ. And let's call them to this Congress and get their testimony on what took place inside that room, Mr. Chairman.

GOODLATTE: We will take your request and advice. And the time of
the gentleman has expired. I told Mr. Strzok you could briefly respond
to Mr. Gowdy's.

STRZOK: Sir, yes, thank you. And If I may, just briefly to Mr.
King, sir, right? First, I am asserting to you that my personal belief
does not -- did not constitute bias. Every American has political
belief. Every single one. And I would submit to you that the vast vast
majority of those people are not biased individuals. So that is a
comment I'd like to make to you.

KING: By your testimony, I'm free from that allegation for myself
for life, Mr. Strzok.

STRZOK: Mr. Chairman, if I can respond to you, my mentions of the
word "impeachment," if you look at the selective text that you've
chosen and you expand that, look to others, you will see that in no way
did I prejudge that outcome. In fact, what you've conspicuously
admitted, omitted rather, is a statement I made by expressing concern
that I'm not sure there is a big there (ph) there.

What that clearly demonstrates, sir, is I had prejudged nothing.
What it clearly demonstrates was I was looking at one potential
outcome, being impeachment, I was simultaneously looking at the polar
opposite outcome that there might be nothing, that there might be no
criminal activity whatsoever. And I think it's fair that you take text
in the totality of the context in which they are made.

GOODLATTE: The Chair recognizes the gentleman from Georgia, Mr.
Johnson, for five minutes.

JOHNSON: Thank you, Mr. Chairman. Mr. Strzok, you were -- or you
are a special agent for the FBI. How long?

STRZOK: Going on 22 years, sir.

JOHNSON: And you pretty much spent your...

STRZOK: Actually that's -- just over 20, sir.

JOHNSON: You pretty much spent your professional career at the
FBI. Is that correct?

STRZOK: That's correct.

JOHNSON: And the Republicans on this committee seem to be obsessed
with your text messages, but during your long career with the FBI,
you've accomplished quite a bit more than simply leaving a text message
trail. Is that correct?

STRZOK: I've had the privilege of working on extraordinary number
of very great cases.

JOHNSON: You rose to the ranks at FBI to, at one point, become
Chief of the counterespionage section at the FBI. Is that correct?

STRZOK: Yes.

JOHNSON: And your career at the FBI culminated with your appointment as the Deputy Assistant Director of the Counterintelligence Division. Is that correct?

STRZOK: Well, certainly held that. I would tell I'm extraordinarily proud to have worked as a DAD in the Human Resources Division as well.

JOHNSON: And during your career in counterespionage the FBI, did you lead account to intelligence operation that was called Operation Ghost Stories?

STRZOK: I did not lead it. I was one of the many agents who started that investigation. And a pair of the subjects early on that I was one of the case agents on.

JOHNSON: You worked on it throughout the course of that 10-year investigation?

STRZOK: No, just at the beginning seven (ph) years, sir.

JOHNSON: I see. But you worked on many other counterintelligence investigations during your career at the FBI.

STRZOK: Yes, sir, that's correct.

JOHNSON: Now, Operation Ghost Stories was a multi-year counterintelligence investigation of a network of United States based Russian spies working as covert agents of Russian intelligence. The agency known as SVR (ph). Isn't that correct?

STRZOK: That's correct.

JOHNSON: And the target of that investigation was a group of covert SVR (ph) agents who had assumed false identities and were living in the United States on long-term deep-cover assignments, correct?

STRZOK: That's correct.

JOHNSON: You've investigated a number of those kinds of counterintelligence -- you've presided over a number of those types of investigations during your time with the FBI. Is that correct?

STRZOK: I have, yes.

JOHNSON: And these Russian agents have infiltrated America set up to be undercover and then develop sources that they can use then to develop information and then funnel that information back to Russia. Isn't that correct?

STRZOK: Yes, route that information from the United States and other denied areas from within our government.

JOHNSON: And as soon as you find one cell, if you will, of Russian spies, take them down, there are also other cells working throughout America. Isn't that correct?

STRZOK: That's generally (ph) correct.

JOHNSON: And it was your job to keep on top of that kind of activity.

STRZOK: Yes.

JOHNSON: You led a team of FBI agents who did nothing other than counterintelligence investigations for the FBI. Is that correct?

STRZOK: Yes.

JOHNSON: And you were successful in arresting and prosecuting numerous individuals for espionage and other crimes against the United States of America. Isn't that correct?

STRZOK: Me as part of a large number of very competent and talented folks, yes.

JOHNSON: And sir, you've gained a great deal of intelligence about Russian spying activities, their methods and sources as they operate in the United States and in other allied nations. Isn't that correct?

STRZOK: Certainly true in the United States and to a lesser extent, overseas.

JOHNSON: And you've used your skills to keep America safe.

STRZOK: I have, sir. It's my proud -- my proud duty to have done so.

JOHNSON: There's a lot more to your career than a few e-mails, isn't that correct, and text messages?

STRZOK: Absolutely, sir.

JOHNSON: So to boil it down to that is really a disservice to you, I think, as opposed to the Republicans here being so desperate to find a way to discredit the Mueller investigation by discrediting you as a person. I think rather than they doing that, we should be honoring you for the work that you have done over the last 22 years to keep this nation safe.

And this hearing is a reckless abuse and misuse of Congressional authority. I'm looking forward to Republicans finishing the hell up with this damn Peter Strzok text message investigation. And with that, I'll yield back.

GOODLATTE: The Chair recognizes the gentleman from Texas, Mr. Gohmert, for five minutes.

GOHMERT: I'd be right here, Mr. Strzok. You said earlier in this hearing you were concerned about a hostile foreign power affecting our election. Do you recall the Intelligence Community Inspector General Chuck McCullough having an investigation into an anomaly found on Hillary Clinton's e-mails?

STRZOK: I do not.

GOHMERT: Let me refresh your recollection. The Intelligence
Community Inspector General Chuck McCullough sent his investigator
Frank Rucker along with an ICIG attorney Janette McMillan to brief you
and Dean Chappell and two other FBI personnel that I won't name at this
time about an anomaly they had found on Hillary Clinton's e-mails that
were going to and from the private unauthorized server that you were
supposed to be investigating. Now do you remember it?

STRZOK: I remember meeting Mr. Rucker on either one or two
occasions. I do not remember the specific content or discussions.

(CROSSTALK)

GOHMERT: Well, I'll help with you that too then. Mr. Rucker
reported to those of you, the four of you there, in the presence of the
ICIG attorney that they had found this anomaly on Hillary Clinton's
e-mails going through our private server.

And when they had done the forensic analysis, they found that her
e-mails, every single one except for four, over 30,000 of them were
going to an address that was not on the distribution list. It was a
compartmentalized bit of information that was sending it to an
unauthorized source. Do you recall that?

STRZOK: Sir, I don't.

(CROSSTALK)

GOHMERT: Well, why don't you explain it. And you didn't say
anything...

STRZOK: No...

GOHMERT: ... you thanked him, you shook his hand. But the problem
was that it was going to an unauthorized source that was a foreign
entity unrelated to Russia. And from what you've said here, you did
nothing more than nod and shake the man's hand when you didn't seem to
be all that concerned about our national integrity of our election when
it was involving Hillary Clinton.

So the forensic examination was done by the ICIG -- and they can
(ph) document that. But you were given that information and you did
nothing with it. And one of the things I found most egregious with Mr.
Horowitz's testimony -- and by the way, Horowitz got a call four times
by someone wanting to brief him, leaving messages, telling him about
this, and he never returned the call.

He had 500 pages of bias that he gave us, and then he threw a bone
to the Democrats and said, "But we can't find bias." And let me tell
you. When you have text messages, Mr. Strzok, the way you do, saying
the things you did, you'd been better off coming in here and say,
"Look, that was my bias." And you kind of a get around to that a little
bit when you say, "Hey, everybody's got political abuse." Those are
called biases. And we all have them.

And you have come in here and said, "I had no bias." And you do it with a straight face. And I watched you in the private testimony you gave. And I told some of the other guys, "He is really good. He is lying. He knows we know he's lying. And he could probably pass a polygraph." It's...

(CROSSTALK)

CICILLINE: Mr. Chairman...

GOHMERT: No, this is my time...

CICILLINE: Mr. Chairman, I'm sorry, I (inaudible) point of order.

(CROSSTALK)

GOHMERT: ... and he needs to be paused.

CICILLINE: This -- point of order.

GOHMERT: No...

GOODLATTE: The gentleman will state his point of order.

CICILLINE: A member of this committee just asserted that this witness who was under oath and a former agent of the FBI lied. There is no evidence to that. I ask him to withdraw it.

GOHMERT: I do not withdraw it. He is not a member of Congress. It's not a violation of the rule. And just as you have been expressing bias through your members about what a...

(CROSSTALK)

CICILLINE: There is not a single person on this committee who has ever characterized a witness as lied...

(CROSSTALK)

GOODLATTE: The gentleman from Rhode Island -- the gentleman from...

(CROSSTALK)

GOHMERT: It's my time.

CICILLINE: That's a disgrace...

(CROSSTALK)

GOODLATTE: Gentleman from Rhode Island will suspend.

(CROSSTALK)

GOHMERT: ... no, the disgraced -- what this man has done...

(CROSSTALK)

GOODLATTE: The gentleman from Texas will suspend for a moment.

GOHMERT: ... there is the disgrace. And it won't be recaptured anytime soon because of the damage you've done to the justice system. And I've talked to FBI just around the country. You've embarrassed them. You've embarrassed yourself. And I can't help but wonder when I see you looking there with a little smirk, how many times did you look so innocent into your wife's eye and lied to her about Lisa Page...

(CROSSTALK)

(UNKNOWN): Mr. Chairman, this is outrageous.

GOHMERT: Credibility of a witness is always...

(CROSSTALK)

(UNKNOWN): Shame on you...

(UNKNOWN): Mr. Chairman...

(CROSSTALK)

GOHMERT: ... an issue, and you...

(UNKNOWN): Mr. Chairman, please...

(CROSSTALK)

(UNKNOWN): Have you not...

(UNKNOWN): Mr. Chairman, this is intolerable. Harassment of witness.

(UNKNOWN): What is wrong with that? You need your medication.

GOODLATTE: The gentleman controls the time.

GOHMERT: Thank you.

CICILLINE: I ask that the witness be permitted to respond...

GOODLATTE: He will be permitted...

(CROSSTALK)

CICILLINE: (inaudible).

GOODLATTE: He will be permitted to respond. The gentleman controls the time.

GOHMERT: Did you ever talk to Hillary Clinton during your investigation besides the one questioning you mentioned, before that or after that to this day?

NADLER: Point of order, Mr. Chairman. Point of order, Mr.
Chairman.

GOODLATTE: The gentleman will state his point of order.

NADLER: It is I think against the rules of the House for a member
of the committee to be impugning the character of a witness.

GOHMERT: It is not.

NADLER: He should ask questions to a list -- the purpose of this
hearing is to solicit information. HE should ask questions to solicit
information. HE should not be impugning the character of the witness.

GOODLATTE: The gentleman is advised the rules of the House only
are directed to members of the House and the President of the United
States.

NADLER: In other words, it is OK to impugn the character of
witnesses in anyway whatsoever?

GOODLATTE: Listen. I've heard many members on your side of the
aisle impugn the character of somebody who is covered by the rules of
the House, but the gentleman -- the gentleman has 20 seconds left. The
clock will be turned back on and he can complete his time. And then the
witness can respond.

GOHMERT: So have you talked to Hillary other than -- Hillary
Clinton other than the time she was examined in front of the witnesses.

STRZOK: No.

GOHMERT: So after throwing away what you have with all the bias
you have, you never even gotten a thank you.

I yield back.

GOODLATTE: The gentleman may respond.

STRZOK: Sir, well, that's quite a set of statements...

GOHMERT: Mr. Chairman...

STRZOK: ... and I'm not quite sure how to respond.

GOHMERT: ... I did not finish with a question.

GOODLATTE: The gentleman...

GOHMERT: There was no question asked...

(CROSSTALK)

(UNKNOWN): Mr. Chairman, he's been given the opportunity to
respond.

GOODLATTE: The gentleman -- the gentleman will suspend. The time

of the gentleman has expired. And as I've indicated earlier...

GOHMERT: The rules of our hearings are if there is a question asked during the time, the witness may respond to the question after the time.

GOODLATTE: The witness is -- the witness is going to be allowed to respond briefly...

GOHMERT: That's a new rule.

STRZOK: Sir, first, I assure you...

GOHMERT: No question.

STRZOK: ... under oath, as I spoke also during my interview a week or two ago, I have always told the truth. The fact that you would accuse me otherwise, the fact that you would question whether or not that was the sort of look I was engaged with in a family member who I have acknowledged hurting goes more to a discussion about your character and what you stand for and what is going inside you...

(CROSSTALK)

GOHMERT: It's to your credibility and...

(CROSSTALK)

STRZOK: ... and...

(CROSSTALK)

GOHMERT: ... you've lost your credibility.

(CROSSTALK)

GOODLATTE: ... order.

GOHMERT: ... lost your credibility. That's the problem.

STRZOK: While I doubt it (inaudible) to America...

GOODLATTE: The gentleman from Texas will...

STRZOK: ... I'm not sure...

GOODLATTE: Will -- the gentleman from Texas will suspend. The witness has had ample opportunity to express his feelings about that. And now the Chair recognizes the gentleman from Florida...

STRZOK: Mr. Chairman, there is a -- there is a discussion about the representative's first assertion about what the ICIG said that I would like to respond to.

GOODLATTE: Very briefly.

STRZOK: Very briefly. I have no recollection of that conversation.

I can tell you I am not a computer forensic expert. I can tell you that every allegation that we had -- and ICIG was a great and close partner. Every allegation that we had, whether from them or anybody else, was forwarded to experts who looked at it. The scores and scores of servers and BlackBerrys and e-mails and everything we got were combed over carefully by the FBI's experts to see if there is any indicia of...

(CROSSTALK)

GOHMERT: But you don't recall going over those e-mails, correct?

(CROSSTALK)

STRZOK: (Inaudible).

GOODLATTE: Gentleman will suspend.

STRZOK: ... I have no idea what you're talking about and frankly...

(CROSSTALK)

GOODLATTE: And the witness will suspend as well.

STRZOK: ... I do not know what you're talking about.

GOODLATTE: That is enough.

GOHMERT: You just can't let a witness...

GOODLATTE: The...

GOHMERT: ... go on forever when the fact is you never did anything...

(UNKNOWN): Mr. Chairman, order.

GOHMERT: ... about those. Correct?

GOODLATTE: Regular order.

(CROSSTALK)

(UNKNOWN): Your members are all out of order.

(UNKNOWN): ... going judiciary, OK? Judiciary (inaudible).

GOHMERT: You didn't do anything about it.

STRZOK: Sir, if there was a lead, I gave it to the team unequivocally.

GOODLATTE: The gentleman...

STRZOK: There was nothing along the lines that was not addressed.

GOODLATTE: Mr. Strzok, you will suspend.

GOHMERT: Well, that would come out...

GOODLATTE: Mr. Gohmert, you will suspend.

Mr. Deutch, I apologize I've been instructed by the Ranking Member that we're going committee to committee. So the next gentleman is going to be recognized, the gentleman from Virginia, Mr. Connolly, for five minutes.

CONNOLLY: Wow! The American public might be forgiven for mistaking this so-called hearing for a Russian political or so (ph) trial. It's got all the trappings. Character assassination, demagogy, connecting dots that aren't meant to be connected, generalizing from an isolated incident, cherry-picking facts, sometimes fabricating facts. It's astounding. It's a new low in the United States Congress. What a shame!

But Mr. Strzok, you're under oath. And my understanding is the big Republican beefed in order to discredit you and discredit the FBI and thereby hopefully, from their point of view, undermine the Mueller investigation hinges on the fact that you sent out some indiscrete personal e-mails about your political views on the then pending 2016 elections. Is that correct?

STRZOK: Sir, that's my understanding.

CONNOLLY: All right. So you're under oath. I want you to say yes or no. The following e-mail, "Character matters. Real Donald Trump is obviously not going to win, but he can still make an honorable move, step aside and let someone else try." Did you write that e-mail?

STRZOK: I don't believe I did.

CONNOLLY: No, you didn't. Republican Senate Ben Sasse wrote that e-mail. Another unforgivable sin he should be here as well apparently.

"My wife Julia and I, we have a 15-year-old daughter. Do you think I can look her in the eye and tell her that I endorsed Donald Trump when he acts like this and his apology that was no apology? That was an apology for getting caught. I can't tell the good people in my state that I endorsed a person who acts like this." Was that you, Mr. Strzok?

STRZOK: No, sir.

CONNOLLY: No, it wasn't. It was Republican Jason Chaffetz, Former Chairman of my committee.

Did you write the following? "For the good of the country and to give the Republicans a chance to defeating Hillary Clinton, Mr. Trump should step aside, as defeat at this point seems almost certain. And four years of Hillary Clinton is not what's best for this country. Mr. Trump should put the country first and do the right thing." That's you certainly, right?

CONNOLLY: No, you're right. It was Republican member of Congress, Mike Coffman from Colorado.

"In light of these comments, Donald Trump should step aside and
allow our party to replace him with Mike Pence or another appropriate
nominee. I cannot in good conscience vote for Donald Trump and I would
never vote for Hillary Clinton." That's yours?

STRZOK: No, sir.

CONNOLLY: No. That's Republican Barbara Comstock of our home state
of Virginia. All right.

Well, here's another one. "It's now clear Donald Trump is not fit
to be President of the United States and cannot defeat Hillary Clinton.
I believe he should step aside and allow Governor Pence to lead the
Republican ticket." You wrote that one?

STRZOK: No, sir.

CONNOLLY: You didn't. No, you're right. That's Republican Bradley
Byrne of Alabama.

Well, how about this one? "Donald Trump's behavior makes him
unacceptable as a candidate for President. And I won't vote for him. As
disappointed as I've been with those antics throughout this campaign, I
thought supporting the nominee was the best thing for our country and
our party. Now it's abundantly clear that the best thing for our
country and our party is for Trump to step aside and allow responsible,
respectable Republicans to lead the ticket." You wrote that one?

STRZOK: No, sir.

CONNOLLY: Oh, no. That was Republican Martha Roby of Alabama.

Well, how about this one? "I respectfully ask that you, Mr. Trump,
with all due respect step aside, step down, allow someone else to carry
the banter of principles." You wrote that one?

STRZOK: No, sir.

CONNOLLY: No, you're right again. That was Republican Senator Mike
Lee of Utah.

So it sounds like when you were writing these e-mails in the heat
of the campaign, you had a lot of good company on the Republican side
of the aisle. And now you're an orphan. I wonder what changed. But your
opinion was hardly a striking one, hardly unusual, especially where you
and I live, Northern Virginia. Is that correct?

STRZOK: Yes, sir.

CONNOLLY: So your sin of writing an e-mail, criticizing the
candidate Trump and predicting he would lose was not an isolated kind
of opinion. Is that correct?

STRZOK: No, it's not, to my knowledge.

CONNOLLY: And do you under oath confirm what the Inspector General
Mr. Horowitz said, "There's no evidence, your personal opinion

notwithstanding, in any way had tainted the ongoing criminal
investigation led by Mr. Mueller."

STRZOK: I do.

CONNOLLY: That's your testimony under oath?

STRZOK: Yes.

CONNOLLY: I thank you. And I'm so sorry for the treatment you've
received here today. As a member of Congress, as a member of the
Oversight and Government Reform Committee, I take no pleasure on
watching the spectacle.

Thank you, Mr. Strzok, for being here.

GOODLATTE: The Chair recognizes gentleman from Texas, Mr. Poe, for
five minutes.

POE: I thank the Chairman. And I take no pleasure in the self-pity
that you have shown the rest of us the entire day. I'm a former
prosecutor. I loved being a prosecutor in the District Attorney's
Office. And I spent 22 years on the criminal bench trying criminal
cases, saw about 25,000 felony cases. And I saw a lot of people in law
enforcement.

But in our entire justice system, from the beginning to the end of
the justice system, people are involved in our justice system. And
those people, whoever they are, cannot be biased one way or the other.
And it starts in a courtroom with the jury. Both lawyers spend a lot of
time, including the court, talking to jurors about whether they're
biased. Why? Because people who are bias are come across as bias,
they're out of here. You can't serve on the jury. You cannot be fair.

We don't let judges serve on cases if they have a biased. They are
recused. Many times they just recuse themselves. They recognize there
is a bias. And we don't let people testify unless the biased when they
testify is allowed to be brought out.

In other words, if a witness is testifying, let's say, you, for
example, both sides are entitled to bring out the bias for or against
the -- about the witness that is against the offender, let's use, in
that case. Because in our justice system, things must be fair and
things must look fair. There must not be bias, and there must not be a
look of bias by any one. That's the way our system works.

Now, in my opinion, who -- my opinion is not any better than
anybody else's, but I have seen a lot of people over the years, kind of
in the people business, judging people. And I have heard your
statements today, and it seems to me that your own words have shown
your bias.

You say you're not bias. But we base things on evidence, not based
necessarily on words. And your words, to me, prove your bias. Your
attitude proves your bias. Your arrogance proves your bias. And I think
your protesting too much proves your bias.

But be that as it may, the scary part of that is not whether
you're biased or not, the scary part of it is what about other people
in the FBI, what about people we don't know about that have the same
attitude that you do about people who are being investigated by the
FBI.

That is what is scary, because people out here, the rest of us who
don't get to work for the FBI, or the Justice Department, we are
concerned about our justice system doing the right thing for the right
reason. And making sure that our justice system is just. And the part
of the fairness in justice is that there isn't a bias for or against
anybody as they go through the system.

Now, based on what you said, I don't think I would ever allow you
as a juror to be on a criminal case ever. I don't know that the defense
attorney or the prosecutor would allow you to be on a jury because your
words are what we hear. Your protesting just seems to make those words
more of a show of your bias.

The comment that you're going to stocking (ph) at an e-mail or a
text or something, that not only shows your bias, that shows that
you're going to act on your bias. And you're going to stop President
Trump. That's the way it comes across, the evidence comes across.

So, how do you assure us that the attitude that you have shown us
today of the text messages and all of this things that we've been
talking about, how do we know that's not rampant throughout the FBI?
How do we know that?

STRZOK: Sir, what I would answer to you...

POE: Can you just answer that question?

STRZOK: Yes.

POE: How do we know that there's not bias in the FBI in this
particular investigation or other investigations? How do we know that?

STRZOK: Sir, the way you do that is exactly what you suggested.
You look to the evidence. You look to the actions of the men and women
of the FBI in the conduct of their cases. You look to my actions in the
conduct of the investigation. You have done with others a spectacular
job of equating the word "bias" with personal and political belief. And
it's astounding how effective that's been. But you know full well they
are not the same. The fact of bias...

(CROSSTALK)

POE: Reclaiming my time.

STRZOK: ... political...

(CROSSTALK)

POE: Reclaiming my time. You had chance to try to answer the other
question that you're trying to answer. How do we know that the attitude
that you have shown us today, whatever you want to call it -- you know

that Mr. Cohen wants to make a saint out of you. How do we know that
the attitude you have today is not the same attitude of the FBI as
they're investigating other cases? How do we know that?

(UNKNOWN): I'd ask that the witness be permitted...

(CROSSTALK)

GOODLATTE: The time of the gentleman has expired. And the
gentleman may answer the question.

(UNKNOWN): Hopefully without interruption.

STRZOK: Sir, the way you judge that is what I said. You look at
the evidence, you look at the acts, what FBI agents and analysts and
everybody else do. You look at what I did. You look at what the
Inspector General concluded. Not only me, but all the agents and
assistant directors and EADs and DDEs and everybody involved in an
investigation. And you see that the evidence unequivocally is there is
no act of bias.

So this false assertion that you're making that political and
personal belief must equal bias, that somehow we've merged those two
words together in the dictionary is one of the triumphs of what's been
going on recently that I cannot disagree with more.

A judge asks jurors, "Are you able to set aside your personal
opinions and render a judgment based on the facts?" Sir, you know that
based on your extensive experience. What I am telling you is that I and
the other men and women of the FBI, every day, take our personal
beliefs and set those aside in vigorous pursuit of the truth wherever
it lies, whatever it is.

POE: And I don't believe you. I yield back.

GOODLATTE: Time of the gentleman has expired. The Chair now
recognizes the gentleman from Florida, Mr. Deutch, for five minutes.

DEUTCH: I thank the Chairman. Let's be clear about what's going on
here. We understand that President Trump doesn't like this
investigation. We understand that. That's clear. But what we've seen in
this joint committee and in the Judiciary Committee meeting just a
couple weeks back, with members of the House demeaning themselves by
asserting that the Deputy Attorney General sat there under oath and
lied.

Today, repeated assertions that Mr. Strzok is sitting before us
under oath, lying to us. The efforts to impugn the credibility not just
on Mr. Strzok but of the entire FBI, it's shameful. Truly shameful.

The depths to which some of my colleagues have plummeted in order
to advance a narrative to support the President's opposition to an
investigation, which is an investigation as Mr. Strzok pointed out and
as too many of us seem to have forgotten is an investigation into the
Russian's efforts to destabilize the democracy of the United States of
America.

I wish that the attacks that have been leveled against Mr. Strzok, the attacks on Rod Rosenstein, and the attacks on our FBI Director, I wish there was even a slight degree of that same fervor directed against what the Russians did in 2016 so that we could get to the bottom of that and anticipate what they're trying to do this November and in 2020.

Now, Mr. Strzok, this is the Inspector General's report. The number one finding, in this Inspector General's report, is that the FBI should not discuss ongoing criminal investigations. That's what the IG said Director Comey did wrong. The IG said he shouldn't have done it. The IG went into great deal about the longstanding practice and the reasons for that practice to protect the integrity of ongoing criminal investigations.

In this case, the investigation that I just referred to a direct attack by a foreign adversary. But listening to my Republican colleagues, it's almost as if they never read this report. Like you never bother to pick it up. Or worse, you read it, you understand it, but you don't care. You're asking Mr. Strzok to do exactly what the Inspector General said not to do. Exactly.

Mr. Strzok, if you answer these questions that you've been asked about this investigation, are you concerned that the Inspector General could investigate you and issue a report just like this one that says that you should never have done that?

STRZOK: Certainly that's possible. I'd be more worried about the impact on the ongoing investigation.

DEUTCH: I understand. It's a ridiculous position to put you in. The Inspector General explained in this nearly 600-page report that the mistake Director Comey made was discussing the ongoing steps the FBI was taking in the Hillary Clinton investigation. Here's what we've heard today. We heard it from the Chairman, we heard it from my colleagues.

You've got two choices. You can ignore the FBI's policy that has been put in place to protect these investigations -- I'm going to let you talk about that in a second -- and answer the questions, in which case maybe you trigger an IG report, or you don't answer those questions and maybe we hold you in contempt. Now, can you just again -- since this has been a really long day, can you explain why it's important not to interfere with ongoing criminal matters?

STRZOK: There are a variety. And I'm sure I won't come up with all the reasons, but the first is, we do a lot of investigations where we never charge anybody. And it's simply not fair to -- given the investigative power we have to do something that would unnecessarily tarnish them or their image.

Two, in the cases where we are investigating, talking about it is going to screw up a bunch of things you might want to do investigatively talking to witnesses, talking to the subject. And then finally, you want somebody to have a fair trial, and if we're talking about it or putting our finger on the scale, that would just be horribly inappropriate and against what we stand for in the criminal

justice system.

DEUTCH: And the negative consequences on the outcome of that investigation?

STRZOK: That would be tremendous. That would adversely impact potentially the ability to get a fair trial, to conduct a competent investigation, to conduct one that arrived at the truth.

DEUTCH: Right. Mr. Strzok, I appreciate that last comment. And I would just urge my colleagues that in the midst of this apoplexy that seems to be breaking out among someone (ph) in my colleagues that we remember that ultimately what we're really trying to do here is get to the truth.

And the truth that we need to get to is exactly what a hostile foreign adversary did to interfere with our democracy. Let's please keep that in mind as we move forward. Let's make that the focus. That's what the American people are expecting. That's what they're counting on us to do. Get out of the way. Let this investigation go forward. Let's get to the truth.

I yield back the balance of my time.

GOODLATTE: The gentleman from Pennsylvania, Mr. Marino, is recognized for five minutes.

MARINO: Thank you, Chairman. Mr. Strzok, I have here -- and I'm sure you're familiar with it -- ethics handbook of Department of Justice of which the FBI falls under.

STRZOK: Yes, sir.

MARINO: And there are several paragraphs that I want to read to you. First one is general principles of ethical conduct, continued. Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with the knowledge of the relevant facts.

Next one is appearance of impropriety. Employees shall endeavor to avoid any actions creating the appearance that the employee is violating the law or the ethical standards set forth in these guidelines. Furthermore, it states, for employees for whom a security clearance is required -- and you do have a security clearance, correct?

STRZOK: Today, I do. Yes.

MARINO: You've had one for quite a while...

STRZOK: Yes.

MARINO: ... other than the circumstances.

STRZOK: Yes.

MARINO: -- for performance of their official duties, prohibited conduct and more may be grounds for suspension, revocation of clearance. This could also result in adverse disciplinary action, including suspension or removal.

Under the Hatch Act, all federal employees may vote, express opinions and make political contributions under the Hatch Act. Active participation in person, political activities by federal employees is restricted. And employees -- and I want you to listen to this very carefully -- serving in certain positions are more restricted than others. I think you are a person that falls into that category as well.

I am just actually disheartened about the situation that you're in. and I say this with no prejudice. And I think you are your own worst enemy. You have an answer for everything. You have an attitude that is very obvious today.

And you are the kind of witness that you and I as a prosecutor for 18 years, a district attorney, and you as attorney would love to get on the stand. And the reasonable of the statements that you made -- and I'm not going to get into the language, but the repetitiveness of it, where was your judgment? What were you not thinking when you were sending the e-mails and the statements that you made and the comments in -- of the people in Virginia? I would expect someone of your caliber to be way above that. You got carried away. You got impressed with yourself. And you're in a position that I'm sorry that that's the case.

But if you are trying to draw a distinction, a wide distinction between bias and political opinion, there is not the wide distinction that you are drawing at this point, because I would bet the farm that if you are sitting next to me as the investigating prosecutor and I was the prosecutor and Judge Poe or any other judge were handling the case, whether it's civil or criminal, we -- you and I would be pointing out the biases that I see that you have exhibited here. I just don't understand your judgment based on your background. And you need to (ph) respond to that.

STRZOK: Sir, I -- I appreciate your comments and I appreciate your concern. The first thing I would tell you is I -- I'm disappointed if you did not understand the amount of regret that I express in my -- from the beginning of my opening statement to the harm and damage that this has caused the people I love and the institution I love.

MARINO: I do -- I do understand that now. But it's in hindsight. And people like you and I that are here to protect the citizens, we should be thinking this before...

STRZOK: Congressman, without question. And I would absolutely agree with you that there are things that I regret in retrospect. And I hope that comes across today. I know a large portion of today has been combative in a way that has nothing to do with my sense of regret and remorse.

I would draw -- since you brought up the ethics manual, I would note in that manual in further restricted employees, if the FBI employee, many DOJ employees or the members of the intelligence

community are restricted, but within that category.

If you read that manual citing the Hatch Act, it says "except for where otherwise prohibited," and that has to do with activities coordinating with the political party, "employees may not only have political opinions but they are encouraged to express them privately and publicly."

MARINO: Yes.

STRZOK: So, sir, I don't -- I don't draw any disagreement with you about bias where it occurs. What I disagree with you and so many people today is that political belief does not equate to bias. And we always have to go to the evidence.

If you can demonstrate evidence of acts of bias, well, then bias is there. But in the absence of any -- and truly the Inspector General, this committee, any number of other people have looked and looked and looked, and not a single act tells me it didn't occur. Because really competitive people have looked for it.

And so, beyond me telling you under oath that I know it didn't happen, what is important to realize is it's not just me. It's this entirety of folks looking at it. It's the entirety of structure of the FBI who's built not to do those things and not to...

(CROSSTALK)

GOODLATTE: The time of the gentleman has expired. The Chair recognizes the gentlewoman from Illinois, Ms. Kelly, for five minutes.

KELLY: I know it's been a long day for you. So I will keep it simple. Some questions will be repetitive. But if you could just say yes or no. In your time at the FBI, have you ever investigated a member of the Democratic Party?

STRZOK: Yes.

KELLY: Did any of those investigations resulted in an indictment?

STRZOK: No, not to my recollection.

KELLY: Have you ever investigated anyone that identifies as independent or unaffiliated with either of the two major political parties?

STRZOK: Ma'am, I don't know.

KELLY: So you don't know if any of those resulted in...?

STRZOK: Well, I don't know that -- I know when I'm thinking of the Democratic Party, clearly Secretary Clinton was part of who we looked at and she was very clearly part of the Democratic Party. I don't tend to -- beyond that, I'm not a public corruption agent and political affiliation is not something we looked at.

KELLY: But in your assessment, would your work history suggest a

bias by you toward any one political party?

STRZOK: No. Not at all.

KELLY: You investigated, as you said, Secretary Clinton for use of
private e-mails.

STRZOK: Yes.

KELLY: She is a member of the Democratic Party.

STRZOK: Yes.

KELLY: We know you have investigated a Republican, provided your
participation in the ongoing Mueller investigation. And we know that
that investigation has led to an indictment. In fact, it has led to 19
indictments, five guilty pleas and a host of charges filed against
former campaign and White House advisors to President Trump as well as
Russian nationals and companies.

So, is it fair to say that you have investigated and indicted
individuals from the political spectrum? Or you may not even be aware.

STRZOK: Yes, ma'am, we don't look at that. So I don't know, but
it's a fair assumption.

KELLY: There have been news reports that President Trump's
advisors, Ivanka Trump, Jared Kushner, Steven Miller, and former White
House officials, Steven Bannon, Reince Priebus and Gary Cohn, all use
private e-mail to conduct official business. President Trump is a
Republican. Correct?

STRZOK: Yes.

KELLY: So these individuals were or are key staffers for
Republican President. Correct?

STRZOK: Yes.

KELLY: These individuals serve or served as senior advisors to the
President, White House Chief Strategist, White House Chief of Staff,
and Director of the National Economic Council. It is safe to say that
individuals in such high-ranking positions are exposed to sensitive,
perhaps top secret materials.

STRZOK: Yes.

KELLY: To your knowledge, has the FBI opened investigations
against the use of private e-mails for official White House business?

STRZOK: I'm going to answer that I can't answer that based on if
they were ongoing, it would be inappropriate for me to talk about them.

KELLY: OK. I would like to know that neither the House Judiciary
Committee nor the House Oversight and Government Reform Committee have
opened hearings on that issue. And several of those individuals named
continue to advice the President of the United States and receive a

paycheck paid by our tax dollars.

Also, I'd like to say when constituents call my office, they are
Dems, they're Republicans, they're independents, and they're not
involved like all of us. And if you ask them, I am sure that they would
say they receive topnotch service from my office. And I have my biases
like everybody else, like we've talked about.

And listening to the conversation today, I have to wonder about
some of my Republican colleagues, not everybody, listen to apparently
think that biases prevent people from doing their best job. It makes me
wonder what happens when Democrats call your office. Do you not give
them the same service as you give your Republican constituents because
that's what you keep applying -- implying over and over and over and
over.

I yield back.

GOODLATTE: The Chair recognizes the gentleman from South Carolina,
Mr. Sanford, for five minutes.

SANFORD: I appreciate, Chairman. And if I might, I'm going to
yield my time to my colleagues from Ohio.

KELLY: Oh, my!

JORDAN: I thank the gentleman for yielding. Agent Strzok, I want
to go back to this e-mail you sent on January 10th regarding the
BuzzFeed pending publishing of a -- BuzzFeed publishing of the dossier.
Do you have that in front of you again?

STRZOK: I do.

JORDAN: OK. My last round of questioning. You said you spoke with
Bruce Ohr several times in the 2016-2017 time period. Is that accurate?

STRZOK: That's correct.

JORDAN: OK. And at that time, you were working with Mr. Ohr, did
you know that he was meeting with representatives from Fusion,
including Glenn Simpson?

STRZOK: May I consult with counsel, sir?

JORDAN: You sure can. You could hold my time, please.

STRZOK: Sir, again, I would like to answer your question. And it's
a short and easily answerable question, but at the direction of the
FBI, I cannot discuss the content of the operational matters that I'm
discussed Mr. Ohr.

JORDAN: I appreciate that, agent Strzok. At the time of your
meeting with Bruce Ohr, did you know that his wife Nellie worked for
Fusion?

STRZOK: Again, I believe the same answer. Standby sir, again,
please and sorry about the time. Sir, again, I'm sorry. I would like to

answer that question, but at the direction of the FBI, because it relates to an ongoing operational matter, I can't.

JORDAN: Let's go back to the e-mail. I just want to make sure I understand this. It sounds like in your e-mail you're saying comparing now, sounds like there were three copies, but two different versions.

The set you were examining and referencing to your colleagues, you say is identical to what McCain had, again referring to the dossier. And then you're saying the one from Corn and Simpson, you won't tell me who those individuals are, but that one is different. Is that an accurate reading of your e-mail?

STRZOK: Sir, it isn't. And I think to give you the contents or the context of that comment, I would have to -- I have to tell you, sir, this is more frustrating for me than it is for you.

JORDAN: I'm not...

STRZOK: Because of -- to frame that -- to give you an accurate answer, I would have to give you the context of what was going on, which included details that I've been instructed by the FBI that I may not provide.

JORDAN: Well there's another e-mail down below, the one you're looking at, which talks that BuzzFeed has 16 of the reports. Looks like they have 16 of the, I believe, 17 sections that made up the entire dossier. Is that an accurate reading there?

STRZOK: Sir, again, it's not an accurate reading. I would tell you what the FBI has told me, I may say and may answer to the dossier is that...

JORDAN: Well, it's not an accurate reading. That's what it says. Buzzfeed has 16 of the reports.

STRZOK: Sir, that is a literal reading, but understanding what that means would require me to provide information that is beyond the scope of what the FBI has permitted me to tell you.

JORDAN: Well, we'd sure like to know. I want to refer you to -- I don't know that you have this in front of you, but this is the House Intelligence Committee's report Chapter 6. There's a footnote on Page 113 and it says this.

"In late March 2017, Daniel Jones met with the FBI regarding PQG, The Penn Quarter Group, which he described as exposing foreign intelligence -- foreign influence in Russian election. He told the FBI that PQG was being funded by seven of 10 wealthy donors located primarily in New York and California who provided approximately $50 million."

You further stated that, "PQG had secured the services of Steele, his associate and Fusion GPS to continue exposing potential Russian interference in the 2016 U.S. presidential election." Are you familiar with this meeting Mr. Jones had with the FBI?

STRZOK: I'm not and I don't know if that's accurate or not. But I'm not aware.

JORDAN: I'm going from the intelligence report that the majority issued from the House Intelligence Committee.

STRZOK: I'm not aware of that meeting or who that is.

JORDAN: Have you ever spoke with Daniel Jones?

STRZOK: No.

JORDAN: You know Mr. Jones at all?

STRZOK: I do not.

JORDAN: All right. I want to go back to -- one more question I asked you the first round Mr. Strzok. Mr. Simpson when he did testify in front of the Senate Judiciary Committee was asked about Fusion. No one from Fusion ever spoke with the FBI. Is there any way that that contradicts what's in the e-mail that I've been referencing with you?

STRZOK: I don't know. I can tell you I've not spoken to Mr. Simpson.

JORDAN: Not spoken to Mr. Simpson, but I haven't asked you that. I asked you that the first time. All right. I thank the Chairman and I think the gentleman from South Carolina for yielding. I yield back to the gentleman.

GOODLATTE: The Chair would note that several of the questions asked by the gentleman were not answered by the witness on the advice of his counsel, and I presume through the FBI. And we will know those questions so that we can address them at a future time, because I find it stunning that they are not allowing you to answer those questions Mr. Strzok.

Chair now recognizes the gentleman from Illinois, Mr. Gutierrez for five minutes.

GUTIERREZ: Thank you, very much Mr. Chairman. The Chairman started this hearing by saying I wish this hearing wasn't necessary. Well, I'm sorry if I don't believe that. Of course, he wants his hearing and it isn't necessary.

I think there are hearings that are necessary and we see them every day. There are 3,000 children separated from their moms and dads and the government doesn't know where their moms and dads are and can't even bring them together. That seems like something the Judiciary Committee should be investigating.

We start a policy in this country where we ban -- ban Muslims from coming in, and we make a test -- a religious test. Sounds to me like something the Judiciary Committee should take up. We have a President of the United States.

There are 16 women who have come forward to say that the President

of the United States has attacked them and what is this Committee doing? No hearings. Even one of the members of this Committee had to resign in disgrace, because he asked one of his staffer for a $1 million if she would carry a baby for him.

Do we have any hearings on the state and the plight of women in the workplace in America? No. These are all things and issues that are on the American people's minds. We don't want to talk about those issues. Those are the issues that I believe are pertinent and should have hearings before this Committee.

But what we want to have hearings is to bring Mr. Strzok here so that we can regurgitate and continue to say that he is lying and that he is biased and somehow he corrupted the investigation to the point that we can't believe Mr. Mueller, that we can't believe Mr. Rustin (ph), that we can't believe the new FBI Director who was appointed by the current President of the United States and that we should abandon.

My members on the other side, if there are two people that are thrilled and excited today -- there are still people -- the folks over at Fox News and at the Kremlin, because they both worked on one thing, electing President Trump, President of the United States of America.

They've got to be overjoyed today at the Kremlin and they've got to be applauding and watched the newsreel tonight, because a lot of this today is simply what, a listening for Fox News and of course at the clapping at the Kremlin.

I never thought I would see a time that the Congress of the United States would do the work of destroying, because what do we know? We know very clearly that our men and women of the intelligence community have unanimously stated -- and this is refutable that the Russians worked to undermine our democracy and to elect Donald Trump President of the United States.

And that is something that's irrefutable. You can say what you want about Mr. Strzok, that's irrefutable. And yet we do not investigate that. How can we have such an attack on our democracy and we don't investigate? We want to investigate Mr. Strzok.

So I want to ask you Mr. Strzok, because they've kept saying you have this bias. When did you learn and how did you learn about the investigation into the possible collusion between the Donald Trump campaign and Russian influence in our 2016 election?

STRZOK: Sir, I am limited to what Director Comey was authorized to say by the Department of Justice, but in late July.

GUTIERREZ: So in late July. And when did the public learn about the investigation into Russian collusion and Donald Trump's investigation?

STRZOK: I don't have specific date, but it was well into the following year.

GUTIERREZ: It was after the election.

STRZOK: Yes sir. So what we're to believe from our Republican
majority that you're so biased, you're such a Democrat that you can't
hold back from trying to destroy Donald Trump. Yet you never told
anybody that there was an investigation into Donald Trump's campaign
and collusion with the Russians? You never told anybody about that?

STRZOK: No sir.

GUTIERREZ: You never talked to a reporter about that?

STRZOK: No.

GUTIERREZ: But you had it in your hands or maybe you didn't,
because you're in America, so you can do almost anything. But you did
have almost a magical bullet in your hand to derail the Donald Trump
investigation and did you use it?

STRZOK: No sir.

GUTIERREZ: No you didn't it, right? Are there Republicans at work
at the FBI, because it makes me sound like you're all Democrats? I
never heard that before. But are there Republicans?

STRZOK: Yes, sir.

GUTIERREZ: OK. What would be interesting here is since you like to
cherry pick the Democrats that given money, the FBI agents that give
money to Democrats, why don't you reveal the Republican members of the
FBI that give money to Republicans?

Why don't you reveal the Republican members of the FBI that are in
and state very clearly when they apply for a voter registration, they
apply as Republicans. They don't, because that's not what this is
about.

What this is about is that the American public, Mr. Strzok, it's
really not about you. They want to damage and destroy our democracy and
one of the ways they do it is by taking the institution like the FBI
and destroying it, and that I think is really regrettable.

OK, Kremlin another good day for you. You influenced the election,
you wanted Donald Trump to win, you won that one and now you want to
destroy our institutions. Congratulations Kremlin and congratulations
to everybody that's helping them.

GOWDY: Gentleman from Illinois yields back. Gentleman from
Tennessee, Dr. DesJarlais is recognized.

DESJARLAIS: Thank you, Mr. Chairman. And I just have a couple of
questions for you Mr. Strzok and I would like to yield the balance of
my time to Chairman Gowdy. But in light of the last round of
questioning, it's fair to say that you wanted to stop President Trump
from being elected in your own words didn't you?

STRZOK: No sir. That was my expression that I had a preference,
not for candidate Trump to be President, but that I did not and would
not...

DESJARLAIS: Did I not hear you read your own text directly that you would stop him? You would stop it?

STRZOK: No sir, you misunderstood or misheard me. I said that my sense I'm not recalling writing that text. It was that the American populace wouldn't elect Mr. Trump.

DESJARLAIS: You don't like Donald Trump, do you?

STRZOK: Fair to say, I'm not a fan, sir.

DESJARLAIS: Yes. And were you the only one who could have done the job you're doing or you're the only one that could have lead this investigation in the FBI?

STRZOK: So it was logical given that I was number two in counter-intelligence that I would have a role in this investigation. But, no, there are very qualified folks in the FBI, (inaudible).

DESJARLAIS: Well, in retrospect then should you recuse yourself in this case.

STRZOK: Absolutely not, sir.

DESJARLAIS: You don't like this man. You didn't want him to become President. You had several very disparaging text messages with your friend about this. But yet you didn't once think that maybe somebody else should take this case?

STRZOK: No sir and I'll say what. There are times were I didn't particularly care for Secretary Clinton and I've investigated that absolutely as objectively and aggressively as I did any other investigation. So, no, I don't think recusal was at all merited.

DESJARLAIS: OK. Well that's one thing I've struggled with here today, listening to your testimony, because I do think a man in position of power and the respect you should have -- or that people should have for you, because of your position at the FBI, that you would have stopped saying that maybe there was somebody that could do a better job that didn't have such disdain for this President, you claim to be such a patriot.

But once he was elected you continue to do this and I think that you have to accept that elections have consequences. But I'll the balance of my time to gentlemen.

GOWDY: Gentlemen yields. Agent Strzok now I'm confused because I thought on that August 8, 2016 text that you did not recall typing it and then you said that you recalled it was late at night and now somehow mitigated the content of what you typed. So do you recall that or was it late at night and what else do you recall about the timing of that?

STRZOK: Mr. Chairman, I think, my recollection is same as it been, consistent across the board. I don't remember typing it. It was late at night. My sense was I can tell you what it was not. It was not a

suggestion that I or the FBI take any action on anyone in any way.

GOWDY: Instead of us musing about what you meant, why don't we just go with what you said?

STRZOK: OK. I would actually you rather go with what I did.

GOWDY: Well...

STRZOK: That is at the end of the day -- that is...

GOWDY: We'll get to that --we'll get to that in a second, I promise you. No, he's not. We'll stop it. And I think you've agreed it, it was in his candidacy, right?

STRZOK: Or his election, I don't think -- again, not recalling writing it. His candidacy, his election, I'm not -- I don't recall writing it. I'm not sure what it...

GOWDY: And what do you mean by stop?

STRZOK: Stop it, again, in my sense, looking at the context, was that there was no way coming off the heels of insulting the Khan family that the American and all the other statements that have been made in the comparison to genital size during a debate and everything else -- that there was no way that the American population was going to elect this man.

So my sense was this is a, off the cuff, "hey, don't worry about", this sort of comment. And if you look at the next day when I sent a text saying, "hey, what was that?" it's clear there is no conspiracy. There's a meeting of the minds. There's no suggestion of actions. It was merely a one off comment.

GOWDY: And of course is about a week before you used the word, we, again in connection with an insurance policy to make sure that he was not elected President. And then we get to the day Mueller was appointed special counsel -- day after. Let's goes through this one again and see if it rings a bell with you.

Who fives a F, one more ED and investigation leading to impeachment with the question mark? Why are you talking about impeachment, the day of special counsel's appointment?

GOWDY: STRZOK: Well, sir.

GOWDY: And while you're thinking about that, let me give you a few other options you could have said, an investigation leading into indictments against Russians, an investigation leading to better election security, an investigation leading into a robust response to what Russia tried to do to our country. But you didn't say any of that Agent Strzok, you went straight to impeachment. Do you know how impeachment works?

STRZOK: I have a general understanding.

GOWDY: How does it work?

STRZOK: Sir, my understanding is limited to that is something done by the Congress. That there are articles of impeachment and the procedure by which that occurs, I am not an expert...

GOWDY: Well, let me ask you this. Do you have to be a sitting officeholder to be impeached?

STRZOK: Sir, I don't know the answer to that.

GOWDY: Well, I actually do. And I will take note that you never once used the word in connection with Secretary Clinton did you?

STRZOK: Sir, I did not, no.

GOWDY: No, you didn't. If you did, we don't have it. So that's an investigation where you didn't think about mentioning it. But the day Mueller was appointed, rather than punishing Russia, rather than indicting Russians, rather than doing something about social media, you went straight to impeachment, wrong.

STRZOK: That's correct, sir.

GOWDY: Well, I'll tell you what.

NADLER: ...Mr. Chairman, time is expired.

GOWDY: I'm out of time and we'll revisit the issue.

STRZOK: May I respond to your question sir?

GOWDY: You may when we revisit the issue.

STRZOK: You just asked the question -- respond now.

CICILLINE: Answer the question

NADLER: Mr. Chairman, the witness is permitted to answer the question briefly as...

GOWDY: The gentleman from Louisiana is recognized.

NADLER: As the Chairman has repeatedly said today.

GOWDY: The gentleman from Louisiana is recognized.

CICILLINE: Is the witness not going to be permitted to answer the question Mr. Chairman?

NADLER: Mr. Chairman, I'm going to object to you're not permitting the witness to answer the question you asked him.

GOWDY: One moment while I find who is next on the Democrat side.

NADLER: Mr. Chairman that is not the question.

STRZOK: Sir, you asked if I went directly to impeachment rather

than Russia. I would like to respond to that question that you asked immediately...

GOWDY: We're going to come back to it. But if you are dying...

NADLER: He should be permitted to answer the question.

GOWDY: ...to respond to it now, as long as you do actually respond to the question.

STRZOK: Yes sir. My immediate concern was absolutely having to do with Russia and everything related to that. My concern was what Russia was doing on social media. My concern was what Russian intelligence sources were doing in the United States. My concern was what the government of Russia might or might not be doing with members of the Trump campaign.

GOWDY: That's great Agent Strzok.

STRZOK: It was broad and robust. That was my response.

GOWDY: That's wonderful. And trust me when I tell you that would've been a longer text. I get that. It would have taken a lot longer for you to actually type that. But you didn't.

CICILLINE: Regular order Mr. Chairman, are you going to just pontificate for nonstop...

GOWDY: Gentlelady from Michigan is recognized.

LAWRENCE: Thank you. Mr. Strzok, during your 11 hour closed door interview with our Committee Republicans ask you more than 200 questions on the special counsels and the FBI investigation of the Trump/Russia collusion and interference with the 2016 election.

At one point he described how the special counsel's investigation had and I quote, "Credible allegation that the government of Russia had offered assistance to elements and matters of the Trump team on the election." Is that correct?

STRZOK: I believe so. I don't have a copy of the transcript, so I will...

LAWRENCE: And subsequently, Rep. Nettles (ph) followed up with this question. He stated and I quote, "There was evidence that Russia was trying to do it. There was no evidence the other way around." Do you recall that?

STRZOK: I don't remember that specific exchange, ma'am.

LAWRENCE: You told -- and I am going from the transcript...

STRZOK: And I...

LAWRENCE: You told Rep. Nettles (ph) that you understood his questionable, but could not answer in an unclassified setting. It appears from your transcript sir, that you interpret his question ask

10Z9

quote, "Whether or not there were any reciprocation of that by members of the Trump team in offering their assistance back to Russia".

You later continued to explain and I'm quoting from your transcript, "As whether or not there was information about whether elements of the Trump campaign were themselves engaging in that. I can't answer that in a classified setting. And furthermore, I don't think the FBI or special counsel would want me commenting on ongoing investigations."

So just to be clear, the question of whether the Trump campaign was trying to collude with Russia, calls for classified response and a response that would involve information as part of an ongoing investigation. Is that right?

STRZOK: Yes.

LAWRENCE: Thank you. I certainly would not want you to reveal any classified or sensitive, investigative information in this setting. We have repeatedly gone back and forth with that, and I don't understand why we have to repeat things -- repeatedly to such an intelligent group of people.

Back in March, Chairman Gowdy stated on national TV and I quote, "And if you believe, as we have found, that there's no evidence to collusion, you should watch Special Counsel Mueller to take all the time and have all the independence he needs to do his job."

Chairman Gowdy also stated and I quote, "When you're innocent if the allegation of collusion with the Russians there's no evidence of that, you are not innocent of that, act like it."

If President Trump and his allies want us to believe that there's no collusion with Russia, and that's what this is about, I would suggest that they take Chairman Gowdy's recommendation and begin acting like it. And I yield back my time.

GOWDY: Gentlelady yields back. Gentleman with Idaho is recognized.

LABRADOR: Thank you, Mr. Chairman. In your opening testimony today you stated that quote, "Not once did my personal bias interfere with my judgment. There's no evidence of bias in my professional actions." Close quote.

OK. Let's explore that statement for a second. Can you please define, because I'm really confused, can you define your -- what's your definition of bias?

STRZOK: I think sir bias depends on the context in which you talk about it. With regard to political opinion, that is allowing your beliefs to get in the way of the honest independent pursuit of facts.

LABRADOR: So allowing your own beliefs to get in the way of your actions?

STRZOK: If you're honest -- right -- if you're honest....

LABRADOR: OK. But please give me an example of situation when bias would interfere with your aspect, your professional judgment?

STRZOK: That's difficult to answer, hypothetical. I'm not going to interview a witness, I'm going to destroy, evidence I'm going to prevent somebody from taking investigative steps. I'm not -- it's a difficult...

LABRADOR: Has there ever been a time when your professional actions or you believe that you had bias that you needed to move on from an investigation at any time?

STRZOK: No.

LABRADOR: No. Has there been a time in your career that you recused yourself from a professional action?

STRZOK: No.

LABRADOR: OK. So you'll be surprised what I actually believe that the Russians tried to destabilize our economy, our way of life, our government. I think they've been doing it for a long time. I'm curious if this is the first time that Russia tried to interfere with an American election?

STRZOK: I'm aware of times were they -- going back to the 60s and 70s, that they planted evidence where they were seeking to introduce items of information that were false in newspapers. I'm not aware of any direct outreach to members of the presidential -- either candidate or his immediate team.

LABRADOR: Did they attempt to interfere in the 2012 election?

STRZOK: I'm certain they did, yes.

LABRADOR: So do you recall when President Obama telling Russian President Medvedev that he would have more flexibility to negotiate on issues like missile defense after the 2012 election?

STRZOK: I don't remember that sir.

LABRADOR: He said that in a hot mic, why wasn't that investigated?

STRZOK: Sir, because, one, there were no allegations to my knowledge. Again, I was not in the position...

LABRADOR: This is the President of the United States telling the Russian President that he was not going -- he was going to have more flexibility and he was going to do certain things. Do you recall during the debates when President Obama objected to candidate Romney that the 1980s are now calling to ask for their foreign policy book, "The Cold War is Over". Do you remember that?

STRZOK: I don't know. But I...

LABRADOR: OK. So you are not interested in Russian interference with our elections in 2012. But you were interested in Russian

interference in 2016?

STRZOK: That's not true, sir.

LABRADOR: And you were not interested in the actions of a
President who was saying that Russia was no longer a foreign power that
we need to be concerned about?

STRZOK: Sir, I disagree with that statement.

LABRADOR: Well, you don't even recall those statements, so I don't
know how you can disagree with them?

STRZOK: You were characterizing my interest in their interference
and I can respond to that.

LABRADOR: OK. That's fine. How can you assure the American people
that you are not lying today?

STRZOK: Because, one, as I said before, I'm doing it under oath.
I'm telling you, having spent 26 years putting on a gun, putting my
life at risk for this country. I am not lying to you right now.

LABRADOR: You are doing under oath.

STRZOK: Well, then that's fair, if you don't want to take my word
for it...

LABRADOR: No, no, that's fine.

STRZOK: I get people might be hesitant. I would say look at the
record, look at everybody who's worked with me.

LABRADOR: So let's look at...

STRZOK: ...lot at what IG said...

LABRADOR: And today...

STRZOK: ...that would absolutely...

LABRADOR: Today you stated that you don't mean it when you said
Trump supporters smell and you did not really mean it when you said
that -- used the word impeachment, you did not mean it when you said
Republicans were hillbillies. You were not telling the truth in those
moments?

STRZOK: No, I disagree with that sir. I said I didn't mean it when
I talked about people that you could smell the supporter hillbillies.
That was a poor choice of words. I don't believe. I did not say, I did
not believe impeachment.

My explanation for impeachment was very different. My explanation
for impeachment was, as I considered it that was on the far end of what
might be occurring.

LABRADOR: OK. So you...

STRZOK: What I want to say is the opposite.

LABRADOR: I understand. But -- so finally Democrats have made assertions today that are just not true. First, that the IG found no bias in your actions. This is not true. The IG said, quote "We were deeply troubled by text messages sent by Strzok and Page that potentially indicated or created the appearance that investigative decisions were impacted by bias or improper consideration?

STRZOK: Right. And read what you just said sir, potentially create the appearance. That says nothing about an act of bias. It is a hedged three adjective descriptions about something which I can tell you doesn't exist.

LABRADOR: Moreover, as we describe in Chapter 9 in assessing Strzok's decision to prioritize the Russia investigation over following up on the midyear related investigative lead, discovery on the Weiner laptop in October 2016, these text messages led us to conclude that we did not have confidence that Strzok's decisions was free from bias.

STRZOK: Yes, sir.

LABRADOR: So you did -- he -- there was no there was no decision that there was no bias. They just cannot find whether there was bias or not. And moreover, they didn't...

CICILLINE: Mr. Chairman, regular order.

LABRADOR: They did not investigate their Russian investigation in the IG report, so there is going to be still pending report.

GOWDY: The gentleman is out of time and yields back. The gentleman from...

STRZOK: May I respond to gentleman's (ph) question.

NADLER: He's permitted to answer the question.

GOWDY: I didn't hear a question.

STRZOK: I don't agree with it. He was asking me whether or not the -- whether I believe that the IG report indicated that there is an act of bias or not and I was...

GOWDY: All right.

CICILLINE: They're afraid to hear your answer, but I'd to ask the witness be permitted to answer the question.

STRZOK: May I respond, sir?

LABRADOR: Sure.

STRZOK: Sir, let's look at the facts of that laptop. The facts of that laptop are within hours. Literally less than four hours of learning of that laptop, I assigned agents to go and check in and

figure out...

LABRADOR: Mr. Chairman, that wasn't in the...

STRZOK: Within a day they had done so. And so these were folks...

GOWDY: Unrelated to gentleman from Idaho is yielded back. If you want to give a short response to a question he does not believe he asked, you're welcome to do it. But just keep it short.

LEE: Mr. Strzok, speak clearly into the mic to raise the mic, please, for you.

STRZOK: Absolutely. So sir I would take issue -- I do take issue with the IG's conclusion there. The IG said something that they could not exclude the possibility that it played a role. And what I would point you and point them to with the facts and the facts of these.

Within hours of learning -- hours of the learning of the Weiner laptop I signed very seasoned supervisory agents and subordinate agents and analysts to follow up on that. And within a day of getting that information, they've gotten in touch with New York, determined that New York had not completed the processing and that they were going to get back together when that occurred.

So the notion that anything was backburner is belied by the fact that literally within 24 hours of learning of that information, I had assigned people who by the way had nothing to do with the Russia investigations to follow up on the matters.

GOWDY: You've been given a chance. And let's resume but New York is recognized.

JEFFRIES: Mr. Strzok the investigation into possible Trump/Russian collusion in the 2016 election has resulted in 23 indictments, correct?

STRZOK: I don't know the number, but it's sizable.

JEFFRIES: It's resulted in 18 individuals who have been indicted, true?

STRZOK: Again, I don't know the numbers, but I'm...

JEFFRIES: Three corporate entities have been indicted in connection with the Trump/Russian collusion investigation, correct?

STRZOK: I'll accept your representation, I don't know.

JEFFRIES: The investigation has identified at least 75 different criminal acts. Correct?

STRZOK: Again sir, I haven't tallied them up.

JEFFRIES: There have been five guilty pleas. True?

STRZOK: I believe that's correct, sir, but I'm not certain.

JEFFRIES: Trump's campaign Manager Paul Manafort has been charged
with conspiracy to defraud the United States of America, correct?

STRZOK: He's been charged. I don't know the specific crimes.

JEFFRIES: He's sitting in jail right now as a result of alleged
witness tampering, correct?

STRZOK: Yes sir.

JEFFRIES: Trump's former National Security Advisor, Michael Flynn
has pled guilty to lying to the FBI. Correct?

STRZOK: Yes sir.

JEFFRIES: Trump's Deputy Campaign Manager, Rick Gates has been
indicted for conspiracy to defraud the United States. Correct?

STRZOK: Sir, he's been indicted, I don't know the charges.

JEFFRIES: George Papadopoulos, a Trump campaign National Security
Adviser has pled guilty to lying to federal investigators about his
contacts with Russian spies during the campaign? True?

STRZOK: Certainly with Russians, I don't know how to characterize
those Russians.

JEFFRIES: OK. Now the FBI publicly disclosed information about the
Hillary Clinton e-mail investigation 11 days prior to the election in
2016. True?

STRZOK: Yes, sir. I believe that's right.

JEFFRIES: But the FBI maintained confidentiality about the
Trump/Russia criminal investigation during the entire duration of the
Trump presidential campaign. Correct?

STRZOK: Yes sir.

JEFFRIES: So if you really wanted to stop Donald Trump from
becoming President, you could have revealed the criminal investigation
into the Trump campaign to the American people prior to the election.
True?

STRZOK: Yes sir.

JEFFRIES: Mr. Strzok, you are before this Committee for one reason
to serve as a monumental distraction. There was a criminal
investigation into the Trump campaign and possible crimes related to
the 2016 presidential election involving collusion with Russian spies
to sell out our democracy and hijack the presidency.

My colleagues in the Cover-Up Caucus don't like that criminal
investigation and therefore they need to identify a villain. Mr. Strzok
tag you're it. Here is what's so ironic about that characterization.

Vladimir Putin is a thug and a dictator who hijacked and

interfered and attacked our democracy. But apparently he doesn't need the Republican villain test. Our so-called Commander in Chief continues to play footsie with him.

Kim Jong-un murderous his people and has threatened nuclear annihilation against American cities, but apparently he doesn't meet the Republican villain test. The administration continues to engage in fake negotiations with him.

David Duke and neo-Nazis, apparently for some, don't meet the Republican villain test. That's right, I forgot, they're all fine people on both sides. Roy Moore, an alleged serial pedophile, apparently doesn't meet the Republican villain test. He was the nominee of your party for a seat in the United States Senate.

But we're supposed to believe that a day Peter Strzok, a former Army officer, who has served the FBI with distinction -- yes, made some mistakes -- is the gravest existential threat to our democracy. How dare you lecture us about villains when your party continues to turn a blind eye to that parade of degenerates that I just listed?

This investigation is a joke; it's a fraud. This hearing is a kangaroo court. It is a three ring circus. It is not even meritorious of an investigation by Ace Ventura Pet Detective, let alone 75 members of the United States Congress. Let's stop wasting taxpayer dollars and get back to the business of the American people.

GOWDY: Gentleman yields back. The gentleman from Georgia is recognized.

(UNKNOWN): Thank you, Mr. Chairman.

GOWDY: Gentlelady from North Carolina is recognized.

(UNKNOWN): Thank you Mr. Chairman. I would like to yield my time to you. Thank you.

GOWDY: Thank you. Gentlelady from North Carolina. Agent Strzok, on March 14, 2017, I think we were a couple of months into the presidency. See if you can recall this text that you received. "Finally, two pages away from finishing ATPM." Do you know the President resigns in the end? What is ATPM?

STRZOK: It is reference to book called The President's Men.

GOWDY: All right. Do you recall how you replied?

STRZOK: Generally I feign surprise and said something to the fact that we should be so lucky or fortunate.

GOWDY: Knows lucky. Lucky in what way?

STRZOK: Sir my -- that he would resign as President.

GOWDY: You wanted him to resign two months into his presidency?

STRZOK: Sir, my sense was and a personal belief that I was not

pleased with the direction and things that are being done with the
presidency.

GOWDY: I thought you trusted the American people. I thought that
was what you said in August of 2016 that the American people would stop
him and then they didn't stop him and...

STRZOK: Sir, I didn't trust him...

GOWDY: Here we are in March all of a sudden not trusting the
American people anymore.

STRZOK: Sir, what -- I utterly trust the American people. What I
worry about is when the government of Russia puts their fingers on the
scale and causes the will of the American people to be something other
than...

GOWDY: How many...

STRZOK: ... America elected their President.

GOWDY: How many indictments have there been of Americans for
collusion with Russia?

STRZOK: Sir, I couldn't answer that question.

GOWDY: Sure you could. Your worked on the investigation.

STRZOK: First you know full well, sir, collusion is not a crime. I
don't know where that term came from. But...

GOWDY: Well, you're right. It's not conspiracy, coordination,
collusion a lot of people use those words in the same way. How about we
say conspiracy. How many Americans have been indicted for conspiring
with Russia to impact the 2016 election?

STRZOK: None to my knowledge.

CICILLINE: Yet.

GOWDY: And we'll be happy to get Mr. Nadler's witness week's
hearing if he wants to help you answer that. So you wanted President
Trump to resign two months into his presidency.

STRZOK: No sir, I think I read that text as a snarky comment about
a book that was being read and a comment made. It is a conversational
text exchange. It is not a desire for something like occur.

GOWDY: Maybe I missed it. Help me God that we should be so lucky.

STRZOK: Yes, sir, and I think you would accept as a very
intelligent sophisticated man that people frequently speak when they're
texting or in conversation, you'll say things that are hyperbole or
exaggerations are not literal because that's just the nature of...

GOWDY: Usually Agent Strzok, not when I was supposed to be
dispassionately neutrally investigating someone, I actually did not.

But let's go, let's go. We've already passed Who Gives F one more AD (ph) versus an investigation leading to impeachment.

And I think we've already established that there is a school of thought that you can be impeached even if you are not a current officeholder, you can be barred from holding office in the future, but you did not engage in any impeachment analysis in your other 2016 investigation with Secretary Clinton. You saved all of that for Candidate Trump.

So I want to go to another text. "You and I both know the odds are nothing. If I thought it was likely I'd be there. No question. Now this is the day after Mueller was appointed. When you said be there, are you talking about on his team?

STRZOK: Yes, sir.

GOWDY: "I hesitate in part because of my gut sense and concern. There's no big there, there." So in addition to disappointing the hell out of my Democratic colleagues that someone who is investigating Russian collusion didn't think there was any there, there. Why would you be concerned? Why would you not be ecstatic if there was no collusion? Why the word concerned?

STRZOK: Sir, I don't know what -- I meant, a concern to me seems like there is a lot going on and a lot presumptive that there may be something like impeachment. But, sir, you got to pick, which one you want.

I'm either convinced that there's impeachment or I'm convinced what you just read that there's no there, there.

GOWDY: No...

STRZOK: And the reality, sir, if you look at it is the fact. That I was looking at this with an open mind and saying I don't know what there is.

GOWDY: Actually Agent Strzok, of all the universe of options, that's not the one I picked. Of all the universe of options, you're looking at something with an open mind is not the one I pick.

NADLER: But that's the obvious one to conclude from that e-mail.

GOWDY: I will tell you the one that I picked. The one I picked and it breaks my heart to say this about an agent for an Agency that I have tremendous respect for, you as a counterintelligence officer had no interest in participating in a counterintelligence investigation that was not going to lead to impeachment.

STRZOK: No, sir.

GOWDY: That's how I read it. If I...

LEE: Mr. Chairman, you are assuming someone's position -- Mr. Chairman, you are coming to conclusions on someone else's viewpoints in the hearing. Allow the witness to respond.

GOWDY: I'm pretty sure it's my time and the gentlelady is not recognized. I hesitate in part, because of gut sense and concern, there is no big there, there. What were you concerned wasn't there?

STRZOK: Sir, my concern was not knowing, given these allegations, what existed. Whether on the one hand there was no criminal activity whatsoever, towards the middle that there were individuals kind of pursuing their own agendas for their own self-enrichment or on the far end that there might be an impeachable offense.

GOWDY: Why wouldn't you want to investigate?

STRZOK: May I answer your question?

GOWDY: My question is why would you not want to investigate that.

STRZOK: Sir, I did want to investigate that. That is not what you are reading. What you were reading is my trying to decide what I want to do with the course of my career and whether to stay as a Deputy Assistant Director in the Counterintelligence division where I have oversight of a wide variety of threats, around the globe.

Or whether I want to remove myself and go work on something in the Special Counsel's Office that is very specific that is going to take -- that I don't know how I'm going to take. Now, so sir -- but to your point...

GOWDY: You are leaving out one really important word Agent Strzok impeachment. That was in all of your text.

CICILLINE: Regular order. Now a minute and a half over. Does it make this go on and on and on as long as...

(CROSSTALK)

CICILLINE: Point of order. Your time is up.

STRZOK: I would take your one big word of impeachment and add four big words of no big there, there. And the reality is you know full well I said both. And you know why I said both. Why I did that and what I'm telling you under oath is that I did not know what existed. I had prejudged nothing. That was all to be determined. And that is a logical way for investigators, attorneys and...

GOWDY: Starting with the political...

STRZOK: ...approaches investigation.

GOWDY: ... death penalty and impeachment is not logical way a neutral dispassionate...

COLEMAN: Point of order, Chairman. You are not testifying...

CICILLINE: Mr. Chairman, we are demanding equal time for every member of this Committee.

GOWDY: Gentlelady from New Jersey is recognized.

NADLER: Mr. Chairman, Chairman...

COLEMAN: ...Mr. Chairman, and if you can't control yourself, how do you expect this Committee to control itself. You've been out of control since you've been on this Committee. Why don't you leave it alone? This is not Benghazi.

GOWDY: The gentlelady from New Jersey is recognized.

(UNKNOWN): You're recognized, Congresswoman. You're recognized.

COLEMAN: Well, hallelujah. First of all, Mr. Strzok, I want to thank you for your service. Secondly, Mr. Strzok, I think you made a big mistake by putting those text messages on your business phone, because then you opened up your personal phone.

And here we are talking about this mess when it really isn't important, because the other thing that I know Mr. Strzok is that even if you do have biases you did not influence the outcome of this investigation. The IG found that the outcome of this investigation was predicated upon evidence and information.

The other thing I know is that no matter how much you wish Hillary and/or Donald Trump, you didn't have anything to do with either one of them getting elected. You had nothing to do with the President of the United States disgracing this country every single solitary day when he embraces our enemies and sucks up -- embraces our enemies and is disrespectful to our allies.

You have nothing to do with the fact that the President of the United States has declared higher tariffs in the name of security to this nation against our closest friend and neighbor Canada. But no one on this side of the aisle has opened again.

You have had nothing to do with the President enriching himself with his emoluments and carving out opportunities for his daughter so that she's not negatively impacted with her brands in China, while this side of the aisle says nothing.

You've had nothing to do with the fact that Puerto Rico is still under water and without any kind of electricity in so many places, while this side of the aisle that's the part of the Oversight Committee has forgotten what its mission is.

But, nonetheless, you have been here and you have tried to answer their questions. And I have never seen my colleagues so out of control, so angry and desperate to protect the President that we all know is not fit to be President.

So I want to leave you this opportunity. Is there any question on the table Mr. Strzok that you've asked, that you'd like to clarify, because I can give you two minutes and 25 seconds to have your say uninterrupted?

STRZOK: Congresswoman. I deeply appreciate that time. I do want --

everybody is watching this and making up their own mind. And what I would tell you is, one, I'm sitting here telling you the truth. And, two, independent of me, I cannot express to you my love of FBI enough.

The men and women who make up that workforce, their ethics, their integrity are unmatched anywhere in the world. And I think that's important, one, because it is who we are. Two, that none of them would accept any of the behaviors that are being alleged any more than I would accept it in him.

And three, this entire exercise comes at a cost. We're doing things that are going to in the future tear down the underpinnings of what represent law and order in this country and there is not a robust thick wall there. I think people don't appreciate how tenuous the balance of the rule of law versus chaos is.

And when we as a people engage in activity where we think institutions wholesale, whether it's the FBI or the U.S. intelligence community and compare them with Nazis, we destroy things that, one, we may not see for years and years and years and once we break those down, the amount of time it takes to fix this is going to be tenfold. And I cannot stress enough that I ask all of you to take deeply your responsibility to maintain...

COLEMAN: Thank you, Mr. Strzok. I just need to say in closing. If anybody should be pissed at the FBI, because you all helped this unfit man become President of United States by not revealing to the people that he was under investigation in his campaign. It should be me. They should be applauding you, kissing you and giving you all awards, because but for you, we would have had a legitimate President elected. I yield back my time.

GOWDY: Gentleman from New York is recognized for unanimous consent.

NADLER: Mr. Chairman, as you are aware under House Rules minority members have the right to demand a day of hearings to allow witnesses to testify on the subject of today's hearing. As you also know, during the course of today's hearing, the majority opposed Representative Swalwell's (ph) motion to subpoena Steve Bannon for testimony.

On behalf of the minority members of both the judiciary and Government Reform Committees, I am delivering a letter to Chairman Goodlatte and Chairman Gowdy, formally invoking our right to call a minority day of hearings so that Steve Bannon may testify and I ask unanimous consent to insert a copy of that letter into the hearing record.

GOWDY: Without objection.

NADLER: Thank you.

GOWDY: Gentleman from Georgia is recognized.

COLLINS: Thank you Mr. Chairman. Mr. Strzok, I appreciate your being here. Thank you and I will assure you I take this very seriously. But I also want to -- as you go and looking, there's been a lot of talk

about text, there's been a lot of talk about you are biased and
non-biased, your opinions and your willingness to elaborate on that.

I have some questions that will not require you to have me
elaborate or anything. They're going to be simple straightforward
questions, because as I've been looking through this and also talking
to the current FBI Director, the current Deputy Attorney General and
reading through some things, some things have popped up that I think at
least need some clarification.

When was the last time you were subject to a polygraph?

STRZOK: Approximately two or three years ago.

COLLINS: Two or three ago. To your knowledge have you ever failed
a polygraph or found to be out of scope?

STRZOK: I've never failed one. I was not a scope prior to my last
polygraph.

COLLINS: When would -- and that would have been in what time, you
said two to three years ago, could you be more specific?

STRZOK: Sir, I think if we can cut to the chase. I think there's
an e-mail that talks about people being out of scope for polygraph,
which generated my last polygraph.

COLLINS: Don't worry. We're going to be cut to the chase. So you
want to go and say January 2016 when you received a text or an e-mail.
Correct?

STRZOK: Sir, if that's the date, I stipulated to that. I don't
have those dates.

COLLINS: OK. We'll take that as stipulation. Has an examiner ever
accused you of attempting to use countermeasures to -- during a
polygraph examination?

STRZOK: Not to my recollection, no.

COLLINS: You received your e-mail in January as you've stated and
you've stipulated to. Your polygraph was out of scope in January 2016.
To your knowledge how long was your polygraph out of scope?

STRZOK: Sir. I don't know. I recall it's -- the penultimate -- the
second last polygraphs I had was when I was the Supervisor at
Washington field office which would have occurred somewhere between
2008 and 2011.

My understanding, what scope means to the FBI is that polygraphs
have a kind of five year span of effectiveness or validity. We --
several people, were trying, including me, trying to get right into a
particular intelligence compartment. They ran the names, means, some
others were out of scope, which happens because polygraphs are -- the
line for polygraphs is longer than the...

COLLINS: I understand -- I'm -- military Mr. Strzok I understand

the line for polygraph. I understand the delays in them. However, you having to have a very secure job and a very one that is highly sensitive.

So the question is, again, I would assume to answer your evasiveness you didn't know how long you were out of scope. Is that correct? Yes or no?

STRZOK: This fair, sir. I recreated by recollection, but I -

COLLINS: So, yes or no? Do you know how long you were out of scope?

STRZOK: I do not.

COLLINS: OK. Do you -- what was taken. What steps were taken to bring you into scope?

STRZOK: I went and had a polygraph.

COLLINS: OK. When was then -- was this after the January 16th letter that you received?

STRZOK: It would have afterwards. Yes sir.

COLLINS: OK. If you were out of scope the last time -- when was the last time you accessed classified information?

STRZOK: Last night, before while I was preparing for this.

COLLINS: OK. You currently have what classification?

STRZOK: I have a top secret clearance with some SCI compartments.

COLLINS: OK. During the time that you were out of scope did you have access to SCI?

STRZOK: Yes sir.

COLLINS: Are you aware that it is FBI procedure that a failure or out of scope polygraph, does not terminate a top secret. But however, a failure of this would require you to be read out of SCI access, although you could maintain your top secret. This was a direct answer from a question that I posed and was received within the last week. Were you aware that you should have been read out of any SCI information when you were out of scope?

STRZOK: I believe you used the word failure, which implies in my mind a failed poly, I am not and was not aware of the fact that an out of scope polygraph required to read out of SCI.

COLLINS: Then the question -- then I accept that Mr. Strzok. But I want stand by the question, does answer came back from the FBI and Justice itself (ph) that it was -- that is the procedure.

So the next question I have is, after the 26, '18 you did your polygraph at what time? You said you were out of scope. You were

brought in by giving a polygraph. When would have that been?

STRZOK: Again, sir my recollection is that 2016 timeframe. But I -- after that e-mail, but I don't when -- within a month or two, I think.

COLLINS: Are you also aware in the publicly stated version of IG report that there has been some serious questions and issues concerning polygraph information and lack of polygraph procedures in the Department of Justice and FBI that was brought out by the Inspector General?

STRZOK: I'm not -- I'm generally aware that there was a report, but I'm not aware of the conclusions of the...

COLLINS: One of the general concerns on this is, when you are out of scope -- and this is the answer coming back from Department of Justice, you should have been read out of SCI. My concern is, is it during this timeframe you were involved in two very high profile, what would have been, or at least getting ready for SCI information in which you are not read out of. This is a concern. There's nothing else from that question. I have no further questions and I'm finished and I yield back.

STRZOK: I think you misstated the conclusion there, sir. I think you said that...

COLLINS: Mr. Strzok...

STRZOK: ...that in event of a failure...

COLLINS: Mr. Strzok...

GOODLATTE: Mr. Strzok the gentleman from Georgia controls the time.

(UNKNOWN): The time is over. Mr. Chairman, the time is up.

STRZOK: May I respond sir?

COLLINS: There was no question to respond to. The answer is from the Department of Justice, I read you the answer.

STRZOK: May I comment to what I believe is a misstatement by gentleman from Georgia?

GOODLATTE: Briefly.

STRZOK: Sir, from your answer, what I took that to be is, in the event of a failure, an individual should be read out. You were conflating that with a scope or failure. It is not my understanding that outer scope requires somebody to be read out.

It may be. I'm not just security professional, but you appear to -

COLLINS: You are out of seat right now with an answer that we've received from the Department of Justice, and that is an interesting

answer that you just gave. That you may have been now saying.

And the question now becomes is policies and procedures fail or not fail? This is a serious investigation which I do take seriously. And if you are being read out you should have been read out. That is my final answer, statement not a question, not a poise (ph). I yield back.

GOODLATTE: The gentleman from Rhode Island Mr. Cicilline is recognized for five minutes.

CICILLINE: Mr. Chairman, I look forward to couple of extra minutes of each of my Republican colleagues have had.

Mr. Strzok, I'm serving on this Committee and representing the state of Rhode Island has been one of the greatest honors of my life. But the conduct of this Committee today has been, for me tremendously sad, embarrassing really dangerous to our democracy.

I want to apologize to you for the way you've been treated by this Committee. And for the American people who are watching, you ought not wonder why they've lost confidence in Congress and are sick of the kind of circus that they saw being conducted in this room today.

Because rather than focusing on urgent issues like family separation, reasonable efforts to reduce gun violence in our communities, considering legislation to reform our broken immigration system, passing legislation to reduce the cost of prescription drugs and addressing the inability of Americans who fall behind in their student loans to discharge that debt and bankruptcy or oversight of the many conflicts of interest and corruption in this administration, we're having yet another hearing on the Hillary Clinton e-mails.

What you should understand Mr. Strzok is, the reason my Republican colleagues will not let you answer a question because they are not interested in your answers. This is about promoting a narrative. You are being -- you are a prop, so they can promote a narrative in an ongoing effort to distract from the serious investigations of Special Counsel that is closing in on the Trump inner circle.

This is a campaign to undermine that work and sadly they will do whatever is necessary to do it in concert with the President, attack the FBI, attack the Department of Justice, undermine the rule of law. And so your e-mails are a perfect foil for this effort.

They're not interested in hearing your context and your explanation, because it's not about you, it's about protecting the President. My colleagues have acted more like they're on the defense team for Donald Trump than exercising their very serious oversight responsibilities as members of these two Committees.

Now Robert Mueller was praised to the heavens by everyone, Republican and Democratic, like when he was appointed. Now he's a villain. What's the only thing that's changed? 19 indictments, 5 guilty pleas, and the circle is closing in.

So I accept your sworn testimony about the difference between bias and the actions you took. We don't have to take your word for alone,

although I do. The IG report of 500 pages of interviews, review of
documents comes to the same conclusions. And we find the decisions they
were consistent with the analytic approach described above.

We found that these specific decisions were the result of
discretionary judgments made during the course of investigation by the
media agents and prosecutors and that these judgments were all were
reasonable.

So it's -- there was a big analysis that was done. Lots of
interviews, 500 pages, that's the same conclusion, the same
representation you made today. But don't be frustrated, because they're
not interested in that. This is about promoting a narrative.

So we know, of course, Mr. Strzok that the President -- the
intelligence communities unequivocally conclude that Russia interfered
in our elections. That it was directed by Vladimir Putin for the
purposes of helping Donald Trump and hurting Hillary Clinton, isn't
that correct.

STRZOK: Yes sir.

CICILLINE: Do you have any reason to doubt the assessment around
intelligence agency that made it high confidence?

STRZOK: No sir.

CICILLINE: And thereafter this Senate Intelligence Committee in a
bipartisan way, a Republican led Committee, came to the same
conclusion, is that right?

STRZOK: Yes sir.

CICILLINE: And yet the President of the United States and members
of the administration continue to deny that the Russian government
interfered in our elections. In fact, just as recently as June 28th,
the President said, Russia continues to say they had nothing to do with
meddling in our elections.

STRZOK: Yes sir.

CICILLINE: And even Secretary Nielsen said, "I do not believe that
I've seen that conclusion that the specific intent was to help
President Trump win."

STRZOK: I don't recall hearing that.

CICILLINE: OK. And in addition to that, you know about a Trump
Tower meeting where there was a discussion between the Trump campaign
and Russian operatives, correct?

STRZOK: Yes, I am aware of that.

CICILLINE: And the President then...

STRZOK: Sir, I would just add -- I would not characterize it one
way or the other as Russian operatives or not, but I'm aware of a

meeting.

CICILLINE: OK. And in that meeting there was a discussion about
some dirt that the Russians had on Hillary Clinton, correct?

STRZOK: Media reporting has indicated that.

CICILLINE: And the President then issued a statement in which he
lied about that meeting and said it was not an adoption discussion.
Correct?

STRZOK: Those statements have been made. Again, I'm relying on
what's been reported in the media, not FBI or Special Counsel or
something.

CICILLINE: So would you tell me, Mr. Strzok in the time that I
have remaining, what should we conclude or what raises eyebrows to you
about members of a presidential campaign meeting with a foreign
adversary of the United States to talk about dirt from -- about their
opponent, and then lying about the nature of that meeting. What should
we -- why should that concern the American people?

STRZOK: Sir, I don't want to -- I don't want to comment on any
specific fact pattern or anything that relates to the ongoing
investigation. So I hesitate and I don't want to do that in this
context.

CICILLINE: Thank you. Thank you. Mr. Chairman, I'd just like to
note for the record, we've had zero hearings on Russian interference in
the American presidential election. Zero hearings in this Committee
about our efforts to secure our democracy and secure elections coming
up in November.

We've had hundreds of hours to vote to Hillary Clinton's e-mail.
This Committee has failed in its responsibilities to secure our
elections, which is a responsibility we have to the American people.
And then when we finally have an opportunity to raise the issue,
instead we're going to talk about Hillary Clinton's e-mail. Shame on
all of the...

GOODLATTE: Time of the gentleman has expired.

CICILLINE: History is going to judge you very harshly for this
behavior.

GOODLATTE: ...the gentleman from Florida Mr. DeSantis for five
minutes.

DESANTIS: Thank you, Mr. Chairman. Mr. Strzok you've defended your
actions and said that you did not evince bias. That your actions were
motivated by bias. But the Inspector General disagreed when he asked
you about the insurance policy text, the we'll stop it text, you
provided an explanation similar that you did today. And he found your
explanation to be unpersuasive, and you're aware of that, correct?

STRZOK: I'm not aware of that with regard to that text.

DESANTIS: Well, he did, he testified when we had him in here on
June in response to my questioning.

He also said that your explanation for how you handled the Anthony
Weiner laptop. You delayed, you didn't take action initially. He said
your explanation for that, and he did note in the report, was not
persuasive. You're aware of that, correct?

STRZOK: Sir. I'm aware of facts rebutting that -- that he has
rebutting that specific assertion.

DESANTIS: Well, he testified to us that he was not persuaded by
your explanation for why you focused on the Trump/Russia collusion and
you let the Weiner thing sit.

And then he testified in front of our Committee that it was
reasonable to infer that your actions involving Weiner's laptop, the
fact that you didn't pursue that aggressively, that it is reasonable to
infer that it was because of the bias that you have evinced in those
text messages. Are you aware of his testimony with that?

STRZOK: Not specific to that, but I will accept your
representation.

DESANTIS: Yes. I think it's important to show while the IG report
said the Clinton charging decision was not necessarily due to bias. He
said that the Weiner is absolutely a fair game to infer that and then
they're obviously continuing to investigate the genesis of this Russia
interference case.

Do you also know that Rod Rosenstein on June 28th, when he
testified in front of this Committee, he said you were biased? Are you
aware of that?

STRZOK: I'm not aware of that.

DESANTIS: In response to my questions? Yes, he did. And he also
says that the bias that you evinced, it does undermine the integrity of
your investigative actions and it causes the American people lose
confidence in the institution. Do you know he said that?

STRZOK: I don't and he is...

DESANTIS: Well, he did. So I just -- the idea that there's no bias
here is not -- I don't think your explanations have incredible. And I
think that if you acted so appropriately, Mueller removed you from
team. You are now at Human Resources, which is obviously a demotion.
And then you are now the subs -- one of the subjects of an ongoing IG
investigation, correct?

STRZOK: No sir.

DESANTIS: Your conduct is not being reviewed by Horowitz about
what you did or did not do with Russian collusion case...

STRZOK: I'm really unaware of being a subject of any ongoing IG...

DESANTIS: Well, I bet you, your conduct is at issue there. Let me ask you this. You opened up the counter-intelligence investigation on 31st July, was that because of the George Papadopoulos information?

STRZOK: Sir, I can't get into the guidance that the FBI has provided me about answers I can provide. That gets into a level of detail that I can't -- that I've been directed not to provide.

DESANTIS: Well, you have answered some questions. I mean I think this has been a little bit of convenience. I mean, you've answered some questions about there was grave concerns in all this stuff about why you were doing it. You didn't do that. The dossier -- was the dossier a part of why you opened up the investigation?

STRZOK: No. But sir, none of this has been convenience. All of this has been based on what the department has worked out with Chairman Goodlatte about what is permitted and not.

DESANTIS: OK.

STRZOK: This is not a function...

DESANTIS: So the dossier was not part of it, so that's important. When did you learn that dossier was funded by Hillary Clinton and the Democratic Party?

STRZOK: I cannot -- I don't think that's an accurate representation in the department or that the FBI's direction to me not to answer that question based on...

DESANTIS: Well, right. So Hillary DNC sent to Perkins Coie who sent to Fusion who paid -- I mean, common.

STRZOK: Again, that's -- I'm not...

DESANTIS: It was a political document, correct?

STRZOK: The ladder is closed. I cannot comment. The FBI has directed me to not answer that question based on the operational...

DESANTIS: Would it be fair to say that dossier -- what would you choose? Is it a political document, opposition research or is it legitimate intelligence?

STRZOK: Sir. I would very much like to answer that question.

DESANTIS: OK.

STRZOK: I was directed by the FBI that I may not get into that based on operational requirements or equities.

DESANTIS: So here's the issue, I think we have. We see the bias that you did. Your explanations for why you said what you did really aren't credible. We're trying to get to the genesis of why open up a counterintelligence investigation against the opposing party's campaign?

I'm with you about focusing on Russia and holding them accountable. But you tried to rope in the other party's nominee. There was also a lot of bias and then we can't get any answers to the questions of what the genesis of any of this was. And...

STRZOK: Sir.

DESANTIS: Let me finish. May 18th, Chairman Gowdy mentioned, you say look my concern is that there is no there there. So this has been going on for at least 10 months. I think it was going on before July 31st and there you are Mueller is appointed and you can't even identify any reason to suspect that there was collusion between Trump's campaign and Russia.

There was no big there there after 10 months. So that's -- the concern is that somebody like you who said will stop him. He said we needed insurance policy. That you let that bias, you wanted there to be something there. You wanted it to be true. And that I think influenced your actions.

You can prove us wrong by providing us the information. I'd like the information on any type of informants pre July 31st. I'd like the information on what you use to open up the counterintelligence investigation.

I want to know whether that was any foreign intelligence involved or was whether it was funneled through the State Department? These are all questions that if we just put those out and answer them then a lot of us would be able to then make -- I think, the American people can make a judgment. I'm going over my time. I yield back.

STRZOK: Mr. Chairman...

GOODLATTE: Time has expired. Briefly.

STRZOK: Sir. Two things, you asked why -- I couldn't explain why, case would be open. I don't think that's accurate. If you look at Director Comey's statement when the Department of Justice had authorized him to say that the FBI had opened a case into allegations that the government of Russia had made an offer of assistance and the potential involvement of members of the Trump campaign.

I cannot envision a scenario where that would not be a reasonable predication to open a Russia.

DESANTIS: Well it is Papadopoulos, that's not quite what they had. I mean, you didn't quite get there. I know Comey may have said that, but you didn't quite get there. So if it's Papadopoulos that's weak.

STRZOK: I think the characterization was that it was a credible source of information stands on its own. I don't think anybody in this Committee would argue that.

One, it wasn't appropriate to open that, and two, that it wasn't absolutely predicated about whether it was appropriate, because we don't know the underlying information. We read in The New York Times from leaks that it was -- because Papadopoulos said at a bar...

GOODLATTE: The time of the gentleman has expired.

STRZOK: That's the reason.

(CROSSTALK)

LEE: Regular order.

GOODLATTE: The Chair recognizes this gentleman...

STRZOK: Mr. Chairman there is not -- there is a second element of the question that gentleman...

GOODLATTE: Very -- no...

STRZOK: You raised the question about whether or not I agreed with Inspector General that I had acted in any way that biased...

GOODLATTE: You had an opportunity to answer that earlier.

STRZOK: Sir, I did not to this time...

GOODLATTE: The gentleman from Illinois Mr. Krishnamoorthi is recognized for five minutes.

KRISHNAMOORTHI: Thank you, Mr. Chair. Thank you, Mr. Strzok. Mr. Strzok on July 3rd, your lawyer Mr. Gallman (ph) made the following statement to Chris Cuomo on CNN regarding you, his client.

On Fox News they talk about him as the center of this anti-Trump cabal that was determined to throw the election against Trump. None of this has a shred of truth. Do you agree with this statement sir?

STRZOK: I do.

KRISHNAMOORTHI: And at a June 19th Op-Ed in USA Today your lawyer said regarding the Russia investigation, what we call the Russian collusion investigation, that you and your team quote unquote "Went out of their way to prevent leaks and actively ensured that news reports did not overplay the seriousness of the investigation" Is that true sir?

STRZOK: Yes.

KRISHNAMOORTHI: Now tell us why it's so important to prevent leaks from the FBI to journalists or to others?

STRZOK: Leaks are terrible. They undercut things in a variety of ways they can upend investigations. They can lead to incorrect assumptions. They can let witnesses, subjects know that they're being investigated. That can lead to wild speculation, destruction of evidence, any number of really bad -- disclosure of classified information, any number of really bad adverse things.

KRISHNAMOORTHI: Got it. The DOJ IG's report has this to say about your involvement in the decision to inform Congress about the Weiner

laptop. Quote unquote, "Strzok explained that the decision to seek a search warrant for the Weiner laptop was known to many people beyond the mid-year team and this raised a concern that this information could leak." Is this statement from the IG's report, true?

STRZOK: Yes.

GOODLATTE: Now could you unpack that for us a little bit? First of all, you said according to IG's report that the search warrant for the Weiner laptop was known to many people beyond the mid-year team. Could you explain whether any of those people would be in the New York field office?

STRZOK: So the invest -- my recollection is that the investigation of the crimes against children case of Mr. Wiener was handled by the New York field office by the Southern District of New York or maybe the Eastern District. I think it was SDNY.

KRISHNAMOORTHI: And show the people to whom you're referring included people in the New York field office correct?

STRZOK: That's correct.

KRISHNAMOORTHI: And you had concerns about their actions if Director Comey did not inform Congress about this Weiner laptop.

STRZOK: I did not have concerns about New York. My concerns were just general that the more people who are aware of something, the greater chance that it leaks out somehow. But those concerns were not specific in my mind to New York.

KRISHNAMOORTHI: OK. Let me ask you about this, in a report -- in that same report. Attorney General Loretta Lynch recalled a conversation with then Director Comey in the final days of the 2016 election.

Quote unquote, he, referring to Comey, said, "It's clear to me that there is a cadre of senior people in New York who have a deep and visceral hatred of Secretary Clinton." And he said it is quote unquote, "Deep". Were you aware of this concern?

STRZOK: I was aware of the -- certainly some of the press reporting and some people expressing that concern, yes.

KRISHNAMOORTHI: Was one of those people Director Comey?

STRZOK: A person having that concern?

KRISHNAMOORTHI: Yes.

STRZOK: Yes.

KRISHNAMOORTHI: Could you explain to me a little bit about that and how that in your view affected the revelation of the warrant for Weiner's laptop?

STRZOK: You'd have ask Director Comey that. I think the -- there

was discussion I remember and particularly some of it was in the context of reporting from Mr. Giuliani and others about connections to New York.

But again I don't want to scapegoat New York, because a lot of people were aware of it and there were concerns just about the number of folks. But with regard to Mr. Comey, my recollection is that he was aware of those concerns. But I was not privy to discussions he had with the Attorney General or other concerns you might have had outside of my presence or conversation.

KRISHNAMOORTHI: Now with regard to Mr. Giuliani, on October 25th, then Trump Campaign Adviser Rudy Giuliani promised a quote unquote, "pretty big surprise" coming up in the campaign. On October 28th Giuliani claimed to be in contact with former agents and a quote unquote "few active agents" who obviously don't want to identify themselves.

Let me make sure I have this right. There was a concern that there is a deep and visceral hatred towards Secretary Clinton in the New York field office. At the same time Mr. Giuliani says that he's having contacts with agents -- active agents. What is -- can you give us your take on this in your comments on this particular issue?

STRZOK: I recall that comment. I recall it caused me a lot of concern. You know...

KRISHNAMOORTHI: And why? Why did it cause you concern?

STRZOK: Because while it's certainly possible that Mr. Giuliani is exaggerating or engaging in some sort of puffery. The reality is that also given the things that were going on, giving timing that the laptop was there and he was talking about that in the context of a big surprise, it caused me great concern that he had information about that.

KRISHNAMOORTHI: In other words...

STRZOK: ...that he could not have had.

KRISHNAMOORTHI: That he should not have had.

STRZOK: Correct.

KRISHNAMOORTHI: Through a leak?

STRZOK: Through an unauthorized disclosure, sure, leak. Yes.

KRISHNAMOORTHI: Thank you, sir.

GOODLATTE: The members are advised that there are a floor -- a vote on the floor of the house -- four votes. Mr. Strzok you probably have a good 45 minutes to. All right. Members are advised this will be the last one. So if you want to head to the floor for a votes. But the Chair recognizes the gentleman from Kentucky, Mr. Massie.

MASSIE: Mr. Chairman I yield my five minutes to the gentleman from

Ohio, Mr. Jordan.

STRZOK: Sir, I can't hear you.

JORDAN: Just a couple of questions. Agent Strzok, in earlier round you said you never talked to Glenn Simpson, right?

STRZOK: Correct.

JORDAN: And you never talked to Nellie Ohr?

STRZOK: Correct.

JORDAN: And you wouldn't say whether you knew if Nellie Ohr worked for Fusion? Is that correct?

STRZOK: My understanding from my direction of the FBI is I'm not permitted to answer that question.

JORDAN: OK. But you did say you talked with Bruce, fellow the Department of Justice employee and Nellie Ohr's husband.

STRZOK: Yes.

JORDAN: But it is common knowledge that Nellie worked for Fusion in the summer of 2016. Is that right?

STRZOK: I don't know if it's common knowledge or not.

JORDAN: It's been in all kinds of reports.

STRZOK: It is not, that's absolutely...

JORDAN: All kinds of press reports. All right. You met with Bruce Ohr in 2016 and 2017, so the time very that were focused on.

STRZOK: To the best of my recollection, yes.

JORDAN: All right. And you won't tell me what you guys talked about?

STRZOK: Sir, I can tell you we talked about operational matters that he was involved in. But the FBI has directed me not to give you -- not...

JORDAN: Specifically you can't -- you can't get into specifics and details. Did Bruce or give you any documents?

STRZOK: Sir same answer. I would like to answer the question, but the FBI has directed me not to get into...

JORDAN: You can't. My understanding is Mr. Chairman the discussions we've had with the FBI, he's allowed to tell us those kind of pieces of information. I'm not asking what the documents were. I'm just asking did Bruce Ohr ever handed you documents?

STRZOK: I understand full well what your question is sir and I

would love to answer. My understanding from the FBI is, when it comes to operational details, including whether or not we collected evidence or didn't that I'm not permitted to answer that. Sir, I would love to answer that question.

JORDAN: I mean, you understand where I'm coming from, right, Agent Strzok?

STRZOK: Sir, I understand your frustration and what I'm here to tell you is I think the answers would...

JORDAN: Yes, you understand, we got an e-mail from you briefing everybody on the team. All the key players, Rybicki, Baker, Page, Martha (ph), precept (ph) and Andy McKay (ph). And in that e-mail you say, the dossier that you are now looking at that BuzzFeed is printing has differences from the one given to us by Corn and Simpson.

Earlier today I asked you who Corn and Simpson is and you wouldn't answer that, is kind of funny to me, because yesterday David Corn tweeted out. He is the Corn in your e-mail. So the guy himself identified himself. We all know it's David Corn. And then the other name is Simpson.

So you have this and we're wondering how the dossier got to -- or if, more importantly, if the dossier got to the FBI through media sources, not just through Christopher Steele. And of course we know Nellie Ohr worked for the guy you're mentioning, Glenn Simpson. She worked for him the whole time.

You've never had conversations with her, but you did have a lot of important conversations on operational matters and ongoing investigations with her husband Bruce Ohr, who's also happened to be reassigned at the Department of Justice.

And I'm just one -- and you've said that -- well, you won't answer the question whether Mr. Ohr has given you documents or not. So I'm just wondering if that was the route. Was that the route that dossier went? Glenn Simpson to Nellie Ohr to her husband and then to you.

STRZOK: Sir, I under...

JORDAN: That's my frustration.

STRZOK: I understand your question. I understand your frustration. I understand the absurdity of something produced that you're reading, that I've been directed not to answer questions about. The best I can...

JORDAN: More importantly that wrote...

STRZOK: ...like to answer you and I'm afraid it's an answer to both reassure you and disappoint you.

JORDAN: Well we're going to be asking and I think Mr. Chairman, it's OK with you. We're going to be asking the FBI and the Department of Justice to give us those documents that may or may not have been exchanged between Mr. Ohr an Agent Strzok. I think that's something

this Committee would like to have and see what those -- if in fact there were documents. What the heck they were. I got a minute. I will yield to...

STRZOK: Sir, you're going to love this and it's going to upset the vote. I have been instructed that the FBI has now told me that I can answer questions about the receipt of the documents. So I will defer Mr. Chairman, if you would like to, hear that or take your vote...

GOODLATTE: The gentleman may proceed with his questions and you may answer.

STRZOK: Before -- may I confer with counsel briefly to see if this is completely unbounded or if there are any limitations on what I may say?

JORDAN: Well I got lot of questions I've asked all day long.

GOODLATTE: Just ask the one you've been told he can answer.

JORDAN: All right. So let's hear the answer to this one.

STRZOK: Which question, sir.

JORDAN: One that's on the table, about the documents.

STRZOK: Sir the documents received from a different source in the initial batch in mid-September.

JORDAN: Wait, wait, wait. No, no, no. I'm not understanding. You said you got -- go back, did you get documents from Bruce Ohr?

STRZOK: Yes. At some point we received material from Mr. Ohr.

JORDAN: You've got documents from Bruce Ohr and what were those documents?

STRZOK: We received documents from Mr. Ohr, not me. Excuse sir.

JORDAN: I can maybe make it simpler. Agent Strzok was it the dossier?

STRZOK: Sir, what I am authorized to tell you in response to a question, did you receive any documents from Bruce Ohr, the FBI has directed me that I may say, that me. The FBI received documents and material from Mr. Ohr.

JORDAN: Did you. I appreciate that. I appreciate that. But you did not from Mr. Ohr?

STRZOK: No.

JORDAN: OK. But the FBI did get documents from Bruce Ohr?

STRZOK: Yes sir.

JORDAN: Did they get the dossier from Bruce Ohr?

STRZOK: My direction from the FBI is I may tell you the FBI
received material from Mr. Ohr...

JORDAN: This is amazing...

STRZOK: Congressman, I...

JORDAN: This is amazing. This is amazing. So Nellie Ohr works for
Fusion, works for Glenn Simpson and she's giving documents....

LEE: Regular order, please. Let us bring the Director of the FBI
to answer those questions. The gentleman cannot answer. He has asked
and answered.

JORDAN: The American people....

LEE: He is asked and answered. He cannot answer.

GOODLATTE: The gentlewoman.

LEE: Let's have director...

GOODLATTE: The gentle -- the regular order.

LEE: I Understand Mr. Chairman, regular order. The FBI has now
instructed Mr. Strzok that he can answer additional questions and Mr...

JORDAN: Agent Strzok I asked about...

GOODLATTE: ...additional time to get the answers to those
questions that earlier was...

JORDAN: FBI approved -- has the FBI also given you permission to
if say Glenn Simpson is the name that you used when in e-mail where you
say Simpson?

STRZOK: I don't believe they've given me guidance. My most recent
understanding of my guidance from the FBI is in response to the
question of whether the FBI received documents from Mr. Ohr.

JORDAN: Has the FBI given you the....

STRZOK: The answer is that yes we did, and that's all I'm
authorized to say.

JORDAN: Has the FBI given you information to tell me whether you
knew Nellie Ohr worked for Fusion at the time you were meeting with her
husband?

STRZOK: Sir, to my knowledge the FBI has not directed me to -- or
allowed me to respond to that.

JORDAN: All right. I yield back. Thank you.

GOODLATTE: The committee will stand in recess until immediately
after this series of votes.

(RECESS)

GOWDY: (OFF-MIKE) convened and the chair recognizes the gentleman from California, Mr. Swalwell, for five minutes.

SWALWELL: Thank you.

Mr. Strzok -- Mr. Strzok, I too like my colleagues were disappointed to read the text messages knowing that you had a serious career and have done a lot of good work and the questions that would raise but I also appreciate that you have come here today and have owned them and have apologized for them.

But I want to focus on your work as an investigator in counterintelligence. In your experience, do counterintelligence investigations take longer when subjects to investigation, tamper with other witnesses?

STRZOK: Yes.

SWALWELL: In your experience as a counterintelligence investigator, do counterintelligence investigations take longer when subjects lie to investigators?

STRZOK: Frequently yes.

SWALWELL: And as a counter intelligence investigator, do intelligence investigations take longer when subjects or witnesses refuse to cooperate and you have to go through the subpoena process?

STRZOK: Yes.

SWALWELL: You're here and you're not taking the fifth?

STRZOK: That's correct.

SWALWELL: Did you consider taking the fifth?

STRZOK: No.

SWALWELL: Why not?

STRZOK: I've done nothing wrong. Let me rephrase that, I am sorry, I am sorry for these texts and the way they've been used, for the harm and hurt they've caused my family, for the perception of people in the public and I'm -- I am sorry and deeply regretful for that.

But when it comes to -- that -- that's a personal acceptance of responsibility that I take and I -- I need and I'm working to make right but when it comes to official conduct, when it comes to any action which would violate a law or a crime, absolutely, I've never done that and I've no need to take the fifth.

SWALWELL: Mr. Strzok, you watched as Director Comey testified a number of times under oath to Congress.

STRZOK: I have.

SWALWELL: And to your knowledge, has President Trump, has he raised his right hand and gone under oath, just as you and Director Comey have? to special counsel or anyone else?

STRZOK: Only time I recall is when he was sworn in as President.

SWALWELL: Were you the sole individual who closed the Hillary Clinton investigation?

STRZOK: No.

SWALWELL: Were you the sole individual who opened the Russian investigation?

STRZOK: No.

SWALWELL: On November 3rd, 2015, did you send an e-mail to Michael Cohen and say that 'our boy can become President of the United States and we can engineer it, I will get Putin's team who seem to buy in on this', did you send that e-mail?

STRZOK: No.

SWALWELL: Did you set up a meeting on June 9th where the e-mail setting up that meeting was sent to Donald Trump Junior, where Donald Trump Junior was offered dirt on his father's opponent? Did you set up that June 9th meeting at Trump tower.

STRZOK: Without stating whether or not that meeting happened, I did not set up a meeting.

SWALWELL: Did you reply to the e-mail setting up that meeting, where dirt was offered and was said, I love it?

STRZOK: I did not.

SWALWELL: And in the summer of 2016, were you working as a speech writer?

STRZOK: No.

SWALWELL: So would you happen to have written the speech for Donald Trump, the candidate in the summer of 2016 or he told an audience, Russia, if you're listening and then went on to tell the Russians that if they hacked Hillary Clinton's e-mails, they'll be rewarded, did you write that speech?

STRZOK: I did not.

SWALWELL: Does any of the behavior that I just described concerning you from a counterintelligence perspective?

STRZOK: Tremendously.

SWALWELL: Why?

STRZOK: Because it indicates a -- a set of standards and requests that in my mind, one, encourage a foreign power to begin inserting themselves into our electoral process. It indicates a willingness or a desire to engage in a conversation and dialogue about how to do that. It potentially implicates a variety of laws.

And without getting into what has or has not been done investigatively, simply, I'm expressing that based on the open source reporting about these things.

SWALWELL: Thank you, I yield back.

GOWDY: The Chair recognizes gentleman from North Carolina, Mr. Meadows for five minutes.

MEADOWS: Thank you Mr. Chairman. Mr. Strzok, I'm going to go through a few real quick questions but I think earlier in your testimony today, I want to make sure I have this clear, I think you were quoted as saying, we don't ever talk about ongoing investigations outside of the FBI, is that true?

STRZOK: I -- I don't know the context in which I said it, I can think of -

MEADOWS: I think we're talking about sharing with the media and -

STRZOK: All right, no, you don't -- so my experience in that is, I can think of examples, not that I've participated in, where members, if there is an ongoing case say -- and a field office wanted and lists the public's help and they would talk to the media about giving a lead on the kidnappers.

So I -- there are times where that might occur so that's why I want to be careful to frame what I said and -- and how I said it.

MEADOWS: So you have never talked to anyone outside of the FBI, about the Russia investigation at all?

STRZOK: I have never spoken to any member of the media about the Russian investigation.

MEADOWS: Have you spoken to anyone who is not in the media and is not part of the Department of Justice or the FBI about the Russian investigation?

STRZOK: The U.S. -

MEADOWS: Other than witnesses.

STRZOK: The U.S. intelligence community.

MEADOWS: All right, so you talked to CIA?

STRZOK: The U.S. intelligence community.

MEADOWS: I would not -- I would -- would that include the CIA?

STRZOK: It potentially, I don't think I can answer these specifics
of who I talk to -

MEADOWS: Well, so I'm going -- I'm going to ask questions that you
can answer, that are not specific about this investigation and so in
doing so, I need you to give me clear answers. Are you aware that there
was a meeting between Director Brennan and Senator Harry Reid where
indeed he shared certain intelligence with Senator Reid on August 25th
of 2016, are you aware of that?

STRZOK: I -- not to my recollection, I'm not.

MEADOWS: OK, well then, the text message between you and Ms. Page,
a few days after that, on August 30th, where you said, here it comes,
when Senator Reid sent a letter to Director Comey, what would you have
been referring to then?

STRZOK: My recollection of that, which is very imprecise, it was
that Senator Reid had been making a lot of comments and I don't know,
if it was public comment or comments to Director Comey -

MEADOWS: Well, they weren't public at that time, they became
public with the New York Times but they weren't public at that time so
are you aware that in your e-mail dated January 10th, where you
acknowledge the fact that Harry Reid knew about the dossier, prior to
sending that letter, are you aware of that e-mail from you?

STRZOK: I don't know that I was talking in that about the -- the
-- the Steele material which you're referring to is the dossier. I
would have to check my notes, I -- I'm not -

MEADOWS: I need you to check your notes and report back because we
have evidence that would suggest that so since we're talking about -

STRZOK: The date on this was what? August of?

MEADOWS: August 25th was the briefing with Harry Reid -

STRZOK: Of 2016?

MEADOWS: Of 2016 by Director Brennan, he sends a letter then to
Director Comey which we have acknowledgment of by Director Comey and by
you and Lisa Page in -- in text messages that would suggest that you
were aware of that.

So the CIA Director briefing Harry Reid and the indication is --
is that they talked about the dossier and we get that indication from
an e-mail from you, from January 10th.

STRZOK: Yes, but that's not true. Congressman, the first
recollection I have of any material from the -- the material produced
by Mr. Steele was mid-September 2016 so I did not know or have
information from -- of that material, certainly from any other source
prior to mid-September if my memory serves.

MEADOWS: You had not seen it until mid-September?

STRZOK: My recollection is that in mid-September and again, I have
to refer -

MEADOWS: And I want to -- I want to give you a chance to make sure
that we're clear on the record here, you were not aware of the briefing
that took place between Director Brennan and -- and Senator Harry Reid
on August 25th -

STRZOK: That is correct, my recollection, I was not aware that
meeting.

MEADOWS: All right, so let me go a little bit further because we
got four to five other documents that would indicate that the White
House was notified at least four different times about this
investigation. Do you think that that would be an appropriate during an
ongoing campaign, that the Obama administration would be kept up to
speed on a Russia collusion investigation, do you think that would be
appropriate?

STRZOK: Sir, you're -- you're mixing a couple of things. The -- it
would be entirely appropriate for the White House to be aware and
concerned about what the Government of Russia was doing with regards to
the elections when it comes to -

MEADOWS: That was not my question but I-I agree, I'm concerned, I
actually have a Bill that I -- I encourage my colleagues opposite to
talk about Russian interfere but we can make sure that didn't happen.

We're talking about an investigation that would include collusion
being talked about, with the White House, we have evidence that would
suggest not once, not twice, not 3 times but 4 times that it was
discussed with people in the Obama administration.

Were you aware of any discussions that took place with regard to
Russia collusion investigation that took place with the Obama
administration's executive branch?

STRZOK: So when -- I -- I want to ask you Sir, when you say
investigations, are you talking about investigations, I'm not saying
there were or were not -- investigations of U.S. persons or potentially
investigations of a Russians sitting in the Ukraine?

MEADOWS: Of U.S. persons associating with Donald Trump's campaign.

STRZOK: I am not aware of any briefings to the White House about
this, it -- when was the time frame that you provided? I'm not aware of
any -

MEADOWS: Any time between July 31st and November 8th when the
election happened, you're not aware of any, that's your sworn testimony
-

STRZOK: My sworn -- about specific identities of people who were
there -

MEADOWS: I don't want to ask you about the people, I don't want to

know the people, I want to know did it happen, are you aware of any conversations that happen with Obama administration officials? Be careful, how you answer.

STRZOK: Yes, I am certainly aware of conversations that occurred with Obama administration officials, I'm aware of a variety of conversations that took place across the U.S. intelligence community talking about the Russian efforts, I am aware that my recollection and understanding -

Again, I was not present at any briefing, my understanding is that there were not discussions of identities of individual U.S. persons who may or may not been the subject of -- of investigations.

MEADOWS: OK, I think, you're parsing words, I'll yield back.

GOWDY: Gentleman's time has expired.

STRZOK: You asked me to parse words. If you want me to be careful then I would -- the only way I can do that is by parse.

GOWDY: The Chair recognizes the gentleman from Louisiana, Mr. Richmond for five minutes.

RICHMOND: Thank you, Mr. Chairman and against the -- the wisdom of my grandmother that said that when you see a circus going on, don't jump in the middle of it and expect people not to call you a clown, I will answer -- ask questions anyway because I think that this is a circus.

And the problem is that it's a distraction from real issues that we're talking about or should be talking about in this country. We have asked this committee to have a hearing on the fact that we still have not renewed the Voting Rights Act, we have had no hearing.

We asked this committee to have a hearing on DACA where we are putting at risk dreamers who make this country better place but we've had no hearing on DACA. We've asked for hearings on the fact that we are separating infants and toddlers from their parents with now no clearly no ability to reunite the family.

So we have sick and maniacal things going on in this country and we spent six hours with 20% of Congress, locked in a room, bashing someone in hopes that we can discredit a law enforcement investigation.

In my wildest dreams in my entire life, I never thought, that I, a young black man will be defending the FBI. Well, we were always taught that we have to believe in the system and the people who take an oath and swear to protect, people who protect and serve our communities, people who have fought for this country on foreign land, that we give them the benefit of the doubt of their honesty and integrity and the fact that they want to see justice served.

We have these hearings but we won't have hearings to really look at Russian collusion. We can't even get the administration to admit that Russians played a part in hacking our election so when we look at what we're doing today, what we're doing is wasting precious time and I

can go down the list on September 7th, we sent a -- September 7th of
2017, we sent a letter about DACA.

On October 2nd of 2017, we sent a letter to this Committee, asking
them to have a hearing about the Las Vegas shooting and what we could
be doing as the Judiciary Committee to make sure that that doesn't
happen again.

We sent a letter, November 6th of 2017, to ask about what we could
be doing with 25 people were killed in a church in Texas, we the
Judiciary Committee with jurisdiction, why are we not having a hearing
on that?

So the question is, with all of the talent on this committee on
both sides, my Republican colleagues, my democratic colleagues, we have
spent far too much time today on a red herring that is designed to do
exactly what I'm afraid it's doing, which is distracting from the real
issues that we're dealing with in this country.

And unfortunately, with the media and our 24 hour news site,
American people are going to hear this over and over and actually think
that this is a real substance of hearing when it's not.

And I just think, it's very unfortunate because people in America
have some real problems to deal with, how to find their children, how
to keep a roof over their head, clothes on their back, food on the
table, care for an ailing parent and we're in here wasting time.

And with that I'll just -- I'll just yield the balance of my time.
If there's anything that you think, you need to add or that you were
cut off and not had the time to add to this discussion, I'll yield the
balance of my time to Mr. Strzok to do that.

STRZOK: Sir, I appreciate that offer. Yes, I'm -- I'm struck
listening to your statements and -- and I know the history of the FBI.
I certainly want the FBI to be something that you immediately leap to
the defense of and I think that's something we're -- we're working very
hard to become.

But I -- yes, again, I appreciate the offer and thank you.

RICHMOND: And when it comes to the FBI, I also asked years ago to
have a hearing on the fact that they -- we don't know on track how many
crimes are committed by FBI informants, we haven't had that hearing.
But we spend time on fast and furious because we were putting guns,
introducing guns into the hands of criminals.

But every day, the FBI and law enforcement with snitches in
confidence to informants allow people to deal drugs in African-American
community that cooperate with the FBI, we still have not had that
hearing.

So all I'm asking for is let's at least, keep our eye on things
that are affecting all of our communities and this just, isn't one of
him and the unfortunate part is I think, you know, we've been unable to
keep ton of vision on the things that are important and we've allowed
ourselves to get distracted by something that investigation will at the

end of its day, the thing will speak for itself.

And whether there was collusion, whether people broke the law, we will find out but we do know one thing that there's been indictments and there have been guilty pleas and in my experience, guilty people don't plead guilty very often and when you have indictments that say, the United States of America versus -

GOWDY: The time of gentleman has expired.

RICHMOND: -- then we know that where there's smoke there's fire and we ought to allow the process to play out, with that I surrender the remainder of my time.

GOWDY: The time of the gentleman has expired, the gentleman from Florida, Mr. Ross is recognized for 5 minutes.

ROSS: Thank you Chairman. Mr. Strzok, I thank you for being here, I know it's been a long day and this is the last place you want to be but you're the reason, we're here and actions by you are the reason, we are here and I know that my colleague from Pennsylvania, Representative Marino had chosen this handbook on ethics on -- for on and off duty conduct issued by the U.S. Department of Justice.

Principle 9 of the 14 principles espouse and says, that employees are to protect and conserve federal property and shall not use it for other than authorized activities and as my colleague, on the other side of the aisle, from the district of Columbia, Congressman Norton's pointed out, quote, anything that was on your official phone belongs to the public', would you not agree?

STRZOK: I don't, it is funded by the public, it is in the service of the public, I don't know that necessarily means -

ROSS: And it is federal property?

STRZOK: Yes.

ROSS: And according to Principle 9, should not be used for any other -- anything other than authorized activities. That being said, did you use any other federal property for any other reason, for anything but federal activities?

STRZOK: I would tell you FBI policy allows the use of phones for personal de minimis use and FBI text messages -

ROSS: So would you say you're on de minimis -

STRZOK: It's one big bucket, Sir, it's -- FBI agents can send a hundred billion texts or one text and they would get billed the same.

ROSS: But you specified today that what you texted was considered political free speech, your opinions for political free speech and do you feel that your use of a federally authorized, federally owned cell phone protects your rights of exercising your political free speech.

STRZOK: Sir, look, I think -

ROSS: No, no.

STRZOK: I think, it was bad judgment, I think it was terrible judgment but I do not -I believe -

ROSS: You took a federal car.

STRZOK: I believe it is protected speech.

ROSS: As the same way the perfect speech would be then if you used your -- your federal vehicle and put Hillary -

STRZOK: No, that's -

ROSS: Why not it's protected -

STRZOK: Because if you read the ethics guidelines, Sir, that is -

ROSS: That is what you're doing.

STRZOK: May I answer your question?

ROSS: Please.

STRZOK: That -- the use of or display of any bumper sticker, believe me after this started, I've gone through the ethics guidelines up down left and right and the hatch back. Placing a political bumper sticker on a car -- on a bureau government car, any government car is expressly prohibited to the contrary, expression publicly or privately of personal political beliefs is encouraged and I would encourage you to read -

ROSS: And you can use that on any federal property -

STRZOK: -- the details of that policy guide before you start quoting it out of context.

ROSS: -- even if it violates the principle.

(UNKNOWN): Request the witness to answer the question, Mr. Chairman.

GOWDY: The witness did answer the question, the gentleman from Florida controls the time.

ROSS: The FBI ethics integrity program policy, FBI code of conduct states that employees shall conduct their personal activities in manner that does not impede their professional performance or tarnish the reputation of the FBI, do you agree with that?

STRZOK: I do.

ROSS: And you have blamed today, the media, you have blamed the Washington community, you blamed the President, you blamed everybody and you say, it's just not you. So my question is, do you believe in any way that your personal text that were done on federal property have

in any way tarnished the reputation of the FBI?

STRZOK: Sir, I -- I don't think, I've blamed anybody here at all, today.

ROSS: Have you -

STRZOK: Sir, I take responsibility for sending those texts, those texts have caused, as I said -

ROSS: I -- I agree with you, you said earlier but has this tarnished the reputation of the FBI? Has it tarnished the reputation of the FBI?

STRZOK: Yes Sir.

ROSS: It has, hasn't it?

STRZOK: Yes.

ROSS: And to take it even further, on page forty of ethic handbook, if it's -- it states -

STRZOK: So while you're looking for that reference, I would tell you that -

GOWDY: Time is controlled by the gentleman from Florida.

ROSS: The State Department has defined notoriously discretional conduct as conduct, which were it to become widely known, would embarrass, discredit or subject to a program, the perpetrator of the -- and the United States. My concern is that we've seen little or no remorse here, other than saying, I wish, I had never sent those texts out because I hurt my family.

But in fact as elected member of Congress, I have an obligation and entrusted me by my people, to make sure that we maintain the quality of trust in our government and after today, after what we've seen today, I understand why the federal government has such a low level across from the American people.

My question to you is, having been there, having now been here, how do we reinstate that trust to the American people, how do we make sure this never happens again?

STRZOK: Sir, I would -- a couple answers to several things you said, first, I don't think the American people has lost faith and confidence in the FBI at all, what the FBI does, day in day out, you're wrong, Sir.

I know, I've spoken to agents in 56 field offices and I know, the work they do, day in, day out and what is convenient to say here on some of news clip is absolutely not what exists, second Sir, I would tell you, yes, I -- and I don't know why you're saying, I don't have remorse or somehow I'm not sorry.

I have said and I will tell you again, Sir, it's not knowing -

ROSS: -- answer the question.

STRZOK: Sir, if I may respond to your question, I am deeply regretful for those texts, I wrote them, I know it, I know what has been done with them, at the same time, I will tell you, Sir, the FBI allow -- there is an expectation that those tests are private, the bureau allows me or any FBI employee to text my priest, to text my doctor in -

ROSS: Knowing that this going to be -

GOWDY: The time of the gentleman has expired.

STRZOK: There is an expectation that those are not going to be made public, I had no idea that this was going to happen and darn, if I knew it, I never would have done it for sure.

GOWDY: Thank you, the time of the gentleman has expired. The Chair recognizes the gentleman from California, Mr. Lieu for five minutes.

LIEU: Thank you Mr. Chair. Let me start by saying, this is a stupid and ridiculous hearing, for these two reasons, the Judiciary Committee has jurisdiction over immigration and its July 12th 2018 and as we sit here today, there are nearly 3000 babies and kids that have been ripped away from their parents by this administration and we're not doing a hearing on that.

We're doing a hearing instead on the investigation into Hillary Clinton's e-mails in 2016, it's just dumb. Second, before this hearing today, my Republican colleagues could not point to a single act that you took, Agent Strzok, in official capacity that showed bias in any of these official investigations.

Now more than eight hours later, they still can't point to a single official act that you took that showed bias in these investigations. You know there's a famous book I read called, All I really need to know, I learned in kindergarten based on today's circus side, I hope more members on this committee read that book.

But there's one thing, I wasn't taught in kindergarten which is that actions speak louder than words. Now your words show that you did not like Donald Trump, you used the F work while referring to Donald Trump, you wanted Donald Trump to lose and the one thing you could have done to cause him to lose is to disclose the Russia investigation in July of 2016, did you do that, Sir?

STRZOK: I did not.

LIEU: Did you disclose the investigation in August 2016?

STRZOK: No.

LIEU: September 2016?

STRZOK: No.

LIEU: October 2016?

STRZOK: No.

LIEU: November 2016?

STRZOK: No.

LIEU: What you did as we expect every FBI agent to do, was to
check their personal belief at the door and do your job and that's what
you did. You also showed by your words that you wanted Hillary Clinton
to win. But yet the IG investigation found that you advocated for more
aggressive investigative measures into the Clinton investigation,
including the use of grand jury subpoenas and search warrants to obtain
evidence, is that true?

STRZOK: Yes.

LIEU: And again, you did that because you check your political
belief at the door and when you did your duty as FBI agent, you apply
the law to the facts, that's what we expect you to do, that that's what
we expect prosecutors to do, that's we expect judges to do.

I'm a former prosecutor, to defendants, I despise, to defendants,
I, Sir, was OK with but it didn't matter, all that mattered was could
we prove a charge beyond reasonable doubt. If we could, we went
forward, if we couldn't, we did not go forward and that's what we
expect everybody to do.

Now there's been some allegations by one of my colleagues say
about political donations how that might show bias. So let's talk about
FBI director Christopher Wray, he's a Republican, nominated by
Republican President, confirmed by a Republican controlled Senate, I'm
going to ask you to accept for persist question, the following fact
that he gave over $39000 in political donations exclusively to
Republican candidates.

I still trust FBI Director Wray to do his job because I expect him
to check his personal belief at the door and do his job when he's on
duty, do you still trust FBI Director Christopher Wray?

STRZOK: Implicitly, yes.

LIEU: The Attorney General Jeff Sessions made political
contributions to the Alabama Republican Party, I still trust, if there
is a case involving a Democrat or Republican or independent or some
sign, that Attorney General Sessions could look at the facts and law
and apply it and do it in a fair and unbiased manner.

Do you still trust Attorney General Jeff Sessions, do you do that
even though he made political contributions to the Alabama Republican
party?

STRZOK: I-I-I don't know him in nearly the same capacity as the
Director but he's taken an oath as the Attorney General and I trust him
to discharge that.

LIEU: Thank you and then let me conclude by saying this, we're going to know at some point, what the Robert Mueller investigation found. We already know about Hillary Clinton e-mails because there's been an exhaustive investigation and plus this IG report.

And what we're seeing now is an attack on law enforcement. When I was crossing cases, I know that when defendants don't have the facts always on their side, they resort to attacking law enforcement, that's what we see happening now.

And I just thought and I had a call from Sarah Huckabee Sanders who said, basically when you're attacking the FBI, you're losing, I yield back.

GOWDY: The Chair recognizes gentleman from North Carolina, Mr. Walker for five minutes.

WALKER: Thank you Mr. Chairman, MR. Strzok, you have mentioned, I think to my count over 30 times about your personal beliefs when it comes to your text and that was your just your opinion. One of the texts you said, we will stop it, referring to the Trump campaign.

Mr. Strzok, that's not a personable belief text, that's a plan of action, who's the we in that text?

STRZOK: Sir, I disagree, that's not a plan of action, the we, as I have stated and the reason I'm saying it so many times is I've been at least twice as many times is the reason I said that, I don't recall that text but I look at the context of it, in the middle of the night, I can tell you, I'm certain, it is not.

WALKER: OK, well -

STRZOK: That me or the FBI take any action on it, I can also Sir, assure you -

WALKER: I would like to reclaim my time, you actually question, you don't recall that -

STRZOK: Under oath, there was no plan of action.

WALKER: Yes, well my eighth grade teacher -- English teacher, Mr. Spaniard used to teach me that stop was an action verb so I -- I believe it certainly sounds like -- let me get away from just the content of text as despicable as they were.

Let's talk about the volume of text, if we could please. 50,000 texts over this timeframe, is that the number that you understand?

STRZOK: I -- that is a number I've heard from the -

WALKER: Several hundred pages in the 400 pages, it's about 50,000 text which is amazing, I -- I'm hoping you at agency, at least have the unlimited data plan since it was the taxpayers phone because the great amount of volume and you even testified today under oath, there's many more on your personal phone which blows me away.

Sometimes over 100 texts a day while you're supposed to be doing your job, in fact on Friday, June the 10th 2016, there were 73 exchanged texts, this is the same day that the FBI finally made a deal for Clintons attorneys laptop -- laptops, did you leave your send these 73 plus text on that single day?

STRZOK: I -- I do not recall where I was when I sent those texts.

WALKER: Well, I'm -- I'm sure that you were -

STRZOK: I would say Sir, if you look at those texts, the huge majority of them are in fact related to work, my -- and administrative things.

WALKER: There may be a lot but there's a whole lot more plus you know, I don't get a text with my friends and family sometimes till we finish our work at the end of the day, obviously, you had enough time during the day, being the second lead investigator that you're supposed to be doing your work.

But here we find a lot of time, 50,000 texts.

STRZOK: Sir, which the bulk of which -

WALKER: James told me and talked about how the mid-year investigative team was the A team, spending every waking moment to complete the investigation, how does this statement square with the amount of time you seem to spend texting Lisa -- Lisa page on working days?

STRZOK: Sir, the majority of those texts, the grand majority were work related matters, of the many, many things I've been accused of, some of which are true and horrible, one thing is not being -- one of them is being -- not being lazy so I can assure you that those texts and what they represent was work and work that was going on frequently 5 o'clock in the morning till 11 o'clock at night.

So I would encourage you Sir, if you want to read through the 50,000 and have somebody catalogue what -

WALKER: That's astronomical high, you're talking six to 700 per week so don't give me this is all work related texts unless -

STRZOK: They were not all work related but -

WALKER: The other point I want to make here is that -- this is an integrity issue and that's a part of the problem here, we talked about the texts, no, you're right, they weren't all on official time, like making fun of the Trump people at the Walmart, you're right some of those were in your spare time.

But I believe there is a credibility issue and that's probably one of the reasons that Mr. Mueller decided to take you off this particular case, I -- I believe -- I believe you cannot sit there and tell us, as you testified earlier today, you didn't know for sure what he did but I believe it's pretty obvious to the American people that you have so discredited the FBI that you were removed from this case, with that I

yield the balance of my time to the gentleman from Ohio, Mr. Jordan.

STRZOK: May I respond to the -

GOWDY: The time is controlled by the gentleman from Ohio.

(UNKNOWN): We allow the gentleman to answer that question.

GOWDY: At the conclusion of his time, the gentleman will be allowed to briefly answer anything that was left unanswered by Mr. Walker but Mr. Jordan, now, controls the time.

JORDAN: Agent Strzok, I just want to go back to where we were right before the votes -

STRZOK: Yes Sir.

JORDAN: -- leave the committee, you said when I was asking about documents received by the FBI from Mr. Ohr, you said, you did not personally receive documents from Mr. Ohr but the FBI did, is that correct?

STRZOK: That's correct.

JORDAN: And you also said the FBI got documents from a different source in mid-September, different source than whom?

STRZOK: Different source from Mr. Ohr. It was not Mr. Ohr who provided the initial documents that I became aware of in mid-September.

JORDAN: So Mr. Ohr did not hand you the dossier?

STRZOK: That's -- Mr. Ohr didn't hand me anything. Mr. Ohr...

JORDAN: FBI.

STRZOK: ... provided information to the FBI that included material that is what everybody is calling the dossier, reporting from Mr. Steele...

JORDAN: Say that again, say that again. Mr. Ohr provided what?

STRZOK: He provided some elements of reporting that my understanding it's originated from Mr. Steele.

JORDAN: So -- so Bruce Ohr did give the FBI information relative to the dossier?

STRZOK: Yes.

JORDAN: And another source also in mid-September gave you personally information...

STRZOK: No.

JORDAN: ... you the FBI information relative to the dossier?

STRZOK: I never personally received dossier information.

JORDAN: I got that.

STRZOK: The FBI in mid-September, the first time I am aware of the
FBI having that information, the first time I saw it was in
mid-September. My understanding was that was -- that came into the FBI.
That's when I became more of it and when I first read it.

JORDAN: One -- one more time, just say it. Bruce Ohr gave the FBI
documents relating to and supporting or part of the dossier. Is that
accurate?

STRZOK: Mr. Ohr gave the FBI documents, which included material
that I believe originated from Mr. Steele.

JORDAN: Thank you.

GOODLATTE: The gentleman may briefly answer the question that the
gentleman felt he didn't have an opportunity to answer with Mr. Walker.

STRZOK: Yes, sir, thank you. And I wanted to address when you
bring up an integrity issue, and it's interesting you and the gentleman
from Texas raised this in a way that almost, you know, approaches -- it
is insulting.

WALKER: The gentleman may answer the question. If you're going to
make an accusation, I'm going to come back here.

STRZOK: So -- so what I'm going to respond, sir, is what I'm
saying I am here under oath. I am not lying. I have never lied under
oath and I never will, and so the insinuation -- not even the
insinuation, the direct comment that you somehow say you have an
integrity issue is insulting and I take offense. It is incorrect.
Nothing I have said here today...

WALKER: I never mentioned your personal, I just simply said the
amount of time that you were spending on the taxpayers dollar, wasting
it when you were supposed to be doing your job texting back and forth
to the (inaudible) is a problem...

STRZOK: And, sir, what I am...

WALKER: ... and that's in the...

STRZOK: ... saying is if you look at...

GOODLATTE: And that's in the -- and the gentleman has already
answered that question. So now the gentleman from Maryland, Mr. Raskin,
is recognized for five minutes.

RASKIN: So, we have more than 2,500 kids in America who are
separated from their families, no hearings from Judiciary or Oversight.
We got thousands of people who have been slain in gun violence from
Parkland to Las Vegas, to San Bernardino County. No hearings on the
universal background check favored by 97 percent of the people.

The President has plunged us into trade wars. He's insulting and
taunting our democratic allies around the world. He's flattering
autocrats and kleptocrats and dictators around the world, and he's done
nothing to stop another round of cyber sabotage of our elections coming
in 2018. But our colleagues don't want to do any hearings on any of the
chaos that's been set loose in the land.

No, Mr. Strzok, the GOP wants to talk about your personal texts,
two or three out of more than 50,000 that we've seen. And the purpose,
of course, is to derail and discredit the investigation by the special
counsel that has obtained 19 indictments and five criminal convictions
of people like Flynn, and Gates, and Papadopoulos, and so on. And when
their names come up, you'll notice that our colleagues maintain a
discrete and demure silence on the other side of the aisle.

But they are outspoken about this. They say, Mr. Strzok, that you
were at the heart of a deep state conspiracy to oppose Donald Trump. To
make this claim they've got to ignore the fact that you were an equal
opportunity insulter of politicians. You had choice negative words for
Democrats and independents like Bernie Sanders who you called an idiot,
like Donald Trump, Hillary Clinton and Martin O'Malley who you called a
freak show.

That's not very nice, but, hey, there's a first amendment here in
America and you can still insult government officials without being
thrown into jail or held in contempt of Congress, at least by our side
of the aisle. There are no kings here and we have freedom of speech,
the right that is cherished by the people and feared only by tyrants.
But my colleagues have insisted on making a conspiracy theory out of
your pillow talk texts, but there are a couple of facts they can't get
around.

Number one, the I.G. found no partisan bias affecting the official
investigation. Number two, Attorney-General Sessions is a Republican
appointed by Donald Trump. Rod Rosenstein is a Republican appointed by
Donald Trump. James Comey is a Republican appointed by Donald Trump.
FBI Director Wray is a Republican appointed by Donald Trump, and Robert
Mueller is a lifelong Republican.

So this would have to be a Republican conspiracy, so I'm looking
for evidence of the Republican conspiracy, and all I could find were
the kind of statements that you've been arraigned on today. So I want
to ask you about those statements.

In the spring of 2016, Senator Ted Cruz called Donald Trump a,
quote, "sniveling coward, a pathological liar and a serial
philanderer." Was this attack on Trump by Senator Ted Cruz a
coordinated part of a deep state conspiracy that you organized?

STRZOK: No.

RASKIN: On April 8 -- August 8, 2016, Senator Marco Rubio said
Donald Trump was, quote, "unworthy of being our president." Was this
attack part of a deep state conspiracy that you organized?

STRZOK: No.

RASKIN: In October of 2016, Speaker Paul Ryan said, "I am not going to defend Donald Trump, not now, not in the future. Was this fleeting outburst of moral courage part of a deep state conspiracy that you organized?

STRZOK: No.

RASKIN: Former Secretary of State Rex Tillerson called Donald Trump a moron. Former EPA Administrator Pruitt said he's an empty vessel when it comes to the Constitution. Steve Bannon said he's like an 11-year-old child. General H.R. McMaster referred to Donald Trump reportedly as a dope and an idiot with the intelligence of a kindergartner. Karl Rove called him a complete idiot. Representative Duncan Hunter said he's an A-hole but he's our A-hole. And the Director of the National Economic Council Gary Cohn reportedly sent out an e-mail describing Trump as an idiot surrounded by clowns.

Were all these vituperative negative characterizations of Donald Trump part of a deep state GOP conspiracy engineered by you and your friends?

STRZOK: No.

RASKIN: Were any of these statements part of a conspiracy you organized?

STRZOK: No.

RASKIN: Now, although this conspiracy does appear to be overwhelmingly Republican, if it exists, balance compels me to ask to you about my hero, Bruce Springsteen. Unlike the others who were all Republicans, Springsteen is a Democrat and he said, "The republic is under siege by a moron." Did you tell him to stay that?

STRZOK: No.

RASKIN: Was it part of a deep stated conspiracy to criticize the President?

STRZOK: No.

RASKIN: Mr. Strzok, this hearing has been a circus in a kangaroo court run in banana Republican fashion. And I believe that some of my colleagues have disgraced themselves today in their attack on the FBI and the justice system of America. How can we recover from the hole that's been dug here today?

STRZOK: Sir, America is strong. I have -- however bad I think I have seen it in my life, I am confident that the institutions, the American people will endure and be great. I have full faith in the United States. And all the men and women, and I -- even in times of trial and tribulation, I have every confidence that we will emerge as -- as great as we've ever been and that will...

RASKIN: I'm with you and thank you for your service to America.

STRZOK: Yes, sir.

GOODLATTE: The Chair recognizes the gentleman from Florida, Mr. Gaetz, for five minutes.

GAETZ: Thank you, Mr. Chairman. You've said repeatedly today that you were not biased, but Bob Mueller kicked you off his team as a consequence of your bias, didn't he?

STRZOK: Sir, I wouldn't agree with that characterization. I think I answered earlier my understanding was that -- and again, there were no words spoken about this, but it was the potential appearance that he wanted to avoid as much as anything else.

GAETZ: So did Bob Mueller say, "I'm not firing you from this team for mere bias so he did not.

STRZOK: (Inaudible).

GAETZ: So -- so what is your basis for the belief that it's -- the appearance of your bias rather than your actual bias that resulted in Mueller removing you?

STRZOK: Because I think his experience both with me, my work and the reputation of others about me and my work, that he knows...

GAETZ: So what you said that he...

STRZOK: ... that I'm an individual who follows the facts where they lay.

GAETZ: So -- so your testimony today that you were removed not for bias, but for the appearance of bias, is based on your perception of Robert Mueller's perception of you.

STRZOK: No, Sir. I'm saying what I -- what I would think the logical case if you want to know what his business were you'd need to ask him.

GAETZ: Well, let's just ask it simply. Let me ask -- let me ask it simply, Mr. Strzok. Did Robert Mueller ever ask you if you were biased against Donald Trump?

STRZOK: He did not.

GAETZ: The -- so he didn't ask you when he hired you?

STRZOK: No, that question is not...

GAETZ: That must also mean that -- that must also mean that...

STRZOK: ... typically a question that gets asked during hiring meetings in the U.S. government to my experience.

GAETZ: Gosh, one would seemingly think that if you were hiring somebody to investigate something you might ask, but certainly then when you were removed, was -- was it clear to you that Mr. Mueller was aware of these incendiary text messages?

STRZOK: Yes.

GAETZ: So he knew of the text messages, but never asked you whether you were biased or not?

STRZOK: That's correct.

GAETZ: Your girlfriend texted you on the 8th of August, "Trump's not ever going to be President. Right? Right?" Do you recall your reply?

STRZOK: I do recall my reply, and if I hadn't it's been refreshing my recollection no less than four or five times today, Sir. But yes, I do recall my reply.

GAETZ: And what was it?

STRZOK: I'm sure you have it, I don't want to misstate it by -- but essentially, "No, no, he's not. We'll stop it."

GAETZ: Did Bob Mueller ever ask you about that text message?

STRZOK: He did not.

GAETZ: About a week later on August 15th, you sent a text message regarding a meeting in Andy McCabe's office, is that right?

STRZOK: I don't know the date. I do believe I know the text message that you're going to...

GAETZ: Did Bob Mueller ever ask you what happened in the meeting in Andrew McCabe's office?

STRZOK: There are many meetings that I attended in -- not many, but several meetings in this (inaudible).

GAETZ: Did Bob Mueller ask about any of them?

STRZOK: He did not.

GAETZ: Did Bob Mueller ask you what you meant by an insurance policy?

STRZOK: Director Mueller did not.

GAETZ: On the 26th of July, this is contemporaneous with the opening of the Trump-Russia investigation, your girlfriend texted you, "Clinton just has to win now." And you reply a few days later and, "Damn, this feels momentous because this matters. The other one did, too, but that was to ensure we didn't F something up. This matters because this matters. So super glad to be on this voyage with you." Did -- did Bob Mueller ask you why this matters?

STRZOK: If you are asking why it mattered it was a comparison...

GAETZ: No, I'm not asking -- no, no, no, I'm (inaudible)...

STRZOK: ... between a case about a – about (inaudible)...

GAETZ: ... I've seen you do this -- to answer questions you were
not asked, but that is not what I'm asking you. I want to know if Bob
Mueller asked you about this text message?

STRZOK: Director Mueller did not ask me about any text message,
Congressman.

GAETZ: Well, gosh, what -- I mean, just days after Mueller was
appointed, in two text messages, one on the 19th of May and one on the
22nd of May, you referenced impeachment. Did -- did Bob Mueller ask you
why you were referencing impeachment?

STRZOK: Congressman, as I just stated, Director Mueller did not
ask me about any text message.

GAETZ: I find that very interesting that Bob Mueller has to remove
you as a consequence of bias. Now you don't say it's bias, you say that
based on your perception of Bob Mueller's perception of you, it
couldn't be possibly be your bias, it has to be the appearance of bias.
But when we get in to actually the manifestation of that bias, through
your words, Bob Mueller doesn't ask you about a single one of them.

And so then I looked at other people that Bob Mueller picked on
his team, people like Lisa Page. I'm very curious to know whether or
not he asked her about any of her incendiary text messages. I mean, but
-- but throughout the team, you've got people working for Bob Mueller
who have active connections to the -- to Hillary Clinton, you know,
Greg Andres donated to the Clinton campaign. Kyle Freeny donated to the
Clinton campaign. Andrew Goldstein donated to the Clinton campaign.
Elizabeth Pregolar (sic) donated to the Clinton campaign. James Quarles
donated to the Clinton campaign.

Jeannie Rhee represented Ben Rhodes during the Benghazi
investigation. He -- she represented the Clinton Foundation against
freedom of information Act requests. Andrew Weissmann, the number two
for Mueller attended Hillary Clinton's election night party. Andrew --
Aaron Zeleby (sic) represented Justin Cooper who is the person who
set-up Hillary Clinton's private e-mail server. And then there's you
and Ms. Page.

And it's just really interesting to me that when you were so
damaging to the investigation that you had to go that Bob Mueller, the
person who brought in all these people that -- that had connections to
the Hillary Clinton campaign did not ask you about a single text
message.

And I tend to believe, Mr. Chairman, that it's because he did not
want to know the answer and that there was bias, and that your
perception of Bob Mueller's perception of you is totally unreliable.
And I yield back.

GOODLATTE: Time of the gentleman has expired. The Chair recognizes
the gentleman from Florida, Ms. Demings, for five minutes.

DEMINGS: Thank you, Mr. Chairman.

Mr. Strzok, let me just clear this up right now. I am not angry, and I am not desperate, and I am not afraid of the truth, but I am in pursuit of it. First of all, I want to thank you for your service to our country through the Federal Bureau of Investigation and for your service to our country through the United States Army.

Mr. Chairman, each of us, as members of Congress, took an oath to uphold and defend the Constitution of the United States. My oath as a member of Congress was not the first oath that I took, it was the third oath for I served as a law enforcement officer for 27 years. And like the employees of the Federal Bureau of Investigations and the Department of Justice, I swore to protect this country and to remember uphold the rule of law.

We have now wasted countless hours of our very limited and precious time chasing these phantoms, wasting both the witness's time and our own. The Inspector General's Report must have been a very big disappointment to the President and to my colleagues on the other side of the aisle.

Let me say this. Law enforcement officers -- and you said it earlier, Mr. Strzok -- not only do they have political opinions, but they are encouraged to have them. And as a chief of police, I encourage them to have them and express them. Perhaps -- but -- but their expression never interfered with their ability to conduct their job. Perhaps Congress could learn something from members of the law enforcement community because my colleagues on the other side of the aisle allow political bias to influence their judgment every day, and perhaps they should read and all members of Congress should read the ethics manual for Congress.

The I.G. report said, and I quote, "We found no evidence that the conclusions by department prosecutors were affected by bias or other improper considerations," unquote. President Trump's and his enablers' conspiracy theory about the Department of Justice and the FBI have been investigated. And after hours today, they have still been debunked.

The President's own campaign manager is currently sitting in jail, awaiting trial on multiple charges. And there is enough evidence as we've already seen that resulted in five guilty pleas. The truth hurts, but no matter how you hate it, and no matter how much it hurts, it's not going away. That's the real story here, and we need to keep our eyes on the ball and not chase ghosts through the halls of the Department of Justice while letting the important work of both of these committees go undone.

But since we're here, Mr. Strzok, I want to get your reaction to the President's tweet on December 3rd of 2017. After years of Comey with the phony and dishonest Clinton investigation running the FBI its reputation is in tatters, worst in history. There he goes. This is always the biggest, always the worst, but fear not we will bring it back.

Mr. Strzok, do you agree that the FBI's reputation is in tatters and is the worst in history?

STRZOK: Not at all

DEMINGS: Do you agree with the characterization that the Clinton investigation was phony and dishonest?

STRZOK: No.

DEMINGS: Were you the sole decision-maker on this case?

STRZOK: No.

DEMINGS: In your opinion, what kind of impact do statements like this, because I do care about how it affects the law enforcement community? Apparently, my friends on the other side of the aisle, I never thought as a law enforcement officer I'd ever have to defend the Department of Justice from my Republican colleagues on the other side of the aisle. What kind of effect do statements like this have on the morale on the good men and women who do a tough job every day?

STRZOK: Congresswoman, I think they have a significant impact on the morale of the men and women of the FBI. I would tell you that regardless of what is going on swirling around them that my experience, the agents and analysts and others that I work with are focused on their job and their mission. So there's a lot swirling around and the agents tune that out and focus and do their job, but inevitably, the -- the kind of perception and the things that are being said are heard and are -- are damaging because people know they're simply not true. So they're not helpful, but I -- I have every faith and confidence in the FBI and the agents of the FBI and in what we do every single day.

DEMINGS: Thank you so much. I...

GOODLATTE: Time of the gentlewoman has expired.

DEMINGS: I know. I yield back.

GOODLATTE: The Chair recognizes the gentleman from Georgia, Mr. Hice, for five minutes.

HICE: Thank you, Mr. Chairman. I would like to discuss a little bit of the Weiner laptop discovery. You have explained there was a significant delay from the time that information was discovered in which obviously hundreds of thousands -- by your own words, hundreds of thousands of e-mails were discovered potentially pertinent to the Hillary Clinton e-mail investigation.

There was a delay there and you have explained in the past that the -- the -- the delay was caused simply because you were too busy. What were you doing during October of 2016 that caused you to be so busy?

STRZOK: Sir, I wouldn't call it a significant delay. I don't think it was caused because I was too busy. To answer your question, in the fall of 2016, I was a Deputy Assistant Director of the Counterintelligence Division. I had responsibility over...

HICE: You explained that you were...

STRZOK: ... global (inaudible).

HICE: ... too busy. What were you busy doing?

STRZOK: I was trying to explain what I was doing. I was busy overseeing thousands of cases. Every espionage case in the FBI, every economic espionage case in the FBI, every case that having to do with the (inaudible)...

HICE: Were you involved?

STRZOK: Sir, you asked a question, may I answer?

HICE: Well, and I'm going to reclaim my time. Were you involved in the Russian investigation at that time as well?

STRZOK: That was -- aspects of that were one of the many things that were under my...

HICE: So you were -- you were involved with it. Inspector General Horowitz expressed concern that so many individuals from the Clinton investigation, mid-year team, were assigned to the Russian investigation, people like you. Who made that decision for people from the midyear team to go to the Russian investigation?

STRZOK: Sir, I was Deputy Assistant Director of the Counterintelligence Division. I'm the number two. If there's something large going on in C.I., chances are I'm going to have a role in it. So it isn't (inaudible) working the case...

HICE: My question, who made that decision?

STRZOK: ... but the decision to assign me was certainly made absolutely by my boss.

HICE: OK, this is the director...

(CROSSTALK)

STRZOK: ... both him, the EAD and others.

HICE: ... or how many other people went to the Russian case?

STRZOK: Sir, I can't get in those specific numbers. I can tell you, of the senior managers, several of the senior managers were involved, but it's one of the points I disagree with the Inspector General as he -- he doesn't appreciate the staffing in the context of the level of the people that were involved into these cases.

HICE: Did anyone in the FBI or the DOJ question the overlap of the personnel between the two cases?

STRZOK: Not that I'm aware of.

HICE: So no one questioned it. At the end of the October you were

finally brought to the point to pursue the laptop information and to
make it public days before the election. Did your involvement at that
time with the Russian election interference cease when the Clinton
e-mail case was reopened?

STRZOK: No.

HICE: OK. So you -- you continued working on the Russian case
while also leading the reopened Hillary Clinton case?

STRZOK: A colleague of mine, a co-lead and I were bringing the
team back together again, which was made up, Sir...

HICE: Well, just a month before...

STRZOK: Sir, if I may, because it's important. I think people have
a misunderstanding. At that time, I'm a Deputy Assistant Director.

HICE: All right. Listen, my time (inaudible).

STRZOK: When you talk about the case, you have multiple yes or --
you have multiple layers of people though below that are doing that
work.

HICE: I understand that, but a month before you told the I.G. that
your Russia workload prevented you from addressing the issue on the
laptop discovery...

STRZOK: That's not what I said.

HICE: ... and now you said you have time for both.

STRZOK: That's not what I said, Sir.

HICE: According to the I.G. report...

STRZOK: That's not what I said. That's not what the report says.

HICE: ... that is -- that is in there. So days before the
election, you're investigating two key investigations and a -- a time
lapse of nearly a month goes by where there are hundreds of thousands
of e-mails directly related the e-mail of Hillary Clinton and her
campaign, ignored until days before the election. And only when the --
the New York group demands -- let me ask you this, were -- were any of
your superiors concerned of the overlap that that time was...

STRZOK: Yeah.

HICE: ... water was going under the bridge?

STRZOK: My -- no, my -- my recollection is that all of us were
concerned about the volume of material that we had on our (inaudible)
for national security perspective.

HICE: Well, Andrew McCabe said that he was surprised that you had
not reviewed the laptop before October 30th.

(CROSSTALK)

STRZOK: That's inaccurate. You're misrepresenting what's said. You're misrepresenting what's said.

HICE: This was in the I.G. report.

STRZOK: You're misrepresenting what's stated in the I.G. report.

HICE: I'm -- I'm -- I'm using the I.G. report. McCabe said he was surprised that you had not reviewed the laptop information. James Baker, general counsel said he -- he was -- it was his understanding that that information was being handled. James Comey felt that the entire credibility of the Bureau rested on that case.

And what -- what gets me? How is it possible that you could handle both of these cases, perhaps two of the most important cases in the history of this country, at least in recent history, how in the name of justice does the FBI allow someone so biased as yourself to lead these two investigations at the same time where both end up being compromised, both tainted, justice apparently not happening in either case? You deliberately, from all appearance, delayed the checking into the Hillary Clinton e-mails on the -- the Weiner laptop until after the election or as close thereof, and it's just corruption through and through.

And, Mr. Chairman, I yield back.

STRZOK: Mr. Chairman, may I respond?

GOODLATTE: Briefly since it wasn't posed to you as a question.

STRZOK: Sir, briefly, nothing was compromised in those investigations. There were a team of folks above and below me that were involved. I was the number two in the Counterintelligence Division. If it was important, I had a role in the oversight of that.

There are people below me -- senior executive servicemembers, unit chiefs, supervisory agents, in the field office, ASAC, supervisors, case agents, all who are working on this. To the aspect, there are many things you said about the I.G.'s report that were, if not, there were absolutely misrepresentations.

The response and the facts, if you look at them, in the report is that within hours of hearing from New York that there was a potential material that was relevant, I had assigned subordinates, supervisors attorneys and others to look into it which they in turn did within hours. As a result, less than a day, after finding out about it, I had set into motion a team who had nothing to do with the Russian investigations to pursue that information. They came back and said, New York is still working on it, and my assumption from there was that they having been assigned that task will continue to pursue it.

HICE: It's your representation of the I.G. report that's inaccurate.

GOODLATTE: The -- time of the gentleman has expired. The Chair

recognizes the gentleman from Arizona, Mr. Gosar, for five minutes.

GOSAR: Mr. Strzok, are you familiar with the FBI Domestic
Investigation and Operations Guide known as the, DIOG?

STRZOK: The DIOG, yes, sir.

GOSAR: OK. This is a policy manual that sets forth the rules you
are to follow in deciding to pursue an investigation; correct?

STRZOK: Yes, sir.

GOSAR: And you agree that the DIOG guidelines apply to your
investigation of President Trump and the 2016 election; correct?

STRZOK: Yes, sir.

GOSAR: And the DIOG policy 8.1 requires that all FBI employees
shall comply with policies, quote, isn't that correct?

STRZOK: Sir, I -- I believe that's absolutely true. I don't know
the site.

GOSAR: But you're aware of that?

STRZOK: Yes, yes.

GOSAR: OK. Now, you, no doubt, are aware the DOJ also issues
investigation guidance instructions; correct?

STRZOK: Yes.

GOSAR: Now, specifically DOJ guidance dated March 9, 2012 states
that federal -- federal, quote, "employees are entrusted with the
authority to enforce the laws of the United States and with
responsibility to do so in a neutral and impartial manner. This is
particularly important in an election year," end of quote. Are you
aware of this guidance?

STRZOK: I am not, but I believe it and adhere to it, yes.

GOSAR: So I -- I just want to make sure because this is really
important because attorney-general holder issued these instructions to
all federal law enforcement agencies to conduct their investigations in
a neutral and impartial manner, particularly in an election year. So
once again, you're kind of familiar?

STRZOK: Sir, I don't recall that specific instruction. I focus on
FBI policy, but that direction from the department, if it's enforced, I
readily accept and I (inaudible).

GOSAR: So you understand why federal employees are supposed to be
politically neutral; right? OK.

STRZOK: Yes, yes.

GOSAR: Everything he says on this -- and your anti-Trump text

statements are not politically neutral; correct?

STRZOK: I believe from the perspective of investigating in a politically neutral way, I did that every single day of...

GOSAR: Once again...

STRZOK: ... my job.

GOSAR: Your text statements are not politically neutral?

STRZOK: That's correct, yes.

GOSAR: OK. And your investigation activities were, in fact, taking place in an election year, correct?

STRZOK: Yes.

GOSAR: You, in fact, stated that you intended to, quote, "stop Trump from becoming President" in a clear violation of the FBI, DIOG and DOJ guidance, wouldn't that be correct?

STRZOK: That's absolutely incorrect, Sir.

GOSAR: No, that wouldn't because that shows a strict bias.

STRZOK: Sir, it's completely disagree.

GOSAR: And it's politically charged. Well, let me give you a better situation. Then president or candidate Trump made some comments on the travel ban, did he not?

STRZOK: I -- I recall a variety of comments.

GOSAR: Oh, you got a good memory, and it was used all -- against him by all the lower courts, wasn't it?

STRZOK: Sir, my -- that is not my area of expertise at all.

GOSAR: So, you know what it is. You know -- you know you're very well, you understand this very well, Sir. So it was used against him and upheld in all the lower courts until the Supreme Court. And guess what? Why is it different for him than you?

STRZOK: Sir, I...

GOSAR: There's no difference here.

STRZOK: I -- I -- I...

GOSAR: There's no difference because it's -- it's (inaudible).

STRZOK: Sir, I would argue...

GOSAR: The difference between him and you is you put it in black and white.

STRZOK: Sir, the difference between me and him, and again, I'm not an attorney, you have somebody who is making (inaudible)...

GOSAR: He's not an attorney either.

STRZOK: ... based on protected class in terms of the passage of a federal law, which is wildly demonstrably different from an individual who is expressing a personal political belief. It is stunning that that difference would not be apparent to any outside observer.

GOSAR: Once again a political belief, you -- you used your political belief in black and white in a text message. We've established that...

STRZOK: Sir, I...

GOSAR: ... in my previous question running up to it. OK. I've got very little time here.

So you said about a bias. This morning I watched -- by the way, I'm a dentist. OK? So I read body language very, very well. And I watched you comment in actions with Mr. Gowdy. You got very angry in regards to the gold star father. That shows me that it's innately a part of you and a bias.

STRZOK: Sir, I'd disagree. I don't know if you're saying this experience is like being at the dentist if that's what you are suggesting, but...

GOSAR: So let me...

STRZOK: ... I would -- I would tell you, Sir...

GOSAR: I have to come down.

STRZOK: ... what you see in my response, what you see in my response is a genuine passion for the United States of America. What you see is a passion as a patriot.

GOSAR: I'm going to ask you...

STRZOK: What you see is a genuine...

GOSAR: I got two more questions, I got two more questions.

STRZOK: ... anger at people turning that upside down.

GOODLATTE: The gentleman from Arizona controls the time.

GOSAR: I got two more questions for you. If you're in a jury box and somebody sees these text messages, you are removed from the jury box, are you not?

STRZOK: Sir, I can't...

GOSAR: You are...

STRZOK: ... speculate but that's not what happened.

GOSAR: ... by the way you are, by the way you are.

And the last comment, this morning you're a smart individual. We are not a democracy, we are a constitutional republic. That is why we have two ways, both from a democracy voting and then from the -- where we have the electoral college, so make sure that (inaudible).

GOODLATTE: The time of the gentleman has expired.

(UNKNOWN): (Inaudible) order.

GOODLATTE: The Chair recognizes the gentleman from Louisiana, Mr. Johnson, for five minutes.

JOHNSON: Thank you, Mr. Chairman.

Mr. Strzok, you -- you've taken great offense today at questions about your credibility, but for many of us, that's the real issue here, and I think it is for the American people. As we've been sitting here all day, I have been getting text messages from constituents back home and they're very concerned about this. It's this -- this whole thing has been described as shameful and a train wreck, and it feels that way to many of us.

Here's I've got -- I'm playing cleanup here, many of us will hear at the end. Let me ask you a smattering of questions. Number one, here's what you and Ms. Page exchanged the night that Donald Trump secured the Republican nomination in -- in late 2016. You wrote or she wrote to you, "Holy blank, Cruz just dropped out of the race. It's going to be a Clinton-Trump race. Unbelievable."

You responded, "What?" She writes back, "You heard right, my friend." Now you said, "Now the pressure really starts to finish MYE," which we know now as the FBI code name for the Clinton e-mail investigation. And she writes back in response, "It sure does."

So here's our problem. You two are the most influential FBI personnel on the Clinton investigation. Within hours of Donald Trump's securing the Republican nomination, you text to her, "OK, now the pressure really begins. Now we really have to finish the Clinton investigation," and she agrees, and she says, "It sure does."

Here's the question. Why did you have to finish it up so fast? What were you all referring to? Why? Was it -- was it to stop President Trump?

STRZOK: Not at all. So, she -- there was -- she was not one of the two most influential people on the investigation. The purpose of that text was not at all having anything to do with candidate Trump or candidate Clinton. That had everything to do with Director Comey's sense and urgency to try and resolve the investigation as soon as we could to get the FBI and the investigation out of the Presidential race.

The last thing that, sir, I mentioned...

JOHNSON: Were you -- were you slow walking it prior that time?
Were you slow walking it prior that time?

STRZOK: Absolutely not, but there was -- there was a constant
sense of urgency, and I think everybody on the team, everybody on the
senior executive management on the FBI understood that the closer and
the closer and the longer and longer the investigation took that we
continued, thanks to the actions of some including some of the
candidates, to be inserted into as an issue in the presidential
campaign. And Sir...

JOHNSON: So we're not -- let me -- let me stop you because this is
my time. We're not supposed to associate this in -- in way with all of
your many other volumes of texts, all the negative weight, all the
disparaging things you said about Donald Trump as a candidate and the
fact that you said, "Will stop it." So those two things are not related
in any way at all; right?

STRZOK: Congressman, I understand your concern and those are your
constituents. What I'm telling you under oath is that that expression
was what I just told you, it was a desire from the highest levels of
the Bureau throughout the team to get us out of the process of the
general election.

JOHNSON: OK, let me move on. Did -- did you ever find --
personally, did you ever find evidence of collusion or conspiracy as
you said today between then candidate Trump and Russia?

STRZOK: Sir, I can't -- based on the direction of the FBI, I
cannot comment on ongoing investigation.

JOHNSON: You said in your text of May 18th, 2017, you concluded,
quote, "There is no there there." What were you referring to?

STRZOK: Sir, I said part of my concern is there might not be a
there there. And as I -- I mentioned earlier, I think it's certainly at
the beginning as we looked at the allegations. There were a wide range
of potential things that were going on.

On one end, it was that there was nothing, that there was no
illegal activity. There was absolutely no conspiracy to do anything.
Moving up to potentially individuals doing things that are illegal
based on individual agendas, and on the very far end some of the things
that might be in the worse case -- in the worse case, things which
might lead to impeachment.

But I was approaching that with a very open mind not knowing where
the facts lay or where they might lead. And some of that is saying,
"Hey, there is a reasonable chance, there is a reasonable realistic set
of things which might indicate there's nothing going on here."

JOHNSON: OK. Look, you said several times today that every
American has a political bias, but not every American has your level of
responsibility, the duty, the extraordinary level of responsibility
that you had on behalf of the American people. And our entire system of
justice depends upon equal and impartial justice under the law. Don't

you agree with that?

STRZOK: I absolutely agree on that.

JOHNSON: Look, you -- you've spoken in lofty terms today about ethics and honesty and integrity, and yet by every objective measure, the public record of your actions belie those virtues. And the inspector general's report concluded that your conduct demonstrated, quote, "extremely poor judgment and a gross lack of professionalism." Why should this Committee, why should my constituents back home, why should the American people trust you as a credible witness?

STRZOK: Sir, I regret and I'm sorry for the way that those texts have cast my actions into question and those of the FBI and the investigations. What I am telling you and what I'd ask you to relay your constituents is to look at the facts, beyond -- set aside the texts, look at what the I.G. found, look at the actions, the actions that I took, the actions of the team, the action -- but, Sir...

JOHNSON: With all due respect -- I'm out of time, hold on. With all due respect, we cannot separate the texts from that question because the texts were written during the investigation, while you were in charge of these investigations, while you're the most responsible important person in these investigations at many times, and we cannot separate your personal views and bias from the facts as they developed. That's our problem. And at the end of the day, that's what we're all still very concerned about even after all these hours of hearings.

STRZOK: What I would tell you, sir, is look at the...

GOODLATTE: The time of the gentleman has expired. That was a statement, not a question.

JOHNSON: Thank you, Mr. Chairman. I yield back.

GOODLATTE: So the gentleman from Oklahoma, Mr. Russell, is recognized for five minutes.

RUSSELL: Thank you, Mr. Chairman.

Mr. Strzok, you've stated today, quote, I do not think that bias was expressed in those text messages," end quote. Inspector General Horowitz stated in his report that those derogatory texts were, quote, "not only indicative of a biased state of mind," end quote but were also, quote, "antithetical to the core values of the FBI and the Department of Justice," end quote. He stated further that such actions implicated, quote, "provisions in the FBI's offensive code and penalty guidelines," end quote, and referred information to the FBI for adjudication, which is still outstanding.

You stated today, quote, "at no time did personal beliefs enter into decisions I made," end quote. Yet Mr. Horowitz report stated, quote, "in assessing Strzok's decision to prioritize the Russian investigation over following up on the midyear-related investigative lead discovered on the Weiner laptop in October 2016, these text messages led us to conclude that we did not have confidence that Strzok's decision was free from bias," end quote.

You stated today that culture training and policy prevent bias in
the FBI. They would be noted and stopped. The Justice Department
ethical guidelines state the following, quote, "Superiors may never
send to subordinate employees an -- an e-mail directed at the success
or failure of a political party, partisan political group, or partisan
candidate," end quote. Another one, quote, "Expressed opinions about
the candidates and issues if the expression is political activity
directed at the success or failure of a political party, candidate or
partisan political office or partisan political group, the expression
is not permitted while the employee is on duty," end quote.

The FBI Domestic Investigations and Operation Guide in Section
3.1, because we've heard so much about the adherence of policies and
what these things do, that's why it's important to quote them. And I
quote, in Section 3.1, "We, who enforce the law, must not merely obey
it." This is the FBI guideline. "We have an obligation to set a moral
example that those whom we protect can follow. Because the FBI's
success in accomplishing its mission is directly related to the support
and cooperation of those we protect, these core values are the fiber
that holds together the vitality of our institution," end quote.

Mr. Strzok, given the extramarital relationship and types of
derogatory communication officially exchanged with FBI Counsel Lisa
Page, as laid out in the I.G. report, that these actions exhibit a,
quote, "moral example that those whom the FBI protects can follow," end
quote.

STRZOK: Sir, thanks for your question. I know that you're CIB (ph)
and I want to thank you for your service.

RUSSELL: I've had decades of it myself.

STRZOK: I would tell you I am not proud, I am ashamed.

RUSSELL: Did the policies guide your behavior for these actions?

STRZOK: Sir, for the bulk of my professional actions, every day of
my life they did (inaudible).

RUSSELL: But you stated that these actions...

STRZOK: I did.

RUSSELL: Had no bias and yet we heard from Mr. Horowitz' I.G.
report that they concluded that there was. And now we see an
extramarital relationship and types of derogatory communications
officially exchanged that does not appear to exhibit the actions that
would exhibit a moral example for those whom the FBI protects. Do you
believe it does?

STRZOK: Sir, I would -- I would respond this way.

RUSSELL: Yes or no?

STRZOK: I disagree profoundly with the inspector general's
(inaudible).

RUSSELL: With the FBI guidelines, OK, thank you for that.

STRZOK: I believe that...

RUSSELL: In Section 3.1.1, and I quote, "In general, the FBI requires employees to report known or suspected failures to adhere to the law, rules or regulations by themselves or other employees to any supervisor in the employees' chain of command," end quote. You knew your conduct was wrong, not only in the use of texts, the forwarding of political e-mails, the forwarding of links, all of that is laid out in the guideline.

STRZOK: None of that is wrong, sir, none of it is wrong.

RUSSELL: And also that the extramarital relationship could place you outside of what would be proper for an FBI agent. So my question is, did you make any attempt to report your conduct to the chain of command?

STRZOK: Sir...

RUSSELL: Yes or no?

STRZOK: ... my conduct in the context of the FBI guidelines was not improper.

RUSSELL: Did you make an attempt to report your conduct to the chain of command?

STRZOK: My conduct to the investigations was always, always proper...

RUSSELL: And we can see what that was. OK, thank you. Reclaiming my time...

STRZOK: ... (inaudible).

RUSSELL: ... and Mr. Chairman, my closing remarks I address to you. I don't have any further comment that I need or any other questions to be answered.

FBI agents are required to adhere to strict standards of conduct and exemplify the FBI's core competencies including communication, respect, leadership and compassion, problem-solving, judgment. The I.G. found that the use of official devices to send messages intermixing work-related discussions and political commentary demonstrated extremely poor judgment and gross lack of professionalism.

The powers of government are drawn from the people's consent. The executive branch draws its law enforcement powers not only from that consent but most importantly from the trust to wield such power without prejudice and with integrity.

Mr. Chairman, we've heard a lot about ethics, patriotism and service today. We are all accountable for our actions. I am mindful of the words of Christ in Luke, "You shall know a tree by its fruit. From

the abundance of the heart, the mouth speaks." And I yield back my time to you, Mr. Chairman.

GOODLATTE: The Chair thanks the gentleman. And the gentleman from Arizona, Mr. Biggs, is recognized for five minutes.

BIGGS: Thank you, Mr. Chairman.

Mr. Strzok, you've worked as a criminal investigator for at least. Isn't that correct?

STRZOK: National security investigator, primarily C.I. work, which within the bureau we differentiate criminal, which is...

BIGGS: But you're -- you're -- you did -- you're familiar with criminal investigation.

STRZOK: Yes, Sir.

BIGGS: Correct? And you understand that as you're aggregating evidence you're looking for a couple of areas. Number one, you're looking to see if there's an act -- the act is (inaudible) of a crime, right?

STRZOK: Yes.

BIGGS: You're also looking for culpable mental state of a crime, right?

STRZOK: Yes.

BIGGS: You have to demonstrate a culpable mental state if you're going to bring a case forward, right, intentional, knowingly, reckless, et cetera, right?

STRZOK: Almost always, yes.

BIGGS: Yeah, unless there's some kind of strict liability, right. And you'd would agree that short of some statement against interest. Most of the time the culpable mental state of either intentional or knowingly, that's -- that's usually done through circumstantial evidence, correct?

STRZOK: I hesitate to generalize. I would -- I...

BIGGS: Trust me, it is...

STRZOK: ... don't know that I could (inaudible).

BIGGS: Trust me it is, it is, because short of someone making a statement against interest, you've got to prove that the intended, not only the -- all -- every element of the offense, right, or knowingly did that offense. That -- that has to be proved. And oftentimes it's by circumstantial evidence which, by the way, there's a jury instruction typically that goes forward that says there's no qualitative difference between circumstantial evidence and direct evidence. You would agree with that statement, right?

STRZOK: So I'm not an attorney. I -- I would (inaudible)...

BIGGS: Well, you've been in a court many times, right?

STRZOK: Well, you're doing -- you're doing...

BIGGS: You sure -- you sure sound like an attorney sometimes, right?

STRZOK: ... very educated recitations and legal terms that I -- I don't have the education to be able to respond to them.

BIGGS: OK. Well -- OK, well, trust me on that that there's a jury...

STRZOK: So I will -- I will (inaudible)...

BIGGS: ... instruction that says...

STRZOK: If you are representing to me that's accurate...

BIGGS: Yeah, that's right.

STRZOK: ... I will accept that.

BIGGS: Right. And then this morning, you said and you've -- this has been a theme and -- and I don't know how many umpteen times you said it, but I broke down the one quote you gave to Chairman Goodlatte. You said, quote, "My text messages are not indicative of bias," close quote. Do you still hold that position?

STRZOK: I do.

BIGGS: OK. Now, as we go forward here, when the FBI is trying to get put together circumstantial evidence of a culpable mental state, they're looking at things such as text messages. They're looking at things such as communications between people for whatever reason, right? You'd agree with that?

STRZOK: I would.

BIGGS: Yeah. And so that indicates someone's mental state that you're going to take before a jury where you're going to say by -- beyond a reasonable doubt, we can demonstrate either intentional or knowing by this serious, this cumulation of -- of circumstantial evidence, right?

STRZOK: Rephrase the question please, Sir. I'm not...

BIGGS: OK, this is not hard.

STRZOK: Right.

BIGGS: So when you're trying to prove a culpable mental state...

STRZOK: Yeah.

BIGGS: ... most of it's coming from circumstantial evidence, very
rarely unless you got a confession, right?

STRZOK: Yes.

BIGGS: And so you're taking accumulation of various pieces of
evidence and you're saying...

STRZOK: Yes.

BIGGS: ... look, this -- this adds up to intentional or knowingly,
right?

So, one of the things that's been made evident here is that your
statements and your communications with Ms. Page was -- it wasn't a
one-off, it wasn't two, it wasn't three. This is a whole series. It's a
whole series that goes not for a day or a week, this goes on for a long
period of time. Is that not true?

STRZOK: It is true.

BIGGS: Yeah. And so when people begin to say was there bias on the
part of Peter Strzok, they're not saying, "Oh, gee, on this one just on
August 8th, they're going for a whole cumulation and aggregation of
various statements that you made and that Ms. Page made as well." So
that leads us to the I.G.'s statement. So when the inspector general
comes in and I asked him the question, I said, "Look, you've said
regarding Mr. Strzok and Ms. Page you didn't find documentary testimony
or evidence that they -- that they had improper considerations
including bias directly affecting.

I said that's directly affecting because they -- you said they
want to solve decision-makers. I said, "Did they indirectly affected?"
You said, "Yeah."

Why? Because he said you were the lead investigator, the lead
investigator of the Hillary Clinton. You were the -- you were the
liaison, if you will. You were the flow of information from -- from the
investigative team that you've said there's lots of (inaudible) kind of
actually sketched the -- kind of a Venn diagram how this -- this worst
organizational chart is worse. As you were describing it earlier today,
you were the gatekeeper of information. Lisa Page was providing counsel
to Andrew McCabe.

On the Russian investigation, you were the head guy, you're the
head guy. Now, we have accumulation of biased information that
indicates some kind of mental state of bias and at the other -- other
end of this, we've got it that you're the head guy on this. That's what
the inspector general said under oath in testimony not too many weeks
ago.

STRZOK: Sir, Mr. Chairman, if I may respond, I think...

BIGGS: There's no question for you.

STRZOK: I want to correct some inaccurate things you just said.

BIGGS: But I didn't say anything inaccurate. There's nothing...

STRZOK: Oh, you did. (Inaudible).

BIGGS: ... to correct.

(UNKNOWN): Let the witness -- the witness needs to be able to answer the question.

BIGGS: And you're out of order, you're out of order all day.

(UNKNOWN): The witness should be answering to the question.

(UNKNOWN): Mr. Chairman, when aspersions are cast and the witness is going to be able...

BIGGS: There's no aspersions cast.

(UNKNOWN): Oh, there were, Sir...

(CROSSTALK)

JACKSON LEE: Well, you should allow the witness to answer. Why are you afraid (inaudible) the witness to answer the question?

GOODLATTE: Everyone will suspend -- everyone will suspend. And the time of the gentleman has expired and the chair recognizes the gentleman from Wisconsin, Mr. Grothman, for five minutes.

STRZOK: Sir, may I respond to the gentleman who just spoke?

GOODLATTE: No, you may not. The gentleman from Wisconsin has the time.

(UNKNOWN): Mr. Chairman, you have said throughout this hearing that at the conclusion of the questioning the witness would be permitted to respond. Is that will now change?

GOODLATTE: There's no question directed to him.

(UNKNOWN): That's not true, Mr. Chairman.

GOODLATTE: It is true.

(UNKNOWN): But he has a response he'd like to give to the Committee.

GOODLATTE: (Inaudible).

(UNKNOWN): You said throughout the day that was the procedure, now you're changing it (inaudible) allow people to make claims...

GOODLATTE: The gentleman -- the gentleman is completely out of order.

(UNKNOWN): No, Mr. Chairman, you're out of order.

GOODLATTE: The time -- no, the time belongs to the gentleman from Wisconsin and he may proceed.

JACKSON LEE: Mr. Chairman, you indicated -- you must remember that you indicated that the gentleman could answer the question.

GOODLATTE: The gentlewoman is not in order. The chair -- the chair recognize the gentleman of Wisconsin.

JACKSON LEE: I beg of you to allow the gentleman at the end of this long hearing to be able to explain conflicts in representation that have been made by various persons on the panel.

GOODLATTE: The gentleman from Wisconsin may proceed.

GROTHMAN: Well, it seems to me that on the advice of counsel a lot of the things we want to find out here today we're not going to find out. But I'd like to focus a little bit on the milieu in which you operate in the FBI.

When I look at this area around Washington, D.C., I look and we -- we had a candidate run for president who ran on the promise to drain the swamp. When I look at the election results in the areas in which you and other people work for the government around here live, I see a monolithic -- almost monolithic mindset that -- that can be illustrated in the election results in the area, things that given the country as a whole was almost half for the candidate who wanted to drain the -- drain the swamp and half for the candidate who didn't.

You look at District of Columbia four percent for Donald Trump, Prince George County eight percent, Arlington, Virginia 17, Alexandria 18%. I mean, things that -- and Wisconsin has 72 counties, and normally we're about a 50-50 state. There's not one county in which you have that everybody voting together, so I want to -- I want to dig into a little bit about the milieu in which you -- which you hang around with.

Now, at the time where Mr. McCabe, who I believe was Ms. Page's boss, at the time his wife ran for Congress -- (inaudible) Congress or was it maybe a -- a state -- a state -- a state-elected position, you refer to people who live in a county just beyond Washington, D.C. a little bit more normal, still a democratic county. You refer to them as this county, Loudoun County as being gentrified but is still largely ignorant hillbillies. I don't mean to embarrass you in that because it doesn't surprise me that people in the swamp would refer to people once you get a couple of hours away from Washington as ignored hillbillies.

It wouldn't surprise me if somebody was -- inadvertently got a hold of e-mails and people were saying that and the newsroom at MSNBC. It wouldn't surprise me if they were saying it and the Department of the Interior, the Department of Education. It disappoints me a little bit that they were saying it in -- in the FBI.

But I'm going to ask you. In -- in the areas which people you -- you congregate in your business, how -- you obviously talked about politics, how many people do you run into, say, in the Washington office here who are overtly supporting President Trump?

STRZOK: When you say in the offices, Sir -- Sir, a couple of things that I -- you may not have been here this morning. I certainly -- I do not view the people of Loudoun County's ignorant hillbillies. I live in an adjacent county and much like in Wisconsin you might let folks in Minnesota...

GROTHMAN: Well, no...

STRZOK: ... with a sense of rivalry.

GROTHMAN: ... I know people like you.

STRZOK: I regret that statement and...

GROTHMAN: I know you regret it, I know.

(CROSSTALK)

GROTHMAN: It's one of those things that you never thought would come out, but I...

STRZOK: When you say the office, right, I don't understand what you mean by around the office.

GROTHMAN: People you work with on a daily basis.

STRZOK: I don't tend to know who they support, Sir.

GROTHMAN: Well, it's apparent in the e-mails that you exchanged with Ms. Page that -- not only with regard to her opinions, but (inaudible) obviously the McCabes were very political in nature. You must have some general opinions of the politics of the people you work around. You were not shy about sharing your political opinions.

STRZOK: Right. My sense is the -- the FBI, including me, is a very conservative typical organization. They believe in law and order. They believe in strong national (inaudible).

GROTHMAN: I'm going to say when it comes...

STRZOK: It's a -- traditionally, sir, that hits the (inaudible).

GROTHMAN: ... to drain the swamp or otherwise.

STRZOK: ... (inaudible) Republican (inaudible). I'm sorry, Sir?

GROTHMAN: In the areas in which I worked in the past prior to getting involved in politics, I could almost always tell you we have an opinion where people come down to on these issues. You are not shy about talking about politics. I want to know in the social circle that you hang around with, including at work, maybe you get at home, do you ever run into people who would have voted for President Trump, people who you know?

STRZOK: Yes, Sir. Yes, Sir.

GROTHMAN: Would you guess in the FBI -- like I said, we rattled
off the percentage of people voting for President Trump and the
surrounding counties. It looks like overall maybe less than one in six
is just amazing. Could you comment again on your comment (inaudible)
ignorant hillbillies? And there are a lot of people who think like you
in the swamp, OK? It's not unusual, probably a lot of lobbyists
probably feel that way, congressional staffers.

Could you comment in general on the political viewpoint of the
people who work in the Washington office with you?

STRZOK: The general perspective, as I just said, sir, the -- most
FBI agents, in my experience, tend to be strongly conservative...

GROTHMAN: Outside of Washington...

STRZOK: ... strongly -- in Washington, D.C., strongly
conservative, strongly law and order, strongly national defense. Up
until the current date, very strongly Republican. I -- I don't know I
couldn't tell you what people did or didn't vote for this election
because we don't tend to talk about that.

GROTHMAN: I guess, I'm out of time.

GOODLATTE: The Chair recognizes the gentleman from California, Mr.
Gomez, for five minutes.

GOMEZ: Thank you, Mr. Chairman.

Mr. Strzok, you've been on the hot seat for a number of hours. I
just wanted to give you an -- first thank you for being here and thank
you for trying to answer the questions as -- to the best of your
ability, but I want to give you at least 45 seconds to respond to any
of the comments that have been made that you feel like you haven't been
given the opportunity to respond to.

STRZOK: Sir, I appreciate that. And -- and one thing -- two
things. One, with regard to the I.G. and what they found, to be clear,
the I.G. report found no active bias by me or anybody in the FBI.
Period. And he said, in his testimony, my understanding is the same.
Two, the I.G. found and stated in the report that I was the most -- the
most aggressive people in pursuing the Hillary Clinton investigation
going after Secretary Clinton, so those facts are indisputable.

They're written down and there -- there's no two ways to try and
spin out of those. And I don't want to take your time and so I'll try
and do some 15 seconds. The insurance policy text that has come up
before, that text represented a debate on information that we had
received from an extraordinarily sensitive source and method, and that
typically when something is that sensitive, if you take action on it
you put it at risk. And so there's a tension there.

Maybe we should, you know, just real slow take a typical three or
four-year counterintelligence investigation because the more aggressive
you are, the more you put it at risk. What -- and some people said
that, some people said, "Hey, look, every poll is saying candidate
Trump is likely not to win." Every Republican was saying that. Some

people said, as a result of that, let's not risk the source, let's go
slow.

What I advocated for, what I'm saying is, look, we're the FBI. We
need to do our job. We need to go and investigate. While it isn't
likely according to all the pollsters and everybody that candidate
Trump is going to be elected, we need to make sure we are protecting
America. We need to responsibly and aggressively investigate these
accusations because you know what, if candidate Trump is elected, there
might be people we need to be investigating that might be nominated for
important national security positions.

Everybody in America would want to know that. Candidate Trump
would want to know that. So much like that you probably won't die
before you're 40...

GOMEZ: No, thank you...

STRZOK: That's the -- that's the meaning, Sir. I appreciate it.

GOMEZ: No, no, thank you so much. I got sworn in July 11, 2017, so
I am one of the most freshmen members of -- of Congress. It was about a
year ago yesterday, and I was excited to be on the Oversight Committee
because I believe that Congress has the responsibility to be a check on
the executive branch, but that's when it's being honest in its purpose,
right?

I don't believe our committees led by the majority has been honest
in its purpose because if it has been it would be treating requests by
the minority with as much important as their own. They've -- so I have
a question. It's a -- it's -- it's a rhetorical question. Why is it
that the House Oversight Committee and the House Judiciary Committee
have refused to issue a single subpoena to compel documents or
witnesses from the Trump administration on any topic other than this
one? It's because they don't believe and they don't care to discover
the truth. They are using this process to throw more red meat to their
base in order to turn it out for the midterms, and to protect a
President that has no moral authority to lead this country.

You know, so it is kind of embarrassing. I've been watching this
-- this is a farce, this circus for the last five hours. And -- and I
wonder to myself, you know, what are people thinking that there's grown
men and women shouting over each other, insulting one another. Yeah,
they -- they try to dress it up with saying the gentleman from North
California, the gentlelady from California, but it's all a farce and
the American people know it.

You know, we've asked for subpoenas for a variety of issues --
Commerce Department and the Census Bureau withholding documents on
citizenship question, Department of Justice withholding documents on
request to add a citizenship question. Department of Justice
withholding documents on politicized hiring allegations for immigration
judges, Department of Homeland Security and Department of Justice
withholding documents on gag orders against whistleblowers, White House
withholding information on charter flights, the list goes on. There's
about 12 of them, but they have never issued a subpoena except on this.

And the American people should ask why, why, why. And it's -- and the reason is because they're not interested in finding the truth or making sure that we hold the administration accountable. It's all for tossing red meat to their base.

And you know what? We should never talk ill about anybody, you know, in any particular part of our country. But this President has lower that standard. He questions immigrants, he questions the allegiance of judges, the FBI. And that, in my opinion, is insulting, and I think we need to grow up and show that the American people that were here to act as a responsible branch of government. And I yield back.

GOODLATTE: The Chair recognizes the gentleman from Florida, Mr. Rutherford, for five minutes.

RUTHERFORD: Thank you, Mr. Chairman.

Mr. Strzok, when -- when I hear you talk about your passion for America, I -- I believe you. I -- I can see that passion. When you talk about your love for the FBI, I see it, I believe it. When you talk about your -- your -- your faith in the American electorate, I believe that.

Now, what -- what concerns me is you -- you said that you didn't trust the elections. To quote, "You didn't trust the election after Russia put their finger on the scale." Remember saying that earlier?

STRZOK: That I don't believe that's exactly what I said, Sir. I think I said something slightly different, but I recall that exchange.

RUTHERFORD: Well, but that was your -- that was the meaning, right?

STRZOK: Yeah, I don't think that was the meaning, Sir. My -- the meaning was I was very concerned that Russia was attempting to do that. I -- I pray...

RUTHERFORD: You simply said...

STRZOK: ... I prayed...

RUTHERFORD: ... Russia had put their finger on the scale.

STRZOK: I don't recall...

RUTHERFORD: Well...

STRZOK: ... what I said specifically.

RUTHERFORD: ... you can find it later, but I wrote it down.

STRZOK: If I -- OK, I'm happy...

RUTHERFORD: So...

STRZOK: ... to tell what I felt.

RUTHERFORD: ... and what I want to ask you is do you think that justifies then you, Mr. McCabe and Lisa Page to correct that wrong that you perceived was done by the FBI?

STRZOK: That never happened and that would not happen.

RUTHERFORD: Let me ask you, the I.G.'s report that -- that I have right here, you said that political bias did not impact your professional actions. You said that earlier in this meeting as well. Let me give you a little background.

In a text message sent on August 15th, and this has been discussed earlier, you wrote to Lisa Page, "I want to believe the path you threw out in Andy's office that there is no way he gets selected, but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event, you die before you're 40.

STRZOK: Yes, Sir.

RUTHERFORD: Certainly remember that, you've heard a lot. The reason -- was there anyone else in that meeting?

STRZOK: I am sure there was, I don't remember who.

RUTHERFORD: But -- so, you don't remember who all was it (inaudible)?

STRZOK: There were -- there were inordinate number of meetings with the government. We had meetings...

RUTHERFORD: OK/

STRZOK: ... I don't remember this particular meeting who was there. I could look at my notes, maybe (inaudible).

RUTHERFORD: At least two of those people that were in that meeting with you are no longer working for the FBI, are they?

STRZOK: I don't know that Mr. McCabe was there.

RUTHERFORD: You don't know that Mr. McCabe was in the office?

STRZOK: He was in the office. My recollection of that meeting is that we had had a briefing to the director. Sometimes after briefings like that, the director will stay behind with his very senior staff like this general counsel and the deputy. And if we have other matters to discuss that don't merit the importance of the director's time. We'll go down to the deputy's office and wait for him to return. So he may have been there, he may not have been there, I don't recall.

RUTHERFORD: But Mr. McCabe is no longer working at the FBI, is that correct?

STRZOK: That is correct.

RUTHERFORD: How about Lisa Page?

STRZOK: She is not.

RUTHERFORD: Anybody else who was in that meeting that you recall that no longer works with the FBI?

STRZOK: Possibly Mr. Baker, but I don't know who's in the meeting or not.

RUTHERFORD: OK. Let me ask...

STRZOK: You know, that's -- that's it, possibly that I don't think Mr. (inaudible) on either?

RUTHERFORD: OK. Let me ask, did you present the original FISA application?

STRZOK: No. So, sir, when I assume you're talking about the FISA application and Carter Page that have been...

RUTHERFORD: Correct.

STRZOK: ... limited (inaudible) ask a question...

RUTHERFORD: Correct.

STRZOK: ... I did not.

RUTHERFORD: Were -- were you in the courtroom?

STRZOK: No.

RUTHERFORD: OK. And do you -- and there were three renewals, correct?

STRZOK: Sir, I'm not certain I can discuss that without divulging classified information, and I don't know that I've been given clearance by the FBI to discuss that.

RUTHERFORD: OK. Well, Mr. Rosenstein was here and admitted that he signed the third renewal.

STRZOK: I certainly defer to his statement, Sir.

RUTHERFORD: He signed a third renewal, but amazingly to me Mr. Strzok -- apparently because of the information that was in that renewal, he would -- he would not admit that he actually read the document. Do you know of any falsehood, any half-truth, any -- any misinformation that was in that third renewal that would preclude him from being able to say he read it and has signed it and approved it?

STRZOK: Sir, I have no information about the Deputy Attorney-General and what he did or didn't do or why he did or did not do anything.

RUTHERFORD: OK. You said that political bias didn't affect your -- your work, but the FBI and DOJ were both admonished for misconduct in

the prosecution of Senator Ted Stevens, right?

STRZOK: Sir, I -- I don't...

(CROSSTALK)

STRZOK: I was not involved in that investigation, I don't know.

RUTHERFORD: OK. Well, former Director Comey said that...

GOODLATTE: The -- the time of the gentleman has expired. The witness can answer the question.

(UNKNOWN): (OFF-MIKE)

GOODLATTE: OK.

RUTHERFORD: You know that they're undergoing training right now for political bias at the FBI. Is that correct?

STRZOK: I understand that that was the recommendation in the I.G. report.

GOODLATTE: The time of the gentleman...

RUTHERFORD: I yield back.

GOODLATTE: ... has expired. The Chair recognizes the gentleman from Alabama, Mr. Palmer, for five minutes.

PALMER: Thank you, Mr. Chairman.

Mr. Strzok, despite your assertations that the I.G. report did not, in any way indicate bias, I -- I would disagree with that. But also on page 424 of the Inspector General's Report, he said that we therefore refer this information to the FBI for its handling and consideration the message is sent by the five employees of (inaudible) listed above, violates the FBI's offense code of conduct. Are you understand review by the FBI Office of Professional Responsibility?

STRZOK: Yes, Sir.

PALMER: Thank you. In January 2014, the inspector general for the Intelligence Community, Mr. Charles McCullough, sent out a letter and -- and indicated that he had received two sworn declarations from one intelligence community element. These declarations cover several dozen e-mails containing classified information determined by the intelligence community element to be at a confidential secret and top secret special access program levels, which was -- were you aware of this letter?

STRZOK: What was the date of that letter?

PALMER: January 14, 2016.

STRZOK: I -- I don't recall it now, but I may have noted at the time. Correspondence like that, sir, we had a team of -- anywhere from

20 to...

PALMER: Right.

STRZOK: ... 60 people so...

PALMER: Well, this is -- I understand that you can't know everything, and I get it. And I -- and I also want you to understand that I'm not going to be in be necessarily an attack mode because I -- I want to get some answers.

STRZOK: Absolutely.

PALMER: And this is a very, very serious problem that's raised for this letter whether it's confidential secret, top secret, but certainly special access program, your foreign military, correct?

STRZOK: Yes, Sir.

PALMER: You can understand then the danger that this could pose for our men and women in harm's way.

STRZOK: Yes, Sir.

PALMER: OK. This was January and then -- and again on March 4 you send the text saying that Hillary should win 100 million to nothing. Then on May 4th is when you said now the pressure really starts to finish the midyear evaluation. At one point in there was the memo change from gross negligence to extremely careless?

STRZOK: Sir, I...

PALMER: That was in May.

STRZOK: I'm not going to be able to give you a (inaudible)...

PALMER: I'm not asking for a date but do...

STRZOK: ... the calendar I can't give you a breakdown of what occurred before but I'm (inaudible).

PALMER: And I understand you have been here a long time and so have we, but -- but it was in May.

STRZOK: OK.

PALMER: And -- and -- and what appears here and it's in the context of -- of the need to finish the midyear investigation is that Donald Trump had just won the primary. It was obvious that he was going to be the Republican nominee. And -- and I believe you when you say you're a patriot. I believe that you cared deeply about the country, and I can see how you and some of your colleagues have concluded that it's in the best interest to change it from gross negligence to extremely careless because you couldn't -- you just couldn't comprehend a President Trump or -- or -- in your mind the danger that that -- that might pose to the country.

STRZOK: That's why it happened, Sir.

PALMER: Well, something happened to change this from gross negligence because -- to extremely careless because extremely careless is not prosecutable.

STRZOK: I -- I can tell you why it happened if you'd like me to answer, but I don't want to take your time if you don't.

PALMER: Well, I know what the inspector general said he thought happened. He said it was changed because it wasn't prosecutable because it's not in the code. The Espionage Act doesn't have anything in the criteria for extremely careless.

So I think again, you know, trying to give you some credit for your patriotism and your desire to do what's best for the country, I can -- I mean, our history is replete with people who've made decisions that they thought were the right decisions at the time.

(UNKNOWN): Great.

PALMER: They got outside the lines. And -- and the -- the text messages and the fact that -- that clearly there is a bias. And I get it we all have biases. It's what we do with them. It's how we act on them, how we are able to compartmentalize these things that -- that determine the course of things, really the course of history.

One of -- in the last few seconds here, I want to tell you that I appreciate the fact that you sought forgiveness from your family. I appreciate the fact that you realized that you have severely damaged the reputation of the FBI. We're not here about the FBI, we're about -- here about you and -- and what you did.

I literally sat here and I mean this sincerely and prayed for you and your family because that -- that -- I can't imagine what your family is feeling -- going through this. And I'm not going to question your integrity, but I -- I will say this to you and I hope this is constructive. I hope you take it as constructive.

As I watched your body language, as I watched your facial expressions, it's almost as though you've enjoyed this. This is a competition for you. And in many respects, even now...

STRZOK: Sir, I can tell you...

PALMER: And -- and I don't think you're...

STRZOK: (Inaudible).

PALMER: ... I'm not going to say your problem is a lack of integrity, I think it's -- it's a problem with hubris. And I think you need to take that into account in regard to how you handle this going forward because it -- it -- it makes it more difficult for us to give you the benefit of the doubt.

GOODLATTE: The time of the gentleman has expired.

STRZOK: Mr. Chairman -- Mr. Chairman?

GOODLATTE: OK.

STRZOK: Mr. Chairman...

GOODLATTE: The...

STRZOK: Mr. Chairman...

GOODLATTE: ... gentleman may briefly respond.

STRZOK: Thank you. No, sir, I -- I appreciate your prayers. Sir, I can tell you when you -- when you look at what happened in the investigation, everything was done by the book, and you can assure yourself and your constituents and everybody you're talking to when you look at both investigations, notwithstanding what decisions are made at a high level and to say something, not say something, when you look at the investigation, what those men and women did, everything was done right and by the book.

And I share your concern about the nature of the classified information. We found a bunch, T.S. (ph) special access program, confidential and secret, all that was found, all that was detailed in Director Comey's statement, so I appreciate it but...

PALMER: In regard to that, I want you to understand everybody here who (inaudible)...

GOODLATTE: The gentleman's time has expired.

JACKSON LEE: Mr. Chairman, parliamentary inquiry.

GOODLATTE: The gentleman's time has expired.

JACKSON LEE: Mr. Chairman, parliamentary inquiry...

GOODLATTE: That...

JACKSON LEE: ... relating to the rules of this hearing, parliamentary inquiry, Mr. Chairman. The...

GOODLATTE: (Inaudible) parliamentary inquiry.

JACKSON LEE: The -- the witness had attempted to answer the gentleman's question.

GOODLATTE: And he was allowed to.

JACKSON LEE: And, Mr. Chairman, just a moment please. On a question that's been asked over and over again about the gross mismanagement, gross negligence issue, and the witness was not allowed at that time to give the clarification. I think the record (ph)...

GOODLATTE: The -- the gentlewoman has...

JACKSON LEE: ... clarification...

GOODLATTE: ... the gentlewoman has not stated...

JACKSON LEE: ... about the gross...

GOODLATTE: The gentlewoman has not stated a parliamentary inquiry.

JACKSON LEE: ... negligence, which was not written by the gentleman as I understand.

GOODLATTE: The gentlewoman from Georgia, Ms. Handel, is recognized for five minutes.

HANDEL: Thank you, Mr. Chairman, and thank you, Agent Strzok for being here. I have found your testimony today frankly to be quite remarkable in its disingenuousness. And you have shown a disturbing degree of denialism about your actions and the impact of those actions. I think we would all agree that everyone does have personal viewpoints. That is very true, but Agent Strzok, there is a very big difference between someone expressing his or her political views generally and someone leading an FBI investigation, making highly negative and explosive comments about the actual target of that investigation. Would you agree? That's a yes or no.

STRZOK: Rephrase the question. I don't understand the yes or no of that.

HANDEL: You have a really awesome talent for filibustering. You might want to think about running for the Senate. I'll just say again. You are in -- you were the lead investigator, one of the lead investigators and you made highly negative and explosive comments about the actual target of an investigation. That is distinctly different from an individual expressing his or her political views.

You were in a -- in a position that you needed to be at a higher, much higher level of standard and you failed to reach that. Your assertion that your statements do not constitute bias is well absurd. The facts are this. The FBI inspector general testified before this very body that you did indeed exhibit bias. And further in its report he detailed numerous examples of investigative steps that were not quote by the book as you just testified.

What I also find stunning is that someone in your role with the responsibilities that you've had engage in such grossly unprofessional, unacceptable and unethical behavior. And now truly ironic, did I hear you say earlier that you're in a senior position in the H.R. division for the FBI?

STRZOK: Yes, ma'am, currently (inaudible).

HANDEL: That's very ironic. So let me ask you this. You were in the supervisory role with the FBI. Suppose you found out that one of your direct reports was sending the kind of text messages that you are sending about the target of -- of an investigation that they were working on. What action would you take?

STRZOK: Ma'am, if they were sending personal opinion about a

political matter that's their business, I think given my experience to date, I would caution them against doing that on a government device that is entirely separate and distinct from an individual that was under -- that was not a -- a political candidate, that was not -- did not have the kind of personal protection attached to it.

HANDEL: Right. Suppose that you found out that one of your director report was having an extramarital affair with a colleague or with someone outside of the bureau. What action would you take?

STRZOK: Ma'am, it depends. If it was in -- if it was against the FBI's regulations in terms of if it was somebody in their chain of command, above or below them, which is inappropriate are -- are not allowed by regulations, I would tell them and report that. If it was otherwise permitted in our regulations, I would probably talk to him and say, "Hey, look, you know, this -- I'm aware of this and you need to be aware, you know, and just take into consideration what you're doing in the appearance of it."

HANDEL: So, I -- obviously you understand the gravity of the transgressions, you know, engaging in the kind of behavior that you've been engaging in especially with the extramarital affair. It opens up an agent to exploitation and even blackmail. Given the fact that you haven't and currently hold a high-level of security clearance, did you ever discuss her relationship with Ms. Page with H.R. or anyone around your security clearance?

STRZOK: They -- they were well aware of it but -- well, they...

HANDEL: When did they become aware of it?

STRZOK: Well, when it was kind of made very public by the media (inaudible) late last year.

HANDEL: So -- so it was -- it was in the press...

STRZOK: But, ma'am, I can tell you...

HANDEL: ... (inaudible).

STRZOK: ... if I can do your premise though that it makes it susceptible to blackmail, I never, never could have been blackmailed or coerced by the nature of that relationship. That is not...

HANDEL: That's the -- when you're undergoing a security clearing, you are asked a question about that.

STRZOK: ... the nature of my patriotism and the nature of what I believe in this country, you could not...

HANDEL: There's a reason that security clearances ask those kinds of questions. Did you ever advise Mr. Mueller of your relationship with Ms. Page?

STRZOK: I did not.

HANDEL: Why?

STRZOK: It didn't strike me as -- as relevant.

HANDEL: You have a lot to learn about human resources. Wow. It is absolutely relevant. There should have been conversations. I find it interesting that there was no discussion that the two of you shouldn't both be together on that same investigation.

Mr. Strzok, no reasonable person could not be concerned about your actions in this investigation, no reasonable person could not be concerned about this situation involving yourself, so thank you.

Mr. Chairman, I yield back.

GOODLATTE: The Chair recognizes the gentleman from California, Mr. DeSaulnier, for five minutes.

DESAULNIER: Thank you, Mr. Chairman. I want to thank you for your testimony and your service. It's been a long day and I admire your resume. I came from a similar background. I went to a catholic high school and a catholic college. I remember going to Holy Cross and having people say the graduates from Harvard and Yale make the laws, but the graduates from Holy Cross and Fordham enforce the laws. And we always took great pride in that because I think you as well, and I having had friends who have served in the Bureau took great pride in that -- that education reinforce your ethical beliefs in a difficult world where we make -- all make mistakes and that's part of our humanity. So I admire your work.

I must say I'm discouraged today to have listened to much of this hearing on many levels. I'm discouraged because I consider many of the people on the other side of the aisle as friends, good friends. I must say this reminds me of what it must have been like to sit through the McCarthy hearings. I'm waiting for that moment at long last. Do you have no shame? But maybe that's to come.

Having said that, I am troubled by the fact that someone in your background did what you did, but you and I both leave in -- believe in redemption so I think you have acted that way today.

I wanted to ask you a couple -- just a comment and a question specifically for one case. So there's been a persistent conspiracy theory about the Hillary Clinton e-mail investigation in one of your former colleagues, John Giacalone, the executive assistant director for the FBI's National Security Branch. He left the FBI because he was upset that there was a bias in the Clinton case so the conspiracy therapist say -- theorist say and going, quote, "sideways" or, quote, "nowhere by design."

So he respond in testimony in front of our Committee on June 21st and said that these allegations were completely false, quote-unquote, "nonsense." Quote, he said, "Totally inaccurate, this is all nonsense. Almost the whole thing is nonsense. I'd have to read it again to definitively say that, but from what I recall I didn't leave because I was disgruntled. I left because I was broke."

He continues, "I loved every minute I spent in the FBI. I have one

bad day in 25 years, and that was on 9/11. And I think it was a bad day for a lot of people and for this country. So there's no way I left because I was sideways or because I was disgruntled. That was purely the right time for me 25 years in right opportunity. I never spoke to anybody that wrote the Internet article. I don't know who they used the source of this thing."

He further said, explaining the Clinton case from the outset he said, quote, "I fully recognize right at the gate that it was a political bombshell that we," meaning the FBI, "were an apolitical organization, right? So I had the referral. We were going to open up the case, and we were going to wait to put together a team and we're going to conduct a thorough down the middle investigation, which is what we did," end quotes.

And then starting again in quotes, he said about Director Comey, "He's a straight ahead guy, right, I mean, and you know if the evidence existed he would have pushed it for prosecution." And then about you, he said, quote, "There was no indication that he exhibited any bias while he was conducting the investigation while he was working for me. He went 110 miles an hour, and we were always looking for new ways to uncover information and evidence. So I had no indication that he even had -- would politically lean the way, I guess, some of these text message that show that he leaned. At no point in time during my management of this case did he exhibit anything that would provide any slight indication of some of those things that were, you know, posted and put out to the media," end quotes.

Do you have any comments on your former colleague's comments?

STRZOK: Sir, I...

DESAULNIER: So what he said and go through.

STRZOK: ... I deeply appreciate them. Mr. Giacalone is an extraordinary agent with a heart of gold, and I appreciate it.

DESAULNIER: So just in closing, I'm just curious and not to be redundant but I really want to sort of reiterate you are nonpartisan in your comments and criticisms, which I think is fair. My dad used to be a state superior court judge in Massachusetts, and I remember one of my siblings once active in politics put a bumper sticker in his car, and he went ballistic. There was no question that he was a very committed Republican, but he was concerned about the perception.

So sitting here today after all this hours, is there any one thing that you can encapsulate what the Bureau could learn from this experience to make sure no one would sit where you're sitting in?

STRZOK: Sir, sir, there is. I -- I deeply -- my belief is that this text should never be public and whether reasonable or not they were made public. And I deeply regret certainly the -- the appearance that they created and all the way that manifested itself out personally with regard to the Bureau. So at the end of the day we're judged on our actions. Certainly, you know, what I do with regard to my personal matters is my own business, but I would also say I take comfort that when I look at my actions in the workplace that they are proper, that

they are correct, that they were done for the right reasons and done in the right way.

And so whenever I get ups and downs in this experience, I look at that record of work and it gives me considerable comfort that it was done right and well so.

DESAULNIER: Thank you. Thank you, Mr. Chairman. I yield back.

GOODLATTE: The Chair recognizes the gentleman from Pennsylvania, Mr. Rothfus, for five minutes.

ROTHFUS: Thank you, Mr. Chairman.

Mr. Strzok, you were the lead investigator in the Clinton e-mail investigation. Where there ever any searches for e-mails with the Clinton e-mail dot-com route on the government data warehouse that would have held data collected to 702 or other FISA authorities?

STRZOK: Sir, I would have to think about that. I...

ROTHFUS: Think hard (inaudible).

STRZOK: ... rephrase the question, were there any searches of the June e-mail...

ROTHFUS: The I.G. report talks about servers that were searched and devices that were -- were searched. Were there ever searches done on the data warehouse system that would contain data collected pursuant to FISA or 702?

STRZOK: So when you say data warehouse system you're referring to any FBI data system that would house FISA or 702 data?

ROTHFUS: Correct.

STRZOK: Yes, sir, I believe there were.

ROTHFUS: There were. Do you know if anything was found sound on those?

STRZOK: Not a fan, I don't.

ROTHFUS: It's not referenced in the I.G. report whether that was searched. On page 96, the I.G.'s report have said that investigators learned late in their review that the FBI considered seeking access to certain highly classified materials that may have included information relevant to the midyear investigation, but ultimately did not do so. Furthermore, unnamed FBI Attorney 1 went so far to say that review of those materials was necessary to complete midyear and even started to draft a memo about it. And per the I.G., you thought reviewing those e-mails would have been a logical investigative step. Who stopped it?

STRZOK: I don't know. It was levels above me. My understanding was it was outside the Bureau that that was stopped.

ROTHFUS: Did you object to that?

STRZOK: I -- I disagreed. I wanted to search it. We're getting
very close to classified information, so I want to be very careful and
(inaudible).

ROTHFUS: Did you -- did you send him an e-mail or a memo to that
effect that you said we need to search this?

STRZOK: Sir, I don't recall the nature and what the discussion
was. I remember talking about doing and wanting to do it.

ROTHFUS: As a counter-intel officer, did you know if any other
non-DOJ governmental officials have reviewed the classified materials
in question in this case?

STRZOK: I don't know.

ROTHFUS: Did any non-DOJ personnel communicate with anyone at the
FBI or DOJ or to midyear personnel about this classified material?

STRZOK: Sir, I can't -- I can't answer that question without
providing or without saying (inaudible)...

ROTHFUS: Do you know if anybody on the midyear team, FBI or DOJ
ever briefed anyone at the White House about such classified material
as a potential related to midyear?

STRZOK: I don't know. I'm not aware of it, but I don't know.

ROTHFUS: Well, who had the most influence on midyear investigators
believe that this classified material was ultimately not necessary and
will not have a material (inaudible)?

STRZOK: Sir, those are two different questions. There's an
investigative question which I is the leader of the team, which
included the senior investigators, had a desire to do something. And
then there's a decision at a much higher level and at a different
organizational spot that was well above in (inaudible).

ROTHFUS: Yeah, this was all happening in May of 2016. Was there a
rush to wrap this up?

STRZOK: This was not all happening in May of '16.

ROTHFUS: What's the point...

(CROSSTALK)

ROTHFUS: ... the I.G. report this was all coming out in May of
'16.

STRZOK: Sir, there were -- there may have been aspects to that
discussion of May of '16, but my -- my recollection is that this was
broader than that and that was...

ROTHFUS: On page 96 of the I.G. report, it said investigators
learned late in their review that the FBI considered seeking access to

certain highly classified materials.

STRZOK: I think that (inaudible) when the I.G. learned about it, sir, if I'm not mistaken on that reading.

Sir, I don't remember specifically when this came up in the context of midyear. I could not tell you when I first became (inaudible)...

ROTHFUS: And you were the lead investigator (inaudible), right?

STRZOK: ... classified matter. It is -- I was.

ROTHFUS: OK. Did -- during midyear exams...

STRZOK: Sir, I was -- I was...

ROTHFUS: ... during midyear exam, did investigators find any e-mails between Secretary Clinton and President Obama including any e-mails that would have used aliases?

STRZOK: Including any e-mails...

ROTHFUS: E-mails that would have used aliases.

STRZOK: Yes.

ROTHFUS: Did any of those e-mails contain classified information?

STRZOK: With President Obama?

ROTHFUS: Between Mrs. Clinton and President Obama.

STRZOK: I don't believe so, but I would have to verify that with the case officer.

ROTHFUS: Do you know if any of those e-mails were ever intercepted by a foreign actor?

STRZOK: I don't know.

ROTHFUS: On Page...

STRZOK: When you say an e-mail, sir, are you talking about e-mails between Secretary Clinton and President Obama...

ROTHFUS: Yes.

STRZOK: ... or the e-mails containing classified?

ROTHFUS: No, between Secretary Clinton and President Obama.

STRZOK: I don't know.

ROTHFUS: On Page 149 of the I.G. report it noted they found evidence that you advocated for more aggressive tactics in the Clinton investigation like grand jury, subpoenas and search warrants.

Ultimately, the midyear team decided to go with the kid globe approach using consent agreements. I can't think of some recent high-profile examples where federal agents did not use the kid treatment.

Relating to midyear, who specifically had the authority to decide not to use compulsory process to obtain evidence in this investigation?

STRZOK: Sir, I'm certain the I.G. did not use the phrase "kid glove." The decision ultimately about whether or not to issue the process to rest of the prosecutors so the -- the...

ROTHFUS: Did anyone outside of the midyear team suggest to the team not to use an aggressive approach?

STRZOK: There -- there was a constant debate, which is normal and healthy between the agents and the attorneys about how aggressive to be. My recollection is that...

ROTHFUS: Anybody outside the midyear team? You're talking about people on those (inaudible)?

STRZOK: No, sir, not -- not that I know.

GOODLATTE: The time of the gentleman has expired. The witness may answer the question.

STRZOK: No, not -- to my recollection there's nobody outside the midyear team that was exerting any pressure one way or the other.

GOODLATTE: The Chair recognizes the gentleman from Kentucky, Mr. Comer, for five minutes.

COMER: Thank you, Mr. Chairman.

Mr. Strzok, Hillary Clinton has said publicly that FBI Director James Comey costs her the election. Do you share Hillary Clinton's opinion?

STRZOK: Sir, I don't know. I've read a lot of pollsters and a lot of speculation, but I -- I don't know.

COMER: It's an important question because you think about Hillary Clinton making a statement like that about the FBI and the FBI director as well as the statements that President Trump has made recently about the FBI. And those are the two leaders of each party in the last Presidential election, so I think it does matter.

Out of curiosity, are there any recordings of the interviews of the Clinton e-mail investigation?

STRZOK: No, sir, I don't believe that we recorded any interviews.

COMER: So none of the interviews were recorded.

STRZOK: To the best of my recollection, sir, I'm not -- I would need to review the case file, but I don't believe anywhere.

COMER: Is that normal for a...

STRZOK: Yes.

COMER: ... an investigation of that size?

STRZOK: Yes.

COMER: Mr. Strzok, did you consult with James Comey before he made the decision to go public days before the presidential election with the fact that the FBI was going to reopen the investigation into to Hillary Clinton's e-mails once it was determined that Anthony Weiner had access to the e-mails and potentially had access to classified information? Did you consult with James Comey before he made that decision?

STRZOK: I was present at meetings where that decision was discussed.

COMER: Do you think that was the right decision?

STRZOK: Sir, ask also a different question. I think for all of us, it was kind of a 51-49 proposition. I came out of that decision comfortable with doing so.

COMER: Did Ms. Page consult with James Comey before he made the decision to go public?

STRZOK: I -- you'd have to ask her, Sir. I don't know that she did, but I think so.

COMER: We hope to get to ask her some questions. Do you think that James Comey leaked out the -- well, let me -- let me back up. In a text message from you to Ms. Page, you mentioned insurance policy. That's been referenced many times today. What exactly did you mean by having an insurance policy in case, I would assume President Trump won the election or was looking like he was going to win the election?

STRZOK: Sir, I appreciate that question because it is taken very much. I understand it's ambiguous and that people have taken out of context. The insurance policy was merely an analogy to you do something when something isn't likely to happen. You're probably not going to die before you're 40, but you have an insurance policy anyway.

What we had before us was an allegation that something significant, that -- that members of the Trump campaign may have been working in cooperation with the Russians. And some people were saying, "Hey, look, this sensitive source of information that's so -- so sensitive, so vulnerable, we shouldn't put it in danger because sometimes you go out and do aggressive investigation. If it's a drug snitch or intelligence source, you can cause significant harm.

And a lot of people looked and said, "Hey, well, look, all the pollsters, everybody in the world they're saying it's not likely that President Trump is going to be elected, so don't worry about it. We can just let this sly."

I had a different view and I said, "You know what, it -- it doesn't matter whether or not he's going to be elected. We need to do our job. We're the FBI. We need to aggressively go out there, pursue the allegations because there's like...

COMER: Let me ask you this.

STRZOK: ... but I want to finish up because (inaudible).

COMER: You've answered the question. Do -- do you think that James Comey leaked out about the reopening of the Hillary e-mail investigation because he needed a, quote, "insurance policy" to cover his back for predetermining that Hillary Clinton was -- was innocent in the e-mail investigation before it ever even began?

STRZOK: I don't think Director Comey leaked anything with regard to -- that I'm aware of. With regards to the Clinton investigation, I certainly do not think he, I or anybody else viewed any investigation or any step in the -- in the sense of what you're saying that we need to do something to prevent any particular action at all.

COMER: With respect to the clear bias of Donald Trump in your text messages and your clear prejudice against the Trump voters, and by the way, I'm one of those smelly hillbillies from Appalachia that you've referenced in your text. You were in a supervisory role at the FBI. What would you do if you found the text from a subordinate of yours that exhibited the same type of bias that you had towards a group of people that were key witnesses or -- or key whatever to the investigation? How would you handle that scenario?

STRZOK: Sir, if I found a text of a subordinate that was expressing a political opinion, one, I don't think I'd see it, and two, I think it's entirely appropriate. If your question is the text was about a target of an investigation talking about the target that's an entirely different matter and that bring that subordinate in and counsel, but those are -- those are apples and oranges, they are not at all the same.

COMER: I will conclude by this statement, Mr. Chairman, I -- I believe that this is a bad day for the FBI. I believe that we have an overwhelming majority of quality FBI agents and intelligence agents all across the United States and all across the world, but it's unfortunate that when reading the inspector general's report and sitting here, listening to your testimony, watching the reactions from some of the -- your colleagues behind you with rolling their eyes and -- and frowning faces and, you know, it's -- it's just very discouraging as a member of Congress that we've tried this hard to get information. The American people want to know.

This Russia investigation has been going on for a long time. Many believe that it -- it is a witch hunt, it needs to wrap-up. But from what we've heard today, you know, there -- there are a lot of problems with your credibility as the lead agent in the entire Russia investigation.

Mr. Chairman, I yield back.

GOODLATTE: There is a gentlewoman from Texas before we close and we will -- we will now be closing. There's a gentlewoman from Texas desire a couple of minutes to make any closing remarks.

JACKSON LEE: Mr. Chairman, thank you for your indulgence. This has been a long day. First, let me thank the Federal Bureau of Investigation, the agents that I have worked with in my years of service on Judiciary and Homeland Security. The aftermath of 9/11, which I had the lack of distinguishable -- if you will, distinguished position to be in the United States Congress during 9/11 and certainly in the aftermath of the investigation, let me thank the FBI and Mr. Strzok for their service.

Let me quickly say this and then conclude my remarks. I wanted to be clear that General Flynn, in his offense, asked the Russian ambassador to refrain from escalating the situation in response to sanctions that the United States had imposed against Russia. Following a whistleblower then said that he referred as to Mr. Flynn that the sanctions would be, quote, "ripped up to allow money to start flowing to one of Flynn's business projects."

Did you have anything to do with any comments by General Flynn?

GOODLATTE: This is not for asking questions, Ms. Jackson Lee.

JACKSON LEE: I will leave that on the record, Mr. Chairman. I thought that it will be good to clarify it because I've asked others, but let me finish my remarks.

In the concluding comments, Mr. Strzok, again I believe this hearing in its long period of time, showed no bias in the decisions regarding the final report on Hillary Clinton's e-mails. She was vindicated. Nothing changes the Russian interference in our elections of 2016. Unfortunately, no questions were asked by the Republicans about the Russian interference. And the GOP, in many instances, would not let you, Mr. Strzok, answer the questions.

Finally, the hearing did not give the American people, I think, the important answers that they needed and that is how will we secure our elections in 2018? That, unfortunately, plays into Putin's hands. It also did not respond or did not answer what you do when White House officials have not gotten their own security clearance.

And finally, let me be very clear. When our country is attacked, I want to make sure that the FBI and not the KGB shows up. We need to do a better job of answering the concerns of children that have been snatched away from their parents, the violation of voting rights, the need to end gun violence and many other issues. But today you stood the test of time at least, you have admitted fault and certainly admitted that you would have wanted to do things in a better way as I've gleaned from your testimony, but it cannot take away your service in the United States military, your service to the FBI and your willingness to offer, if you will, your deference and your concern about the continuation of the FBI and its service to this nation.

Mr. Chairman, I hope that the Judiciary Committee and Oversight Chairman, I believe, is not present but in any event that we will take

up the issues that the American people desire and that we will solve problems, which are important to democracy, security and the values of this nation. I thank you, Mr. Chairman, and I yield back.

GOODLATTE: I thank the gentlewoman. Many members on the other side of the aisle have attempted to denigrate this investigation and, in particular, this hearing today, one going so far as to calling it stupid. This investigation and hearing aren't just about reviewing the 2016 election however -- however important that is. This is a much bigger matter.

Our investigation and this hearing goes to a larger global and existential issue of equality under the law. So for my democratic colleagues to call this review stupid, denigrates the importance of our founding principles and the core of a system of justice. I'd venture to guess that most Americans don't view equality under the law and fair and unbiased investigations as stupid.

Mr. Strzok, this has been a lengthy hearing, so thank you for your time today. It has been extraordinarily frustrating though in trying to get answers to many important questions. I understand that you have refused to answer many questions on the advice of the FBI. You've also said you cannot answer questions on the advice of counsel because they -- they could disrupt the ongoing Mueller investigation.

So we are presented with a situation where you have not answered questions from Congress under the cover of the FBI and Special Counsel Mueller. Neither the FBI nor the special counsel is mentioned in the Constitution. Congress is -- and we have a constitutional right to have answers to the many questions that have been posed to you.

While you have consistently referred to the FBI as the ultimate arbiter who is preventing you from answering questions today, the FBI Director reports to the deputy attorney general. The FBI is a component of the Department of Justice so at the end of the day, Deputy Attorney General Rosenstein, who has oversight over the Federal Bureau of Investigation and of the Mueller investigation is where the buck stops. We now consider the Department on the line in addition to the FBI for failing to permit you to answer questions that don't even go to the substance of any investigation but have focused on your involvement in the process of those investigations. This is unacceptable.

Congress has been blocked today from conducting its constitutional oversight duty and more importantly, the American people have not received answers on why our chief law enforcement agencies and agents and lawyers operating within them permitted improper bias to permeate through three of the most important investigations in our nation's history.

The Constitution's construct of congressional oversight over the executive branch has been severely undermined today. We will resist attempts to prevent us from getting to the facts. This is not over and you as well as future witnesses are on notice that fulsome answers are expected promptly.

With that, this hearing is adjourned.

END

Copyright 2018 Bloomberg Government All Rights Reserved.