*Strzok v. Garland, et al.,* **No. 1:19-cv-2367-ABJ (D.D.C.)**

# Plaintiff's Exhibit 52

## To Plaintiff's Summary Judgment Memorandum



# Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations

★ ★ ★

21-127

SEPTEMBER 2021

PSTRZOK-DOJ-00010625



# EXECUTIVE SUMMARY

## Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations

### Introduction[1]

The Federal Bureau of Investigation's (FBI) mission is to protect the American people and uphold the Constitution of the United States. To accomplish this, the FBI expects its roughly 36,500 employees to exemplify its core values of integrity, accountability, and leadership. The FBI has defined the actions that violate its standards of conduct, identified the range of discipline that it may impose when an employee commits misconduct, and developed a disciplinary process to address misconduct matters. The disciplinary process consists of five phases: (1) reporting misconduct allegations, (2) investigating misconduct allegations, (3) adjudicating misconduct investigations, (4) appealing misconduct adjudications, and (5) implementing discipline.

The U.S. Department of Justice Office of the Inspector General (OIG) reviewed the FBI's disciplinary system in 2009.[2] In that review, we found that aspects of the FBI's disciplinary system worked well but identified deficiencies in the reporting, adjudication, and appellate phases. The report made 16 recommendations, which the FBI subsequently implemented.

In this follow-up review, we focus on the third phase of the disciplinary process, the adjudication of employee misconduct investigations. The FBI's Office of Professional Responsibility (FBI OPR) is responsible for adjudicating misconduct investigations and imposing discipline on most FBI employees, with the primary exception being some senior executives. The OIG conducted this review to assess how efficiently and effectively FBI OPR manages misconduct adjudications and the extent to which those adjudications follow FBI policy. We also examined how FBI OPR determines when to revise its policies and processes.

### Results in Brief

We found that, while FBI OPR generally adjudicated employee misconduct matters consistent with FBI policy, there are several areas in which the FBI should take action to improve its adjudication process. First, FBI policy and guidance do not adequately address three potential outcomes of the disciplinary process regularly used by FBI OPR: summary dismissals, last chance agreements, and a 60-day cap on disciplinary suspension. Second, FBI OPR closes its adjudicative file and does not regularly document substantiation decisions when employees resign or retire during the adjudication process. Third, FBI OPR's recordkeeping processes continue to rely on hard copy records and outdated management systems. Finally, we identified gaps in training for new FBI OPR adjudicators and infrequent training for FBI employees.

### The FBI Should Update Its Policy and Guidance to Cover All Disciplinary Options Used by FBI OPR

While FBI policy and guidance address and adequately describe most aspects of the disciplinary process, we found that they do not sufficiently detail three options FBI OPR regularly uses: summary dismissals, last chance agreements, and a 60-day cap on disciplinary suspensions. These three options are directly related to whether employees subject to disciplinary action as a result of a misconduct finding can continue their FBI employment, yet we found that FBI OPR's current policies do not adequately describe the circumstances under which the FBI may invoke them.

A summary dismissal is immediate removal from FBI employment, usually without the procedural protections that FBI OPR provides in non-summary dismissal cases. We found that FBI policy does not

---

[1] At the outset of the coronavirus disease 2019 pandemic in March 2020, the OIG shifted resources to conduct extensive pandemic-related oversight, which delayed our completion and issuance of this report.

[2] See DOJ OIG, *Review of the Federal Bureau of Investigation's Disciplinary System*, Evaluation and Inspections (E&I) Report I-2009-002 (May 2009), www.oversight.gov/sites/default/files/oig-reports/final_4.pdf.

PSTRZOK-DOJ-00010626

define when summary dismissal is appropriate, even though over a quarter of all disciplinary dismissals during fiscal years (FY) 2013 through FY 2018 were summary dismissals. We also found that the FBI's use of summary dismissals has increased. Further, because a summary dismissal cannot be challenged through the FBI's disciplinary appeals process, there is less oversight of its use than most other FBI disciplinary actions.

A last chance agreement allows an employee to receive a reduced disciplinary penalty in exchange for waiving appeal rights and agreeing to be subject to summary dismissal in the event of future serious misconduct. We found that FBI OPR has been using last chance agreements with increasing frequency yet this option is nowhere mentioned in FBI policy. Additionally, when we asked FBI OPR staff about the use of last chance agreements, we found that they did not agree on a consistent set of criteria for their use.

Lastly, FBI OPR has a long-standing practice of not issuing disciplinary suspensions of more than 60 days. However, this cap, and the reason for it, is not described in FBI policy. As a result, we found inconsistent use of suspensions longer than 60 days in appellate decisions.

### The FBI Should Document Substantiation Decisions in All Matters During Which an Employee Separates Under Inquiry

When an FBI employee retires or resigns prior to or during the adjudication process (separation under inquiry), we found that FBI OPR closes its adjudication proceeding without documenting a substantiation decision in all but two circumstances: (1) when FBI OPR determines that the misconduct was substantiated and it likely would have resulted in the employee's dismissal and (2) when FBI OPR has issued a disciplinary decision letter or proposal letter to the employee prior to separation. In all other circumstances, when an employee separates, FBI OPR closes the file by including a memorandum listing the allegations but does not make a substantiation decision, even if the OIG or the FBI has fully investigated the allegations and FBI OPR could make a substantiation decision based on the available evidence. We examined separations under inquiry over a 2-year period and found that 60 percent of the time FBI OPR did not document its resolution of the misconduct matter.

Closing without documenting substantiated misconduct in all matters under which an employee separates under inquiry fails to hold accountable former FBI employees who choose to separate while under investigation and empowers those employees to remain with the FBI during the pendency of an OIG or

FBI misconduct investigation, knowing they can avoid a substantiation decision (so long as the misconduct does not involve potential dismissal) if they resign or retire prior to FBI OPR issuing its decision or proposal letter. Equally important, the policy unfairly fails to clear former employees in cases in which the misconduct allegations were unsubstantiated following investigation. Further, if the OIG or the FBI has investigated the misconduct allegations, the lack of documentation of substantiated misconduct results in a waste of OIG and FBI investigative resources. Additionally, making substantiation decisions in all cases in which employees separate under inquiry would enable the FBI to more readily satisfy its discovery obligations in criminal cases for which those former employees may be called upon to testify as government witnesses. It also would enable the FBI to more clearly respond to employment inquiries from government agencies about former FBI employees.

We therefore concluded that FBI OPR should document substantiation decisions in all misconduct matters involving employees who separate under inquiry.

### FBI OPR Could Benefit From Modernizing Its Workflow Management Processes

We found that FBI OPR has not fully transitioned from hard copy recordkeeping processes to electronic recordkeeping, which affects its ability to monitor adjudication timeliness and creates challenges for other FBI offices. Further, the electronic workflow management database FBI OPR used at the time of our review was outdated and had limited functionality.

### FBI Employees and FBI OPR Adjudicators Could Benefit from Increased Training

FBI OPR provides training on the adjudication process during employee orientation and on FBI OPR's intranet site, but we learned of persistent concerns about the extent to which FBI employees understand this information. A third of FBI OPR employees whom we interviewed offered a variety of suggestions to expand the frequency and content of training about FBI OPR to better ensure that FBI employees understand the adjudication process. We also found that FBI OPR adjudicators believe that new adjudicators could benefit from more standardized adjudication training and that those without prior FBI field experience could also benefit from additional operational training.

### Recommendations

We make eight recommendations to improve the transparency and effectiveness of FBI OPR's adjudication process.

PSTRZOK-DOJ-00010627

# Table of Contents

Introduction ........................................................................................................................................ 1

    Background .................................................................................................................................. 1

    Overview of the FBI's Disciplinary Process .............................................................................. 4

    Circumstances, Other than the Disciplinary Process, in Which the FBI Needs Access to Disciplinary History .................................................................................................................... 10

    Databases Used by the FBI to Manage Misconduct Cases ...................................................... 10

    Prior Work Related to the Review ............................................................................................. 11

    Scope and Methodology of the OIG Review ............................................................................ 11

Results of the Review ........................................................................................................................ 13

    The FBI Should Update Its Policy and Guidance to Cover All Disciplinary Options Used by FBI OPR ..................................................................................................................................... 13

    The FBI Should Document Substantiation Decisions in All Matters During Which an Employee Separates Under Inquiry ........................................................................................... 23

    FBI OPR Could Benefit From Modernizing Its Workflow Management Processes ................ 29

    FBI Employees and FBI OPR Adjudicators Could Benefit from Increased Training............... 35

Conclusion and Recommendations ................................................................................................... 40

    Conclusion ................................................................................................................................. 40

    Recommendations ...................................................................................................................... 40

Appendix 1:  Purpose, Scope, and Methodology .............................................................................. 42

    Standards .................................................................................................................................... 42

    Purpose and Scope ..................................................................................................................... 42

    Data Collection and Analysis .................................................................................................... 42

    Interviews ................................................................................................................................... 45

    Policy and Document Review ..................................................................................................... 46

Appendix 2:  The FBI's Response to the Recommendations the OIG Made in Its 2009 Report ........ 48

Appendix 3:  Overview of the FBI's Disciplinary Process and Other Circumstances in Which the FBI Needs Access to Disciplinary History ............................................................................................... 53

    The FBI's Disciplinary Process .................................................................................................. 53

    Circumstances, Other than the Disciplinary Process, in Which the FBI Needs Access to Disciplinary History .................................................................................................................... 57

Appendix 4:  Data Comparison ......................................................................................................... 62

    Overview ..................................................................................................................................... 62

    Disciplinary Outcomes of Employees in All Closed Misconduct Investigations ..................... 63

    Disciplinary Outcomes by Demographic Groups ...................................................................... 64

    Timeliness of Adjudications ....................................................................................................... 73

PSTRZOK-DOJ-00010628

Appeals ..................................................................................................................................................74

**Appendix 5: Prior OIG Work Related to FBI Misconduct** ........................................................ **78**

**Appendix 6: The FBI's Response to the Draft Report** ............................................................... **80**

**Appendix 7: OIG Analysis of the FBI's Response to the Draft Report** ................................... **84**

PSTRZOK-DOJ-00010629

# Introduction

## Background

The Federal Bureau of Investigation's (FBI) mission is to protect the American people and uphold the Constitution of the United States.  The Bureau is the United States' primary law enforcement and domestic intelligence organization, with a budget of approximately $9.9 billion per year and approximately 36,500 staff throughout the United States and in U.S. embassies around the world.  This includes 13,487 Special Agents and 23,090 non-agent professional staff, such as Intelligence Analysts, Language Specialists, scientists, Information Technology Specialists, and administrative employees.  The FBI expects its employees to adhere to its core values, which include integrity, accountability, and leadership.  The FBI maintains employee standards of conduct and has identified the range of discipline it may impose when an employee deviates from these standards and commits misconduct.

In May 2009, the U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) issued a report on the FBI's disciplinary process.[3]  Our report found that aspects of the FBI's disciplinary system worked well but that deficiencies in the reporting, adjudicative, and appellate phases hampered the FBI's ability to ensure reasonable and consistent discipline for its employees.  The report also found evidence to support FBI employees' perception that the FBI had a double standard for discipline in which senior managers were treated more leniently than other employees.  The report made 16 recommendations to assist the FBI in improving its disciplinary process, including 4 recommendations related to adjudications.[4]  As of January 2012, we had closed all 16 recommendations.

In this follow-up review, we focus on the intermediate phase of the disciplinary process:  the adjudication of employee misconduct investigations by the FBI's Office of Professional Responsibility (FBI OPR).[5]  We assessed how efficiently and effectively the FBI manages its misconduct adjudications and the extent to which the adjudications follow FBI policy.  Below, we provide the legal framework for discipline in the FBI, the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (Offense Codes and Penalty Guidelines), an overview of the FBI's disciplinary process, databases used by the FBI to manage misconduct cases, prior OIG work related to the review, and the scope and methodology of this review.

---

[3]  In our 2009 report, we examined the consistency, reasonableness, and timeliness of the five phases of the FBI's disciplinary process:  (1) reporting misconduct allegations, (2) investigating misconduct allegations, (3) adjudicating misconduct investigations, (4) appealing misconduct adjudications, and (5) implementing discipline.  See DOJ OIG, *Review of the Federal Bureau of Investigation's Disciplinary System*, E&I Report I-2009-002 (May 2009), www.oversight.gov/sites/default/files/oig-reports/final_4.pdf.

[4]  See Appendix 2 for more information about the perception of a double standard, the work we did in our 2009 report to evaluate that perception, and the FBI's response to our recommendations.

[5]  We did not evaluate the reporting, investigation, appeal, or implementation of discipline.  See Appendix 3 for an overview of those phases of the FBI's disciplinary process.  Also, see Appendix 4 for a summary of data analysis presented in our 2009 report compared to the FBI's performance on those same metrics between fiscal years (FY) 2013 and 2018.

PSTRZOK-DOJ-00010630

## Legal Framework for Discipline in the FBI

The legal framework for most federal agencies to address employee misconduct through disciplinary actions, including suspensions, demotions, and removals, is established in 5 U.S.C. Chapter 75 and 5 C.F.R. Part 752. These laws and regulations refer to the full range of disciplinary options as *adverse actions* and require different procedures for less serious penalties (suspensions of 14 days or less) and more serious penalties (suspensions of greater than 14 days, demotions, and removals). This legal framework was established as part of the Civil Service Reform Act of 1978, but the FBI is not bound by it because the FBI is excepted from the competitive service.[6] See the text box for the FBI's terminology referring to the severity of penalties.

> **FBI Terminology in Misconduct Adjudications**
>
> The FBI uses its own terminology to refer to the severity of penalties. In this report, we use the FBI's terminology unless we specifically state that we are discussing statutory language.
>
> | Non-Adverse Action |
> | --- |
> | Oral reprimand |
> | Letter of censure |
> | Suspension of 1–14 days |
> | **Adverse Action** |
> | Suspension of 15 days or more |
> | Demotion |
> | Dismissal |
>
> Source: FBI documents

The FBI's internal process for imposing adverse actions parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties even though it is not required to offer those protections to most of its employees.[7] The protections that the Civil Service Reform Act mandates are required only for the FBI's preference-eligible veterans facing FBI adverse actions.[8] Most FBI employees are subject to disciplinary rules and processes established by the FBI.[9] The Constitution and other laws, such as Executive Order 11478 on Equal Employment Opportunity in the Federal Government, prohibiting employment

---

[6] Pub. L. No. 95-454, Title II, Sec. 204.

The competitive service consists of all civil service positions in the executive branch of the federal government, not including those positions that are specifically excepted, usually by statute. 5 U.S.C. § 2102. The FBI's exception is codified at 28 U.S.C. § 536. Positions excepted from the competitive service are considered excepted service.

[7] The FBI does not offer procedural protections for non-adverse suspensions and is not required to do so by the Civil Service Reform Act.

[8] Preference-eligible veterans are considered part of the competitive service for the purpose of imposing FBI adverse actions even though the agency they work for is an excepted service agency. 5 U.S.C. § 7511(a)(1)(B). Veterans are preference eligible if they are disabled or served on active duty during certain specified time periods or in military campaigns. 5 U.S.C. § 2108.

[9] The FBI's disciplinary process does not apply to the FBI Director, who is nominated by the President, confirmed by the Senate to serve a 10-year term, and can be removed by the President. Nor does the FBI's disciplinary process apply to the FBI's other senior executive level positions: the Deputy Director, the Associate Deputy Director, all Executive Assistant Directors, the General Counsel, and all Senior Executive Service (SES)-level officials who report directly to the FBI Director. The U.S. Attorney General retains the authority to reprimand, suspend, or remove individuals serving in these positions. In these cases, FBI OPR makes a recommendation for discipline for the Attorney General's consideration, following an investigation by the OIG or the FBI. The U.S. Attorney General also retains disciplinary authority for individuals serving in career SES attorney positions or emergency or limited-term positions. We do not evaluate the disciplinary processes for the FBI's executives or other employees for whom the Department retains disciplinary authority in this report. Instead, we focus on the disciplinary process that applies to all other FBI employees.

PSTRZOK-DOJ-00010631

discrimination on the basis of race, color, religion, sex, and national origin, continue to apply to the FBI even though it is an excepted service agency.[10]

In 2016, Congress passed 5 U.S.C. § 3322 to establish documentation requirements for when the subject of a misconduct investigation separates from a federal agency before the disciplinary adjudication is completed.[11] (In this report, we refer to that occurrence as "separating under inquiry.") This statute requires federal agencies to include a notation in the Official Personnel Folder of an employee who voluntarily separates while under investigation if an adverse finding is made in the case.[12] The statute does not define the term "adverse finding," nor does it require the U.S. Office of Personnel Management (OPM) to prescribe implementing regulations.[13] In lieu of formal regulations, OPM issued guidance to all federal agencies in May 2018 instructing that 5 U.S.C. § 3322 does not provide details on implementation and that the statute mandates the process for making a notation but not the format the notation must take. OPM did not provide further guidance to federal agencies. As described later in this report, FBI OPR files do not consistently contain documentation of the FBI's resolution of misconduct matters involving employees who separate under inquiry.

## The FBI's Offense Codes and Penalty Guidelines

The FBI defines the behaviors for which an employee may be disciplined (misconduct), and the penalties for such behavior, in its Offense Codes and Penalty Guidelines. The Offense Codes and Penalty Guidelines group misconduct into 62 offense codes in 5 categories:

1. *Investigative*–investigative deficiencies and improper interactions with sources;

2. *Integrity/Ethical*–falsification of FBI documents, lack of candor, misuse of position, failure to cooperate in or obstruction of an administrative inquiry, and violation of ethics rules;

3. *Property Related*–loss or misuse of government property;

4. *Illegal/Criminal*–various felonies and misdemeanors, including assault, drug offenses, driving while intoxicated, fraud or theft, and indecent or lascivious acts; and

5. *General*–additional behaviors that do not fit in the above categories, including alcohol or drug abuse on duty, unwelcome sexual conduct, discrimination, and unprofessional conduct on or off duty.[14]

The Offense Codes and Penalty Guidelines establish a standard penalty for each offense code, as well as a mitigated penalty range and an aggravated penalty range, if applicable.[15] FBI OPR takes mitigating and

---

[10] E.O. 11478.

[11] Pub. L. No. 114-328, Title XI, Sec. 1140.

[12] 5 U.S.C. § 3322(a).

[13] OPM is the chief human resources agency and personnel policy manager for the federal government.

[14] It is not necessary for criminal charges to be filed or for an employee to be found guilty for the FBI to investigate and discipline an employee for behaviors in the illegal/criminal category.

[15] In response to a working draft of this report, FBI OPR noted that nine offense codes do not have a mitigated penalty range and four offense codes do not have an aggravated penalty range.

PSTRZOK-DOJ-00010632

aggravating factors into account when such factors are present.[16] FBI OPR describes mitigating factors as those that make the offending conduct less severe, including personal circumstances suggesting that the employee was not in a proper frame of mind (such as a death in the family), a lack of disciplinary history, an excellent work record at the FBI, and efforts to remedy the wrongdoing. FBI OPR describes aggravating factors as those that make the offending conduct worse, including a history of similar behavior, damage to the FBI's mission or reputation, harm to an innocent victim or an investigation, and the employee having been warned previously not to engage in the behavior. Table 1 below shows an example of an FBI offense code and its accompanying penalty guideline.

Table 1

Example of an FBI Offense Code and Penalty Guideline

| Offense Code 2.2    False/Misleading Information–Fiscal Matter(s) | | |
|---|---|---|
| **Knowingly providing false or misleading information in a fiscal-related document; or signing or attesting to the truthfulness of the information provided in a fiscal-related document in reckless disregard of the accuracy or completeness of the pertinent information contained therein.** Documents involving fiscal matters include, but are not limited to, Time & Attendance (T&A) records, travel vouchers, disbursement/expenditure forms, draft requests, expense forms, supporting documentation for leave purposes, insurance forms, benefits forms, and transfer documents. | | |
| **Mitigated Penalty Range** | **Standard Penalty** | **Aggravated Penalty Range** |
| Letter of Censure to 7-day Suspension<br><br>*Minor issues, little benefit to employee* | 10-day Suspension | 14-day Suspension to Dismissal<br><br>*Serious T&A Abuse*<br><br>*NOTE: Voucher fraud warrants dismissal.* |

Source:  FBI Offense Codes and Penalty Guidelines

## Overview of the FBI's Disciplinary Process

The FBI's disciplinary process consists of five phases:  (1) reporting misconduct allegations, (2) investigating misconduct allegations, (3) adjudicating misconduct investigations, (4) appealing misconduct adjudications, and (5) implementing discipline.  Responsibility for these phases is divided between three different entities at FBI headquarters:  the Inspection Division, FBI OPR, and the Human Resources Branch.

### Reporting and Investigation

Allegations of potential misconduct, whether criminal or administrative (noncriminal), are reported to the Internal Affairs Section of the FBI's Inspection Division.  (In this report, we discuss only administrative investigations.)  Because the OIG has right of first refusal for all misconduct investigations, the FBI's Internal Affairs Section provides the allegations to the OIG, which reviews and selects those that it will investigate. The Internal Affairs Section's Initial Processing Unit determines which of the remaining allegations warrant investigation by the FBI, and its Internal Investigations Unit (IIU) handles those investigations.  Both the OIG

---

[16]  According to the FBI's Offense Codes and Penalty Guidelines, the FBI has the discretion to consider any factors relevant to the case being adjudicated and is not limited to only those mitigating and aggravating factors specifically described in the Offense Codes and Penalty Guidelines.

PSTRZOK-DOJ-00010633

and the IIU, at the conclusion of their misconduct investigation, prepare a report of their findings and forward the report to FBI OPR for adjudication.  Appendix 3 describes the FBI's processes for reporting and investigating misconduct.

## Adjudication

FBI OPR is responsible for adjudicating misconduct investigations that have been conducted by the OIG or the FBI's IIU.  FBI OPR is led by an Assistant Director, who oversees two adjudication units and FBI OPR's front office staff.  The FBI OPR Assistant Director reports to the FBI Deputy Director.  Each adjudication unit is led by a Unit Chief and is staffed with adjudicators.[17]  The front office staff consists of the Special Assistant to the FBI OPR Assistant Director and two Paralegal Specialists.

FBI OPR adjudicates misconduct investigations by determining whether allegations are substantiated and, if so, proposing and deciding discipline.  (See the text box above for a list of the penalties that FBI OPR imposes for substantiated allegations.)  Cases are assigned to an adjudication unit according to the FBI division in which the subject of the investigation works and to an individual adjudicator by the Unit Chief.[18]  The adjudicator reviews the entire case file and drafts FBI OPR's own report of investigation (ROI) to document FBI OPR's analysis and decisions in the case.  Figure 1 below provides an overview of FBI OPR's adjudication process.

---

[17]  As of November 2019, FBI OPR employed nine adjudicators—all attorneys—across the two adjudication units.  Two of the adjudicators are both Supervisory Special Agents and attorneys, one of whom is working in FBI OPR on an 18-month detail from his regular position in an FBI field division.  The remaining adjudicators are solely General Attorneys and work in FBI OPR as permanent staff.  FBI OPR's two Unit Chiefs told us that all adjudicators are held to the same performance standards, regardless of their agent status.  In this report, we will use the term "adjudicators" when referring to adjudicators generally.  In sections below where it is relevant to separately discuss the experiences of Special Agent adjudicators on detail and General Attorney adjudicators on FBI OPR's permanent staff, we will use the terms "Special Agent adjudicator" or "General Attorney adjudicator."

[18]  For the purposes of our analysis, we defined a case as a distinct set of allegations associated with a single individual.  See Appendix 1 for more information about our methodology.

PSTRZOK-DOJ-00010634

Figure 1

**FBI OPR Process for Adjudicating Misconduct Investigations**



Sources: FBI documents and OIG interviews with FBI officials

Our analysis of FBI data shows that, on average, less than 1 percent of FBI employees were the subject of a misconduct investigation during each year of our scope. FBI OPR adjudicated 1,992 cases between fiscal year (FY) 2013 and FY 2018. Of those cases, FBI OPR did not substantiate any allegations in 16 percent of

6

PSTRZOK-DOJ-00010635

the cases, imposed a non-adverse action in 41 percent of the cases, and imposed an adverse action in 25 percent of the cases. FBI OPR administratively closed the remaining 18 percent of the cases, as it does if FBI OPR concludes that an investigation does not contain sufficient information for FBI OPR to make a substantiation decision.[19]

### Substantiation Decision

Every ROI must document FBI OPR's decision as to whether the facts found during the investigation constitute a violation of one of the FBI's offense codes. This is known as the substantiation decision. FBI policy requires FBI OPR to make substantiation decisions using the preponderance of the evidence standard: "the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue."[20] To document a substantiation decision in an ROI, the adjudicator first documents the allegation; relevant facts found by the investigation; and applicable laws, regulations, and FBI policies. The adjudicator then cites the relevant offense code and draws a conclusion as to whether the facts found during the investigation constitute a violation of the offense code.

### Penalty Determination

If FBI OPR determines that one or more offense codes are substantiated, the ROI must also assess a penalty and document the specific factors FBI OPR considered before selecting that penalty. This is known as the penalty determination. The adjudicator drafts a penalty determination by weighing the facts of the case, any mitigating or aggravating factors that are present, and the relevant Douglas Factors.[21] The adjudicator then selects a penalty within the range established by the Offense Codes and Penalty Guidelines for each substantiated offense code. If FBI OPR substantiates multiple offense codes, "the penalties for the respective offenses will normally be added together, with appropriate aggravation, up to and including dismissal, for repetitive misconduct within the same inquiry."[22] Adjudicators also review past FBI OPR disciplinary decisions on similar behavior (precedents) to assess the reasonableness of penalty determinations.

### Management Review and Approval

Each draft ROI undergoes multiple layers of review before FBI OPR renders a decision in a case. First, the adjudicator provides the draft ROI to a fellow adjudicator for a peer review. In addition to proofreading the

---

[19] Retirement or resignation under inquiry was the most common reason for administrative closure, accounting for nearly two-thirds of the closures. Other examples of administrative closure include cases in which the investigation did not identify any subjects and cases in which the subject was dismissed from the FBI for other reasons prior to an adjudication decision.

[20] 5 C.F.R. § 1201.4(q) and FBI Policy Directive 0047D, OPR Statement of Authorities and Responsibilities, March 31, 2008.

[21] The Douglas Factors are a set of criteria, established in the Merit Systems Protection Board decision *Douglas* v. *Veterans Administration,* 5 M.S.P.R. 280 (1981), that obtain structured feedback from the subject's immediate supervisor on 12 topics, including the subject's past work record, the effect of the offense on the subject's ability to perform at a satisfactory level, and the effect of the offense on the supervisor's confidence in the subject's ability to perform assigned duties. FBI OPR considers the Douglas Factors even though the FBI's status as an excepted service agency means that it is not required to do so by law. FBI policy requires each subject's division or field office to prepare and submit a Douglas Factors assessment to FBI OPR within FBI OPR's timeframes.

[22] FBI, Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, January 1, 2017, 4.

PSTRZOK-DOJ-00010636

ROI, the peer reviewer may also provide feedback on whether the substantiation decision appears to be objective and grounded in facts, whether the adjudicator cited the most appropriate precedent, and whether the peer reviewer agrees with the adjudicator's draft penalty determination. The adjudicator takes the peer reviewer's feedback under advisement but is not required to revise the draft ROI as a result.

After peer review, the adjudicator's Unit Chief and the FBI OPR Assistant Director review the draft ROI. The Unit Chief reviews the ROI to assess how the adjudicator came to the substantiation decision and penalty determination and to determine whether the Unit Chief agrees. Because Unit Chiefs are supervisors, the Unit Chief can direct an adjudicator to make specific changes to the substantiation decision, the penalty determination, or the analysis supporting either before approving the ROI and submitting it to the FBI OPR Assistant Director for final approval. The FBI OPR Assistant Director reviews and approves the ROI and makes the final determination on all FBI OPR decisions.[23]

### Notification and Procedural Protections

FBI OPR's adjudication process is the same for all cases until the FBI OPR Assistant Director approves the ROI. Once the ROI is approved, the process for notifying the subject of FBI OPR's decision and offering the subject procedural protections varies depending on whether any allegations were substantiated and, if so, whether the penalty determination resulted in a non-adverse action or an adverse action. The notification process is as follows:

- If FBI OPR decides that no allegations are substantiated, the Unit Chief signs a "no action" letter to notify the subject that no disciplinary action will be taken.[24]

- If FBI OPR substantiates at least one allegation and makes a penalty determination that results in a non-adverse action, the Unit Chief signs a decision letter notifying the subject of the substantiation decision, the reasoning supporting it, and the final penalty being imposed.[25] If FBI OPR imposes a suspension of 1–14 days, the decision letter includes a description of the subject's appeal rights and instructions about how to invoke those rights. Letters of censure and oral reprimands are not appealable.

- If FBI OPR substantiates at least one allegation and makes a penalty determination that results in an adverse action, the Unit Chief signs a proposal letter notifying the subject of the substantiation decision, the proposed discipline, and the procedural protections that the subject may choose to

---

[23] The Offense Codes and Penalty Guidelines state that "the [FBI] Director has the authority to review and amend any disciplinary decision, either in favor of or to the disadvantage of an employee, if the [FBI] Director considers it necessary to correct an injustice or to prevent harm to the FBI. This authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the [FBI] Director." The FBI Director exercised this authority in 4 of 1,992 cases that were closed by FBI OPR between FY 2013 and FY 2018. We do not evaluate the FBI Director's use of this authority in this report.

[24] In response to a working draft of this report, FBI OPR stated that in some cases in which it does not substantiate allegations, it will instead draft a memorandum to the Special Agent in Charge of the subject's division requesting that the division provide non-disciplinary counseling to aid the subject in avoiding similar circumstances in the future.

[25] If FBI OPR imposes an oral reprimand—the least serious penalty available—the FBI OPR Assistant Director drafts a memorandum to the Special Agent in Charge of the subject's division describing the findings of the investigation and asking the Special Agent in Charge to orally reprimand the subject regarding the behavior.

PSTRZOK-DOJ-00010637

invoke before a final penalty is imposed by the FBI OPR Assistant Director. The procedural protections are as follows:

- o the opportunity to review the redacted investigative file relied upon by FBI OPR when making its decision;

- o the opportunity to provide a written response to the substantiation decision and proposed penalty; and

- o the opportunity to make an oral presentation by telephone, by videoconference, or in person to the FBI OPR Assistant Director.

The FBI OPR Assistant Director makes the final decision on each proposed adverse action after considering the subject's written and oral responses, should the subject choose to submit either or both. The FBI OPR Assistant Director may impose the proposed penalty or a lower penalty, but not a higher penalty.[26] The FBI OPR Assistant Director's final decision, and the reasoning supporting it, is documented in a decision letter provided to the subject. The decision letter also includes a description of the subject's appeal rights and instructions about how to invoke those rights. Once FBI OPR makes a disciplinary decision and closes a case, its staff enter data about the decision into FBI databases (discussed below) that track the outcomes of misconduct investigations.

## Appeals and Implementation

The subject may appeal most disciplinary decisions to the Office of Disciplinary Appeals (ODA) in the FBI's Human Resources Branch.[27] It is at the subject's discretion to decide whether to file an appeal. Appeals of non-adverse actions are decided by the Executive Assistant Director of the Human Resources Branch (EAD HRB). Appeals of adverse actions are decided by the Disciplinary Review Board, a five-member panel chaired by the EAD HRB and consisting of four FBI supervisors serving 1-year terms. Between FY 2013 and FY 2018, 393 non-adverse and adverse appeals were decided. Most discipline is implemented either after the timeframe for filing an appeal has passed or after a final appellate decision has been made.[28] Appendix 3 describes the FBI's processes for analyzing and deciding appeals of misconduct adjudications and for ensuring the implementation of discipline.

---

[26] While FBI OPR staff described this as standard practice, it is not stated in FBI policy. Because the FBI is not bound by the requirements of the Civil Service Reform Act, we compared this aspect of the FBI's adjudication process with the processes of other excepted service agencies to assess whether this practice was reasonable. We concluded that it was reasonable because officials from five agencies told us that, in cases with both proposed discipline and a final decision, the final decision cannot be higher than the proposal. For more information about our methodology, see Appendix 1.

[27] Probationary employees do not have appeal rights. Preference-eligible veterans retain the right to appeal adverse actions to the Merit Systems Protection Board in addition to the right to appeal within the FBI. We did not evaluate FBI employees' appeals to the Merit Systems Protection Board in this report.

[28] Dismissal is an exception to this rule. FBI appellate policy states that dismissal is implemented immediately even if the subject opts to appeal the dismissal. FBI Policy Directive 0915D, Disciplinary Appeals Process, October 23, 2016.

PSTRZOK-DOJ-00010638

## Circumstances, Other than the Disciplinary Process, in Which the FBI Needs Access to Disciplinary History

Beyond the disciplinary process, we identified three circumstances in which the FBI needs access to information about the adjudication of misconduct investigations. We describe these circumstances in Appendix 3: the process for issuing retired law enforcement officer identification cards, the National Name Check Program, and the FBI's responsibility to respond to requests by prosecutors for information that could be used to undermine the credibility of a government witness in a criminal prosecution.

## Databases Used by the FBI to Manage Misconduct Cases

The FBI uses multiple databases to maintain case records, manage workflow, and document decisions in misconduct cases.

- *Case Management System (CMS):* The CMS is a Microsoft Access database storing misconduct allegations, demographic information about the subjects of investigations, investigation and adjudication workflow information, and disciplinary outcomes for all misconduct cases opened since November 2004.[29] Staff in the Internal Affairs Section, FBI OPR, and the ODA have access to the CMS. The FBI was developing a new database for misconduct case tracking to replace the CMS during the period of our fieldwork.[30] In the Results of the Review, we discuss CMS capabilities and limitations and the FBI's plans to upgrade the CMS.

  The CMS includes a Precedent Module, which uses free text fields to summarize closed cases, allowing adjudicators to search for, identify, and compare previous cases that are similar to the current case under adjudication. The data that FBI OPR enters into the Precedent Module captures the substantiation decision, aggravating and mitigating factors, and penalty determination for every offense code adjudicated by FBI OPR, ensuring that each substantiated decision can be considered as precedent for future cases.

- *Disciplinary Management System (DMS):* The DMS is a Java-based application launched in 2018 within the FBI's official system of records for human resources. It is the official repository for all disciplinary decisions since 1990. FBI OPR front office staff ensure that data on disciplinary decisions that are recorded in both the CMS and the DMS are recorded identically in both databases. The DMS includes less detail than the CMS and therefore is accessible to a wider range of FBI offices for vetting purposes.

- *Sentinel:* Sentinel, in use since 2012, is the FBI's third generation case management and official records management system.[31] It maintains records of the FBI's investigative and administrative

---

[29] We analyzed data from the CMS during this review. Appendix 1 describes our methodology, and Appendix 4 describes our results.

[30] We completed our fieldwork in November 2019. In response to a working draft of this report, the FBI reported that it deployed its new database, known as the Disciplinary Module, in February 2020. We discuss some of the FBI's plans for the new database in the Results of the Review. We did not evaluate the implementation of the new database during this review.

[31] Between 2006 and 2014, the OIG issued a series of 10 audits evaluating the FBI's planning for and implementation of Sentinel. A 2014 audit includes a complete list of all of the audits in the series. See DOJ OIG, *Audit of the Status of the*

Continued

PSTRZOK-DOJ-00010639

activities in case files that document each case from inception to conclusion. Unlike the FBI's prior case management systems, Sentinel is a fully electronic records system. We discuss FBI OPR's use of Sentinel in the Results of the Review.

## Prior Work Related to the Review

As noted above, our 2009 report examining the consistency, reasonableness, and timeliness of the FBI's disciplinary process also found evidence to support FBI employees' perception that the FBI had a double standard for discipline in which senior managers were treated more leniently than other employees. In response to the report, the FBI took steps in an effort to address these concerns.[32] During the current review, we found that there were fewer misconduct investigations per year but that the FBI imposed adverse actions more frequently between FY 2013 and FY 2018 than it did during the scope of our 2009 report. We also performed data analyses to evaluate whether misconduct cases were handled consistently across different demographic groups. We concluded that, between FY 2013 and FY 2018, the FBI's adjudication of misconduct investigations for most demographic groups generally resulted in consistent penalty outcomes and that there were reasonable explanations for some of the differences we observed. For example, we found that differences in disciplinary outcomes between Special Agents and professional staff may be due in part to differences in the types of allegations made against those groups. However, there were differences in outcomes for some groups, such as Senior Executive Service (SES) and non-SES staff, that we could not fully explain. See Appendix 4 for the full discussion of these data results.

Subsequent to our 2009 report, the OIG released four additional reports that examined training that the FBI provides to its staff on appropriate conduct, portions of the FBI's disciplinary process, or behavior that constituted misconduct. We describe the findings of these reports in Appendix 5.

## Scope and Methodology of the OIG Review

The OIG examined whether the FBI's adjudications of employee misconduct investigations were handled according to FBI policy and how the FBI determines when and how to revise its misconduct adjudication policies. Our fieldwork spanned August 2018 through November 2019 and consisted of document reviews, data analysis, interviews, and observations.[33] We analyzed applicable policies and data covering FY 2013 through FY 2018. We interviewed FBI officials who held the following roles during the timeframe of our fieldwork but are now former employees: the FBI Deputy Director, the EAD HRB, and the ODA Unit Chief. We also interviewed the FBI official who was the IIU Unit Chief and who now works for the FBI in a different capacity. These individuals are referred to throughout the report by their positions when interviewed. We also interviewed the former and two acting Assistant Directors of FBI OPR, the Assistant Director of the Human Resources Division, FBI OPR employees, FBI Office of General Counsel employees, Human Resources Division employees, and Security Division employees.[34] We also interviewed disciplinary officials

---

*Federal Bureau of Investigation's Sentinel Program*, Audit Report 14-31 (September 2014), www.oig.justice.gov/reports/2014/a1431.pdf.

[32] Appendix 2 summarizes how the FBI responded to the recommendations from our 2009 report.

[33] At the outset of the coronavirus disease 2019 pandemic in March 2020, the OIG shifted resources to extensive pandemic-related oversight, which delayed our completion and issuance of this report.

[34] We interviewed the former and two acting Assistant Directors of FBI OPR because those three individuals led FBI OPR during the timeframe of our fieldwork.

PSTRZOK-DOJ-00010640

from 10 other excepted service agencies across the government.  See Appendix 1 for a more detailed description of the review's methodology.

PSTRZOK-DOJ-00010641

# Results of the Review

We found that, while FBI OPR generally adjudicated employee misconduct matters consistent with FBI policy, there are several areas where improvements should be made with respect to clarifying FBI OPR policies, modifying FBI OPR procedures, improving workflow management procedures, and enhancing training. First, FBI policy and guidance does not adequately address three options that FBI OPR regularly imposes: summary dismissals, last chance agreements, and a 60-day cap on disciplinary suspensions. Second, when an employee retires or resigns while under inquiry, FBI OPR closes its file and documents substantiated misconduct findings only if FBI OPR determines that the employee's misconduct likely would have resulted in the employee's dismissal. Third, FBI OPR's recordkeeping processes continue to rely on hard copy records and outdated management systems. Finally, we identified opportunities to provide more-accessible information and more-frequent training on the disciplinary process. In the following sections, we discuss these policy and procedural gaps, which we recommend the FBI address to ensure that adjudications are handled transparently, efficiently, and according to relevant statutes and policies.

## The FBI Should Update Its Policy and Guidance to Cover All Disciplinary Options Used by FBI OPR

As an excepted service agency, the FBI has broad discretion with respect to its disciplinary process, including the disciplinary actions it imposes.[35] We found that FBI policy and guidance address most disciplinary actions, from oral reprimand to dismissal, but do not adequately describe three options that FBI OPR may consider: summary dismissals, last chance agreements, and a 60-day cap on disciplinary suspensions. While these three options directly relate to whether an employee subject to disciplinary action as a result of a misconduct finding can continue his or her employment with the FBI, we found that FBI OPR's current policies do not adequately describe situations in which the FBI may invoke them. We believe that clearly defining their use in FBI policy will increase FBI employees' awareness and understanding of FBI OPR's adjudication decisions and better ensure their fair and consistent application.

### Updating FBI Policy to Clearly Define Summary Dismissal Would Improve the Transparency and Consistency of Its Use

Usually, when a subject's misconduct warrants dismissal, the subject may invoke the procedural protections described in the Introduction to this report, including the opportunity to respond to the proposed penalty and the opportunity to appeal. However, FBI OPR may also issue a summary dismissal, in which the subject is immediately removed from employment, usually without receiving these procedural protections.[36]

Based on our analysis of FBI data, we found that the use of summary dismissals has become more frequent in recent years. In the 6 years prior to our review period (FY 2007–FY 2012), there were 16 total summary dismissals, accounting for less than a tenth of all of FBI OPR's dismissal actions during that period. In

---

[35] Unlike competitive service agencies, the FBI is generally not bound by the civil service rules established in 5 U.S.C. Chapter 75 and 5 C.F.R. Part 752 (see the Introduction to this report).

[36] Employees who are preference-eligible veterans retain their procedural protections as required by 5 U.S.C. § 7513. Specifically, they still receive a letter informing them of the proposed summary dismissal, have the opportunity to review their case file and provide a written or oral response, and receive a final written decision from FBI OPR. Preference-eligible employees may also appeal a summary dismissal to the U.S. Merit Systems Protection Board (MSPB). However, 5 U.S.C. § 7513(b) authorizes a shorter timeframe when an agency has reasonable cause to believe that the subject has committed a criminal act for which a term of imprisonment may be imposed.

PSTRZOK-DOJ-00010642

contrast, we found that FBI OPR issued summary dismissals in 51 misconduct cases from FY 2013 through FY 2018.[37] While this represents less than 3 percent of all misconduct cases during our 6-year review period, it accounted for over a quarter of all disciplinary dismissals. FBI OPR staff could not definitively identify a cause for the increase in summary dismissals, but their most common suggestion was that there had been an uptick in egregious behavior warranting summary dismissal. Figure 2 below shows the proportion of summary dismissals between FY 2007 and FY 2012 and between FY 2013 and FY 2018.

### Figure 2

#### Proportion of Summary Dismissals, FY 2007–FY 2012 and FY 2013–FY 2018



Source: OIG analysis of FBI OPR Case Management System (CMS) data

### The Use of Summary Dismissal Is Not Discussed in Current FBI Policy

We found that FBI policy does not define the circumstances under which summary dismissal is an appropriate disciplinary penalty. The FBI OPR policy establishing the roles and responsibilities of the FBI OPR Assistant Director lists summary dismissal as a possible disciplinary penalty "in accordance with FBI Policies and Procedures."[38] However, we did not identify any other FBI policy that describes summary dismissal and the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (Offense Codes and Penalty Guidelines) do not provide additional information about when summary dismissals are appropriate or how they are implemented.

FBI OPR pointed to a 1997 memorandum by then FBI Director Louis Freeh (Freeh Memorandum) as the source of its authority for summary dismissal.[39] However, the Freeh Memorandum is not available to employees in the FBI's Policy Library.[40] Also, FBI OPR's intranet site, which generally includes relevant

---

[37] In two of these cases, the subject retired or resigned before FBI OPR could deliver the final summary dismissal letter. FBI OPR may also summarily dismiss an employee who violates a last chance agreement. Between FY 2013 and FY 2018, there were 5 summary dismissals due to last chance agreement violations in addition to the 51 summary dismissals imposed due to an FBI OPR adjudication decision. We discuss last chance agreements later in this section.

[38] FBI Policy Directive 0047D, OPR Statement of Authorities and Responsibilities, March 31, 2008.

[39] Louis J. Freeh, Director, FBI, memorandum for all Special Agents in Charge, Standards of Conduct Disciplinary Matters–Revision of the FBI's Disciplinary Process, March 5, 1997.

[40] The FBI's Policy Library is a digital repository of all FBI policy. Some of the aspects of the disciplinary process established by the Freeh Memorandum, not including summary dismissal, have been updated and included in FBI

*Continued*

PSTRZOK-DOJ-00010643

FBI OPR policy and guidance, does not include the Freeh Memorandum. An FBI OPR Unit Chief told us that she keeps a copy of the Freeh Memorandum at her desk for reference because she has had trouble finding it in the past. The only other description of summary dismissal that we found was in FBI OPR's April 2017 quarterly email, which mentioned the Freeh Memorandum and gave examples of past summary dismissal cases.[41] While this email was a helpful step in increasing transparency and employee understanding of summary dismissal, it is limited in reach and employees hired after April 2017 will not have received this information.

We also found that the lack of clear FBI OPR policy on summary dismissal creates a contradiction with the FBI's appellate policy. Specifically, appellate policy states that "employees may appeal any sanction imposed by OPR, with the exception of an oral reprimand or a letter of censure."[42] However, FBI OPR's summary dismissal letters state, "no additional procedural protections, including an appeal to the Disciplinary Review Board, are available" to the summarily dismissed employee. The Unit Chief of the Office of Disciplinary Appeals (ODA) told us that she has received questions from employees who were summarily dismissed and has had to tell them that they have no right to appeal. The ODA has also rejected an appeal request from an employee who was summarily dismissed on the grounds that a summary dismissal is not subject to appeal. One FBI OPR Unit Chief suggested that the ODA should update appellate policy to state that summary dismissal is not subject to appeal. However, the ODA Unit Chief stated that the ODA cannot reference summary dismissal in appellate policy until FBI OPR policy defines it, as a summary dismissal arises out of the adjudication process and FBI OPR determines both summary dismissal policy and how it is implemented.

### FBI OPR Uses Different Criteria for Summary Dismissal than the Criteria Described in the Freeh Memorandum, Risking Inconsistent Application

The Freeh Memorandum states that immediate summary dismissal is appropriate in extraordinary cases "where the safety of the public, our fellow employees, national security interests or other compelling considerations may be at stake." Our review of precedent summaries identified that 10 of the 51 summary dismissals (20 percent) issued between FY 2013 and FY 2018 appeared to involve safety and security concerns.[43] For example, in 1 of the 10 cases, FBI OPR summarily dismissed an employee for providing foreign officials with sensitive, nonpublic FBI information. The remaining 41 summary dismissals issued between FY 2013 and FY 2018 (80 percent) appeared to fall into the broad category of "other compelling considerations" specified in the Freeh Memorandum.

---

policies accessible in the Policy Library. Other provisions of the Freeh Memorandum were superseded due to a 2004 restructuring of the FBI's disciplinary process.

[41] On a quarterly basis, FBI OPR sends all FBI employees an email that includes the anonymized circumstances and outcomes of recently adjudicated cases "to educate employees about the [FBI's] standards of conduct and to aid employees in steering clear of ethical pitfalls and other violations." Archives of the quarterly emails are available on FBI OPR's intranet site, but the site does not indicate that this particular email includes information on summary dismissal.

[42] FBI Policy Directive 0915D, Disciplinary Appeals Process, October 23, 2016. FBI Policy Directive 0915D superseded FBI Policy Directive 0235D, Disciplinary Appeals Process, September 23, 2009, which included the same language.

[43] For this analysis, we read precedent summaries from FBI OPR's CMS and identified whether any of the suggested criteria that would warrant a summary dismissal were mentioned in the descriptions. For more discussion of our methodology, see Appendix 1.

PSTRZOK-DOJ-00010644

When we asked FBI OPR managers and adjudicators to describe the criteria for summary dismissal, they provided a different, more specific, set of criteria than what is described in the Freeh Memorandum.  The four more-specific criteria most frequently identified by the 15 FBI OPR managers and adjudicators we asked—egregiousness, illegal or criminal conduct, overwhelming evidence, and impact on the FBI's reputation—are overlapping.  For example, in the case of an employee who stole drug evidence for personal use, the employee's conduct was egregious and illegal and could have had a negative impact on the FBI's reputation.  Our review of the 51 summary dismissal precedent summaries found that all but 3 cases appeared to involve at least 1 of the criteria that FBI OPR staff suggested, with many cases involving multiple criteria.  In comparing the suggested criteria to the summary dismissal cases, we found the following:

- *Egregiousness:*  Eleven FBI OPR employees, including the former Assistant Director, identified egregious, extreme misconduct as potentially warranting summary dismissal.  In our review of precedent summaries, we identified types of egregious misconduct that consistently resulted in summary dismissal.  For example, cases that involved child pornography resulted in summary dismissal.

- *Illegal or Criminal Conduct:*  Six FBI OPR employees identified illegal or criminal conduct as a potential summary dismissal criterion.  In our review of precedent summaries, this appeared to be the most consistent of the suggested summary dismissal criteria, with 40 of the 51 summary dismissals (78 percent) involving some sort of illegal or criminal conduct, including 15 that specifically mentioned criminal charges, indictments, guilty pleas, or convictions.[44]

- *Overwhelming Evidence:*  Six FBI OPR employees, including the former Assistant Director, identified the need for indisputable, compelling evidence, beyond FBI OPR's usual preponderance of the evidence standard, in order to impose a summary dismissal.  For example, in one case an employee was caught shoplifting on store security cameras.  We could not determine how many of the summary dismissal cases met this possible criterion because the precedent summaries do not state whether there was indisputable, compelling evidence.

- *Impact on the FBI's Reputation:*  Four FBI OPR employees suggested that impact on the perception of the FBI is a factor in summary dismissal.  We found that 21 of the 51 summary dismissal precedent summaries (41 percent) mentioned damage to the FBI's reputation.  For example, in one case an employee was taken into custody by local law enforcement following an altercation while intoxicated in public.  The summary states that the employee's conduct "diminished the FBI's reputation with…law enforcement partners."

Because FBI OPR consistently uses these criteria when making summary dismissal decisions, we believe that the FBI should incorporate them into policy as specific examples of the "other compelling considerations" that could warrant summary dismissal.  Currently, these more-specific conditions that might warrant summary dismissal are not made clear and accessible to FBI employees.  We believe that the lack of transparency surrounding what might warrant summary dismissal increases the risk of improper use and may contribute to perceptions of unequal treatment.

---

[44]  The standard template language for an FBI OPR summary dismissal letter suggests that "willful and intentional violation of law" is a basis for summarily dismissing an FBI employee.

PSTRZOK-DOJ-00010645

In fact, we found examples of seemingly similar cases, some that resulted in summary dismissal and others that resulted in dismissal with procedural protections.  For example, in two cases FBI OPR summarily dismissed employees who had committed a second incident of driving while intoxicated (DWI) and therefore were not provided procedural protections.  However, we identified five other cases in which a second DWI incident resulted in dismissal with procedural protections.  While the FBI Offense Codes and Penalty Guidelines state that an employee's second DWI case warrants dismissal and the end result of removing the employee from FBI service is the same, the fact that some employees were granted procedural protections and others were not appears inconsistent.

### Summary Dismissals Are Adjudicated Faster than Other Disciplinary Actions but Have Less Oversight

FBI OPR staff told us that the benefit of issuing a summary dismissal is the ability to quickly remove an employee from access to FBI spaces, if needed.  We found that the median adjudication time for summary dismissal cases was 14 days, almost 12 times faster than dismissals with procedural protections, for which the median adjudication time was 166 days.  In fact, as Table 2 below shows, the median adjudication time for summary dismissal is several weeks faster than every other adjudicative outcome except administrative closure.[45]  While a quick turnaround may be appropriate when there are safety and security issues, given the lack of notice to FBI employees and clear criteria as to when summary dismissal may be imposed, this disciplinary action is subject to the potential for abuse and exposes the FBI to accusations that its processes are inconsistent and arbitrary.  Moreover, because preference-eligible veterans are the only employees who retain appeal rights when summarily dismissed, there is typically no additional check on the reasonableness of the decision for the majority of summarily dismissed employees.[46]

---

[45]  Administrative closures include retirements and resignations under inquiry.  Other reasons for administrative closure include cases in which the investigation does not identify any subjects and cases in which the subject had already been dismissed for another reason.

[46]  Per 5 U.S.C. § 7513, preference-eligible employees within the FBI may appeal disciplinary decisions to the MSPB.  This includes summary dismissals.

In response to a working draft of this report, FBI OPR noted that the Offense Codes and Penalty Guidelines permit the FBI Director to review and amend any disciplinary decision under certain circumstances.  The Offense Codes and Penalty Guidelines further state that "[t]his authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the [FBI] Director."  We found that the FBI Director exercised this authority in only 4 of the 1,992 cases closed between FY 2013 and FY 2018; therefore, we concluded that independent oversight of FBI OPR's decisions is limited.

PSTRZOK-DOJ-00010646

Table 2

## Median Adjudication Length by Disciplinary Outcome

| Disciplinary Outcome | Median Adjudication Length (Days) |
|---|---|
| Closed administratively | 15 |
| No disciplinary action | 44 |
| Non-adverse action | 40 |
| Adverse suspension | 126 |
| Dismissal | 166 |
| Summary dismissal | 14 |
| All Cases | 50 |

Source: OIG analysis of FBI OPR's CMS data

We found that FBI leadership shares our concerns about the lack of an independent check on the reasonableness of summary dismissal decisions. The then Executive Assistant Director of the Human Resources Branch (EAD HRB), who chaired the Disciplinary Review Board (Board) tasked with making appellate decisions on other adverse disciplinary actions, told us that he believes that someone should be able to review summary dismissal decisions to ensure they are in line with precedent.[47]  He emphasized that a Board of five people review and make the final disciplinary decision for a dismissal case if it is appealed but only the FBI OPR Assistant Director makes a summary dismissal decision, which cannot be appealed at all. The then FBI Deputy Director, who oversaw FBI OPR, stated that he would like to have known when FBI OPR is planning to summarily dismiss an employee and believes that the FBI OPR Assistant Director should discuss the decisions with him. He said that he sees this as a possible check and balance on what is otherwise a single individual's decision.

The then FBI Deputy Director also told us he believed that summary dismissal is a useful sanction because some cases require a strong and swift response. He added that a summary dismissal sends a message to the employee, FBI staff, and the public that the FBI is taking misconduct seriously. Additionally, FBI OPR staff told us that there are cases that warrant summary dismissal because there is no possible mitigation or explanation that the subject could present in an oral hearing that would change the FBI OPR Assistant Director's mind on the penalty determination.

Since the FBI has broad discretion with respect to its disciplinary actions, all of the criteria described to us could be valid reasons to summarily dismiss an FBI employee. However, because these criteria are not clearly defined and not easily accessible to FBI employees, we believe that there is a risk of improper use or FBI employees' perceptions of unequal treatment. While we found that the vast majority of summary dismissal cases appeared to be reasonable and consistent uses of summary dismissal, there is no check on the appropriateness of the disciplinary action. Overall, we believe that it is important for transparency,

---

[47]  For more information about the FBI's appellate process, including the role of the Board, see Appendix 3.

PSTRZOK-DOJ-00010647

consistency, and equitable treatment of similarly situated offenders that the FBI OPR make the thresholds for summary dismissal clear.

Alternatively, recent changes to the FBI's Indefinite Suspension policy may mitigate some of the safety and security concerns that FBI OPR has used summary dismissal to address. While in the past only summary dismissal allowed the FBI to remove employees from FBI space quickly, a 2017 update to the FBI's Indefinite Suspension policy now effectively removes employees proposed for dismissal from FBI space pending the final disciplinary decision. Under this policy, the Human Resources Division indefinitely suspends an employee who is not a preference-eligible veteran when he or she receives an FBI OPR letter proposing dismissal.[48] An FBI Assistant General Counsel told us that the FBI updated its Indefinite Suspension policy in 2017 due to instances of disruptive behavior following proposed dismissals.

## Lack of Awareness About Last Chance Agreements Could Lead to Inconsistent Use

A last chance agreement is a tool used by FBI OPR that is not currently described in FBI policy and guidance. It has been used to enable some employees the opportunity to receive a reduced disciplinary penalty than initially proposed in exchange for the employee making certain concessions. The terms of a last chance agreement generally include waiver of all appeal rights for both the FBI's internal appeal process and, if applicable, appeals to the U.S. Merit Systems Protection Board (MSPB) and acceptance by the employee that FBI OPR can summarily dismiss the employee for any subsequent "serious misconduct."[49] We found that between FY 2013 and FY 2018 FBI OPR entered into 40 last chance agreements. We also found that the use of last chance agreement was more frequent over that 6 year period compared to the 6 years prior (FY 2007–FY 2012), during which FBI OPR entered into six last chance agreements.

When we asked FBI OPR staff about the increased use of last chance agreements, two suggested that FBI OPR might be using this tool more frequently as an effective means of preventing repeat misconduct. Others said that the benefit of a last chance agreement is that it allows the FBI to retain a valuable employee while also allowing FBI OPR to quickly and easily summarily dismiss the employee if he or she commits additional misconduct. Our analysis of last chance agreement violations found that 5 of the 40 employees who signed them during the scope of our review subsequently violated the terms of their agreement by engaging in serious misconduct and were summarily dismissed. Four of the five violations occurred within 6 months of the first disciplinary decision.

### FBI Employees May Not Be Aware of the Possibility of a Last Chance Agreement Because It Is Not Included in FBI Policy or Guidance

We did not find any reference to last chance agreements in FBI policy or in the FBI's Offense Codes and Penalty Guidelines. FBI OPR staff, including the former Assistant Director, could not point to a governing document that specifically granted them the authority to execute a last chance agreement. However, such agreements have been used throughout the federal government. The MSPB recognizes an agreement that waives appeal rights as enforceable and conforming to public policy as long as the terms of the waiver are "comprehensive, freely made, and fair, and the execution of the waiver was not the result of duress or bad faith on the part of the agency."[50] Further, the MSPB recognizes that if an employee does not comply with

---

[48]  Preference-eligible employees are placed on paid administrative leave for 30 days before being indefinitely suspended because they are entitled to advance notice of an indefinite suspension under 5 U.S.C. §§ 7511–7513.

[49]  The terms of FBI OPR's last chance agreements do not include a time period for which the terms are in effect.

[50]  *Merriweather* v. *Department of Transportation,* 59 M.S.P.R. 434 (Nov. 10, 1993).

PSTRZOK-DOJ-00010648

the terms of his or her last chance agreement the previously proposed action is imposed and the employee's right to challenge the action is limited by the terms of the agreement.[51]

Moreover, FBI OPR did not provide meaningful information to FBI employees about the possibility of a last chance agreement by any other method. While we found that last chance agreements have been mentioned in FBI OPR's quarterly emails, those emails merely listed that a last chance agreement was part of the penalty in the case and did not discuss what a last chance agreement is or why it was warranted in the given case. Additionally, two FBI OPR adjudicators who conduct FBI OPR training for new FBI employees said that they do not discuss the possibility of a last chance agreement during their training sessions. One adjudicator specifically reported not knowing enough about how and when a last chance agreement is used to be comfortable including it in the training.

When we asked FBI OPR adjudicators whether they thought the average FBI employee was aware that last chance agreements were available as part of the FBI's disciplinary process, they said that employees who retained an attorney familiar with the FBI's process would likely be aware but that other employees would likely not know. The FBI OPR adjudicators were divided about whether they thought this lack of knowledge had an effect on whether a subject was offered a last chance agreement. Some adjudicators told us that they believe FBI OPR would suggest a last chance agreement if it considered it appropriate, regardless of whether the subject requested one. Others were concerned that the lack of awareness of the possibility of a last chance agreement put subjects at a disadvantage because they could not raise the prospect of one themselves. In particular, they were concerned that employees who did not retain outside legal counsel would be at a disadvantage since they observed that an employee's attorney often suggested a last chance agreement. One FBI OPR Unit Chief emphasized that retaining a lawyer is the subject's choice; FBI OPR's process does not require one and FBI OPR does not penalize the subject for not knowing how the process works. However, our analysis found that, of the subjects who received a last chance agreement, 85 percent (34 of 40 subjects) had retained legal counsel. More generally, 57 percent of all FBI employees who received a proposed adverse action in our scope retained counsel.

**FBI OPR Employees Did Not Identify Consistent Criteria for Use of Last Chance Agreements**

In addition to last chance agreements not being referenced in FBI policy, FBI OPR staff did not have a clear consensus on criteria that warranted use of a last chance agreement. The 15 FBI OPR managers and adjudicators we asked identified a variety of possible criteria, but no single criterion was identified by more than half of the staff members. Our review of 40 last chance agreement precedent summaries found that 36 of the cases appeared to involve 1 or more of the criteria mentioned to us by FBI OPR staff.[52] In comparing the various criteria that FBI OPR staff indicated were applicable to the information provided in the last chance agreement precedent summaries we reviewed, we found the following:

- *Remorse:* 58 percent (23 of 40) of the last chance agreement precedent summaries noted that the employee had expressed remorse. Five of the 15 FBI OPR staff we asked identified remorse as a potential basis for entering into a last chance agreement.

---

[51] *Ferby* v. *U.S. Postal Service,* 26 M.S.P.R. 451, 453, 455–56 (Feb. 14, 1985).

[52] For this analysis, we read precedent summaries from FBI OPR's CMS and identified whether any of the suggested criteria that would warrant the use of a last chance agreement were mentioned in the summaries. For more discussion of our methodology, see Appendix 1.

PSTRZOK-DOJ-00010649

- *Positive Performance Record:* 58 percent (23 of 40) of the precedent summaries we reviewed noted that the employee who received a last chance agreement had a positive performance record. Only 2 of the 15 FBI OPR staff cited a positive performance record as an appropriate consideration for a last chance agreement.

- *Proactive Remediation or Rehabilitation Potential:* 38 percent (15 of 40) of the precedent summaries we reviewed mentioned good rehabilitation potential or the subject having taken steps to ensure that the misconduct would not recur. For example, in nine cases, the employee proactively sought treatment or counseling for an addiction related to the misconduct. Seven of the 15 FBI OPR staff identified this factor as supporting a last chance agreement.

- *Aberrational Misconduct:* 15 percent (6 of 40) of last chance agreement case summaries we reviewed cited the subject's lack of disciplinary history as a mitigating factor. Five of the 15 FBI OPR staff indicated that consideration of whether the misconduct was aberrational in view of the employee's history as an appropriate consideration for a last chance agreement.

FBI OPR staff also described last chance agreements as involving a penalty reduction from dismissal to a 60-day suspension. Although those penalties are in FBI OPR's template for last chance agreements, we found that in 20 percent (8 of 40) of the last chance agreement cases this was not the case. Specifically, we found that the final reduced penalty in these 8 cases was a suspension of less than 60 days, including 5 in which the proposed original penalty was a suspension rather than a dismissal. This data raised concerns about the equity of the FBI's disciplinary process and exposes the FBI to accusations that it does not treat similarly situated employees in the same manner. Use of a last chance agreement in non-dismissal cases raises questions about the extent to which FBI OPR considers a last chance agreement in, for example, all proposed 30- and 60-day suspensions. Use of a last chance agreement accompanying a suspension of less than 60 days raises questions about the extent to which a last chance agreement shortens the final suspension. Additionally, our review identified broader questions arising from the lack of guidance on what cases are eligible for last chance agreement consideration, what the FBI considers "serious misconduct" for purposes of enforcing a last chance agreement, and how long the last chance agreement is applicable in the event of subsequent employee misconduct.

We understand that FBI OPR must consider the unique facts of every case it adjudicates and has discretion to make these types of disciplinary decisions. However, we believe that clearly defining the conditions and criteria for a last chance agreement would serve several important functions in giving FBI employees confidence in the disciplinary system. If the FBI expects to continue using last chance agreements, it should amend its policy and training so that employees are aware of this option. In addition, the FBI should define last chance agreements, the categories of employees who are eligible, the criteria for using them, and the circumstances that could result in an employee violating such an agreement. We believe that updating policy to clearly explain last chance agreements would improve the consistency of how they are used and increase the transparency of their use.

## Formalizing in Policy FBI OPR's 60-day Cap on Disciplinary Suspension Would Help Ensure Consistency Between FBI OPR and Appellate Decisions

We found that FBI OPR does not impose disciplinary suspension longer than 60 days, but that this cap is not in FBI policy, resulting in inconsistent use of lengthy suspensions in FBI OPR and appellate decisions. Adjudicators told us that having this maximum suspension length is appropriate because dismissal is also a justifiable action for any behavior that would warrant a suspension longer than 60 days. Four adjudicators

said that the 60-day suspension cap balances the need to appropriately penalize misconduct with the needs of the FBI, which include ensuring that divisions are not understaffed for long periods due to an employee's suspension and maintaining morale in the office where the subject works.

The 2017 update of the Offense Codes and Penalty Guidelines states that penalties for multiple substantiated offenses within a single case will normally be added together "up to and including dismissal," but it does not identify a suspension cap.[53]  However, every FBI OPR adjudicator we asked confirmed that 60 days is the longest suspension that FBI OPR will impose.  Adjudicators identified the 60-day suspension cap as a long-standing practice that has never been included in FBI policy.  None of the adjudicators knew how this practice originated; but one suggested that the practice was at least 15 years old, predating all of the current and former FBI OPR staff we interviewed.  Given that 60 days has been the maximum allowable suspension in practice for years, we question why it has not been formalized in FBI OPR policy or guidance.

While a 60-day maximum for suspensions was consistent across FBI OPR decisions, whether FBI OPR proposed that a subject receive the maximum suspension or a dismissal when multiple offenses resulted in an aggregate of more than 60 days' suspension was inconsistent.  We identified six cases in our scope in which the sum of proposed suspensions for all of the subject's substantiated offenses would have been greater than 60 days.[54]  Of the six cases, FBI OPR proposed dismissal in four and proposed the maximum 60-day suspension in two.  There did not appear to be a threshold sum of proposed suspensions that would warrant reducing the penalty to 60 days or increasing it to dismissal.

The lack of FBI policy regarding a cap on the length of suspensions has led to inconsistent application of suspensions in excess of 60 days.  We found three cases in our scope that were modified on appeal from dismissal to suspension for a period longer than 60 days, the longest of which was a 110-day suspension.  In addition, the then EAD HRB described a more recent appealed case that the Board modified from dismissal to a suspension longer than 60 days.  He said that the fact that the 60-day suspension cap is not defined in FBI policy influenced the Board's decision to mitigate FBI OPR's dismissal and impose a longer suspension.  The ODA Unit Chief stated that she does not see a need for a suspension cap since both the MSPB and DOJ have imposed longer suspensions.  However, she stated that, if the cap were specified in FBI OPR policy, the ODA would abide by it when making recommendations.[55]  She added that this change would also require FBI OPR to specify the penalties it imposes for each offense code in cases involving multiple offense codes so the ODA could apply its appropriate standard of review.

The then FBI Deputy Director told us that the lack of a clearly defined maximum suspension has affected his decision making as well.  He described an instance in which he amended a Board decision, having determined that the subject should have received a suspension longer than 60 days.[56]  In retrospect, he is not sure that he made the correct decision, noting that the suspension length he imposed was a long time

---

[53]  The current version of the FBI's Offense Codes and Penalty Guidelines was published in 2017; prior versions published in 2004 and 2012 did not include the quoted language.

[54]  FBI OPR does not consistently capture disaggregated penalties for each offense code in cases in which there are multiple substantiated offenses, so we cannot state with certainty that we identified all cases reaching the 60-day penalty cap.  See Appendix 1 for more information about our data analysis methodology.

[55]  For more information about the FBI's appellate process, including the role of the ODA, see Appendix 3.

[56]  FBI Policy Directive 0915D, Disciplinary Appeals Process, states that "the FBI Director (or his or her designee) maintains the authority to modify any disciplinary finding, penalty, or both as deemed necessary and in the best interests of the FBI."

PSTRZOK-DOJ-00010651

for a supervisor to be without a staff member. He said that he would like the FBI to make a decision about an appropriate cap on the length of suspension and would like to see a discussion of the suspension cap included in FBI policy.

## Conclusion

We believe that FBI policy should clearly define summary dismissal, last chance agreements, and the 60-day suspension cap. Doing so would be an important safeguard to ensure that they are used equitably, consistently, and transparently. In 2017, FBI OPR began working on a draft FBI OPR Policy Guide that would consolidate existing policies and codify existing practices that are not in policy, including summary dismissal and the 60-day suspension cap.[57] However, a subsequent version of the draft Policy Guide excised summary dismissal. In addition, we found that no iteration of the draft Policy Guide included a discussion of last chance agreements. FBI OPR managers told us that the federal government shutdown in FY 2019 and turnover in the FBI OPR Assistant Director position had stalled the policy development process. Interviewees also described "sticking points" between different stakeholders of the misconduct investigation process regarding proposed additions to the draft Policy Guide. We believe that an FBI OPR Policy Guide would provide the FBI an opportunity to codify these long-standing practices and that the stakeholders of the process need to come to a consensus on appropriate additions to FBI OPR policy.

## The FBI Should Document Substantiation Decisions in All Matters During Which an Employee Separates Under Inquiry

Prior to 2017, when an FBI employee retired or resigned during the pendency of a misconduct investigation (separated under inquiry), FBI OPR drafted a memorandum for the misconduct file listing the allegations but did not make a substantiation decision. We found that, starting in 2017, the FBI began reviewing misconduct files of employees who separated under inquiry to determine whether the case likely would have resulted in dismissal. If FBI OPR determines that the employee likely would have been dismissed for misconduct, FBI OPR documents its substantiation decision in a memorandum for the misconduct file that lists the allegations, describes the facts found during the investigation, and states that the employee "likely would have been dismissed from the rolls of the FBI."[58] If FBI OPR determines that the case likely would *not* have resulted in dismissal, FBI OPR drafts a memorandum for the misconduct file listing the allegations but not making a substantiation decision. According to an FBI OPR Unit Chief, the FBI made this change in 2017 because it became concerned that subjects would resign from the FBI and reapply for new positions to avoid discipline. The other FBI OPR Unit Chief said that it is also important to document whether a subject who separated under inquiry likely would have been dismissed because this determination affects a retired Special Agent's eligibility to carry a concealed weapon under the Law Enforcement Officers Safety Act of 2004 (LEOSA) (see the text box).

---

[57] In 2008, FBI OPR was involved in preparing a draft manual covering the entirety of the FBI's disciplinary process. This draft included a discussion of summary dismissal but was never finalized. The current draft FBI OPR Policy Guide is a new, separate document.

[58] The substantiation decision is FBI OPR's decision as to whether the facts found during an investigation constitute a violation of one of the FBI's offense codes. See the Introduction of this report for more information about how FBI OPR makes substantiation decisions.

PSTRZOK-DOJ-00010652

**LEOSA**

LEOSA exempts a qualified retired law enforcement officer from most state and local laws prohibiting the carrying of concealed weapons. To take advantage of this exemption, a retired FBI Special Agent or FBI Police Officer must apply to the FBI for an identification card indicating that he or she retired "in good standing" (a LEOSA card). One of the FBI's criteria for good standing is that the employee did not separate under inquiry when he or she likely would have been dismissed. If the separated employee has a misconduct file that includes an FBI OPR "likely would have been dismissed" memorandum, he or she did not separate in good standing and would not be granted a LEOSA card. Misconduct is only one reason why an FBI employee may not have separated in good standing. Appendix 3 provides more information about how LEOSA defines a qualified retired law enforcement officer and the FBI's process for determining whether a separated employee is qualified.

Sources: 18 U.S.C. § 926C, FBI policy, and OIG interviews

During our review, we found that, in 72 of the 617 cases adjudicated by FBI OPR between FY 2017 and FY 2018, the subject separated under inquiry. FBI OPR administratively closed all 72 of these cases, documenting a decision substantiating misconduct in just 40 percent of them. As shown in Figure 3 below, these 72 cases included 16 cases in which FBI OPR determined that the matter likely would have resulted in the employee's dismissal but FBI OPR did not have the opportunity to propose a penalty prior to the employee's separation and 13 cases in which FBI OPR substantiated the allegations, completed its adjudication before the subject separated, and drafted both a report of investigation (ROI) and a proposal letter documenting its substantiation decision.

In the remaining 43 cases (60 percent), FBI OPR did not document a substantiation decision. This included cases in which FBI OPR concluded that: (1) the allegations likely were not substantiated, (2) the allegations likely were substantiated but would not have resulted in a dismissal, or (3) there was not enough information in the investigative file to make a substantiation decision. Among these 43 cases were 8 instances in which FBI OPR administratively closed OIG-led misconduct investigations without documenting a substantiation decision, despite the OIG having completed its investigation and issued a report to the FBI with its findings (the OIG completes its misconduct investigations and prepares a report even if a subject separates during the course of the investigation). In five of those eight cases the OIG found that the separated employee committed misconduct, while in the remaining three cases the OIG concluded that the evidence did not support a finding of misconduct.

In contrast to the OIG, the FBI's Inspection Division generally terminates its misconduct investigation upon learning of a subject's separation, even if the ongoing investigation is not yet completed.[59] We could not determine from the FBI's data how many FBI-led misconduct investigations were terminated prematurely due to the subject's separation and therefore did not contain enough information for FBI OPR to make a substantiation decision or how many were completed before the subject's separation but FBI OPR concluded did contain enough information to make a substantiation decision. We believe that the FBI will be better served in the future by ensuring that all FBI-led misconduct investigations contain sufficient information for FBI OPR to make a substantiation decision even if the subject chooses to separate before that investigation is complete.

---

[59] As noted in the Introduction, the FBI's Inspection Division performs administrative misconduct investigations. See also Appendix 3 for more information about the FBI's misconduct investigation process.

PSTRZOK-DOJ-00010653

While FBI OPR's decision in 2017 to document substantiation decisions in cases that likely would have resulted in dismissal was a positive change, we are concerned about FBI OPR's continued practice of not documenting substantiation decisions in all cases in which the employee separates under inquiry. Closing cases that would have resulted in a penalty less than dismissal without documenting the substantiated misconduct fails to hold employees—who have chosen to separate under inquiry—accountable for their behavior, including potentially serious misconduct that would have warranted lengthy suspensions or demotions. Further, it empowers FBI employees who have engaged in misconduct to remain with the FBI during the pendency of an OIG or FBI misconduct investigation knowing that they can avoid an FBI OPR substantiation decision against them so long as they resign or retire prior to FBI OPR issuing its decision or proposal letter. This is particularly concerning given that supervisory and Senior Executive Service (SES)-level employees are more likely to be eligible for retirement based on their age and years of service, which could result in those individuals disproportionally avoiding consequences for misconduct. (See Appendix 4 for more information on

### Figure 3

**FBI OPR's Documentation of Decisions in 72 Cases in Which the Subject Separated Under Inquiry, FY 2017–FY 2018**



- FBI OPR drafted a proposal letter.
- FBI OPR did not prepare any documentation of a decision.
- FBI OPR prepared a "likely would have dismissed" memorandum.

Source: OIG analysis of FBI OPR's CMS data

demographic differences.) We are similarly concerned about the fairness of FBI OPR closing a matter without reaching a substantiation decision following an employee's separation under inquiry in circumstances in which FBI OPR would have concluded that the allegations against the employee were unsubstantiated. Misconduct investigations by the OIG and the FBI can take months, or even a year or more for complex matters, and we believe that simply closing a matter following the conclusion of an investigation due to an employee's separation from the FBI, even when the evidence would allow FBI OPR to make a substantiation decision, results in a lack of accountability for employees found to have engaged in misconduct, is unfair to employees wrongfully accused, and results in a waste of OIG and FBI resources. Further, the failure to make substantiated or unsubstantiated findings in all cases in which an employee separates under inquiry makes it difficult for the FBI to fully respond to its reporting obligations, as we describe below.

## Making a Substantiation Decision in All Matters in Which an Employee Separates Under Inquiry Would Enable the FBI to More Fully Meet Its Disclosure Obligations in Other Areas

While FBI OPR's change in practice in 2017 to document whether an employee who separated under inquiry would likely have been dismissed is sufficient to determine eligibility for a LEOSA card (see the text box above), we identified at least two instances in which FBI OPR's failure to document a substantiation decision impairs its ability to fully satisfy its reporting obligations. Under the FBI's National Name Check Program

PSTRZOK-DOJ-00010654

(NNCP), the FBI needs to have complete information about whether a former employee engaged in misconduct in order to respond to requests for preemployment vetting information from other federal agencies. Additionally, the FBI needs to have complete information about whether a law enforcement agent engaged in misconduct to provide accurate responses to requests by prosecutors for impeachment information about current or former law enforcement officers who testify as witnesses for the government in criminal cases. In these circumstances, we believe that the FBI must be able to identify all cases of substantiated misconduct, not just those cases that likely would have resulted in dismissal. We also found that 5 U.S.C. § 3322, a 2016 statute, may require the FBI to document more substantiation decisions for cases in which subjects separate under inquiry.[60]

The FBI's NNCP has established a routine use for disclosure of information from its official records system, which includes records of personnel and misconduct matters, when it is relevant to the employment decisions of other federal agencies (see the text box entitled NNCP and Appendix 3). Specifically, the routine use authorizes disclosure to any federal agency to assist the recipient agency in determining an individual's suitability for employment, trustworthiness for employment, and/or trustworthiness for a security clearance. In response to a name check, FBI OPR provides a summary of the substantiation decision. If the subject separated under inquiry, FBI OPR describes the allegations for which the subject was under investigation, along with the fact that the subject separated before a substantiation decision was reached. In such cases, the FBI is not able to definitively report to the agency that submitted the Name Check whether the FBI employee in question has a misconduct history. This creates risks for both former FBI employees and other federal agencies that are considering hiring them. Specifically, it requires these other agencies to determine whether alleged misconduct is disqualifying, which could result in the decision not to hire an employee who would have been cleared of the allegations or the decision to hire an employee whose misconduct allegations would have been substantiated.

**NNCP**

Federal agencies may submit a name check request to the FBI's NNCP when adjudicating an applicant's suitability for federal employment. The NNCP runs an automated search of the FBI's electronic recordkeeping system, Sentinel, to identify any relevant information. If the search identifies a misconduct investigation related to the individual in question, an NNCP analyst will request additional information regarding the allegation and substantiation decision from FBI OPR and provide that information to the requesting federal agency.

Source: OIG interviews

---

[60] We say that the statute "may require" the FBI to document more substantiation decisions because the language of the statute does not allow a more definitive statement and, as we discuss below, there is limited guidance from the U.S. Office of Personnel Management (OPM) and the Justice Management Division.

PSTRZOK-DOJ-00010655

Further, we believe that a substantiation decision in all cases in which an employer separates under inquiry would allow the FBI to more accurately identify all cases in which disclosures under the Department's *Giglio* policy are or are not appropriate. The FBI's Office of General Counsel (FBI OGC) needs to know whether allegations were substantiated in order to fulfill the FBI's responsibility to respond to requests by prosecutors for information that could be used to undermine the credibility of a government witness in a criminal prosecution (see the text box entitled *Giglio* Requests and Appendix 3). The Department's *Giglio* policy requires the disclosure of misconduct findings or pending allegations pertaining to veracity, bias, past or pending criminal charges, and anything that could influence the case at hand.[61] The policy does not require the disclosure of unsubstantiated allegations unless those allegations were originally made by a federal prosecutor or judge or received publicity.[62] Two FBI OGC employees told us that if an FBI employee separates from the FBI while under inquiry the Investigative Law Unit considers the inquiry to be effectively pending for *Giglio* policy

> ### *Giglio* Requests
>
> Government disclosure of exculpatory material and impeachment evidence is part of the constitutional guarantee of a fair trial. Federal prosecutors request relevant information from the FBI for any FBI employees whom they plan to use as witnesses (*Giglio* requests). The FBI reviews personnel and misconduct files for any potentially impeachable information and determines whether that information should be disclosed in response to a *Giglio* request. We describe the Department's *Giglio* policy, and the FBI's process for receiving and responding to *Giglio* requests, in greater detail in Appendix 3.
>
> Sources: *Giglio* v. *United States*, 405 U.S. 150 (1972) and OIG interviews

purposes. However, we note that, if FBI OPR documented substantiation decisions in all cases in which an employee separated under inquiry, FBI OGC would not have to treat those cases as pending and could definitively determine whether disclosure was, or was not, required.

Finally, we found that a 2016 federal statute may require the FBI to document more substantiation decisions for cases in which subjects separate under inquiry. In 2016, Congress passed the National Defense Authorization Act for Fiscal Year 2017, which contains a section, codified at 5 U.S.C. § 3322, requiring federal agencies to include a notation in the official personnel file of an employee who voluntarily separates while under investigation if an adverse finding is made in the case.[63] When Congress passed 5 U.S.C. § 3322, it did not require the U.S. Office of Personnel Management (OPM) to prescribe implementing regulations. In lieu of formal regulations, OPM issued guidance on the statute to all federal agencies in May 2018.[64] OPM advised that agencies may use their discretion in determining the format of the notation required by 5 U.S.C. § 3322 but suggested that a memorandum to the file signed by the agency official who decided the adverse finding would be acceptable. OPM did not provide further guidance to federal agencies.

The Justice Management Division (JMD), which is responsible for Department-wide policy and guidance on human resources matters, forwarded OPM's guidance to all DOJ components, including the FBI, allowing each component to decide the best way to implement the provisions of the statute. In September 2020, JMD issued guidance to the Department's components on the implementation of 5 U.S.C. § 3322, but JMD

---

[61] Justice Manual (JM), 9-5.100.

[62] JM, 9-5.100, 6. Information regarding unsubstantiated allegations will also be provided when required by a court decision, when the Requesting Official and the Agency Official agree that disclosure is appropriate based upon exceptional circumstances involving the nature of the case or the role of the agency witness or when disclosure is otherwise deemed appropriate by the agency.

[63] Pub. L. No. 114-328, Title XI, Sec. 1140.

[64] Jeff T.H. Pon, Director, OPM, memorandum for Chief Human Capital Officers, Implementing Policy Guidance for 5 U.S.C. § 3322–Voluntary Separation Before Resolution of Personnel Investigation, May 7, 2018.

excluded the FBI from that guidance because FBI employees' appeal rights to the MSPB are limited by law.[65] JMD stated that the FBI will be responsible for drafting its own policy addressing how 5 U.S.C. § 3322 will be applied for FBI employees.

As the FBI determines how to implement 5 U.S.C. § 3322, we believe there is an opportunity for FBI OPR to expand on its current practices to ensure that all substantiated misconduct is documented, even if an employee separates. We found that FBI OPR's "likely would have been dismissed" memorandum, which includes a substantiation decision, is very similar to OPM's suggestion for the permanent notation required by 5 U.S.C. § 3322.[66] Further, we note that, while the statute requires agencies to document an adverse finding (substantiated misconduct), it does not require agencies to document the penalty that would have been imposed had the subject not separated. Therefore, FBI OPR's practice of documenting a penalty only for cases in which the subject likely would have been dismissed if not for the separation could form the basis of the FBI's implementation of 5 U.S.C. § 3322. Expanding documentation practices to all misconduct cases in which the subject separates under inquiry would not only enable the FBI to comply more fully with 5 U.S.C. § 3322, but it would also allow the FBI to provide clearer and more complete information in response to its reporting obligations.

## Conclusion

We found that FBI OPR revised its practice in 2017 to document substantiated misconduct in those cases in which FBI OPR determined that an employee who separated under inquiry likely would have been dismissed for the misconduct. We determined that the FBI largely made this change to meet the FBI's need to document whether a former employee is eligible for a LEOSA card. However, we believe that the FBI did not recognize the broader reasons why documentation of substantiation decisions in all cases in which an employee separates under inquiry is important. For example, other federal agencies that are considering hiring a former FBI employee need to know with certainty whether that individual committed misconduct, not just whether allegations were made. Equally important, former FBI employees who would have been cleared of wrongdoing if the FBI had made a substantiation decision should not be considered to have separated under inquiry. We believe that the FBI's current practice results in a lack of accountability for employees found to have engaged in misconduct, is unfair to employees wrongfully accused, and results in a waste of OIG and FBI resources. We recognize that, in the past, FBI OPR's ability to adjudicate all cases in which employees separated under inquiry has been hampered by the FBI's practice of terminating ongoing misconduct investigations at the time of separation rather than continuing those investigations to completion. However, we believe the FBI will be better served in the future by ensuring that all investigations contain sufficient information for FBI OPR to make a substantiation decision, even if the subject chooses to separate before that investigation is complete.

We also believe that expanding the use of a memorandum, with the supporting evidence, to document a substantiation decision for cases in which a subject separates under inquiry would improve the FBI's ability to meet these broader needs by making its responses to requests for information made through the NNCP,

---

[65] DOJ Policy Memorandum 2020-01, Implementing Guidance for Voluntary Separation Before Resolution of Personnel Investigation Under 5 U.S.C. § 3322, September 4, 2020, 1. As we described above, the FBI's status in the excepted service means that preference eligible veterans are the only FBI employees who have the right to appeal adverse actions to the MSPB.

[66] OPM suggested documenting basic information about the requirements of 5 U.S.C. § 3322, the fact that the employee was the subject of a personnel investigation and separated prior to the resolution of the investigation, a summary of the agency's adverse finding, and any response provided by the employee. See Pon, memorandum for Chief Human Capital Officers.

PSTRZOK-DOJ-00010657

as well as requests from prosecutors made in accordance with the Department's *Giglio* policy. Further, it would help the FBI prepare to draft an FBI-specific policy on the implementation of 5 U.S.C. § 3322.

## FBI OPR Could Benefit From Modernizing Its Workflow Management Processes

In 2012, the FBI modernized its operations by transitioning from primarily hard copy records and information management systems to a fully electronic records and information management system called Sentinel. Most FBI offices adopted this transition as the FBI intended and now exclusively use Sentinel for electronic workflow and electronic recordkeeping. In contrast, we found that FBI OPR only partially adopted Sentinel and continues to rely in part on hard copy recordkeeping processes. Further, during the period of our fieldwork, FBI OPR used an electronic workflow management database, the Case Management System (CMS), which was not upgraded for 15 years.[67] We identified numerous concerns with the CMS, including slowness and instability, limited search capabilities, and inability to track case timeliness in accordance with FBI OPR's performance work plans. Multiple FBI employees told us that other systems, including Sentinel, offer features that may help FBI OPR address the weaknesses of the CMS.

The FBI has long required that documents added to its recordkeeping system be indexed, which is a form of structured data entry that allows the system to return more refined search results. Under the recordkeeping system that the FBI used prior to Sentinel, which was primarily paper based, document authors indicated on a paper cover sheet the information that they wanted to be indexed into the electronic aspect of the recordkeeping system and support staff performed the necessary data entry.[68] Under Sentinel, which is fully electronic, a document's author uploads the full document into Sentinel and indexes the document as part of that upload process.

FBI OPR continues to rely on a pre-Sentinel method for indexing documents, by which an adjudicator fills out a "Sentinel sheet" identifying information from a new source document that should be uploaded into Sentinel and provides this cover sheet to one of FBI OPR's paralegals. Paralegals enter data from the cover sheet into Sentinel, and Sentinel assigns a serial number to the cover sheet to acknowledge that the document has been logged as an official part of the case file. The paralegals then place the serialized source document into the hard copy case file. Unlike most FBI offices, FBI OPR does not upload an electronic version of the entire source document into Sentinel.

### FBI OPR's Reliance on Hard Copy Records Hinders Its Internal Processes and Other FBI Offices That Work With FBI OPR

We found that case files are delivered to FBI OPR, adjudicated, and reviewed by FBI OPR management in hard copy. While some adjudicators were comfortable with this format, others said that working with hard copy case files was inconvenient. They described large case files as "cumbersome and unwieldy," felt they

---

[67] We completed our fieldwork in November 2019. In response to a working draft of this report, the FBI reported that it deployed a new database known as the Disciplinary Module in February 2020 to replace the CMS. We discuss some of the FBI's plans for the new database below. We did not evaluate the implementation of the new database in this review.

[68] The FBI's pre-Sentinel recordkeeping system was an electronic repository of investigative documents but did not have the capability for FBI employees to electronically sign documents. As a result, when this system was in use, FBI agents and officials had to sign printed copies of the documents contained in the system. These printed copies of investigative documents were the official records.

PSTRZOK-DOJ-00010658

sometimes got "bogged down" by working entirely in paper, and said that they would appreciate the ability to electronically search or copy and paste the text of long documents.

We found that FBI OPR's use of hard copy files means that files for closed cases must be delivered to FBI OPR from storage and that the time necessary to do so causes delays that are expected to increase. For example, FBI OPR considers a history of prior misconduct to be an important aggravating factor that should be considered when making a penalty determination on a case. Because FBI OPR does not maintain electronic records, the Special Assistant to the FBI OPR Assistant Director (Special Assistant) requests the hard copy files of any previous misconduct investigation of a subject through the FBI's records request system and receives the files from one of the FBI's Washington, D.C., area records storage facilities. Currently, these requests are fulfilled within 2 working days; but the Special Assistant told us that the response time would lengthen beginning in 2020, when the FBI consolidated its current records storage facilities into a single location approximately 75 miles from Washington.

FBI OPR also limits itself to hard copy correspondence, in the form of hand deliveries, physical mail, and faxes, when communicating with subjects and other FBI offices. FBI OPR notifies the FBI's Security Division of all final disciplinary decisions in case any of the decisions have implications for the subject's ability to maintain a security clearance. A Security Division Unit Chief told us that, because FBI OPR provides these documents in hard copy through the FBI's internal mail system, it may take several weeks for the Security Division to receive the information.

We also found that FBI OPR's use of hard copies sometimes causes extra work for other FBI offices that would be unnecessary if FBI OPR's practices were more in line with the rest of the FBI's electronic record usage. For example, a subject who is proposed for an adverse action may review a redacted copy of the file that FBI OPR relied on in making its proposal.[69] If a subject requests access to the file, the FBI OPR adjudicator hand delivers the physical case file to the FBI's Office of General Counsel (FBI OGC) for redaction, a process that multiple FBI OPR staff we interviewed recognized as inefficient. An FBI OGC Supervisory Paralegal told us that FBI OPR is not the only office that provides hard copy files to be redacted but it is the only office that requests multiple paper copies of the redacted file instead of accepting digital files in return. Accordingly, the Supervisory Paralegal said that FBI OPR's process places burdens on FBI OGC.

If a subject appeals an FBI OPR adjudication, the Office of Disciplinary Appeals (ODA) also faces challenges stemming from FBI OPR's reliance on paper files. Redacting the entire hard copy case file and making it available to the subject for review are critical early steps in the appellate process, but ODA staff cannot initiate this work until they receive the hard copy file from the FBI's records storage facility.[70] The ODA Unit Chief told us that appellate staff may have to wait up to a month for FBI OPR to deliver the hard copy case file to the FBI's records storage facility before they can request it and that they sometimes need FBI OPR's assistance to locate the file. Once a hard copy file is located and delivered, the ODA's Administrative Duties

---

[69]  The right to review a redacted copy of the file that FBI OPR relied on is one of several procedural protections available to subjects who are proposed for an adverse action. For more information about these procedural protections, see the Introduction to this report.

[70]  In addition to the time necessary to obtain the case file, have it redacted, and make it available to the subject, FBI policy grants a subject 20 business days to file a written appeal after reviewing the redacted case file. ODA attorneys do not begin their review and analysis of the case until after FBI OPR returns the case file to the records storage facility, the ODA receives the case file from the records storage facility, FBI OGC redacts the file, the subject reviews the redacted file, and the subject files a written appeal.

PSTRZOK-DOJ-00010659

Manual counsels staff to be "extraordinarily cautious" when handling it because it is the only copy in existence, none of the information is backed up electronically, and the file cannot be recreated.[71]

## FBI OPR Records Case Outcomes in Multiple Databases, but These Systems Are Outdated and Incompatible

We found that the multiple databases that FBI OPR uses to record case outcomes are outdated, have limited functionality, and do not communicate across platforms. The CMS, FBI OPR's primary database for recording case outcomes, was used from 2004 to 2020 and remained essentially unchanged over that period of time.[72] Maintenance of the CMS was the responsibility of a single FBI Data Scientist, who managed the database as a tertiary duty unrelated to his main responsibilities. The Data Scientist told us that his role was to fix corrupted data and bugs in the database's code and to help CMS users run unique reports.

FBI OPR management demonstrated the CMS for us, and we observed a noticeable lag time between when a user initiated an action and when that action was completed. Two FBI OPR employees said that the CMS crashed frequently and was "glitchy" when opening records. Adjudicators also reported that the database was "very low tech" and that its interface was difficult to navigate due to its age. Two adjudicators described workarounds they sometimes employed to find information they needed more quickly than through the CMS. Another adjudicator believed that FBI OPR could adjudicate cases more efficiently if the CMS was faster. The Data Scientist who maintained the CMS agreed that the system is slow, and he attributed this to the demands the database places on an individual computer's memory when it is opened.

FBI OPR staff also reported that the CMS's search capabilities were limited. Users told us that they searched the CMS by key words or by offense code. Adjudicators reported that the key word search capability did not work particularly well, saying that it was slow even compared to the rest of the CMS, and that they were not always confident in the comprehensiveness of the results. Adjudicators would prefer natural language search and Boolean search capabilities to replace the key word search function.[73] The offense code search results in unrefined and overbroad results because it returns every case substantiated under the searched offense code since the CMS was implemented in 2004. One adjudicator observed that, for some of the more frequently adjudicated offense codes, the resulting precedent report contains hundreds of case summaries that needed to be reviewed and evaluated for their similarity to the case currently under adjudication. We ran a CMS offense code precedent search for the most-frequently substantiated offense code in our review scope and found that the CMS returned a 141-page precedent report containing 308 case summaries.[74]

---

[71] The ODA's Administrative Duties Manual was last updated in 2018. The Unit Chief of the Internal Investigations Unit (IIU) told us that the IIU began electronically backing up the investigative portion of misconduct files in 2018 but could not guarantee that there were electronic backups prior to that time. FBI OPR does not electronically back up the adjudicative portion of misconduct files.

[72] The other two FBI divisions involved in the disciplinary process—the Inspection Division and the ODA—also use the CMS as the primary database for recording data on disciplinary cases.

[73] Natural language search entails entering regular sentences as queries; the database uses programmed logic to determine the key words of the search based on their position in the sentence. Boolean search uses "AND," "NOT," and "OR" to combine search terms and return more precise results.

[74] We ran a precedent search for Offense Code 5.22 (Unprofessional Conduct on Duty). This offense code was substantiated 150 times between FY 2013 and FY 2018. Our copy of the CMS contains cases adjudicated through
*Continued*

PSTRZOK-DOJ-00010660

Further, the CMS's two existing search capabilities could not run more-complex searches that would help FBI OPR identify important trends. For example, the then FBI Deputy Director told us that he was interested in misconduct trends, particularly trends that highlight a gap in training or potential hiring issues. However, we found that the CMS did not enable reporting of substantiation decisions or penalty determinations over time, making it difficult to identify trends. The Special Assistant said that the most difficult searches were those that were topical and likely to have relevant results in multiple offense codes. Our own evaluation of a small sample of precedent summaries in the CMS led us to agree that conducting such a search across all cases in the CMS would have been challenging.[75] The former FBI OPR Assistant Director said that FBI OPR has not historically sought to analyze CMS data to inform policy decisions.

We further found that FBI OPR could not use the CMS to monitor case timeliness to support performance work plans because the CMS did not track the data necessary to do so. The performance work plan for FBI OPR Unit Chiefs sets a target to complete the initial letter in an adjudication within 90 days of receipt by FBI OPR.[76] The CMS captured the date that FBI OPR received a case, but not the dates on which proposal letters or decision letters were issued. Instead, to monitor case timeliness, the two Unit Chiefs each maintained a separate list of all cases assigned to their respective units. FBI OPR also records the dates of every proposal and decision letter in each case file; but it must individually review each file to identify these dates, according to FBI OPR paralegals. As a result, FBI OPR cannot easily evaluate whether the portions of the adjudication process that are entirely within its control are timely.[77]

Although the CMS was the primary database that FBI OPR used to record case outcomes during the period of our fieldwork, the FBI did not consider it an official FBI recordkeeping system.[78] FBI OPR also maintains the Disciplinary Management System (DMS), a separate database that the FBI considers as the official FBI recordkeeping system.[79] When FBI OPR makes a final decision and closes a case, the assigned adjudicator

---

October 12, 2018, the date the FBI provided it to us for review. If FBI OPR were to run the same search today, the resulting precedent report would be longer.

[75] We evaluated a small sample of precedent summaries from the CMS and found that sample cases in which the misconduct occurred after the subject had been drinking alcohol were adjudicated under at least six separate offense codes. This included offense codes in which alcohol was obviously involved, such as DWI, as well as offense codes in which alcohol would not always be involved, such as Unprofessional Conduct Off Duty.

[76] For cases in which misconduct is substantiated and the penalty determination is adverse, the initial letter in an adjudication is the proposal letter, which is issued several weeks before a final decision is made and the case is closed. In all other cases, the initial letter in an adjudication is the decision letter issued at the time the case is closed. See Figure 1 above.

[77] Table 2 above summarizes the timeliness of adjudications by disciplinary outcome. The FBI completed adverse action cases (adverse suspensions, dismissals, and summary dismissals) within a median of 127 days, including both the time to complete an initial proposal letter (which is fully within FBI OPR's control) and the time to complete the procedural protections should the subject choose to invoke them (which is not fully within FBI OPR's control). FBI OPR managers estimated that the procedural protections typically took 2 months to complete.

[78] The FBI considers the CMS to be an unofficial recordkeeping system because its primary purpose is to improve case tracking, from allegation through final appeal, over the system that had been in use prior to 2004. The CMS contains information that is not stored in other databases, such as FBI OPR personnel that have been assigned to handle a particular adjudication.

[79] The FBI used to record data on all human resources related matters in a database known as the Bureau Personnel Management System. In 2018, the FBI created the DMS as a standalone database solely for disciplinary records as part of a larger project to upgrade and replace the Bureau Personnel Management System. The DMS is now considered the FBI's official repository for all disciplinary case outcomes from 1990 to the present. Because the DMS contains less

*Continued*

PSTRZOK-DOJ-00010661

prepares a case summary in the CMS. The summary includes information on FBI OPR's substantiation decision, aggravating and mitigating factors, and the penalty determination so that the case appears in future search results when adjudicators search for relevant precedents. However, data from the CMS cannot be uploaded electronically to the DMS. To ensure that the information in the CMS is also recorded in the DMS, the FBI's official recordkeeping system, FBI OPR's paralegals must retype the information from the CMS case summaries into the DMS. The paralegals said that it would help their overall efficiency if it were possible to eliminate the duplicate data entry steps.

## FBI OPR Limits Its Use of Sentinel Due to Security Concerns, but Existing Sentinel Features May Address These Concerns

To accommodate the FBI's implementation of Sentinel while still maintaining its reliance on hard copy case files, FBI OPR uses a multistep process for uploading cover sheets into Sentinel instead of uploading fully electronic records. This process appeared to us to be more complicated and inefficient than it would have been to simply use Sentinel as it was designed. As we described above, FBI OPR's cover sheet process matches the process used to index documents in Sentinel's predecessor system. The rest of the FBI stopped using the cover sheet process after Sentinel was introduced in 2012.

FBI OPR staff told us that its method for indexing documents in Sentinel is time-consuming and does not result in an adequate backup of FBI OPR records. FBI OPR's two paralegals estimated that they spent at least a quarter, and possibly as much as half, of their time entering data into Sentinel to serialize documents. Two adjudicators described FBI OPR's Sentinel cover sheet process as an administrative burden and said that it would be more efficient for adjudicators to upload documents they author directly into Sentinel. FBI OPR staff also worried that not uploading documents into Sentinel means that there would be no electronic backup if the hard copy file were accidentally damaged or destroyed.

FBI OPR staff told us that FBI OPR has not historically maintained electronic records in Sentinel because misconduct cases are highly sensitive personnel matters that should not be shared with anyone other than the subject and the subject's supervisor. The former FBI OPR Assistant Director said that Sentinel was not an appropriate repository for adjudication records because Sentinel is designed to facilitate ready access to information.[80] We believe that FBI OPR's hesitance to use Sentinel stems in part from a lack of familiarity. Because FBI OPR's paralegals are the only employees who currently enter data into Sentinel, other FBI OPR employees told us that they have not received training in how Sentinel works. One FBI OPR employee said that, after a colleague explained how Sentinel is programmed to limit search results for unauthorized users, she wondered why FBI OPR was not uploading documents into Sentinel.

The Case Management Applications Section Chief, who is the FBI employee responsible for Sentinel, told us that Sentinel is programmed so that any misconduct cases are automatically designated "prohibited access," the most highly restrictive access level available in the system.[81] Eight current and former FBI OPR

---

detail than the CMS, FBI OPR can grant DMS access to FBI employees that need access to disciplinary history in order to fulfill the FBI's obligations to respond to other types of requests (we describe these circumstances in Appendix 3).

[80] The FBI implemented Sentinel in part to link cases with similar information and streamline the process of making new case information and intelligence available to agents and analysts.

[81] Documents and data uploaded into Sentinel are assigned one of three access levels: unrestricted, restricted, or prohibited. The extent to which information appears in search results depends on the data's access level and the searcher's permissions. Prohibited data is visible only to users with permission to view the underlying case; all other

*Continued*

PSTRZOK-DOJ-00010662

employees told us that they believe that FBI OPR should use Sentinel because the prohibited access level allows for appropriate file restriction, Sentinel is the FBI's system of record, using Sentinel would enhance FBI OPR's efficiency by eliminating the Sentinel sheet process, and Sentinel offers robust search capabilities. Multiple adjudicators also noted that other FBI divisions trust Sentinel to store highly sensitive investigative information. The Internal Investigations Unit (IIU), which performs the misconduct investigations that FBI OPR adjudicates, began uploading all of its misconduct investigation documents into Sentinel in 2018.

## Conclusion

We found that FBI OPR has not adopted changes in the FBI's electronic recordkeeping practices and that its adherence to older, hard copy recordkeeping processes negatively affects its efficiency and places burdens on other FBI offices that frequently interact with FBI OPR. By indexing documents into Sentinel without uploading electronic files, FBI OPR does not use Sentinel as it was originally designed and therefore bears the system's administrative burdens without being able to take advantage of any of its benefits.

In response to a working draft of this report, the FBI reported that in February 2020 it deployed a new database, the Disciplinary Module, to replace the CMS.[82] Like CMS, the Disciplinary Module will allow workflow tracking of misconduct allegations, investigations, adjudications, and appeals and will also allow users to link case documents.[83] While the Disciplinary Module is generally intended to replicate the CMS using a more robust and updated database architecture, some of the features that FBI OPR and the ODA requested have the potential to alleviate some of the challenges FBI OPR faced with the CMS. For example, a journaling feature will allow FBI OPR to record the dates that proposal letters are sent, potentially improving FBI OPR's ability to monitor case timeliness. The Disciplinary Module will also allow users to apply tags to mitigating and aggravating factors as they draft precedent summaries, improving adjudicators' ability to refine their precedent searches to return only cases that feature particular mitigating or aggravating factors. FBI OPR also requested that the Disciplinary Module offer Boolean search capabilities, although this is a midlevel priority that may be added to the system after its initial implementation. Additionally, the Disciplinary Module will be an official FBI system of record, which could eliminate the need to record disciplinary outcomes in multiple systems.[84] We believe that FBI OPR could benefit from reconsidering its use of electronic recordkeeping systems and evaluating how it could take advantage of features in Sentinel and the Disciplinary Module to maintain more robust, efficient, and useful electronic records.

---

users receive no search results and would not know that information relevant to their search exists in a prohibited case. The FBI programmed Sentinel to automatically set all misconduct cases at the prohibited access level because, under the FBI's file numbering system, all misconduct cases begin with the same number.

[82] The FBI is developing a new database for this purpose rather than using Sentinel because it is the FBI's practice to use other applications for functions, such as the adjudication of misconduct, whose workflows differ from the FBI's standard workflow for investigative case files.

[83] The Inspection Division uses an existing CMS feature that allows users to link case documents that are stored in a shared drive, but FBI OPR does not use this feature. Further, FBI OPR has not committed to using such a feature in the new Disciplinary Module.

[84] A Supervisory Special Agent working on the development of the Disciplinary Module said that, as part of this process, developers were designing the Disciplinary Module to push information directly to Sentinel. FBI OPR also requested that the Disciplinary Module have a flexible design in case FBI OPR chooses to expand its use of Sentinel in the future.

PSTRZOK-DOJ-00010663

## FBI Employees and FBI OPR Adjudicators Could Benefit from Increased Training

While FBI OPR introduces all new employees to the disciplinary process as part of the FBI's orientation, some FBI employees told us that their colleagues tend not to seek out a deeper understanding of the disciplinary process out of a belief that it will never apply to them. FBI OPR staff and other FBI employees also told us that unfamiliarity with the disciplinary process has contributed to confusion about, or suspicion of, FBI OPR and its decision making processes. FBI OPR adjudicators have also expressed a desire for more standardized and comprehensive training to help them better understand the day-to-day realities of the FBI's law enforcement operations. We believe that FBI OPR should provide more external education for FBI employees whose conduct may be adjudicated to increase their understanding of, and confidence in, that adjudication process. We also believe that FBI OPR should provide more internal education for the FBI OPR adjudicators responsible for making those decisions to increase their understanding of the policies and situations about which they must make judgments.

### FBI Employees Could Benefit From More Awareness of FBI OPR's Role in the Disciplinary Process

FBI policy requires FBI OPR to conduct training on its policies and procedures for newly hired employees, legal attachés, field offices, and interns.[85] Between January 2017 and May 2019, FBI OPR conducted 89 training events for FBI employees, of which approximately 60 percent occurred as part of an employee orientation for either permanent FBI employees or interns.[86] Sixteen percent of the training events were for staff transferring to legal attachés, and 9 percent of the events were for staff in field offices.[87]

During each orientation training event, the Inspection Division, FBI OPR, and the ODA make a joint presentation about the investigative, adjudicative, and appellate phases of the disciplinary process. The entire presentation lasts about an hour, with the time divided among each presenter and FBI OPR's segment lasting 15-30 minutes.[88] During this time, the FBI OPR presenter describes FBI OPR's process for making substantiation decisions and penalty determinations, the procedural protections offered to subjects proposed for an adverse action, and the Offense Codes and Penalty Guidelines. Due to time limitations, the FBI OPR presenters discuss a handful of offense codes that they see frequently rather than covering all of the prohibited behaviors. The presenters encourage trainees to visit FBI OPR's intranet site, where they can review the Offense Codes and Penalty Guidelines, a written description of the adjudication process, and FBI OPR policies. Trainees do not receive copies of these documents during orientation.

While information is available on FBI OPR's intranet site, we believe that it may not be presented in the most clear, practical, and relevant format for the average FBI employee looking to understand the misconduct adjudication process. For example, the FBI OPR policies cover discrete issues related to adjudication, such as the recusal requirements for FBI OPR staff, rather than the overall process FBI OPR follows to make

---

[85] FBI Policy Directive 0047D, OPR Statement of Authorities and Responsibilities, March 31, 2008, para. 11.1.3.

[86] FBI OPR also conducted 10 training events for non-FBI employees, mostly for officials from law enforcement agencies in foreign countries that were interested in establishing an internal affairs function in their agencies.

[87] Legal attachés are the FBI's international field offices. The remaining 15 percent of training events were for employees with a particular job title or rank, such as Supervisory Intelligence Analysts.

[88] The agenda for an October 2019 session of the orientation training allotted 45 minutes for this presentation. It was one of 17 briefings that new employees received during the 3-day orientation.

PSTRZOK-DOJ-00010664

substantiation decisions and penalty determinations.[89]  Additionally, we observed that the document that describes the adjudication process, called "The FBI's Disciplinary Process," does not present the information to the level of detail and clarity that an FBI employee might be seeking.  Our observations of this document included the following:

- It states that FBI OPR staff "will review all investigative materials" and "make a finding as to whether the employee violated an FBI Offense Code" without describing what those terms mean.

- It lists the types of documents that FBI OPR issues to employees to inform them of FBI OPR's penalty decisions but does not describe what the penalties entail.  For example, it describes a letter of censure as being "issued when [FBI] OPR concludes the employee committed misconduct that warrants a letter of censure."

- It states that an employee may make an oral presentation as part the FBI's procedural protections but does not explain the purpose of the oral presentation or what will happen during the hearing.

In contrast, the in-person training describes how FBI OPR considers some of the investigative materials available, such as the employee's statement to the investigator and the Douglas Factors, to determine whether or not the subject committed misconduct.  The in-person training also describes what FBI OPR considers when making a penalty determination, including mitigating and aggravating factors, and provides additional information about the possible penalties.  Further, one of FBI OPR's trainers emphasized the importance of engaging with the trainees during the presentation, using eye contact and audience participation to increase the likelihood that the trainees retain the information presented.  While written information about FBI OPR's processes is maintained on FBI OPR's intranet site, we noted that it lacks these personal, engaging elements employed by the trainers.

Although information about the adjudication process is provided during orientation training and available to those who visit FBI OPR's intranet site, FBI OPR staff did not agree on whether FBI employees understand that process.  We found that FBI OPR's Special Agent adjudicators were more likely to believe that FBI employees do not understand the adjudication process, while the General Attorney adjudicators were more likely to believe that FBI employees do understand.  We further observed that the Special Agent adjudicators have all worked in multiple offices over the course of their FBI careers while General Attorney adjudicators typically have no FBI experience outside of FBI OPR.

During our review, numerous interviewees cited examples that made them concerned that FBI employees do not understand how misconduct cases are adjudicated.  FBI OPR's Unit Chiefs said that they frequently receive calls from subjects facing a proposed adverse action, or their attorneys, who do not understand how the procedural protections work.  Two FBI employees we interviewed from outside FBI OPR said that FBI employees tend to perceive FBI OPR as "mysterious" and a "black box" and these specific concerns were shared by some of FBI OPR's Special Agent adjudicators.  One of the adjudicators said that this affects

---

[89]  The FBI OPR policies on the FBI OPR intranet site are also in the FBI's online Policy Library, which is the FBI's sole repository for official FBI policies.  The Offense Codes and Penalty Guidelines are not available in the FBI's online Policy Library.  We found that this was because the FBI's Internal Policy Office is responsible for maintaining the Policy Library but FBI OPR does not coordinate with that office when updating the Offense Codes and Penalty Guidelines.

PSTRZOK-DOJ-00010665

FBI OPR's reputation: because FBI employees do not understand how FBI OPR does its work, they are less likely to view its decisions as fair, impartial, and objective.

Additionally, FBI OPR staff, as well as other FBI employees we interviewed, told us that FBI employees continue to misunderstand the role of FBI OPR in the FBI's disciplinary process. For example, we were told that an FBI slang term for a misconduct investigation is "an OPR" and, according to FBI OPR staff, they frequently field calls from FBI employees trying to report misconduct even though the Inspection Division has been responsible for receiving and investigating misconduct allegations since 2004. One of FBI OPR's Unit Chiefs said that she believes this misunderstanding persists because the FBI did not clearly explain the change when the FBI first separated the responsibilities of investigation and adjudication of misconduct allegations into two separate offices.

Numerous FBI employees we interviewed said that it would be helpful if FBI OPR were able to train employees more frequently than just during orientation. The two most common reasons interviewees gave for this perspective were that orientation is too overwhelming for new employees to retain much of the information they receive and that multiple sessions of FBI OPR training over the course of an FBI career would better reinforce the rules and help employees avoid problems.[90]

Interviewees also offered multiple suggestions for how FBI OPR could expand its training footprint. Some interviewees suggested that FBI OPR develop an online training for the FBI's Virtual Academy training intranet site.[91] However, others said that it was important to use a live presenter for FBI OPR's trainings to humanize the process, help FBI OPR build trust with the rest of the FBI, and respond to audience questions. One FBI OPR Unit Chief recommended that FBI OPR take better advantage of the FBI's videoconferencing capabilities and partner with the Inspection Division to give video presentations to field divisions during field division training while minimizing the impact on FBI OPR staff.[92] We agree, and believe that FBI OPR should explore offering more frequent training through in-person or virtual platforms. We also believe that the FBI should offer expanded materials on the FBI OPR intranet site, such as definitions, process flow charts, or recorded training presentations that focus on clear, practical, and relevant information for FBI employees.

### New FBI OPR Adjudicators Could Benefit from More Standardized and Comprehensive Training

New adjudicators learn about FBI OPR's processes through on-the-job training and mentorship from an experienced adjudicator. However, we found that adjudicators believe that they would benefit from additional standardization of the training process and materials. Adjudicators also told us that training

---

[90]  One FBI employee who attended the current version of the FBI's orientation training told us that he recalls few specifics other than a few general security briefings and having to fill out a lot of forms.

[91]  The Inspection Division has a Virtual Academy training module that is required for any FBI employee before investigating misconduct. Two FBI employees whom we interviewed misidentified this training as an FBI OPR training; this training covers misconduct investigations but not misconduct adjudications. We believe this further illustrates the concern that some FBI OPR staff expressed about whether FBI employees accurately understand the separate roles of the Inspection Division and FBI OPR in the disciplinary process.

[92]  Most FBI orientation trainings occur at one of two FBI training facilities in Virginia, so an FBI OPR adjudicator must set aside at least half a day to account for travel time even though FBI OPR's training presentation takes under an hour. In-person presentations at sites farther from Washington, D.C., would require additional travel time. An FBI OPR Unit Chief said that, to date, FBI headquarters divisions have been more likely than field divisions to request FBI OPR training.

PSTRZOK-DOJ-00010666

focused on familiarization with broader FBI functions, especially field division operations, could be helpful for new adjudicators without FBI experience.

### FBI OPR Adjudicators Believe that FBI OPR's New Adjudicator Training Could Be Improved Through Standardization

Adjudicators we interviewed generally felt that the training they received sufficiently prepared them for FBI OPR's work, but several identified areas for standardization and improvement. When a new adjudicator joins FBI OPR, he or she is paired with a mentor who is an experienced adjudicator. Through one-on-one mentoring, the new adjudicator learns about FBI OPR's processes, approach to adjudications, and expectations for their work products. Several adjudicators described their mentor working with them on their first simple adjudication, reviewing their work, and providing feedback. The Unit Chiefs review all work products and provide feedback as well.

We found that there is no standard curriculum for the mentors to follow when training new adjudicators. As a result, the quality and breadth of training may vary. For example, one adjudicator told us that no one walked through a case with him and that his work products were returned to him with changes but without an explanation of why management wanted the changes made. Two adjudicators stated that their training did not sufficiently cover the details of underlying processes, such as which FBI divisions need to receive which documents from FBI OPR. One described the mentoring process as "piecemeal" and did not think it provided new staff the full picture with respect to expectations. Four adjudicators wanted FBI OPR to have a more comprehensive, formal training for new adjudicators. Overall, adjudicators emphasized that access to standard information and training materials as a supplement to the mentoring would be preferred over formal classroom training.

During our fieldwork, we found that there are multiple versions of "how-to" guides that mentors may provide to new adjudicators. These unofficial guides include procedural checklists and compilations of printed emails with instructions. They cover topics such as how to prepare ROIs, proposal letters, and final decision letters; handling oral hearings; closing cases; and confirming suspensions, with a focus on which buttons to click and which documents are required at each step. Two adjudicators who actively maintain their own set of the documents believe that they would be useful training resources.

### FBI OPR Adjudicators Without Field Experience Could Benefit from Additional Operational Training

We found that FBI OPR staff believe that there is potential for additional operational training specifically for General Attorney adjudicators. While all FBI OPR adjudicators are attorneys by training, three-quarters of them are General Attorneys and one-quarter of them are Special Agents. The majority of the adjudicators that we interviewed spoke to the benefit of having varied backgrounds and types of experience within FBI OPR. In particular, General Attorney adjudicators said that, because they do not have FBI field experience, it is helpful to have the Special Agent adjudicators on staff to provide input in cases involving firearms and law enforcement operations, as well as to provide perspective regarding how FBI policies are applied in the field. Despite the benefits of having both General Attorneys and experienced Special Agents in FBI OPR, the number of Special Agent-filled positions in FBI OPR decreased from four to two following the government sequestration in 2013.

Six of the 14 current and former adjudicators we interviewed had specific ideas about improving training for General Attorneys by providing them with additional field perspectives. Their suggestions included offering short-term assignments to field divisions to work in Division Counsel positions; training on common Special Agent activities, such as handling firearms, interviewing subjects, and serving search warrants; and training

PSTRZOK-DOJ-00010667

on behavioral analysis.[93]  One General Attorney adjudicator who advocated for more training on common field activities noted that it can be "uncomfortable to be a judge of people when you yourself...aren't as familiar with those things."  As one Special Agent adjudicator explained, this type of training could help adjudicators understand the complications that can arise in the field in order to help distinguish between misconduct and atypical actions due to a complicated situation.

## Conclusion

Based on FBI OPR employees' descriptions of continued misunderstanding of FBI OPR's processes, we believe that FBI OPR needs to do more to educate FBI employees on its processes.  Our review of existing FBI OPR training content and the recommendations of FBI OPR staff indicate that FBI OPR could consider creating online training, expanding its use of videoconferencing for training purposes, or regularly updating training materials and FBI OPR's intranet to clearly and comprehensively address frequently asked questions and other information that would help FBI employees understand FBI OPR's adjudication process and decisions.

We found that adjudicators generally found the mentoring process helpful and that they believe that the training they received sufficiently prepared them for FBI OPR's work.  However, they also identified ways for FBI OPR to enhance its internal training.  Because of this, we believe that FBI OPR has an opportunity to draw upon the diverse experiences of its Special Agent and General Attorney adjudicators to standardize its new adjudicator training and to provide opportunities for adjudicators to become more familiar with the FBI's law enforcement operations.

---

[93]  Division Counsels are embedded in the FBI's field offices to provide comprehensive legal advice and services.

PSTRZOK-DOJ-00010668

# Conclusion and Recommendations

## Conclusion

We identified deficiencies in the FBI's disciplinary policies and processes that adversely affect the transparency, efficiency, perception, and documentation of the FBI's disciplinary system and its decisions. We found that three possible outcomes of the disciplinary process regularly used by FBI OPR are not clearly defined in FBI policy. FBI OPR can address this problem by including definitions in a policy guide currently being drafted. We also found that the FBI's practice of not adjudicating all cases in which employees separated under inquiry did not fully recognize that both former employees and their potential future employers need definitive answers about whether those former employees have committed misconduct. We recognize that, in the past, FBI OPR's ability to do so has been hampered by the FBI's practice of terminating ongoing misconduct investigations at the time of separation rather than continuing those investigations to completion. However, we believe that the FBI will be better served in the future by ensuring that all investigations contain sufficient information for FBI OPR to make a substantiation decision, even if the subject chooses to separate before that investigation is complete. We believe that the FBI could further address this weakness by writing substantiation memoranda for all misconduct files of employees that separate under inquiry and that the drafting of these additional memoranda could also improve the FBI's ability to respond accurately and completely to requests for information in connection with National Name Check Program and *Giglio* requests.

Additionally, we found that FBI OPR has lagged in adopting electronic recordkeeping practices and integrating its electronic recordkeeping into Sentinel, with appropriate security to protect sensitive information. The upcoming launch of FBI OPR's new Disciplinary Module presents an opportunity for the FBI to reassess and more fully transition to electronic recordkeeping of disciplinary files. Finally, we found that FBI OPR could increase its training for FBI employees in general in order to increase confidence in FBI OPR's processes and decisions and that it could expand training for new FBI OPR adjudicators in order to foster a deeper understanding of FBI OPR processes and the FBI's law enforcement operations.

## Recommendations

To improve the transparency, efficiency, documentation, perception, and understanding of FBI OPR within the FBI, we recommend that the FBI:

1. Update FBI policy to cover summary dismissal, including the criteria for its use, as well as the procedural and oversight processes that differentiate summary dismissal from other adverse disciplinary actions.

2. Update FBI policy to cover last chance agreements, including eligibility criteria and standard conditions included in the agreements.

3. Update FBI policy to clearly specify whether there is a maximum duration for disciplinary suspensions and, if so, the maximum such duration, as well as the reason for the policy.

4. Ensure that FBI OPR has the information it needs to adjudicate all cases by ensuring that every FBI misconduct investigation is completed, regardless of whether the subject separates.

PSTRZOK-DOJ-00010669

5. Write a memorandum for each misconduct file documenting a substantiation decision and the evidence supporting it in all cases in which an employee separates under inquiry.

6. Assess the capabilities of available electronic recordkeeping platforms and identify ways for the FBI's Office of Professional Responsibility to improve its efficiency through increased use of one or more of these platforms.

7. Increase availability of training and information on the FBI's Office of Professional Responsibility processes for FBI employees, including through the FBI Office of Professional Responsibility intranet site.

8. Standardize and update training materials for new FBI Office of Professional Responsibility adjudicators, and consider adding operational training for adjudicators without FBI field experience.

PSTRZOK-DOJ-00010670

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Purpose and Scope

The OIG conducted this review to examine whether the FBI handled the adjudication of misconduct investigations according to FBI policy.  We excluded the other four phases of the FBI's disciplinary process: reporting and investigation of misconduct allegations, appeal of misconduct adjudications, and implementation of disciplinary decisions.  Our fieldwork, conducted from September 2018 through November 2019, included data collection and analysis, interviews, and document reviews.  We analyzed data on misconduct investigations that FBI OPR adjudicated and closed between FY 2013 and FY 2018.  For select data analysis, we sought totals from the 6 fiscal years prior to this scope for comparison as well.  We also examined data on appeals closed between FY 2013 and FY 2018.

## Data Collection and Analysis

FBI OPR provided data from its internal Case Management System (CMS) database, which stores misconduct allegations, demographic information about the subjects of investigations, adjudication workflow information, and disciplinary outcomes for all misconduct cases.  The CMS also includes a module known as the Precedent Module, which uses free text fields to summarize closed cases, allowing adjudicators to search for and compare previous cases that are similar to the current case under adjudication.

For purposes of our analysis, we defined a case as a distinct set of allegations associated with a single individual.  We considered cases that FBI OPR closed from FY 2013 through FY 2018.[94]  Based on these criteria, we identified 1,992 cases in our scope.  Using demographic information stored in the CMS, we split the cases into groups by job type, sex, participation in the oral hearing (adverse actions only), and whether or not the employee retained an attorney, to identify any differences in outcomes between the groups.  We also split the cases into groups to identify differences between supervisory and non-supervisory employees.  To do this, we first separated the cases by the General Schedule (GS) level of the subjects: GS-13 and below and GS-14 and above.  In 65 cases, there was no GS level listed for the subject so we filled in the missing information using current position data, which identifies supervisory status.

As part of our analysis, we compared the results of this CMS data analysis from our current scope to data results presented in the OIG's 2009 *Review of the FBI's Disciplinary System*.  (See Appendix 4 for the full results.)  We also used CMS data to analyze what happened to misconduct investigations as they proceeded through the adjudicative process, including any changes to the disciplinary determinations between the proposal and final decisions and the effects of subjects opting to use their procedural protections, such as retaining outside legal counsel and responding to proposed discipline via an oral hearing.

---

[94]  Under this definition, a single investigation involving two subjects would count as two cases and two separate investigations of the same subject would count as two cases.

PSTRZOK-DOJ-00010671

We further analyzed case outcomes between job types by separating offense codes that are primarily violated by either Special Agent or professional staff employees based on the roles and responsibilities of their job. We identified the offense codes in which one of the two job types represented over 85 percent of the offenses. We then removed the cases that involved at least 1 of these offenses from the dataset (1,545 of 1,992 cases remaining) and examined the differences in outcomes. Table 3 below shows the list of offense codes excluded from this analysis. We further removed cases that involved any of the Illegal or Criminal Conduct offenses codes from the dataset (1,196 of 1,992 cases remaining). Figure 11 in Appendix 4 shows the results of the analysis using this dataset.

Table 3

Offense Codes Violated Primarily by Either Special Agents or Professional Staff Employees

| | Violated Primarily by Special Agents | | Violated Primarily by Professional Staff Employees |
|---|---|---|---|
| 1.1 | Asset/CW/Informant/CHS (Source)–Failure to Obtain Authorization or Report Criminal Activity | 2.9 | Misuse of Position–Impersonating an Agent |
| 1.2 | Asset/CW/Informant/CHS (Source)–Improper Financial Relationship | 3.2 | Loss of Badge and/or Credentials |
| 1.3 | Asset/CW/Informant/CHS (Source)–Improper Intervention on Behalf of | 5.3 | Discrimination |
| 1.4 | Asset/CW/Informant/CHS (Source)–Improper Personal Relationship | 5.4 | Disruptive Behavior |
| 1.5 | Asset/CW/Informant/CHS (Source)–Violation of Operational Guidelines and Policies, Other | 5.5 | Failure to Honor Just Debts/Regulatory Obligations |
| 1.7 | Investigative Deficiency–Misconduct Related to Judicial Proceedings | | |
| 1.8 | Investigative Deficiency–Violation of Operational Guidelines and Policies, Other | | |
| 2.7 | Misuse of Position–Abuse of Authority [CODE RETIRED IN 2012] | | |
| 2.10 | Failing to Cooperate in an Administrative Matter | | |
| 3.4 | Loss of Weapon | | |
| 4.3 | DUI/DWI–Government Vehicle | | |
| 5.13 | Misuse of Weapon/Safety Violation | | |
| 5.14 | Misuse of Weapon–Accidental Discharge | | |
| 5.15 | Misuse of Weapon–Intentional Discharge | | |

Notes: Offense Codes shaded gray and in italics were substantiated in five or fewer cases across both job types. CHS=Confidential Human Source; CW=Confidential Witness; DUI=Driving Under the Influence; DWI=Driving While Intoxicated.

Sources: FBI Offense Codes and Penalty Guidelines and OIG analysis of CMS data

We assessed timeliness of adjudications using workflow data stored in the CMS to determine when FBI OPR received and closed each case. From this duration, we subtracted any time that a case spent with the

PSTRZOK-DOJ-00010672

Internal Investigations Unit (IIU) for additional investigation and any time that a case spent closed before being reopened, in order to obtain the best estimate of the time each case spent in active adjudication by FBI OPR.[95] We used medians instead of averages for our timeliness analysis because our dataset included extreme outliers.

As shown in Figure 4 below, the 1,992 cases in our scope required the adjudication of 3,713 offenses, 2,114 of which were ultimately substantiated. Since the CMS does not store specific penalty outcomes for individual offenses in cases involving multiple substantiated allegations, we built our own dataset by recording the disaggregated penalties from FBI OPR's report of investigation (ROI) summaries, proposal letters, and final decision letters contained within FBI OPR's hard copy records of its work products. We identified 409 cases with multiple substantiated allegations in our scope, involving a total of 1,423 offense codes. We recorded the proposed and final disaggregated penalty for each offense if the information was available in the documents examined. Of the 1,423 offenses, we could not determine a disaggregated penalty for 381 of the offenses due to missing information.

## Figure 4

### Overview of Offenses Adjudicated and Substantiated Between FY 2013 and FY 2018



Sources: OIG analysis of CMS data and OIG-collected data

---

[95] We were not able to remove time required for procedural protections that are out of FBI OPR's control, such as file redaction, requests from the subject for additional time to review and provide information, and scheduling an oral hearing, because the CMS does not track dates relevant to these steps.

PSTRZOK-DOJ-00010673

We used two different methods to identify cases for which the suspensions for individual offense codes summed to greater than 60 days, either at the proposal stage or at the final decision stage. First, we identified some cases while collecting disaggregated penalty data from FBI OPR's ROI summaries, proposal letters, and final decision letters within FBI OPR's hard copy records. These letters specifically stated that the sum of suspensions was greater than 60 days and thus warranted dismissal. Second, we identified additional cases through data analysis by summing the disaggregated penalties for a single case and identifying those cases in which the sum was greater than 60 days.

For our analysis of summary dismissals and last chance agreements, we analyzed CMS data to identify relevant cases. We also conducted text searches of the CMS Precedent Module to find cases in which the presence of a last chance agreement was identified in free text fields rather than in the final outcome data fields in the database. We analyzed whether these cases appeared to conform to the criteria for summary dismissal or a last chance agreement that we had identified though document review and interviews with FBI OPR staff. We recorded information from the CMS case summaries for the identified cases to create our data set, identifying and categorizing text from the case summaries that matched the criteria for summary dismissal or a last chance agreement. We also conducted some limited demographic analysis on the cases identified.

The FBI's Office of Disciplinary Appeals (ODA) provided data from its internal SharePoint-based workflow tracking. To assess timeliness of appeals, we used this data to determine when the ODA first received each case and when the ODA sent the final decision letter in each case. This method mirrors the methodology used in the 2009 report. However, this duration also includes steps that are outside of the ODA's control, such as the time for the subject to review his or her case file and provide supplemental appeal arguments. Therefore, we also examined timeliness from the start of the ODA's case analysis to the date the ODA sent the final decision letter in order to obtain the best estimate of the time each case spent under consideration by appellate officials.

## Interviews

We conducted 62 interviews during the course of this review. Our fieldwork took place between August 2018 and November 2019; the FBI employees whom we interviewed held their identified roles during that timeframe. To understand the intersection between the FBI's documentation of adjudications and its disclosure obligations under the Department's *Giglio* policy, we interviewed an Associate Deputy Attorney General. To understand the FBI's oversight of FBI OPR's processes and to obtain an executive perspective on FBI OPR policies, we interviewed the FBI Deputy Director. To evaluate FBI OPR's policies and processes, we interviewed the former FBI OPR Assistant Director and both acting FBI OPR Assistant Directors, two current and former Unit Chiefs, 14 current and former adjudicators, the Special Assistant to the FBI OPR Assistant Director, and both paralegals.[96] Six of the adjudicators we interviewed were Special Agent adjudicators; the remaining eight were General Attorney adjudicators.[97]

---

[96] The former FBI OPR Assistant Director retired in December 2018. The first acting FBI OPR Assistant Director served in the position between January 2019 and her retirement in May 2019. The second acting FBI OPR Assistant Director served in the position between May 2019 and September 2019. The current FBI OPR Assistant Director entered on duty in September 2019.

[97] FBI OPR requires that all adjudicators be licensed attorneys, so the Special Agent adjudicators are both attorneys and agents. See the Introduction to this report for additional information.

PSTRZOK-DOJ-00010674

To evaluate the FBI's appellate policies and processes, and to understand the interaction between FBI OPR and the FBI's appellate processes, we interviewed the Executive Assistant Director of the Human Resources Branch (EAD HRB) and the Unit Chief of the ODA.

To understand the FBI's current and planned data systems available to manage disciplinary cases, we interviewed two employees in the Information Technology Applications and Data Management Division and three employees in the Insider Threat Center.  To understand the FBI's requirements for recordkeeping and storage of official records, we interviewed the Records Management Officer.

To understand the interaction between FBI OPR and the work of other FBI divisions, including the human resources implications when the subject of a misconduct investigation retires or resigns before FBI OPR makes a final decision, we interviewed one employee in the Security Division, nine employees in the Office of General Counsel, the Unit Chief of the Inspection Division's IIU, a Unit Chief and a supervisor in the Human Resources Division's Security and Credentials Office, and a supervisor in the Human Resources Division's Workforce Injury and Retirements Unit.  To understand the FBI's policymaking process, we interviewed the Unit Chief and a Policy Manager in the Internal Policy Office.

To understand guidance issued by the U.S. Office of Personnel Management (OPM) in response to a federal law passed in 2016 regarding how federal agencies should document instances of employees retiring or resigning under inquiry (5 U.S.C. § 3322), we interviewed a Counsel to the OPM Inspector General.  To understand how the Department implemented OPM's guidance, and whether the Department established any additional guidance or requirements for DOJ components, we interviewed the Deputy Assistant Attorney General for Human Resources and Administration and the Department's Human Resources Director.  To understand how the FBI implemented OPM's guidance, we interviewed the Assistant Director, the Deputy Assistant Director, a Section Chief, a Unit Chief, and a Human Resources Specialist in the FBI's Human Resources Division.

To understand the extent to which FBI employees comprehend the FBI's adjudication process, we interviewed an attorney at Swick & Shapiro, P.C., the law firm that serves as legal counsel for the FBI's Agents Association and often represents FBI employees during the disciplinary process.

To understand how other excepted service agencies adjudicate misconduct, as points of comparison, we interviewed relevant officials from the National Security Agency, the Defense Intelligence Agency, the Office of the Director of National Intelligence, U.S. Customs and Border Protection, the U.S. Department of State, the Central Intelligence Agency, U.S. Immigration and Customs Enforcement, the National Geospatial-Intelligence Agency, and the Federal Emergency Management Agency.

## Policy and Document Review

We reviewed FBI policy directives, guidance, and documents relevant to the FBI's adjudication and the subject's appeal of misconduct investigations.  To understand the behaviors that the FBI defines as misconduct and the range of penalties available for each, we reviewed the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process.  To understand FBI OPR's internal processes and procedural protections for adjudicating cases, we reviewed FBI policy directives outlining FBI OPR's responsibilities; a draft of an updated FBI OPR Policy Guide; FBI OPR internal guidance documents, including training materials provided to new FBI OPR staff; and training materials used by FBI OPR as part of the FBI's new employee orientation training.  To understand appellate processes and procedural protections, we reviewed FBI policy directives outlining the appellate process and responsibilities assigned to the ODA, the

PSTRZOK-DOJ-00010675

EAD HRB, and the Disciplinary Review Board.  We also examined training materials used to train FBI employees selected for terms of service on the Disciplinary Review Board.

To understand the purpose of 5 U.S.C. § 3322, we reviewed the text of the statute and its accompanying U.S. House of Representatives report, along with OPM's May 2018 guidance to federal agencies on implementation of the statute.  To understand internal FBI vetting processes that may be affected by the FBI's documentation of misconduct adjudications, we reviewed a template memorandum of understanding used for federal agencies to participate in the FBI's National Name Check Program; FBI policy directives and other materials governing the issue of Law Enforcement Officers Safety Act identification cards; and the Department's Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses (*Giglio* Policy).

PSTRZOK-DOJ-00010676

# Appendix 2: The FBI's Response to the Recommendations the OIG Made in Its 2009 Report

In our 2009 report, we made 16 recommendations to the FBI to help it address deficiencies in the reporting, adjudicative, appellate, and implementation phases of its disciplinary process, as well as to address the continuing perception that there was a double standard of discipline at the FBI.[98] This appendix, based on subsequent status reports provided by the FBI, describes the actions the FBI took to address each of the recommendations. We closed the last of these recommendations in January 2012 because we found sufficient evidence that the FBI had taken reasonable steps to address the concerns we had identified.

*Recommendation 1: Remind all employees on an annual basis that all allegations of misconduct must be promptly reported to the FBI Internal Investigations Section or to the OIG.[99]*

The FBI periodically inserts language into the introductory paragraph of its Quarterly All Employee E-mail, reminding employees of their obligation to report misconduct to the Inspection Division. The OIG closed this recommendation in January 2010.

*Recommendation 2: Stress to field and headquarters divisions that they must forward all allegations of potential misconduct they receive to the Internal Investigations Section.*

In September 2009, the FBI's Inspection Division sent an email to all FBI Executive Assistant Directors, Assistant Directors, Deputy Assistant Directors, and Special Agents in Charge (FBI division leaders), reminding them of their obligation to promptly forward all allegations of misconduct to the Internal Investigations Section and instructing that this guidance be further shared with all management personnel in each leader's respective division. The OIG closed this recommendation in January 2010.

*Recommendation 3: Consider automating the allegation-reporting process so that allegations can be reviewed by the OIG electronically instead of in hard copy.*

The FBI considered automating its allegation reporting process but ultimately decided not to do so due to concerns that automation would make external reporting of misconduct more difficult and jeopardize the anonymity of complaints. Instead, the FBI took steps within its review process to ensure that the OIG's review of each complaint is documented in the FBI's Case Management System (CMS). For example, the FBI updated the CMS so that a complaint cannot be marked as having been handled without an appropriate OIG classification being entered. The OIG closed the recommendation in May 2011.

---

[98] Our report found that, as of 2009, a significant percentage of FBI employees continued to believe that the FBI's disciplinary process was unfair and that senior managers were treated more leniently than other employees. To evaluate this perception, we conducted a file review and found that the discipline of Senior Executive Service (SES) employees was mitigated more often on appeal than the discipline of non-SES employees and that the mitigation in most of the SES cases was not reasonable. See DOJ OIG, *Review of the Federal Bureau of Investigation's Disciplinary System,* E&I Report I-2009-002 (May 2009), 76–104, www.oig.justice.gov/reports/FBI/e0902/ final.pdf.

We did not make any recommendations to the FBI concerning the investigative phase of its disciplinary process.

[99] The Internal Investigations Section was renamed the Internal Affairs Section in 2019.

PSTRZOK-DOJ-00010677

**Recommendation 4:** *Ensure that Internal Investigations Section personnel enter information regarding the OIG's review into the FBI's Case Management System.*

The FBI created a CMS query to identify complaints that are missing data on the OIG classification. Supervisors in the Internal Investigations Section run the query every 30 days to identify complaints missing this data and ensure that they are reviewed by the OIG. The OIG closed the recommendation in January 2010.

**Recommendation 5:** *Require field and headquarters divisions to specify, when forwarding allegations to the Internal Investigations Section, the date they became aware of the potential misconduct.*

As discussed in the response to Recommendation 2, the Inspection Division's September 2009 email to FBI division leaders also instructed them to specify the date they became aware of each allegation of potential misconduct that they report to the Internal Investigations Section. The OIG closed the recommendation in January 2010.

**Recommendation 6:** *Modify the FBI's Case Management System so that users can track the date that divisions become aware of potential misconduct.*

The FBI added to the CMS a field called "Division Aware Date." The OIG closed the recommendation in January 2010.

**Recommendation 7:** *Require FBI OPR to document its consideration of precedent when a mitigated or aggravated penalty is imposed.*

The FBI agreed that it would discuss every precedent case upon which a subject relies in arguing for mitigation of a proposed penalty, discuss every precedent case that is especially influential in FBI OPR's penalty decision, and identify the range of penalties imposed in the precedent cases decided under the offense codes at issue. The OIG closed the recommendation in January 2012.

**Recommendation 8:** *Require field and headquarters divisions to submit a Douglas Factors assessment in misconduct cases, except in unsubstantiated Delegated Investigation and Adjudication cases.*

In November 2009, the FBI issued a policy requiring field and headquarters divisions to submit Douglas Factors assessments within the timeframes established by FBI OPR and establishing a process for elevating the issue through the chain of command if a division fails to meet those timeframes. The OIG closed the recommendation in January 2011.

**Recommendation 9:** *Clarify in policy that FBI OPR and appellate officials should not seek or consider unwritten information when making disciplinary decisions.*

In November 2009, the FBI issued a policy prohibiting FBI employees from providing oral opinions or comments on the merits of a particular investigation, or on the character of a particular subject, to Inspection Division, FBI OPR, or Human Resources officials. Instead, the policy mandates that all opinions or comments must be submitted in writing in order to be further considered. The OIG closed the recommendation in January 2011.

PSTRZOK-DOJ-00010678

**Recommendation 10:**  *Consider changing the adjudicative process to ensure that the proposing and deciding officials within FBI OPR are separate.*

The FBI considered changing the adjudicative process to separate proposing and deciding officials within FBI OPR, but ultimately it decided not to do so.  The FBI examined disciplinary practices of other agencies and concluded that altering its process could create a less efficient system or vest decision-making authority in a less experienced or rank-inappropriate official.  The FBI also stated that the FBI OPR Assistant Director is the only FBI official authorized to deviate from the FBI's penalty guidelines.  Finally, the FBI cited Merit Systems Protection Board precedent cases establishing that the same individual may serve as both the proposing official and the deciding official.  The OIG continues to believe that independent proposal and decision authorities can provide important checks and balances in the disciplinary process, but the OIG accepted that the FBI had considered the recommendation.  The OIG closed the recommendation in January 2010.

**Recommendation 11:**  *Clarify FBI policies on the appellate officials' authority to modify findings of fact and penalties to resolve different interpretations of the policies by FBI OPR and appellate officials.*

In September 2009, the FBI issued a policy on the appellate process, which included language that appellate deciding officials must apply the substantial evidence standard of review to review the reasonableness of FBI OPR's underlying findings of misconduct, as well as the reasonableness of the penalty that FBI OPR assessed.[100]  (See the text box below.)  Reasonableness with respect to the penalty determination is defined as whether the sanction comports with the penalty ranges set forth in the FBI's penalty guidelines; whether the sanction is consistent with FBI disciplinary case precedent and/or applicable statutory provisions; and whether a consideration of Douglas Factors, including aggravating and mitigating factors, occurred prior to the imposition of the penalty.[101]  The FBI incorporated these definitions into its training of new members of the Disciplinary Review Board (Board) and stated that Board members would be further reminded of the substantial evidence standard both in writing and verbally prior to the deliberations of each appeal.

The FBI issued a new disciplinary appeals policy in October 2016, superseding the September 2009 policy.[102]  The new policy contains the same language on the substantial evidence standard and definition of reasonableness.  The OIG closed the recommendation in January 2010.

---

[100]  FBI appellate policy establishes separate deciding officials for appeals of non-adverse actions and appeals of adverse actions.  See Appendix 3 for more information.  We refer to these officials collectively as "appellate deciding officials."

[101]  We describe the Douglas Factors in the Introduction to this report.

[102]  The FBI issued the October 2016 policy to elevate responsibility for deciding non-adverse appeals and chairing the Board one level in the FBI's organization, from the Assistant Director of the Human Resources Division to the EAD HRB.  The FBI also moved the Appellate Unit, renamed the Office of Disciplinary Appeals, out of the Human Resources Division to report directly to the EAD HRB.

PSTRZOK-DOJ-00010679

**Standards Used by the Disciplinary Review Board**

During the current review, the FBI provided the OIG with copies of the training materials used since FY 2012 to train new members of the Board; each year's training covered the substantial evidence standard and definition of "reasonableness." The EAD HRB told us during the current review that he reads the substantial evidence standard and the definition of reasonableness into the record at the beginning of each Board deliberation and that an attorney from the FBI's Office of General Counsel attends each Board deliberation to answer questions. If the Office of General Counsel attorney becomes concerned about whether the Board is properly applying the substantial evidence standard of review, the attorney is empowered to intervene and guide the Board back on track.

Sources: FBI documents, FBI training materials, and OIG interviews

**Recommendation 12:** *Consider appointing a permanent appeals decision maker or board, rather than an appeals board composed of employees who rotate in and out of their board service after 6 months. In addition, if the permanent appellate decision-maker is a board rather than an individual, expand the board membership for SES appeals beyond only SES employees.*

The FBI considered establishing a permanent appellate decision board but ultimately decided not to do so, citing turnover of management as a barrier to establishing permanent positions on the Board. The FBI also believed that rotation of Board members increased the number of FBI employees with Board service, thus enhancing the transparency of the process and preventing biases from taking root. The FBI eliminated the use of an all-Senior Executive Service (SES) board to hear SES appeals, opting instead for a five-member board, consisting of the Assistant Director of the Human Resources Division as the permanent chair, two SES-level managers, and two non-SES midlevel managers, to hear all appeals. Finally, the FBI expanded the term of service on the Board from 6 months to 1 year to increase Board members' expertise. The five-member Board, now permanently chaired by the EAD HRB, continues to include two SES-level managers and two non-SES midlevel managers, each serving a 1-year term.[103] Additionally, two of the term members are Special Agents and the other two are professional staff. The OIG closed the recommendation in January 2010.

**Recommendation 13:** *Require appellate officials to fully document in writing the reasons for their decisions, including their consideration of precedent and mitigating or aggravating factors.*

The FBI's September 2009 disciplinary appeals policy included language requiring written documentation of the Board's decisions, including the consideration of precedent and mitigating or aggravating factors. The policy also required that all Board proceedings be audio recorded. The FBI incorporated these requirements into its Board training.

The FBI's October 2016 revised disciplinary appeals policy continues to require written documentation of the Board's decisions, as well as audio recording of all Board proceedings. The Board training used since 2017 also provides new Board members with specific guidance about how to articulate the reasons for their decisions so that their reasoning is clear in the case record. The OIG closed the recommendation in January 2010.

---

[103] As noted above, the EAD HRB became the permanent chair of the Board when the FBI revised its disciplinary appeals policy in October 2016.

PSTRZOK-DOJ-00010680

**Recommendation 14:** *In addition to Recommendation 12, which recommends a change in the FBI's appellate process, ensure that FBI policies are applied consistently to all levels of employees at all stages of the disciplinary process.*

The FBI's 2009 and 2016 appellate policies include language requiring the appellate deciding officials to ensure that FBI policies are applied consistently to all levels of employees at all stages of the disciplinary process. The FBI also stated that the presence and guidance of an attorney from the FBI's Office of General Counsel at each Board meeting is intended to ensure that FBI policies are applied fairly and consistently to all appellants. The OIG believes that the FBI needs to continue to focus on the issue to ensure that discipline is consistently applied to all levels of FBI employees at all stages. The OIG closed the recommendation in January 2010 but noted that it would consider conducting a follow-up review on this issue.[104]

**Recommendation 15:** *Conduct a review of the personnel files and timekeeping records of all employees who were suspended since October 1, 2004, to verify that the suspensions were properly documented, that the employees served their suspensions, and the employees were not paid during their suspension periods.*

The FBI reviewed the personnel files of all employees who were suspended between October 2004 and July 2009 to verify that suspensions were properly documented and were for the correct number of days. For employees who were identified as having served either too few or too many days of suspension, the FBI took corrective action to ensure that each employee served the correct number of days and that his or her pay was adjusted accordingly. FBI OPR also checks suspensions in the FBI's human resources and timekeeping databases to ensure that each was correctly served. The OIG closed the recommendation in January 2011.

**Recommendation 16:** *Revise FBI policy to begin suspensions on the first day of the workweek, as is done by other Department components.*

In August 2009, the FBI issued a policy requiring that all disciplinary suspensions begin on a Monday and that the actual days to be served be approved by FBI OPR in advance. The OIG closed the recommendation in January 2010.

---

[104] The OIG has not conducted a follow-up review specifically on this issue.

PSTRZOK-DOJ-00010681

# Appendix 3:  Overview of the FBI's Disciplinary Process and Other Circumstances in Which the FBI Needs Access to Disciplinary History

The FBI's disciplinary process consists of five phases:  (1) reporting misconduct allegations, (2) investigating misconduct allegations, (3) adjudicating misconduct investigations, (4) appealing misconduct adjudications, and (5) implementing discipline.  Responsibility for these phases is divided among three entities at FBI headquarters:  (1) the Inspection Division, (2) the Office of Professional Responsibility (FBI OPR), and (3) the Human Resources Branch.  We describe the reporting, investigation, appellate, and implementation phases in greater detail below.  We describe the adjudication phase in greater detail in the Introduction to this report.

There are three circumstances beyond the disciplinary process in which the FBI requires access to information about the adjudication of misconduct investigations to satisfy its obligations, which we also describe in this appendix:  (1) issuance of retired law enforcement officer identification cards, (2) the FBI's National Name Check Program (NNCP), and (3) the FBI's responsibility to respond to requests by prosecutors for information that could be used to undermine the credibility of a government witness in a criminal prosecution.

## The FBI's Disciplinary Process

### Reporting and Investigation

The Inspection Division's Internal Affairs Section handles the intake and processing of both administrative (noncriminal) and criminal misconduct allegations through the Initial Processing Unit and the investigation of allegations through the Internal Investigations Unit (IIU).  FBI employees are required to report misconduct that they witness, which they are aware of and have reason to believe has not already been reported, or that they personally commit.  Allegations of misconduct must be reported in writing either to the FBI's Internal Affairs Section or to the OIG.[105]  Allegations may be reported anonymously.

Staff in the Initial Processing Unit enter information regarding all new allegations into an FBI tracking database called the Case Management System (CMS) and provide a copy of each allegation to the OIG for review.[106]  The OIG retains the right of first refusal for all misconduct allegations and reviews the allegations to determine whether to initiate an OIG investigation, refer the matter to the FBI for investigation with an instruction to report back to the OIG upon completion, or return the matter to the FBI for it to handle as it deems appropriate.[107]  Between FY 2013 and FY 2018, the OIG returned 84 percent of allegations to the FBI.

---

[105]  Employees also have the option to report allegations of misconduct to their supervisors; these reports do not necessarily have to be in writing.  If an employee reports an allegation to a supervisor, it is the supervisor's responsibility to report the allegation in writing to either the FBI's Internal Affairs Section or the OIG.

[106]  We describe the CMS in greater detail in the Introduction to this report.

[107]  The OIG investigates four types of allegations:  (1) allegations that, if substantiated, would likely result in criminal prosecution; (2) serious administrative allegations made against employees at the General Schedule 15 level and above; (3) allegations pertaining to whistleblower retaliation; and (4) allegations that, for various reasons, the OIG believes should not be investigated by the FBI.  If the OIG initiates an OIG investigation, it conducts that investigation independently of the FBI and provides a report on the completed investigation to the FBI's Internal Affairs Section.

PSTRZOK-DOJ-00010682

If an allegation is returned to the FBI, the Initial Processing Unit assesses the allegation to determine whether further action should be taken. The Initial Processing Unit opens a misconduct investigation if an allegation contains sufficient information to suggest that an FBI employee may have violated an FBI policy, procedure, or government regulation or engaged in criminal activity.[108] The Initial Processing Unit may also determine that an allegation does not require further action.

Once the Initial Processing Unit opens an investigation, responsibility for conducting the investigation transfers to the IIU. Investigations may be conducted directly by a Supervisory Special Agent assigned to the IIU or delegated to a supervisor in the subject's field division and overseen by a Supervisory Special Agent in the IIU. Staff are required to take an FBI Internal Investigations training course through the FBI's Virtual Academy before they are allowed to conduct a misconduct investigation. This training describes the role of the Internal Affairs Section, the procedures that should be followed by the investigator when interviewing subjects and witnesses, and the rules governing an attorney's representation of a subject or witness during those interviews.

The IIU notifies the subject by sending a notification and three forms to the subject's division head, or delegate, for presentation to the subject. The subject signs the notification, which describes the behavior being investigated and the offense code this behavior may have violated, and it is returned to the IIU. One of the three forms describes the subject's rights and responsibilities during the misconduct investigation, including the right to retain an attorney at his or her own expense and the responsibility to be fully cooperative with the investigation. This form also describes the procedural protections that will be offered to the subject if FBI OPR proposes an adverse action, as well as the processes that will apply if the subject chooses to appeal a final FBI OPR decision. We discuss these procedural protections in greater detail in the Introduction to this report and discuss the appellate processes in greater detail below. The remaining two forms consist of the rules a subject must follow if retaining an attorney and the non-disclosure agreement an attorney must sign if retained.

All investigations, whether they are conducted directly by the IIU or delegated to the field, must be reviewed and approved by the IIU Unit Chief. The IIU Unit Chief assesses whether an investigation contains enough information for FBI OPR to make a decision about the allegation(s) at issue and may request additional work, if necessary, before approving the investigation.[109] Once the IIU Unit Chief approves the investigation, the IIU forwards the case to FBI OPR for adjudication and sends the subject a notification that the investigation was forwarded. The OIG forwards its completed misconduct investigations to the IIU, which then forwards them to FBI OPR for adjudication.

## Adjudication

FBI OPR adjudicates misconduct investigations that have been conducted by the FBI's IIU or by the OIG, by determining whether allegations are substantiated and, if so, proposing and deciding discipline. This process is described in greater detail in the Introduction to this report.

---

[108] Because criminal allegations are typically investigated by the OIG, nearly all misconduct investigations conducted by the FBI are administrative rather than criminal investigations. In this report, we discuss only administrative investigations.

[109] The IIU Unit Chief forwards an incomplete investigation to FBI OPR only if the subject of the misconduct investigation retired or resigned before the investigation was completed.

PSTRZOK-DOJ-00010683

## Appeals

The subject may appeal most disciplinary decisions, with the exception of an oral reprimand, letter of censure, or summary dismissal, to the Office of Disciplinary Appeals (ODA) in the Human Resources Branch.[110] A subject who is suspended, demoted, or dismissed has 10 days to decide whether to file an appeal. The ODA, which consists of a Unit Chief and seven attorneys (two of whom are also Special Agents), along with one support employee, manages the administrative aspect of the appeals process. The ODA Unit Chief reports to the Executive Assistant Director of the Human Resources Branch (EAD HRB).[111]

The deciding official for non-adverse actions (suspensions of 1–14 days) is the EAD HRB. The deciding official for adverse actions is the Disciplinary Review Board (Board). The Board is composed of the EAD HRB as permanent chair and four voting members who serve a 1-year term.[112] FBI policy requires that the four voting members be equally divided between Senior Executive Service (SES) and non-SES managers, be equally divided between Special Agents and professional staff, and include at least one representative from a field division. In this report, we use the term "appellate deciding officials" when referring to aspects of the appellate process that apply to both the EAD HRB and the Board.

FBI policy requires that appeals be analyzed and decided using the substantial evidence standard.[113] Federal regulation defines substantial evidence as "the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. This is a lower standard of proof than preponderance of the evidence."[114]

FBI policy and the training provided to new members of the Board instruct that, because reasonable persons can disagree, deference should be given to FBI OPR's substantiation decisions and penalty determinations unless those decisions are not reasonable. FBI policy further states that an evaluation of whether a penalty determination is reasonable should consider whether the penalty comports with the penalty ranges set forth in the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (Offense Codes and Penalty Guidelines); whether the penalty is consistent with precedent, applicable statutory provisions, or both; and whether the Douglas Factors, including mitigating and aggravating factors, were considered prior to the imposition of the penalty.

---

[110] Probationary employees do not have appeal rights. Preference-eligible veterans retain the right to appeal adverse actions to the U.S. Merit Systems Protection Board (MSPB) in addition to the right to appeal within the FBI. We do not evaluate FBI employees' appeals to the MSPB in this report.

[111] Prior to October 2016, the ODA was known as the Appellate Unit. It was renamed when the FBI decided to elevate appellate decision-making responsibility one level in the FBI's organization, from the Assistant Director of the Human Resources Division to the EAD HRB. As part of that decision, the ODA was moved out of the Human Resources Division to report directly to the EAD HRB. The appellate process itself was not changed.

[112] The EAD HRB votes only in the event of a tie. Board proceedings are also observed by several individuals who do not vote, including a midlevel manager, a representative from the FBI's Office of Equal Employment Opportunity Affairs, and an attorney from the FBI's Office of General Counsel.

[113] FBI Policy Directive 0915D, Disciplinary Appeals Process, October 23, 2016.

[114] 5 C.F.R. § 1201.4(p). We described "preponderance of the evidence" in the Introduction to this report.

PSTRZOK-DOJ-00010684

A subject who files an appeal may elect to review the redacted case file, submit a written appeal, and be represented by counsel. The subject does not have the right to attend a meeting of the Board or otherwise make an oral presentation to the appropriate appellate deciding official.

Before an appeal is provided to the appropriate appellate deciding official for a decision, an ODA attorney prepares a legal analysis of the subject's written appeal and the case file. The ODA analysis uses the substantial evidence standard to identify relevant issues for consideration by the appellate deciding official and includes a recommendation based on that analysis. For adverse action appeals, the ODA schedules meetings of the Board, facilitates discussion at the meetings, and audio records the meetings.[115] For the audio recording, Board members are required to specifically state why substantial evidence does or does not support FBI OPR's substantiation decisions and penalty determinations.

The appellate deciding officials review the case file, the subject's written appeal, and the ODA's analysis and are authorized to take one of the following four actions in each appeal:

1. *Affirm:* Affirm both FBI OPR's substantiation decision and penalty determination.

2. *Modify:* Affirm FBI OPR's substantiation decision and modify the penalty determination in accordance with the Offense Codes and Penalty Guidelines, precedent, and the Douglas Factors.[116]

3. *Vacate:* Void both FBI OPR's substantiation decision and penalty determination consistent with the substantial evidence standard.

4. *Remand:* Send the case back to the Inspection Division, the OIG, or FBI OPR if the case requires further investigation or adjudication.

Once the appropriate appellate deciding official has made a decision, the ODA attorney prepares a final appellate decision letter notifying the subject of the appellate decision and the reasoning supporting it. Between FY 2013 and FY 2018, 393 appeals were decided.[117] Of these, 72 percent were affirmed.

## Implementation

Because oral reprimands and letters of censure are not appealable, they are implemented when FBI OPR provides the subject with a final decision letter. If the subject decides not to appeal an action that is appealable, for example, a suspension, the suspension is imposed once the 10-day window to file an appeal has expired. If the subject appeals, all sanctions except dismissal are stayed pending completion of the appeal. All suspensions begin on a Monday.

---

[115] The Board meets once a month and decides on one to two appeals per meeting.

[116] We describe the Douglas Factors in the Introduction to this report.

[117] Additionally, the ODA administratively closed 68 appeals before a final appellate decision was made. The ODA administratively closes appeals for a number of reasons, including the subject retiring or resigning while an appeal is pending or the subject withdrawing his or her appeal.

PSTRZOK-DOJ-00010685

The Special Assistant to the FBI OPR Assistant Director checks the FBI's official human resources database and timesheet records to confirm that the duration of each suspension served is correct.[118]  FBI OPR documents its check of these systems in the case file and in the CMS.

## Circumstances, Other than the Disciplinary Process, in Which the FBI Needs Access to Disciplinary History

We identified three sets of circumstances outside the disciplinary process in which the FBI needs access to information about the adjudication of misconduct investigations in order to satisfy its obligations.  These circumstances are the issuance of retired law enforcement officer identification cards, the NNCP, and the FBI's responsibility to respond to requests by prosecutors for information that could be used to undermine the credibility of a government witness in a criminal prosecution (*Giglio* requests).

### Retired Law Enforcement Officer Identification Cards

The Law Enforcement Officers Safety Act of 2004 (LEOSA) exempts a qualified retired law enforcement officer from most state and local laws prohibiting the carrying of concealed weapons.[119]  The term "qualified retired law enforcement officer" is defined by the statute as an individual meeting seven criteria, including that the individual retired from his or her agency in good standing and with at least 10 years of law enforcement experience.[120]  The individual must also carry a photographic identification card (LEOSA card) issued by the agency from which he or she retired.[121]

To obtain a LEOSA card, a retired FBI Special Agent or FBI Police Officer submits a request to the Security and Credentials Office in the FBI's Human Resources Division.  Upon receiving the request, the Security and Credentials Office initiates a records check with four FBI divisions to determine whether any derogatory information on the retired individual exists, which would indicate that the individual did not retire in good standing.  For the purpose of responding to LEOSA card requests, FBI OPR considers derogatory information to mean that an individual retired while under investigation for misconduct that likely would have resulted in dismissal if not for the retirement.  The four divisions whose records are checked are:

1.  FBI OPR,

2.  the Criminal Justice Information Services Division,

3.  the Human Resources Division Health Care Unit, and

---

[118]  Our 2009 report on the FBI's disciplinary system found that at that time that the FBI did not ensure that FBI employees served their suspensions.  We reviewed human resources and timesheet records for a sample of employees who had been suspended and found that 18 percent of the employees we sampled had an error in the duration of the suspension they had served.  FBI OPR implemented the process described here in response to a recommendation in our 2009 report.  For more information on how the FBI responded to all of the recommendations from that report, see Appendix 2.

[119]  18 U.S.C. § 926C.

[120]  18 U.S.C. § 926C(c).  The Office of Personnel Management considers retirement to be a voluntary action, initiated by an employee, which does not include being dismissed due to misconduct.

[121]  18 U.S.C. § 926C(a).

PSTRZOK-DOJ-00010686

4.   the Security Division.[122]

All four divisions must provide a response to the Security and Credentials Office before the office can determine whether the retired officer left the FBI in good standing. In cases in which the records check identifies an ongoing investigation, the response will remain in pending status until the underlying investigation is closed. During the time that an investigation is ongoing, no information is disclosed to the Security and Credentials Office about the substance of that investigation and no action is taken on the individual's application for a LEOSA card.

If all four records checks come back with a report that no derogatory information exists, the Security and Credentials Office concludes that the retired individual separated in good standing and issues the LEOSA card. If one or more of the divisions reports derogatory information to the Security and Credentials Office, then the Security and Credentials Office concludes that the retired individual did not separate under good standing and issues an initial denial letter.[123]

In all cases in which the subject of a misconduct investigation separates under inquiry, FBI OPR reviews the misconduct file and determines whether the case likely would have resulted in dismissal. If so, FBI OPR drafts a memorandum for the misconduct file documenting this conclusion so that the memorandum will be available if that individual later applies for a LEOSA card. When such a memorandum exists in a misconduct file, FBI OPR informs the Security and Credentials Office that the retired individual does not qualify for a LEOSA card and provides the Security and Credentials Office with a copy of the memorandum to support that conclusion. FBI OPR does not provide the Security and Credentials Office with information about any other disciplinary history, such as a case that resulted in a suspension rather than dismissal or a case in which the individual retired under inquiry but FBI OPR determined that the individual would not have been dismissed as a result of that inquiry.

## National Name Check Program

Executive Order 13467 on Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information authorizes the NNCP.[124] A name check performed under this program is a search of the FBI's files for background information before a federal executive agency bestows a privilege, including government employment; a security clearance; or attendance at a White House function. The NNCP is exclusively for federal executive agencies and does not perform name checks on behalf of federal legislative or judicial agencies, state or local government agencies, or private employers. Federal executive agencies that have signed a memorandum of understanding with the FBI may submit names for name checks, including when those agencies are adjudicating an individual's suitability for federal employment.

---

[122] The Criminal Justice Information Services Division reports whether the retired individual has a criminal history. The Human Resources Division Health Care Unit reports whether the retired individual has a health condition that precludes carrying a weapon. The Security Division reports whether the retired individual's security clearance was in good standing.

[123] The Security and Credentials Office has also established a process by which a retired individual may appeal an initial denial of a LEOSA card to the Assistant Director of the Human Resources Division for a final decision.

[124] E.O. 13467.

PSTRZOK-DOJ-00010687

Upon receiving a name check request, an analyst in the FBI's National Name Check Program Unit searches Sentinel for all potential instances of the name in the FBI's records. The analyst then reviews all of the information returned to determine whether hits match for the individual whose name is being checked and whether the information is reportable. Information is considered reportable if it relates to the character, reliability, or trustworthiness of the individual whose name is being checked.

If the Sentinel search identifies a potentially relevant misconduct investigation file, the NNCP analyst receives an alert but cannot see any of the details that are contained within that misconduct file. The NNCP analyst then provides the name check to FBI OPR and asks FBI OPR to review the identified file. FBI OPR responds with a confirmation as to whether the subject of the misconduct file is the same person as the individual whose name is being checked and, if so, provides a summary of any substantiated allegations. If the individual whose name is being checked separated from the FBI while under inquiry, FBI OPR provides a summary of the allegations that were under investigation and a statement that the individual separated during this inquiry. If FBI OPR provides a substantive response to a name check, the NNCP analyst returns that information verbatim to the requesting agency.

### The FBI's Response to Giglio Requests

The U.S. Supreme Court decision in *Giglio v. United States,* 405 U.S. 150 (1972), is one of a series of cases governing the prosecution's duty under the U.S. Constitution to disclose to the defense in criminal cases information that could be used to undermine the credibility of a government witness in a criminal prosecution (component witness). The Department's *Giglio* policy, most recently updated in 2014, governs the obligations of investigative agencies, including the FBI, to disclose information that could be used to undermine the credibility of a government witness (known as potential impeachment information) to the U.S. Attorney's Offices and DOJ litigating sections with authority to prosecute criminal cases. Those federal prosecutors then assess the potential impeachment information in light of the role of the component witness, the facts of the case, and known or anticipated defenses.[125] Most FBI employees who undergo *Giglio* checks are Special Agents, but *Giglio* checks may also be performed on FBI Laboratory employees, language specialists, or intelligence personnel.

The *Giglio* policy defines potential impeachment information as information about a component witness that includes, but is not limited to:

- any finding of misconduct that reflects upon the truthfulness or possible bias of the employee, including a finding of lack of candor;

- any past or pending criminal charge brought against the employee;

- any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation;

- prior findings by a judge that a component witness has testified untruthfully, knowingly made a false statement in writing, engaged in an unlawful search or seizure, illegally obtained a confession, or engaged in other misconduct;

---

[125] Justice Manual (JM), 9-5.100.

PSTRZOK-DOJ-00010688

- any misconduct finding or pending misconduct allegation that either casts a substantial doubt upon the accuracy of any evidence—including witness testimony—that the prosecutor intends to rely on to prove an element of any crime charged or that might have a significant bearing on the admissibility of prosecution evidence;

- information that may be used to suggest that the component witness is biased for or against a defendant; and

- information that reflects that the component witness's ability to perceive and recall truth is impaired.[126]

The *Giglio* policy further states that most allegations that were not substantiated, were not credible, or resulted in exoneration are not considered to be potential impeachment information and, therefore, do not have to be disclosed.[127]

Federal prosecutors and component witnesses are required to have a candid conversation in which the component witness discloses all potential impeachment information to the prosecutor. Because there are times when a component witness may not know that he or she is the subject of a pending investigation, the *Giglio* policy also encourages the prosecutor to submit a request for impeachment information to the component employing the witness, the OIG, and the DOJ Office of Professional Responsibility.[128]

A DOJ prosecuting office initiates such a request to the FBI through the FBI field division employing the witnesses whom the prosecutor plans to call. The field division's point of contact, typically the Chief Division Counsel, forwards the witness names to the FBI Office of General Counsel's Investigative Law Unit for processing. Staff in the Investigative Law Unit review each FBI witness's personnel file along with any misconduct investigation files that exist.

If this file review identifies any information in an FBI witness's disciplinary history that meets the *Giglio* policy criteria for potentially impeachable information, the Investigative Law Unit provides the relevant FBI OPR finding to the Chief Division Counsel for disclosure to the requesting prosecutor. The Department's *Giglio* policy does not require disclosure of disciplinary history that does not implicate an FBI witness's veracity or potential bias. As a result, the Investigative Law Unit does not disclose misconduct findings that are purely administrative or related to performance. In cases in which it is unclear whether a misconduct finding meets the criteria of the *Giglio* policy, an Associate General Counsel in the Investigative Law Unit said, the FBI will err on the side of disclosure. The Associate General Counsel and a Management and Program Analyst further said that, if an FBI witness separates from the FBI while under inquiry, the Investigative Law Unit considers the inquiry effectively to be pending for *Giglio* purposes. In such cases, the Investigative Law Unit determines which of the allegations under investigation meet the *Giglio* policy's

---

[126] JM, 9-5.100, 5c.

[127] The *Giglio* policy defines a few exceptions in which unsubstantiated allegations should be disclosed, including allegations that were originally made by a federal prosecutor or judge and allegations that received publicity. JM, 9-5.100, 6.

[128] The DOJ Office of Professional Responsibility investigates allegations that DOJ attorneys, prosecutors, and immigration judges committed misconduct while performing their duties to investigate, litigate, or give legal advice. The office also investigates certain misconduct allegations involving federal law enforcement agents when they relate to a DOJ attorney's alleged professional misconduct, as well as claims of reprisal against FBI whistleblowers.

PSTRZOK-DOJ-00010689

definition of impeachment information and then discloses a summary of those allegations along with the date of the subject's separation from the FBI.

The Investigative Law Unit maintains a record of all *Giglio* requests received, and the information provided in response, to ensure that the unit provides consistent information for subsequent checks of the same FBI witness.  Additionally, once a DOJ prosecuting office submits a *Giglio* request to the FBI, the FBI has a continuing duty to disclose to that prosecuting office any potentially impeachable information on the FBI witnesses that arise after the request is made and as long as the underlying criminal case in which the FBI witnesses will testify remains pending.[129]

---

[129]  JM, 9-5.100, 9.

PSTRZOK-DOJ-00010690

# Appendix 4:  Data Comparison

Our 2009 report included several analyses of data from the FBI's Case Management System (CMS), which we performed to determine whether misconduct adjudications were timely and whether the disciplinary actions imposed were consistent regardless of employees' grade level, job series, or gender.  As noted in Appendix 2, our 2009 report found evidence to support FBI employees' perception that the FBI applied differing standards of discipline to its senior managers, in that senior managers were treated more leniently than other employees.[130]  In this report, we repeated those analyses using more recent CMS data and compared our new results to the results we reported in 2009 to see whether there had been any changes in outcomes over time.

We found that, overall, the FBI's adjudication of misconduct investigations generally resulted in consistent penalty outcomes across demographic groups and that there were reasonable explanations for some of the differences we observed.  For example, we found that differences in disciplinary outcomes between Special Agents and professional staff may be due in part to differences in the types of allegations made against those groups.  In this appendix, we share the data results supporting these conclusions.

## Overview

The 2009 report covered 3 years of data, from FY 2005 through FY 2007, during which FBI OPR adjudicated 1,657 misconduct cases.[131]  Our current scope covers 6 years, from FY 2013 through FY 2018, over which FBI OPR adjudicated 1,992 cases.  The average number of misconduct cases closed per year decreased significantly, from 552 cases per year in the 2009 report to 332 cases per year in the current review (see Table 4 below).  The subjects in these cases represent a very small proportion of FBI employees overall, and that proportion was even smaller in the current scope than it was in the 2009 scope.  During the scope of the 2009 report, about 1.8 percent of FBI employees were the subject of a misconduct investigation each year.  On average, less than 1 percent of FBI employees were the subject of a misconduct investigation each year during the scope of the current review.

---

[130]  In response to our 2009 report, the FBI took steps to ensure that discipline is administered equitably across grade levels and job types.  We describe those actions in Appendix 2.

[131]  Our 2009 report used the term "case" to refer to a single investigation that might have involved individual or multiple subjects.  The current review uses the term to refer to a unique set of allegations against a single individual.  Therefore, we use the number of employees investigated from the 2009 report as the comparator to our current analysis.

PSTRZOK-DOJ-00010691

**Table 4**

**Overview Statistics**

|  | 2009 Report FY 2005–FY 2007 | Current Review FY 2013–FY 2018 |
|---|---|---|
| Total Cases Closed | 1,657 | 1,992 |
| Average Cases Closed per Year | 552 | 332 |
| Average Total of FBI Employees | 30,341 | 35,876 |
| Average Number of Misconduct Cases per 1,000 FBI Employees | 18 | 9 |

Sources:  OIG analysis of FBI population data and FBI OPR's CMS data

## Disciplinary Outcomes of Employees in All Closed Misconduct Investigations

Our 2009 report analyzed how often FBI OPR substantiated allegations in misconduct cases and whether the substantiated allegations resulted in a non-adverse or an adverse action for the subject of the investigation.[132]  Cases were closed administratively if the subject retired or resigned before a final decision was made or if FBI OPR did not have sufficient information to make a substantiation decision.[133]  Figure 5 below shows the percentage of disciplinary outcomes in each category for both the 2009 report and the current review.

---

[132] Unsubstantiated allegations result in no disciplinary action.  An adverse action refers to discipline ranging from a 15-day suspension to dismissal.  A non-adverse action refers to disciplinary suspensions ranging from 1 to 14 days, as well as oral reprimands and letters of censure.

[133] Other examples of administrative closure include cases in which the investigation did not identify any subjects and cases in which the subject was dismissed from the FBI for other reasons prior to an adjudication decision.

PSTRZOK-DOJ-00010692

Figure 5



Disciplinary Outcomes in All Closed Misconduct Cases,
2009 Report and Current Review

|  | Closed Administratively | No Disciplinary Action | Non-Adverse Action | Adverse Action |
|---|---|---|---|---|
| FY 2005–2007 | 17% | 22% | 48% | 13% |
| FY 2013–2018 | 18% | 16% | 41% | 25% |

Sources: DOJ OIG, *Review of the Federal Bureau of Investigation's Disciplinary System*, E&I Report I-2009-002 (May 2009), www.oig.justice.gov/reports/FBI/e0902/final.pdf, and OIG analysis of FBI OPR's CMS data

The 2009 report found that in 61 percent of cases at least one allegation was substantiated, resulting in either a non-adverse or an adverse action, compared to 66 percent of cases in the current review. While the overall substantiation rates were similar, the proportion of cases resulting in an adverse action was 12 percentage points higher during the scope of our current review that it was during the scope of the 2009 report. When we asked FBI OPR staff about this increase, they suggested that the increased proportion of adverse actions could be due to higher standard penalties for some offense codes in the Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (Offense Codes and Penalty Guidelines). The 2012 update to the Offense Codes and Penalty Guidelines raised the standard penalties for nine offense codes, six of which went from non-adverse actions to adverse actions.[134] The 2017 update to the Offense Codes and Penalty Guidelines raised an additional three standard penalties from non-adverse to adverse actions.

## Disciplinary Outcomes by Demographic Groups

Our 2009 report also examined FBI OPR's disciplinary outcomes to determine whether there were different rates of substantiation between various demographic groups, including:

---

[134] At the time of the 2009 report, FBI OPR adjudicated all cases under the 2004 version of the Offense Codes and Penalty Guidelines.

PSTRZOK-DOJ-00010693

- the employee's Senior Executive Service (SES) or non-SES status,

- the employee's supervisory status,[135]

- the employee's job type (Special Agent versus professional staff position), and

- the employee's gender.

Our 2009 report found large differences in substantiation rates between SES and non-SES employees, moderate differences between supervisory and non-supervisory employees, and little variation in substantiation rates between employees of different job types and between employees of different genders.

For this report, we analyzed disciplinary outcomes between FY 2013 and FY 2018. Where we found differences in the distribution of outcomes, we considered possible explanations for those differences, including explanations offered by FBI OPR employees after we shared our findings with them. We then reexamined the differences in disciplinary outcomes with those explanations in mind and concluded that the differences we observed appeared reasonable. In the sections below, we share the results of our analysis by demographic groups and the possible explanations we and FBI OPR staff identified.

## SES and Non-SES Employees

As illustrated in Figure 6 below, FBI OPR disciplinary outcomes differed significantly based on an employee's SES or non-SES status in both the 2009 report and the current review. We believe that there are reasonable explanations that could account for some of the differences in the distribution of outcomes overall, but we could not account for all of the differences. One possible contributor to the differences between the SES and non-SES outcomes is simply population size. In the 2009 report, there were only 37 cases involving SES employees compared to 1,238 involving non-SES employees.[136] During the current review scope, there were 68 cases involving SES employees compared to 1,874 cases involving non-SES employees. The relatively small population of SES cases means that the individual case outcomes have a disproportional effect on the overall proportions of case outcomes.

We also observed that the proportion of cases resulting in non-adverse actions was over 30 percentage points higher for non-SES employees during the scope of both the 2009 report and the current review. This is likely due, in part, to federal regulations that state that SES employees cannot be suspended for fewer

---

[135] For the purpose of this comparison, we defined supervisors as employees at the General Schedule (GS)-14 level and above as well as SES employees, regardless of whether the role specifically involved supervision of staff. We defined non-supervisors as employees at the GS-13 level and below. For employees under other pay systems, we used their GS pay level equivalent.

[136] We excluded 382 cases from our analysis of SES outcomes in the 2009 report because there was either no final penalty or the employee's SES status was unknown.

PSTRZOK-DOJ-00010694

than 15 days.  This means that non-adverse actions for SES employees consist of oral reprimands and letters of censure only and do not include suspension of 1–14 days.[137]

Figure 6



Disciplinary Outcomes by SES Status, 2009 Report and Current Review

Sources:  DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of FBI OPR's CMS data

We found that the most common outcome for SES cases between FY 2013 and FY 2018 was administrative closure, which is a change from previous years.  In the 2009 report, a plurality of cases involving SES employees were unsubstantiated, resulting in no disciplinary action.  During the current review, a plurality of cases involving SES employees ended in administrative closure.  For SES employees, the most common reason for administrative closure was retirement (11 of 31 administratively closed cases).  We found that cases involving SES employees were about three times as likely to result in retirement under inquiry as cases involving non-SES employees.  We believe that this is because SES employees were almost three times as likely as non-SES employees to be of possible retirement age.  As we described in the Results of the Review, the FBI administratively closes investigations if a subject retires (separates) under inquiry instead of documenting a decision as to whether or not the investigated conduct was substantiated.  As a result, we are concerned that FBI employees who choose to separate under inquiry cannot be held fully accountable for their behavior.

The second most common reason for administrative closure for SES cases between FY 2013 and FY 2018 was an OIG investigation for whistleblower retaliation that found insufficient evidence to support the

---

[137] The Offense Codes and Penalty Guidelines state:  "When [FBI] OPR concludes that a non-SES employee would have received a punishment of more than a three-day suspension but less than a 15-day suspension, an SES employee will receive a minimum of a 15-day suspension.  If a non-SES employee would have received a one-day to three-day suspension in a given case, an SES employee may receive either a letter of censure or a minimum of a 15-day suspension."

PSTRZOK-DOJ-00010695

reprisal claim (7 of 31 administratively closed cases). In these instances, the OIG does not provide the FBI with a full investigative file due to whistleblower confidentiality limitations and protections. In the absence of a complete investigative file, FBI OPR closes the case administratively rather than making a substantiation decision.

We do not know whether the explanations above fully account for all of the substantial differences in outcomes that we observed between SES and non-SES cases. For example, we were not able to identify any explanations for the difference in the percentage of SES and non-SES cases that end with a finding of "no disciplinary action."

## Supervisory and Non-Supervisory Employees

The 2009 report examined whether there were differences in substantiation rates based on an employee's supervisory status. The 2009 report used General Schedule (GS) level as a proxy for supervisory status and used the general assumption that employees at the GS-14 level and above are supervisory while employees at the GS-13 level and below are non-supervisory. We used the same assumptions here. In comparing supervisors to non-supervisors, the 2009 report found that FBI OPR substantiated 51 percent of cases involving employees at the GS-14 level and above compared to 67 percent of cases involving employees at the GS-13 level and below. The difference in substantiation rate was similar during the current review, with 58 percent of cases substantiated for higher grade-level employees compared to 71 percent of cases substantiated for lower grade-level employees.

Figure 7 below shows the distribution of disciplinary outcomes by grade level. FBI OPR managers noted that higher grade-level employees are more likely to be investigated for retaliation, since they are more likely to be supervisors, and that retaliation allegations are frequently unsubstantiated. Higher grade-level employees are also more likely to be eligible for retirement, which could explain the slightly higher proportion of cases closed administratively.

PSTRZOK-DOJ-00010696

Figure 7

### Disciplinary Outcomes by Grade Level, 2009 Report and Current Review



Sources:  DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of FBI OPR's CMS data

The 2009 report identified that employees at the GS-14 level and above were more likely to be subject of an investigation than employees at the GS-13 level and below.  During scope of the current review, we continue to see that higher grade-level employees were investigated at a slightly higher rate than were lower grade-level employees.  As shown in Figure 8 below, higher grade-level employees represented 20 percent of all FBI employees but 27 percent of misconduct cases.  Stated another way, there were about 12 misconduct cases for every 1,000 employees at the GS-14 level and above.  For employees at the GS-13 level and below, there were about 8 misconduct cases for every 1,000 employees.

PSTRZOK-DOJ-00010697

Figure 8

Proportion of Misconduct Cases, Compared to Proportion of All FBI Employees by Grade Level, Current Review Only



Source: OIG analysis of FBI population data and FBI OPR's CMS data

## Special Agents and Professional Staff Employees

In both our 2009 report and during this review, we found that Special Agents were more likely to be subject of a misconduct investigation than professional staff employees. Figure 9 below shows that Special Agents represent 38 percent of the total FBI population but about 55 percent of misconduct cases during our scope. Stated another way, there were about 12 misconduct cases per 1,000 Special Agents compared to 6 misconduct cases per 1,000 professional staff employees. FBI OPR adjudicators we interviewed thought that Special Agents might be more likely to be the subject of a misconduct investigation because their jobs involve more frequent travel and interaction with the public and because there are several offense codes, such as Loss of Weapon, specific to Special Agents.

PSTRZOK-DOJ-00010698

Figure 9



Proportion of Misconduct Cases Compared to Proportion of
All FBI Employees by Job Type, Current Review Only

Source:  OIG analysis of FBI population data and FBI OPR's CMS data

We also see differences in the disciplinary outcomes between Special Agents and professional staff employees, as shown in Figure 10 below.  While there was little variation in overall substantiation rates, we found that Special Agents were more likely to receive non-adverse actions, and less likely to receive adverse actions, than professional staff.  Further, we found that both of these gaps were larger during the current scope than they were in the 2009 report.

PSTRZOK-DOJ-00010699

## Figure 10

### Disciplinary Outcomes by Job Category, 2009 Report and Current Review



Sources: DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of FBI OPR's CMS data

We asked FBI OPR adjudicators what might be contributing to the differences in outcome. Adjudicators told us that offenses unique to Special Agents, such as Investigative Deficiencies or Loss of Weapon, typically result in non-adverse actions in line with the Offense Codes and Penalty Guidelines. Thus, a larger proportion of substantiated allegations against Special Agents could necessarily result in non-adverse penalties. Adjudicators also told us that a higher proportion of professional staff employees had been investigated for allegations, including illegal or criminal conduct, that would warrant higher penalties.

When we excluded 19 offense codes that were disproportionately committed by either Special Agents or professional staff, we noted that this appeared to reduce the gap in non-adverse action cases between the two groups.[138] We found that professional staff did have a higher proportion of cases involving allegations in the "illegal or criminal conduct" category of offense codes than Special Agents. When we excluded these 10 offense codes, we noted that this appeared to reduce the difference in adverse action cases.

Figure 11 below shows the differences in disciplinary outcomes between Special Agents and professional staff once we removed these 29 offense codes. In sum, removing these categories of offenses results in roughly comparable substantiation rates between Special Agents and professional staff employees, as well as similar disciplinary outcomes. Because this is a new analysis, we do not have comparable results from the 2009 review.

---

[138] For example, 98 percent of Loss of Weapon allegations involved Special Agents and 100 percent of Impersonating an Agent allegations involved professional staff employees.

PSTRZOK-DOJ-00010700

Figure 11

**Disciplinary Outcomes by Job Category, Excluding Cases Involving Offense Codes Unique to One Job Category and Cases Involving Offense Codes for Illegal and Criminal Conduct, Current Review Only**



Source: OIG analysis of FBI OPR's CMS data

## Female and Male Employees

Male employees represent about 57 percent of the total FBI population but 72 percent of misconduct investigations in our scope. There were about 12 misconduct cases per 1,000 male employees compared to 6 misconduct cases per 1,000 female employees. Although there were twice as many cases involving male employees as female employees, the disciplinary outcomes for both groups were similar, both in 2009 and during the current review, as shown in Figure 12 below.

PSTRZOK-DOJ-00010701

Figure 12

Disciplinary Outcomes by Gender, 2009 Report and Current Review



Sources:  DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of FBI OPR's CMS data

## Timeliness of Adjudications

In the 2009 report, we evaluated FBI OPR's adjudication timeliness, finding that the median adjudication time had gone from 94 days in FY 2005 to 44 days in FY 2007.  During the current review, we found that the overall median adjudication time from FY 2013 through FY 2018 was 50 days.  While the median adjudication time fluctuated over the 6 years, the time appears to be related to the number of cases that FBI OPR handled that year, as shown in Figure 13 below.  Years in which FBI OPR handled more cases had longer median adjudication times.

PSTRZOK-DOJ-00010702

## Figure 13

### Cases Closed and Median Adjudication Length, Current Review Only



| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|
| Cases Closed by FBI OPR | 374 | 368 | 360 | 273 | 263 | 354 |
| Median Adjudication Length (Days) | 60 | 57 | 54 | 36 | 40 | 56 |

Source: OIG analysis of FBI OPR's CMS data

# Appeals

## Appellate Outcomes

Our 2009 report examined the mitigation rates of appeals of Special Agent and professional staff and found that disciplinary decisions for Special Agents were more likely to be mitigated than disciplinary decisions for professional staff. In particular, appeals of adverse actions were more likely to result in mitigation for Special Agents than for professional staff employees. Between FY 2013 and FY 2018, the difference in mitigation rates between the two groups of employees was less pronounced, as Figure 14 below shows. We believe that this was a positive result of the FBI's implementation of recommendations related to the appeal of misconduct adjudications from the 2009 report. Specifically, the FBI made several changes to its Disciplinary Review Board (Board) processes for making appellate decisions in adverse action cases, including diversifying the composition of the Board, improving training for Board members, and requiring clear documentation of the rationale for Board decisions. See Appendix 2 for additional information about how the FBI implemented recommendations from the 2009 report.

PSTRZOK-DOJ-00010703

**Figure 14**

**Mitigation Rates for Special Agents and Professional Staff on Appeal, 2009 Report and Current Review**



Sources:  DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of FBI OPR's CMS data

Our 2009 report also reported on differences in mitigation rates for SES and non-SES employees, finding that SES employees had their cases mitigated on appeal at a higher rate than non-SES employees.  We did not replicate this analysis in the current review because only two SES employees appealed disciplinary actions between FY 2013 and FY 2018.  Neither of the two SES appeals were mitigated.

## Timeliness of Appeals

In the 2009 report, we reported on improved timeliness of the appellate process from appeal request to final decision.  Between FY 2013 and FY 2018, there was a dramatic decline in appellate timeliness, as well as a change from the typical pattern of adverse cases taking longer to process than non-adverse cases.  See Figure 15 below.

PSTRZOK-DOJ-00010704

## Figure 15

### Median Number of Days to Decide Appealed Cases, 2009 Report and Current Review



Note: Our 2009 report also reported data for the first 3 quarters of FY 2008, which continued the trend of improving timeliness. We excluded that data here because it does not cover a full fiscal year.

Sources: DOJ OIG, *The FBI's Disciplinary System* (May 2009) and OIG analysis of data from the Office of Disciplinary Appeals

When we asked the ODA Unit Chief about the circumstances surrounding the spike in the time cases spent under appeal, she identified multiple contributing causes. Primarily, she identified a backlog of appealed cases related to cheating on an FBI-mandated exam on its new Domestic Investigations and Operations Guide (DIOG) in 2009 and 2010.[139] According to the ODA Unit Chief, appeals in 36 of these cases were pending for over 2 years while FBI officials debated an appropriate resolution. These cases were resolved in July 2014 pursuant to an FBI executive action in which all DIOG appeals were resolved with a letter of censure.

The ODA Unit Chief also identified changes in staffing levels that contributed to differences in timeliness. In 2013 and 2014, the ODA employed three attorneys and two paralegals to review appeals and manage the administrative work associated with processing the cases. In 2015, the ODA employed seven attorneys to review appeals and an administrative assistant to handle the administrative tasks for which the attorneys had been previously responsible. The ODA Unit Chief said that the ODA also brought in detailees from the

---

[139] FBI employees were required to take training on the DIOG and pass a computerized exam; they were not permitted to consult with other employees while taking the exam. A 2010 OIG investigation found that, despite these instructions, many FBI employees cheated on the exam. The OIG recommended that the FBI take appropriate disciplinary action. The OIG also found that the FBI's administration of and communication about the exam could have been better. See DOJ OIG, *Investigation of Allegations of Cheating on the FBI's Domestic Investigations and Operations Guide (DIOG) Exam* (September 2010), www.oversight.gov/sites/default/files/oig-reports/s100927.pdf.

PSTRZOK-DOJ-00010705

field around this time to help reduce the office's backlog of cases.  Since March 2016, the ODA has employed eight attorneys.

PSTRZOK-DOJ-00010706

# Appendix 5:  Prior OIG Work Related to FBI Misconduct

Since the release of the OIG's 2009 report examining the consistency, reasonableness, and timeliness of the FBI's disciplinary process as a whole, described in Appendix 2, the OIG has released four additional reports that examined the training the FBI provides to its staff on appropriate conduct, portions of the FBI's disciplinary process, or behavior that constituted misconduct.

In 2015, the OIG released a report examining the Department's policy and training addressing off-duty conduct abroad, specifically including the FBI and four other DOJ components that have permanent positions in foreign countries.[140]  The report found that, of the components studied in the review, the FBI had done the most to prepare employees who would be working abroad to make day-to-day decisions that reflect well on themselves and the FBI, including general training governing the standards for on- and off-duty conduct that reflects the FBI's core values and pre-deployment training regarding conduct while abroad.  However, the report also found that the FBI's policies governing excessive alcohol consumption, use of illegal drugs, solicitation of prostitutes, and engaging in notoriously disgraceful conduct were not comprehensive.  Three of the report's six recommendations applied to the FBI.

Also in 2015, the OIG released a report examining the handling of sexual misconduct and harassment allegations by the Department's four law enforcement components, including the FBI.[141]  We found that the FBI was the only component in this review that referred all misconduct allegations to security personnel for a determination as to whether the allegation raised security risks for the FBI or concerns about the employee's continued eligibility to hold a security clearance.  When allegations of sexual misconduct or harassment were adjudicated, we found that the FBI sometimes relied on general offense categories rather than offense categories specifically designed to address this form of misconduct.  As a result, the FBI risked imposing inconsistent penalties for similar conduct.  Additionally, the FBI may have had a more difficult time determining the overall number of sexual misconduct and harassment cases.  We also found that the FBI lacked clear policy on whether to report alleged sexual misconduct to FBI headquarters, that not all allegations of sexual misconduct that were reported were investigated, and that the FBI faced technical limitations in its ability to archive all text messages sent and received by FBI employees on FBI-issued cell phones.  Three of the report's eight recommendations applied to the FBI.

Although our March 2015 report found that the FBI referred all misconduct allegations with security implications to FBI security staff, our March 2018 report about the FBI's process for investigating and adjudicating unresolved polygraph results found that the reverse was not the case.  Specifically, our 2018 report found that some instances of alleged misconduct that were identified during polygraph examinations and investigations were not forwarded to the FBI's Internal Investigations Section for a determination as to

---

[140]  DOJ OIG, *Review of Policies and Training Governing Off-Duty Conduct by Department Employees Working in Foreign Countries*, E&I Report 15-02 (January 2015), www.oig.justice.gov/reports/2015/e152.pdf.

[141]  DOJ OIG, *The Handling of Sexual Harassment and Misconduct Allegations by the Department's Law Enforcement Components*, E&I Report 15-04 (March 2015), www.oig.justice.gov/reports/2015/e1504.pdf.

PSTRZOK-DOJ-00010707

whether a misconduct investigation was also warranted.[142]  We brought this issue to the FBI's attention via a Management Advisory Memorandum issued in September 2017.[143]

Our June 2018 report on various actions by the FBI and the Department in advance of the 2016 election identified text messages and instant messages sent on FBI mobile devices or computer systems by five FBI employees who were assigned to the investigation into former Secretary of State Hillary Clinton's use of a private email server.[144]  The text messages and instant messages sent by these employees included statements of hostility toward then presidential candidate Donald Trump and statements of support for then presidential candidate Clinton, and several appeared to mix political opinions with discussions about the investigation.  We believed that using FBI devices to send the messages—particularly the messages that intermixed work-related discussions with political commentary—potentially implicated provisions in the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process.  At a minimum, we found that the employees' use of FBI systems and devices to send the identified messages demonstrated extremely poor judgment and a gross lack of professionalism.  We therefore referred this information to the FBI for its handling and consideration of whether the messages sent by the five employees violated the FBI's Offense Code of Conduct.  Additionally, we found that numerous FBI employees, at all levels of the organization and with no official reason to be in contact with the media, were nevertheless in frequent contact with reporters.  Two of the report's nine recommendations related to the FBI's training about the proper use of FBI devices and contact with the media.

---

[142]  DOJ OIG, *Public Summary:  Review of the Federal Bureau of Investigation's Response to Unresolved Results in Polygraph Examinations,* E&I Report 18-02 (March 2018), www.oig.justice.gov/ reports/2018/e1802.pdf.

[143]  Michael E. Horowitz, Inspector General, DOJ, memorandum for Christopher A. Wray, Director, FBI, Referring Alleged Misconduct to the Federal Bureau of Investigation's Inspection Division and the Department of Justice's Office of the Inspector General, September 25, 2017, www.oig.justice.gov/reports/2017/09-26-17-memo.pdf.

[144]  DOJ OIG, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election,* Oversight and Review Report 18-04 (June 2018), www.oig.justice.gov/reports/2018/o1804.pdf.

PSTRZOK-DOJ-00010708

# Appendix 6: The FBI's Response to the Draft Report



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

September 20, 2021

The Honorable Michael E. Horowitz
Inspector General
Office of the Inspector General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Mr. Horowitz:

The Federal Bureau of Investigation (FBI) appreciates the opportunity to review and respond to the Office of the Inspector General (OIG) report titled, "Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations" (Report). The FBI accepts your recommendations and has already issued the policy clarifications the OIG proposed.

As noted in the Report, the FBI has broad discretion with respect to the disciplinary process and disciplinary actions it takes with onboard personnel. The FBI understands the significance of this responsibility, and its importance to our employees and our mission.

The FBI has developed a well-established and effective disciplinary process, and we remain committed to transparency and consistency within that process. The Report confirmed FBI policy and guidance addressed and adequately described most aspects of the Bureau's disciplinary process and identified three areas for which additional clarification was needed. As the Report explains, a policy regarding the FBI's Office of Professional Responsibility was in draft form prior to the OIG's review; the FBI subsequently finalized and issued the policy, which addresses each of the three recommended areas.

The FBI's response to the Report is enclosed and we will diligently work toward resolution of the remaining recommendations. The FBI will continue to update you and your office as we complete our responses to your recommendations, and we look forward to additional conversations with your team as we finalize these efforts.

80

PSTRZOK-DOJ-00010709

We appreciate the professionalism with which your staff conducted their review. Please feel free to contact me should you have any questions.

Sincerely,

L. Stuart Platt
Assistant Director
Office of Professional Responsibility

Enclosure

81

PSTRZOK-DOJ-00010710

**The Federal Bureau of Investigation's Response to the
Office of the Inspector General's Review of the Federal Bureau of Investigation's
Adjudication Process for Misconduct Investigations, Assignment Number A-2018-004**

**Recommendation 1:** "Update FBI policy to cover summary dismissal, including the criteria for
its use, as well as the procedural and oversight processes that differentiate summary dismissal
from other adverse disciplinary actions."

**FBI Response to Recommendation 1:** The FBI concurs with this recommendation. The FBI
has issued specific FBI policy to address summary dismissals, including the criteria authorizing
their use as well as the procedural and oversight processes that differentiate summary dismissals
from other adverse disciplinary actions. This policy will be provided to the OIG.

**Recommendation 2:** "Update FBI policy to cover last chance agreements, including eligibility
criteria and standard conditions included in the agreements."

**FBI Response to Recommendation 2:** The FBI concurs with this recommendation. The FBI
has issued specific FBI policy to address last chance agreements, including the eligibility criteria
and standard conditions included in the agreements. This policy will be provided to the OIG.

**Recommendation 3:** "Update FBI policy to clearly specify whether there is a maximum
duration for disciplinary suspensions and, if so, the maximum such duration, as well as the
reason for the policy."

**FBI Response to Recommendation 3:** The FBI concurs with this recommendation. The FBI
has issued FBI policy that specifies a maximum duration for disciplinary suspensions and
explains the reason for the policy. This policy will be provided to the OIG.

**Recommendation 4:** "Ensure that FBI OPR has the information it needs to adjudicate all cases
by ensuring that every FBI misconduct investigation is completed, regardless of whether the
subject separates."

**FBI Response to Recommendation 4:** The FBI concurs with this recommendation. The FBI's
Inspection Division will ensure that all completed misconduct investigations are provided to FBI
OPR for adjudication. In the instance of a separated employee, the FBI will further review
existing law to determine the authority under which the FBI could continue misconduct
investigations, which are compelled, and if it is authorized, then consider the instances where it
would be practicable to complete investigations of separated employees. The FBI will further
update the OIG upon its determination.

**Recommendation 5:** "Write a memorandum for each misconduct file documenting a
substantiation decision and the evidence supporting it in all cases in which an employee
separates under inquiry."

82

**FBI Response to Recommendation 5:** The FBI concurs with this recommendation. For each misconduct file in which the subject employee separates while under administrative inquiry, the FBI will prepare a memorandum with a synopsis of the allegations and available evidence. In cases of separation, the FBI is unable to provide the procedural protections afforded FBI employees during the disciplinary process; as a result, the FBI may be unable to issue a substantiation decision in every such case. The FBI will evaluate the legal requirements necessary to institute such a process and will update the OIG upon its determination.

**Recommendation 6:** "Assess the capabilities of available electronic recordkeeping platforms and identify ways for the FBI's Office of Professional Responsibility to improve its efficiency through increased use of one or more of these platforms."

**FBI Response to Recommendation 6:** The FBI concurs with this recommendation. The FBI created and deployed the Disciplinary Module, a new electronic recordkeeping platform on February 1, 2020. Following deployment, the FBI has worked with developers to strengthen the platform's capabilities. The FBI will continue to assess the capabilities of available recordkeeping platforms and to identify ways for FBI OPR to improve its efficiency through increased use of one or more of these platforms.

**Recommendation 7:** "Increase availability of training and information on the FBI's Office of Professional Responsibility processes for FBI employees, including through the FBI Office of Professional Responsibility intranet site."

**FBI Response to Recommendation 7:** The FBI concurs with this recommendation. The FBI OPR intranet site has been updated to include a new policy with more detailed descriptions of FBI OPR's processes. The FBI also created an additional intranet site, accessible by all FBI employees, to provide workforce resources and support for issues of harassment and misconduct. The site, which was launched through an FBI-wide communication, provides employees with additional information regarding FBI OPR's processes. Finally, the FBI will review the FBI OPR intranet site and consider developing additional content to supplement the numerous in-person and virtual trainings conducted each year.

**Recommendation 8:** "Standardize and update training materials for new FBI Office of Professional Responsibility adjudicators, and consider adding operational training for adjudicators without FBI field experience."

**FBI Response to Recommendation 8:** The FBI concurs with this recommendation. The FBI will review the training materials provided to new FBI OPR adjudicators to ensure the documents are updated and standardized. The FBI will also consider implementing operational training for adjudicators who do not have FBI field experience.

PSTRZOK-DOJ-00010712

# Appendix 7:  OIG Analysis of the FBI's Response to the Draft Report

The OIG provided a draft of this report to the FBI for comment.  The FBI's response is included in Appendix 6 to this report.  The OIG's analysis of the FBI's response and the actions necessary to close the recommendations are discussed below.

## Recommendation 1

Update FBI policy to cover summary dismissal, including the criteria for its use, as well as the procedural and oversight processes that differentiate summary dismissal from other adverse disciplinary actions.

**Status:**  Resolved.

**FBI Response:**  The FBI concurred with this recommendation.  The FBI stated that it has issued specific FBI policy to address summary dismissals, including the criteria authorizing their use as well as the procedural and oversight processes that differentiate summary dismissals from other adverse disciplinary actions.  The FBI stated that it would provide this policy to the OIG.

**OIG Analysis:**  The FBI's actions are responsive to our recommendation.  By January 3, 2022, please provide a copy of the new FBI policy that addresses summary dismissal, including the criteria for its use as well as the procedural and oversight processes that differentiate summary dismissal from other adverse disciplinary actions.

## Recommendation 2

Update FBI policy to cover last chance agreements, including eligibility criteria and standard conditions included in the agreements.

**Status:**  Resolved.

**FBI Response:**  The FBI concurred with this recommendation.  The FBI stated that it has issued specific FBI policy to address last chance agreements, including the eligibility criteria and standard conditions included in the agreements.  The FBI stated that it would provide this policy to the OIG.

**OIG Analysis:**  The FBI's actions are responsive to our recommendation.  By January 3, 2022, please provide a copy of the new FBI policy addressing last chance agreements, including the eligibility criteria and standard conditions included in the agreements.

## Recommendation 3

Update FBI policy to clearly specify whether there is a maximum duration for disciplinary suspensions and, if so, the maximum such duration, as well as the reason for the policy.

**Status:**  Resolved.

PSTRZOK-DOJ-00010713

**FBI Response:** The FBI concurred with this recommendation. The FBI stated that it has issued FBI policy that specifies a maximum duration for disciplinary suspensions and explains the reason for the policy. The FBI stated that it would provide this policy to the OIG.

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide a copy of the new FBI policy that specifies a maximum duration for disciplinary suspensions and the reason for the policy.

## Recommendation 4

Ensure that FBI OPR has the information it needs to adjudicate all cases by ensuring that every FBI misconduct investigation is completed, regardless of whether the subject separates.

**Status:** Resolved.

**FBI Response:** The FBI concurred with this recommendation. The FBI stated that its Inspection Division will ensure that all completed misconduct investigations are provided to FBI OPR for adjudication. In the instance of a separated employee, the FBI stated that it will further review existing law to determine the authority under which it could continue misconduct investigations, which are compelled, and, if continuing misconduct investigations would be authorized, consider the instances in which it would be practicable to complete investigations of separated employees. The FBI stated that it will further update the OIG upon its determination.

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide the results of the FBI's review of relevant existing law to determine its authority to continue misconduct investigations of separated employees. Please also provide any determinations made about when it is practicable to continue these investigations to completion.

## Recommendation 5

Write a memorandum for each misconduct file documenting a substantiation decision and the evidence supporting it in all cases in which an employee separates under inquiry.

**Status:** Resolved.

**FBI Response:** The FBI concurred with this recommendation. For each misconduct file in which the subject employee separates while under administrative inquiry, the FBI stated that it will prepare a memorandum with a synopsis of the allegations and available evidence. In cases of separation, the FBI stated that it is unable to provide the procedural protections afforded FBI employees during the disciplinary process; as a result, it may be unable to issue a substantiation decision in every such case. The FBI stated that it will evaluate the legal requirements necessary to institute such a process and update the OIG upon its determination.

PSTRZOK-DOJ-00010714

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide the results of the FBI's review of the relevant legal requirements and a description of the process the FBI plans to establish as a result of that review.

## Recommendation 6

Assess the capabilities of available electronic recordkeeping platforms and identify ways for the FBI's Office of Professional Responsibility to improve its efficiency through increased use of one or more of these platforms.

**Status:** Resolved.

**FBI Response:** The FBI concurred with this recommendation. The FBI stated that on February 1, 2020, it created and deployed the Disciplinary Module, a new electronic recordkeeping platform, and that following the platform's deployment it has worked with developers to strengthen the platform's capabilities. The FBI stated that it will continue to assess the capabilities of available recordkeeping platforms and identify ways for FBI OPR to improve its efficiency through increased use of one or more of these platforms.

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide a description of how the FBI has strengthened the Disciplinary Module's capabilities since its deployment to help FBI OPR improve its efficiency. Please also provide the results of the FBI's evaluation of its other available recordkeeping platforms and describe whether FBI OPR chose to increase its use of those other recordkeeping platforms as a result of that evaluation.

## Recommendation 7

Increase availability of training and information on the FBI's Office of Professional Responsibility processes for FBI employees, including through the FBI Office of Professional Responsibility intranet site.

**Status:** Resolved.

**FBI Response:** The FBI concurred with this recommendation. The FBI OPR intranet site has been updated to include a new policy with more detailed descriptions of FBI OPR's processes, the FBI stated. The FBI also stated that it created an additional intranet site, accessible by all FBI employees, to provide workforce resources and support for issues of harassment and misconduct. The site, which the FBI launched through an FBI-wide communication, provides employees with additional information regarding FBI OPR's processes. Finally, the FBI stated that it will review the FBI OPR intranet site and consider developing additional content to supplement the numerous in-person and virtual trainings conducted each year.

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide: (1) screenshots documenting the updates to the FBI OPR intranet site described above, (2) copies of any documents that are linked directly to the updated intranet site, and (3) the results of FBI OPR's evaluation as to whether it should develop additional content for its intranet site to supplement its in-person and virtual trainings.

PSTRZOK-DOJ-00010715

## Recommendation 8

Standardize and update training materials for new FBI Office of Professional Responsibility adjudicators, and consider adding operational training for adjudicators without FBI field experience.

**Status:** Resolved.

**FBI Response:** The FBI concurred with this recommendation. The FBI stated that it will review the training materials provided to new FBI OPR adjudicators to ensure that the documents are updated and standardized and will also consider implementing operational training for adjudicators who do not have FBI field experience.

**OIG Analysis:** The FBI's actions are responsive to our recommendation. By January 3, 2022, please provide a copy of the updated, standardized training material FBI OPR uses to train its new adjudicators. Please also describe the results of FBI OPR's evaluation to determine whether it should implement operational training for adjudicators who do not have FBI field experience.

PSTRZOK-DOJ-00010716