# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ATTORNEY GENERAL MERRICK B.<br>GARLAND, in his official capacity<br>as Attorney General of the United States, *et al.*,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:19-CV-2367-ABJ

**PROVISIONALLY FILED
UNDER SEAL**

**REDACTED**

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNT II

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.    The Parties Agreed to the LCA, and It Creates a Valid Property Interest. ........................ 4

II.   Mr. Bowdich Afforded Insufficient Due Process. ........................................................... 19

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armstrong v. Manzo,*
  380 U.S. 545 (1965) ............................................................................................... 19

*BP Amoco Corp. v. N.L.R.B.,*
  217 F.3d 869 (D.C. Cir. 2000)................................................................................... 4

*Buchanan v. Dep't of Energy,*
  247 F.3d 1333 (Fed. Cir. 2001) ................................................................................ 9

*Califano v. Sanders,*
  430 U.S. 99 (1977) ................................................................................................. 17

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) .........................................................................................21, 23

*Cobell v. Norton,*
  226 F.R.D. 67 (D.D.C. 2005) ................................................................................. 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ..................................................................................................... 6

*Dodson v. United States Capitol Police,*
  633 F. Supp. 3d 235 (D.D.C. 2022)........................................................................ 10

*Gibson v. Dep't of Veterans,*
  160 F.3d 722 (Fed. Cir. 1998) .................................................................................. 9

*Gilbert v. Dep't of Just.,*
  334 F.3d 1065 (Fed. Cir. 2003) ................................................................................ 9

*Goldberg v. Kelly,*
  397 U.S. 254 (1970) ................................................................................................. 4

*Hall v. Ford,*
  856 F.2d 255 (D.C. Cir. 1988)............................................................................9, 14

*Hewitt v. Helms,*
  459 U.S. 460 (1983) ............................................................................................... 23

*Link v. Dep't of Treasury,*
  51 F.3d 1577 (Fed. Cir. 1995) .................................................................................. 9

*Lizzio v. Dep't of Army*,
    534 F.3d 1376 (Fed. Cir. 2008) ................................................................. 9

*Marbury v. Madison*,
    5 U.S. 137 (1803) ................................................................. 14, 17

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ................................................................. 7

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................. 19

*McCall v. U.S. Postal Serv.*,
    839 F.2d 664 (Fed. Cir. 1988) ................................................................. 10

*Moore v. Coca-Cola Bottling Co. Consol.*,
    113 F.4th 608 (6th Cir. 2024) ................................................................. 9

*Murray v. City of Charleston*,
    96 U.S. 432 (1877) ................................................................. 7

*Nat'l Ass'n of Realtors v. United States*,
    97 F.4th 951 (D.C. Cir. 2024) ................................................................. 12, 14

*Nat'l Parks Conservation Ass'n v. United States Dep't of the Interior*,
    2024 WL 1344450 (D.D.C. Mar. 29, 2024) ................................................................. 6

*Perry v. Sindermann*,
    408 U.S. 593, 601 (1972) ................................................................. 9

*Ramos v. Garland*,
    2023 WL 4547991 (D.D.C. July 14, 2023) ................................................................. 8

*Rogers v. U.S. Postal Serv.*,
    1993 WL 513485 (M.S.P.B. Dec. 6, 1993) ................................................................. 9

*Scott v. Dep't of Agric.*,
    484 F. App'x 522 (Fed. Cir. 2012) ................................................................. 9

*Sheriff v. Medel Elec. Co.*,
    412 A.2d 38 (D.C. 1980) ................................................................. 4

*Snowden v. Zinke*,
    506 F. Supp. 3d 18 (D.D.C. 2020) ................................................................. 9

*Turner Const. Co. v. United States*,
  367 F.3d 1319 (Fed. Cir. 2004) ............................................................................. 12

*U.S. Dep't of Air Force v. Fed. Lab. Rel. Auth.*,
  949 F. 2d. 475 (D.C. Cir. 1991) ............................................................................... 9

*United States v. Moreno-Membache*,
  995 F.3d 249 (D.C. Cir. 2021) ............................................................................... 12

*Willard v. Tayloe*,
  75 U.S. 557 (1869) ................................................................................................. 17

*Williams v. U.S. Postal Serv.*,
  58 F. App'x 469 (Fed. Cir. 2003) ............................................................................. 9

**Statutes**

5 U.S.C.  5596 ................................................................................................... 17, 18
5 U.S.C. § 7703(b)(1) ............................................................................................ 17
5 U.S.C. § 8412 ...................................................................................................... 18
18 U.S.C. 926C ...................................................................................................... 18
28 U.S.C. § 1295(a)(9) ........................................................................................... 17
28 U.S.C. § 2201 .................................................................................................... 17
U.S. Const. amend V .............................................................................................. 19

**Rules**

Federal Rule of Civil Procedure Rule 37 ........................................................... 20, 21

**Regulations**

5 C.F.R. § 752.404 ................................................................................................. 24

**Other Authorities**

Restatement (Second) of Contracts § 63(a) ............................................................ 13
Restatement (Second) of Contracts § 206 .............................................................. 12

## INTRODUCTION

There are no material disputes of fact left to resolve on either element of Plaintiff's Fifth Amendment deprivation of due process claim. Mr. Strzok has demonstrated that: (1) he enjoyed a property interest in continued government employment (and in benefits associated with a non-cause separation) through the Last Chance Agreement ("LCA") that he entered with the FBI; and (2) the government deprived him of that property interest without adequate due process.

Defendants do not dispute that on August 8, 2018, FBI Assistant Director Candice M. Will signed and issued a final disciplinary decision. That final decision suspended—and agreed not to fire—Special Agent Strzok. It recorded the parties' agreement that "the LCA and this letter reflect *the Bureau's final disposition* of this disciplinary inquiry, from which no appeal will be taken." (Pl. Ex. 3 at 3 of 36 n.2 (emphasis added)). It attached and incorporated Mr. Strzok's signed LCA. The LCA—which the FBI's Office of Professional Responsibility ("OPR") had drafted and sent to Mr. Strzok to sign—provided that "OPR will retain jurisdiction over this matter" and "that the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless the matter is reopened based on credible evidence of a violation of this agreement." (*Id.* enclosure at 27 of 36).[1] The FBI had told Mr. Strzok that acceptance of the LCA was "in the end, as you know, the AD's decision." (Pl. Ex. 1). As the FBI's appointed decision maker, Ms. Will made that decision through her final disciplinary letter.

In response to these undisputed facts, Defendants make a number of arguments, all of which are fatally flawed:

---

[1] Defendants make the unsupportable assertion that the LCA is invalid because "Ms. Will never signed the LCA" and that her signature is somehow "missing." (Opp. at 34). The FBI drafted the LCA without a line for Ms. Will's signature. Ms. Will executed the LCA when she signed her final disciplinary letter and attached the LCA. Defendants then recorded that the LCA was part of the "FINAL" outcome of OPR's process, and that Mr. Strzok had been "required" to sign it. (Pl. Ex. 62 at 8 of 10).

*First*, Defendants' contention that Ms. Will's final decision can be construed as merely "*her* 'final' decision—not the FBI's" deserves short shrift. (Defs' Opp. at 3 (emphasis in original)). Ms. Will's letter accepting the LCA ("the Will Letter") states clearly that the "LCA and this letter reflect *the Bureau's final disposition* of this disciplinary inquiry," (Pl. Ex. 3 at 3 of 36 n.2 (emphasis added)), verbiage that was repeated in a host of contemporaneous documents, including internal FBI documents and communications to Mr. Strzok. Defendants' efforts to portray the LCA as merely something Mr. Strzok proposed bears no resemblance to the truth. And Defendants' assertion that Ms. Will's decision was "not the FBI's final decision" is true only in the literal sense that the FBI took the improper and unprecedented step of attempting to renege on the final, binding contract that the long-time head of its independent disciplinary office executed.

*Second*, Defendants falsely assert that Mr. Strzok lacked an objectively reasonable expectation in continued employment with the FBI. Mr. Strzok's testimony, along with the express terms of the LCA, Ms. Will's final disciplinary letter, and Defendants' numerous representations that they would follow the OPR process, show that Mr. Strzok had a subjective and objectively reasonable expectation in continued employment. Moreover, Defendants' internal files, along with foundational contract law, confirm that Ms. Will's acceptance of the LCA was effective when it was issued and sent.

*Third*, Defendants' assertions that Mr. Strzok "no longer asserts that he was demoted 'out of the SES' such that he became a for-cause employee before Mr. Bowdich dismissed him" is simply wrong. Ms. Will testified that her decision ███████████████ (Pl.'s Resp. to Defs' SOF ¶ 134 (quoting Will Dep. 288-89)). And Defendants fail to offer any meaningful response to Mr. Strzok's considerable interest in avoiding termination *for cause*—independent of continued employment more generally—both of which he had bargained for and was promised.

**Fourth**, Defendants' assertion that Mr. Bowdich acted in accordance with a supposed "normal process" when he purported to overturn the contract that Ms. Will had executed on behalf of the FBI is unprecedented and unsupported. (Defs' Opp. at 3, 41). The FBI has not and cannot identify any prior last chance agreement that had ever been unilaterally overturned in the long history of their use in the FBI or anywhere across the federal government, or for that matter any instance in which Mr. Bowdich overturned any decision by Ms. Will in any of the thousands of prior disciplinary cases that she handled. And caselaw is entirely consistent, *see infra* at pp. 9-10, that last chance agreements are binding contracts between the government and its employees, a position that has been echoed by a host of federal agencies, *including the Department of Justice*, when it suits its purposes.

**Fifth**, assuming *arguendo* that the FBI could have lawfully designed a process that permitted its deputy director to abrogate the FBI's entry into the LCA, Mr. Bowdich failed to afford Mr. Strzok adequate due process. Mr. Strzok was not even told that Mr. Bowdich could overturn Ms. Will's decision, much less given an opportunity to tailor a written or oral presentation to him. (*See* Pl. Ex. 16 at 20-22 of 22 (explaining the process without reference to Mr. Bowdich)). Assuming even further that, as Defendants wrongly imply, an established, constitutionally adequate process could have permitted the Deputy Directory to abrogate the LCA after considering Mr. Strzok's written response to his proposed termination (Pl. Ex. 12) and his oral presentation to three OPR staff members including Ms. Will (*see* Def. Ex. 61), the record shows that Mr. Bowdich failed to review those materials. His deficient process rendered OPR's notice, written submission, and hearing process illusory and not "meaningful," because it left Mr. Strzok without an "effective opportunity to defend . . . by presenting his own arguments and evidence" to the actual decisionmaker. *Goldberg v. Kelly*, 397 U.S. 254, at 268 (1970). Mr. Bowdich further erred when

he considered material outside the OPR file and materials that were not the basis of any proposed discipline. Whereas Ms. Will's acceptance of the LCA was procedurally adequate, Mr. Bowdich's effort to overturn the LCA was procedurally deficient and must be set aside in favor of Ms. Will's decision.

## ARGUMENT

**I.      The Parties Agreed to the LCA, and It Creates a Valid Property Interest.**

      ***Ms. Will's "final" decision bound the FBI when it was issued.***  Defendants attempt (Opp. at 3, 34-35) to construe Ms. Will's decision as merely "*her* 'final' decision—not the FBI's," but that is contrary to the express and unambiguous language of Ms. Will's final decision and the LCA. The August 8, 2018, final letter ("the Will Letter") states unambiguously that the "LCA and this letter reflect *the Bureau's final disposition* of this disciplinary inquiry, from which no appeal will be taken." (Pl. Ex. 3 at 3 of 36 n.2 (emphasis added)). The LCA promised that "OPR will retain jurisdiction over this matter" and that "the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless the matter is reopened based on credible evidence of a violation of this agreement." (*Id.* enclosure at 27 of 36 (emphasis in original)).[2] The discipline that Ms. Will imposed consistent with the LCA is similarly unambiguous: "I am: (a) suspending you from duty, without pay, for 60 calendar days, *not dismissing you*, as originally proposed; and (b) demoting you to a non-supervisory position." (*Id.* at 3 of 36 (emphasis added)). As Ms. Will testified, this was ███████████████████████████████." (Will Dep. 267-68).

---

[2] *See BP Amoco Corp. v. N.L.R.B.*, 217 F.3d 869, 874 (D.C. Cir. 2000) ("It is generally held that when a document incorporates outside material by reference, the subject matter to which it refers becomes part of the incorporating document just as if it were set out in full." (cleaned up)); *accord Sheriff v. Medel Elec. Co.*, 412 A.2d 38, 41 (D.C. 1980) ("When a contract incorporates another writing, the two must be read together as the contract between the parties.").

Defendants argue that they should be able to avoid the effect of their "FINAL decision in this matter" because those capitalized letters are "from the LCA that Mr. Strzok and his counsel proposed" rather than "in Ms. Will's letter," and because Ms. Will's letter supposedly "merely notes that Ms. Will had decided to impose the discipline requested by Mr. Strzok in his LCA" and that the LCA "was not written or signed by Ms. Will." (Defs' Opp. at 34-35). The contortions that Defendants engage in to distance themselves from the LCA are no doubt convenient to their defense, but they bear little resemblance to the truth.

As an initial matter, although Defendants repeatedly pretend to the contrary, it was not Mr. Strzok or his counsel who drafted the LCA. It was Ms. Will's deputy, the OPR Unit Chief, who used a standard FBI template that the Department of Justice Inspector General found the FBI was using "with increasing frequency." All of the language and the structure of the LCA were written by the FBI, including the title of the document, "Last Chance Adjudication *Agreement*," (emphasis added), its description of proposed "terms" (standard contract language), and the phrasing of those contractual terms, including that "OPR will retain jurisdiction over this matter" and that "the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless the matter is reopened based on credible evidence of a violation of this agreement." (Pl. Exs. 1, 2, 3).

It was also the FBI that created the format of the document containing only a signature block for Strzok. This too appears to be the standard template that OPR uses for all LCAs.[3] If Defendants intend to imply that the FBI was craftily giving the appearance of a meaningful agreement, while in reality depriving the document of contractual force, Defendants should make that point explicitly. After all, the government in dealings with citizens and as a litigant is expected

---

[3] *See* Pl. Ex. 64 (showing that Defendants amended their standard LCA form on or about October 18, 2023, to provide that LCAs could be amended by the Director, the Deputy, or their designee).

to "turn square corners."  *Nat'l Parks Conservation Ass'n v. United States Dep't of the Interior*, 2024 WL 1344450, at *10 (D.D.C. Mar. 29, 2024) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020)).  But Defendants' insinuation that the LCA was a mere "request for leniency" (Opp. at 32) cannot be squared with the agreement itself, let alone OIG's recognition, after a thorough investigation of OPR's process, that "[a] last chance agreement allows an employee to receive a reduced disciplinary penalty *in exchange for* waiving appeal rights and agreeing to be subject to summary dismissal in the event of future serious misconduct."  (Pl. Ex. 52 at ii (emphasis added)).  Nor would Defendants' construction comport with what OPR told Mr. Strzok when it provided him to the OPR to sign: "in the end . . . it is the AD's decision," or with Ms. Will's testimony that ████████████████████████████████.  (Pl. Ex. 1; Will Dep. 266-67).  The only sensible construction is the one Ms. Will testified to:  ████████████ ████████████████████████████████████████.[4]

        Defendants' other attempts to twist the language of the LCA and Will Letter to argue that they do not comprise an agreement between Mr. Strzok and the FBI fare no better.  In their initial motion, Defendants made the plainly incorrect assertion that the "letter does not indicate that Ms. Will or the FBI were agreeing to the terms of the LCA" based on the boilerplate footnote that "the Human Resource Division, Security Division, or other Bureau component" could address Mr. Strzok's conduct "as a performance matter, security matter, or otherwise, as appropriate."  (Defs' Mot. at 40).  Defendants appear to abandon that argument in their response given Ms. Will's

---

[4] As noted in our opening brief, Ms. Will testified that ████████████████████████████████ ████████████████████████████████████████████████████████████.  (Will Dep. 245-46).  The government protests that none of this is admissible as it presents a "legal conclusion" to which they objected.  (Opp. at 36 n.16).  But this testimony is not offered as any type of expert opinion or binding conclusion of law.  Rather, it shows that Will, the person who entered into the LCA on behalf of the FBI, understood at the time that ████████████████████████████.

testimony that this meant, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████" (Will Dep. 266-67).

To the extent that Defendants have not abandoned this argument, it is easily disposed of and in fact adds support to the conclusion that this was an *agreement* and not a unilateral plea for mercy. The Will Letter's second footnote, as Ms. Will explained, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████. (Will Dep. 267). This footnote is as telling for what it does not say as for what it does say. It does *not* say that, in addition to the possibility of non-disciplinary action by the Human Resources or Security Divisions, the Deputy Director might step in and overrule the agreement between Strzok and the FBI. And it is indisputable that Mr. Bowdich's decision to abrogate the LCA purported to be a *disciplinary* act, which is directly inconsistent with the footnote's characterization that the LCA and the letter represented the "*Bureau's* final disposition of the disciplinary inquiry." (Pl. Ex. 3 at 3 of 36 (emphasis added)). Defendants' construction would violate the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see also Murray v. City of Charleston*, 96 U.S. 432, 445 (1877) (recognizing that contracts between governments and citizens "have the same

meaning as that of similar contracts between private persons" and a promise "with a reserved right to deny or change the effect of the promise, is an absurdity").

In their Opposition, Defendants resort to some arguments about the text of the LCA and the Will Letter that are even more specious. They assert that "Ms. Will's letter does not state that she was accepting the LCA; it merely notes that Ms. Will had decided to impose the discipline requested by Mr. Strzok in his LCA, listing that document—along with other submissions by Mr. Strzok—as one of the materials she considered in making her determination." (Opp. at 34). The implication is that the LCA was just another data point considered by Ms. Will, as opposed to a template created by the FBI to induce employees to give up certain rights in return for disciplinary consideration. Similarly specious is Defendants' repeated insistence that the LCA was unilateral and "does not contain any commitments by the FBI." (Opp. at 32, 34 ("[E]ven the quoted passage speaks, as does the LCA itself, to Mr. Strzok's vows, not any commitment by the FBI.")).

This is a curious way to describe an arrangement that the FBI has used "with increasing frequency" to reach agreements with employees to resolve disciplinary matters. (Pl. Ex. 52 at ii). If the language in Mr. Strzok's LCA and the Will Letter do nothing more than set forth "vows" or concessions by Mr. Strzok, this means that none of the LCAs executed by the FBI before October 2023 that contained the FBI's standard language and structure, carried any legal weight. But the FBI has for years relied on the fact that these were binding contracts. *See, e.g.*, *Ramos v. Garland*, 2023 WL 4547991, at *6 (D.D.C. July 14, 2023) (recognizing but declining to address the government's argument that the LCA was a voluntary contractual agreement).[5]

---

[5] *See also* Defs' MTD, *Ramos v. Garland*, Case No. 1:22-cv-01143-DLF (D.D.C. Sept. 12, 2022), ECF No. 8-1 at 18-20 (arguing that the executed LCA was a contract, and indeed a "settlement in order to resolve pending disciplinary action with the FBI").

Defendants' contention that their LCA was not a contract is also flatly inconsistent with the numerous court rulings that have consistently held that last chance agreement are indeed contracts governed by standard contract law.[6]  Defendants attempt to sidestep the examples cited by Mr. Strzok's motion, including *U.S. Dep't of Air Force v. Federal Labor Relations Authority*, 949 F. 2d. 475 (D.C. Cir. 1991); *Link v. Dep't of Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995) and *Gilbert v. Dep't of Justice*, 334 F.3d 1065, 1071 (Fed. Cir. 2003), each of which shows that LCAs are enforceable contracts, by relying on the same fiction described above:  "The facts here therefore distinguish this case from the decisions Mr. Strzok cites . . . because the LCA here remained a proposal to which the FBI was never bound."  (Opp. at 37).  In fact, though, that authority is on point.  The LCA entered here provided Mr. Strzok with a reasonable expectation of continued employment sufficient to create a property interest under the Fifth Amendment.  The LCA was entered into pursuant to the standard OPR process that the FBI Director had promised to adhere to, and it vested Mr. Strzok with a "property interest[] . . . secured by 'existing rules or understandings.'"  *Perry v. Sindermann,* 408 U.S. 593, 601 (1972); *see also Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988) (recognizing that "a legitimate expectation" may arise "based on rules (statutes or regulations) or understandings (contracts expressed or implied)*, that* [the plaintiff] would continue in his job")).  That the government has routinely argued that LCAs are contracts underscores this point.  *See, e.g.*, *Snowden v. Zinke*, 506 F. Supp. 3d 18, 30 (D.D.C. 2020) ("The

---

[6] *See, e.g.*, *Scott v. Dep't of Agric.*, 484 F. App'x 522, 524 (Fed. Cir. 2012); *Lizzio v. Dep't of Army*, 534 F.3d 1376, 1385 (Fed. Cir. 2008); *Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003); *Williams v. U.S. Postal Serv.*, 58 F. App'x 469, 471 (Fed. Cir. 2003); *Buchanan v. Dep't of Energy*, 247 F.3d 1333, 1338 (Fed. Cir. 2001); *Gibson v. Dep't of Veterans Affs.*, 160 F.3d 722, 725 (Fed. Cir. 1998); *Link v. Dep't of Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995); *U.S. Dep't of Air Force v. Fed. Lab. Rel. Auth.*, 949 F. 2d. 475, 478 (D.C. Cir. 1991); *Rogers v. U.S. Postal Serv.*, 1993 WL 513485 (M.S.P.B. Dec. 6, 1993).  Last chance agreement are employed by private sector employers as well.  *See, e.g.*, *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 618 (6th Cir. 2024) (applying "ordinary contract principles" to last chance agreement).

parties do not dispute that the LCA contains the necessary elements of contract formation—and for good reason. [The United States Park Police] specifically spelled out the terms of the agreement in the LCA, and Snowden accepted those terms by signing the contract. . . . . The Court finds that the LCA, as a general matter, is a valid and enforceable contract"); *McCall v. U.S. Postal Serv.*, 839 F.2d 664, 665 (Fed. Cir. 1988) (finding waiver of rights written in first person and signed by plaintiff and union representative were part of binding last chance settlement agreement); *see also Dodson v. United States Capitol Police*, 633 F. Supp. 3d 235, 265 (D.D.C. 2022) (finding that entry into an LCA may inform "procedural-due-process question[s]").

Moreover, the FBI's description of Ms. Will's decision as the agency's "final" decision was not included merely on the first page of Ms. Will's letter accepting the LCA and (in all capital letters) on the LCA itself.  (Pl. Ex. 3 at 3, 27 of 36).  Representations that OPR's decision would be final featured prominently in the original disciplinary proposal and a host of other communications from the FBI to Mr. Strzok during the disciplinary process, including the June 15, 2018, letter that proposed Mr. Strzok for discipline, which concluded by informing Mr. Strzok that "Assistant Director (AD) of the Office of Professional Responsibility (OPR) [i.e. Ms. Will] *will make the final decision in this matter* after consideration of your written and/or oral response(s)."  (Pl. Ex. 16 at 20-22 of 22 (emphasis added)).

Three days later, the FBI Director assured the United States Congress that the "Office of Professional Responsibility, or OPR, the FBI's independent disciplinary office" would handle Mr. Strzok's matter, and the FBI would "adhere to the disciplinary process that that office has fairly but without delay" and ensure that "all the steps in the process are complete" before imposing

discipline.[7]  Prior to Mr. Strzok's oral presentation, the FBI Director's Chief of Staff echoed the message that the Director would adhere to the outcome of the OPR process.  *See* Def. Ex. 61 at 18:30 (Counsel for Mr. Strzok: "I had a conversation with his Chief of Staff last week and asked, because I didn't quite understand whether this was the end of the line or if we had an appeal up to the director's office.  And they were very clear.  They said [Director Wray] is not going to have anything to do with this.  And he wants this treated like every other case."); *id* at 22:42 (Ms. Will: "I did know that you chatted with Zach, he shared that with me.").  During Mr. Strzok's oral presentation, before any discussion of Mr. Strzok and the FBI entering an LCA with the FBI, Ms. Will noted that while *the Director* had the power to overrule her decisions, that "rarely happens" and "almost never from my experience," and she did so without any suggestion that Mr. Bowdich might have that power.  (*Id.* at 1:55:38).  Mr. Strzok's counsel noted, consistent with Director Wray's congressional testimony and the FBI Chief of Staff's statements to counsel, that Director Wray had already said "he didn't have any intention of" doing that, to which Ms. Will responded, "Yeah."  (*Id.* at 1:56:05).

Throughout their brief, Defendants dismiss Assistant Director Will's decision demoting and suspending Mr. Strzok as merely "*her* 'final' decision,'" as if she is some bit player, not "the deciding official" designated by the FBI to impose its final disciplinary action.  Using the same tactic, defendants refer to the demotion as merely "OPR's" action (as if it were a rogue office).  But as Director Wray testified, OPR was the FBI's "independent disciplinary office," and the FBI

---

[7] Christopher A. Wray, "Statement before the Senate Judiciary Committee" (June 18, 2018), https://www.judiciary.senate.gov/imo/media/doc/Wray%20Testimony.pdf; Tim Hains, Full Replay: DOJ Inspector General, FBI Director Wray Testify On IG Report At Senate Judiciary Committee,    POLITICO    (June    18,    2018), https://www.realclearpolitics.com/video/2018/06/18/watch_live_doj_inspector_general_fbi_dire ctor_wray_testify_on_ig_report_at_senate_judiciary_committee.html (video at 31:50).

had promised to "adhere to the disciplinary process that that office has."[8]  Ms. Will had ████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████.  (Will Dep.

29-30, Pl. Ex. 18 (emphasis added)).  She was among the most senior executives in the FBI at the

time, and the discipline she imposed on behalf of the FBI was fully consistent with the FBI's

ordinary process.

    Nor does it matter that Ms. Will knew that Mr. Bowdich was considering overruling her

decision.  Whatever Ms. Will *expected* Mr. Bowdich to do after she issued that final decision is

not relevant to the objective meaning of the agreement that Mr. Strzok and the FBI entered, and

that objective meaning governs.  *See Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957

(D.C. Cir. 2024) ("[I]f the text of the closing letter is unambiguous, 'that is the end of the matter'

and we need not address the parties' negotiation history or any other extrinsic evidence.").  And if

the meaning was ambiguous (and it is not), it would be interpreted against the government as its

drafter.  *See Turner Const. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (recognizing

that the doctrine of *contra proferentem* applies against the government when it drafts a contract);

Restatement (Second) of Contracts § 206 ("meaning is generally preferred which operates against

the party who supplies the words or from whom a writing otherwise proceeds"); *cf. United States

v. Moreno-Membache*, 995 F.3d 249, 254 (D.C. Cir. 2021) ("Consistent with constitutional

principles and the settled rule that contracts are construed against their drafters, we construe any

ambiguities in the plea agreement against the government.").

---

[8] FBI Director Wray Testify On IG Report At Senate Judiciary Committee, Politico (June 18, 2018),
https://www.realclearpolitics.com/video/2018/06/18/watch_live_doj_inspector_general_fbi_director_wray_testify_on_ig_report_at_senate_judiciary_committee.html (video at 31:50).

The undisputed evidence is that Ms. Will accepted the LCA on August 8, 2018, and imposed non-termination discipline as the agency's authorized decision maker in a "FINAL" disciplinary action. Ms. Will's testimony ███████████████████████████████ OPR's internal emails, which recorded "60-day suspension and demotion . . . Strzok has signed a last chance agreement waiving his appeal rights. The file is closed," (Pl. Ex. 4). The summary of the discipline in OPR's recording system likewise states, "OPR FINAL DECISION . . . Required to Sign a Last Chance Agreement." (Pl. Ex. 62 at 8 of 10). Defendants' complaint that these reports were "not written or sent by Ms. Will" (Brief at 35) merely underscores the point: OPR's regular process resulted in the entry of an LCA, and that process and the relevant records confirm that Ms. Will's action was indeed final.

As discussed *infra*, Defendants also quibble with Mr. Strzok's testimony that he reviewed Ms. Will's letter as somehow insufficient to show Mr. Strzok's expectation for continued employment. While Mr. Strzok indeed expected the last chance agreement to be enforced when he received Ms. Will's letter adopting it, his right to the benefits that the LCA affords accrued as a matter of law when Ms. Will issued it. Mr. Strzok manifested his intent to be bound by the LCA when he signed the LCA and sent it to OPR. Consistent with ████████ email conveying the LCA for Mr. Strzok's signature, counsel's email back with the signed LCA implicitly recognized that it would be accepted, if at all, "when the AD issues her final decision." (Pl. Ex. 2). Ms. Will manifested the FBI's entrance into the LCA on August 8, 2018, when she signed and issued her final letter adopting the LCA. (*See* Pl. Ex. 3). That was an "acceptance made in [the] manner and by [the] medium invited by an offer." Restatement (Second) of Contracts § 63(a). And the contract was "operative and complete[] . . . as soon as put out of the offeree's possession, without regard to whether it ever reache[d]" Mr. Strzok—though of course, it did. *Id.* Ms. Will's acceptance was

therefore binding, at the latest, when the letter was dispatched. (Pl. Ex. 9 (informing Mr. Strzok on August 9, 2018 that "OPR's final letter for Peter Strzok was sent to AD, HRD today")). *See Nat'l Ass'n of Realtors*, 97 F.4th at 956 ("'[F]ederal common law,' [] looks to the Restatement of Contracts.").

Defendants twist the D.C. Circuit's observation in *Hall,* 856 F.2d at 266, that for "[an] employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it." While Mr. Strzok certainly had a subjective belief, *Hall* says nothing about "subjective belief." *Hall* is instead about an "objectively reasonable" entitlement to continued employment.

Contrary to Defendants' position, American jurisprudence has recognized, for more than two centuries, that government employment decisions are binding when properly issued. *See Marbury v. Madison*, 5 U.S. 137, 161 (1803) ("[T]he law orders the secretary of state to record [commissions]. When therefore they are signed and sealed, the order for their being recorded is given; and whether inserted in the book or not, they are in law recorded."). While an agency might delay the effective date of an action by explicitly providing such a limitation in the document creating the right, that did not happen here. The date on Ms. Will's letter is August 8, 2018: the date on which it was signed and issued. That is also when the file was "closed." (Pl. Ex. 4).

***Mr. Strzok also had a subjective expectation of continued employment.*** Defendants contend that Mr. Strzok's testimony that he reviewed Ms. Will's letter before Mr. Bowdich's is somehow insufficient to show an expectation for continued employment, arguing (without citing any authority) that the question of whether Mr. Strzok has a property interest in his continued employment cannot "turn on the order in which he opens two simultaneously delivered letters." (Defs' Opp. at 37). As set forth above, that question does *not* turn on the order in which Mr. Strzok

14

opened the two letters, since Mr. Strzok acquired his property interest when Ms. Will accepted the LCA by signing her letter, which occurred before Mr. Strzok received or read either letter. But the question of whether Strzok possessed a constitutionally cognizable property interest can similarly not turn on Mr. Bowdich's decision to delay the delivery of the Will Letter so that the two letters could be delivered at the same time.

But even assuming that Defendants are correct, and that Mr. Strzok must show his *subjective* belief that the FBI had accepted the LCA, the evidence is undisputed that he had such a belief, and for good reason. Mr. Strzok testified that his expectation was based on Ms. Will's final letter, as well as the process that led to it. (*See, e.g.*, Strzok Dep. 333, Ex. 17 ("Q . . . Before you were dismissed from the FBI, did you have any other indication other than the one you just described that Ms. Will was going to accept the last-chance agreement? A Yes, I received a letter accepting the last-chance agreement changing the offensive codes and meting out the discipline of the FBI's final decision by their final decision-maker."); *id.* at 338 ("Q Do you remember which document you read first? A The one from Candice. Q And then you read the -- a letter terminating you; is that correct? A Correct."); Pl. Ex. 25, Resp. to Rog. No. 16 ("Plaintiff received, opened, and reviewed Ms. Will's letter prior to his review of DD Bowdich's letter purporting to modify Ms. Will's acceptance of the Last Chance Agreement, but regardless Ms. Will's acceptance of the LCA was effective no later than when her final decision was rendered and dispatched.")).[9] And

---

[9] In responding to Mr. Strzok's statement of facts, Defendants make a remarkable effort to avoid the obvious meaning of Mr. Strzok's testimony. They seem to think that there is room to believe that Mr. Strzok *opened* the letter from Mr. Bowdich first, but then *read* the letter from Ms. Will first. (*See* Defs' Resp. to PSOF ¶ 34). Mr. Strzok did not anticipate Defendants' remarkably creative effort to read ambiguity into his testimony and interrogatory responses. We submit that the record provided with Mr. Strzok's motion is sufficient and unambiguous, but for the avoidance of any doubt, Mr. Strzok will clarify his interrogatory responses on this point to explicitly state that he indeed opened, read, *and* understood Ms. Will's letter (in the big envelope) before he opened, read, *or* understood Mr. Bowdich's letter (in the small envelope).

while Defendants are correct that Mr. Strzok understood that his signature on the LCA did not create a binding contract *until Ms. Will accepted it*, Mr. Strzok felt he had "a clear signal, yes, she is going to accept this" based on the indication that Ms. Will did not see the need to wait for his character references or to conduct the further factual inquiry he had suggested if termination was on the table. In fact, Mr. Strzok forewent the opportunity to submit additional evidence to Ms. Will based on that subjective, albeit well-founded, belief.[10] Moreover, the reasonableness of Mr. Strzok's belief that he was entitled to continue his employment at the FBI is confirmed by the FBI's representations that it would comply with the OPR process, and that the final decision would be made by Ms. Will. *See supra.*

Defendants' counterfactual assertions about Mr. Strzok supposedly lacking a subjective expectation that he could keep his job is based entirely on unsupported speculation about Mr. Strzok's mental state that was contained in an email sent by the FBI employee who delivered the letters to Strzok. The agent apparently watched Mr. Strzok open the large envelope with Ms. Will's final letter that enclosed and accepted his LCA and then observed Mr. Strzok open the second letter from Mr. Bowdich that purported to abrogate the LCA. He noted that Mr. Strzok "appeared to know it was coming" but "was still shaken" and "it is going to take some time to sink in." (Defs' Ex. 56). This email is neither admissible nor helpful to Defendants' case. First, it is unsworn hearsay and incapable of being rendered into admissible evidence. It is telling that while Defendants urge the Court to disregard Ms. Will's testimony about ███████████████████

---

[10] Strzok Dep. 330-31 ("When asked by OPR personnel, my recollection is we responded if she is still trying to decide whether or not to grant the LCA, then yes, we would like them. If she's going to grant it, then no need to delay it, and go ahead, and we were told nope, don't worry about it. Consequently we said fine, we don't need to wait on ████████'s recommendation, we don't need to ask you to go out and interview all these people that will rebut some of the facts. My take-away from that was a clear signal, yes, she is going to accept this, and therefore, you may give up these rights you're entitled to.").

contract because they (wrongly) objected to this as a legal conclusion (Defs' Opp. at 36 n. 16), they feel free to rely on an unsworn email from an FBI employee interpreting Mr. Strzok's facial expressions when reading documents.

This email does not create a genuine issue of material fact. Mr. Strzok certainly knew that a decision from Ms. Will was coming, because the FBI told him it was (*see* Pl. Ex. 9), but he could not have imagined that Mr. Bowdich would overturn her decision, since no one told him that was even a possibility. The email does nothing to refute Mr. Strzok's testimony that he understood Ms. Will was going "to accept the last-chance agreement," and indeed did so, because he received her "letter accepting the last-chance agreement[,] changing the offensive codes[,] and meting out the discipline of the" FBI as its final decision maker before reviewing the contrary letter from Mr. Bowdich. (Strzok Dep. 333, 338).

*In addition to the valid property interest created by the LCA, Mr. Strzok also had a valid property interest in rights affected by his removal for cause*. The government is also wrong that Mr. Strzok "no longer asserts that he was demoted 'out of the SES' such that he became a for-cause employee before Mr. Bowdich dismissed him." (Defs' Opp. at 31 n.14). As Mr. Strzok noted in responding to Defendants' assertions, Ms. Will testified that ███████████ ███████" (Pl.'s Resp. to DSOF ¶ 134 (citing Will Dep. 288-89)). Defendants undeniably failed to effectuate the demotion required by the LCA, but principles of equity foreclose such dodges around constitutional requirements. *See Marbury* 5 U.S. at 161; *Willard v. Tayloe*, 75 U.S. 557, 565 (1869) (recognizing the remedy of specific performance where one party stands ready to perform on a contract); *Califano v. Sanders*, 430 U.S. 99, 109 (1977) (recognizing "the well-

established principle that when constitutional questions are in issue, the availability of judicial review is presumed"); *see also* 28 U.S.C. § 2201.[11]

Even setting aside ███████████████████████████████████████████

████████, Defendants are incorrect that Mr. Strzok did not a have a right to due process before being removed for cause by Mr. Bowdich.  Mr. Bowdich's termination of Mr. Strzok for cause eliminated valuable statutory rights that Mr. Strzok had earned through his decades of exemplary service.  Those included the ability to receive a pension under 5 U.S.C. § 8412 upon reaching 50 years of age and 20 years of service, or 25 years of service (Mr. Strzok is 54 years old and would have 28 years of service), but that statutory pension is unavailable to an agent "separated . . . for cause on charges of misconduct or delinquency." *Id.*  Similarly, 18 U.S.C. 926C permits a former agent who separates "in good standing" after obtaining "an aggregate of 10 years or more" (which Mr. Strzok had easily obtained) to carry a concealed firearm.[12]  If Mr. Strzok had no LCA, and was still a member of the SES, he could have been terminated without cause, but he still would have had a property right not to be terminated for cause and lose the attendant benefits.

---

[11] Defendants make the rather bizarre argument (Opp. at 31 n.14) that this Court lacks jurisdiction under 5 U.S.C. § 7703(b)(1) ("Judicial review of decisions of the Merit Systems Protection Board") and 28 U.S.C. § 1295(a)(9), which provides that the Federal Circuit has exclusive jurisdiction over "an appeal from a final order or final decision of the Merit Systems Protection Board . . . ."  Mr. Strzok indeed sought review by the MSPB, but the Board found that it lacked jurisdiction, because Mr. Strzok's transition out of the SES had not been recorded by the FBI.  (*See* ECF No. 30-11).  Mr. Strzok filed this action to remedy Mr. Bowdich's violation of his due process rights seeking, *inter alia*, an order compelling the FBI to comply with Ms. Will's letter and removing the errant effect of Mr. Bowdich's violations of due process.  The remedy of that issue would render Mr. Strzok eligible for various relief.  *See e.g.*, 5 U.S.C. 5596 ("Back pay due to unjustified personnel action").

[12] Defendants correctly note (Opp. at 44 n.19) that Mr. Strzok has not briefed the remedies issues, including because the calculation of back pay and attorneys' fees depend on the timing of reinstatement, but Defendants are mistaken in implying that Mr. Strzok is not entitled to back pay or attorneys' fees.  *See* 5 U.S.C. 5596.  In any event, the *sine qua non* for ending this case is providing Mr. Strzok reinstatement, so that he may retire in good standing with the benefits he earned through decades of service.

## II.    Mr. Bowdich Afforded Insufficient Due Process.

*No process could have permissibly voided Mr. Strzok's contractual rights.*  The LCA

provides that the OPR Assistant Director's decision would be "FINAL" and that Mr. Strzok would

be terminated only for "*other* serious misconduct."   (Pl. Ex. 3 at 27 (emphasis added)).

Defendants' entire brief is therefore premised on the notion that Ms. Will did not accept the LCA

on behalf of the FBI.  If the Court rejects Defendants' inaccurate assertion that the LCA was "never

accepted,"[13] Mr. Strzok's motion must be granted. (Opp. at 38).[14]

*Mr. Bowdich's "process" was constitutionally deficient.*  Our opening brief discussed the

factors identified by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), that

determine what process is due before depriving a citizen of a protected property interest.

Defendants passed on discussing *Mathews* or these factors in their Opposition, and for the reasons

set forth in our opening brief, they each favor Strzok.  (*See* Mem. at 43-45).  At bottom, however,

"[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time

and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S.

545, 552 (1965).

The parties agree on several salient facts: (1) the only "notice" identified is Defendants'

June 15, 2018 letter, which stated that "Assistant Director (AD) [i.e. Candice Will] of the Office

of Professional Responsibility (OPR) will make the final decision in this matter after consideration

of your written and/or oral response(s), should you choose to submit either or both"—without any

---

[13] Defendants' assertion that the LCA was never accepted is contrary to both the FBI's internal records, as discussed *supra*, and Director Wray's pledge to ensure "all the steps in [OPR's] process are complete" before individuals were disciplined.  The "final" step in OPR's process was issuing Mr. Strzok's disciplinary letter.

[14] The government can, of course, seize a private citizen's contractual property rights, but the Fifth Amendment demands both due process and "just compensation."  U.S. Const. amend V.

mention of Mr. Bowdich or any action he might take (*see* PSOF ¶¶ 9-10; Pl. Ex. 16 at 21); (2) Mr. Bowdich did not review the lengthy written response that Mr. Strzok and his lawyers prepared addressing the facts, the charges, and the penalties, and arguing for a non-termination penalty (*see* PSOF ¶ 39; Pl. Ex. 12); (3) he did not ████████████████████████ (Bowdich Dep. 346-47); (4) ███████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████ (Bowdich Dep. 345; Will Dep. 297-98); and (5) in deciding to terminate Mr. Strzok, Mr. Bowdich ████████████████████████████ ████████████████████████████████████████. (Bowdich Dep. 345).

Defendants respond that none of that matters because the process afforded to Mr. Strzok before Ms. Will, in her capacity as the deciding official, was sufficient and all that the Fifth Amendment required. That is a curious argument, since according to the government, Ms. Will was not the actual deciding official. Moreover, that very process convinced Ms. Will (a seasoned executive with a well-deserved track record of being tough on employee discipline) *not* to fire Mr. Strzok. If Mr. Bowdich was indeed open-minded, one would think he would have been open to affording the same meaningful process prior to rendering his decision. In any event, none of the authority that the agency cites supports such a cramped interpretation of the constitutional guarantee of due process.

Defendants reach back in their Opposition Memorandum (at 41) to the cases cited on page 44 of their original brief for the proposition that the Due Process Clause does not compel an in-person hearing. Defendants primarily rely upon *Cobell v. Norton*, 226 F.R.D. 67, 90 (D.D.C.

2005).  But that case has nothing to do with the reach of the due process clause, it involved a

motion for costs as a discovery sanction under Federal Rule of Civil Procedure Rule 37, and Judge

Lamberth merely noted that he had afforded the defendant the opportunity to respond in writing to

the motion, which is all that Rule 37 required.  The only other case Defendants rely upon is

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985).  But both the holding and

reasoning of *Loudermill* strongly support Mr. Strzok, not Defendants.  As to the holding, the Court

held that in the context of a discharge of a government employee with a property interest in his

job, "[t]he essential requirements of due process . . . are notice and an opportunity to respond . . .

*either in person or in writing* . . . ."  Because Loudermill had been deprived of either method of

pre-termination response, his due process rights were violated. (Emphasis added.)

> As to the reasoning behind its decision, the Court explained:
>
> First, the significance of the private interest in retaining employment cannot be
> gainsaid.  We have frequently recognized the severity of depriving a person of the
> means of livelihood.  While a fired worker may find employment elsewhere, doing
> so will take some time and is likely to be burdened by the questionable
> circumstances under which he left his previous job.  Second, some opportunity for
> the employee to present his side of the case is recurringly of obvious value in
> reaching an accurate decision.  Dismissals for cause will often involve factual
> disputes.  Even where the facts are clear, the appropriateness or necessity of the
> discharge may not be; in such cases, the only meaningful opportunity to invoke the
> discretion of the decision maker is likely to be before the termination takes effect.
> The cases before us illustrate these considerations.  Both respondents had plausible
> arguments to make that might have prevented their discharge.  The fact that the
> Commission saw fit to reinstate Donnelly suggests that an error might have been
> avoided had he been provided an opportunity to make his case to the Board.  As for
> Loudermill, given the Commission's ruling we cannot say that the discharge was
> mistaken.  Nonetheless, in light of the referee's recommendation, neither can we
> say that a fully informed decision-maker might not have exercised its discretion
> and decided not to dismiss him, notwithstanding its authority to do so.  In any event,
> the termination involved arguable issues, and the right to a hearing does not depend
> on a demonstration of certain success.

*Id*. at 543-44.  Moreover, in *Loudermill* the Court noted that in determining what *pre-termination*

procedures were due, "[o]ur holding rests in part on the provisions in Ohio law *for a full post-*

*termination hearing*." *Id.* at 546 (emphasis supplied).  That is, Ohio law already guaranteed Loudermill a full evidentiary post-termination hearing, which he utilized nine months after his discharge.

Here, in contrast, Mr. Bowdich not only declined to either meet with Mr. Strzok or read his written reply,[15] but he specifically deprived Mr. Strzok of any appeal process in his decision and the FBI opposed (and obtained dismissal of) Strzok's attempt (post-termination) to challenge his dismissal before the MSPB.  This simply was not a "meaningful" opportunity to challenge his discharge in any way.

The government protests that we are providing a misleading description of the steps that Mr. Bowdich took to familiarize himself with the record prior to overturning Ms. Will's decision, and that he was "provided" with more materials, such as a written description of the *Douglas* factors.  But ███████████████████████████████████████████████████, so this argument rings hollow.   It is hardly sufficient due process for an agency to provide materials to a decisionmaker (and there is no record of Mr. Strzok's written submission ever being supplied to Mr. Bowdich), who then renders a decision without reviewing them.   And Mr. Bowdich's assertions about █████████████████████████████████████████ cannot establish the process he actually took, since he had *never* overturned a decision by Ms. Will before, despite testifying that ██████████████████████████████████████" (Bowdich Dep. 60, 350; PSOF ¶ 37 (Defendants' response indicates that Mr. Bowdich could recall only

---

[15] As we explained, the record in this case identifies only one instance where a decision by Ms. Will was overruled without an appeal.  That nineteen-year-old case is categorically different for several reasons.  Most notably, the final discipline imposed by the Deputy Director was a ten-day suspension, not termination nor abrogation of an LCA, and the decision letter noted a case-specific delegation of authority from the Director.  Just as critically, even in imposing far less significant 10-day suspension, the Deputy Director recorded that he had reviewed "the complete file in this matter."  (Pl. 63).

overturning two disciplinary decisions, and in both cases, he had reinstated the penalty imposed by OPR after the employee appealed)).

In their effort to make what Mr. Bowdich did sound consistent with some process, Defendants follow Mr. Bowdich's lead in relying on Policy Directive 0915D while conspicuously omitting that the directive is titled "Disciplinary Appeals Process," even though there was an agreed final decision and no appeal in Mr. Strzok's case. (*See* Opp at 38; Defs' Ex. 18).[16]

Similarly, the government gives the back of the hand to the elementary idea that the Due Process Clause requires, at a minimum, the opportunity to convince the *actual* decision-maker prior to the deprivation of the protected property interest. In our opening brief, we cited to a variety of contexts in which courts have implemented that principle. The government dismisses them all as factually distinct. And indeed, none of those cases dealt with government employment—but the salience of the principle remains sound. As the Supreme Court in *Hewitt v. Helms*, 459 U.S. 460 (1983) explained in the context of a prisoner's rights case:

> An inmate must merely receive some notice of the charges against him *and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.* Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. *So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.*

459 U.S. at 476 (emphasis added). Moreover, in *Loudermill*, which like this case involved a due process claim in the context of government employment, the Court emphasized the importance of "a fully informed decision-maker" to the due process analysis. 470 U.S. at 543. Defendants offer

---

[16] Defendants also fail to explain why the FBI Offense Codes and Penalty Guidelines maintained that this "remain[ed] *the sole province* of the Director" or why Ms. Will referenced only the Director as capable of overturning a typical decision she issued. (Pl. Ex. 60 at 6 of 34; Defs' Ex. 61). Meanwhile, Defendant pour out ink to cite two general delegations of authority which, as our motion explained, are so obscure they were unavailable and unknown to FBI employees.

nothing to explain why a sham process—where an employee is offered only the opportunity to persuade an irrelevant non-decision-maker before deprivation of a valid property interest—passes constitutional muster.

Defendants' memorandum also offers no response to Mr. Bowdich's improper consideration of information that Mr. Strzok was not notified he was being proposed for discipline for, namely Mr. Strzok's congressional testimony.  *See* 5 C.F.R. § 752.404 ("In arriving at its decision, the agency will consider *only the reasons specified in the notice of proposed action and any answer* of the employee or his or her representative, or both, made to a designated official. . . ." (emphasis added)).  Had Mr. Strzok known that he was going to be fired in part because Mr. Bowdich believed he had failed to show remorse before Congress, he would of course have made every effort to correct Mr. Bowdich's misperception and call his attention to the numerous portions of his Congressional testimony where he expressed remorse, but he received no notice and had no chance to respond to Mr. Bowdich's error.

Defendants also argue that the Court can ignore former ████████████████'s declaration on the basis that certain of Mr. Strzok's text messages were identified only after Mr. ████████ had left the FBI.  (Defs' Opp. at 26-27, 40 n.17).[17]  Mr. Bowdich's testimony is, however, devoid of any indication that he felt Mr. Strzok should be fired only after the OIG issued its report in June 2018, which noted a late-night exchange from August 2016 in which Ms. Page expressed concern about Trump, and Mr. Strzok wrote "we'll stop it," before encouraging her to go to sleep. Mr. Bowdich's extensive efforts to press OPR to move quickly against Mr. Strzok *before* OIG's

---

[17] Mr. ████████ declared *inter alia* that he ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  (Pl. Ex. 86).

report (in apparent response to President Trump's demands) lay waste to any argument that this text message made a meaningful difference to Mr. Bowdich.  Indeed, in their opening Brief, Defendants indicated that Mr. Bowdich consistently believed, from the time that he first read the (incomplete) universe of texts in the summer of 2017, that Strzok would need to be fired.  (Defs' Mot. at 8, 26, 30).  It was only after seeing the Strzok Memorandum, including the McCabe Declaration, that Defendants changed their narrative, albeit without pointing to any actual evidence that Bowdich's change of heart was caused by the late-discovered texts instead of the President's relentless demands for Strzok's firing.

While Defendants spend great effort trying to explain why Mr. Bowdich was not *required* to review Strzok's written response, or meet with him, it spills no ink on the bewildering question of why Mr. Bowdich would make such a weighty and unusual decision without doing so.  While the Fifth Amendment claim is certainly distinct from Strzok's First Amendment retaliation claim, the circumstances surrounding both claims cannot be ignored.  The then-President of the United States was campaigning hard and loudly for Strzok's firing.  Perhaps that explains Bowdich's disinterest in hearing (or even reading) Mr. Strzok's direct reply.

## CONCLUSION

Mr. Strzok had a valid property interest in his continued employment and in not being terminated for cause, which Deputy Director Bowdich could not have lawfully deprived him of, let alone without any meaningful process.  That is a violation of the Fifth Amendment, proven by undisputed facts.  Summary judgment for Mr. Strzok is warranted on that claim.


Date: December 16, 2024                    Respectfully submitted,

                                           /s/ Christopher R. MacColl
                                           Aitan D. Goelman (DC Bar 446636)
                                           Christopher R. MacColl (DC Bar 1049153)

ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
AGoelman@zuckerman.com

/s/ Richard A. Salzman
Richard A. Salzman (DC Bar 422497)
HELLER, HURON, CHERTKOF & SALZMAN
PLLC
1730 M Street, NW, Suite 412
Washington, DC 20036
Tel: (202) 293-8090
salzman@hellerhuron.com