# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER STRZOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-2367 (ABJ) |
| ) | |
| MERRICK GARLAND, ) | |
| *in his official capacity* ) | |
| *as Attorney General, et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff Peter Strzok, who served with distinction as an FBI Special Agent for approximately twenty-five years and rose to the rank of Counterintelligence Section Chief and then Deputy Director of the Counterintelligence Division, filed this action to challenge the FBI's August 2018 decision to terminate his employment. The disciplinary action arose out of the Department of Justice Inspector General's July 2017 discovery of thousands of text messages that Strzok and a government attorney exchanged on their FBI-issued phones, including many that contained derogatory comments about the very people they were investigating.

At that time, plaintiff Strzok was leading both the politically sensitive investigation into then-Secretary of State Hillary Clinton's use of a private email server (the "Midyear" investigation) and the equally high-profile investigation into potential Russian interference in the 2016 election (the "Crossfire Hurricane" investigation), and both Strzok and the lawyer had served or were serving on the team assisting the then-Special Counsel for the Department of Justice, Robert S. Mueller III, with his investigation into potential Russian interference and related matters. The messages came to light during a routine Office of Inspector General review of the Midyear investigation.

Given the concerns that the set of disparaging messages that had been initially discovered could reflect bias on plaintiff's part, he was immediately removed from both investigations and all operational duties within the Bureau while the Office of Inspector General completed a thorough

review of the Midyear investigation, including gathering and examining all of the troubling communications and assessing whether any bias had affected the integrity of the Bureau's work.

Several months later, in December 2017, news of plaintiff's removal from the Special Counsel's team was reported in the press. The Department of Justice informed Congress of the circumstances behind the reassignment, and it publicly released the messages, thrusting Strzok, the lawyer, and their relationship into the public eye. This provoked a firestorm of criticism of the FBI at a time when the ongoing investigations were already the subject of attacks by President Donald Trump, who was then serving his first term.

The Office of Inspector General issued its report on the Midyear investigation, including Strzok's messages, in June 2018. It concluded that while there was no indication that bias had tainted the ongoing inquiry, Strzok and others had demonstrated extremely poor judgment and a gross lack of professionalism, damaging the FBI's reputation for neutral factfinding and political independence. The matter then fell within the purview of the FBI Office of Professional Responsibility ("OPR"), which issued a Notice of Proposed Termination to Strzok. In the Notice, the Chief of Adjudication Unit II advised plaintiff that she had concluded, based on a preponderance of the evidence, that the allegations were substantiated, and she proposed dismissing him from the rolls of the FBI. The Notice identified the Assistant Director of OPR as the final decision maker, and it offered plaintiff the opportunity to respond to the Notice in writing and in person. Represented by counsel, plaintiff availed himself of both chances to be heard, and at the meeting, the then-Assistant Director of OPR, Candice Will, concluded by cautioning plaintiff and his lawyer that no matter what she decided to do, the FBI Director had the authority to overrule her decision.

After the meeting, plaintiff transmitted a proposed "Last Chance Agreement" to the Assistant Director, offering to accept the lesser sanction of a sixty-day suspension and demotion, to waive his right to appeal that sanction, and to be fired immediately in the event of any disciplinary infraction in the future, if his offer was accepted. After consideration of the evidence upon which the disciplinary sanction was based, plaintiff's written response, his oral presentation, and his execution of the Last Chance Agreement, the Assistant Director of OPR decided, among other things, that the allegation that plaintiff violated FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty) was substantiated, and that while termination would also have been

warranted, the appropriate penalty should be the sixty-day suspension and demotion. She informed the agency's Deputy Director, David Bowdich, of how she intended to proceed, and he told her he needed to think it over. The next morning, he informed her that he would exercise the authority delegated to him by the Director to overrule her decision, and that plaintiff would be terminated. They agreed that the letters announcing their separate determinations would be delivered to plaintiff at the same time.

The OPR head drafted her letter and shared it with the FBI Deputy Director, and she supplied the Deputy Director with sample language and editing suggestions as he drafted his. The two letters were hand-delivered to plaintiff in the same envelope on the same date.

On August 6, 2019, plaintiff filed this lawsuit, alleging that: the dismissal based on his statements violated the First Amendment to the Constitution; the decision by the Deputy Director deprived him of a contractual interest in continued tenure in violation of the due process clause in the Fifth Amendment; and the defendants violated the Privacy Act when they disseminated the messages to the public. In September 2020, the Court denied defendants' motion to dismiss, and the parties embarked on a lengthy and contentious period of discovery, during which the Court permitted plaintiff to depose multiple present and former government officials, often over the government's objection.

The Privacy Act claim was later dismissed, and now that discovery is complete, the First Amendment and due process claims are the subjects of motions for summary judgment. The defendants have moved for judgment in their favor on both counts, and plaintiff has filed a cross-motion for summary judgment on his due process claim. At this point, only two issues remain to be resolved: did plaintiff's termination violate the First Amendment, and did his termination violate the Fifth Amendment guarantee against the deprivation of property without due process of law? The questions of whether the Department of Justice violated the Privacy Act in disclosing the texts to the media, and whether the plaintiff suffered any harm as a result of that disclosure are no longer part of the case.

It is undisputed that Strzok served his country with distinction in the armed services and as an FBI Special Agent for twenty-five years, and that at the FBI, he was promoted several times to become Deputy Assistant Director of the FBI's Counterintelligence Division. Prior to the events

at issue, he was among the FBI's leading counterintelligence experts, widely recognized as an extremely intelligent, talented, and hard-working Special Agent.

It is important to underscore that the Court is not being asked to determine whether, in its view, termination was the appropriate sanction for the conduct uncovered by the Office of Inspector General. As both parties acknowledged at the hearing on the pending motions, it is not up to the Court to decide whether it was unnecessarily harsh to end plaintiff's career after a long, unblemished record of outstanding service to the agency, or whether a severe sanction was necessary to address the lack of professionalism and appearance of bias in the messages, particularly in light of plaintiff's high rank and the leadership role he played in both investigations. The Court has no say in whether, given the absence of any finding that actual bias impaired plaintiff's performance of his duties, firing him was an overreaction to remarks he made in the context of personal – albeit discoverable – communications on a government phone, or whether the damage to the Bureau's reputation and integrity demanded it.[1]

In short, the Court is not being asked to substitute its judgment for that of the agency in this employment matter. As the former Assistant Director of the FBI for the Office of Professional Responsibility stated repeatedly in her testimony in this case, "reasonable minds can differ" on those questions, and passions run hot on both sides of the divide.

The sole question to be determined here, then, is whether the FBI's imposition of the sanction of termination comported with the Constitution. Plaintiff has deposed all of the individuals involved whom he asked to depose, including such high-ranking officials as the then-Deputy Attorney General, the then-Director of the FBI, and the President of the United States. And after a thorough review of the pleadings and the materials submitted in support of the cross-motions, the Court finds that there is no genuine dispute of material fact that would preclude the entry of summary judgment in the defendants' favor and that plaintiff's motion for summary judgment should be denied.

---

1    Also, this case is about whether it was lawful to fire an FBI agent for making many troubling comments about the subjects of two politically sensitive investigations, while he was leading those investigations. It does not involve, and this opinion should not be read to address, whether it would be proper to fire a law enforcement officer for *participating* in an investigation to which he was assigned.

When assessing the type of First Amendment claim raised in Count One, a court must balance the government employee's interest in speaking as a citizen on matters of public concern against his employer's interest in preserving the effectiveness and efficiency of its operations. The Court has considered the time, place, and manner of plaintiff's comments, his rank and responsibilities, and the particular position of trust he held within the Bureau in 2017 and 2018, as the law requires it to do. And it finds that his interest in expressing his opinions about political candidates on his FBI phone at that time was outweighed by the FBI's interest in avoiding the appearance of bias in its ongoing investigations of those very people, and in protecting against the disruption of its law enforcement operations under then-Director Wray's leadership.

Also, while plaintiff's memorandum marshals considerable indignation, he cannot point to evidence that supports the conclusion advanced "upon information and belief" in Count One: that defendants treated plaintiff more harshly than they would have treated employees in similar circumstances because the viewpoint expressed in the texts was critical of President Trump. Each of the FBI officials deposed maintained that given plaintiff's rank and his role in the two investigations, and the appearance of bias that permeated the messages, the situation was unprecedented, and there were no comparators. As to Count Two, the due process claim is predicated on a misrepresentation of the facts and distortion of the chronology. Once one gets past the rhetoric and considers the undisputed factual record, it becomes clear that there is no evidence to support a finding that plaintiff entered into a contract with Will that gave him a property interest in his tenure before the Deputy Director exercised his authority to terminate him, or that plaintiff lacked notice and an opportunity to be heard before his fate was decided.

For these reasons, and as set forth fully in the Memorandum Opinion filed under seal on this date, defendants' motion for summary judgment on Counts One and Two will be granted, and plaintiff's motion for summary judgment on Count Two will be denied.

## CHRONOLOGY OF EVENTS[2]

Much of the argument and analysis turns upon the chronology of what took place, and given how frequently that chronology has been obscured or mischaracterized, it is necessary to set out the facts in some detail.

| | |
|---|---|
| Aug. 2015 | Plaintiff was selected by the FBI to head its investigation into the then-Secretary of State and Democratic candidate for president, Hillary Clinton, and her use of a private email server, referred to as the "Midyear Exam" investigation. Pl.'s Statement of Material Facts as to which There is No Genuine Dispute [Dkt. # 155-1] ("PSOF") 3. |
| Feb. 2016 | Plaintiff became a Section Chief in the Counterintelligence Division, a Senior Executive Service position. *See* Defs.' Statement of Material Facts as to which There is No Genuine Dispute [Dkt. # 152-1] ("DSOF") 6, citing Dep't of Justice Office of Inspector General, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*" (June 2018) ("Midyear Report") at 43 n.51, https://oig.justice.gov/reports/2018/18-04.pdf [https://perma.cc/95XY-7TSQ]. |
| July 2016 | Plaintiff was selected to help lead the investigation into potential Russian interference in the 2016 election, referred to as the "Crossfire Hurricane" investigation. PSOF 4. |
| Sep. 2016 | Plaintiff was promoted to serve as the Deputy Assistant Director, Counterintelligence Division, also a Senior Executive Service position. DSOF 13. |

---

2       The entries in the chronology are based on undisputed evidence unless otherwise specified. Since many of the parties' proposed statements of fact employ adjectives or other means to characterize or "spin" the facts, the Court has relied wherever possible on the documents cited in the statements of fact rather than the statements themselves.

Both parties docketed their motions for summary judgment with full deposition transcripts as exhibits, and the hyperlinked Statements of Fact they were ordered to file linked statements purportedly based on deposition testimony to the complete transcripts rather than excerpts. When the Court asked for mini-script versions of the transcripts, it invited the parties to put boxes around the relevant testimony relied upon in their pleadings, but both sides declined to do so. Therefore, the Court has reviewed and considered the full deposition transcripts that were submitted by the parties.

| | |
|---|---|
| Nov. 2016 | Donald J. Trump was elected to his first term as 45th President of the United States. |
| Jan. 12, 2017 | The Department of Justice ("DOJ") Office of Inspector General ("OIG") began a review of the Midyear Exam investigation. *See* Midyear Report at 2. |
| May 17, 2017 | The Acting Attorney General of the United States appointed former FBI Director, Robert S. Mueller III, as Special Counsel for DOJ to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." *See* Defs.' Ex. ("DEX") 27 [Dkt. # 151-29] Order No. 3915-2017; PSOF 7. |
| June 2015–July 2017 | Plaintiff and a government attorney, Lisa Page, exchanged more than 40,000 text messages using their FBI-issued mobile telephones. DSOF 22, citing Midyear Report at 397 n.198. The attorney was serving as Special Counsel to Andrew McCabe, the then-FBI Deputy Director, and she had also been involved with the Midyear investigation, the Crossfire Hurricane investigation, and the Special Counsel investigation. DSOF 20–21. The set of messages included many comments about Donald Trump and Hillary Clinton and other political figures, and some that explicitly referred to the ongoing investigations. *See* Midyear Report at 396. |
| July 2017 | DOJ's OIG Midyear Review Team obtained the messages. According to then-Inspector General ("IG") Michael Horowitz, by July, there were concerns that some of the texts revealed potential bias. DEX 14 [Dkt. # 151-16]; Pl.'s Ex. ("PEX") 20 [Dkt. # 155-21] ("Horowitz Dep.") at 90, 92–93. |
| July 27, 2017 | IG Horowitz met with Deputy Attorney General ("DAG") Rosenstein and Special Counsel Mueller to inform them about the messages. Horowitz Dep. at 151. In his deposition, Horowitz described their reaction as "stunned silence. It was clear that people were very disturbed by it." Horowitz Dep. at 133. *See also id.* at 133–34 (Mueller seemed "very concerned," and they discussed the need to "promptly . . . reassign Mr. Strzok back to the FBI"). |
| July 28, 2017 | Plaintiff was removed from the Special Counsel's team. Midyear Report at 397. |
| | IG Horowitz met with then-FBI Associate Deputy David Bowdich. Horowitz Dep. at 140–41 ("I recall him being . . . very disturbed and concerned about what he was seeing . . . . I recall him in subsequent meetings and discussions telling me that [it] was probably one of the hardest meetings he'd ever been a part of during his FBI tenure."). |

| | |
|---|---|
| Late July/<br>Early Aug. 2017 | Bowdich removed Strzok from all operational duties and reassigned him to Human Resources. DEX 9 [Dkt. # 151-11] ("Bowdich Dep.") at 122; PEX 25 [Dkt. # 155-26] ("Pl.'s Am. Interrog. Resp.") at 35–36. Plaintiff has averred that during their meeting, he expressed the desire to remain in an operational division or counterintelligence, but Bowdich remained firm in his decision that he be placed in the Human Resources Division. PEX 17 [Dkt. # 155-18] ("Strzok Dep.") at 137. According to plaintiff, Bowdich commiserated with him and predicted that what was going on at the time might leave him "scathed," but "would ultimately be okay," and that he "would eventually return to the mainstream of the FBI's activities." Strzok Dep. at 138. *See also* Pl.'s Am. Interrog. Resp. at 36; Pl.'s Statement of Genuine Issues Necessary to be Tried [Dkt. # 155-1] ("PSGI") 16.[3] |
| Aug. 2017 | Plaintiff met with Bowdich and Andrew McCabe, the then-Deputy Director/Acting Director of the FBI, and McCabe reassured plaintiff about his prospects for the future with the FBI. *See* Pl.'s Am. Interrog. Resp. at 36; PEX 86 [Dkt. # 153-17] ("McCabe Decl.").[4] |
| Sep. 1, 2017 | A DOJ Oversight and Review Investigation was initiated concerning Strzok. *See* PEX 51 [Dkt. # 155-45] ("Notification of DOJ Investigation"). |

---

[3]    Defendants do not dispute this assertion for purposes of the motion, but they point out that at that time, "Mr. Bowdich did not have all of the facts or analysis available to him, such as the OIG's analysis of Mr. Strzok's conduct, the full panoply of text messages including the one in which Mr. Strzok claimed he would 'stop' Mr. Trump from becoming President, [or the] FBI OPR's analysis of Mr. Strzok's conduct." Defs.' Resp. to PSGI [Dkt. # 158-1] 16.

[4]    Plaintiff directs the Court to PEX 25, his interrogatory answers, and PEX 86, the Declaration of Andrew George McCabe, *see* Pl.'s Mem. in Supp. [Dkt. # 153-1] (Public)/[Dkt. # 155] (Sealed) ("Pl.'s Mem.") at 29; PSGI 19, to support his understanding of what Bowdich's position was at the time. However, the interrogatory answer states, "Mr. McCabe said that once the Inspector General's report was done, the Office of Professional Responsibility would take the findings, and in the worst case would conclude that Plaintiff had misused a government IT system, and following what would at worst be a brief suspension, that the group would be back talking about where to send Plaintiff out as a Special Agent in Charge of a field office." Pl.'s Am. Interrog. Resp. at 36. It does not attribute any comments to Bowdich. McCabe's declaration corroborates that he did not believe Strzok would end up being fired, but he does not put words in Bowdich's mouth. "Although I do not recall Bowdich saying much in the meeting, he did not express any disagreements with my assurances to Mr. Strzok before, during, or after the meeting." McCabe Decl. ¶ 10.

| Dec. 2, 2017 | The New York Times and Washington Post published articles about the messages. PSGI 23–24 (not disputed).[5] *See* PEX 23 [Dkt. # 155-25] Sarah Isgur Dep. ("Isgur Dep.") at 62 (referring to December 2, 2017 New York Times article entitled, "Mueller Removed Top Agent in Russian Inquiry over Possible Anti-Trump Text," and Washington Post article entitled, "Top FBI Official Assigned to Mueller's Russia Probe Said to Have Been Removed After Sending Anti-Trump Text"). |
|---|---|
| Dec. 12, 2017 | DOJ Press Secretary permitted members of the media to review a set of the text messages. PSGI 23, 28 (not disputed). |
| Dec. 12, 2017 | DOJ delivered the text messages to Congress on the evening of December 12, 2017. Defs.' Resp. to PSGI 28 [Dkt. # 158-1]. |
| Dec. 13, 2017 | DAG Rosenstein appeared before Congress. *See* PEX 80 [Dkt. # 153-15]. |
| Early 2018 | Plaintiff had what he described as a "final" meeting with Bowdich, who stopped by to see how he was doing after the texts had been disclosed. Pl.'s Am. Interrog. Resp. at 36–37. |
| Jan. 11, 2018 | Trump publicly accused plaintiff of "treason." PSGI 42. |
| Mid-Jan. 2018 | The FBI discovered that a number of text messages, including some of those exchanged between Strzok and Page on their government phones, were missing from its server. Midyear Report at 397–98; PSGI 43; PEX 37 [Dkt. # 155-35].[6] |
| Jan. 22, 2018 | Then-Attorney General Jeffrey Sessions and then-FBI Director Christopher Wray attended a meeting at the White House, during which the missing texts were discussed. An online media outlet later reported that at the meeting, |

---

5        Defendants state it is "undisputed that, prior to those stories, the information about Mr. Strzok's text messages with Ms. Page were already outside of the government." Defs.' Resp. to PSGI 26, citing *United States v. Flynn*, 411 F. Supp. 3d 15, 24 (D.D.C. 2019). *See also* DEX 62 [Dkt. # 158-2] at 4–7 (detailing Ms. Page and her counsel's communications with reporters between November 1, 2017 and December 12, 2017); Defs.' Mem. in Supp. [Dkt. # 150-1] (Public)/[Dkt. # 151-1] (Sealed) ("Defs.' Mem.") at 10 n.2, citing *Flynn*, 411 F. Supp. 3d at 24; 411 F. Supp. 3d at 31–32 ("The government notes – and Mr. Flynn does not challenge – that it informed [him] about the existence of the text messages and their import on November 30, 2017 . . . and it later informed [him] that it had learned there were additional text messages that it did not have access to at that time.") (internal quotation marks omitted).

6        The OIG recovered 9,311 of the missing text messages from Strzok's phone and 10,760 from Page's phone, which was "generally consistent with previous time periods," but it could not be definitive as to whether every missing text message was recovered. Midyear Report at 398.

|  | President Trump also demanded that Strzok and the lawyer be fired. *See* Murray Waas, *Exclusive: Trump pressed Sessions to fire 2 FBI officials who sent anti-Trump text messages*, VOX (April 20, 2018), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages [https://perma.cc/UNJ7-U8UV].[7] Trump tweeted about the missing messages the next day. PSGI 43, citing PEX 38 [Dkt. # 153-6]. |
|---|---|
| Jan. 30, 2018 | Bowdich was named interim Deputy Director of the FBI, then named Deputy Director a few weeks after. Bowdich Dep. at 120. |
| Feb. 21, 2018 | Trump met with Chief of Staff John Kelly, Attorney General Sessions, and White House counsel, and mentioned firing Strzok and the government attorney. *See* DEX 17 [Dkt. # 151-19]; PEX 85 [Dkt. # 153-16] ("Kelly Decl."). |
| Mar. 2018 | The OIG opened a review of the Crossfire Hurricane investigation. *See* DOJ OIG, *Review of Four FISA Applications & Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) ("Crossfire Report") at 8, https://www.justice.gov/storage/120919-examination.pdf [https://perma.cc/5LUS-TMGW]. |
| Apr. 11, 2018 | Bowdich called then-Assistant Director ("AD") of the Inspection Division Nancy McNamara and asked if the Strzok case had arrived in OPR for |

---

7    The admissible evidence concerning the meeting is former Director Wray's testimony that he recalled attending one meeting at the White House in the first quarter of 2018 that concerned Strzok, and he recalled that the "point of the meeting" was the recent discovery that a quantity of FBI text messages were missing, and that he attended the meeting to explain to the Attorney General what the agency knew about why they were missing. DEX 10 [Dkt. # 151-12] ("Wray Dep.") at 14, 19–20 ("[T]he point of the meeting and the sum of the exchange" was Wray's explanation that there had been some sort of IT issue related to the transfer of phone systems, and the President "expressed skepticism at that explanation.").

|  |  |
|---|---|
|  | adjudication yet.  He was informed that OPR had not received the file as the OIG investigation was still ongoing.  PSGI 45.[8] |
| Apr. 23, 2018 | The FBI Director's thirteen-page AM News Briefing[9] included a reference to the April 20, 2018 Vox article about the President's meeting with Wray and Sessions three months earlier.  PSGI 46; PEX 41 [Dkt. # 155-36] at 1 ("*Trump Urged Sessions To Fire Two FBI Officials Behind Anti-Trump Text Messages*"). |
| Apr. 30, 2018 | A Wall Street Journal article concerning the texts was one of the news items synopsized in the twelve-page, single-spaced Director's AM News Briefing.  PSGI 48; PEX 42 [Dkt. # 155-37] at 8 ("*Strzok-Page Texts Reveal Sympathy for Comey over Dismissal*"). |
| May 1, 2018 | Bowdich called IG Horowitz.  Horowitz emailed William G. Blier in OIG: "I spoke to Dave Bowdich tonight and he said he wants [the Assistant Director of OPR, Candice Will] to start reviewing the possible misconduct matter involving Strzok and Page.  He asked who she should call and I told him you were the one who interacts with her on misconduct issues." |

---

[8]     Plaintiff asserts that "Bowdich was 'growing impatient,' and called Ms. McNamara to ask whether the 'Lisa Page/Pete Strzok' case had arrived in OPR for adjudication yet."  PSGI 45, citing Bowdich Dep. at 235, 238.  Bowdich testified that "[he] grew impatient with OPR – with the Inspector General's Office on many matters" and did not recall if the Strzok/Page matter was one of them.  Bowdich Dep. at 235; *id.* at 237 ("[N]one of these investigations move fast.  Midyear and Russia collusion, in particular, investigations were long, if you read them, and took a long time, but as a matter of course in my meetings with Nancy, which were regular, I would probe what's going on with this case, what's going on with that case.  There's a lot of investigations that the Inspector General has that we have a significant interest in.").

[9]     Wray explained that the Director's AM News Briefing is a "news aggregator" service prepared by the FBI's Office of Public Affairs that "digests news items with varying levels of comprehensiveness related to the FBI."  Wray Dep. at 49.  Bowdich explained that he received paper copies every morning and reviewed them "at some point during the day."  Bowdich Dep. at 52.  The News Briefings introduced as exhibits reflect that they are single-spaced and can exceed ten pages; they cover a range of topics and may cite multiple news sources concerning any particular topic.  *See, e.g.*, PEX 41, 42, 46, 48–50, 79 [Dkt. # 155].

|  | Horowitz told Blier to expect a call from Will.  PSGI 48; PEX 43 [Dkt. # 155-38].[10] |
|---|---|
| May 3, 2018 | Will emailed Blier at OIG:  "Dave Bowdich asked me to reach out to you regarding the Strzok and Page matter.  I gather the OIG is ready (or almost ready) to provide us access to those materials.  If we could get them on a disk like we did in the last matter, that would [be] ideal."  PEX 44 [Dkt. # 155-39]. |
| May 7, 2018 | Trump tweeted about Strzok, again decrying the fact that he was still at the FBI.  PSGI 49. |
| June 13, 2018 | The Assistant Director of the FBI's Inspection Division sent a notification to the Assistant Director of the Human Resources Division that on September 1, 2017, a DOJ Oversight and Review Investigation was initiated concerning Strzok; and that on June 13, 2018, it was referred to OPR for review and adjudication.  *See* Notification of DOJ Investigation. |
| June 14, 2018 | The OIG Midyear Report was issued.  It found no evidence that bias affected investigative decisions but concluded that the text messages and the conduct of plaintiff and others "demonstrated extremely poor judgment and a gross lack of professionalism," "brought discredit to themselves, sowed doubt about the FBI's handling of the Midyear investigation, and impacted the reputation of the FBI."  Midyear Report at xi–xii, 423–24.  *See also* Horowitz Dep. at 316. |
| June 14, 2018 | Director Wray stated at a press conference, "We're going to adhere to the appropriate disciplinary process, and once that process is complete, we won't hesitate to hold people accountable for their action."  FBI, *Justice Department OIG Report on Clinton Email Probe*, at 2:43 (C-SPAN Jun. 14, 2018),  https://www.c-span.org/video/?447050-1/fbi-director-accepts-oig-report-clinton-email-probe. |
| June 14, 2018 | Trump was briefed about the OIG's Midyear Report by DAG Rosenstein and Scott Schools.  PSGI 50. |
| June 15, 2018 | Trump stated that Strzok should have been fired long ago.  PSGI 50. |

---

10     PSGI 57 refers to this email as Bowdich's "demand" that OPR open a file, and PSGI 58 asserts that Bowdich "demanded only" that OIG expedite the misconduct matter involving plaintiff and the government lawyer, citing PEX 43, the May 1, 2018 Horowitz email, as support for those statements.  Plaintiff's characterization is not supported by the cited evidence.

PSGI 48 includes the sentence, "Mr. Bowdich pressed Ms. Will to move quickly," citing Bowdich Dep. at 244, 247.  Neither page includes any such testimony.

June 15, 2018        Jessica A. Loreto, Chief, Adjudication Unit II, OPR, transmitted a Notice of Proposed Termination to Strzok. PEX 16 [Dkt. # 155-17]; DEX 3 [Dkt. # 151-5] ("Notice"). The Notice stated that Loreto found the allegations that plaintiff "made inappropriate political comments in text messages on [his] FBI-issued cell phone, in violation of FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty)," as well as alleged violations of FBI Offense Code 5.18 (Security Violation – Other) and Offense Code 1.7 (Investigative Deficiency – Misconduct Related to Judicial Proceedings) to be substantiated, and "considering the 12 *Douglas* Factors, including but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors," she proposed the penalty of termination.[11] Notice at 1. "Although you repeatedly denied that your investigative decisions in the Clinton Email and Russia investigations were the result of actual bias, the *appearance* of biased decision-making caused by your outrageous texts is as bad as if you had been biased." Notice at 18 (emphasis in original). The Notice stated that the Assistant Director of the OPR "will make the final decision in this matter"; it informed plaintiff that he could be assisted by an attorney in the disciplinary matter; and it offered him the opportunity to request to review the material that was relied upon by OPR's proposing official, to provide a written response to the proposed action, and to request to make oral presentation to the AD of OPR

---

11    The term "*Douglas* factors" refers to the twelve factors set out by the Merit Systems Protection Board ("MSPB") in *Douglas v. Veterans Administration*, which deciding officials are supposed to consider "in determining the appropriateness of a penalty." 5 M.S.P.R. 280, 305 (1981). The factors are: "(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others." *Id.* at 305–06.

|                | either telephonically, in person, or by video conference at his election. Notice at 21–22. |
|----------------|--------------------------------------------------------------------------------------------|
| July 11, 2018  | Trump tweeted about "former FBI Agent/Lover Peter Strzok." PSGI 52, citing July 12, 2018 Dir.'s AM News Briefing, PEX 49, [Dkt. # 155-43] at 1. |
| July 12, 2018  | Plaintiff testified before Congress. PSGI 35. Trump publicly called for him to be fired. PSGI 38. |
| July 12–14, 2018 | Bowdich received an email from an acquaintance commenting on plaintiff's testimony:  "he makes the bureau look great, and the Republicans on the committee are coming across as the ones who operate with bias."  Bowdich Dep. at 306–07.  Bowdich replied:  "Though I felt Pete held up well on the Hill, he made some very serious mistakes by opining about a presidential candidate, or maligning any political candidate."  Bowdich Dep. at 309–10. He added, "In the FBI, we draw a very hard line about any political opinions at the workplace, rightly so.  In this case, it was particularly harmful to our reputation with a segment of the country."  Bowdich Dep. at 310–11. |
| July 15, 2018  | Trump called plaintiff a "disgrace to our county" and the FBI.  PSGI 53, citing July 16, 2025 Dir.'s AM News Briefing, PEX 50 [Dkt. # 155-44] at 9. |
| July 16, 2018  | Trump again called plaintiff a "disgrace to our county" and the FBI, and said, "how he's still being paid is beyond belief."  PSGI 54. |
| July 17, 2018  | Through counsel, plaintiff filed a written response to the Notice of Proposed Termination.  PEX 12 [Dkt. # 155-13]; DEX 5 [Dkt. # 151-7] ("Resp. to Notice").  He maintained that given OIG's finding that there was no evidence that his political opinions affected any investigative step or decision, the proposal to fire him was "unfair."  Resp. to Notice at 1.  He described the proposed discipline as "a capitulation to the wishes of the President, who has repeatedly called for his head," which is "not due process."  Resp. to Notice at 1–2.  He also contended that it would be unfair and in contravention of the First Amendment to terminate him for expressing his personal political opinions in private conversations.  Resp. to Notice at 4.  Plaintiff detailed his lengthy career as a highly skilled investigator and the many awards and commendations he received, Resp. to Notice at 4–5, and he addressed each of the allegations in detail.

With respect to the text messages, the response acknowledged "the concern that Special Agent Strzok used an FBI device to express these opinions, and that he should have foreseen at the time that there was a realistic possibility that his texts with Ms. Page would be publicly revealed and create an 'appearance' of bias (whether true or not)."  Resp. to Notice at 14. |

> Special Agent Strzok has from the very beginning of this
> inquiry acknowledged this mistake and is genuinely sorry
> that it has resulted in negative publicity to the agency he
> loves. But we respectfully disagree that it was in any way
> foreseeable that his communications with Ms. Page would
> be publicly revealed, or that he is primarily responsible for
> the public disclosure.

> *Id.* at 14–15. *See also id.* at 15 ("[I]t was the OIG briefing officials within
> DOJ who both publicly named Special Agent Strzok and Ms. Page, and
> released to the media a selective sample of their text messages . . . . By
> taking this action, OIG and DOJ contributed to the very same public
> perception of bias that the Proposed Removal and IG Report bemoans.");
> *id.* ("Not only is it indisputable that Special Agent Strzok believed that his
> text messages to Ms. Page would remain private, this belief was objectively
> reasonable. . . . [T]he public disclosure here of texts that were always
> intended to remain private was both unforeseen and unforeseeable.").

July 24, 2018    Plaintiff and his counsel attended the in-person hearing before the Assistant
Director of OPR, Candice Will, that they had requested. *See* DEX 6 [Dkt.
# 151-8] ("Hearing Tr.").[12] Both counsel and plaintiff spoke on plaintiff's
behalf. *See* Hearing Tr. Will specifically informed plaintiff and his lawyer
that "[t]he Director has the right to review any decision I make" or decision
made by the Disciplinary Review Board ("DRB"), and to modify it "if the
Director thinks it's in the best interest of the organization." Hearing Tr.
at 128.

The hearing then concluded with plaintiff's request for a sanction short of
termination, and plaintiff mentioned last chance agreements as one of the
available options. Hearing Tr. at 130–31.[13] There is no dispute that the

---

12    Defendants also provided an audio recording of the hearing to the Court. DEX 61 [Dkt.
# 151-63]. Plaintiff admits that he participated in the hearing and to the existence of the audio
recording "with the caveat that the transcript of the hearing contains numerous inaccuracies"
without identifying them. Pl.'s Resp. to DSOF [Dkt. #155-1] 78. In citing to what transpired at
the hearing, plaintiff's Statement of Facts cites only to the audio recording.

13    After emphasizing his years of service with the agency, plaintiff asked for leniency:
"I want to keep working here. I have a lot of good yet to do. And I asked, just give me that
opportunity in whatever context, and I know reading all of it, there's 30, 60 days, last chance
agreements, demotions. I mean you've got a range of things at your disposal. And I think my
argument and plead to you would be there are appropriate sanctions short of termination that
achieve what you need to do." Hearing Tr. at 131; PSOF 15. This was the sum total of any
discussion of last chance agreements at the meeting.

concept of a Last Chance Agreement ("LCA") was first raised by the plaintiff at the hearing.  *See* DSOF 82; PSOF 15.

July 24, 2018          Plaintiff's counsel spoke with OPR Unit Chief Loreto about LCAs later that day.  DSOF 83.  Loreto emailed AD Will, saying, "Aitan called me back. He had a lot of questions, apparently he had never heard of these before his client brought it up in the hearing.  He's going to take to his client and get back to me." DEX 42 [Dkt. # 151-44].[14]

July 25, 2018          OPR Unit Chief Loreto sent an unsigned version of an LCA form to plaintiff's counsel.  DSOF 84; DEX 43 [Dkt. # 151-45]; PSOF 16; PEX 1 [Dkt. # 155-2].   The transmittal email stated, "Based on your client's statements during yesterday's hearing that he would accept a 60-day suspension, demotion, and a Last Chance Agreement in lieu of dismissal, and at your request, I am forwarding you the attached Last Chance Agreement.  I want to stress, Aitan, in the end, as you know, it is the AD's decision.  I am waiting to hear back from you before speaking further with the AD." DEX 43; PEX 1.

July 26, 2018          Plaintiff and counsel signed the LCA and returned it.  DSOF 86; PSOF 17. Counsel's cover email stated:  "Here is the LCA signed by me and Pete. Please let me know when the AD issues her final decision."  DSOF 86; PEX 2 [Dkt. # 155-3] ("the LCA").[15]

The LCA requested sanctions other than dismissal, and plaintiff offered to relinquish certain rights, including the right to contest any future disciplinary infractions, in return.  DSOF 87; LCA. *See also* PSOF 18 ("The LCA provided, if accepted, that the 'OPR Assistant Director's decision will constitute the FINAL decision in this matter . . . ,' Strzok would 'complete a suspension of 60 calendar days . . . .'" and if he engaged in any other serious misconduct, the appropriate penalty would be "removal from the rolls of the FBI.").  The signed LCA was not operative until accepted by Will, and if it was not accepted, Strzok would not lose his right to appeal. PSOF 19, citing PEX 18 [Dkt. # 155-19] ("Will Dep.") at 241.

---

14     At the July 12, 2025 hearing on the parties' motions for summary judgment, counsel professed to being unable to remember calling Loreto to inquire about last chance agreements.

15     This exchange was repeatedly characterized in plaintiff's submissions over the course of this litigation as plaintiff's acceptance of Will's offer, but it is undisputed now that there had been no offer extended by her for him to accept, so no contractual right in the job existed at that point. *See* PSOF 19.

| | |
|---|---|
| July 26, 2018 | After counsel returned the signed LCA to Loreto, Will considered the matter.  Will Dep. at 239–40 ("What I'm going to do with this is consider that he's executed this now and have my quiet moment rethinking the file and say to myself, Am I good with this?  Am I good with 60, demotions and an LCA?  And at the end of the day, I said, [y]es I am.  I have Pete Strzok's signed LCA, 60, demotion.  For me that is a reasonable and appropriate penalty in this matter."). |
| On or about July 26, 2018 | Will informed Bowdich in a telephone conversation that after reviewing all of the material, including everything plaintiff submitted, and after listening to everything plaintiff and his lawyer had to say, she intended to reduce the proposed penalty to a sixty-day suspension, demotion to non-supervisory status, and the execution of a LCA.  Will Dep. at 287–91 ("Reasonable minds can differ. . . . That's what I think is appropriate."). |

Bowdich responded that he needed to think about it and that he may go a different way.  Will Dep. at 291–92; *id.* at 292–93 ("I may have said to him, it will take me a few days to finalize it, and . . . my recollection is that he said, Let me think about . . . what I am going to do, whether . . . I, as the delegated authority in the FBI, am comfortable with your final decision and whether it's fine to let that stand or whether I think . . . it has to be termination."); *id.* at 301 ("I remember him, you know, saying, Okay.  All right.  Well, let me think about this.");[16] *see also id.* at 299–300, 327–328, 470–471.[17]  Will was in the process of drafting her letter on behalf of OPR, but she agreed to give Bowdich time to decide.  *See id.* at 292.

---

16    Will's uninterrupted narrative response to the question, "can you tell me what you do remember about your communications with Mr. Bowdich?" takes up approximately thirteen pages of the deposition transcript.  The summary of this testimony on page seventeen of plaintiff's memorandum as "Ms. Will described Bowdich's reaction as 'Oh.  Huh.  Okay.' (Will 307)" is incomplete and misleading.

17    The parties' memoranda refer to a number of dates as when Will and Bowdich spoke about Will's decision.  Since the hearing before AD Will was on July 24, and counsel for plaintiff transmitted the signed LCA on July 26, the conversation between Will and Bowdich could not have happened before July 26.  And it appears from the contemporaneous documents that the first conversation was on the 26th and the second one Will described was on July 27.  *See* DEX 46–47 [Dkt. # 151-48–49] (regarding meeting of AD Will and DD Bowdich on July 26); DEX 48–50 [Dkt. # 151-50–52] (communications between AD Will and DD Bowdich's executive assistant regarding Bowdich's request that Will call him on July 27, and the delivery of "the CD Dave needs" and a copy of the LCA to Bowdich on that date).

| | |
|---|---|
| On or about<br>July 27, 2018 | The next day, Bowdich told Will in their second phone call, "I'm going to go a different way. I just feel that Pete Strzok did so much damage to this agency's reputation I cannot keep him on the rolls." Will Dep. at 293–94. Bowdich wanted plaintiff to receive both letters at the same time, in a single package. DEX 22 [Dkt. # 151-24]; DEX 50 [Dkt. # 151-52]; Will Dep. at 294, 309.<br><br>Will provided Bowdich with her intended decision letter, samples of previous letters by Deputy Directors overturning disciplinary decisions, the LCA, and a copy of the audio recording of the July 24, 2018 hearing before her. DEX 22, 50; Will Dep. at 296–98. |
| July 27–early Aug. | Bowdich was out of town for several days. *See* Will Dep. at 297–98. |
| July 27, 2018 | Bowdich began an initial draft of the termination letter on his iPad. *See* Bowdich Dep. at 73, 343. |
| July 30, 2018 | Plaintiff's counsel asked OPR to contact additional character references "to the extent that AD Will is considering terminating Pete instead of moving forward with the LCA." DEX 51 [Dkt. # 151-53]; PEX 53 [Dkt. # 155-46]. |
| July 31, 2018 | Plaintiff added former FBI General Counsel James Baker to the list of references to be contacted, and Loreto contacted Baker, requesting a response by August 6. PEX 56 [Dkt. # 155-49]; PEX 57 [Dkt. # 155-50]. |
| Aug. 5–6, 2018 | Baker asked Loreto for an extension until the end of the week, and she agreed. PEX 57 [Dkt. # 155-50]. |
| Aug. 6, 2018 | On a call with Loreto, plaintiff's counsel indicated that Will's disciplinary decision was still pending. *See* DEX 52 [Dkt. # 151-54]. |
| Aug. 8, 2018 | Will signed and dated her twenty-four-page letter. DEX 2 [Dkt. # 151-4]; PEX 3 [Dkt. # 155-4] ("Will Letter"). "As the deciding official in this matter, I have given full and impartial consideration to all the documentation and evidence upon which the proposed disciplinary action was based, your written response dated July 17, 2018, the oral presentation by you and your counsel on July 24, 2018, and the 'Last Chance Agreement' you executed on July 26, 2018." Will Letter at 1. She concluded that the allegations that plaintiff violated FBI Offense Code 5.21, 5.18, and 5.2 were substantiated. Will Letter at 20–21.<br><br>With respect to the allegation of unprofessional conduct based on the text messages, Offense Code 5.21, she wrote: |

Your excessive, repeated, and politically-charged text messages, while you were assigned as the lead case agent on the FBI's two biggest and most politically-sensitive investigations in decades, demonstrated a gross lack of professionalism and exceptionally poor judgment.  Your misconduct has cast a pall over the FBI's Clinton Email and Russia investigations and the work of the Special Counsel. The immeasurable harm done to the reputation of the FBI will not be easily overcome.  While "Trump is a fucking idiot," "I hate these people," "I need to fix it," "No he's not [going to become president]," and "We'll stop it," took less than a minute for you to transmit by text message, the long-term negative impact on the FBI cannot be overstated. Your vituperative text messages will be the subject of damning public discourse for days, months, and even years to come, and the FBI will be recipient of the expressed outrage.

You acknowledged:  1) you were aware of the significant public interest in and political ramifications of the Clinton Email and Russia investigations; 2) your text messages were monitored and preserved; and 3) disclosure of your messages would hurt the integrity of the FBI and the Clinton Email and Russia investigations.  You also said your conduct was a mistake "from the perspective of perception."  Your argument that it would be difficult to "find a person [who] does not have an opinion about things of either a political or a public interest perspective" is misguided and irrelevant. The hypothetical person you refer to is not:  (a) tasked as the lead investigator on the FBI's two biggest and most politically-sensitive investigations during a presidential election year; or (b) in a position to actually influence the investigation, alter investigative decisions, or potentially "stop" someone from becoming president.  Your texting became a media sensation, cast doubt on the FBI's investigative findings and the Special Counsel's investigation, and brought harsh criticism upon the FBI from politicians at all levels of both political parties, President Trump, the media, and the public.  Although you repeatedly denied that your investigative decisions in the Clinton Email and Russia investigations were the result of actual bias, the *appearance* of biased decision-making caused by your outrageous texts is as bad as if you had been biased.  You admitted that your texts "without question" constituted

> "horrible judgment" and have done significant damage to the reputation of the FBI.
>
> Based on a preponderance of the evidence, including your own admissions, I conclude the allegation that you violated Offense Code 5.21 is substantiated.

Will Letter at 19–20 (emphasis in original).  As to the penalty, she wrote:

> When proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.
>
> The investigation establishes you violated FBI Offense Code 5.21 (Unprofessional Conduct – Off Duty).  The standard penalty is a five-day suspension.  Mitigating factors warrant an oral reprimand to a three-day suspension.  Aggravating factors warrant a seven-day suspension to dismissal.
>
> ***
>
> I have considered all mitigating factors supported by the record, including, but not limited to, your 21 years of FBI service, outstanding performance record, and numerous awards, including those noted in your written response.  I am also cognizant of the fact that you were assigned to two very stressful and high-profile investigations during the time of your misconduct.  Nevertheless, severe aggravation is warranted because your inappropriate text messages were extensively covered by the media and brought extreme criticism on the FBI and DOJ.  Your conduct also caused immeasurable harm to the Bureau's reputation with DOJ, other government officials, and the American public.  Potential harm to the Bureau's reputation is listed as an aggravating factor for all misconduct in the Penalty Guidelines.  Your inappropriate political comments on your FBI-issued cell phone resulted in skepticism about major investigative conclusions in an extremely high-profile case and required you to be removed for just cause from the Special Counsel's investigation.  Your actions showed extremely poor judgment.
>
> ***

> The nature and scope of the misconduct certainly warrants dismissal. However, you executed a Last Chance Agreement acknowledging the seriousness of your misconduct. You are profoundly remorseful and determined to overcome your misdeeds. Your Division asserts you are an extremely talented and intelligent investigator, gifted agent, and hard-working employee, who your Division believes will never again engage in misconduct. Based on the record as a whole, including your written response and oral presentation, I am suspending you for 60 days, and demoting you to a non-supervisory position for your 5.21, 5.18, and 5.2 offenses.

Will Letter at 22–23.

The LCA executed by plaintiff and his lawyer was appended to the letter. *See* Will Letter.

The letter also included a footnote stating, "[i]n your Last Chance Agreement (LCA), you agreed the LCA and this letter reflect the Bureau's final disposition of this disciplinary inquiry, from which no appeal will be taken. However, nothing in this disposition affects the ability of the Human Resource Division, Security Division, or other Bureau component to address your conduct as a performance matter, security issue, or otherwise, as appropriate." Will Letter at 1, n.2.

While the letter is dated August 8, 2018, it was not transmitted to the plaintiff at that time. *See* Will Dep. at 317; DSOF 105; Pl.'s Resp. to DSOF 105.

| | |
|---|---|
| Aug. 8, 2018 | Loretto sent an email transmitting OPR's Bi-Weekly Report July 28– August 10, 2018. Under "Final Actions," it reported plaintiff's sixty-day suspension and the LCA waiving appeal. "This file is closed." PSOF 29, citing PEX 4 [Dkt. # 155-5]. |
| Aug. 8–9, 2018 | Will and the FBI's Office of General Counsel edited Bowdich's draft letter. DSOF 103; Pl.'s Resp. to DSOF 103. |
| Undated | Around the time of Bowdich's return, Will informed David Schlendorf, the FBI Assistant Director for Human Resources Division, in his capacity as plaintiff's direct supervisor, that the matter was coming to a conclusion. Will Dep. at 299. "There will be two decision letters that you will need to serve. . . . You're getting mine, and then you'll be getting one from Dave Bowdich." Will Dep. at 299. She explained that her letter "says 60, demotion, LCA," but the second letter would indicate that Bowdich had |

overruled her, and plaintiff would be terminated.   Will Dep. at 300; DSOF 97.

Aug. 9, 2018      Will's letter was delivered to plaintiff's supervisor, Schlendorf, to be hand-delivered together with the forthcoming Bowdich letter.   Will Dep. at 317.

OPR Chief Loreto informed counsel for plaintiff that "[OPR's] final letter for Peter Strzok was sent to the AD, HRD [Schlendorf] today."   PSOF 32, citing PEX 9 [Dkt. # 155-10].   *See also* Will Dep. at 324 ("but Schlendorf knows from a call from me . . . , You'll be getting something separately from the DD and that actually trumps my action, and that will be the final letter").

Aug. 9, 2018      Bowdich signed and dated his termination letter.  *See* DEX 1 [Dkt. # 151-3] ("Bowdich Letter").

> I concur with the AD's conclusion that these offenses are substantiated.   However, I disagree with her evaluation of the relevant *Douglas* factors in deciding an appropriate penalty in your case.   FBI Corporate Policy Directive 0915D, *Disciplinary Appeals Process*, authorizes the Director or the Director's designee to modify disciplinary decisions as necessary in the best interests of the FBI. Pursuant to my delegated authority as the Deputy Director, I have reconsidered the AD's punishment and conclude that dismissal is appropriate under the facts of this case.
>
> In making this decision, I reviewed relevant material pertaining to your case, including the text messages between you and Lisa Page, the *Douglas* factor analysis drafted by the AD of the Counterintelligence Division, your role as one of the most senior counterintelligence agents in the FBI, and your many years of dedicated service.   While there is no doubt your 21 years of service to this organization should not be discounted, I am persuaded that serious aggravation is warranted for your 5.21 offense given the severe, long-term damage your conduct has done to the reputation of the FBI.   It is difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in the country.
>
> ***
>
> Though the Office of Inspector General found no evidence that your bias impacted your investigative actions or decisions, your sustained pattern of bad judgment in the use

of an FBI device called into question the decisions made during both the Clinton E-Mail investigation and the initial stages of the Russian collusion investigation. In short, your actions have called into question the credibility of the entire FBI.

As I considered the facts associated with the adjudication of your case, I could not recall another incident like yours that brought such discredit on the organization. In my 23 years in the FBI, I have not seen a more impactful series of missteps that has called into question the entire organization and more thoroughly damaged the FBI's reputation. In our role as FBI employees we sometimes make unpopular decisions, but the public should be able to examine our work without having to question our motives.

I made this decision considering all of the facts surrounding your precise conduct and the extremely damaging impact it has had and will have on this organization. It will take years to overcome this lasting impact. As a Deputy Assistant Director in the Counterintelligence Division, you were expected to be a leader who was beyond reproach and to set an example for not only your direct subordinates, but others throughout the organization who watched and observed your behavior and actions. You failed to do so repeatedly and put your own interests above the interests of the organization. My decision in this matter is final, and is not subject to further administrative review.

Bowdich Letter at 1–2.

Aug. 10, 2018    Mr. Baker's character reference arrived at OPR. PSOF 23; PEX 11 [Dkt. # 155-12].

Aug. 10, 2018    Will's and Bowdich's letters, *see* DEX 1–2, were hand-delivered to plaintiff at his home at the same time. DSOF 105–06.[18] *See also* Pl.'s May 10, 2021 Resp. to Interrog., DEX 60 [Dkt. # 151-62] at 33 ("Interrogatory No. 19: Describe in detail the circumstances of when you learned of DD Bowdich's decision to terminate you, including but not limited to how you were

---

18    Based on the exhibits, it appears the two letters were in separate envelopes, *see* Will Letter; Bowdich Letter, but they were delivered simultaneously to plaintiff. *See* Aug. 10, 2018 email from George Crouch to Candice Will and others, DEX 56 [Dkt. # 151-58] ("The termination letter was delivered to Pete at his home. . . . Although he appeared to know it was coming, he was still shaken.").

notified in relation to when you learned of AD Will's earlier decision to demote and suspend you.  Response to Interrogatory No. 19:  AD Will's and DD Bowdich's respective decisions were simultaneously, or nearly simultaneously delivered to Plaintiff at his home on August 19, 2018.").  Plaintiff read the Will letter first.  Strzok Dep. at 338.

Dec. 9, 2019[19]    OIG issued its report on the Crossfire Hurricane investigation and four individual investigations on members of the Trump campaign.  It did not find evidence "that political bias or improper motivation influenced" the decision to open any of the investigations.  Crossfire Report at iii–iv.

## PROCEDURAL HISTORY

On August 6, 2019, plaintiff filed a three-count complaint against then-Attorney General William Barr, the United States Department of Justice, then-FBI Director Christopher Wray, and the FBI.  Compl. [Dkt. # 1].  Count One alleged that defendants fired plaintiff because of his protected political speech, in violation of the First Amendment to the Constitution.  Compl. ¶ 72. *See also* Compl. ¶ 73 ("Upon information and belief, defendants treated plaintiff more harshly than they would have treated similar communications because the content of plaintiff's communications was critical of President Trump.").  Count Two alleged that defendants' actions deprived plaintiff of his contractual property interest in his public employment without due process of law, in violation of the Fifth Amendment to the Constitution.  Compl. ¶ 76 ("Defendants refused to abide by the final decision of the appropriately designated 'deciding official.'  Defendants instead fired plaintiff while depriving him of an appeal procedure to the Disciplinary Review Board . . . . ");  Compl. ¶ 2 ("The disciplinary decision was also reflected in a 'last chance agreement' which Will offered and which Strzok accepted.").  Count Three alleged that the public disclosure of the text

---

19    Originally issued on December 9, 2019, the report was updated on December 11 and December 20, 2019, with corrections and changes identified on the page before the report's Executive Summary.  *See* Crossfire Report, Notice.

messages, stored within FBI or DOJ systems of records, violated the Privacy Act.  Compl. ¶¶ 79–82.

 On September 25, 2020, the Court denied defendants' motion to dismiss.  *See* Minute Order (Sep. 25, 2020); Tr. of Proceedings [Dkt. # 48] at 56.  The parties conducted discovery from November 12, 2020 to October 17, 2023, *see* Scheduling Order [Dkt. # 54] at 5; Minute Order (Oct. 23, 2023), and they engaged in mediation from November 2023 to May 2024, but did not come to an agreed resolution.  *See* Joint Status Rep. [Dkt. # 136] at 1–2.

 On July 26, 2024, the parties filed a stipulation dismissing Count Three, the Privacy Act claim.  Joint Stipulation [Dkt. # 146].  Plaintiff filed an amended complaint the same day.  Am. Compl. [Dkt. # 147].  Count One re-alleges that plaintiff was fired because of his protected speech in violation of the First Amendment.  Am. Compl. ¶¶ 71–74.  Count Two re-alleges that plaintiff

was deprived of his property interest in his public employment without due process of law.  Am. Compl. ¶¶ 75–77.[20]

On September 16, 2024, defendants filed a motion for summary judgment,[21] and the motions are fully briefed.[22]

---

20      Plaintiff alleged in his original complaint and maintained in opposition to defendant's motion to dismiss that there was a contractual basis for his property interest in his job arising out of Will's transmission of the Last Chance Agreement to him.  Paragraph 2 of the initial complaint alleged that Will issued the suspension decision on August 8, 2018, and that "[t]he disciplinary decision was also reflected in a 'last chance agreement' *which Will offered* and which Strzok accepted."  Compl. ¶ 2 (emphasis added).  Plaintiff's December 13, 2019 opposition to the motion to dismiss also told the Court that "Will offered a Last Chance Agreement, which Strzok and his counsel signed and thereby accepted on July 26, 2018."  Opp. to Mot. to Dismiss [Dkt. # 36] at 27.

After discovery was completed, and all of the documents concerning these events – which were already well-known to present counsel and plaintiff since they were personally involved at the time – were exchanged, the claim remained unchanged.  *See* Am. Compl. ¶ 35.  The amended complaint again alleged that Ms. Will "offered" and plaintiff "accepted" the LCA.  *Id.*

There is no evidence to support the factual assertions underlying the due process claim as stated in the original or the amended complaint, and the Court finds it troubling that plaintiff's team persisted in advancing this demonstrably false theory for so long.  Plaintiff's current theory – that the contractual interest in the job was created when Will transmitted her decision letter and accepted *his* offer – appeared for the first time in the summary judgment briefing.  Notwithstanding these circumstances, the Court will address the new version of the claim in this opinion.

21      Defs.' Mot. [Dkt. # 150] (Public)/[Dkt. # 151] (Sealed); Defs.' Mem. in Supp. [Dkt. # 150-1] (Public)/[Dkt. # 151-1] (Sealed) ("Defs.' Mem."); Defs.' Statement of Facts [Dkt. # 151-2] (Sealed) ("DSOF").

22      Pl.s' Opp. & Mot. for Partial Summ. J. on Count Two [Dkt. # 153] (Public)/[Dkt. # 155] (Sealed) ("Pl.'s Mot."); Pl.'s Mem. in Supp.  [Dkt. # 153-1] (Public)/[Dkt. # 155] (Sealed) ("Pl.'s Mem."); Pl.'s Statement of Facts ("PSOF"), Genuine Issues ("PSGI"), and Resp. to DSOF ("Pl.'s Resp. to DSOF") [Dkt. # 155-1] (Sealed); Defs.' Opp. & Reply [Dkt. # 158] (Sealed); Pl.'s Reply [Dkt. # 159] (Public)/[Dkt. # 160] (Sealed).

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences

are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

**ANALYSIS**

Since both the defendants and plaintiff have moved for summary judgment on Count Two, the Court will take up that count first.

## I.    Plaintiff's termination did not violate the due process clause of the Fifth Amendment.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  Therefore, the threshold question to be determined when considering the parties' cross-motions is whether plaintiff had a property interest in his continued employment at the FBI that was protected by the Fifth Amendment. *See id.*  If that question is answered in the affirmative, the Court must then determine if he received the process that was due.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.  Plaintiff acknowledges that as a Senior Executive Service employee at the highest level of the Bureau, he was terminable at will by the Director, and he did not have any for-cause protections against dismissal, or any inherent entitlement to remain in his position. *See* Pl.'s Mem. at 38; Pl.'s Reply at 18; *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988) ("Those who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely.").  *See also O'Donnell v. Barry*, 148 F.3d 1126, 1139 (D.C. Cir. 1998) ("[A]n at-will employee has no liberty or property interest in continued employment, and it is clear that D.C. law

28

creates no such interest."). Moreover, the FBI policies in evidence show that termination was always a potential penalty for a confirmed violation of Offense Code 5.21. *See* 2017 Dep't of Justice FBI Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, PEX 60 [Dkt. # 155-53] ("FBI Offense Codes and Penalty Guidelines") at 17.

Plaintiff has never alleged or argued at any point that he had a pre-existing property interest in his employment at the time these events began to unfold; his sole argument is that the Last Chance Agreement changed the terms of the admittedly at-will employment. *See* Pl.'s Mem. at 38–39. Indeed, plaintiff testified that he did not even think he had a guarantee that he could keep his job once he signed the document; he was waiting for the Assistant Director of Human Resources, Candice Will, to accept it. *See* Strzok Dep. at 324–28.

But plaintiff contends that when Will made her decision to impose a punishment consistent with the Last Chance Agreement he offered as a resolution, a contract was formed that gave him a property interest in his tenure at the FBI. *See* Pl.'s Mem. at 36–38.

The Court finds that there is no genuine dispute of material fact that would preclude the entry of summary judgment as a matter of law on this issue. There is no evidence to support a finding as a matter of constitutional law that when Strzok received Will's letter on August 10, he acquired an interest in his position as a Special Agent that was protected by the Fifth Amendment; nor does the evidence permit a finding that he had a right to the position as a matter of contract law.

### A.    The undisputed facts reveal the absence of a property interest protected by the Fifth Amendment.

Property interests recognized by the due process clause "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Roth*,

408 U.S. at 577. In the case of government benefits, those rules could be a matter of state law, and in the context of employment, the Supreme Court has explained that the property interest in the position is "created and defined by the terms of [one's] appointment." *Id.* at 577–78. The *Roth* case involved an assistant professor at a state college who had been hired for a fixed term of one academic year. *See id.* There was no provision for renewal in the contract, and the Court found that the terms of his appointment did not support a claim of entitlement to re-employment; nor was there any "rule or policy that secured his interest in re-employment or that created any legitimate claim to it." *Id.* at 578.

In a companion case to *Roth*, *Perry v. Sindermann*, 408 U.S. 593 (1972), the Court reached the opposite conclusion. Sinderman was a junior college professor who asserted a property interest in his job even though there was no written tenure contract. *Id.* at 595. But at his institution, there was a Faculty Guide that stated:

> Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work.

*Id.* at 600 (quoting the Faculty Guide). Given that statement, the Court held that the surrounding practice and expectations may have created a property interest. *See id.* at 602–03. It observed, quoting *Roth,* that "'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* at 601, quoting *Roth*, 408 U.S. at 577 (internal citations omitted).

30

The *Perry* court also pointed out that "[e]xplicit contractual provisions may be supplemented by other agreements implied from the promisor's words and conduct in the light of the surrounding circumstances." 408 U.S. at 602 (internal quotation marks omitted). It ruled that "the respondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause,'" and it remanded the matter to give the professor "the opportunity to prove the legitimacy of his claim of such entitlement in light of the policies and practices of the institution." *Id.* at 602–03 (internal quotation marks omitted).

Following that guidance and looking at the policies and practices of the FBI, one cannot find that Will's letter created an entitlement to remain at the FBI for purposes of the due process clause. Will's findings exposed plaintiff to termination as a penalty under the FBI Offense Codes and Penalty Guidelines, and a series of pre-existing written agency policies plainly state that the Director and Deputy Director have the authority to reverse or modify otherwise "final" decisions issued by the appropriate decisionmakers or the Disciplinary Review Board.[23]

_____

23    Plaintiff points to the OPR Section Chief's Aug. 8, 2018 OPR Bi-Weekly Report July 28–August 10, 2018, which contained an entry under "Final Actions" summarizing plaintiff's 60-day suspension and the LCA waiving appeal and announcing, "[t]his file is closed." *See* Pl.'s Mem. at 16–17, citing PEX 4. Like all the other uses of the term "final" in the materials in this case, this does not create a genuine issue of material fact that precludes summary judgment; there is no dispute that the matter had been "finally" resolved as far as OPR was concerned. The applicable regulations expressly grant the Director or his designee authority to modify a "final" decision issued by OPR or the DRB. *See* FBI Offense Codes and Penalty Guideline at 3, PEX 60; FBI Disciplinary Appeals Process Directive 0915D ¶ 4.3, DEX 18; FBI Policy Directive 0235D, ¶ 12.3, DEX 19. And Will advised plaintiff and his lawyer of this possibility at the in-person hearing. Hearing Tr. at 128. Counsel plainly understood, as he responded "yeah" when Will concluded with the observation that such discretion was rarely exercised. Hearing Tr. at 128.

31

- The 2017 FBI Offense Codes and Penalty Guidelines sets out the penalties for a violation of Offense Code 5.21, Unprofessional Conduct – Off Duty.  The standard penalty is 5 days, a "mitigated" offense warrants an oral reprimand to a three-day suspension, and an "aggravated offense" can be addressed with anything from a seven-day suspension to dismissal.  PEX 60 at 17.  OPR Assistant Director Will found that the violation was substantiated, Will Letter at 20, and that "severe aggravation" was warranted, *id.* at 22, thereby exposing plaintiff to the potential sanction of termination.

- The Offense Codes and Penalty Guidelines, introduced in evidence by plaintiff, further state:  "The Director has the authority to review and amend *any* disciplinary decision, either in favor of or to the disadvantage of an employee, if the Director considers it necessary to correct an injustice or prevent harm to the FBI.  This authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the Director."  PEX 60 at 3 (emphasis added).

- The Director may exercise this plenary authority even after an employee exercises his right to appeal.  Paragraph 4.3 of the FBI Disciplinary Appeals Process Directive 0915D states, "by virtue of the authority inherent in the position, the FBI Director (or his or her designee) maintains the authority to modify any disciplinary finding, penalty, or both as deemed necessary and in the best interests of the FBI."  DEX 18 [Dkt. # 151-20].

- Paragraph 12.3 of the FBI Policy Directive 0235D also provides:  "Although the decisions rendered by the AD, HRD, (in non-adverse matters) and by the DRB, (in adverse action matters) are considered the FBI's final disciplinary action, by virtue of the authority inherent in the position of the Director, the FBI Director maintains the authority to modify any disciplinary finding and/or penalty as deemed necessary and in the best interests of the FBI."  DEX 19 [Dkt. # 151-21].

There is no dispute that Will took care to ensure that plaintiff and his counsel were advised that her decision might not end the matter.  The transcript and recording of the July 24 hearing reveal that she placed plaintiff on notice that she could be overturned.

> [Plaintiff's Counsel]:   [A]ssuming that the decision is for Pete to be terminated, I know there's no right of appeal to the Director. . . .
>
> Ms. Will:  So when I make my final decision, . . . Agent Strzok would have the right to appeal to the internal disciplinary review board . . . . Also to the MSPB . . . . There is no right of appeal to the Director.  The Director has the right to review any decision I make . . . or any decision made by the

DRB to modify that if the Director thinks it's in the best interest of the organization. It rarely happens.

[Plaintiff's Counsel]: Yeah.

Hearing Tr. at 128. *See also* PSOF 13 ("Prior to any discussion of LCA, Ms. Will added that the Director had the right to review any decision, though that 'almost never' happens.").[24] This cuts against plaintiff's ability to maintain, under *Perry,* that there were "mutually explicit understandings that support his claim of entitlement to the benefit." 408 U.S. at 601.

The record also reflects that all of the FBI participants in the events at the time were well aware of the Deputy Director's authority to determine the outcome. AD Will took the initiative to

---

[24]    During the course of the hearing before AD Will, plaintiff's counsel chatted at some length about his understanding of Director Wray's intention to stay out of the disciplinary matter that followed the IG report. *See* Hearing Tr. 25–26. Referring to Director Wray as a law school classmate, counsel opined, "I thought that Chris was very strong in saying we have a process. I'm not going to put my finger on the scale. I'm going to let it play out because this is exactly the kind of situation that it is most important to adhere to past practices." *Id.* at 26. Counsel added that he had received assurances from the Director's Chief of Staff that "Chris is not going to have anything to do with this. And he wants this treated like every other case," *id.*, and he used that to segue into his discussion of how the instant case compared to past precedent. *See id.* at 26–29. Eventually Will interrupted to suggest that citing precedent was not necessarily helpful given the unique nature of the case. *Id.* at 29. Just before the hearing ended, counsel asserted that the Director had already said that he did not have any intention of modifying her decisions, to which Will responded, "Yeah." *Id.* at 128–29.

There are obvious problems that would arise from counsel serving as a witness, and his recitation of Wray's purported statements, as passed along by the Chief of Staff, would be inadmissible double hearsay. But even if there is some information in the record that counsel was informed by the Chief of Staff that Wray intended to let the OPR process play itself out, there is no admissible evidence in the record that Wray told Strzok or anyone else that neither he nor the Deputy Director would exercise their authority afterwards. In a statement made by Director Wray before the House Judiciary Committee on June 28, 2018, which was proffered as evidence by plaintiff and read by plaintiff's counsel to Will at her deposition, what Wray said was: "we're holding employees accountable for misconduct. We have referred conduct highlighted in the report to the Office of Professional Responsibility, our independent disciplinary office. Once the necessary process is complete, we won't hesitate to hold people strictly accountable for their actions." Will Dep. at 208–09. Nothing about that is inconsistent with what transpired in this case.

go to Bowdich before she had even finalized her letter to alert him to what she had decided, *see* Will Dep. at 285–92, anticipating that he might disagree and acknowledging to him that "reasonable minds can differ." Will Dep. at 291, 312. She fully understood that he could overturn her determination, and she does not report experiencing or expressing any shock or surprise when he said he planned to go in a different direction. Instead, the two discussed the procedure they would follow.

> [Y]ou know his history much more than I do, but I have studied his history for the purposes of this case. I listened to him. I listened to counsel. I've considered all of the facts in the case. I've reviewed the record. I've reviewed the IG report. I've looked at everything, and I'm satisfied this is the way to go, you know, but I understand that – that somebody could decide to go a different way.
>
> You do not offend me in telling me that you wish to overrule me in this matter and go a different way. . . . [T]he decision I made was right for me, but if you decided to go a different way, that's your business.

Will Dep. at 313–14. Will then assisted Bowdich in drafting his determination by providing him with copies of letters prepared on previous occasions when a Deputy Director reversed the Office of Professional Responsibility. Will Dep. at 296–97.

The conversation is similarly matter-of-fact when Will explains to plaintiff's supervisor, Schlendorf, what is going to happen next.

> I would have told Schlendorf, . . . as Pete Strzok's boss, direct report, that – that the Strzok matter is coming to a conclusion. There will be two decision letters that you will need to serve. Dave [Schlendorf] knew enough about the process. Dave is a sharp guy. . . . He probably wouldn't have been surprised to hear that. I don't remember him expressing surprise, maybe just because I explained it. You're getting two decision letters. You're getting mine, and then you'll be getting one from Dave Bowdich. . . . [B]ut mine won't rank supreme because I don't – I don't trump the DD. The D and the DD run this organization. They decide at the end of the day what the final decision is . . . ."

Will Dep. at 299–300.

Moreover, the sworn testimony establishes that before Bowdich issued his formal written decision to dismiss plaintiff, he informed Director Wray about his intentions.  Wray Dep. at 57. Wray did not object or intervene; he understood – although he could not recall at the deposition where his longstanding understanding came from – that this fell well within his Deputy's purview.

> I don't recall exactly when I first learned that the Deputy Director had that authority.  That's been my understanding for quite some time.  Among other things, the Assistant Director for OPR reports directly to the Deputy Director as his or her immediate supervisor and so at least during the time I've been FBI Director I can't recall a time when I did not think that was part of the Deputy Director's authority.

Wray Dep. at 55.  *See also id.* at 53–54 ("[W]e have a disciplinary process that involves OPR reviewing the available record, doing its own analysis, reaching – reaching a potential disciplinary resolution.  There are opportunities for further review both by the subject of – of the potential discipline and at higher levels within the organization. . . . I think there are – are levels within the Office of Professional Responsibility for one, up to and including the Assistant Director in charge of – of OPR.  There is also the ability for the Deputy Director to modify disciplinary outcomes in either direction.  There's also, if I recall correctly, some sort of – I forgot the name of it.  I don't know that much about it, but I think there's an office of Disciplinary Appeals or something like that, that is also relevant."); *id.* at 64 ("I understood . . . that the Deputy Director had that authority with respect to Mr. Strzok as well as with respect to other individuals going through the disciplinary process. . . . I was comfortable in that conversation that he was exercising an authority which I believed he had.").  *See also* FBI Director Robert Mueller, *Standing Delegation of Authorities of the Dir., FBI* (Mar. 2007), DEX 21 [Dkt. # 151-23] ("1. The Deputy Director, for all functions and duties of the Director, except for those that by law must be performed by the Director."); Memorandum from FBI Dir. Louis J. Freeh, *Standards of Conduct, Disciplinary*

*Matters – Revision of the FBI's Disciplinary Process* (March 5, 1997), DEX 20 [Dkt. # 151-22] at 2 ("I have decided to task the Deputy Director with personal responsibility for executive oversight of all aspects of the disciplinary process.").

Plaintiff maintains that his constitutional claim rises and falls with the LCA – as counsel put it at the hearing, the contract *is* the constitutional right. But *Perry v. Sinderman* calls for more than a review of what was written down; the existence of a property interest can also be implied from "the promisor's words and conduct in the light of the surrounding circumstances." *Perry*, 408 U.S. at 602 (internal quotation marks omitted). Here, the undisputed surrounding circumstances and statements establish that both parties knew or were on notice that Will's determination could be subject to reversal by the Director, and that mutual understanding weighs against the existence of a property interest.

The chronology of events also militates against the finding of a property interest. After plaintiff and his lawyer had the opportunity to make their case in opposition to the Notice of Proposed Termination in writing and again in person at the hearing, plaintiff transmitted a Last Chance Agreement to OPR on July 26. It said:

> In lieu of dismissal, *Mr. Strzok requests* that the Assistant Director, OPR, reduce the penalty to a 60-day suspension . . . and he be demoted to a non-supervisory position. *In support of this request, Mr. Strzok agrees to the following terms*:
>
> *Mr. Strzok agrees* to complete a suspension of 60 calendar days . . . .[25]

---

[25]    While plaintiff "*requests*" in the LCA to be subject to the reduced penalty and then "agrees to complete it," Strzok testified at his deposition that even the sixty days was too harsh; he averred that he "accepted it" but did not "agree with it." Strzok Dep. at 304. This hairsplitting is inconsistent with the document.

> *Mr. Strzok agrees* that OPR will retain jurisdiction over this matter, and that failure to abide by this agreement will cause OPR to reopen the matter and summarily dismiss the employee.

> *Mr. Strzok further agrees* that the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter . . . . *Mr. Strzok agrees* to waive his right to appeal to the FBI's internal disciplinary entity or to the Merit Systems Protection Board.

> *Mr. Strzok further agrees* that if he engages in any other serious misconduct, the appropriate sanction will be removal from the rolls of the FBI.[26]

LCA (emphasis added).  Plaintiff is making an offer, and the LCA conferred no rights or obligations unless accepted.  If the Assistant Director did not reduce the penalty, plaintiff would not be obliged to waive his right to appeal internally or to the MSPB.

Will finalized and signed her letter, which was delivered to the plaintiff, along with Bowdich's determination.  *See* DEX 56 (emails confirming delivery to plaintiffs' home); DSOF 105–06.  At no point does her letter purport to be a contract; nor does it state that it "accepts" the LCA.

The introductory paragraph of the letter reads as follows:

> As the deciding official in this matter, I have given full and impartial consideration to all the documentation and evidence upon which the proposed disciplinary action was based, your written response dated July 17, 2018, the oral presentation by you and your counsel on July 24, 2018, and the "Last Chance Agreement" *you executed* on July 26, 2018.

Will Letter at 1 (emphasis added).  The paragraph concludes:

---

26      It is this provision giving up the right to contest disciplinary allegations in the future that is the basis for the "Last Chance" moniker.  As Will explained in her deposition, the LCA basically means this infraction is the employee's last chance.  The employee offers to give away rights associated with any future disciplinary violation in return for the lesser punishment.  *See* Will Dep. at 235–36.

> Based on a preponderance of the evidence, I conclude the allegations are substantiated. However, based on the circumstances of this case, including the supplemental information you presented, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/ mitigating factors, I am: (a) suspending you from duty, without pay, for 60 calendar days, not dismissing you, as originally proposed; and (b) demoting you to a non-supervisory position.

*Id.* There was a footnote immediately following this sentence:

> In *your* Last Chance Agreement (LCA), *you agreed* the LCA and this letter reflect the Bureau's final disposition of this disciplinary inquiry, from which no appeal will be taken. However, nothing in this disposition affects the ability of the Human Resource Division, Security Division, or any other Bureau component to address your conduct as a performance matter, security issue, or otherwise, as appropriate.

Will Letter at 1 n.2 (emphasis added).[27]

Nor does Will purport to enter into a contract or state that the LCA is being accepted at the end of the letter.

> The nature and scope of the misconduct warrants dismissal. However, *you executed* a Last Chance Agreement acknowledging the seriousness of your misconduct. You are profoundly remorseful and determined to overcome your misdeeds. Your Division asserts you are an extremely talented and

---

27    During her deposition, Will was asked about this footnote advising plaintiff that her disciplinary decision would not bind other agency actors. She explained that while the Human Resources Division did not have the authority to overrule her disciplinary decision, other FBI components could address plaintiff's conduct as they deemed appropriate. Will Dep. at 264. For example, the Human Resources Division could address plaintiff's conduct as a performance matter and the Security Division could address it as a security issue. *See id.* (explaining that although Will's decision "is the end of the OPR process, . . . this is not the end of the security division process. They could still pull your clearance. If they do, you're out. . . . It's not the end of the HRD process. They have the right to act on performance matters. I do misconduct, and it's not the end . . . other bureau components need to address your conduct as deemed appropriate"). Defendants maintain that with this footnote, Will was placing Strzok on notice that her decision was not final. Defs.' Mem. at 40. While Will's caveat may have been broad enough to cover later actions taken by the Director and his Deputy in the scope of their authority, it was not explicit about that point, and the Court is not relying on the footnote as the basis for its ruling on the cross-motions on Count Two.

> intelligent investigator, gifted agent, and hard-working employee, who your Division believes will never again engage in misconduct. Based on the record as a whole, including your written response and oral presentation, I am suspending you for 60 days, and demoting you to a non-supervisory position for your 5.21, 5.18, and 5.2 offenses.

Will Letter at 23 (emphasis added). The LCA was appended to the letter, but it is the same document that was transmitted to Will by counsel. It bears Strzok's signature and his lawyer's signature, but there is no line for Will's signature, and she did not sign it, initial it, or add her written imprimatur to it in any way. *See id.* (attaching the LCA after the last page of Will's letter).

Indeed, Will's explanation of her thought process when she received the LCA makes it clear that she was not thinking of plaintiff's transmission of the LCA in contractual terms or focusing on whether it would bind her superiors; she saw his willingness for this incident to be his last chance to contest disciplinary violations to be part of the punishment:

> Question by counsel: . . . [A]fter you make the final decision, this agreement is binding on Mr. Strzok [?] . . .
>
> Will: I cannot say – I don't know quite how to answer that.
>
> What I'm going to do with this is consider that he's executed this now and have my quiet moment rethinking the file and say to myself, Am I good with this? Am I good with 60, demotions and an LCA? And at the end of the day, I said, Yes, I am. **I have Pete Strzok's signed LCA, 60, demotion. For me, that is a reasonable and appropriate penalty in this matter**.

Will Dep. at 239–40 (emphasis added). *See also id.* at 291 ("I have given him the penalty that is closest to termination that you can come short of termination, which is 60, demotion, last chance.").

Even if one could construe Will's adoption of the terms of the LCA in her letter as her acceptance of plaintiff's offer, the letter was not transmitted to plaintiff until August 10, 2018. The evidence establishes without any dispute that Will's letter was deliberately delivered simultaneously with the Deputy Director's letter overruling it, and that plaintiff read them one

after the other. *See* DSOF 105; Strzok Dep. at 338. This leaves plaintiff with no evidence to support a finding that his receipt of Will's letter gave him a constitutionally protected entitlement to remain in his position; to the extent Will's willingness to accept the LCA gave rise to any expectation, it lasted only as long as it took plaintiff to begin reading the second letter.

And, to the extent plaintiff is relying upon traditional contract principles in an effort to enforce the LCA, the law does not support his position.

**B.    The application of traditional contract law principles requires a finding that there was no contract.**

Plaintiff points to caselaw that provides that Last Chance Agreements are contracts that can bind the parties, *see* Pl.'s Mem. at 36–37, but that is not the point. The question is whether an enforceable contract was formed in this case.

**1.    The record reveals a lack of the mutual assent or meeting of the minds needed to create a valid contract.**

Courts have held that LCAs are a type of settlement agreement; they are "probationary contracts negotiated by an agency with an employee who faces removal [and] . . . [i]n exchange for the employer's withholding the adverse action . . . pledges rehabilitation or job performance improvement in specific ways." *U.S. Dep't of Air Force v. FLRA*, 949 F.2d 475, 478 (D.C. Cir. 1991); *see Snowden v. Zinke*, 506 F. Supp. 3d 18, 29 (D.D.C. 2020) (applying D.C. contract law). Accordingly, LCAs are governed by the applicable jurisdiction's contract law. *See Blackstone v. Brink*, 63 F. Supp. 3d 68, 76–77 (D.D.C. 2014) (applying D.C. law to determine whether to enforce an oral settlement agreement brought to federal district court under diversity jurisdiction).

Under D.C. law, for an agreement to be an enforceable contract, the parties must manifest both their mutual assent to all of the material terms of the arrangement and their intention to be contractually bound to those terms. *Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236,

1238 (D.C. 1995); *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005*); SJ Enters. LLC v. Quander*, 207 A.3d 1179, 1183 (D.C. 2019). Material terms are those that are necessary for the parties to understand what they are promising or how to perform the contract, such as subject matter, price, payment terms, quantity, quality, and duration. *See Dyer v. Bilaal*, 983 A.2d 349, 356–57 (D.C. 2009) ("A contract's material terms (such as subject matter, price, payment terms, and duration) must be sufficiently definite so that each party can be reasonably certain about what it is promising to do or how it is to perform.") (internal quotation marks omitted). *See also Blackstone*, 63 F. Supp. 3d at 77 ("The first criteria requires that the court determine what terms of the parties' alleged agreement are material, which is a question of fact that depends on the particular circumstances of the case.").

Mutual assent to the terms of the contract, or what is known as the "meeting of the minds," requires an offer, consideration, and acceptance of the offer. *See Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) (holding that a meeting of the minds "is most clearly evidenced by the terms of a signed written agreement"); *see* 1 Williston on Cont. § 3:6 (4th ed. 2025) ("Assent is usually given by means of an offer and an acceptance.").

D.C. courts apply an objective standard when determining whether a contract was formed, and they consider both the written documents and the parties' actions. *Brooks v. Rosebar*, 210 A.3d 747, 751 (D.C. 2019) (holding that "[t]o assess whether there [is] a 'meeting of the minds,' we consider whether the parties' objective acts manifested agreement as to each material aspect" of the alleged settlement agreement at issue in the case); *Hood v. District of Columbia*, 211 F. Supp. 2d 176, 180 (D.D.C. 2002) (stating that "[t]he District of Columbia adheres to the 'objective law of contracts,' meaning that the court must look at the parties' objective manifestations of intent in interpreting settlement agreements," and ruling that the "defendants'

41

objective acts" showed the parties had not reached an accord on a material aspect of their settlement).  "Determining whether documents or oral representations constitute an enforceable contract is a question of law."  *Dyer*, 983 A.2d at 355 (D.C. 2009).[28]

Plaintiff insists that his offer was "accepted" on August 8, 2018, the date Will signed her letter.  Pl.'s Mem. at 38.  But that conclusion is contrary to both the law and the undisputed facts. It is true that the so-called "mailbox" or "dispatch" rule, which plaintiff's counsel referenced at the hearing, provides that an acceptance conveyed by mail is effective once it leaves the control of the offeror.  *See* 2 Williston on Cont. § 6:33; *id.* § 6:41 ("[T]he main purpose of the dispatch rule is to prevent an offeror from withdrawing the offer after an acceptance has been dispatched."). However, the evidence establishes that while Will signed her letter on the 8th, she did not part with it until the 9th, when she provided it to plaintiff's supervisor to be hand-delivered to him.  PSOF 32; Will Dep. at 317.  She might have been able to retrieve it at that point, but even if August 9 were the operative date as opposed to the 10th when the supervisor arranged to have Will's letter placed in plaintiff's hands, the evidence of mutual assent is lacking.

The surrounding circumstances here include the fact that the parties to the alleged contract were subject to the pre-existing regulatory regime that accorded ultimate authority to the Director and his Deputy.  Moreover, there is no evidence to contradict Will's testimony that at the time she

---

28      D.C. law is consistent with the well-recognized principle that an acceptance is an outward, objective manifestation of assent.  Robert Braucher, *Offer and Acceptance in the Second Restatement*, 74 Yale L.J. 302, 304–05 (1964) ("[I]t is in general the deed rather than the thought that counts, and that one can agree by negligently appearing to agree.").  A response that does not provide a clear and unequivocal manifestation of assent to the exact terms of the offer is not an acceptance.  *See* Restatement (Second) of Conts. (A.L.I. 1981) § 61 cmt. a ("An acceptance must be unequivocal."); 2 Williston on Conts. § 6:4 ("[W]hen the offeree's outward manifestations are ambiguous or unclear . . . an inquiry into subjective intent, as well as into all of the other circumstances surrounding the outward manifestation, is appropriate.").

delivered her letter, she told David Schlendorf, plaintiff's supervisor, that the Bowdich letter reversing hers was on its way to him and would be delivered to the plaintiff at the same time. *See* Will Dep. 299–300 ("[M]ine won't rank supreme because I don't – I don't trump the DD.  The D and the DD run this organization.  They decide at the end of the day what the final decision is . . . .").  The evidence also establishes without contradiction that Will knew that her proposed penalty for the violation of FBI Offense Code 5.21 would be overruled while she was drafting her letter and as of the time she signed it; indeed, she was simultaneously engaged in providing Bowdich with assistance in drafting *his* decision overturning hers.  While she made reference to the LCA that Strzok signed as a factor she considered, she did not sign it herself or state in her letter that it has been accepted.[29]  Finally, Will was well-aware that her letter would be delivered to plaintiff along with Bowdich's letter.  Under all of those circumstances, the record does not support a finding as a matter of law that Will objectively manifested an intention to be bound by the LCA, and there is no genuine dispute of material fact that could lead to a different outcome.

### 2. There is no dispute of fact that precludes a ruling that Will lacked authority to bind the FBI over the Deputy Director's veto.

Given Will's stated understanding of the scope of her authority and the set of FBI regulations set forth above, the Court also finds that Will lacked the authority on August 8, 2018 to enter into a contract that would be binding in the face of the Deputy Director's veto.

Under D.C. law, a government agent cannot bind a principal or government entity unless doing so is within the agent's express or implied actual authority, or if the action is subsequently

---

29    The letter itself, plaintiff's Exhibit 3, is therefore inconsistent with the repeated assertion in plaintiff's memorandum that "[t]he FBI and Mr. Strzok executed an LCA."  *See, e.g.*, Pl.'s Mem. at 12.

ratified by the principal or agency, which is not the situation here. *Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 669 (D.C. 1983); *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008).

Express actual authority to perform an act must be granted to the agent in unambiguous terms. *See Perkins v. District of Columbia*, 146 A.3d 80, 85–86 (D.C. 2016) (holding that the "civil advocate" who represented the District of Columbia at a mediation possessed no express actual authority to commit the city to forgive a debt because the plaintiff could not identify any "statute, regulation, . . . rule or policy document" that authorized the advocate to bind the District in that manner). And an agent has implied actual authority to bind the government only "when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees." *Colo. Wild Pub. Lands v. U.S. Forest Serv.*, No. 21-cv-2802 (CRC), 2022 WL 17250238, at *3 (D.D.C. Nov. 28, 2022), citing *Perkins*, 146 A.3d at 85–86 (holding that, in an action to enforce a settlement agreement entered into by a non-supervisory Assistant U.S. Attorney in the DOJ Civil Division, the lawyer lacked implied actual authority because the department's internal regulations placed the authority to bind the government to settlement agreements in more senior officials). Neither of those circumstances pertains here.

As the D.C. Court of Appeals explained in *Perkins,* it is also "a basic principle of District law that a contracting official cannot obligate the District to a contract in excess of . . . her actual authority." 146 A.3d at 85, citing *District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 446–47 (D.C. 2010); *Monument Realty LLC*, 535 F. Supp. 2d at 70 ("Agreements made by government employees beyond the scope of their actual authority do not bind the government.").

And of most significance here, a third party who was "on notice that a purported agent did not have authority to enter into an agreement cannot invoke the agent's apparent authority as a mechanism to nonetheless bind the principal." *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 181 (D.D.C. 2011) (applying D.C. contract law), citing *Ins. Mgmt. of Wash., Inc. v. Eno & Howard Plumbing Corp.,* 348 A.2d 310, 312 (D.C. 1975).

The party relying upon the agent's authority to bind the principal "bears the burden of proving that the agent's act was authorized initially or [retroactively] by ratification." *Lewis*, 463 A.2d at 673. Here, pursuant to the applicable regulations, Will's decision was subject to a veto. While if left undisturbed, it could have led to an agreement among the parties to implement the LCA, that is not what happened; the letters were delivered simultaneously and there was no opportunity for any enforceable rights to attach. Furthermore, it is not disputed as a matter of fact that Will informed plaintiff and his lawyer that her decision could be overturned by the Director, even if his exercise of such authority was rare. In sum, plaintiff cannot show that Will was accorded express actual authority in a statute, regulation, or policy document to enter into a contract that would preclude Bowdich from firing him. And since that power was expressly placed in the Director's office, plaintiff cannot show that Will had implied authority to bind the FBI if the Director or Deputy Director disagreed with her decision.

Plaintiff's memorandum is entirely disingenuous when it attempts to bolster his legal argument with excerpts of Will's testimony. It states:

> Ms. Will – an attorney with decades of experience – *knew* Mr. Strzok's signed LCA "could be characterized as" an offer, that her "final decision" could fairly be characterized "as an acceptance of Mr. Strzok's offer," and that Mr. Strzok's "waiver of rights . . . in exchange for the LCA" could be characterized as "consideration." (Will 245–246). *In other words, it was a contract*. (*See id.*) Ms. Will knew that Mr. Bowdich might *purport* to overrule her decision, but she acted in her capacity as the AD of OPR when she *formally accepted* the LCA on behalf of the FBI. (*See* Ex. 3 at 24). At that point, no decision from Mr. Bowdich existed. (Will 323).

Pl.'s Mem. at 16 (emphasis added).  But none of this comports with the record.

First of all, Will did not offer anything close to an admissible legal opinion that the decision letter was a contract.  She made clear that she was not qualified to render an opinion at all, and, when answering questions that were properly objected to as calling for a legal opinion, she merely acceded to the possibility that aspects of the exchange with Strzok "could" be characterized in contract terms.

> Question by plaintiff's counsel:  You're an attorney, right?
>
> Will:  I am.
>
> Q:  Not licensed any more, but you practiced for many, many years?
>
> A:  Right.
>
> Q:  You studied contracts in law school?
>
> A:  Yeah. Many years ago, yeah.
>
> Q:  You recall that a contract involves –
>
> A:  An offer and acceptance.
>
> Q:  – an offer, acceptance, and consideration, right?
>
> A:  Yes.
>
> Q:  Is it fair to say that this Last Chance Agreement signed by Mr. Strzok is an offer?

[Objection by defense counsel to the question as calling for a legal conclusion]

THE WITNESS:  Yeah, I don't know. I suppose it could be characterized as such.

Q:  And is it fair to characterize your approval, your final decision as an acceptance of Mr. Strzok's offer?

[Same objection]

THE WITNESS:  I believe it could be characterized as such.

Q:  And do you believe that the waiver of rights that Mr. Strzok is agreeing to in exchange for the LCA . . . is consideration?

[Same objection]

THE WITNESS:  I believe it could be characterized as such.

Will Dep. at 244–46.  Will also resisted counsel's efforts to put a legal conclusion in her mouth at

an earlier point in the deposition:

Q:  [A]fter you make the final decision, this agreement that Mr. Strzok signed is binding on Mr. Strzok?

[Objection by defense counsel to the question as calling for a legal conclusion]

A:  I cannot say – I don't quite know how to answer that.

Will Dep. at 239–40.

The second problem with plaintiff's supposed summary of the record is that Will did not

merely "know that Bowdich might purport to overrule her decision," Pl.'s Mem. at 16; she knew

that he had the actual authority to do so, and she knew that he *would* do so even before she had

begun to draft her letter, much less by the time she transmitted it.  Also, as set forth above, Will

did not say or do anything to "formally accept" the LCA.

Finally, the suggestion that Will issued her decision and thereby committed the FBI to an arrangement with plaintiff at a time when "no decision by Bowdich existed," is also contrary to the known chronology and undisputed facts. Pl.'s Mem. at 16. Will prepared her letter with the understanding it would be countermanded, and she was well-aware that Bowdich had in fact decided to reverse her, and that his letter would be delivered with hers, when she signed her letter. *See* Will Dep. 293–94, 297, 300. Will's testimony on those points is corroborated by the exhibits defendants attached to their memorandum, showing that Will was personally editing Bowdich's draft on August 8, DEX 54–55 [Dkt. # 151-56–57], and plaintiff has pointed to no evidence that supports a contrary inference. So it is not at all clear to the Court how plaintiff could advance this description of the case, and it certainly does nothing to forestall the entry of summary judgment in defendants' favor on Count Two.

Moreover, even if Will's decision to impose a punishment consistent with the LCA created some sort of contractual right or short-lived expectation of continued employment, the evidence does not support a finding that plaintiff was deprived of his constitutional right to due process when he was terminated instead.

### C.    Plaintiff received notice and an opportunity to be heard.

Plaintiff asserted in his written response to the Notice of Proposed Termination, "if the FBI were now to fire Special Agent Strzok without affording him genuine due process, such action would . . . violate his rights under the Due Process clause . . . ." Resp. to Notice at 16. He later alleged in the Amended Complaint: "Special Agent[] Strzok's termination deprived him of the standard internal due process afforded to other FBI employees, and which was promised to Special Agent Strzok in the initial proposed removal." Am. Compl. ¶ 40. The record reflects, however, that he received the notice and opportunity to be heard that were required under the Constitution.

"An essential principle of [procedural] due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985), quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). *See also UDC Chairs Chapter v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995), quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("[T]he Supreme Court has established a 'general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.'"). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane*, 339 U.S. at 314, and "the opportunity to be heard" must be "'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Procedural due process is "a flexible concept that varies with the particular situation" and "usually . . . requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127–28 (1990) (emphasis in original), citing, *e.g.*, *Cleveland Bd. of Educ.*, 470 U.S. at 542 (termination of employment); *Parham v. J.R.*, 442 U.S. 584, 606–07 (confinement of child in mental health facility); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) (termination of utility service); *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (suspension of students from public schools); *Wolff v. McDonnell*, 418 U.S. 539, 557–58 (1974) (forfeiture of prisoner's good-time credits); *Fuentes v. Shevin*, 407 U.S. 67, 80–84

(1972) (issuance of writ allowing repossession of property); *Goldberg v. Kelly*, 397 U.S. 254, 264

(1970) (termination of welfare benefits).[30]

Courts determine the adequacy of the process provided by balancing three factors: (1) "the

private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation

of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards," and (3) "the Government's interest, including the function

involved and the fiscal and administrative burdens that the additional or substitute procedural

requirement would entail." *Mathews*, 424 U.S. at 335. In *Cleveland Board of Education v.*

*Loudermill*, the Supreme Court ruled that the plaintiffs' procedural due process rights were

violated because they were terminated from their jobs without being given the chance to respond.

470 U.S. at 542; *see id.* at 533 (balancing "the private interest in retaining employment, the

governmental interests in expeditious removal of unsatisfactory employees and the avoidance of

administrative burdens, and the risk of an erroneous termination"). It made clear, however, that a

hearing need not be in person; rather, "[t]he opportunity to present reasons, *either in person or in*

*writing*" satisfies due process. *Id.* at 546 (emphasis added).

Here, the plaintiff had both. Unlike the plaintiffs in *Cleveland Board of Education*, Strzok

received notice and an opportunity to be heard before he was terminated. He received notice of

the disciplinary action. Notice, PEX 16. He was offered, and he availed himself of, the

opportunities to be represented by counsel, to review the underlying evidence, to respond in

---

[30]     Post-deprivation remedies may satisfy due process in situations where a pre-deprivation
hearing is "unduly burdensome in proportion to the liberty interest at stake" or "where the State is
truly unable to anticipate and prevent a random deprivation of a liberty interest." *Zinermon*,
494 U.S. at 132.

writing, to have an in-person hearing, and to submit letters of recommendation. *See* Resp. to Notice; Hearing Tr. *See also* Notice at 21–23 (setting forth the procedural protections available to plaintiff); Will Dep. at 25–26 (noting that when employees receive a proposed penalty of suspension of fifteen days or more, demotion, or termination, they "get to come in, review the file, prepare a written response and have an oral hearing" before she issues her final decision).[31] Thus, plaintiff does not – and cannot – argue that he did not receive notice of the disciplinary action against him or an opportunity to be heard.

Plaintiff's due process argument boils down to his complaint that he did not have the opportunity to be heard *by Bowdich*. *See* Pl.'s Mem. at 44 (arguing that he was denied "any meaningful due process after Mr. Bowdich unilaterally and without warning replaced Will as the actual decision maker"). Setting aside the demonstrably false assertion that plaintiff had no "warning,"[32] the Constitution does not mandate that the employee be given the opportunity to make his case to each decision maker in the chain personally.

---

31    Further, the record shows that if Will had decided to fire plaintiff, he would have had the opportunity to appeal to the DRB since the LCA only agreed to give up appeal rights *if* he was suspended and demoted as requested. *See* DSOF 58; Pl.'s Resp. to DSOF 58 (undisputed).

32    Will told plaintiff and his counsel at the hearing that "[t]he Director has the right to review any decision I make" or any decision made by the DRB "if the Director thinks it's in the best interest of the organization." Hearing Tr. at 128. *See also* 2017 FBI Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, PEX 60, at 3 (emphasis added) ("The Director has the authority to review and amend *any* disciplinary decision, either in favor of or to the disadvantage of an employee, if the Director considers it necessary to correct an injustice or to prevent harm to the FBI. This authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the Director."); FBI Policy Directive 0915D (Disciplinary Appeals Process), DEX 18, ¶ 4.3 ("[B]y virtue of the authority inherent in the position, the FBI Director (or his or her designee) maintains the authority to modify any disciplinary finding, penalty, or both as deemed necessary and in the best interests of the FBI."); FBI Policy Directive 0235D (Disciplinary Appeals Process), DEX 19, ¶ 12.3 (same).

In *Gottlieb v. Pena,* 41 F.3d 730 (D.C. Cir. 1994), a Coast Guard lieutenant commander applied to a Coast Guard board for correction of his military record, and the board heard evidence before submitting a recommended decision to the Secretary of Transportation. The Secretary was the final decision maker, and the plaintiff complained that he had been given no opportunity to examine the board's initial recommendation or to make a submission to the Secretary. The D.C. Circuit held that the Coast Guard's procedures did not violate the plaintiff's due process rights, concluding that he was not "entitled to input or process past the first 'tier.'" *Id.* at 737. In sum, all that was required was that plaintiff be afforded "an opportunity to present his side of the story." *Cleveland Bd. of Educ.*, 470 U.S. at 546.[33]

The Court finds that the plaintiff here was given "notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ.*, 470 U.S. at 546; *Mullane*, 339 U.S. at 313. This is not a case in which another hearing would mitigate "the risk of an erroneous termination," 470 U.S. at 543, because the circumstances surrounding the messages at issue and plaintiff's history of outstanding service to the agency were not in dispute, and with the assistance of counsel, plaintiff had addressed all of that fully and forcefully in a written submission and in a hearing that was recorded. The question to be decided was the nature of the penalty, an issue about

---

33    Plaintiff also submits that he was denied due process because Bowdich failed to consider the sixth recommendation submitted on his behalf, the letter from former General Counsel Baker, which arrived the day Bowdich's decision was delivered. *See* Pl.'s Mem. at 44. But there is no guarantee of a particular quantum of process; due process is measured by what is "appropriate to the nature of the case." *Cleveland Bd. of Educ.*, 470 U.S. at 542, citing *Mullane*, 339 U.S. at 313. Baker's letter echoed the opinions voiced by the other five references, and he reiterated facts that were well-established and undisputed: that plaintiff had an exemplary career prior to the events that resulted in his termination. *See* PEX 11. *See also* Will Dep. at 249 (testifying that there was no reason to wait on the sixth letter because she was going to approve the lesser penalty Strzok offered to accept in the LCA).

which, as Will repeatedly testified, "reasonable minds can differ." Will Dep. at 291, 312. Will reviewed the same record made available to plaintiff and to Bowdich, and she held the in-person meeting with plaintiff and his lawyer that he maintains he should have had with Bowdich. But after that process, which plaintiff acknowledges comported with the Fifth Amendment, even she found that the "nature and scope of [plaintiff's] misconduct certainly warrants dismissal." Will Letter at 23. Will chose to give greater weight to plaintiff's unsullied record of service to the Bureau and his expressions of remorse, and she found the suspension, demotion, and the agreement not to contest disciplinary charges in the future to be sufficient. Will Dep. at 239–40. Bowdich considered the same record, which included Will's lengthy letter, Strzok's submission, and the glowing letters of reference, but in the end, he simply could not get past the content of the text messages and the effect they had on the Bureau's reputation.

> Question by plaintiff's counsel: Mr. Bowdich, you keep talking about the texts. Given the texts, was there anything that Special Agent Strzok could have said, his lawyer could have said, his character witnesses could have said that would have persuaded you that termination was not the right decision? . . .
>
> THE WITNESS: Unless the facts substantially changed, I don't know that there was.

Bowdich Dep. at 350–51; *see* Bowdich Letter at 1.

The sanction was undeniably harsh. While some high-ranking FBI officials agreed it was warranted, *see, e.g.*, Wray Dep. at 65–66; PEX 24 [Dkt. # 155-25] ("McNamara Dep.") at 265–66, and others did not, *see, e.g.*, McCabe Decl. ¶¶ 9, 14, the process that led to its imposition comported with the Fifth Amendment. Since the Court finds that plaintiff did not have a property interest in his continued employment, and that even if he did, he received the process he was due

in this matter, judgment will be entered in favor of the defendants on Count Two, and plaintiff's motion for summary judgment on that count will be denied.

## II.    Plaintiff's termination did not violate the First Amendment.

Plaintiff alleges that defendants violated his First Amendment rights when they terminated him for engaging in political speech using a government device, and that he received a harsher punishment than other employees who engaged in similar activity because his communications were critical of President Trump.  Am. Compl. ¶¶ 72–73.

### A.    The resolution of plaintiff's claim turns on the elements of *Pickering* test.

The Supreme Court has long recognized that a citizen does not forfeit his constitutional right to speak out on matters of public concern entirely when he accepts a government position. *See Connick v. Myers,* 461 U.S. 138, 140 (1983), citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968) ("[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.").  The Court has also steadfastly maintained, though, that government employers have a substantial interest in ensuring the efficient operations of their agencies.  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006).  "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.*; *see Pickering,* 391 U.S. at 568 ("[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").

When an employee challenges government action against him on First Amendment grounds, these interests must be balanced in accordance with the well-established *Pickering* framework, which identifies the four elements a claimant must establish in order to prevail:[34]

1) he must have spoken as a citizen on a matter of "public concern";

2) his interest in speaking on matters of public concern must out-weigh the government's interest "in promoting the efficiency of the public services it performs";

3) his protected speech much have been a substantial or motivating factor in prompting the government's decision; and

4) the government must be unable to show that it would have reached the same decision absent the protected speech.

*See Connick*, 461 U.S. at 142; *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 287 (1977). *See also Orange v. District of Columbia*, 59 F.3d 1267, 1272 (D.C. Cir. 1995) ("In reviewing a public employee's First Amendment claim, this Circuit engages in a four-part inquiry that derives from *Pickering* and its successors . . . ."); *LeFande v. District of Columbia*, 841 F.3d 485, 493–94 (D.C. Cir. 2016).

As to the first factor, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48. And as the Supreme Court explained in the case involving an employee who was overheard in the office making an ugly remark concerning the attempt on then-President Reagan's life to her boyfriend, "[t]he inappropriate or controversial

---

34    The *Pickering* decision does not spell out the four-part test, but subsequent opinions distilled the four considerations underlying that case and referred to them as the *Pickering* factors.

character of a statement is irrelevant to the question of whether it deals with a matter of public concern." *Rankin v. McPherson,* 483 U.S. 378, 387 (1987).

In this case, the government does not dispute that plaintiff has established the first and third factors, and as the plaintiff submits in his brief setting out the same factors, there can be no debate over the fourth factor either: it was the text messages that prompted Strzok's termination. Pl.'s Mem. at 31. This leaves only the second element, the balancing at the heart of the analysis, which is a question of law for the Court to resolve. *See Navab-Safavi v. Glassman,* 637 F. 3d 311, 316 (D.C. Cir 2011) ("The first two of the four questions set forth above are questions of law for the court to resolve."); *Orange,* 59 F.3d at 1272 (stating the first two questions of the four-part inquiry derived from *Pickering* inquiries "are questions of law").

When assessing this factor, the court's task "is to seek a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick,* 461 U.S. at 142 (alteration in original) (internal quotation marks omitted), citing *Pickering*, 391 U.S. at 568. "This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin,* 483 U.S. at 384.

It is a fact-based inquiry, and when the court undertakes the assessment, "the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id*. at 388. The court should also consider the employee's role and rank within the agency. *Id.* at 390 (requiring courts to pay "some attention . . . to the responsibilities of the employee within the agency"); *Hall*, 856 F.2d at 261, quoting *Rankin*, 483 U.S. at 390 ("The burden of caution employees bear with respect to the words they

speak will vary with the extent of authority and public accountability the employee's role entails."); *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1177 (D.C. Cir. 2021) (same). As the Supreme Court has explained, pertinent considerations are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, citing *Pickering*, 391 U.S. at 570–73.

Finally, the court is supposed to approach this task by according the government employer a great deal of deference, *see Waters v. Churchill*, 511 U.S. 661, 673 (1994), and that is particularly true when a law enforcement agency is involved. *O'Donnell v. Barry,* 148 F.3d 1126, 1135 (1998).

### B.    The *Pickering* test applies to "private" conversations.

Plaintiff takes the position that the case falls outside of the *Pickering* framework since he was engaged in purely private conversations and had no reason to believe they would ever be shared. Pl.'s Mem. at 24. As plaintiff put it in his response to the Notice of Proposed Termination: "[n]ot only is it indisputable that Special Agent Strzok believed that his text messages to Ms. Page would remain private, this belief was objectively reasonable." Resp. to Notice at 15. Therefore, he maintains that his messages should be likened to a personal conversation between two employees in a break room to which he says *Pickering* would not apply. *See* Pl.'s Mem. at 24–25.

When considering defendants' motion for summary judgment, the Court assumes that plaintiff is being entirely credible when he reports that prior to June of 2017, he was not thinking about the possibility that the couple's communications would come to light, and that he certainly did not anticipate that they would be publicly disseminated by the Department of Justice. *See* Resp. to Notice at 14–15. But the record reflects that Assistant Director Will and others found the

suggestion that his expectation of privacy was reasonable, and that disclosure was not just

unforeseen, but unforesee*able* to a highly trained, highly experienced Special Agent, very hard to

swallow.  *See* Hearing Tr. at 112.  And at this point, there is no genuine dispute of material fact

with respect to that question.

The Department of Justice internal manual provides the following guidance concerning

electronic communications:

> All prosecution team members should be aware of the government's
> obligations regarding the preservation and disclosure of electronic
> communications, or "e-communications," which include emails, text
> messages, SMS (short message service), instant messages, voice mail,
> pin-to-pin communications, and similar means of electronic
> communication.  Although e-communications offer benefits in the form of
> speed and efficiency, all team members should understand that case-related
> e-communications may potentially be disclosed to the defense.  Thus, all
> team members should understand the risks of e-communications; the need
> to comply with agency rules regarding documentation and record-keeping
> during an investigation; the importance of careful and professional
> communication; and the obligation to preserve and produce such
> communications when appropriate.  All members of the prosecution team,
> including federal, state, and local law enforcement officers, are responsible
> for making available to the prosecutor all potentially discoverable
> e-communications.

U.S. Dep't of Just., Just. Manual § 9-5.004 (2019) (Guidance on the Use, Preservation, and

Disclosure of Electronic Communications in Federal Criminal Cases).[35]

During the hearing on the proposed termination, plaintiff explained that as he saw it at the

time, he was just expressing personal opinions in private:  "I was not posting them in a public

setting.  I had no anticipation that they . . . were going to be released in the way they were . . . ."

Hearing Tr. at 112.  But Will immediately took him to task for that and reminded him that the

---

35    Available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-
proceedings#9-5.004 [https://perma.cc/CJ3T-7L9J].

admonition "if you don't want to see it on the front page of the Post, don't put it in a text" is drummed into every agent from the day they take the oath. *Id.* "That's pretty obvious. . . . [H]ow do you not know that?" *Id.*[36] She emphasized that her concern was not the employees' relationship, but "this [was] about . . . you used the government's devices in a way you should not have used them." *Id.* at 115–16. Stzrok responded, "I [ac]cept that," *id.* at 116, and he agreed that his conduct was serious and unacceptable. "Without question it was dumb and horrible judgment." *Id.* at 113. *See also id.* (calling it "dumb, and wrong, and bad judgment on my part").[37]

Will made the same point in her decision letter. Referring to plaintiff's voluntary sworn interviews with the Office of Inspector General, she wrote:

> You stated that [the government attorney] was a "colleague who is also a close friend" and noted that your personal opinions and beliefs "intermixed" in some of your work conversations. You acknowledged that expressing your opinions in such a manner "was dumb to do [] on a government device . . . ." You posited that your texts with [government attorney] were a "direct, one-on-one, private conversation" and "a non-official record between two friends." You stated your use of your FBI-issued phone to engage in these conversations was a matter of "convenience" and acknowledged that in hindsight you "would have preferred [] to do that [] not on a [] government system." You were aware your communications with GA on your FBI-issued phone were monitored and logged and admitted you could "envision a number of scenarios" in which the

---

36    Will's complete comment was, "here's what I feel on that . . . because you're obviously very smart, and very talented and people think a lot of your abilities, and who you are. How [do you] just not know that? I mean, 14 years ago when I was first hired by Bob Mueller sitting in an ADA meeting, he was like, if you don't want to see it on the front page of the Post, don't put it in a text. Don't put it in an email. Thank you. That's pretty obvious. I mean you['re] where you are, how do you not know that? Why do you put words on a device that belongs to the government that can get grabbed by the IG and can be published and we all know that the IG send their crap to Congress and then it's out." Hearing Tr. 112–13.

37    "[M]y sense said you know what, all I'm doing is expressing my First Amendment right. Is that smart? Absolutely not. It's not. Would – should I have been able to say you know what, even if it's your personal, the front page of the New York Times test, should I have known that? Without question." Hearing Tr. at 114.

> disclosure of those messages would hurt the integrity of the FBI and the Clinton Email and Russia investigations. You acknowledged your conduct was not "smart from the perspective of perception."

Will Letter at 11–12 (alternations in original); *id.* at 20 ("You acknowledged . . . your text messages were monitored and preserved . . . .").

Moreover, no other witness deposed in this case considered communications on government phones to be private. *See, e.g.*, Horowitz Dep. at 384 ("[H]ere they were using FBI devices. . . . FBI employees texting or e-mailing on private devices, it's a difficult argument to make – particularly an agent leading, or agents, leading an investigation – that they have an expectation that those are going to be private and no one is going to see them."); *id.* at 385–86 (explaining that even a water cooler conversation could be problematic if it was about the subject of an investigation one was handling).

At this stage of the case, there is no longer any dispute with respect to this issue. In his deposition, plaintiff acknowledged his understanding that anything said on government devices might be monitored. Strzok Dep. at 106–07 ("My expectation was anything on government devices might be monitored in the context of making sure information is not being provided to the government of China or the New York Times, . . . ."). And while he noted unidentified "caveats," he did not dispute defendants' proposed statement of undisputed fact that "Mr. Strzok knew that his FBI-issued phone was logged and monitored, and he admitted to OIG he could 'envision a number of scenarios' in which disclosure would hurt the integrity of the FBI and the Clinton Email

and Russia investigations." DSOF 27, citing Will Letter at 11, 20; Pl.'s Resp. to DSOF 27. There simply is no dispute of fact with respect to this question.[38]

In any event, even if one were to grant plaintiff the benefit of a factual inference that these were private conversations, First Amendment protections apply to a public employee's speech made in a private setting. In *Givhan v. W. Line Consol. Sch. Dist.*, the Supreme Court overturned a decision by the Fifth Circuit that the First Amendment did not protect a public school teacher's expression of her opinions despite the fact that she arranged to communicate them within the privacy of her principal's office. 439 U.S. 410, 415–16 (1979). "This Court's decisions . . . do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Id.* at 414. Later, in *Waters v. Churchill*, the Court again applied these principles. *See* 511 U.S. at 668. In that case, two nurses working at a public hospital stepped into the kitchen for a tète-á-tète during dinner, and one made remarks critical of the management of her department that were overheard and reported to her supervisor. *Id.* at 664. She was fired and challenged her termination under the First Amendment, and the fact that her comments were not meant to be disseminated did not factor in the analysis. *See id.* at 680 ("[U]nder the *Connick* test, Churchill's speech as reported by Perkins-Graham and Ballew was unprotected. Even if Churchill's criticism of cross-training reported by Perkins-Graham and Ballew was speech on a matter of public concern

---

[38] It is undisputed that the Department of Justice disclosed the existence of the Strzok-Page text messages and their general content to defense counsel as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation. *See United States v. Flynn*, 411 F. Supp. 3d 15, 24 (D.D.C. 2019); DSOF 50; Pl.'s Resp. to DSOF 50.

– something we need not decide – the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had.").

Plaintiff's argument that the balancing test does not apply is based solely on a concurring opinion in *Rankin v. McPherson*. *See* Pl.'s Mem. at 24, citing *Rankin*, 483 U.S. at 393. The case involved an unfortunate snide remark made by an employee in the constable's office to her boyfriend in the immediate aftermath of the attempt on then-President Reagan's life, which, unbeknownst to her, was overheard and led to her dismissal. 483 U.S. at 380–82. Justice Powell expressed the view that it was unnecessary to engage in an extensive *Pickering* analysis since there was no dispute that the comment was made during a private conversation, and the employee "had no intention or expectation that it would be overheard or acted on by others." 483 U.S. at 393 (Powell, J., concurring). He observed, "[i]f a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace." *Id.*

But plaintiff neglects to mention that the majority did not agree with Justice Powell's view that the case fell outside of the *Pickering* paradigm. The *Rankin* majority opinion – including the footnote that counsel for plaintiff recited several times during oral argument – makes it clear that even a private statement on a matter of public concern may require a court to perform the balancing

step of the *Pickering* analysis.[39]  At that point, the time, place, and manner of the communications will all be relevant to the assessment, but the assessment must still be made.  *See Rankin*, 483 U.S. at 388.[40]

Moreover, the concurring opinion in *Rankin* would do little to advance plaintiff's case even if it had precedential value.  It is true that the employee involved was having a private, unguarded conversation with her boyfriend.  But the fact that she was a clerical employee with no law enforcement responsibilities was also a fundamental aspect of Justice Powell's analysis.  *See id.* at 392 (Powell, J., concurring) ("McPherson was a 19-year-old probationary employee in the Constable's Office . . . . Her only job was to type information from court papers into a computer. She had no law enforcement responsibility, nor was she permitted to perform the primary task of the Constable's office, serving civil process.").  Her situation bears no resemblance to that of a

---

39    *Rankin*, 483 U.S. at 388, n.13 (citations omitted) ("We agree with Justice POWELL that a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee.  To the extent petitioners' claim that McPherson's speech rendered her an unsuitable employee for a law enforcement agency implicates a serious state interest and necessitates the application of the balancing element of the *Pickering* analysis, we proceed to that task.").

40    Plaintiff's insistence that *Pickering* should not apply left the Court scratching its head since it is *Pickering* that gives what would otherwise be a mere employment dispute its constitutional dimension, provides the Court a role to play, and requires the Court to weigh the employee's First Amendment rights in the balance.  *See Connick,* 461 U.S. at 140, 147 (considering under *Pickering* whether the First Amendment prevents the discharge of a state employee for circulating a questionnaire to colleagues concerning internal office affairs, and holding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior").  Given the well-recognized constitutional right to speak out on public affairs, which includes the right to criticize public officials, *see Connick,* 461 U.S. at 162 (Brennan, J., dissenting), citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 279–80 (1964), the Court will decline plaintiff's invitation to put the four-part test aside, and it will give the claim the attention it is due under the *Pickering* standard.

twenty-plus year veteran of the FBI, who was serving as the Deputy Assistant Director of the Counterintelligence Division. Also, while Justice Powell opined that not every casual remark in the workplace would warrant discipline, his conclusion that "[t]he risk that a single, offhand comment directed to only one other worker will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful," 483 U.S. at 393 (Powell, J., concurring), is inapposite to the case at hand, which involves multiple comments about the particular public figures who were under investigation. Therefore, Justice Powell's agreement with the majority that Ms. McPherson's termination violated the First Amendment provides little guidance here.

### C.    Plaintiff's interest in speaking on matters of public concern does not outweigh the FBI's interest in avoiding the appearance of bias in its investigations.

The task before the Court, then, "is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick*, 461 U.S. at 142, quoting *Pickering*, 391 U.S. at 568. This is a question of law. *See Navab-Safavi,* 637 F.3d at 315–16; *Orange*, 59 F.3d at 1272.

The Supreme Court accords "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters*, 511 U.S. at 673.

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible.

***

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Id.* at 674–75.

The D.C. Circuit has recognized that "because of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees." *O'Donnell*, 148 F. 3d at 1135;[41] *Breiterman*, 15 F.4th at 1176–77 (finding that the U.S. Capitol Police did not violate an officer's First Amendment rights by disciplining her for leaking a photograph of an unattended Capitol Police firearm to the press, in part because there was a danger that she had discredited the Capitol Police by making her statement, "thus undermining the particular trust required in a police force"); *Baumann v. D.C.*, 795 F.3d 209, 217–18 (D.C. Cir. 2015) (holding that sanctioning a police officer for disclosure of emergency radio communications to the media without authorization "carried the clear potential for undermining the ongoing investigations" and was not protected by the First Amendment) (internal edits and quotation marks omitted).

Moreover, the Supreme Court pointed out in *Rankin* that "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." 483 U.S. at 390. The D.C. Circuit has weighed

---

41    This case does not present facts that would place it within the exceptional situation of "when a police officer speaks out on an issue that he is uniquely qualified to address." *O'Donnell*, 146 F.3d at 1135.

this consideration in balancing the *Pickering* factors.  In a case involving the athletic director of the University of the District of Columbia, the court observed, "*Rankin* indicates that the higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest."  *Hall*, 856 F.2d at 261.  And the Circuit reiterated the point in *Breiterman*, which involved both the "particular trust required in a police force" and an employee of high rank. 15 F.4th at 1177.  "As a supervisor, Breiterman had greater responsibility to uphold the mission and policies of the Capitol Police, and her breach undermined her ability to continue in a supervisory role."  *Id.*

In the letter transmitted to plaintiff on August 10, 2018, the Deputy Director of the FBI wrote, "I concur with the AD's conclusion that these offenses are substantiated.  However, I disagree with her evaluation of the relevant *Douglas* factors in deciding an appropriate penalty in your case. . . . Pursuant to my delegated authority as the Deputy Director, I have reconsidered the AD's punishment and conclude that dismissal is appropriate under the facts of this case."  Bowdich Letter at 1.  He then set out the reasoning underlying his decision succinctly.

> In making this decision, I reviewed relevant material pertaining to your case, including the text messages between you and Lisa Page, the *Douglas* factor analysis drafted by the AD of the Counterintelligence Division, your role as one of the most senior counterintelligence agents in the FBI, and your many years of dedicated service.  While there is no doubt your 21 years of service to this organization should not be discounted, I am persuaded that serious aggravation is warranted for your 5.21 offense given the severe, long-term damage your conduct has done to the reputation of the FBI.  It is difficult to fathom the repeated, sustained errors of judgment you made while serving as the lead agent on two of the most high-profile investigations in this country. . . .
>
> Considering *Douglas* factor 8, the notoriety of the offense or its impact upon the reputation of the agency, I find that dismissal is warranted. As an organization we are entrusted to investigate high level public officials, regardless of party affiliation.  If we ourselves show personal bias or demonstrate a lack of objectivity, that trust can be lost. . . . Though the

> Office of Inspector General found no evidence that your bias impacted your investigative actions or decisions, your sustained pattern of bad judgment in the use of an FBI device called into question the decisions made during both the Clinton E-mail investigation and the initial stages of the Russian collusion investigation.  In short, your actions have called into question the credibility of the entire FBI.

Bowdich Letter at 1–2.  Bowdich concluded:

> I made this decision considering all of the facts surrounding your precise conduct and the extremely damaging impact it has had and will have on this organization.  It will take years to overcome this lasting impact.

*Id.* at 2.

A facet of the *Pickering* and *Connick* analysis is the public employer's interest in whether the expression at issue impeded its employees' ability to fulfill their responsibilities.  *Rankin*, 483 U.S. at 388.  Plaintiff submits that this should not weigh against him at all since the blow to the Bureau's reputation was not a problem of his making; he was engaged in an unremarkable private chat about personal viewpoints that would never have affected the Bureau if DOJ had not released the texts and caused the public uproar.  *See* Pl.'s Mem. at 24–25, 34.  *See also* Strzok Dep. at 282–83 (when asked whether he agreed with the IG's conclusion that "the messages cast a cloud over the FBI's investigations to which these employees were assigned," he answered, "I think DOJ's illegal release of the text messages created the environment that caused that cloud.  I think but for the illegal release and the decision to release to Congress and the way that occurred, that cloud might look nothing like the cloud that the IG was writing about or perceived to exist at the time of this report"); *id.* at 304 ("I think at the end of the day, the events in question related to a private conversation about personal opinions over political entities, and everything that followed, all the public outcry was set in motion . . . by the . . . Department of Justice . . . .").

Plaintiff reminds the Court of the contemporaneous comment made by the then-Assistant Director of the FBI Inspection Division, Nancy McNamara, on December 3, 2017, just after the messages were publicly released: "It's bad.  I don't recall ever seeing personnel exposed like this." Pl.'s Mem. at 6, citing McNamara Dep. at 98, 227.  However, he does not mention her testimony that put the empathetic email in the context of those early days.

> Q:  Did you believe that Mr. Strzok could survive this and continue to have a career at the FBI when you wrote this?
>
> A:  I believed there was the potential for that.

McNamara Dep. at 237.  He also ignores her views about the ultimate resolution of the matter completely; McNamara testified that in her opinion, the "correct outcome" was that "Mr. Strzok should have been terminated."  McNamara Dep. at 265–66.

But plaintiff's attempt to deflect responsibility does not affect the outcome here.  The record includes evidence that the existence of the texts had already appeared in the Washington Post and New York Times before the DOJ Press Secretary distributed them to representatives of the media, *see* PEX 73 (New York Times article); PEX 74 (Washington Post article); Isgur Dep. at 63–76.  There is also evidence in the record that it could have been necessary to disclose the texts at some point in the future, *see, e.g.*, Midyear Report at 421–22; Will Letter at 11–12, 20, just as they were in pre-plea meetings with defense counsel in November 2017 in *United States v. Flynn.  See* 411 F. Supp. 3d 15, 24 (D.D.C. 2019).  Finally, it is undisputed that the alarming content of the texts, for which plaintiff cannot disavow responsibility, prompted the former FBI Director and then-Special Counsel, Robert Mueller, and Deputy Director Bowdich to take action long before they were released to the public.

More importantly, the question of whether DOJ acted properly is not before the Court; the claims based on the agency's actions and alleged violations of the Privacy Act have been dismissed, and the only claims to be considered relate to solely to the constitutionality of the disciplinary decision.

The FBI's stated reasons must be weighed against plaintiff's legitimate interest in expressing his opinions about matters of public concern.  While the Court has rejected his contention that he could not have foreseen that these private communications would be publicly revealed, his emphasis on the fact that he was not intentionally participating in a public discussion of the candidates as an involved citizen – not exhorting voters to consider the characteristics or actions of either candidate or bringing his specialized knowledge and experience to a debate about public policy – tends to weaken his stake in the balancing.  While the two employees were indisputably texting about matters of public concern for purposes of the first prong of the *Pickering* test, these were not the sort of communications that could "enable members of society to make informed decisions about the operation of their government," and would therefore deserve the highest level of First Amendment protection.  *O'Donnell*, 148 F.3d at 1133, citing *Hall*, 856 F.2d at 279.

Also, plaintiff was the highly-trained and highly-experienced lead investigator in the two most high-profile and politically-charged cases then pending before the FBI.  This is not a case like *O'Donnell*, where the law enforcement officer was addressing an issue he may have been

uniquely qualified to address in a public forum,[42] or like *Rankin,* where the untoward comments about a public figure had absolutely nothing to do with the employee's duties.  Special Agent Strzok was expressing negative views about the subjects of the investigations he was leading,[43] in message after message exchanged with another government employee, who was also involved, on their FBI phones.  So what the Court must balance is Strzok's First Amendment right to do *that* against the FBI's stated interest in avoiding even the appearance of partiality in any investigation, much less the ones involved in this case.

These were messages that unquestionably would have had to be produced if either investigation resulted in an indictment,[44] and their revelation prompted broad and long-lasting attacks on the agency's integrity.  Strzok's repeated disparagement of the very individuals he was investigating posed problems that were serious enough, but the messages that could be read as expressing those views within the context of the investigation could not be ignored.[45]  The

---

42      The D.C. Circuit remanded the case back to the trial court to further develop the record on this issue.  *See O'Donnell*, 148 F.3d at 1139 (concluding "it is not possible to decide what value O'Donnell's letter would have had to the public without a more complete record as to the state of the public debate at the time the letter was written").

43      Plaintiff's own description of the texts emphasizes that he made derogatory remarks about both of the individuals under investigation.  *See* Resp. to Notice at 14 n.6 (admitting that "Special Agent Strzok's texts contain repeated criticism of Secretary Clinton and former President Clinton, along with numerous other Democrats like Eric Holder and Bernie Sanders").

44      *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring prosecutors to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial).

45      *See* Will Letter at 7 (quoting plaintiffs' texts with the government attorney) ("GA: [Trump's] not ever going to become president, right?  Right?!  [Plaintiff]:  No.  No he's not.  We'll stop it."); *id.* at 8 ("[Plaintiff]:  I want to believe the path you threw out for consideration in [DD's] office – that there's no way [Trump] gets elected – but I'm afraid we can't take that risk.  It's like an insurance policy in the unlikely event you die before you're 40 . . . ").  *See also* Midyear Report at 404 (quoting same texts).

unprecedented combination of circumstances presented – the tone and substance of the communications, the number of communications, plaintiff's high rank within the Bureau, and his role in the investigations – compounded the problem further.[46]

Indeed, the letter that plaintiff would have the Court enshrine as the FBI's final word on the matter was uncompromisingly harsh about the conduct and its effect on the Bureau.

> Your excessive, repeated, and politically-charged text messages, while you were assigned as the lead case agent on the FBI's two biggest and most politically-sensitive investigations in decades, demonstrated a gross lack of professionalism and exceptionally poor judgment. Your misconduct has cast a pall over the FBI's Clinton Email and Russia investigations and the work of the Special Counsel. The immeasurable harm done to the reputation of the FBI will not be easily overcome. While "Trump is a fucking idiot," "I hate these people," "I need to fix it," "No he's not [going to become president]," and "We'll stop it," took less than a minute for you

---

[46]    As the former Assistant Director of the FBI Inspection Division explained:

> Q: Ms. McNamara, why did you believe that Mr. Strzok should have been terminated?
>
> A: I believe that in this instance when you have – you hold that level of authority . . . in the FBI that, this was a case that had political connections and ramifications that – unfortunately that those messages and those comments, again, created the appearance of impropriety or bias, and that essentially returning to the FBI as an agent or in an investigative capacity would have been nearly impossible for Mr. Strzok to continue the investigative process.
>
> Q: Do you believe that Mr. Strzok's . . . conduct harmed the bureau?
>
> A: Yes. . . . Again, it created the appearance of bias.
>
> Q: And was that harmful within the culture of the bureau? . . .
>
> A: I think it caused significant morale problems within the FBI because of the negative exposure to the bureau and also diminished our reputation externally in our ability to conduct investigations. . . . I am not aware of any similar situations.

McNamara Dep. at 266–68.

> to transmit by text message, the long-term negative impact on the FBI cannot be overstated. Your vituperative text messages will be the subject of damning public discourse for days, months, and even years to come, and the FBI will be recipient of the expressed outrage.

***

> [Y]our texting became a media sensation, cast doubt on the FBI's investigative findings and the Special Counsel's investigation, and brought harsh criticism upon the FBI from politicians at all levels of both political parties, President Trump, the media, and the public. Although you repeatedly denied that your investigative decisions in the Clinton Email and Russia investigations were the result of actual bias, the *appearance* of biased decision-making caused by your outrageous texts is as bad as if you had been biased.

Will Letter at 19–20 (emphasis in original).  After her point-by-point refutation of plaintiff's response to the proposed termination, Will concluded, "[t]he nature and scope of the misconduct certainly warrants dismissal."  Will Letter at 23.

It is true that a reasonable human resources manager could and did favor a lesser penalty after measuring the offense against plaintiff's years of service and his otherwise sterling record. But the same factors that led her to show lenience also fairly demanded a strong punishment, as they pointed to the inarguable conclusion that he surely knew better. *See* Bowdich Letter at 2 ("As a Deputy Assistant Director in the Counterintelligence Division, you were expected to be a leader who was beyond reproach and to set an example for not only your direct subordinates, but others throughout the organization who watched and observed your behavior and actions. You failed to do so repeatedly . . . .").  The position Strzok occupied and the great responsibility he was accorded to manage sensitive matters in light of his experience and intelligence meant that the barrage of scathing comments he fired off over a period of two years had a much more profound impact on the public impression of the FBI as an institution than any of the isolated statements by lower level employees that plaintiff tries to pass off as comparators ever could. *See* Pl.'s Mem. at 21–22.  For

72

all of these reasons, giving the decision made by the leaders of the agency at that time the deference it is due, the Court cannot find that the FBI got it wrong as a matter of constitutional law.

In any event, attacking the penalty on constitutional grounds is not the main thrust of plaintiff's opposition to defendants' motion. He maintains that the case is not ripe for summary resolution because there is a question as to whether FBI's stated reasons for discharging Strzok can be believed.

### D.    There is no genuine dispute of fact that bears on the resolution of Count One; the testimony that Bowdich did not fire plaintiff to mollify the President stands uncontested.

Federal Rule of Civil Procedure 56 requires a party asserting that a fact is genuinely disputed to do so by "citing to particular parts of materials in the record," including depositions, documents, electronically stored information, declarations, and interrogatories. Fed. R. Civ. P. 56(c)(1). And it is well-established that to defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

In his August 10, 2018 letter, the then-Deputy Director of the FBI set out his reasons for overturning Will's decision and terminating plaintiff. *See* Bowdich Letter; Section II, C. above. He reiterated those concerns under oath at his deposition.

> I had looked at those texts over and over and over again and I was seeing the damage that it was doing to our organization. We had new agent classes coming in on a regular basis, and when FBI agents come into Quantico, it is made crystal clear, crystal clear to them, check your political beliefs at the door. Check your biases at the door. Objectivity is one hundred percent important as an investigative organization. That is something you are taught from the time you are an infant entering the organization.
>
> So, I am taking all – all the noise, all that stuff, I try to clear that out completely and really focus on, What is the message that we are sending internally across the board? Because this isn't a GS-10 agent, a brand new

73

agent. This is a Deputy Assistant Director with [an]other 20 years of experience, extensive experience in counterintelligence, of all things –

Bowdich Dep. at 347–48.

[W]hat I saw here was a sustained and repetitive series of missteps while we had the – essentially the leader of this investigation, both the midyear investigation and the Russia investigation, in his position. I also looked at their positions, especially Pete's, but both of their positions as leaders. He was a Deputy Assistant Director, which is a very high level in the FBI. Lisa was the Deputy Director's Counsel, which is a very coveted position and an important position in the organization, where she has access to – there's not much she does not have access to or insight into within the organization.

The series of missteps, when you read the texts, I think it's pretty clear. When you look at the positions they were on, the two most high-profile cases in the entire FBI, at that time that were going to be peeled back six ways to Sunday and reviewed and second guessed and then to have these steps taken or these mistakes made was monumental in my mind.

\*\*\*

Q: And what was the basis for your belief that the reputation of the FBI had been called into question by Special Agent Strzok's conduct?

A: I think that was clear. Look, I think . . . an investigative organization has to be viewed by all sides of the public regardless of political beliefs or political affiliation as one hundred percent objective. When you see texts like this with the bias and the animus that was inside these texts, that was contained in these texts, it's hard to see either one of these people as objective.

Q: But my question is how did you in your position measure the extent of the damage to the FBI's reputation?

A: Well, number one, I knew this would come out at some point either way, no matter how it comes out. These are two of the – the most high-profile cases in the entire FBI as I mentioned earlier. They're going to be opened up, peeled back, second guessed, third guessed. It is going to be constant, and so all these things will come out, and they did. That was clear to me.

Bowdich Dep. at 42–46.

Plaintiff puts forward a few, purported evidence-based arguments for why the Court should reject the testimony he elicited from Bowdich and the other FBI witnesses during their depositions,

74

but as will be set forth below, the few excerpts from the record that plaintiff cites do not create a genuine dispute about the FBI's motivation. Beyond those factual arguments, plaintiff adamantly maintains that Bowdich is not credible. But in the absence of contradictory testimony or documents, that does not suffice to ward off summary judgment. There is no conflict between the testimony of two witnesses that needs to be resolved by a jury; there is simply a conflict between plaintiff's long-standing theory and the evidence he was able to adduce to prove it.

> **1.    The declaration of former Chief of Staff John Kelly does not present a factual dispute.**

Plaintiff's memorandum in opposition to the motion announces: "[d]iscovery has shown that contrary to defendants' interrogatory responses, President Trump *did* pressure aides and DOJ officials to fire Mr. Strzok." Pl.'s Mem. at 27 (emphasis in original). In support of that assertion, though, plaintiff does not direct the Court to any deposition testimony or any documents discovered in the FBI's files. The only source cited is the declaration of retired General John F. Kelly, who was the Chief of Staff to President Trump at the time of the events in this case. *See id.*, citing Kelly Decl.

What Kelly said in his sworn declaration was the following:

> As White House Chief of Staff in 2018, I observed then President Trump make comments about Peter Strzok and Lisa Page. The then President questioned to me and others whether Mr. Strzok and Ms. Page could be disciplined. It appeared from President's Trump's comments, both public and private, that he wanted to see Mr. Strzok fired. **I do not recall President Trump ever posing such questions to FBI Director**

> **Christopher Wray, FBI Deputy Director David Bowdich, or anyone else at the FBI.**

Kelly Decl. ¶ 1 (emphasis added).[47]  General Kelly's remarks do not begin to support the sweeping statement in the memorandum, and his declaration falls short as evidence to create a genuine dispute of fact as to Bowdich's motivation.[48]  *See also* Wray Dep. at 36 ("I do not believe that I was pressed to fire Mr. Strzok by the President.").

### 2.   The record does not contain evidence of a change of heart on Bowdich's part that would create a genuine dispute of material fact.

Plaintiff also predicates his argument that a jury trial is needed on his contention that Bowdich changed his view as to what the appropriate disciplinary outcome should be, and that he did so in response to the President's public cries for Strzok's dismissal after the messages were released.  *See* Pl.'s Mem. at 29–31.  But he has not come forward with evidence of that either.  Plaintiff's suggestion that Bowdich had a change of heart is not supported by the limited evidence proffered on that point, and it is inconsistent with statements the Deputy Director made both before and after the texts became public.

To consider this assertion, it is necessary once again to place the events at issue in their proper sequence.  The reaction to Strzok's conduct began on July 27, 2017, when Inspector General Horowitz informed Deputy Attorney General Rosenstein and former FBI Director and then-Special Counsel Robert Mueller about the discovery of the text messages as part of the Midyear Exam review.  *See* Horowitz Dep. at 151.  At that time, the IG's office had not yet

---

47   Kelly averred that he found two handwritten notes in his records regarding statements of President Trump about Strzok and Page, one of this which read:  "Firing love birds."  Kelly Decl. ¶¶ 6–7; Ex. A to Kelly Decl.

48   Rule 56(c)(3) provides that the Court need consider only the cited materials.

reviewed all of the thousands of communications, but based on what he had already seen, Horowitz and his team had concerns that the messages revealed potential bias.  *See* Horowitz Dep. at 90, 92–93.  He presented a spreadsheet of significant messages that had been uncovered at that point, what he described as a "first cut at what they had" to Rosenstein and Mueller.  Horowitz Dep. at 140, 149–51.  And it is undisputed that at that meeting – well before there had been any public revelation of the texts – they promptly decided that plaintiff had to be removed from the investigation.  *See id.* at 134.

The next day, armed with the same information, Horowitz met with FBI Deputy Director Bowdich, who made the additional decision – still well before the material had been shared with the media or with Congress – that Strzok had to be removed from any and all operational responsibilities within the Bureau.  *See* Bowdich Dep. at 122.  Horowitz describes the Deputy Director as being "very disturbed and concerned about what he was seeing," Horowitz Dep. at 140–41, and Bowdich testified that he "knew from day one" that the messages "were going to rock the organization in a very negative way."  Bowdich Dep. at 129.

Plaintiff agrees that the decision to remove him from any operational duties was made at that early stage.  *See* Pl.'s Am. Interrog. Resp. at 35–36.  He voiced a desire to remain in operations at his meeting with Bowdich, and he recalls that Bowdich was firm that Human Resources was the appropriate assignment.  *Id.* at 36.  Plaintiff adds, though, that at that time, Bowdich predicted that the reassignment would not last "forever";  he would be "scathed," and the fallout from the events might "splash" on the Bureau, but Strzok would eventually be able to return to operational matters. *Id.*

Plaintiff also describes a meeting he had in the late summer of 2017 with Bowdich and then-Acting FBI Director Andrew McCabe as another example of Bowdich's assurances.  Pl.'s

Mem. at 5–6, citing Pl.'s Interrog. Resp. at 36.  He points to the declaration of Andrew McCabe as confirmation of his contention that Bowdich started out firmly on his side.  *See* Pl.'s Mem. at 5–6, citing McCabe Decl.  But the declaration does not supply evidence on that point.  McCabe confirms that he was present along with Bowdich at one reassuring meeting with plaintiff in or around August 2017, and he does say, "[i]n the meeting Mr. Bowdich and I assured Mr. Strzok that his role at HRD was not permanent, and that he would eventually return to an operational role."  McCabe Decl. ¶ 8.  But McCabe goes on to provide more detail:

> At no point in time did *I* contemplate that Mr. Strzok would be fired because of the texts . . . .  Although I do not recall Mr. Bowdich saying much in the meeting, he did not express any disagreement with *my* reassurances to Mr. Strzok before, during, or after the meeting.

McCabe Decl. ¶¶ 9–10 (emphasis added).  This tells us little about Bowdich's state of mind.[49]

Plaintiff also maintains, again citing his own interrogatory response,  that on a trip to Puerto Rico after Hurricane Maria, which struck several islands in the Caribbean in September of 2017, Bowdich remained encouraging.  *See* Pl.'s Mem. at 29, citing Pl.'s Am. Interrog. Resp. at 35–36.  The discovery response states, "Bowdich said words to the effect, we made the right decision putting you in Human Resources Division, then, can you imagine the man (which plaintiff took to mean Trump) getting a hold of them (making a gesture imitating texting on a smartphone)."  Pl.'s

---

49      In its description of plaintiff's meeting with Bowdich and McCabe, Plaintiff's Statement of Genuine Issues Necessary to be Tried # 20 posits:  "*Based on his extensive experience at the Bureau*, McCabe indeed believed that Mr. Strzok's career should and would continue."  PSGI 20, citing McCabe Decl. (emphasis added).  But this characterization was supplied by plaintiff.  The declaration described Strzok as being among the most talented agents McCabe had worked with in his more than twenty-year career, but McCabe states his view of what the outcome should be "based on [his] personal observations of Mr. Strzok and [his] knowledge of investigations that he worked on."  McCabe Decl. ¶ 12.  The declarant did not expressly ground his view of the appropriate penalty in his own "extensive experience at the Bureau."

Am. Interrog. Resp. at 36–37. Even if one accepts plaintiff's account as accurate for purposes of the pending motion, nothing about that statement supplies evidence of what Bowdich's view was at that time about the penalty that should ultimately be imposed. All plaintiff could offer was his own impression: he "*took this to mean* that his move to Human Resources Division had successfully shielded him from the President learning of the texts and tweeting about them." *Id.* at 37 (emphasis added). According to plaintiff, "Bowdich's comments and tone *seemed* confidential and supportive rather than critical." *Id.* (emphasis added).

The text messages were disclosed to the public in December of 2017, and there is no dispute that thereafter, the President had plenty to say about them in his tweets and public appearances. *See, e.g.*, PSGI ¶¶ 38, 42–43, 49–50, 52–54. According to plaintiff, though, another indication that Bowdich was still on his side at that point is that in early 2018, Bowdich stopped by his office to see how he was doing. During this "final" meeting of the two men, plaintiff asked Bowdich what Director Wray's thoughts were, and according to plaintiff's interrogatory answer, Bowdich said that it would depend "on what the Inspector General report ended up saying." Pl.'s Am. Interrog. Resp. at 37. This does not indicate Bowdich's view at all, so it does not advance an inquiry into whether there was a change in his attitude. Nor does it suggest that Wray had made up his mind one way or the other at that point. It conveys nothing more than that the Director and Deputy Director were watching and waiting, just as they were before the President began to publicly weigh in.

This is the sum total of the evidence proffered in support of plaintiff's contention that Bowdich changed his mind, and it is insufficient to prove anything.

Even if one were to grant plaintiff the benefit of the rather strained inferences he asks the Court to draw about what Bowdich was thinking in those early days, they would not give rise to a

material factual dispute.  All of the supposedly encouraging conversations plaintiff has described took place well before the OIG report – which catalogued the number and nature of all of the text messages and identified the offenses that might have been committed – was issued.[50]

The reassuring conversations upon which plaintiff relies also preceded the decision made by the Bureau component with specific responsibility for disciplinary matters, the Office of Professional Responsibility, to recommend termination on that record.  So plaintiff has not pointed to anything that sheds light on what Bowdich was thinking once the full scope of the problem was known and OPR had weighed in, much less any evidence that after becoming aware of those facts, he was of the view that Strzok should stay but changed his mind under pressure from the White House.

Instead, the evidence tends to show that as events unfolded, Bowdich remained as deeply troubled as he was when the IG first broke the news about the messages.  The Office of Inspector General issued its report in June of 2018, and it was scathing.  Although it found no evidence that bias had affected investigative decisions, the report concluded that the text messages and plaintiff "demonstrated extremely poor judgment and a gross lack of professionalism," "brought discredit to themselves, sowed doubt about the FBI's handling of the Midyear investigation, and impacted the reputation of the FBI."  Midyear Report at xi–xii, 423–24.  OPR then issued the Notice of Proposed Termination on June 15.  Notice at 1.  In it, the Chief of Adjudication Unit II concluded,

---

50      As Inspector General Horowitz explained, as of the time of the initial meetings with Rosenstein, Mueller, and Bowdich, OIG still had more to do to understand the significance of the text messages:  "one of the things that we had ongoing, was more work to try and understand what they meant, [to] see if we had all of them. . . . [W]e expanded the scope of our timeline and what we were looking for in terms of texts.  The review, for example, was focused on [Mid]year.  Then we expanded . . . into [the] Russia investigation, because we saw how the texts spilled into the Russia investigation."  Horowitz Dep. at 147.

"the *appearance* of biased decision-making caused by your outrageous texts is as bad as if you had been biased," and she recommended termination.  Notice at 18, 21 (emphasis in original). That was the proposed official outcome, and if the Assistant Director of OPR had agreed, there was nothing to indicate that Bowdich would have been involved at all.

On July 12, 2018, Strzok testified in a public hearing before Congress.  The record reflects that Bowdich received an email from an acquaintance on July 13, saying Strzok "makes the bureau look great, and the Republicans on the committee are coming across as the ones who operate with bias."  Bowdich Dep. at 306–07.  Bowdich replied:

> [T]hough I felt that Pete held up well on the Hill, he made some very serious mistakes by opining about a presidential candidate, or maligning any political candidate.
>
> ***
>
> In the FBI, we draw a very hard line about any political opinions at the workplace, rightly so.  In this case, it was particularly harmful to our reputation with a segment of the country.

Bowdich Dep. at 309–11, discussing Dep. Ex. 53 (July 12–14, 2018 emails).  This is one of the few contemporaneous statements by Bowdich that the Court has in writing.  It was an email to a distant acquaintance, not to anyone in the FBI, the government, or the media, and this glimpse into his thought process then was consistent with what he said and did later.

In his deposition, Bowdich explained why he felt compelled to respond.

> I didn't want to just let that go, that he makes the bureau look great, and he's obviously looking through one set of lenses.  I'm looking through lenses at the center.  I'm focused purely on the organization and the credibility of the organization.  So I didn't want to just let that go and say, Hey, I totally agree, because I did not agree, absolutely did not agree, and I wanted to explain it to him a little bit.

Bowdich Dep. at 313.

It was not until Will informed Bowdich that she planned to impose a lower penalty than the one that OPR had recommended that it fell to Bowdich to consider taking any action at all. According to Will, his immediate reaction was, "I'm just hearing this so I need to think about it a bit, and I may or we may, I don't know if he used I or we, may choose to go a different way." Will Dep. at 291–92.[51]  Bowdich testified that he was "blown away" by Will's decision, Bowdich Dep. at 329,[52] and he was not alone in that regard.  Former Director Wray also testified that he was surprised by Will's decision to impose a sanction short of dismissal.

> Q: Why were you surprised?
>
> A: Well, a couple reasons.  One, having read the Inspector General's report, which describes in some detail Mr. Strzok's conduct, including lots of quotations from text messages among other things, and then, second, as I mentioned, having heard at some point along the way that OPR had recommended dismissal.  The combination of the factual recitation of the Inspector General's report combined with OPR's initial determination, as I understood it, to dismiss, to then hear that there was potentially an outcome other than that surprised me.

Wray Dep. at 67.

The evidence also reflects that Bowdich informed the Director of his intentions before he put pen to paper.  *See* Wray Dep. at 56–57.  Director Wray did not weigh in to disagree with or dissuade Bowdich from dismissing Strzok; to the contrary, in his opinion, it was the appropriate

---

51      *See also* Will Dep. at 292–93 ("[M]y recollection is he said, let me think about . . . what I am going to do, . . . whether I, as the delegated authority in the FBI, am comfortable with your final decision and whether I think it's fine to let that stand or whether I think that . . .  it has to be termination.").

52      Bowdich was not surprised by the original OPR proposal, Bowdich Dep. at 278, but he testified, "I was surprised when [Will] overruled her original proposal, which she modified her original proposal the way she did." *Id.* at 280.  When asked why, he responded, "Because the nature of these offenses were so severe and impacted in a very negative way the entire organization back then and continues today and I believe will continue for years to come." *Id.*

decision.  *See id.* at 65–67.  The deposition does not include any indication that Bowdich mentioned the President at that time.

In sum, plaintiff has not pointed to evidence that raises a genuine dispute of material fact on the question of whether the Deputy Director changed his mind under the President's influence.

### 3.    Plaintiff has not created a record to give rise to an inference that the discipline imposed was so out of line with Bureau policy and precedent that it must have been the result of improper pressure.

Plaintiff maintains that the record supports an inference that the ultimate sanction was so out of line with agency policy and precedent that it must have been the result of the agency's – and particularly, Bowdich's – succumbing to pressure.  *See* Pl.'s Mem. at 20–22.  But neither the exhibits nor the depositions point in that direction, and the document that forms the foundation of plaintiff's case does not help him either.[53]

---

53    This argument is based, in part, on the lack of any agency regulation authorizing the Deputy Director to act or supporting such severe punishment.  *See* Pl.'s Mem. at 20.  However, the regulations and internal memoranda that authorized the Director or his Deputy to act, FBI Disciplinary Appeals Process Directive, DEX 18; FBI Policy Directive 0235D, DEX 19; Freeh, *Standards of Conduct, Disciplinary Matters – Revision of the FBI's Disciplinary Process*, DEX 20; Mueller, *Standing Delegation of Authorities of the Dir., FBI*, DEX 21, and the FBI Offense Codes laying out the potential punishment for this offense, PEX 60, are set forth at Section I.A above.  *See also* DEX 23–26 [Dkt. # 155-25–28] (previous Deputy Director disciplinary decisions overturning OPR).

Plaintiff's insistence that the decision is contrary to FBI policy is also based on his assertion that no LCA had ever been overturned before.  *See* Pl.'s Mem. at 17, 28.  But this is completely irrelevant given the undisputed chronology.  There was no LCA in place in late July when Bowdich informed Will of his decision; all he knew was that Strzok had offered one.  And Will's letter, written after Bowdich had told her what he was going to do, did not purport to accept the LCA; the LCA is simply described as something she considered, with its proposed suspension, demotion, and acknowledgment that any future infraction would result in termination being consequences she found to be appropriate.  *See* Will Dep. at 239–40, 292.

Plaintiff emphasizes that Will considered all the material in the record, and that she brought substantial judgment and experience to the task. *See* Pl.'s Mem. at 16. "Ms. Will's review had been thorough, and she was knowledgeable about typical discipline. She had served as an FBI disciplinarian for 15 years and had a reputation for being tough based on her handling of thousands of cases." *Id.* at 17 (internal citations and quotation marks omitted). Yet this official, whose opinion should be credited in plaintiff's view, concluded that "severe aggravation is warranted," and that "[t]he nature and scope of the misconduct certainly warrants dismissal." Will Letter at 22, 23. Also, the undisputed evidence establishes that as she saw it and as she assured Bowdich at the time, "[r]easonable minds can differ," Will Dep. at 291, 312, and termination was without question an appropriate penalty. *See also id.* at 313–14 ("I probably said to Dave, You know a lot – a lot more about Pete Strzok than I'll probably ever know. You're an agent that grew up with him. You know – you know his history much more than I do, but I have studied his history for the purposes of this case. I listened to him. I listened to counsel. I've considered all of the facts in the case. I've reviewed the record. I've reviewed the IG report. I've looked at everything, and I'm satisfied this is the way to go, you know, but I understand that – that somebody could decide to go a different way. You do not offend me in telling me that you wish to overrule me in this matter and go a different way. . . . I think that . . . the decision I made was right for me, but if you decided to go a different way, that's your business.").

Plaintiff fully explored the question of parity during discovery, and he has devoted a great deal of ink to the question of whether the decision in his case is consistent with others. *See* Pl.'s Mem. at 21–22; Pl.'s Resp. to Notice at 12, 17–18. He insists that the facts show that no one else who engaged in comparable conduct received a comparable penalty, and that is evidence that his firing was a viewpoint-based First Amendment violation. But plaintiff lacks the evidence to back

that up.  Plaintiff is trying to liken himself to other employees who, in his words, "engaged in inappropriate messaging," but he can only get there by minimizing and mischaracterizing the record upon which his own dismissal was based.  *See* Pl.'s Mem. at 21–22 (citing the matter of two different employees who hung nooses in the workplace and were suspended for ten days and cases in which employees used their work emails to send racist messages about President Obama and the Muslim community and received letters of censure).

Moreover, his argument cannot be squared with the consistent testimony of all the witnesses in this case that his situation has no comparators.  They agree that yes, other people used their government phones to make ugly political comments that could give rise to an appearance of partiality on their part, but none was a person of comparable rank who was running the two most important, high-profile investigations at the FBI at the time, investigations that were aimed at the two people being discussed in the messages.

As Assistant Director Will, who is being held up by plaintiff as the model of a fair and unbiased decisionmaker, wrote:

> Your argument that it would be difficult to "find a person [who] does not have an opinion about things of either a political or a public interest perspective" is misguided and irrelevant.  The hypothetical person you refer to is not:  (a) tasked as the lead investigator on the FBI's two biggest and most politically-sensitive investigations during a presidential election year; or (b) in a position to actually influence the investigation, alter investigative decisions, or potentially "stop" someone from becoming president . . . .

Will Letter at 20.  *See also* Hearing Tr. at 29 ("MS. WILL:  . . . I'm happy to hear any arguments you are willing to make about precedent.  I would just share with you anecdotally doesn't really work particularly well . . . . [T]alking about factual situations which have no bearing on this case isn't particularly useful.").

Not only do plaintiff's rank and level of responsibility make his case unique, but the case did not involve merely expressing political viewpoints or sending political messages, as plaintiff repeatedly attempts to claim. *See, e.g.*, Pl. Mem. at 1 (comparing the penalty in the LCA to "any prior punishment of an FBI employee for sending political messages"); *id.* at 22 ("Mr. Strzok's termination was . . . orders of magnitude more severe than the punishments imposed on other FBI employees (including supervisors and attorneys) who, like Mr. Strzok, sent similar anti-Trump messages on government devices . . . .").[54]

The memorandum in opposition to the government's motion asserts that the most significant distinction between plaintiff and other FBI agents sending messages was Trump's campaign to get him fired. *See* Pl.'s Mem. at 22. But that ignores not only the critical fact that the messages did much more than disparage the candidates; they specifically referred to the investigation, what plaintiff's role in it should be, and how the two employees' work could affect the country's future.

> GA:        [Trump's] not ever going to become president, right? Right?!
>
> [Plaintiff]:    No.  No he's not.  We'll stop it.

Will Letter at 7 (quoting plaintiffs' texts with the government attorney).

---

[54]    Plaintiff purports to quote the Will Letter, Pl.'s Mem. at 4 ("Broadly, the messages expressed 'hostility for then-candidate Donald Trump and support for then-candidate Hillary Clinton.'"), citing Will Letter at 3, but that snippet lifted out of context mischaracterizes how Will described the set of communications on which her decision was based. *See* Will Letter at 3–12, 19–20, 22–23.

> [Plaintiff]:    For me, and this case, I personally have a sense of unfinished business.    I unleashed it with [the Clinton email investigation].  Now I need to fix it and finish it. . . . Who gives a f*ck, one more A[ssistant] D[irector] . . . [versus] [a]n investigation leading to impeachment? . . .

*Id.* at 10 (edits in text in original).  Regarding the regarding the government attorney joining the

Special Counsel's investigation, plaintiff wrote:

> [Plaintiff]:    "God I suddenly want on this.  You know why."

*Id.* at 10, n.13.

> [Plaintiff]:    I want to believe the path you threw out for consideration in [DD's] office – that there's no way [Trump] gets elected – but I'm afraid we can't take that risk.  It's like an insurance policy in the unlikely event you die before you're 40 . . . .

*Id.* at 8.

The then-Inspector General Horowitz testified:

> The reason that we ended up looking at Mr. Strzok's and Ms. Page's texts is because, as the information developed, they were so centrally connected – several of them were so centrally connected to the [Midy]ear investigation that it was clear we had to look at them. . . .

> The difference here is the messages that we were looking at, frankly, were more than inappropriate.  They were, in my mind, and as we wrote here, evidence of serious lapses in judgment, e-mails that created questions about the integrity of the investigation.  These were far more significant than what I would refer to as just inappropriate e-mails.

Horowitz Dep. at 382–83.  All of the evidence on this point is consistent, and plaintiff points to

nothing that undermines Bowdich's explanation that this explicit linkage was impossible to ignore.

*See* Bowdich Dep. at 42–46.

Finally, plaintiff's insistence that the sanction he received must be because he criticized

Trump as opposed to Clinton is inconsistent with his own characterization of the messages as a

whole in his response to the notice of termination.  *See* Resp. to Notice at 14 n.6 ("A review of the

entirety of Special Agent Strzok's texts, or even a random sampling of them, would reveal him to be nothing like his public portrayal as a partisan Democrat and Clinton apologist.  In fact, Special Agent Strzok's texts contain repeated criticism of Secretary Clinton and former President Clinton, along with numerous other Democrats like Eric Holder and Bernie Sanders.").

> **4.    Plaintiff's suggestion that Bowdich is not credible is entirely conclusory and is not enough to overcome the uncontroverted evidence in the record concerning his reasoning.**

What is left of plaintiff's opposition to the motion for summary judgment is his adamant position that Bowdich is not worthy of belief.  Defendants cite out-of-circuit authority that addresses when a party's only response to undisputed facts or testimony is "don't believe it."  *See* Defs.' Memo at 34, n.9, citing *Geshke v. Crocs, Inc.*, 740 F.3d 74, 80 (1st Cir. 2014); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir. 1990).  Plaintiff responds with nothing more than his assertion, unsupported by any legal authority, that a "finder of fact would be well-grounded in concluding that the politically motivated demands by then-President Trump and his allies caused Mr. Strzok's termination."  Pl.'s Mem. at 30.  However, the D.C. Circuit has weighed in on how a district court should deal with uncontroverted evidence at the summary judgment stage.

> By the time a party files a summary judgment motion, all parties should have had the opportunity to investigate the case thoroughly and should have done so.  In making or opposing a summary judgment motion, a party may no longer rely on the hope of new testimony or additional documents other than what it put before the court.  Each party's hand is dealt.  The task of the court is to review the factual material the parties present in support of and opposition to the motion, in light of the parties' legal claims and defenses, and assess whether the record contains disputes calling for resolution by a factfinder.  In considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party . . . and draws all reasonable inferences in his favor.  The court may

> not make credibility determinations or otherwise weigh the evidence. The court may not, for example, believe one witness over another if both witnesses observed the same event in materially different ways. But if one party presents relevant evidence that another party does not call into question factually, the court must accept the uncontroverted fact.

*Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (internal citations omitted).

Here, all of the witness testimony is consistent, and no internal emails or other contemporaneous records controvert Bowdich's testimony about why he did what he did. Plaintiff would have the Court disbelieve it, but this is not the rare case described in *United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d 1085 (D.C. Cir. 2017), in which the Court observed that when the non-moving parties' testimony is so unsupported by corroborating evidence, or undermined by other credible evidence, that it can be rejected. *See id.* at 1093.

The Court is bound to give plaintiff the benefit of any reasonable inferences at this stage, but he has not supplied evidence to support those inferences. What plaintiff offers instead of contrary evidence is a conclusion: Trump was tweeting, so Bowdich acceded to his demands.

Plaintiff's case now, just as it was the day he filed the complaint, is predicated on chronology: this was in the news and "after that" something happened. But plaintiff's rhetoric is not supported by the evidence he was able to discover, and he has been unable to show a causal connection or point to evidence that supports an inference that there was one.

Plaintiff posits in his memorandum:

> The record is . . . undisputed that Mr. Bowdich was keenly following the President's public statements about Strzok; he received daily news briefings summarizing all of Trump's increasingly frantic calls for the FBI to punish Strzok, and his contemporaneous notes and his deposition testimony acknowledge that he was well aware of the President's pressure campaign.

Pl.'s Mem. at 28, citing Bowdich Dep. at 57, 104, 188, 258–59, 299.  *See also* Pl.'s Mem. at 9 ("Mr. Bowdich paid attention to media coverage that mentioned the FBI – particularly anything that President Trump said."), citing Bowdich Dep. at 53, 54; *id.* ("He did so by reviewing news stories that the FBI's Office of Public Affairs thought would interest the leadership of the FBI (compiled into a 'Director's AM News Briefing' that Mr. Bowdich reviewed daily), reading newspapers and watching Fox News."), citing Bowdich Dep. at 50–51, 59, 104.  *See also* PSGI 40 (same).

This is not enough to demonstrate a causal connection between something in particular that appeared in the news and something Bowdich may have done, but the first problem with all of it is that it misstates the evidence.  Obviously, it is a very different thing to be "well aware" of what the President of the United States has been saying as opposed to "keenly following" it or acting in accordance with his wishes.  And the gloss plaintiff has added to the evidence is not supported by the deposition excerpts cited or the Director's AM News Briefings introduced in evidence.

On page 52 of the deposition, Bowdich was asked, "So, when you were looking at the newspapers, would you pay particular attention to articles that mentioned the FBI?"

> A:  Yeah, absolutely.
>
> Q:  As Deputy Director . . . you're naturally going to be concerned about what the American public thinks of the FBI; is that fair?
>
> A:  Yes.
>
> Q:  And what Congress thinks of the FBI?
>
> A:  Well, I think that's like chasing a shadow. . . . Look, you know our job is, at least somewhat, we investigate politicians on both sides of the aisle, so we have to remain one hundred percent apolitical, one hundred percent. And so, if I'm trying to appease one side or the other, that's not going to work. That was never a practice of mine.

***

Q:  And it was important for you to know what the President of the United States was saying about the FBI, true?

A:  It was important for me to know what he was saying. I think that's fair.

Bowdich Dep. at 52–54.  That's it for the evidence that Bowdich was "keenly following" what the President was saying.

As for the new sources Bowdich relied upon, he was asked, "Did you monitor the stories that were written in the media about the FBI after the texts became public?"

A:  Some.  I – I don't live in a bubble.  I had a very, very, intense job at a very, very difficult time, where every day I would have probably 30 people around a table saying, Here's what's going on in the world today, and briefing me on what's going on in the world today.  And there was multiple cris[e]s on any given day as a matter of course.  So, did I read some?  Of course, I did.  Did I monitor all of them?  No, I didn't have the time for that.

Q:  Which ones did you read in general?

A:  I have no idea.

Q:  Was there a particular news source that you got your news from in 2018?

A:  I typically read all.  I tried to – the same thing with some of the news stations.  I tried to watch both . . . .

Q:  I'm sorry, when you say both, what do you mean?  Both the right and the left?

A:  The right and left media; correct.

Q:  Okay. Would you classify Fox News as the right?

A:  I would.

Q:  And what would you classify as the left?

A:  MSNBC, CNN . . . . What I tried to do is look at [disparate] views on an issue, and obviously, you know as well as I do which media outlets tend to lean left, tend to lean right.  That's no secret to anybody out there, so I would try to read and view both so that I could understand . . . how is this being viewed?  How is this being spun?  How is this being recorded?

Bowdich Dep. at 48–51.  This does not support plaintiff's summary of the deposition testimony as Bowdich paying "attention to media coverage that mentioned the FBI – particularly anything that President Trump said" by, in part, "reading newspapers, and watching Fox News."  Pl.'s Mem. at 9.

Nor does the evidence support the assertion that Bowdich "paid attention to media coverage . . . particularly anything that President Trump said" "by reviewing news stories that the FBI's Office of Public Affairs thought would interest the leadership of the FBI (compiled into a 'Director's AM News Briefing' that Mr. Bowdich reviewed daily."  Pl.'s Mem. at 9.

With respect to the Daily News Briefing, or "clips" compiled by the FBI Public Affairs Office, Bowdich testified that a hard copy appeared in his mailbox each morning, and that it was his "habit to look at it at some point during the day."  Bowdich Dep. at 57.  His "first priority was to sit down and look at any crises that occurred over night and then look at the Presidential daily brief."  *Id.*

> I'd have an 8:00 where I would have around a big conference table, here's what's going on in the world today.  Something blew up there.  We're going to take down a big case here.  We've got a major problem with this investigation here.  That would last 30 minutes.  The next 30 minutes we would go in and we'd brief the Director at a higher level, and then oftentimes after that I would have to walk across the street and sit down with the Attorney General and the Deputy Attorney General, their chiefs of staff and we would have intelligence briefings as well as discussions on very significant matters. . . .
>
> Q:  Mr. Bowdich, at – at some point during the day though, it was your practice to review the clippings, correct?
>
> A:  Typically.  I can't say I did it every day, but typically, yes.
>
> Q:  And were those clippings, were those synoposes of articles that appeared in the media that OPA felt would be of interest to leadership of the FBI?
>
> A:  Yes.

*Id.* at 57–59.  Thus, plaintiff greatly overstates the importance of the daily news summaries to Bowdich or this case.[55]

Bowdich did not testify that he was moved or influenced by anything he may have absorbed from these daily reports about what the President was saying, and there is no evidence in the record to the contrary.  Absent such evidence from Bowdich or anyone else connecting Bowdich's actions to news reports, the fact that there may be a blurb or two in a handful of these reports that Bowdich could not confirm he had actually read is not sufficient to give rise to an inference of a connection between something in one of them and what Bowdich did later, after he learned of Will's decision on July 26.

Plaintiff has also introduced other evidence of Trump's tweets about Strzok, including one from August 1, 2018, which would have been during the period when Bowdich was crafting his decision letter.  *See* PEX 34 (June 28, 2018 tweet); PEX 35 (July 10, 2018 tweet); PEX 38 (Jan. 23, 2018 tweet); PEX 45 (May 7, 2018 tweet); PEX 75 (Aug. 1, 2018 tweet).  But there is nothing

---

[55]    Plaintiff has selected a total of six of the Daily News Briefings that were disseminated on a daily basis during the fifty-seven weeks between July 2, 2017, when Bowdich was informed of the existence of the texts, and August 9, 2018, when he signed his letter, to introduce in evidence: PEX 41–42, 46, 48–50.  It is worth noting that each of these samples is comprised of ten or more single-spaced pages, jam-packed with synopses of a variety of printed, televised, or online news stories from all over the country and across the political spectrum, many of which touched on a wide variety of topics and developments of importance to the FBI that were unrelated to President Trump's commentary on the two investigations at issue or Strzok's employment status.  *See, e.g.*, Apr. 30, 2018 News Briefing, PEX 42.  The fact that plaintiff has identified a few of the daily briefings that include accounts of  Trump's statements about Strzok, *see* PEX 41 at 1 (April 23, 2018 News Briefing:  "Trump Urged Sessions to Fire Two FBI Officials Behind Anti-Trump Text Messages"); PEX 46 at 1 (May 8, 2018 News Briefing:  "Trump Tweets Allege Bias, Conflicts of Interest in Mueller Probe"); PEX 49 at 1 (July 12, 2018 News Briefing:  "Trump Blasts Page for Denying House Subpoena," which includes a Trump tweet about Strzok); and PEX 50 at 10 (July 16, 2018 News Briefing:  "Trump Calls Strzok a 'Disgrace to Our Country'"), is not – standing alone – a fact that calls Bowdich's testimony that his later decision was not influenced by them into question.

in the record concerning any public statements he may have made between July 26, the date Bowdich was first informed that Will was not going to terminate Strzok, and Bowdich's informing her that he intended to overrule her the next day.

More importantly, there is no *evidence* in the record that Bowdich's reasons were anything other than what he stated. Discovery has not unearthed one document or one bit of testimony from a friend or colleague in whom he confided, that if he did not terminate plaintiff, Trump would be upset.

Instead, there is only evidence in the record to show that the FBI officials were not taking directions from Trump in connection with ongoing inquiries. After all, while he was calling for the dismissal of Strzok and Page, he was also demanding that Hillary Clinton be indicted, that Special Counsel Mueller be fired, and that the investigation into Russian interference in the election be shut down completely. *See, e.g.*, Apr. 30, 2018 Dir.'s AM News Briefing, PEX 42 ("Trump Calls for End to Russia Probe . . . . "). And the public servants leading the nation's law enforcement agencies at that time did not feel compelled to oblige. *See* Bowdich Dep. at 319–20 ("Is it fair to say that . . . had we stuck with [Will's] decision, President Trump at the time would have not praised the FBI? It's possible, but as you can see, it didn't stop it. In fact, he asked for an end of the Russia probe, and we let that play out as it was going to play out by process."); *id.* at 323 ("I haven't seen the President's concerns voiced. There were certain things he was never going to let go, that was clear. The investigation of Russian collusion, he was never going to let that go, but we did exactly what we should have done.").

Given Trump's public boasting to the effect of "he got rid of them all," *see, e.g.*, Pl.'s Resp. to DSOF 131, the Court granted plaintiff's request to depose the then-former President himself. But that testimony did not substantiate plaintiff's theory either. Trump testified at his deposition

that while he did take credit for the firing of then-Director Comey, he was not personally responsible for Strzok's departure.  Trump Dep. [Dkt. # 155-23] at 15 ("I didn't fire him per se, but it was during my administration, so I guess people would give me credit or however you want to phrase that for firing him, but I did fire Comey, but I wasn't responsible for firing the rest. . . . [M]y administration did."); *id.* at 16 ("I didn't do it, I didn't tell them to do it, but they did it during my administration.").[56]  *See also* Wray Dep. at 90–91 ("Do you know why former President Trump would claim credit for having fired Mr. Strzok?  A:  No idea.").

In conclusion, discovery is over and the record is complete.  Plaintiff took multiple depositions and propounded numerous interrogatories and requests for production of documents. The Court permitted him to take the depositions of FBI Director Wray and President Trump.  Yet at the end of the day, the case is still in the "upon information and belief" stage:  there is no one who participated in these events who corroborates plaintiff's theory that they felt obliged to appease the President.  The evidence does not include one text or email from Bowdich or even a casual remark that was overheard on that point, and certainly there is no evidence to be found in

---

[56]    *See also* Trump Dep. at 21 ("Q:  With respect to Mr. Strzok and Ms. Page, what did you do?  A:  Well, I complained about him a lot.  I would Tweet about it.  I thought it was a terrible thing."); *id.* at 22 ("Q: [W]hat were you trying to accomplish by complaining and Tweeting about the texts?  A:  Just to let people know about it.  I think you had to let people know about it."); *id.* at 24 ("I don't know how other people reacted, but from my standpoint, it was a terrible thing to be reading.  Q:  And you thought it was important to let people in general know or – A:  I think the public, yeah.  I want to open it up to the public.  Let the public know.").

Bowdich's own deposition that he was motivated by that concern.[57]  Even the voluble Candice Will did not report that Bowdich ever expressed concern about the President's reaction in their conversations, which were recounted over many pages of deposition testimony.

Moreover, there is no one who accepts the notion that there were any comparators or that it was even marginally reasonable to expect that the texts would not see the light of day.  There is nothing to undermine the evidence that from the day he was told about the texts until the day he learned what Will intended to do, Bowdich was deeply troubled and concerned about the impact on the agency; he expressed those views at the beginning, middle, and end of his involvement in the case.  Before any member of Congress, any reporter, or the White House heard about the texts, and before there was any public disclosure, immediately after the Deputy Attorney General, Special Counsel Mueller, and Deputy Director first saw just a partial set of the texts, plaintiff was

---

57      When he sought to compel the then-Director of the Federal Bureau of Investigation to appear for questioning over the government's invocation of the "apex doctrine," plaintiff proffered that the deposition was to needed gather evidence to show that Bowdich's testimony should be rejected:

> Count I of Mr. Strzok's Complaint alleges that the Defendants treated Mr. Strzok more harshly because Mr. Strzok was critical of President Trump, who made his intent to retaliate against public servants who did not kowtow to his wishes abundantly clear.  It is both likely and unremarkable that DD Bowdich will testify that the decision to terminate Mr. Strzok's employment was not affected by politics.  At trial, Mr. Strzok will ask the finder of fact to reject those statements, and Mr. Wray's testimony is critical to Mr. Strzok's ability to fully present the reasons to do so.

Pl.'s Opp. to Defs.' Mot. for Prot. Order [Dkt. # 78-1] at 4.  Now, the Court has Wray's deposition, and plaintiff has not pointed to anything he said as evidence that undermines the stated grounds for the decision.  In fact, like Bowdich, Wray was surprised by Will's decision.  *See* Wray Dep. at 67.

removed from both investigations.  He was removed from any operational duties.  At that point, everyone was simply waiting for OIG to finish its investigation.

Once OIG released its report and the disciplinary authorities got involved, the initial recommendation of the responsible division within the Bureau was termination.  Will decided to accord Strzok more leniency, but her letter agreed that termination was warranted and flatly rejected every argument plaintiff is making now.  Bowdich imposed a sanction consistent with his profound concerns about Strzok's conduct, and Will and Bowdich agreed on everything except how much to credit Strzok's expressions of contrition and his years of service.[58]

Indeed, Bowdich's decision rested largely on the very circumstances that shook Will and differentiated this case from any other:  plaintiff's very high rank and his role in two of the most

---

[58]    Plaintiff takes issue with the fact that while Will was impressed by plaintiff's demeanor and contrition, Bowdich took a different view.  But that alone does not supply a reason to reject Bowdich's exercise of his own judgment.  Plaintiff complains that Bowdich considered plaintiff's testimony to Congress in the mix, *see* Pl.'s Mem. at 8–9 ("Mr. Bowdich cannot recall when he watched Mr. Strzok's testimony, but he testified that he fired Mr. Strzok in part because Mr. Strzok's testimony lacked 'remorse' – a fallacy that aligned with President Trump's assertions and right-wing media fiction."); *id.* at 18 ("He wrote that he had considered Mr. Strzok's 'testimony before the House Judiciary committee,' even though that testimony was not the basis for any proposed discipline and was sworn and honest speech . . . ."), but he does not explain why impressions formed during plaintiff's public discussion of these matters had to be banished from Bowdich's mind when he considered the overall impact of the offense on the Bureau, or how the Court could find Bowdich's opinion about Strzok's demeanor to be "fallac[ious]."

important cases in FBI history.  Will was impressed by Strzok's statements of regret,[59] and she found his exemplary career and the high positions he had earned to be critical factors.[60]  But Bowdich found that same information – the fact that he was *so* high up and had *such* important

---

[59]    *See* Will Dep. at 219 ("I remember thinking that Pete Strzok gave a compelling performance – I don't want to call it a performance.  That's the wrong spin on it, but he was sincere. He was contrite. . . . I . . . sat there in wonder saying you're too experienced and you're too intelligent to have done this.  I don't get it. . . . [B]ut . . . I was moved by his comments . . . .").

Plaintiff addressed these events again in his deposition, and the record reflects that he backed away from some of the concessions he made in the hearing before Will and the remorse he expressed then for his own actions.  Strzok was asked about the IG's finding that "[a]t a minimum, we [the employees'] use of FBI systems and devices to send the identified text messages demonstrate extremely poor judgment and a gross lack of professionalism."  Strzok Dep. at 278– 79.  This was the same finding quoted by OPR in its Notice of Proposed Termination, Notice at 18, and AD Will in her decision.  Will Letter at 19.  While plaintiff called the texts a "horrible lapse of judgment" before Will, Hearing Tr. at 117, when asked in the deposition, "do you agree that you used extremely poor judgment?" he responded, "No."  Strzok Dep. at 278.

> I would not use the phrase 'extremely poor judgment.'  I think certainly I regret some of those, but I would not use the phrase.
>
> Q:  What about just poor judgment?
>
> A:  In some cases, yes. . . . I couldn't give you specifics.  I mean, certainly I regret the impact those texts had on my family.  I regret the way that they were weaponized by partisan actors . . . .

*Id.* at 278–79.

> Q:  Do you agree that you demonstrated a gross lack of professionalism?
>
> A:  No.
>
> Q:  Why not?
>
> A:  Depends on the definition of "gross."

*Id.* at 279 ("I don't think it was a gross lack of professionalism.  Again, I regret sending them on government devices and how they were used . . . .").  Plaintiff engaged in the same sort of quibbling when he offered his view that the punishment proposed in the LCA was also "too severe" and maintained that while he "accepted it," he did not "agree with it."  *See* Strzok Dep. at 304.

responsibility – to be what cried out for the severe response.[61]  Not one witness, not one document, not one stray comment in the record suggests that Trump's pronouncements were anything but background noise.  Therefore, plaintiff has not produced evidence that calls Bowdich's credibility into question with *facts,* and defendants' motion for summary judgment on Count One will be granted.

---

60    Will Dep. at 222 ("I'm looking at everything, and I'm deciding, he has had a long period of service.  He does strike me as a capable guy.  Certainly the 7th floor must have thought he was a capable guy if I think Andy McCabe decided that he should lead the two most sensitive investigations at the FBI at the same time.").

61    Bowdich Dep. at 41–43 ("I saw a lot of the OPR violations, a lot of adjudications, a lot of internal investigations. As the Associate Deputy Director, I had been in charge of overseeing inspection.  Inspection conducts a lot of internal investigations.  I also was a direct interlocutor with Mike Horowitz, [O]IG.  I saw many of those investigations which involved the FBI.  Good people do bad things at times.  At the same time, what I saw here was a sustained and repetitive series of missteps while we had the – essentially the leader of this investigation, both the [M]idyear investigation and the Russia investigation, in his position.  I also looked at their positions, especially Pete's, but both of their positions as leaders.  He was a Deputy Assistant Director, which is a very high level in the FBI.  Lisa was the Deputy Director's Counsel, which is a very coveted position and an important position in the organization, where she has access to – there's not much she does not have access to or insight into within the organization.  The series of missteps, when you read the texts, I think it's pretty clear.  When you look at the positions they were on, the two most high-profile cases in the entire FBI, at that time that were going to be peeled back six ways to Sunday and reviewed and second guessed and then to have these steps taken or these mistakes made was monumental in my mind.").

**CONCLUSION**

For the reasons explained above, defendants' Motion for Summary Judgment on Counts One and Two [Dkt. # 150] will be **GRANTED**, and plaintiff's partial Motion for Summary Judgment as to Count Two [Dkt. # 153] will be **DENIED**.

A separate order will issue.

\*\*\*

This Memorandum Opinion has been docketed under seal because it contains references to materials, such as deposition transcripts, that were filed under seal in an abundance of caution at the request of at least one of the parties at the time. It is the Court's view that nothing in the Memorandum Opinion needs to remain sealed, and therefore, the parties must inform the Court by September 30, 2025 of whether they have any objection to the Court's unsealing the Memorandum Opinion in its entirety, and if so, specifying what portions they believe should remain under seal and why.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 23, 2025